# Exhibit 2



I, Zheng Renhui, am fluent in the Chinese and English languages, I have been translating documents for over 10 years and am competent to translate from Chinese to English.

•   I hold a translation certification from TransPerfect's Linguistic Certification Program.

I hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of the attached "【美国-纽约】品牌授权技术服务协议 MLNB-OS-20240615" from Chinese to English.

I affirm this 8th day of May, 2026, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, except as to matters alleged on information and belief and as to those matters I believe it to be true, and I understand that this document may be filed in an action or proceeding in a court of law.

_____

[NAME]

May 8, 2026

_____

[Date]

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

1250 BROADWAY, 7TH FLOOR, NEW YORK, NY 10001  |  T 212.689.5555  |  F 212.689.1059  |

WWW.TRANSPERFECT.COM

OFFICES IN 92 CITIES WORLDWIDE



**Molly Tea**| Molly Tea.
*Confidential & Privileged*

# Molly Tea

# Brand Licensing and Technical Services Cooperation Contract

The content of this Contract constitutes the commercial confidential information of Shenzhen Molly Tea Food and Beverage Management Co., Ltd. The copyright of this Contract is owned by Shenzhen Molly Tea Food and Beverage Management Co., Ltd. All parties shall strictly observe the principle of "confidentiality" and shall not copy or disclose this Contract to others.

Party A:

Party B: [hw:] *MHL NY LLC*

Project:

Store Name:

Date:



**Molly Tea**| Molly Tea.

*Confidential & Privileged*

**Signing Statement:**

This Contract is voluntarily entered into by Party A and Party B. Party A agrees that Party B shall operate a "Molly Tea" store at the designated location under this Contract. Party B shall, in accordance with all terms and conditions of this Contract, pay to Party A the brand usage fee, brand security deposit, management fee, design fee, and other relevant charges, and shall be subject to Party A's corporate management system.

Party A and Party B have duly fulfilled their obligations to explain the terms of this Contract to each other, and have fully understood and acknowledged all provisions hereof. Neither Party has any objection to the rights and obligations set forth herein. In particular, Party B has sufficient foresight regarding the assumption of liability for breach of contract. Both Parties acknowledge and agree that this Contract is entered into on the basis of equality, following fair negotiation, and with the full expression of their respective free will.

**Contracting Parties:**

Party A: Shenzhen Molly Tea Food and Beverage Management Co., Ltd.

Unified Social Credit Code: 91440300MA5G6K6D27

Legal Representative: Zhang Biao

Domicile:

Party B: ~~[signature]~~ [hw:] *MHL NY LLC*

Business Entity Code:

Authorized Representative: [signature]

Domicile: [hw:] *131-01 40th Rd, 8J, Flushing, NY 11354*

**Molly Tea**| Molly Tea.

*Confidential & Privileged*

Whereas:

1. Party A is a limited liability company duly established and validly existing in accordance with the law, and is the proprietor of the "Molly Tea" trademark;

2. Party A operates the "Molly Tea" chain beverage business by leveraging its trademark rights, proprietary technology, management system, and other business resources. Having conducted due diligence and recognized Party A's operating system, business resources, experience, and capabilities, Party B voluntarily agrees, on a paid basis, to utilize the "Molly Tea" brand and its associated business resources, and to establish and operate a "Molly Tea" store under Party A's operational system, subject to the professional technical guidance and management services provided by Party A.

3. This Contract is entered into by and between Party A and Party B in accordance with the *Civil Code of the People's Republic of China*, the *Company Law of the People's Republic of China*, and other applicable laws and regulations. Based on the principles of equality and mutual benefit and following friendly consultations, the Parties hereby agree to enter into this Contract in respect of Party A's authorization of the "Molly Tea" brand and the provision of related technical services, for mutual compliance.

### Article 1: Definition

Unless otherwise expressly specified in this Contract, the following terms and expressions shall have the meanings ascribed to them below:

**"This Contract"** refers to this Contract and the appendices specified herein, and shall also include any supplemental contracts that may hereafter be entered into by Party A and Party B in relation to the subject matter hereof.

**"Authorized** Marks" or the "Authorized Business System Corporate Identity System (CIS)" refers to the unified system composed of the identifying symbols associated with the "Molly Tea" authorized business system and their carriers, including but not limited to trademarks, authorization certificates, store signage, packaging materials and packaging methods, utensils, trays and tray liners, equipment, distinctive exterior and interior designs (including decoration, ornamentation, color schemes, layouts, furniture, etc.), uniforms, advertisements and other promotional materials, documents, coupons, business cards, letterheads, and the like. All of the foregoing may be modified, improved, or further developed by Party A at any time.

**"Authorized System"** refers to the unified "Molly Tea" authorized business system, including but not limited to, products, trademarks, service marks, store signage, copyrighted information and materials, distinctive exterior and interior designs (including decoration, ornamentation, color schemes and layouts), uniforms, advertising and promotions, training systems, operational systems, financial and accounting systems, information network systems, ERP software systems (including POS systems, sales cost systems, and transmission systems), proprietary technology systems, product manufacturing or procurement channels, distribution, and other business operation and management systems. All of the foregoing may be modified, improved, or further developed by Party A at any time.

**"Licensor (or Party A)"**, means a Party to this Contract, namely Shenzhen Molly Tea Food and Beverage Management Co., Ltd., and/or its affiliates, as well as any agents or personnel authorized by Party A. As the authorized operator of the "Molly Tea" chain beverage business, Party A shall, unless otherwise expressly agreed, have the right to exercise its rights under this Contract either by itself or through its affiliates or any third party designated by it (**"Party A's Affiliates"**). Any exercise of Party A's rights under this Contract by such affiliates or designated third parties shall be deemed as performance by Party A hereunder, and Party B hereby agrees to and accepts the same.

**"Licensee (or Party B)"** refers to the other Party to this Contract, and/or, subject to Party A's prior approval, Party B's authorized tea beverage stores, successors, authorized agents, employees, and the like.

**"Trademark"** refers to the "Molly Tea" trademark registered with and approved by the Trademark Office of the State Administration for Industry and Commerce of the People's Republic of China (Registration No.: 50234810, Class 43). The signing of this Contract shall not constitute the grant of any license to use the Trademark to Party B. Party A and Party B shall separately enter into a *Trademark License Contract*, which shall constitute a supplemental agreement to this Contract. Party A is currently applying for registration of relevant trademarks and intellectual property rights in the jurisdiction where Party B operates. Party B undertakes not to pre-emptively register such trademarks or engage in any other conduct that may prevent Party A from successfully obtaining the registration of the relevant trademarks and intellectual property rights.

**"Trademark License"** refers to the act whereby Party A, in accordance with the *Trademark Law of the People's Republic of China* and other applicable trademark laws and regulations of the relevant jurisdiction, grants Party B the right to use the trademark in respect of which Party A holds exclusive rights.

**"Non-exclusive License"** refers to a license under which the trademark registrant, Party A, permits Party B to use its registered trademark within the agreed period, territory, and manner of use, while Party A retains the right to use the registered trademark itself and to license the same trademark to other licensees.

**"Brand Usage Fee"** refers to a one-time fee paid by Party B to Party A for Party A's authorization of the "Molly Tea" to Party B and the license granted to Party B to use Party A's trademark, logo, and operating technology assets at the authorized business premises. Such fee serves as the consideration for obtaining the license of the



**Molly Tea**| Molly Tea.

*Confidential & Privileged*

operating rights, the right to use the trademark, and the right to use the operating technology assets. Upon payment, it is non-refundable under any circumstances. The expenses incurred by Party A in providing guidance to Party B, including preliminary market research, business district evaluation, and pre-opening guidance, shall not be included in the Brand Usage Fee.

**"Management Fee"** refers to the monthly fee payable by Party B to Party A pursuant to this Contract for the continued use of the operating rights license, the right to use Party A's trademarks and operational and technical assets, and the receipt of assistance and guidance from Party A and its affiliates.

**"Brand Security Deposit"** refers to a certain fee collected by the Licensor from the Licensee to ensure the Licensee's performance of this Contract. Upon expiry of this Contract, if the Parties do not renew the Contract and the Licensee has not committed any breach of this Contract or any act that damages the Licensor's brand reputation, the Brand Security Deposit shall be refunded to the Licensee.

**"Business Premises"** refers to the location of the store established by Party B as approved by Party A in accordance with the terms of this Contract. Such Business Premises shall include any store location established by Party B that has been changed during the term of this Contract with the prior approval of Party A, and Party A shall have the right of prior consent to any change of the Business Premises.

**"Store"** refers to a wholly-owned or controlling legal entity established by Party B under the "Molly Tea" authorized business system in accordance with the terms and conditions of this Contract, including but not limited to individual business, sole proprietorship enterprises, partnerships, limited liability companies, or other economic organizations.

**"Revenue"** refers to the actual income received and recorded by the Store, as determined by the Store's actual cash register receipts, without deduction of platform fees (such as take-out platform fees), taxes, or any other costs.

**"Trade Secret"** refers to all information, documents, materials, items, software (including all data contained in any software system), and any other business resources provided by Party A to Party B, including but not limited to advertising and marketing plans, customer lists, operational procedures, manuals of all kinds, forms, systems, contracts and agreements of all types, proprietary know-how, and other confidential business information.

**"Confidentiality Obligor"** refers to the natural person, legal person, or other economic organization that bears confidentiality obligations in accordance with this Contract, including but not limited to Party B, Party B's affiliates, and the investors, shareholders, partners, or associates of the aforementioned organizations; Party B's directors, supervisors, senior management personnel, and employees; as well as the spouses, immediate family members, collateral relatives within three generations, and close relatives by marriage of the aforementioned individuals.

**"Electronic Hardware Configuration"** refers to the electronic equipment of authorized operating stores, such as back-office computers.

**"Expiration Date"** refers to the date on which this Contract terminates, including termination upon expiry of the agreed term or early termination.

**"Term"** refers to the period from the commencement date to the expiration date of this Contract, which may be subject to early termination or renewal in accordance with the provisions of this Contract.

**"CIS"** is the abbreviation of Corporate Identity System, which refers to the corporate identity system.

**"QSC"** refers to Q, S, C+V, i.e., the abbreviation for Quality, Service, Clean, and Value.

**"RMB"** refers to Renminbi Yuan. The Brand Usage Fees and other fees under this Contract are all denominated and settled in RMB.

**"Day"** refers to a calendar day.

**"Business Day"** refers to any calendar day other than a public holiday or a statutory holiday.

**"Written Form"** refers to any form that can tangibly represent the contents recorded therein, including letters, correspondence, and emails.

### Article 2: Authorization of Operating Rights

2.1 Party A hereby grants Party B a license to operate under the "Molly Tea" brand during the term of this Contract, in accordance with the provisions hereof. The business resources granted by Party A to Party B include:

(a) Registered trademark: The registered trademark in Chinese Mainland is "Molly Tea" (Registration No.: 50234810, Class 43);

(b) Authorized brand "Molly Tea"

(c) Authorized marks and authorized systems (including but not limited to CIS and VI systems);

(d) Proprietary technology (including but not limited to formulas, process flows, technical specifications, management and sales techniques).

(e) Operations Manuals: *Store Food Safety Management Manual*, *Product Standards Manual*, *Operations Manual*, *Boss Manual*, etc.

2.2 The nature of the license for the operating rights granted by Party A to Party B is: Single-Store License. Party B shall have the right to establish "Molly Tea" stores in accordance with the provisions of this Contract. The number of authorized stores shall be limited to 5, and such stores shall be established at the Business Premises specified in Article 3 of this Contract.



**Molly Tea**| Molly Tea.

*Confidential & Privileged*

2.3 The authorization granted to Party B shall be exclusive within the Business Premises, and Party A shall not grant any similar authorization to any third party within the same protected territory (as defined below), unless otherwise provided in this Contract.

2.4 The Stores established by Party B may use the wording "Molly Tea"; however, neither Party B nor its Stores, nor any enterprise invested in or established by Party B, shall use in their business registration names any wording containing "Molly Tea" or any similar or related words or designs. Party B shall not apply, anywhere in the world, for any trade name, business name, or other intellectual property rights containing or similar to the foregoing. Party B shall further not, directly or indirectly, use, imitate, or misappropriate Party A's business resources for any other brand or scheme, nor shall it guide, transfer, or assist any third party in imitating or using Party A's business resources. Otherwise, Party A shall have the right to terminate this Contract and require Party B to pay liquidated damages of not less than RMB 300,000, and to require Party B to change or cancel the aforesaid trade name.

2. 5 Party B acknowledges that the success or failure of the authorized business operations under this Contract depends on various objective factors, including but not limited to market conditions at the Business Premises, Party B's operational capabilities, and the manner in which the Authorized System is implemented and executed. Party B further acknowledges that neither Party A nor its affiliates has made any promise, or warranty regarding Party B's business performance or profitability. Party B shall not, on the grounds that its actual performance fails to meet expected targets, request termination of this Contract, refuse to pay the Management Fees or any other fees payable under this Contract, or claim any damages.

2.6 Neither Party A, Party A's affiliates, nor any employees of the foregoing entities shall make any commitments to Party B or its Stores. Any such commitments, if any, shall only be valid if confirmed in writing and affixed with the official seal of Party A. Any written confirmation without Party A's official seal, as well as any oral commitments, shall have no binding effect.

2.7 Party A hereby authorizes Party B, in accordance with the terms of this Contract, to use Party A's trademarks, trade names, service marks, and Party A's proprietary operational and technical assets, including but not limited to store decoration style, training system, operational system, financial system, information network system, product technology system, advertising and promotional activities, product manufacturing or procurement channels, distribution, and other business operation and management systems, and to become a Licensee of Party A for the purpose of establishing and operating authorized stores.

Meanwhile, in view of the rapid changes in market conditions and business opportunities, catering brands are required to continuously update and improve their operating models. Party B acknowledges and agrees to the foregoing. In order to ensure that the aforementioned operational and technical assets better serve Party B's Stores and enhance their operational capabilities, Party B agrees to carry out a renewal and upgrade of the Store's operational and technical assets every 3 years, including but not limited to store decoration style, training system, operational system, financial system, information network system, product technology system, advertising, publicity and promotions, product manufacturing or procurement channels, distribution, and other business operation and management systems. If Party B waives the upgrade of the Store's operating and technical assets, it shall be deemed as waiving the authorized operating rights.

2.8 Trademark Licensing

(a) Party A hereby authorizes Party B to use the "Molly Tea" trademark for the operation of the Store, and the license granted hereunder shall be a non-exclusive license.

(b)    Party B shall enjoy the right to use the trademark only during the term of this Contract and within the designated Business Premises. Party B shall be obliged to maintain the goodwill and brand image of Party A's trademark in its use thereof. In the event that Party B engages in any conduct that damages such goodwill or brand image, Party A shall have the right to terminate this Contract, revoke the authorization granted herein, forfeit the Brand Security Deposit, and reserve the right to pursue Party B for any legal liability and damages.

(c)    Party B, its Stores, its affiliates, and the investors, shareholders, partners or collaborators of the foregoing entities, as well as the directors, supervisors, senior management and employees of Party B and its Stores, and the spouses, lineal relatives, collateral relatives within three generations of the foregoing persons, and close in-laws of the foregoing persons, shall not, when applying for trademark registration or enterprise name registration, use any identical or similar words, graphics, or combinations thereof derived from Party A's corporate name, trade name, trademarks, or authorized marks. In the event of any breach of the foregoing, Party A shall have the right to unilaterally terminate this Contract and pursue legal liability against Party B.

(d)    In the event that Party B or its Stores continue to use Party A's relevant trademarks, authorized marks, or Authorized System beyond the term of this Contract, beyond the scope of the license granted herein, or after the early termination of this Contract, such conduct shall be deemed infringement, and Party A shall have the right to pursue the relevant legal liabilities in accordance with applicable laws.


**Article 3: Business Premises**

3.1 The site selection and layout of the Stores shall be uniformly planned and arranged by Party A in accordance with the city-wide network planning. The Business Premises of Party B's Store are set forth in Appendix I hereto.



**Molly Tea**| Molly Tea.

*Confidential & Privileged*

Special Note: Party A shall have no obligation to provide Business Premises for Party B. Party B shall be responsible for selecting its own Business Premises, which shall be submitted to Party A for review and approval. Where Party B fails to determine the Business Premises, resulting in the Store being unable to commence operations, Party B shall not be entitled to unilaterally terminate this Contract, shall not request Party A to assume any liability for breach of contract, and shall not request the refund of any fees already paid to Party A.

3.2 If the Business Premises of Party B's Store have not yet been determined at the time of execution of this Contract, then:

(a)  Party B shall determine the Business Premises within three months from the date of execution of this Contract (i.e., having identified the Business Premises and obtained Party A's written approval, hereinafter the same);

(b)  If Party B fails to determine the Business Premises within three months from the date of execution of this Contract, Party A shall have the right to unilaterally terminate this Contract.

3.3 If, at the time of signing of this Contract, Party B has not yet obtained ownership or the right to use, during the term of this Contract, the Business Premises property as mutually recognized by both Parties, then:

(a)  Party B shall obtain ownership of, or the right to use for the term of this Contract, the Business Premises property within three months after the Business Premises have been determined.

(b)  If Party B fails to obtain ownership of, or the right to use for the term of this Contract, the Business Premises property within three months after the Business Premises are determined, Party A shall have the right to unilaterally terminate this Contract.

3.4 During the term of this Contract, if Party B loses ownership of, or the right to use, the Business Premises property and fails to restore such ownership or right to use within one month, Party A shall have the right to terminate this Contract.

3.5 Party B shall not change the Business Premises of its Store without Party A's prior written consent. Where approved by Party A in writing, Party B may change the address of the authorized Store only within the area designated by Party A, and any newly selected Store address shall be subject to Party A's prior written approval.

3.6 If Party A exercises its right to terminate this Contract in accordance with Clauses 3.2 and 3.3, Party B shall pay Party A liquidated damages in the amount of RMB 50,000. If Party B has already paid the Brand Security Deposit, Party A shall, after deducting the aforesaid liquidated damages, refund the remaining balance of the Brand Security Deposit to Party B without interest.

3.7 If Party A exercises its right to terminate this Contract in accordance with Clause 3.4, the amount of liquidated damages payable by Party B to Party A shall be calculated as follows: <u>Party B's monthly management fee multiplied by 12 months</u>. For the purposes of this Clause, the aforesaid Management Fee shall be calculated based on the average monthly Management Fee collected by Party A from Party B during the 12 months preceding the exercise of Party A's right to terminate this Contract.

3.8 Change of Business Premises

(a)  In the event that Party B needs to change the Business Premises due to changes in the store's geographical environment or force majeure events, Party B shall submit a written application to Party A.

(b)  As changes to the Business Premises involve factors such as the overall distribution of the "Molly Tea" authorized operating system, Party A shall have full discretion in respect of Party B's written application for changing the Business Premises. Party B shall be entitled to change the Business Premises only upon prior written confirmation from Party A.

(c)  Party B shall bear all expenses incurred due to the change of Business Premises: Any lease arising from the change of Business Premises, the replacement of licenses such as business licenses, and the evaluation fee payable to Party A for the change of business premises (RMB 1,000 per occurrence), shall be handled by and borne by Party B.

(d)  All expenses incurred in connection with the change of Business Premises of the store, including but not limited to design fees, renovation costs, and costs for dismantling, transportation, reinstallation, and commissioning of equipment, shall be borne by Party B. Matters regarding store redesign and renovation shall be subject to Party A's regulations.

(e)  Party A and Party B shall separately confirm the new Business Premises in writing and enter into a supplemental agreement regarding the relocation costs and other related matters.

(f)  Party B shall, within three months after the execution of the supplemental agreement for the change of Business Premises, independently obtain ownership of, or the right to use for the term of this Contract, the relevant Business Premises property and complete the procedures for reopening the Store. Otherwise, Party A shall have the right to unilaterally terminate this Contract and claim liquidated damages from Party B in accordance with the calculation method set forth in Clause 3.7 of this Contract.

### Article 4: Trade Area Protection

4.1 In order to avoid conflicts within the "Molly Tea" authorized operating system and to safeguard the interests of Party B, a trade area within a radius of <u>1.5 kilometers</u> centered on Party B's Store shall constitute Party B's protected trade area (**"Protected Area"**). Party A shall not grant any authorization to third parties to open Stores within the Protected Area, nor open "Molly Tea" Stores in the form of directly operated stores within the Protected Area; provided, however, that the following circumstances shall not be subject to the foregoing restriction:

(a)  Where Party A considers it necessary to open additional "Molly Tea" Stores within the Protected Area



**Molly Tea**| Molly Tea.

*Confidential & Privileged*

due to factors such as an increase in population or changes in traffic conditions within the Protected Area, then:

(b)  The Store is located within a commercially prosperous area or a quasi-commercially prosperous area;

(c)  If Party A proposes to open an additional "Molly Tea" Store for the above-mentioned reasons, Party A shall notify Party B in writing. If Party B intends to open a second Store within the relevant trade area, Party B may submit a written application within 7 days upon receipt of Party A's notice. Party A shall have the right, at its sole discretion and based on Party B's performance and operational conditions, to decide whether to approve Party B's application;

(d)  Party A may, in its sole discretion, re-evaluate and adjust the scope of Party B's Protected Area due to changes in market conditions or the trade area.

### Article 5: Cooperation Fees, Term, and Payment Methods
**5.1 Brand Usage Fee**

5.1.1 Party B shall pay Party A a Brand Usage Fee of USD **15,000**, which is equivalent to RMB **100,000** (in words: **One Hundred Thousand** only). The aforesaid amount shall be a fixed amount and shall not be subject to exchange rate fluctuations. The actual amount received in either RMB or USD shall prevail. Please refer to Appendix I for details. Party B shall pay the Brand Usage Fee in a lump sum to Party A's designated account within 24 hours after the signing of the contract.

5.1.2 The Brand Usage Fee is a one-time entry fee paid by Party B to Party A in consideration of Party B's right to use Party A's authorized operational resources within the Business Premises. It reflects Party B's acknowledgment of Party A's prior investment in the brand. Party B shall not, for any reason whatsoever, including but not limited to early termination of this Contract, request Party A to refund, in whole or in part, the Brand Usage Fee.

**5.2 Brand Security Deposit**

5.2.1 Party B shall pay Party A a Brand Usage Fee of USD **15,000**, which is equivalent to RMB **100,000** (in words: **One Hundred Thousand** only). The aforesaid amount shall be a fixed amount and shall not be subject to exchange rate fluctuations. The actual amount received in either RMB or USD shall prevail. Please refer to Appendix I for details. Party B shall pay the Brand Security Deposit in a lump sum to the bank account designated by Party A within 24 hours after the execution of this Contract.

The Brand Security Deposit is collected by Party A to secure the full and proper performance of this Contract. In the event that Party B is in any breach of this Contract, Party A shall have the right to deduct the corresponding outstanding amounts or losses arising from such breach from the Brand Security Deposit.

5.2.2 During the term of this Contract, Party B shall ensure that the amount of the Brand Security Deposit is continuously maintained at the level stipulated in this Clause. In the event that Party A makes any deduction from the Brand Security Deposit in accordance with this Contract, Party B shall replenish the deposit to the required amount within 7 days upon receipt of Party A's written notice. Otherwise, Party A shall have the right to deduct the shortfall of the Brand Security Deposit from any payments made by Party B for raw materials and other goods, and to deliver goods only in accordance with the remaining balance after such set-off, or to adopt other measures such as suspension of supply.

5.2.3 Party B shall not use the Brand Security Deposit already paid as a defense for any non-payment or delayed payment of any amounts due under this Contract.

5.2.4 After the termination or rescission of this Contract, Party B shall strictly perform the corresponding obligations following the termination or rescission of the contract in accordance with the stipulations of this Contract, and the parties shall liquidate their respective claims and debts. Party A shall, within 30 days after Party B has completed its corresponding obligations following the rescission or termination of the Contract, refund the Brand Security Deposit to Party B without interest, after deducting any outstanding amounts and compensation payable by Party B.

5.2.5 If the Brand Security Deposit is insufficient to cover any outstanding amounts or compensation payable by Party B, Party A shall have the right to require Party B to make further payment for the shortfall.

**5.3 Management Fee**

5.3.1 During the term of this Contract, Party A shall continuously provide Party B with technical support and operational guidance, including but not limited to new product development and updates, offline operational guidance, unified management of online delivery operations, online traffic support, marketing, and other related services. Accordingly, Party B shall pay Party A a monthly Management Fee, calculated at **2%/month** of the Store's actual received operating revenue per month. The Parties confirm that any taxes, exchange rate differences, or bank charges shall be borne by Party B. Party B shall ensure that the Management Fee received by Party A is calculated based on the net operating revenue.

5.3.2 In the event that, due to market conditions or other factors, the operating performance of both Parties is unsatisfactory, Party A may grant Party B a reduction or preferential treatment in respect of the Management Fee. Where Party A grants any reduction or preferential treatment in respect of the Management Fee, Party B shall submit a written application, and such reduction or preferential treatment shall be granted on a monthly basis. Any reduction or preferential treatment granted for a particular month or period shall not affect Party A's right to charge the



**Molly Tea**| Molly Tea.

*Confidential & Privileged*

Management Fee in the following month or subsequent periods in accordance with the terms of this Agreement.

**5.4 Online Platform Store Opening Fees**

5.4.1 Party A shall not charge such fee nor provide the corresponding services. If Party B, upon Party A's authorization, subsequently opens an online store, all relevant costs shall be borne by Party B.

**5.5 Staff Training Fees**

5.5.1 After the execution of this Contract, Party A shall provide Party B with pre-opening assistance, including support in staff recruitment, education and training, and other pre-opening training services. For training conducted at Party A's group headquarters, Party B shall pay Party A a Staff Training Fee. Prior to the opening of the Store, Party B shall provide training to its employees. The minimum requirement for staff training is 5 persons per Store. The relevant fees are set forth in Appendix I.

**5.6 Software Fees and IT Equipment Fees**

5.6.1 Party A shall not charge such fee nor provide the corresponding services. If any related expenses arise thereafter, such costs shall be borne solely by Party B.

**5.7 New Store Site Selection, Design, and Engineering Supervision Fees**

5.7.1 Party B shall pay Party A a New Store Site Selection Assessment Fee, as set forth in Appendix I.

5.7.2 Surveying and design services for Party B's Store (including site surveying and evaluation, layout planning, construction drawings, renderings, and drawing disclosure) shall be uniformly provided by Party A. Party B shall pay Party A a service fee, as set forth in Appendix I.

5.7.3 Party B shall pay Party A a Engineering Supervision Fee, as set forth in Appendix I.

[seal:] Shenzhen Molly TeaFood and Beverage
Management Co., Ltd.Special Seal for Contract

**5.8 Term**

5.8.1 The term of this Contract is <u>3</u> years, from <u>December</u> [Month] <u>[hw:] 20</u> [Day], <u>[hw:] 2023</u> [Year] to <u>[hw:] December</u> [Month] <u>[hw:] 20</u> [Day], <u>[hw:] 2026</u> [Year].

5.8.2 Upon expiry of this Contract, provided that Party B is not in any breach of this Contract and intends to continue operating the Store, Party B shall su"bmit a written application to Party A at least <u>90</u> days prior to the expiration of the Contract term. Where Party A agrees to renew the Contract and the remaining lease term or ownership term of Party B's Store premises exceeds <u>2</u> years, Party A shall enter into a renewal contract with Party B for a term of <u>3</u> years. Where the remaining lease term or ownership term is less than two (2) years, Party A shall enter into a renewal contract for a term equal to the remaining lease term or ownership period. Party A shall grant Party B an exemption from the Brand Usage Fee for the renewal contract; however, Party B shall pay all other fees in full in accordance with the renewal contract. Party A reserves the right to adjust the renewal terms.

**5.9 Payment Methods**

5.9.1 Party A's Designated Account

| | |
|---|---|
| Account Name: | Shenzhen Molly Tea Food and Beverage Management Co., Ltd. |
| Bank: | China Merchants Bank Co., Ltd., Shenzhen Chuangye Branch |
| Account No.: | 755958886610802 |

5.9.2 Party B's Designated Account

| | |
|---|---|
| Account Name: | |
| Bank: | |
| Account No.: | |

**5.10 Other Fees**

In the establishment and operation of the Store, regardless of whether a single Store is ultimately opened successfully, if Party B has procured any items listed in Appendix I, Party B shall pay Party A the relevant fees in accordance with the amounts set forth in Appendix I.



**Molly Tea**| Molly Tea.

*Confidential & Privileged*

**Article 6: Store Establishment and Opening**

6.1 After signing this Contract, Party B shall be responsible for independently handling the relevant procedures and licenses required for opening, recruiting personnel, and other matters in preparation for the opening. Party B shall complete the establishment and opening of the Store within six months from the date of execution of this Contract. Otherwise, Party A shall have the right to terminate this Contract at any time and require Party B to pay liquidated damages in the amount of RMB 50,000. The Brand Usage Fee already paid by Party B shall be non-refundable. Where Party B has paid the Brand Security Deposit, Party A shall refund the remaining balance of the Brand Security Deposit after deducting the aforesaid liquidated damages or any other outstanding amounts.

6.2 Party B's Employment: Employees of Party B's Stores shall be recruited by Party B in its sole discretion. The employment relationship shall be established with Party B, and the parties (Party B and its employees) shall execute labor contracts with each other. Party B shall employ personnel in accordance with the law and assume employment responsibilities, <u>must</u> pay social insurance, medical insurance, or similar statutory items required by the laws and regulations of the place of operation for hired employees, and pay wages in a timely manner. Any labor disputes arising therefrom shall have no relation to Party A. If any such disputes cause economic loss or reputational damage to Party A, Party B shall be liable for compensation. Party B shall also bear all litigation or arbitration costs, including but not limited to court or arbitration fees, attorney's fees, investigation fees, appraisal fees, valuation fees, enforcement fees, and other related costs.

6.3 Forms of Store Establishment

6.3.1 Scenarios for the Establishment of Stores by Party B:

(a)   If Party B is itself an economic organization such as an individual business, a partnership, or a limited liability company, Party B may operate the Store either directly or through the establishment of a branch entity.

(b)   If Party B is a natural person, Party B may establish and operate the Store through the separate establishment of an individual business, partnership, or limited liability company.

(c)   If Party B is already an economic organization, Party B may, for commercial or legal considerations, establish another separate economic organization to establish and operate the Store.

(d)   If Party B is already an economic organization, Party B may, for commercial or legal considerations, establish the Store in the form of an individual business registered by its major shareholder.

6.3.2 If Party B establishes and operates the Store through the separate establishment of an economic organization, such Store shall be deemed as Party B itself, shall enjoy the rights and assume the obligations under this Contract, and shall be jointly and severally liable with Party B for the performance of this Contract.

6.3.3 If Party B establishes the Store through the separate establishment of a limited liability company, Party B shall undertake the following obligations:

(a)   Party B shall notify Party A in writing of the details of the proposed shareholders. Party B may enter into a joint venture agreement with such proposed shareholders only upon Party A's prior written approval. During the term of this Contract, Party B shall ensure that:

i.    Party B's shareholding ratio shall not be less than 51%:

ii.   No change shall be made to the shareholders of the Store without Party A's prior written consent.

(b)   The joint venture contract and the articles of association of Party B's company shall clearly state that the company is established solely for the purpose of operating the Store, and that the conduct of Party B and its shareholders shall be fully subject to this Contract, and they shall perform this Contract in good faith.

(c)   One copy each of the joint venture contract and Party B's articles of association shall be submitted to Party A for filing. In the event of any changes to the internal organizational structure, contracts, articles of association, or any other matters of Party B's company operating the Store, Party B shall report such proposed changes to Party A prior to their implementation.

6.3.4 If Party B (as a natural person) establishes the Store in the form of a partnership, Party B shall undertake the following obligations:

(a)   Party B shall notify Party A in writing of the details of the proposed partners. Party B may enter into a partnership agreement with such proposed partners only upon Party A's prior written confirmation. During the term of this Contract, Party B shall ensure that no change shall be made to the partners of the Store without Party A's prior written consent.

(b)   The partnership agreement shall clearly stipulate that the partnership is established solely for the purpose of operating the Store, and that the partnership and its partners shall be fully subject to this Contract, and shall perform this Contract in good faith.

(c)   One copy of the partnership agreement shall be submitted to Party A for filing. In the event of any changes to the internal organization of the Store or the partnership, or any amendment to the partnership agreement or other relevant matters, Party B shall report such proposed changes to Party A prior to their implementation.

6.3.5 Except where the Store is operated in the name of Party B through an individual business, a sole proprietorship, or a branch entity of Party B, in the event that Party B establishes the Store in any other form of economic organization (or where Party B arranges its principal shareholder to establish the Store through an individual business), such economic organization shall, within 10 days from the date of issuance of its business license, issue to Party A a duly sealed accession agreement (as set forth in Appendix III), signed by all shareholders or investors, undertaking that the conduct of such economic organization and its shareholders or investors shall be fully subject to this Contract, and agreeing to jointly and severally assume all obligations of Party B under this Contract and enjoy the corresponding rights. If the accession agreement is not issued within the aforesaid time limit,



**Molly Tea**| Molly Tea.

*Confidential & Privileged*

Party A shall have the right to claim liquidated damages from Party B for late performance in the amount of RMB 200 per day, and shall also have the right to terminate this Contract at any time. Where Party A terminates this Contract pursuant to this provision, Party A shall have the right to require Party B to pay liquidated damages in the amount of RMB 50,000. Where Party B has already paid the Brand Security Deposit, Party A shall refund the remaining balance thereof without interest after deducting the aforesaid liquidated damages.

6.3.6 Except where the Authorized Store is operated in the name of Party B through an individual business, a sole proprietorship, or a branch entity of Party B, in the event that Party B establishes the Authorized Store in any other form of economic organization, and such economic organization ceases operations due to bankruptcy liquidation, revocation of its business license, deregistration, or any other circumstances resulting in its inability to continue operations, Party A shall remain entitled to require Party B to continue to assume liability for all outstanding amounts owed to Party A under this Contract.

6.3.7 Party B shall ensure that the Authorized Store complies with all mandatory and prohibitive legal and regulatory requirements regarding business qualifications, and shall obtain all necessary licenses and permits for operation, including but not limited to fire safety, environmental protection, health, taxation, and any other approvals required for store operation. Party B shall also obtain, within six months after the execution of this Contract, a *Business License*, *Enterprise Legal Person Business License*, or any equivalent operating license in accordance with applicable local laws and regulations. After the opening of the Store, Party B shall independently handle all matters relating to the operation of the Store with the relevant governmental authorities and shall assume all related responsibilities at its own cost.

6.3.8 Party B or its Authorized Stores must notify Party A in writing in advance of any changes to their registration particulars, including but not limited to changes of legal representative, increase or decrease of registered capital, change of enterprise type, or equity changes.

6.4 Opening Time and Conditions

6.4.1 Party B shall ensure that the Store is opened in accordance with the conditions set forth in this Contract within six months after the signing of this Contract. If the Store fails to meet the opening conditions or is not opened within the aforesaid period, Party A shall have the right to hold Party B liable for late performance or to terminate this Contract in advance, unless an extension is granted by Party A in writing.

6.4.2 Opening and Operational Support

(a)  Before opening, Party A shall arrange <u>1-2</u> staff members (the specific number shall be determined by Party A based on Party B's preparation progress) to provide opening support for a period of _7_ days (2 days before opening and 5 days after opening). Such support shall include assistance with store preparation, management training, and opening activities, and Party A shall also conduct a further on-site inspection and acceptance of the Store's renovation works.

(b)  Travel expenses, accommodation costs, and meal expenses of the opening support personnel shall be borne by Party B Where Party B applies for an extension of the opening support period, Party B shall bear all costs incurred during the extended period, including salaries, travel expenses, accommodation, and meal expenses of the opening support personnel. The specific cost standards shall be subject to the details provided by Party A to Party B at that time.

(c)  If Party B requires Party A to assign on-site personnel for support during the operation of the Store, Party B shall submit a written application in advance. Upon Party A's approval, Party A may assign on-site personnel to provide such support, with a maximum support period of 30 days. Party B shall bear all costs in full, including salaries, performance bonuses, travel expenses, accommodation, and meal expenses of the on-site personnel. The specific cost standards shall be subject to the breakdown provided by Party A to Party B at that time.

6.4.3 Store opening must meet the following conditions:

(a)  The Store shall have obtained a *Business License*, *Enterprise Legal Person Business License*, or any equivalent operating license in accordance with applicable local laws and regulations, as well as relevant qualifications such as a Food Business License. The business scope stated in such licenses shall include "catering" items;

(b)  The renovation of the Store premises and the installation and commissioning of equipment shall be subject to acceptance by Party A. In order to standardize Party A's brand image and service requirements, Party B agrees to entrust the Store's decoration works to the professional decoration and design companies designated by Party A, and Party B shall bear all decoration and design costs of the Store. Party B shall procure all operational facilities and equipment required for the Authorized Store from Party A or third parties designated by Party A. After opening, Party B shall still be required to procure the necessary operating facilities and equipment in accordance with Party A's requirements, and the purchase costs shall be borne by Party B;

(c)  All assets of the Store shall have been insured under property insurance; (d) The number of personnel who have received training from Party A in accordance with this Contract and have passed the required assessment has reached the standard stipulated herein, and all employees have obtained the required certificates, including health certificates for practitioners and other relevant qualifications.

(e)  Party B shall have fully performed all pre-opening obligations stipulated in this Contract and have been approved by Party A to open for business;

(f)  Upon satisfying the above conditions for store opening, Party B shall provide Party A with copies of the relevant certificates, lease agreements, and other supporting documents, and shall submit a written application for store opening to Party A by email or other written means. The Store may be opened only upon Party A's verification



**Molly Tea**| Molly Tea.

*Confidential & Privileged*

and approval. If Party B opens the Store without Party A's prior consent, such act shall constitute a material breach of this Contract;

(g)  Party B shall ensure that the Store is opened in accordance with the above conditions within 6 months from the date of execution of this Contract, unless an extension is granted by Party A in writing. Except where an extension is granted by Party A in writing, if Party B fails to establish the Store, fails to open the Store, or the Store fails to meet the opening conditions upon expiry of the aforesaid period, Party B shall be deemed to be in material breach of this Contract;

(h)  After the establishment of the Store entity, Party B shall procure that such entity affixes its official seal to this Contract or issues a confirmation letter acknowledging the rights and obligations under this Contract. Notwithstanding the foregoing, whether the Store entity affixes its official seal or confirms the rights and obligations under this Contract shall not affect such entity's entitlement to the rights under this Contract or its assumption of the obligations hereunder.

### Article 7: Store Operations

7.1 Party B undertakes that, in the course of operation, it shall strictly comply with and implement Party A's standardized specifications, including service standards, operational procedures, sales processes, and work specifications formulated by Party A. Such standards and requirements may be set out in this Contract, in various documents or manuals formulated by Party A and confirmed by Party B, or in any standards, instructions, or requirements communicated by Party A during training and operational guidance.

7.2 Party A may, as required for the operation of the Store and the development of the "Molly Tea" business system, continuously revise, improve, and provide to Party B the relevant standardized specifications, including but not limited to service standards, operational procedures, sales processes, and work standards. Party B undertakes to strictly implement the updated specifications.

7.3 Party B undertakes to properly safeguard all documents, manuals, and management policies provided by Party A, whether in updated or previous versions.

7.4 Party B shall, in accordance with Party A's instructions and regulations, hang and post unified advertisements, signboards, display boards, and other authorized marks within the Store.

7.5 If Party B violates any obligation under this Article, and fails to rectify the situation within 10 days after receiving the relevant rectification notice from Party A, Party A has the right to terminate this Contract at any time, deduct the entire Brand Security Deposit, and require Party B to pay liquidated damages in the amount of <u>RMB 300,000.</u>

7.6 Where Party B requires Party A to assign management personnel to provide guidance for the Store's operations, Party B shall submit a written application.

7.7 Store Business Hours

(a)  Party B shall strictly operate the Store in accordance with the business days and business hours designated by Party A. The Authorized Stores shall be open 7 days a week, with no rest days. The Store's business hours shall be no less than 12 hours per day, and may be extended during public holidays. If Party B needs to adjust the business hours due to any special circumstances, it shall consult with Party A in advance and obtain Party A's prior written approval.

(b)  Unless due to force majeure events not attributable to Party B, such as power outages, water supply interruptions, accidents, or other similar events, the Store shall not suspend business without justified reason. Party B shall promptly notify Party A upon the occurrence of any such force majeure events and shall use its best efforts to take remedial measures. If Party B needs to suspend business for reasons other than the aforesaid force majeure events, it shall submit a written application in advance and obtain Party A's prior written approval; provided, however, that this shall not apply where Party A requires suspension for rectification due to Party B's material breach of contract.

(c)  If Party B violates the agreed business hours of the Store, Party A shall have the right to require Party B to pay liquidated damages in the amount of RMB 5,000 per occurrence, and Party A may deduct such liquidated damages directly from the Brand Security Deposit paid by Party B.

7.8 Production, Sale of Goods and Sales Methods

(a)  Party B shall operate the Store strictly in accordance with Party A's unified business model, and shall only produce and sell products designated by Party A. Party B shall not produce or sell any products other than those authorized by Party A.

(b)  The selling prices of the products shall be determined by Party A with reference to the prices of Party A's stores and taking into account local market conditions. Party B shall not adjust such prices at its sole discretion.

(c)  Party B must clearly label the prices of all products sold in the Store in strict accordance with the style and pricing specified by Party A.

7.9 Party B undertakes that during the Store's business hours, all employees shall wear uniforms and shall strictly provide services to customers and handle customer relations in accordance with Party A's unified standards, such as service standards, operational procedures, sales processes, and work standards.

7.10 Restrictions on Party B's Employment of Personnel

(a)  Party B undertakes that, whether in operating the Store or engaging in any other business activities, without the prior written consent of Party A, it shall not employ or engage, whether by way of labor, service, consultancy, advisory or otherwise, any employee of Party A or its affiliates, including but not limited to current



**Molly Tea**| Molly Tea.

*Confidential & Privileged*

employees, former employees who have left employment for less than one year, and former employees who are subject to non-competition obligations.

(b)   Party B further undertakes that, whether in operating the Authorized Store or engaging in any other business activities, without the prior written consent of Party A, it shall not employ (or engage, whether by way of labor, service, consultancy, advisory, or otherwise) any employee of other stores within the "Molly Tea" authorized operating system, including but not limited to current employees, former employees who have left employment for less than one year, and former employees who are subject to non-competition obligations.

7.11 Financial Accounting (a) Party B undertakes to calculate the daily revenue in the manner prescribed by Party A and to accurately record such data in the systems, reports, and accounting records designated by Party A.

(b) Party B undertakes that, upon completion of each business day, it shall upload the *Daily Revenue Report* and operational data to Party A through Party A's designated ERP system or by email. In the event Party B delays in performing this obligation, Party B shall pay liquidated damages for late performance in the amount of RMB 100 per day. Such liquidated damages shall be accumulated and settled together with the monthly management fee. (c) Party B undertakes that its operating stores shall not violate any national laws, regulations, or other normative legal documents relating to accounting or finance and taxation. If Party B breaches the above undertakings and thereby causes any material or reputational damage to Party A or the "Molly Tea" authorized operating system, Party B shall be liable for compensation.

(d)   Party B undertakes to settle all outstanding accounts for the preceding month before the 5th day of each month and to provide financial reports to Party A in accordance with the methods and report formats prescribed by Party A.

(e)   Party B undertakes to retain monthly financial reports and to accept, at any time, inspections conducted by Party A or audits conducted by a third-party accounting firm designated by Party A. Party B further undertakes not to obstruct or refuse such inspections or audits for any reason.

(f)   Party B undertakes to promptly submit various reports and financial information at any time at Party A's request. This is for the purpose of enabling Party A to fully understand the operating conditions of the Authorized Store and to provide Party B with analysis, diagnosis, and guidance services in respect of business management matters (including revenue improvement, cost control, and profit maximization), so as to assist Party B in improving its operations in a timely manner.

(g)   If Party B is found to have engaged in "off-book transactions" (Fei Bai Dan) or other acts of underreporting or failing to record revenue, Party B shall pay to Party A liquidated damages in the amount of RMB 5,000 to 10,000 per occurrence (the specific amount to be determined by Party A in its sole discretion based on the specific circumstances). If such violation is found three or more times, Party A shall have the right to terminate this Contract and deduct all Brand Security Deposits. In addition to paying the liquidated damages, Party B shall also bear the costs of engaging a third party for auditing and inspection purposes.


**Article 8: Supply Chain Management**

8.1 Pre-opening Procurement

Party B shall complete the procurement of basic materials and equipment required for pre-opening of the Store in accordance with the procurement list provided by Party A or suppliers designated by Party A, no later than 60 days prior to the opening of the Store.

Party B shall be responsible for handling all customs import and export procedures and shall bear all related logistics costs and taxes, such as storage fees, freight charges, customs clearance fees, and other expenses incurred by international logistics service providers. Once the goods are dispatched from the warehouse of Party A or Party A's designated supplier, Party A shall no longer bear any liability for damage, loss, improper transportation, or improper storage of the goods. All such risks and liabilities shall be fully transferred to Party B.

8.2 Daily Procurement

(a)   Party B shall procure materials designated by Party A (as set out in the material list separately provided and updated from time to time by Party A) from suppliers designated by Party A. Party B shall enter into a *Supply Chain Contract* with such designated suppliers and shall perform its obligations in accordance with the *Supply Chain Contract*. Party B shall also purchase specified "Molly Tea" branded retail products (as set out in the retail product list separately provided and updated from time to time by Party A) from Party A or suppliers designated by Party A.

(b)   Given that the simultaneous performance of this Contract and the *Supply Chain Contract* is a necessary prerequisite for ensuring the integrity of the "Molly Tea" brand operation system, Party B agrees and acknowledges that the *Supply Chain Contract* and this Contract shall become effective, be performed, and be terminated simultaneously. The rescission or termination of either of the two contracts shall result in the rescission or termination of the other contract.

(c)   Materials and equipment other than those designated by Party A shall be procured by Party B in accordance with the operation manual. Where Party B's self-procured items do not comply with Party A's requirements, Party A shall issue a rectification notice, and Party B shall make rectifications as required by Party A. Party B shall bear full responsibility for any food safety incidents or infringement disputes arising from self-procured materials or equipment.

(d)   Materials and equipment purchased by Party B from suppliers designated by Party A or directly from Party A shall be used solely for providing services to customers within the Store under this Contract. Unless Party



**Molly Tea**| Molly Tea.

*Confidential & Privileged*

A's prior written consent is obtained, Party B shall not sell such materials or equipment to any third party, use them at any other location, or use them for any other brand's products. Party B shall also not produce or use substitutes, nor procure such materials or equipment from any party other than Party A or Party A's designated suppliers. Any violation of the foregoing shall constitute a material breach of this Contract.

(e)  Party A will continuously change or update materials and equipment based on the market environment, and shall promptly notify Party B of the latest procurement requirements by email or other written means. Party B shall procure and update such materials and equipment in accordance with Party A's latest notice. In the event Party A replaces any supplier, Party B shall cooperate in completing such replacement.

(f)  Party B shall be responsible for handling all customs import and export procedures and shall bear all related logistics costs and taxes, such as storage fees, freight charges, customs clearance fees, and other expenses incurred by international logistics service providers. Once the goods are dispatched from the warehouse of Party A or Party A's designated supplier, Party A shall no longer bear any liability for damage, loss, improper transportation, or improper storage of the goods. All such risks and liabilities shall be fully transferred to Party B.

8.3 All items used by Party B for business purposes that form part of the "Molly Tea Authorized Identification System" shall be uniformly produced by Party A. Party B shall procure all such items from Party A and shall not privately produce them or procure them from any third party. In the event of special circumstances, Party B shall submit a written application to Party A and may only produce or procure such items from a third party upon Party A's prior written approval.

**Article 9: Food Safety Standardization Management and Protection of Consumer Rights and Interests**

9.1 Party A shall provide Party B with a complete set of system standards and regulations relating to food safety standardized management, and Party B agrees to strictly comply with and implement the same. Party B agrees that Party A shall have the right to supervise and inspect Party B's implementation of food safety standardized management at any time. Party A may, depending on the circumstances, require Party B to carry out rectification and improvements, and shall have the right to impose various penalties on Party B, up to and including suspension of business for rectification or termination of cooperation. Party A shall have the right to entrust third parties to conduct audits and inspections of Party B and may require Party B to bear all related audit and supervision costs.

9.2 Party B shall, in accordance with Party A's food safety standardized management requirements, timely dispose of expired materials and products, and shall not use any expired materials or sell any expired products. Party A shall have the right to require Party B to destroy expired materials and products and may impose different penalties on Party B depending on the circumstances. In serious cases, Party A may suspend settlement, require Party B to suspend business for rectification, up to and including termination the cooperation with Party B.

9.3 In the event of any food safety incident, Party B shall promptly handle such incident and immediately report it to Party A. Based on the interests of consumers, the public, and potential social impact, Party A shall have the right to require Party B to suspend business for rectification, up to and including termination the cooperation with Party B.

9.4 To strengthen food safety standardization management, Party B agrees to install monitoring systems in the Authorized Stores as required by Party A and accept Party A's supervision from time to time. Without Party A's prior written consent, Party B shall not turn off the monitoring system, adjust the camera angles, or damage the monitoring system; otherwise, such conduct shall be deemed a material breach of this Contract.

9.5 In order to ensure product quality, Party B agrees to submit products for inspection from time to time as required by Party A and shall bear all costs and expenses arising therefrom.

9.6 Party B's Stores shall properly, sincerely, and diligently handle all complaints, opinions, and suggestions from consumers. Where consumer rights and interests are damaged, Party B shall issue an apology to the consumer and promptly take remedial measures, and shall not raise any objection thereto.

9.7 When providing services to consumers, Party B's Stores shall provide truthful information and shall not engage in false publicity that may mislead others.

9.8 Party B shall maintain proper environmental hygiene and food safety and sanitation at the Store and strictly comply with the relevant provisions of the Food Safety Law. In the event any consumer suffers personal injury or property damage arising from products and/or services provided by Party B's Store, Party B shall promptly provide compensation.

**Article 10: Settlement Rules, Membership System, and Card/Coupon Issuance**

10.1 The specific settlement rules shall be subject to the *Store Settlement Rules* and related settlement notices issued and updated by Party A from time to time.

10.2 Point of Sale (POS) System

(a)  The hardware of the POS system shall be independently purchased and installed by Party B, and Party B shall submit the procurement list to Party A.

(b)  The software of the POS system shall be independently purchased, installed, operated, and maintained by Party B. Where Party B uses any ordering system designated by Party A (including but not limited to HLLPOS International Version / overseas ordering systems, etc.), Party B shall strictly comply with Party A's relevant usage and management requirements for such ordering system.



**Molly Tea**| Molly Tea.

*Confidential & Privileged*

(c)   Party B's Store shall use the POS system in compliance with Party A's requirements and shall not damage the POS system or alter the cashier data; otherwise, it shall constitute a fundamental breach. Party A shall inspect the POS System used by Party B through supervisory store visits. If Party A requires an upgrade or replacement of the Store's POS System, Party B shall cooperate with such upgrade or replacement at its own expense. Party A shall have the right to request access to and review Party B's books, records, documents, sales receipts, and other relevant materials at any time. Party A shall have the right to require Party B to provide an annual audit report issued by an accounting firm.

(d)   The Store operated by Party B shall not use two separate POS systems within the same Store; otherwise, such conduct shall constitute a fundamental breach of this Contract.

10.3 Party B agrees that a portion of the Store's revenue may be collected by Party A on its behalf, and further agrees that Party A may directly deduct any amounts payable by Party B to Party A or any third party from the collected funds before remitting the balance to Party B. Party B agrees that Party A shall have the right to deduct from the collected funds any amounts payable by Party B, including but not limited to service fees, contracting fees, material costs, equipment costs, liquidated damages, penalties, fees advanced or paid by Party A on behalf of Party B to any third party, amortized expenses payable by Party B, and any other expenses payable by Party B.

10.4 Party A shall reconcile accounts with Party B in accordance with the settlement cycle and notify Party B by email or any other method agreed under this Contract. Party B shall confirm within the timeframe required by Party A. Any failure to respond or late response shall be deemed as no objection. If Party B raises any objection to the statement of accounts, both Parties shall jointly verify and confirm such statement. Settlement shall only be made after both Parties confirm that no objection remains.

10.5 The statement of accounts shall serve as the basis for settlement between Party A and Party B. In the event of any inconsistency between the statement of accounts and any other documents or vouchers, the statement of accounts shall prevail. Party A shall periodically or from time to time confirm statements of accounts and other documents with Party B. Party B shall cooperate in confirming such statements and any other documents requiring its confirmation (including contracts, correspondence, notices, and confirmation letters). Otherwise, Party A shall have the right to unilaterally suspend or terminate settlement.

10.6 Party B agrees that Party A shall have the right to formulate, adjust, and update the settlement rules from time to time based on actual circumstances, and both Parties agree that settlement shall be conducted in accordance with the then-effective settlement rules.

10.7 **Membership System and Card/Coupon Issuance**

10.7.1 Party A shall uniformly issue and manage the "Molly Tea" brand electronic membership card, which may be used in all Party A directly operated stores, the Stores under this Contract, and other stores authorized by Party A. All membership benefits attached to such membership card, including consumption points redemption for gifts or vouchers, may be used in all Party A directly operated stores, the Stores under this Contract, and other authorized stores of Party A (with certain campaign-specific stores as specified in the Operation Manual). Party B's Store shall not independently issue any form of membership cards, stored-value cards, or discount coupons, and shall strictly be prohibited from issuing or selling co-branded stored-value cards (recharge cards) without authorization.

10.7.2 Where consumers use membership cards at the Store, Party B shall not refuse acceptance for any reason.

10.7.3 The Store shall uniformly use the headquarters' membership system and Party A's official brand WeChat official account and mini-program.

10.7.4 The Store is strictly prohibited from independently establishing any official self-media accounts on any platform, including but not limited to WeChat Official Accounts, Weibo accounts, Xiaohongshu accounts, or Dianping accounts. Party A shall establish customer fan groups and hand them over to Party B for daily communication, management, and marketing purposes. Party B shall strictly operate such WeChat groups in accordance with Party A's requirements and shall not engage in any conduct that may harm Party A's brand reputation. Party B's daily WeChat operations shall be conducted through Party A's corporate WeChat system, including but not limited to fan groups and related communications.

10.7.5 Party A may adjust the membership card system in accordance with brand development and strategic planning and shall notify Party B in a timely manner. Party B's Store shall accept and strictly implement such adjustments.

10.7.6 Party A may from time to time launch specific stored-value promotional activities for the Stores. Party B shall cooperate in accordance with Party A's notices. All stored-value amounts shall be credited to Party A's designated account. Party A shall, on the 2nd day of each month, conduct verification and settlement of the stored-value consumption of Party B for the preceding month. The settlement ratio shall be determined based on the actual discount ratio of the relevant promotional activity.

10.7.7 Without Party A's prior written consent, Party B shall not independently issue any form of cards/coupons (including electronic cards/coupons), including but not limited to stored-value cards/coupons, redemption cards/coupons, recharge cards/coupons, membership cards/coupons, or discount cards/coupons. Party B shall only sell cards/coupons authorized and issued by Party A, or apply to Party A for the production of cards/coupons for specific requirements. Party B's cards/coupon issuance and sales activities shall strictly comply with Party A's rules and standards.

10.7.8 If Party B issues any cards/coupons without Party A's prior written consent, or violates Party A's cards/coupons issuance or usage rules and fails to effectively rectify such breach within 5 days after Party A's notice,



**Molly Tea**| Molly Tea.

*Confidential & Privileged*

such conduct shall be deemed a material breach of this Contract. Party B agrees to pay liquidated damages to Party A in an amount equal to 5 times the total value of the issued cards/coupons. Where the total value of such cards/coupons cannot be determined, Party B shall first pay liquidated damages of no less than RMB 100,000 to Party A, and Party A reserves the right to further claim liquidated damages up to 5 times the total value of the issued cards/coupons.

10.7.9 Within 3 months prior to the termination of the cooperation between the two parties, Party B agrees to timely report to Party A the issuance and usage of cards/coupons. Party B agrees that, prior to the termination of cooperation, it shall refund to customers the unused value of any outstanding cards/coupons, or pay the equivalent value of such unused cards/coupons to Party A or a third party designated by Party A, and such Party A or designated third party shall continue to provide services to the customers. Where Party A has advanced, on behalf of Party B, any refund of unused card/coupon value/balance to customers, provided services to customers, or otherwise handled such matters in any form on Party B's behalf, whether or not the cooperation has been terminated, Party A shall have the right to require Party B to pay additional compensation equal to 5 times the face value of the cards/coupons, without prejudice to any other remedies available to Party A under this Contract. Such compensation shall not reduce or exempt Party B from any other liabilities or obligations under this Contract.

10.7.10 The card/coupon management rules and standards issued by Party A shall constitute an integral part of this Contract. Party A shall have the right to adjust such rules and standards from time to time, and Party B agrees to comply with the same.

10.7.11 If stores overseas (regions outside Chinese mainland) have not yet opened or do not provide membership card (prepaid card) or related services, then the management rules published by Party A when it actually launches membership card related services overseas shall prevail.

**Article 11: Takeover, Buyback and Transfer of Operating Rights**

11.1 Where the Store is likely to suffer business interruption due to evident operational difficulties, or where Party B fails to make rectifications within the prescribed period after receiving a *Notice of Breach* issued by Party A, Party A shall have the right, where it deems necessary, to take over the operation of the Store. Party B and the Store shall unconditionally cooperate with Party A's takeover actions and shall comply with all instructions issued by Party A during the takeover period. Upon Party A's confirmation that the Store is capable of resuming normal operations, or upon expiry of the agreed takeover period, Party A shall return the operating rights of the Store to Party B. The specific matters relating to the takeover shall be set out in a separate supplemental agreement to be signed by both Party A and Party B.

11.2 Buyback

11.2.1 Upon termination or expiration of this Contract, Party A or its affiliates shall have the right to negotiate the buyback of the Authorized Store operated by Party B with reference to the net asset value and market value of the Store.

11.2.2 If Party B intends to transfer the Store, Party A or its affiliates shall have the priority right to repurchase the Authorized Store operated by Party B.

11.2.3 Default Buyback

If Party B commits any fundamental breach as stipulated under this Contract, or any of the following material breaches, or causes serious damage to Party A's brand reputation, Party A shall have the right to repurchase the Store operated by Party B. The buyback price shall be determined based on the net asset value assessed by a third-party audit and valuation institution designated by Party A. Such circumstances include, but are not limited to: (a) Failure to pay relevant fees as stipulated under this Contract, and failure to make payment within 10 days after Party A issues a written demand notice; (b) Failure to submit reports and documents required under this Contract in a timely, accurate, and complete manner for 2 consecutive months;

(c) Failure to rectify any breach of this Contract within 10 days after receipt of Party A's written rectification notice;

(d) Any other circumstances deemed by Party A as eligible for buyback.

11.3 Transfer Restrictions

11.3.1 Unless Party A's prior written consent is obtained, Party B shall not transfer (or engage in any disguised transfer of) all or part of the operating rights under this Contract by means of assignment, contracting, leasing, or any other form.

11.3.2 Where Party B establishes and operates the Store through a separately incorporated legal organization, Party B shall not transfer (or engage in any disguised transfer of) the ownership, equity, or operating rights of such organization in any form, unless Party A's prior written consent is obtained.

11.3.3 Without Party A's prior consent, Party B (as an enterprise) shall not merge with any other third party, change its shareholders, or restructure its assets.

11.3.4 Unless Party A's prior written consent is obtained, Party B and the Authorized Store shall not create any security interest over the operating rights or ownership of the Store.

11.4 Obligations of Party B upon Transfer

11.4.1 Where Party B applies in writing to transfer the Store to Party A, Party B shall submit relevant supporting documents demonstrating that the proposed transferee is qualified to operate within the "Molly Tea" authorized business system.

11.4.2 If Party A agrees in writing to the transfer of the Store to the aforesaid transferee, Party B shall be



**Molly Tea**| Molly Tea.
*Confidential & Privileged*

obligated to jointly execute with the transferee relevant undertakings, including but not limited to the *Actual Operator Confirmation Letter* and the *Store Accession Agreement* (as attached), and the parties shall undertake as follows:

(a)    The transferee agrees to accept training provided by Party A and shall only formally assume the transferred Store after obtaining a qualification certificate issued by Party A upon completion of training.

(b)    The transferee shall assume joint and several liability for the settlement of all fees, payment of goods and other debts, and supplementation of the Brand Security Deposit.

(c)    If the transfer agreement between Party B and the transferee is determined to be invalid or is rescinded, such invalidity or rescission shall not affect the validity of the aforementioned termination agreement or contract, and the transferee shall not claim rescission of its contract with Party A on such grounds.

(d)    The Brand Security Deposit under this Contract shall be transferred and applied as the brand security deposit under the authorized operation agreement between Party A and the transferee. Party A shall not refund the Brand Security Deposit to Party B.

(f)    The Parties agree that the authorized operation term under the agreement between Party A and the transferee shall be the remaining term of the authorization period under this Contract.

(g)    The transferee shall strictly comply with all provisions of the *Operation Manual* in force at the relevant time and shall fully operate the Store in accordance with all requirements set forth in such *Operation Manual*. These requirements include, but are not limited to, possible architectural modifications, equipment updates, changes to signs, products, or services, changes in operating methods and hours, or reforms and updates to computer settlement and reporting; all such expenses shall be borne by Party B.

11.4.3 Party B shall faithfully perform the above undertakings and shall be responsible for ensuring that the transferee duly performs the same. Party B shall remain bound by this Contract and shall not enter into any termination agreement with Party A prior to Party A's execution of a contract with the transferee.

11.4.4 Party B shall pay Party A a transfer service fee in the amount of RMB 1,000.

11.4.5 Prior to Party A entering into a new contract or supplemental agreement with the transferee, Party B shall continue to perform all obligations under this Contract, regardless of the operating condition of original Party B.

### Article 12: Rescission or Termination of Contract

12.1 This Contract may be terminated early upon mutual agreement between Party A and Party B.

12.2 Party A shall have the right to unilaterally terminate this Contract in any of the following circumstances:

12.2.1 Party B commits a fundamental breach, material breach, or any conduct that seriously damages Party A's brand image or materially harms Party A's interests;

12.2.2 Party B scores below 60 points in Party A's regular or irregular food safety inspections;

12.2.3 The revenue of Party B's Authorized Store decreases to less than 80% of the revenue in the previous fiscal year or previous operating cycle (with each evaluation cycle being no less than 6 months, and the specific period shall be subject to Party A's notification);

12.2.4 Party B operates in an irregular manner or fails to perform its obligations under this Contract, and fails to complete rectification or proper performance within ten days after receiving Party A's written notice.

12.3 Party B agrees that upon the rescission or termination of this Contract, Party A shall have the right to withhold from the funds collected on behalf of Party B an amount ranging from RMB 5,000 to RMB 20,000 per store (the specific amount subject to Party A's actual deduction) as a security deposit. Where Party B completes the removal or destruction of any decoration, signage, materials, or other items bearing Party A's brand identity within 30 days after the rescission or termination of this Contract, and provided that Party B has not committed any other infringement of Party A's rights during such period, Party A shall refund the security deposit to Party B within 10 days after the expiry of the said 30-day period. Otherwise, the security deposit shall be non-refundable.

### Article 13: Contract Termination Liquidation

13.1 Regardless of the circumstances causing the termination of this Contract, the obligation of both Parties to repay debts between them shall not be affected. All debts between the Parties, whether conditional or subject to a term, shall be deemed due and payable or having met the conditions for repayment upon termination of this Contract, and shall be fully settled upon termination or subject to a separate installment repayment agreement.

13.2 Upon liquidation following termination of cooperation, if Party B still has outstanding unpaid debts, Party B agrees that Party A shall have the right to dispose of all operational facilities, equipment, and inventory materials of the Authorized Store and shall have priority in repayment from such proceeds. Party B agrees that the equipment purchased from Party A or Party A's designated supplier that is still in normal operating condition shall have a depreciation and amortization period of 5 years. Such equipment may be transferred to Party A or directly applied to offset Party B's outstanding debts to Party A based on its residual value after amortization and depreciation. Party B further agrees to authorize Party A to sell any equipment in the store that was not purchased from Party A or Party A's designated supplier, any equipment that has exceeded the 5-year depreciation period, and any equipment that is not in normal operating condition. The proceeds from such sale shall be first applied to satisfy Party B's debts to Party A.

13.3 Provided that Party B has fully settled its debts to Party A or both Parties have entered into a settlement agreement regarding such debts, a 30-day inventory clearance period shall commence from the date of termination



**Molly Tea**| Molly Tea.

*Confidential & Privileged*

of this Contract. During such clearance period, Party B may continue to sell products authorized by Party A, and all rights and obligations under this Contract shall remain applicable during such period.

13.4 Upon the expiration of the inventory clearance period, Party B shall immediately cease, in any form, the use of any packaging, advertising materials, or other materials bearing Party A's authorized brand. Party B shall no longer use any trademarks, trade names, patents, or trade secrets licensed under this Contract, shall cease the production and sale of any products authorized by Party A, and shall stop using, by any means, any accounts and passwords for systems, software, platforms, etc., that were activated or accessed under this Contract.

13.5 Termination of this Contract shall not affect either Party's right to pursue liability for breach of contract or infringement in accordance with this Contract.

### Article 14: Rights and Obligations of Party A

14.1 Party A shall provide all services under this Contract to Party B and shall have the right to charge service fees in accordance with this Contract. Party A may directly deduct such service fees, as well as any other amounts payable by Party B, from the funds collected on behalf of Party B.

14.2 Party A shall have the right to formulate, revise, and update from time to time the standards, rules, manuals, guidelines, policies, or systems relating to the standardized operation of the authorized brand. Party A may notify Party B of the same through email, courier, Party A's own platforms (official website, App, mini-program, Super Shopping Guide, etc.), WeChat, SMS, telephone, fax, or other means of public announcement. Party B agrees to comply with and implement the same.

14.3 Party A shall have the right to enter Party B's business premises at any time to supervise and inspect Party B's implementation of standards relating to production, quality control, warehouse management, inventory control, operations, and hygiene. For any non-compliance with Party A's required standards, Party A shall have the right, depending on the circumstances, to impose penalties on Party B, including but not limited to issuing a warning, imposing a fine, suspending settlement, closing online sales channels, removing products from shelves, requiring corrective action within a specified period, ordering suspension of operations for rectification, or closing the authorized store, up to and including termination of the cooperation.

14.4 Party A shall have the right to take measures against Party B's violation of laws or regulations, breach of this Contract, failure to properly implement Party A's brand operation-related systems or standards, violation of the rules published on Party A's platforms, or any other act that harms the authorized brand's image or the legitimate rights and interests of customers. Such measures include, but are not limited to, issuing a warning, imposing a fine, suspending settlement, closing online sales channels, removing products from shelves, requiring corrective action within a specified period, ordering suspension of operations for rectification, closing authorized stores, and up to and including termination of the cooperation with Party B.

14.5 Party A shall have the right to formulate, revise, or update promotional and marketing policies in accordance with actual market conditions from time to time, and to launch special discounts or promotional campaigns, and require Party B to participate therein. Additionally, Party A shall have the right to formulate, modify, or update the product pricing policy, and Party B shall not unilaterally change the product prices without the written consent of Party A.

14.6 For orders where a customer has placed an order and completed payment but Party B has not confirmed acceptance of the customer's offer, Party A shall have the right to collect and retain the payment for such orders on behalf of Party B and dispose of such funds in accordance with customer claims or requests. With respect to customer orders, Party B shall not refuse or reject any customer orders or orders allocated by Party A without Party A's prior written consent.

14.7 Party A shall have the right to require Party B to perform its obligations under this Contract, to implement Party A's brand operation standards and specifications, and to require Party B to make rectifications within a prescribed period.

14.8 In the event that Party B's business conduct, although not expressly stipulated under this Contract, fails to comply with applicable laws and regulations, or fails to meet mandatory national or industry standards, Party B agrees that Party A shall have the right to require Party B to comply with such laws and regulations and implement the applicable national or industry standards.

14.9 Party A shall have the right to formulate and update from time to time a *Dynamic Evaluation and Grading Management System* or other relevant systems, and to evaluate Party B from multiple dimensions including values, performance indicators, and operational metrics, and to determine Party B's grade based on such evaluation results.

14.10 Party A shall have the right to directly deduct any fines and other amounts payable by Party B from the funds collected on behalf of Party B and the Brand Security Deposit. In the event that the Brand Security Deposit is insufficient, Party B agrees that Party A shall have the right to further deduct such amounts directly from the funds collected on its behalf.

### Article 15: Rights and Obligations of Party B

15.1 Party B shall have the right, in accordance with this Contract, to require Party A to pay to Party B the balance of funds collected on its behalf after deduction of service fees and any other amounts payable.

15.2 Party B shall be obligated to perform its obligations under this Contract and agrees to comply with and implement all systems, standards, rules, manuals, and other requirements relating to Party A's brand standardized operation and promotion to ensure that all business activities comply with national laws and regulations.

 **Molly Tea**| Molly Tea.

*Confidential & Privileged*

15.3 Party B agrees to purchase, upon Party A's request, production facilities, equipment, and key raw materials from Party A or Party A's designated suppliers, in order to ensure controllable food safety standards. Other auxiliary equipment and raw materials may be independently procured by Party B; however, Party B shall properly retain purchase contracts, invoices, proof of procurement, and other relevant documentation for the purpose of inspection by Party A and/or relevant administrative authorities such as market regulation and tax authorities from time to time.

15.4 Party B shall operate legally and strictly implement Party A's quality control policies and standards, and ensure that it does not use illegal additives, does not use expired raw materials, does not sell products that do not meet Party A's or national quality standards, does not infringe upon customer rights and interests, and does not engage in any illegal business activities.

15.5 Party B agrees that its business activities shall not exceed the scope of authorization granted by Party A. Under no circumstances shall Party B, in the name of Party A, engage in any borrowing, credit sales, financing, guarantees, or similar activities.

15.6 Party B shall properly use Party A's brand strictly within the scope of authorization and shall maintain and protect Party A's brand image. During Party B's operations, Party B shall use and display Party A's brand logos and brand identity in accordance with Party A's requirements. All employees of Party B shall wear uniforms in accordance with Party A's brand standards. Party B shall, in accordance with the service commitments of the authorized brand, fulfill obligations to customers, such as discounts, returns and exchanges, refunds, gifts, or compensation.

15.7 Where Party B conducts sales via Party A's proprietary platform, it shall be deemed that Party B agrees to and complies with the relevant rules published on Party A's proprietary platform, and Party A has the right to exercise relevant rights in accordance with such published rules.

15. 8 Party B shall not, outside Party A's designated platforms, sell any products of Party A's brand or any form of cards/coupons used for product redemption. Party B shall also not sell any non-authorized products on Party A's designated platforms.

15.9 Party B agrees to strictly comply with the provisions set forth in Articles 6 through 16 of this Contract. Party B further agrees that, in the event that Party B's operations are not in compliance with the requirements or Party B fails to fully perform its obligations under this Contract, Party A shall have the right to take measures against Party B, including but not limited to issuing a warning, imposing a penalty, suspending settlement, closing online sales channels, removing products from shelves, requiring corrective action within a specified period, ordering suspension of operations for rectification, or closing the Authorized Store, up to and including termination of the cooperation with Party B.

15.10 Party B shall not assign or transfer any part or all of its rights and obligations under this Contract to any third party without Party A's prior written consent. Party B shall not, during the term of this Contract or within three years after the termination of this Contract, directly or indirectly engage in any business that is identical, similar, or competitive with Party A's business, whether through sole proprietorship, joint operation with others, nominee shareholding, or any other form. Party B shall not provide any other products or services that are similar to Party A's brand, nor shall it join or establish any chain or franchise system that is identical or similar to Party A's brand or its store decoration and fittings. Party B shall not engage in any commercial activities that are consistent with or similar to the purpose of this Contract.

15.11 Party B shall not, without authorization, suspend order acceptance, suspend or close certain channels, suspend operations, or terminate business, and shall not engage in any conduct that infringes upon Party A's legitimate rights and interests or damages Party A's brand image, nor shall it engage in any conduct that is detrimental to customer interests or the customer experience.

15.12 Party B shall not, by any means, evade or attempt to evade payment of service fees to Party A, nor shall Party B, by any means, evade payment of any other amounts payable to Party A.

15.13 Party A shall have the right to formulate and update from time to time a *Dynamic Evaluation and Grading Management System* or other relevant systems, and agrees that Party A shall have the right to evaluate Party B based on multiple dimensions, including values, performance indicators, and operational metrics, and to determine Party B's grade based on the evaluation results.

15.14 If, prior to the signing of this Contract, Party B has invested in/opened or jointly operated/managed with others (including but not limited to self-operation, joint ventures with others, nominee shareholding, etc.) other tea beverage stores (i.e., tea beverage stores other than Party A's brand), Party B must truthfully disclose the relevant circumstances to Party A at the time of signing this Contract; if Party B fails to make a truthful disclosure, it shall constitute a fundamental breach of this Contract.

### Article 16: Liability for Breach of Contract

16.1 Any failure by either Party to perform, or to fully perform, its obligations under this Contract shall constitute a breach of contract. The breaching Party shall immediately take remedial measures and shall compensate the non-breaching Party for all losses incurred as a result thereof.

16.2 Where Party B fails to perform its obligations under this Contract or fails to implement Party A's brand standardized operation standards, Party A shall have the right, depending on the circumstances, to impose penalties on Party B, including but not limited to issuing a warning, imposing a fine, suspending settlement, closing online sales channels, removing products from shelves, requiring corrective action within a specified



**Molly Tea**| Molly Tea.

*Confidential & Privileged*

period, or ordering suspension of operations for rectification. Party A shall also have the right, depending on the circumstances, to suspend part or all of the services under this Contract, up to and including the termination of the cooperation with Party B.

16.3 In the event that Party B commits a fundamental breach or material breach under this Contract, Party A shall have the right to unilaterally take measures including suspending settlement, requiring Party B to suspend its operations for rectification, or terminating this Contract prior to its expiration date, and shall have the right to demand that Party B pay liquidated damages in an amount not less than RMB 300,000. In addition to material breaches stipulated in other provisions of this Contract, any of the following circumstances occurring with respect to Party B shall also be deemed a material breach by Party B:

16.3.1 Where Party B fails to perform its obligations under this Contract or fails to implement Party A's brand standardized operation standards, and fails to complete rectification, performance of obligations, elimination of adverse effects, or take effective remedial measures within ten days after receiving Party A's notice;

16.3.2 Where Party B, without Party A's prior written consent, establishes, modifies (including but not limited to changes to registered capital, registered address, business address, shareholders, legal representative, business scope, actual operator, etc.), or deregisters the legal entity of the Authorized Store; or where Party A is unable to contact Party B's actual operator or primary responsible person for 15 consecutive days; or where Party B suspends business operations without authorization for more than 3 days, or fails to commence or resume operations within the timeframe required by Party A;

16.3.3 Where Party B, without Party A's prior written consent, sells products outside the authorized product categories, or sells Party A's branded products through platforms or channels not designated by Party A; or where Party B, its actual operator, or their close relatives directly or indirectly engage in any business identical to, similar to, or competitive with the authorized brand through self-operation, joint operation with others, nominee shareholding, or other arrangements;

16.3.4 Where Party B evades or attempts to evade payment of service fees payable to Party A, including but not limited to: directing customers to place orders through non-designated platforms, failing to record orders or store revenue in Party A's controllable POS system, not using or avoiding Party A's designated POS systems and payment methods, falsifying transaction prices or recording lower prices in the POS system than actual selling prices, or any other act of concealing or underreporting revenue of the Authorized Store in order to avoid payment obligations to Party A.

16.3.5 Where Party B's failure to operate the Store in accordance with Party A's standards results in a major food safety incident, or where Party B engages in any other conduct that seriously damages Party A's interests or brand image;

16.3.6 Where Party B refuses, in any manner, to allow Party A's personnel to enter its production premises or refuses to accept Party A's audit and supervision, and fails to cooperate even after being notified by Party A; or where Party B produces non-Party A branded products within the business premises without Party A's prior written consent.

16.4 If any complaint, claim, infringement, or damage to the authorized brand image arises due to Party B, the products sold by Party B, or the services provided by Party B, all related costs and expenses shall be borne by Party B. In the event that Party A makes advance compensation or assumes liability on behalf of Party B, Party A shall have the right to deduct the corresponding amount directly from the funds collected on behalf of Party B or seek reimbursement from Party B by other means.

16.5 For any breach of contract or infringement by Party B, where the liability standard is not expressly specified in this Contract, Party B shall pay liquidated damages of not less than RMB 100,000 per occurrence. (Where the breach or infringement constitutes a fundamental breach or material breach expressly stipulated in this Contract, Party B shall pay liquidated damages of not less than RMB 300,000 per occurrence.) Repeated occurrences of the same act shall be calculated cumulatively.

16.6 From the date of rescission of this Contract or termination of the cooperation, with respect to any outstanding debts owed by Party B to Party A, where no repayment agreement has been reached between the Parties, or where such agreement has been reached but Party B fails to perform it as agreed, interest shall accrue on the total outstanding amount at a rate of 0.1% per day.

16.7 Any acts of Party B's employees, designated contacts, actual operator, or affiliated parties shall be deemed acts of Party B, and Party B shall bear the corresponding liability for breach of contract or infringement under this Contract. Party A's non-pursuit of Party B's liability for breach of contract or infringement shall not be deemed a waiver of Party B's liability, nor shall it be deemed that Party B's business operations are compliant or standardized; Party A reserves the right to pursue Party B's liability at any time.

16.8 Party B shall have the obligation to protect the intellectual property rights of Party A's products. Without Party A's prior written consent, Party B shall not produce or sell Party A's products under any other brand name. Party B shall also not continue to produce or sell Party A's products after termination of cooperation with Party A. Otherwise, Party B shall compensate Party A in an amount equal to 5 times the sales revenue of the infringing products; if 5 times the sales revenue of the products is less than RMB 500,000, Party B shall bear compensation liability in the amount of RMB 500,000. This clause shall remain in effect after the termination of this Contract.

16.9 If Party B intentionally or maliciously damages Party A's brand image or interests, or attempts to coerce Party A into obtaining any benefits by means of damaging Party A's brand image, Party B shall pay compensation to Party A in an amount not less than RMB 1,000,000.



**Molly Tea**| Molly Tea.

*Confidential & Privileged*

16.10 All costs incurred by Party A in asserting claims against Party B for breach of contract or infringement, or in recovering debts from Party B, shall be borne by Party B, including but not limited to direct losses, contracting fees, liquidated damages, compensation, litigation fees, attorneys' fees, notarization fees, and travel expenses.

16.11 Where Party B fails to cooperate with Party A in implementing Articles 17.4 and 17.5 of this Contract, Party B agrees that Party A shall have the right to suspend or terminate any support policies provided to Party B, and to require Party B to immediately repay any subsidies, incentives, or other support previously granted by Party A.

16.12 Without Party A's written consent, if Party B refuses to accept customer orders or refuses to accept customer orders assigned by Party A, Party B agrees to compensate Party A in an amount equal to 3 times the price of the customer order, and Party B agrees to continue to deliver products to the customer in accordance with the order.

16.13 Where, within 90 days after the signing of this Contract, the Authorized Store of Party B has not commenced operations; or where, within 10 days after establishment of the Authorized Store, Party B has failed to execute Appendix II *Store Accession Agreement* to this Contract with Party A; or where the actual operator of Party B (including investors, controllers, or beneficiaries of the Authorized Store of Party B) has failed to execute the Appendix *Confirmation Letter of Actual Operator* with Party A within 10 days after execution of this Contract, Party A shall have the right to terminate the authorization granted to Party B and terminate this Contract. Party B agrees to compensate Party A in an amount equal to twice all preliminary investments made by Party A.

16.14 If Party B, prior to full settlement of all amounts payable, transfers the store premises or disposes of the store's facilities and equipment without Party A's prior written consent, Party B agrees to pay liquidated damages to Party A in an amount not less than 2 times the total value of the store's assets.

### Article 17: Force Majeure

Force majeure refers to any objective circumstances that were unforeseeable at the time of signing of this Contract, and the occurrence and consequences of which are unavoidable and insurmountable. Except for any breach that occurred prior to the occurrence of a force majeure event, where a Party is unable to perform this Contract due to force majeure, such Party may be partially or wholly exempted from liability depending on the impact of the force majeure event. However, such Party shall promptly notify the other Party of the event by email, facsimile, or other means immediately after the occurrence of the event, and shall, within 10 days thereafter, provide the other Party with supporting evidence issued by the relevant government authority or other competent authority at the place where the event occurred to prove the existence of the force majeure event.

### Article 18: Governing Law and Dispute Resolution

This Contract shall be governed by the laws and regulations of the People's Republic of China (excluding the Hong Kong Special Administrative Region, the Macao Special Administrative Region, and the Taiwan region). Any dispute arising out of or in connection with this Contract, including any claim for breach of contract or tort, may be submitted by either Party to Shenzhen Court of International Arbitration for arbitration.

### Article 19: Notice and Service

19.1 Both parties shall send the written notices regarding the performance of this Contract and related matters to the address specified in this Contract. Where notice is sent by express courier or registered mail, it shall be deemed served on the 7th day after dispatch. Where notice is delivered in person, it shall be deemed served on the date of actual delivery. Where notice is sent by electronic means such as email or other data messages, it shall be deemed served on the date when such data message enters the recipient's system.

19.2 Any notice delivered by Party A to Party B via email, courier, public announcement on Party A's proprietary platforms (including but not limited to official website, App, mini-program, Super Shopping Guide), WeChat, SMS, telephone, facsimile, or other means shall have legal effect as written service.

19.3 Both parties unanimously agree to use the email address, contact person, and address registered by Party B on Party A's proprietary platform as the email address for service, contact person for service, and address for service. Meanwhile, both parties agree that the email address, contact person, and address specified in this Contract shall also serve as the email address for service, contact person for service, and phone number for service, specifically as follows:



**Molly Tea**| Molly Tea.

*Confidential & Privileged*

Party A Contact 1:                     '  Email:                          '  Phone:                          ;

Party A Contact 2:                     ,  Email:                          ,  Phone:

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　°

Party B Contact 1: [signature]    ,  Email:   [hw:] dy, liu@kgenesis.com    ,  Phone:[hw:] 13901202592  ;

Party B Contact 2                      ,  Email:                          ,  Phone:                          ;

19.4 During the term of this Contract, if any information of either party (such as address, email, account number, legal representative, designated contact person, etc.) changes, such party shall promptly notify the other party of such change. Otherwise, such party shall bear any and all adverse consequences arising therefrom.

**Article 20: Supplementary Provisions**
20.1 Any appendices to this Contract shall form an integral part hereof. Both Party A and Party B shall fully comply therewith, and any breach thereof shall result in liability for breach of contract.
20.2 This Contract is executed in three original copies, with Party A holding two and Party B holding one.
20.3 The right to interpret this Contract shall reside solely in Party A.
20.4 This Contract shall take effect on the day following the date of signing, and after Party B makes payment in accordance with the provisions of this Contract.
(No further text below)

 **Molly Tea**| Molly Tea.

*Confidential & Privileged*

There is no text below; this is the signature page of the *Molly Tea Brand Licensing and Technical Services Cooperation Contract*

**If Party B has thoroughly read and understood all terms and conditions of this Contract and its appendices, Party B or its authorized representative shall handwrite the following content in the blank box:**

**"Prior to signing this Contract, we have thoroughly read and understood all terms and conditions of this Contract and its appendices, and have comprehensively assessed our own financial capacity and risk tolerance. We expressly acknowledge that the project may involve commercial risks of profit or loss, and voluntarily assume the risks and responsibilities associated therewith. We fully understand and are clearly aware of the corresponding rights and obligations, and we are willing to perform our obligations under this Contract and assume the relevant legal responsibilities."**

**Party B undertakes:**

*[hw:] Prior to signing this Contract, we have thoroughly read and understood all terms and conditions of this Contract and its appendices, and have comprehensively assessed our own financial capacity and risk tolerance. We expressly acknowledge that the project may involve risks, and voluntarily assume the risks and responsibilities associated therewith. We fully understand and are clearly aware of the corresponding rights and obligations, and we are willing to perform our obligations under this Contract and assume the relevant legal responsibilities.*

Signing Declaration:

With respect to the signing of this Contract, Party A has fully performed its obligation of disclosure, and Party B acknowledges and understands all terms and conditions of this Contract. In particular, Party B has no objection to the assumption of liability for breach of contract and the collection of fees as set forth in this Contract.

From the date of signing of this Contract by Party B, this Contract shall be deemed effective with respect to Party B, and Party B shall not refuse to perform its obligations under this Contract for any reason whatsoever.

Signing of Contract:

| Party A: [seal:] Special Seal for Contract of Shenzhen Molly Tea Food and Beverage Management Co., Ltd. | Party B: [hw:] *MHL NY LLC* |
|---|---|
| Shenzhen Molly Tea Food and Beverage Management Co., Ltd. | |
| Representative: | Representative: [signature] |
| Phone: | Phone: [hw:] *13901202592* |
| Date: | Date: [hw:] December 20, *2023* |
| Address: | Address: [hw:] *37-11 C Prince St, Flushing, NY 11354* |

Place of Signing: Molly Tea Office, Bao'an District, Shenzhen



茉莉奶白 | Molly Tea.

*Confidential & Privileged*

# 茉莉奶白

# 品牌授权及技术服务合作合同

本合同之内容属于深圳市茉莉奶白餐饮管理有限公司所有之商业机密，本合同之著作权归深圳市茉莉奶白餐饮管理有限公司所有，任何合作方都需谨守"保密"原则，不得将合同复印、透漏给他人。

甲方：

乙方：MHL NY LLC

项目：

店名：

日期：



签约申明：

　　本合同由甲、乙双方自愿签订，甲方同意乙方在本合同指定位置经营茉莉奶白门店，乙方根据本合同的全部条款向甲方支付品牌使用费、品牌保证金、管理费、设计费等相关费用，并接受甲方公司管理体系的管理。

　　甲乙双方对本合同已尽相互说明之义务，对本合同所有条款均已充分了解和认知，对双方的权利和义务没有任何异议。特别对违约责任的承担，乙方亦有足够的预见。双方均认可，本合同是在双方平等协商、充分表达双方自由意志的情况下签订。

签约主体：

　　甲方：深圳市茉莉奶白餐饮管理有限公司

　　统一社会信用代码：91440300MA5G6K6D27

　　法定代表人：张彪

　　住所：

　　乙方：~~荆志华~~ MHL NY LLC

　　商事主体编码：

　　授权代表：刘清松

　　住所：131-01 40th Rd, 8J, Flushing, NY 11354



茉莉奶白 | Molly Tea.

**Confidential & Privileged**

鉴于：

1、甲方为一家依法设立并合法存续的有限公司，系"茉莉奶白"商标的权利人；

2、甲方以其商标权力、专有技术、管理体系等经营资源，经营"茉莉奶白"连锁茶饮业务，乙方经考察认同甲方的运营系统、经营资源、经验及能力，自愿有偿使用"茉莉奶白"品牌的经营资源，并在甲方经营体系下开设并运营"茉莉奶白"门店，接受其提供专业的技术指导及管理服务；

3、甲、乙双方根据《中华人民共和国民法典》《中华人民共和国公司法》和其他有关法律法规，根据平等互利的原则，经过友好协商，就甲方将甲方所有的"茉莉奶白"品牌的品牌授权及技术服务相关事宜签订本合同，以兹共同遵守。

第一条：定义

除非本合同条款特别指明，本合同的字词与表述含义如下：

"**本合同**"，是指本合同及本合同载明的附件，也包括甲方和乙方以后可能就合同内容达成的补充合同。

"**授权标识**"或《授权经营体系企业识别系统（CIS）"，是指与"茉莉奶白"授权经营体系相关的识别符号及其载体构成的统一体系，包括但不限于商标、授权证书、店铺招牌、包装材料及包装方式、器皿、餐盘及餐盘垫纸、设备、特有的外部与内部设计（装修、装饰、颜色配置、布局、家具等）、制服、广告及其他宣传品、文件、优惠券、名片、信笺等，上述各项可由甲方随时变更、改进和进一步的发展。

"**授权体系**"，是指统一的"茉莉奶白"授权经营体系，包括但不限于产品、商标、服务标志、店铺招牌、享有著作权的信息与资料、特有的外部与内部设计、装修、装饰、颜色配留和布局、制服、广告和促销、培训体系、营运体系、财会体系、信息网络系统、ERP 软件系统（包括 POS 系统、销售成本系统、传输系统）、专有技术系统、商品生产或进货渠道、配送等经营管理体系，上述各项可由甲方随时变更、改进和进一步的发展。

"**授权人（或甲方）**"，本合同的签署一方，即深圳市茉莉奶白餐饮管理有限公司，及/或甲方的关联方、甲方授权的代理人、工作人员等。甲方作为"茉莉奶白"连锁茶饮店的授权经营权人，除另有明确的约定内容之外，仍有权自行或委托甲方关联方或其指定第三方（"**甲方关联企业**"）履行甲方在本合同项下的其他权利，此等甲方关联方或其指定第三方行使合同项下的甲方权利，视为甲方的合同履行行为，乙方对此表示同意并接受。

"**被授权人（或乙方）**"，指本合同签署的另一方，及/或经甲方事先认可的乙方授权经营茶饮店、继承人、授权代理人、工作人员等。

"**商标**"，是指经中华人民共和国国家工商行政管理总局商标局核准注册的"茉莉奶白"商标（注册号：50234810，第 43 类）。本合同的签署并不代表乙方由此获得商标的使用许可。乙方与甲方应另行签订《商标使用许可合同》作为本合同的从合同。甲方目前正在乙方运营所在地申请办理相关商标及知识产权权益,乙方承诺不得抢注或使用其他任何方式致使甲方无法顺利注册相应的商标及知识产权权益。

"**商标许可**"，指甲方根据 《中华人民共和国商标法》及其他属地国关于商标的相关规定将具有专用权的商标许可乙方使用的行为。

"**普通使用许可**"，指商标注册人甲方在约定的期间、地域和以约定的方式，许可乙方使用其注册商标，并可自行使用该注册商标和许可其他被授权人使用的许可行为。

"**品牌使用费**"，指甲方将"茉莉奶白"授权于乙方，并许可乙方在授权营业地使用其商标标识及经营技术资产,由乙方一次性支付甲方一笔费用,作为取得该经营权许可及商标使用权、



茉莉奶白 | Molly Tea.

*Confidential & Privileged*

经营技术资产使用权的费用。品牌使用费缴纳后在任何情况下都不予退还。甲方辅导乙方之前期市场调查、商圈评估及开业指导等项工作所付出的费用不包含于品牌使用费中。

"**管理费**"，指乙方每月须按本合同规定支付给甲方作为持续使用经营权许可、使用甲方商标及经营技术资产、接受甲方及甲方关联企业协助指导的费用，称为管理费。

"**品牌保证金**"，指为确保被授权人履行本合同，授权人向被授权人收取的一定费用。合同到期后，如双方不再续约，被授权人无任何违反合同规定的事项或损毁授权人品牌声誉的事项发生，则品牌保证金退还被授权人。

"**营业地**"，是指由甲方依照合同条款校准的乙方开设门店的住所。该营业地包括在合同期限内根据甲方的核准变更后的乙方开设门店的住所，甲方对营业地的变更享有事先同意权。

"**门店**"，是指由乙方依照本合同约定的条款和条件在"茉莉奶白"授权经营体系下设立的全资或控股的法律实体，包括但不限于个体工商户、个人投资企业、合伙企业、有限公司或其他经济组织。

"**营业额**"，指门店实际入账的营业收入（以门店实际收银金额为准，且不扣除外卖等平台费用、税费成本等）。

"**商业秘密**"，指甲方提供给乙方的所有信息、文件、资料、物品、软件（包括软件系统所载之全部资料）及其他任何经营资源，包括但不限于广告行销计划、客户名录、操作流程、各类手册、表格、系统、各类合同及协议、专有技术等。

"**保密人**"，指按照本合同的约定负有保密义务的自然人、法人或其他经济组织，包括但不限于乙方、乙方的关联方、及前述机构的投资人、股东、合作方或合伙人、乙方的董事、监事、高级管理人员及员工，以及前述人员的配偶、直系亲属、三代以内的旁系亲属及近姻亲属。

"**电子硬件配置**"，是指授权经营门店电子设备，如后台电脑等。

"**到期日**"，是指本合同终止之日，包括按期终止和提前终止。

"**期限**"，是指合同起始日至到期日的时间段，期限可依照合同约定提前终止或续展。

"**CIS**"，是指 Corporate identity system 的缩写，意思是企业形象识别系统。

"**QSC**"，是指 Q、S、C+V，即品质（Quality）、服务（Service）、清洁（Clean）、价值（Value）的缩写。

"**元**"，指人民币元，本合同项下的品牌使用费及其他各项费用均以人民币作为计价和结算货币。

"**日**"，指日历日。

"**工作日**"，指除公休日、法定节假日以外的日历日。

"**书面形式**"，指信件、信函、邮件等可以有形表现所载内容的形式。

**第二条：经营权的授权**

2.1 甲方按照本合同的约定，在本合同的有效期限内授予乙方"茉莉奶白"经营权的许可。甲方授予乙方的经营资源包括：

（a）　注册商标：中国大陆注册商标为茉莉奶白（注册号：50234810，第 43 类）；

（b）　授权品牌"茉莉奶白"

（c）　授权标识及授权体系（包括但不限于 CIS、VI 系统）；

（d）　专有技术（包括但不限于配方、工艺流程、技术规范、管理和销售技巧）。

（e）　运营手册：《门店食品安全管理手册》、《产品标准手册》、《营运手册》、《Boss 手册》等。

2.2 甲方授权乙方经营权的许可性质为：单店授权。乙方有权按照本同的约定设立 "茉莉

茉莉奶白 | Molly Tea.

*Confidential & Privileged*

奶白"门店，且授权门店仅限 5 家，并在本合同第三条约定的营业地设立。

2.3 乙方获准行使的授权在营业地内有排他性，甲方不得在同一保护区域（定义见下文）内又授权其他第三方，但本合同另有约定的除外。

2.4 乙方成立的门店可使用"茉莉奶白"字样，但乙方及其门店及乙方投资设立的任何企业的工商登记的名称中均不得使用任何含有"茉莉奶白"或与其相似、相关的文字、图案，不得以此在全球范围内申请字号、商号或其他知识产权，亦不得直接或间接为其他品牌和方案模仿或盗用授权人的经营资源，或引导、传授、协助第三方模仿和使用授权人的经营资源。否则甲方有权解除本合同并要求乙方承担不低于人民币叁拾万元的违约金及对上述字号做变更或注销的处理。

2.5 乙方确认，本合同项下的授权经营业务的开展成功与否均取决于营业地的市场因素、乙方的经营能力以及对授权经营体系贯彻执行的方式方法等众多客观因素，因此乙方确认甲方及/或甲方关联企业并未对乙方的经营业绩和盈利情况做出过任何的承诺及担保责任，乙方不得以经营业绩未达到预计目标为由要求解除本合同、拒付管理费及本合同项下的其他费用、或请求损害赔偿。

2.6 甲方、甲方关联企业及前述主体之任何员工不对乙方及其门店做任何承诺，若有承诺，以经加盖甲方公章的书面方式确认为准，任何没有甲方公章的书面确认与口头承诺均不具有约束力。

2.7 甲方授权乙方依本合同的约定使用其商标、商号、服务标志及甲方所拥有的经营技术资产，如门店装饰风格、培训体系、营运体系、财务体系、信息网络系统、产品技术系统、广告宣传及促销、商品生产或进货渠道、配送等经营管理体系，成为甲方的一个被授权人，开设授权经营的门店。

同时，鉴于市场环境与商业机会急剧变化，餐饮品牌须不断更新和完善经营模式，乙方对此知晓并予以认同，为保证以上所列举的经营技术资产能更好的为乙方门店服务，加强乙方门店的经营能力，乙方同意每 3 年对门店的经营技术资产进行重装、升级，具体如门店装饰风格、培训体系、营运体系、财务体系、信息网络系统、产品技术系统、广告宣传及促销、商品生产或进货渠道、配送等经营管理体系。如乙方放弃对门店的经营技术资产进行升级的，视为放弃授权经营权。

2.8 商标许可使用

（a）甲方授权乙方使用茉莉奶白商标经营门店，许可方式为普通使用许可。

（b）乙方仅在合同有效的期限和指定的营业地内享有商标使用权，乙方在使用甲方商标时有义务维护商标的商誉及品牌形象，若乙方有损害行为，甲方有权解除本合同，取消其授权，扣除品牌保证金并保留追究乙方法律赔偿责任的权利。

（c）乙方及其门店、其关联方、及前述机构的投资人、股东、合作方或合伙人、乙方及其门店的董事、监事、高级管理人员及员工以及前述人员的配偶、直系亲属、三代以内的旁系亲属在申请商标注册或企业名称登记时，均不得使用甲方的企业名称、字号、商标及授权标识中的任何相同或类似的字样、图形及图文组合、否则甲方有权单方面解除本合同，并追究乙方之法律责任。

（d）乙方或其门店超出本合同有效期、许可使用的范围或在合同提前解除后仍使用甲方之相关商标、授权标识或授权体系的，视为侵权行为，甲方将依法追究相关法律责任。

**第三条：营业地**

3.1 门店选址布局由甲方根据城市网点统一规划和布局安排。乙方门店营业地详见附件一。特别注明：甲方无义务为乙方提供营业地，乙方须自行确定营业地并报甲方审核同意。因



茉莉奶白 | Molly Tea.

*Confidential & Privileged*

乙方未确定营业地导致门店无法开业的，乙方不得单方解除合同，不得要求甲方承担违约责任，不得要求甲方退还已支付的费用。

3.2 若本合同签订时，乙方门店的营业地尚未确定，则：

（a）乙方应于本合同签订之日起三个月内确定营业地（即找到营业地并得到甲方的书面许可，下同）；

（b）乙方未能在本合同签订之日起三个月确定营业地的，甲方有权单方面解除本合同。

3.3 若本合同签订时，乙方并未实际获得双方认可的营业地物业的所有权或本合同有效期内的使用权的，则：

（a）乙方应于营业地确定后的三个月内获得营业地物业的所有权或本合同有效期内的使用权：

（b）乙方未能在营业地确定后的三个月内取得营业地物业的所有权或本合同有效期内的所有权的，甲方有权单方面解除本合同。

3.4 在本合同有效期内，如乙方丧失营业地物业的所有权或使用权且在一个月内无法恢复，甲方有权解除本合同。

3.5 乙方未经甲方事先同意不得变更其门店的营业地，经甲方书面许可，乙方仅可在甲方指定的区域内变更授权门店的地址且新选定的门店地址需取得甲方事先书面同意。

3.6 甲方按照本条第 3.2 项、3.3 项的约定行使合同解除权的，乙方应当向甲方承担违约金人民币伍万元整。乙方若已经支付了品牌保证金的，则甲方在扣除上述违约金后无息退还剩余品牌保证金。

3.7 甲方按照本条第 3.4 项的约定行使合同解除权的，乙方应当向甲方承担的违约金数额的计算方式为：<u>乙方每月管理费乘以 12 个月</u>。为本条之目的，前述管理费以甲方行使合同解除权前 12 个月内向乙方收取的管理费的月平均额为准。

3.8 营业地变更

（a）乙方因门店所处地理环境变化或不可抗力原因需要变更门店营业地时，应向甲方提出书面申请。

（b）由于门店营业地的变更涉及"茉莉奶白"授权经营体系分布等因素，因此对于乙方变更营业地的书面申请，甲方享有完全的决定权。乙方只有在获得甲方书面确认的情况下才能变更营业地。

（c）乙方应承担由于营业地变更而发生的所有费用：营业地变更而发生的租赁，营业执照等证照的更换，以及需向甲方支付的变更营业地评估费用（人民币 1000 元/每次），均应由乙方负责并承担相关费用。

（d）门店因营业地变更而发生的设计费、装修费、设备拆卸、搬运及重新安装调试费由乙方承担。有关门店重新设计、 装修事宜参照甲方规定。

（e）本合同之甲乙双方应就新营业地另行书面确认并就迁址所需费用及其他相关事宜订立补充协议。

（f）乙方须于变更营业地的补充协议签订后三个月内自行取得该营业地物业之所有权或本合同有效期内的使用权并完成重新开业的手续，否则甲方有权单方面解除本合同并按照本合同第 3.7 条约定的计算方式追究乙方的违约金。

**第四条：商圈保护**

4.1 为了避免"茉莉奶白"授权经营体系内部的冲突和保障乙方的利益，以乙方门店为中心，<u>1.5 公里范围内为乙方的商圈保护区域（"**保护区域**"）</u>。甲方在该保护区域内不再授权第三方开设门店或以直营店方式开设茉莉奶白门店，但下述情况不在此限：



茉莉奶白 | Molly Tea.

*Confidential & Privileged*

（a）因商图保护区域内的人口数量增加、交通情况变化等原因，甲方认为有必要再增设茉莉奶白门店的；

（b）该门店位于商业繁华区和准繁华区内；

（c）甲方基于上述原因拟增设茉莉奶白门店的，应当书面通知乙方，乙方如有意向在该商图内开设第二家门店的，可以在接到甲方通知后的 7 日内予以书面申请。甲方有权根据乙方履约情况、运营情况自行决定是否同意乙方申请；

（d）因市场或商圈变化，甲方可重新评估并调整乙方的保护区域范围。

**第五条：合作费用、期限、支付方式**

**5.1 品牌使用费**

5.1.1 乙方应向甲方支付品牌使用费美金 <u>15000</u> 元，即对应人民币 <u>100,000</u> 元（大写：<u>**壹拾万元整**</u>），前述钱款为固定款项，不考虑汇率变化，仅以到账人民币或美元金额为准，详见附件一。乙方应于合同签订后 24 小时内将品牌使用费一次性支付至甲方指定账户。

5.1.2 品牌使用费是乙方为获得甲方授权其在营业地使用其授权经营资源而向甲方支付的一次性入门费用，体现乙方对甲方品牌前期投入的认可。乙方不得以任何理由，包括但不限于以提前解除本合同为由，要求甲方返还或部分返还品牌使用费。

**5.2 品牌保证金**

5.2.1 乙方应向甲方支付品牌保证金美金 <u>15000</u> 元，即人民币 <u>100,000</u> 元（大写：<u>**壹拾万元整**</u>），，前述钱款为固定款项，不考虑汇率变化，仅以到账人民币或美元金额为准，详见附件一，乙方应于合同签订后 24 小时内将品牌保证金一次性支付至甲方指定账户。

品牌保证金以确保本合同的完全正当履行，品牌保证金由甲方收取。如乙方有本合同约定的任何违约情形，甲方有权从品牌保证金中扣除相应欠款或违约损失。

5.2.2 在本合同有效期内，乙方应确保品牌保证金的数额持续保持本条约定之数额，若甲方依约扣除品牌保证金，则乙方应在收到甲方书面通知后的 7 日内补足。否则，甲方有权从乙方已缴纳的原物料等货款中抵扣品牌保证金的差额，并只按照抵扣后的剩余货款发货，或采取不予供货等制裁措施。

5.2.3 乙方不得以已支付品牌保证金为由作为对其不支付或延迟支付的行为的抗辩。

5.2.4 本合同终止或解除后，乙方应严格按照本合同的约定履行合同解除或终止后的相应义务，双方应清算债权债务。甲方应于乙方完成合同解除或者终止后的相应义务后的 30 日内，将品牌保证金在扣除了乙方各类欠款及赔款后无息退还给乙方。

5.2.5 品牌保证金不足以支付欠款或赔偿的，甲方有权要求乙方继续偿付。

**5.3 管理费**

5.3.1 在本合同有效期内，甲方将持续为乙方提供技术支持和经营指导，其中包括但不限于新品研发更新、线下经营指导、线上外卖统一运营管理、线上流量、市场营销等。为此，乙方应每月向甲方支付管理费，收取标准为门店实收营业额的 **2%/月**。双方确认，因税费、汇率或手续费产生的费用均由乙方承担，乙方应确保甲方收取的管理费为营业额净值。

5.3.2 如因市场行情等因素导致双方经营效益不佳，甲方可给予乙方管理费的减免或优惠。如甲方减免或优惠管理费的，须乙方提出书面申请，按单月减免或优惠。某月或某阶段的减免或优惠，并不影响甲方下月或下阶段按本协议约定的标准收取管理费。

**5.4 线上平台开店费用**



茉莉奶白 | Molly Tea.

*Confidential & Privileged*

5.4.1 甲方不收取该项费用亦不提供相应服务内容，后续经甲方许可，乙方若开设线上门店，相关费用由乙方自行承担。

### 5.5 员工培训费

5.5.1 本合同签订后，甲方将给予乙方开业前的协助、人员招募的协助及教育训练、其他开业培训。在甲方集团总部培训的，乙方应向甲方支付员工培训费。乙方门店开业前，均需对员工进行培训，开店员工培训最低要求 5 人/店，费用详见附件一。

### 5.6 软件费、IT 设备费

5.6.1 甲方不收取该项费用亦不提供相应服务内容，后续若产生相应开支，相关费用由乙方自行承担。

### 5.7 新店选址、设计及工程监理费用

5.7.1 乙方应向甲方支付新店选址评估费用详见附件一。

5.7.2 乙方门店之测绘&设计服务（堪铺，平面方案，施工图，效果图，图纸交底）由甲方统一提供，乙方应向甲方支付服务费详见附件一。

5.7.3 乙方应向甲方支付工程监理费详见附件一。

### 5.8 期限

5.8.1 本合同有效期为___3___年，自__2023__年_12_月_20_日起_2026_年_12_月_20_日止。

5.8.2 本合同到期乙方无任何违约情形且有意继续经营门店的，应在本合同期限届满前至少_90_日向甲方提交书面申请，甲方同意续约且乙方门店在营业地的剩余租赁期限或所有权期限超过_2_年的，甲方将与乙方签订期限为_3_年的续约合同，乙方门店在营业地的剩余租赁期限或所有权期限不足_2_年的，甲方将与乙方签订期限为租赁合同或所有权剩余期限的续约合同，甲方给予乙方免收续约合同品牌使用费的优惠，但乙方应按续约合同足额缴纳其余费用，甲方有权调整续约条件。

### 5.9 支付方式

5.9.1 甲方指定账户

账户名称：深圳市茉莉奶白餐饮管理有限公司_____

开户银行：招商银行股份有限公司深圳创业支行_____

账　　号：755958886610802_____

5.9.2 乙方指定账户

账户名称：_____

开户银行：_____

账　　号：_____

### 5.10 其他费用

在门店开设及运营中，无论最终单店是否开设成功，如乙方采购了附件一项下的项目，乙方需按照附件一所示的金额向甲方支付相关费用。



茉莉奶白 | Molly Tea.

*Confidential & Privileged*

第六条：门店设立与开业

6.1 乙方应在本合同签订后负责自行办理开业具备的相关手续及证照、招募人员等事项为开业做准备。乙方须在本合同签订之日起六个月内完成门店的设立和开业，否则甲方有权随时解除本合同，并有权要求乙方承担人民币伍万元整的违约金；且乙方已经支付的品牌使用费不退还；若已经支付了品牌保证金的，则甲方在扣除上述违约金或其他欠款后退还品牌保证金。

6.2 乙方用工：乙方门店员工由乙方自行招募，劳动关系与乙方建立，双方应当签订劳动合同。乙方应当依法用工，承担用工责任，**必须**为受雇员工缴纳运营地法律法规所要求的社会保险、医疗保险或类似法定事项，及时发放工资。如果产生劳动纠纷与甲方无关，如果因此给甲方造成经济损失和商誉损失的，乙方应当承担赔偿责任，还应当承担包括但不限于诉讼费或仲裁费、律师费、调查费、鉴定费、评估费、执行费等诉讼或仲裁成本。

6.3 设立门店的形式

6.3.1 乙方设立门店的几种情况：

（a）乙方本身是个体工商户、合伙企业或有限公司等经济组织的，可自行或通过设立分支机构运营门店。

（b）乙方是自然人的情况下，可通过另行专门设立个体工商户、合伙企业或有限公司等经济组织的方式设立并运营门店。

（c）乙方本身已经是一个经济组织，但出于商业或法律方面的考量，其仍然可以通过另行专门设立其他经济组织的方式设立并运营门店。

（d）乙方本身已经是一个经济组织，但出于商业或法律方面的考量，其可以通过主要股东设立个体工商户的形式设立门店。

6.3.2 在乙方通过另行专门设立经济组织的方式设立并运营门店的情况下，门店视为乙方本身，享有本合同约定的权利，承担本合同约定的义务，并与乙方承担连带责任。

6.3.3 乙方设立门店采取另行专门设立有限公司的方式的，应承担以下义务：

（a）乙方应将拟定中的股东的情况书面通知甲方，经甲方书面认可后，乙方才能与拟定中的股东签订合资合同，且在本合同有效期内应保证：

i. 乙方的持股比例不得低于 51%：

ii. 未经甲方书面许可，门店的股东不得发生变化。

（b）在合资合同及乙方公司章程中应载明专为开设门店而设立，乙方公司及其股东的行为完全受本合同约束，秉承善意履行本合同：

（c）合资合同及乙方公司章程应各交一份给甲方备案。如门店乙方公司的内部组织机构、合同、章程等有任何变动，乙方应在拟变动前将变更情况报告甲方。

6.3.4 乙方（作为自然人）设立门店采取合伙企业形式的，应承担以下义务：

（a）乙方应将拟定中的合伙人的情况书面通知甲方，经甲方书面确认后，乙方才能与拟定中的合伙人签订合伙协议，且在本合同有效期内应保证未经甲方书面许可，门店的合伙人不得变更。

（b）合伙协议中应载明合伙企业专为开设门店而设立，合伙企业及其合伙人完全受本合同约束的约定，并秉承善意履行本合同。

（c）合伙协议应提交一份给甲方备案。如门店或合伙企业的内部组织、合伙协议等有任何变动，乙方应在拟变动前将交更情况报告甲方。

6.3.5 除以乙方名义通过个体工商户、个人独资企业或乙方分支机构的形式经营门店之外，乙方以任何经济组织形式设立门店的（或乙方让其主要股东通过设立个体工商户的形式设立门店的），必须在门店取得营业执照之日起 10 日内，由该经济组织向甲方出具经盖章并由股东或投

茉莉奶白 | Molly Tea.
*Confidential & Privileged*

资人共同签字的加入协议（如本合同附件三所示），承诺该经济组织及其股东或投资人的行为完全受本合同约束，并愿意连带承担本合同项下乙方的所有义务并享有相应的权利。如未能在上述期限内出具加入协议的，甲方有权追究乙方每日人民币贰佰元的迟延履行违约金，并有权随时解除本合同。甲方依此解除本合同的，有权要求乙方承担人民币伍万元整的违约金，乙方已经支付了品牌保证金的，则甲方在扣除上述违约金后无息退还该费用。

6.3.6 除以乙方名义通过个体工商户、个人独资企业或乙方分支机构的形式经营授权门店之外，乙方以任何经济组织形式设立授权门店的，如因该经济组织破产清算、被吊销营业执照、注销等原因终止营业或其他原因导致无法继续经营的，甲方仍有权要求乙方对其欠付甲方的本合同项下的各类款项继续承担责任。

6.3.7 乙方须保证授权门店符合法律、法规关于经营资格的强制性或禁止性要求，取得消防、环境保护、卫生许可、税务及门店经营所需要的一切证照等相关许可证照，并应在本合同签订后的六个月内取得《营业执照》、《企业法人营业执照》或符合当地法规的经营执照。且在门店开业后，乙方应就门店运营自行与相关政府机构处理相关事务并且自行承担所有责任。

6.3.8 乙方或授权门店的登记事项发生任何变动，包括但不限于变更法定代表人、增减注册资本、变更企业性质、股权变动，必须事先书面通知甲方。

6.4 开业时间与条件

6.4.1 乙方应在本合同签订后的六个月内，保证门店按照本合同约定的条件开业，超过上述期限未符合开业条件或未开业的，甲方有权追究乙方迟延履约责任或提前解除本合同，但经甲方书面同意延期的除外。

6.4.2 开业及营运支持

（a）开业前，甲方安排 1-2 名工作人员（具体人数由甲方视乙方的筹建进展情况而定）提供为期 7 天（开业前2天，开业后5天）的开业支持，支持乙方门店的开业筹建、管理培训和开业活动，并再次对门店的装修进行现场验收。

（b）开业支持人员的差旅费、食宿费由乙方承担。乙方申请延长开业支持的，需承担延长期间开业支持人员的工资、差旅、食宿等费用，具体费用标 准以甲方届时向乙方提供的明细为准。

（c）如乙方营运过程中需要甲方安排驻店人员支持，需事先向甲方发起书面申请，甲方同意后安排驻店人员予以支持，支持的最长时间为 30 天，同时乙方需承担驻店人员的全额工资、绩效奖金、差旅、食宿等费用，具体费用标准以甲方届时向乙方提供的明细为准。

6.4.3 门店开业须符合以下条件：

（a）门店已取得《营业执照》、《企业法人营业执照》或符合当地法规的经营执照、食品经营许可证等相应资质，且该执照中的营业范围应包括"餐饮"项目；

（b）营业地的装修、设备安装调试经甲方验收合格；为规范甲方品牌的统一形象及服务要求，乙方同意将门店装修工程承包给甲方指定的专业装修公司与设计公司，乙方自行承担门店装修费用与设计费用；乙方须向甲方或甲方指定的第三方采购授权门店所需的经营设施、设备。开业后乙方仍需按甲方要求添置必需的经营设施、设备，购置费用由乙方承担；

（c）门店的所有财产已投保财产险；）（d）已按照本合同约定接受甲方的培训并通过考核的人数达到本合同约定标准，所有工作人员均取得从业人员健康证等证件；

（e）乙方已全部履行本合同约定的开业前所有义务，并经甲方核准开业；

（f）乙方满足以上开店条件后，应将以上相关证件、租赁合同等复印件交付甲方，并以邮件等书面形式向甲方提交开店申请，经甲方校准后开业。未征得甲方同意，乙方擅自开业的，构成根本违约；

（g）乙方应当在本合同签订之日起 6 个月内保证按照上述条件开业，经甲方书面同意延期



茉莉奶白 | Molly Tea.

*Confidential & Privileged*

的除外。除甲方书面同意延期外，乙方超过上达期限未设立门店、门店未开业或不符合开业条件的，构成根本违约；

（h）门店主体成立之后，乙方应敦促门店主体对本合同加盖公章或出具合同权利义务确认书；尽管有前述约定，门店主体是否盖公章以及是否确认本合同权利义务，不影响门店主体对本合同享有合同权利和承担合同义务。

**第七条：门店运营**

7.1 乙方承诺，在经营过程中严格遵守、执行甲方制定的服务标准、操作流程、销售流程、作业标准等统一规范，这些规范可能约定在本合同中，也可能规定于由乙方确认的甲方制定的各类文件、手册中，或体现为甲方在提供培训和指导过程中告知的各类规范、要求等。

7.2 甲方为门店的营运及"茉莉奶白"经营体系发展需要，可不断就相关服务标准、操作流程、销售流程、作业标准等规范进行修改完善并提供给乙方。乙方承诺严格执行更新后的规范。

7.3 乙方承诺保管甲方提供的各类文件、手册、管理规定（无论新版旧版）。

7.4 乙方应当按照甲方的指示和规定，在门店内悬挂、张贴统一的广告、招牌、看板等授权标识。

7.5 乙方违反本条项下任何义务，且在收到甲方的相关改进通知后 10 日之内仍不改善的，甲方有权随时解除本合同，扣除全部品牌保证金并要求乙方支付违约金人民币叁拾万元。

7.6 如乙方需要甲方委派管理人员辅导门店的业务，则应提交书面申请。

7.7 门店营业时间

（a）乙方应当严格按照甲方指定的营业日和营业时间从事经营。授权门店的营业日为每周 7 日，无休息日。门店的营业时间为每天至少 12 小时，营业时间逢节假日可延长。如乙方有任何特殊情况需调整营业时间，可与甲方协商并需得到甲方的事先书面许可。

（b）除非因乙方以外的原因造成的停电、停水、意外事件等不可抗力情形，乙方门店不得无故停业。乙方须于上述不可抗力情形发生后及时报告甲方，并尽力采取补救措施。乙方非因上述不可抗力情形需要暂停营业的，应事先向甲方提出书面申请并得到甲方的书面许可，但甲方因发现乙方严重违约而要求乙方停业整顿的不在本项所限。

（c）乙方违反有关门店营业时间约定的，甲方有权要求乙方承担每次人民币伍仟元的违约金，甲方可先从乙方品牌保证金中扣除上述违约金。

7.8 生产销售商品及销售方法

（a）乙方必须根据甲方统一的门店营业方式进行经营，生产销售甲方指定贩卖的产品，不得生产销售甲方指定贩售以外的任何产品。

（b）产品之售价，须参照甲方门店之售价及结合当地市场状况等由甲方确定，乙方不得任意调整价格。

（c）乙方必须完全按照甲方指定的样式及价格，对门店内贩售的所有商品进行明码标价。

7.9 乙方承诺，在门店营业时间内，员工应统一穿着制服，并严格按照甲方制定之服务标准、操作流程、销售流程、作业标准等统一规范为顾客提供服务和处理与顾客的关系。

7.10 乙方雇佣人员限制

（a）乙方承诺，无论是门店还是进行其他经营，未经甲方书面同意，均不得雇佣或采用包括但不限于劳务、服务、顾问、咨询等形式任用甲方或甲方关联企业之员工（包括在职员工、离职未满一年的离职人员，以及负有竞业限制义务的离职人员）。

（b）乙方承诺，无论是经营授权门店还是进行其他经营，未经甲方书面同意，均不得雇佣（或采用包括但不限于劳务、服务、顾问、咨询等形式任用）"茉莉奶白"授权经营体系内其他门店之员工（包括在职员工、离职未满一年的离职人员，以及负有竞业限制义务的离职人员）。



茉莉奶白 | MOLLY Tea.

*Confidential & Privileged*

7.11 财务会计(a)乙方承诺按甲方规定的方式计算每日的营业额并如实记录于甲方规定的系统、报表及账册上。

(b)乙方承诺，每日营业结束后将 《营业额日报》及经营数据通过甲方指定的 ERP 上传或者邮件方式给甲方， 如乙方门店迟延履行本项义务，则应承担的迟延履行违约金壹佰元/日。该项违约金累计计算，与当月管理费等一并支付结算。(c)乙方承诺，营运门店不违反国家有关会计、财税方面的法律、法规或其他规范性法律文件。如乙方违背上述承诺致使甲方及"茉莉奶白"授权经营体系遭受任何物质或商誉损失，乙方应当赔偿。

(d)乙方承诺于每月 5 日之前结清上月账务，并按甲方规定的方法及报表格式向甲方出具财务报告。

(e)乙方承诺保留每月财务报告，并随时接受甲方的相关检查或甲方指定的第三方会计师事务所的审计，乙方承诺不以任何理由阻碍或拒绝甲方的上述检查。

(f)乙方承诺，随时根据甲方的要求及时提交各种报表和财务信息。以便甲方在切实了解授权门店经营状况的基础上为乙方提供有关经营管理方面（如营业额的提升、费用的管控、利润的最大化等）的分析、诊断和指导服务，及时协助乙方完善经营。

(g)如果发现乙方有"飞白单" 等漏报漏录或少报少录营业额的，乙方应向甲方支付单次 5000-10000 元的违约金（具体金额以甲方结合具体情况单方决定的金额为准）。发现三次以上的，甲方有权解除本合同，并扣除全部品牌保证金，而乙方除应支付违约金外，还应承担聘请第三方审计和稽核的费用。

### 第八条：供应链管理

8.1 开业前采购

乙方应当于门店开业前 60 日按照甲方或甲方指定供应商提供的开业采购清单的要求完成门店开业前基础物料和设备的采购。

乙方应承担海关进出口事宜手续，并支付跨国物流公司涉及到的仓储费、运费、报关费等所有相关联的物流费用及税费。货物从甲方或甲方指定供应商仓库发出后，甲方不再承担货物损毁、灭失、运输或保存不当导致的任何责任，责任全部转移到乙方。

8.2 日常采购

(a)甲方指定的物料（详见甲方另行提供并不时更新的物料清单）， 乙方应向甲方指定供应商采购，乙方应与甲方指定供应商签订《供应链合同》，并按《供应链合同》执行。同时，乙方须向甲方或甲方指定供应商购买指定的"茉莉奶白"周边零售产品(详见见甲方另行提供并不时更新的周边零售产)清单）。

(b)鉴于本合同与《供应链合同》的同步履行是保证茉莉奶白品牌经营体系完整性的必要前提，因此，乙方同意并认可《供应链合同》与本合同将同时生效、同时履行并同时终止。二者中任一合同的解除或终止都将导致另一合同的解除或终止。

(c)甲方指定物料及设备外的其他物料及设备由乙方按照运营手册自行采购，乙方自行采购不符合甲方规定的，甲方将向乙方发出整改通知书，乙方应按甲方要求整改，乙方自购物品引发食品安全责任事故或侵权事件的，由乙方自行承担责任。

(d)乙方向甲方指定供应商及甲方采购的物料及设备只能用于本合同项下门店内向顾客提供服务，除非事先经甲方书面同意，乙方不得向第三方出售或在其他地点或为供其他品牌产品使用，亦不得生产或使用替代品代替、或者向第三方采购必须从甲方指定供应商及甲方处采购的物料和设备，否则构成根本违约。

(e)甲方将根据市场环境不断改变或更新物料和设备，并将及时以邮等书面形式通知乙方最新采购要求，乙方应根据甲方的最新通知进行采购和更新。甲方更换供应商的，乙方应配合完



茉莉奶白 | Molly Tea.

*Confidential & Privileged*

成更换。

（f）乙方应承担海关进出口事宜手续，并支付跨国物流公司涉及到的仓储费、运费、报关费等所有相关联的物流费用及税费。货物从甲方或甲方指定供应商仓库发出后，甲方不再承担货物损毁、灭失、运输或保存不当导致的任何责任，责任全部转移到乙方。

8.3 乙方之所有有关营业用的属于 "茉莉奶白授权识别系统" 的一切物品均由甲方负责统一制作，乙方必须向甲方订购，乙方不得私自制作或向其他任何第三方订购；如遇特殊情况，乙方须向甲方提出书面申请，经甲方书面同意后，乙方方可自行制作或向其他第三方订购。

### 第九条： 食品安全标准化管理及消费者权益保护

9.1 甲方向乙方输出与食品安全标准化管理相关的全套系统标准、制度，乙方同意严格执行遵守。乙方同意甲方有权随时监督检查乙方食品安全标准化执行情况，并视情况要求乙方整顿、整改，并有权对乙方做出各种处罚，直至停业整顿、终止合作等。甲方有权委托第三方稽查乙方，并要求乙方承担相关稽查督导费用。

9.2 乙方须按照甲方食品安全标准化管理要求及时报废过期物料、产品，不得使用过期物料、不得销售过期产品。甲方有权要求乙方销毁过期物料、产品，并有权视情况给予乙方不同处罚措施，情况严重的可暂停结算、要求乙方停业整顿等，直至终止与乙方的合作。

9.3 若发生食品安全事件，乙方须及时处理并第一时间反馈甲方知悉。甲方基于顾客利益、社会大众利益以及社会影响等，有权要求乙方停业整顿，直至终止与乙方的合作。

9.4 为加强食品安全标准化管理，乙方同意按照甲方要求在授权门店安装监控系统，接受甲方适时监督。未经甲方书面同意乙方不得关停监控系统、不得调整监控角度、不得破坏监控系统，否则视为重大违约。

9.5 为保证产品品质，乙方同意按照甲方要求适时送检产品，并承担送检成本与费用。

9.6 乙方门店对消费者的投诉、意见、建议应当正确、真诚和勤勉地对待。对消费者权益造成损害的，应向消费者赔礼道歉并及时采取补救措施，并不得有异议。

9.7 乙方门店向消费者提供服务时，应提供真实信息，不得作引人误解的虚假宣传。

9.8 乙方应做好门店的环境卫生和食品的安全卫生工作，严格执行食品安全法的有关规定，如果消费者因接受乙方门店提供的产品和/或服务受到人身、财产损害的，乙方应及时进行赔付。

### 第十条：结算规则及会员系统、卡券发行

10.1 具体结算规则详见甲方适时制定并更新的《门店结算规则》及相关结算通告文件。

10.2 收银系统

（a）收银系统硬件设备由乙方自行采购并负责安装，乙方向甲方提交采购清单。

（b）收银系统软件由乙方自行负责采购、安装、运营维护等，如部分使用甲方指定的点单系统（包括但不限于哗啦啦国际版/海外点单系统等），则乙方还应严格遵照甲方指定的点单系统的相关使用、管理要求等进行使用。

（c）乙方门店应按照甲方的要求规范使用收银系统，不得破坏收银系统，不得更改收银数据，否则构成根本违约。甲方将通过督导巡店对乙方使用的收银系统进行检查。甲方要求升级更换门店收银系统的，乙方应当自担费用配合甲方进行升级更换。甲方有权随时要求查阅乙方的账簿、文档、销售小票等。甲方有权要求乙方提供会计师事务所出具的年度审计报告。

（d）乙方门店不得在同一门店使用两套收银系统，否则构成根本违约。

10.3 乙方同意门店收入部分由甲方代为收取，并同意甲方直接在代收款项中扣除乙方应付给甲方或第三方的相关款项后再将余额支付给乙方。乙方同意甲方有权从代收款项中扣除乙方应



茉莉奶白 | Molly Tea.

*Confidential & Privileged*

付的款项，包括但不限于服务费用、承包费、物料款、设备款、违约金、罚款、甲方代乙方向第三方垫付或缴纳的费用、应由乙方承担的摊销费用、以及应由乙方承担的其他费用。

10.4 甲方按照结算周期与乙方对账，并以邮件或本合同约定的其他方式告知乙方，乙方应在甲方要求的时间内确认，未回复或逾期回复的，均视为无异议。若乙方对账单有异议，双方共同确认，待双方确认无异议后再结算款项。

10.5 对账单是甲乙双方结算的依据，其他单据或凭证与对账单不一致，以对账单为准。甲方定期或不定期与乙方确认对账单以及其他文件,乙方须配合甲方确认对账单以及需要乙方确认的其他文件（包括合同、函件、通知、询证函等），否则甲方有权单方暂停或终止结算。

10.6 乙方同意甲方有权根据实际情况适时制定、调整、更新结算规则，双方同意按照届时有效的结算规则进行结算。

10.7 **会员系统、卡券发行**

10.7.1 甲方统一发行并管理"茉莉奶白"品牌电子会员卡，可在所有甲方直营门店、本协议项下门店、及甲方授权经营的其他门店内使用。该会员卡所含的所有会员权益，包括消费积分兑换相应礼品或礼券，可在所有甲方直营门店、本协议项下门店、及甲方授权经营的其他门店内使用（部分活动指定门店详见运营手册）。乙方门店不得自行发行任何类型的会员卡、储值卡或优惠券，严禁擅自发放或发售联名储值卡（充值卡）。

10.7.2 消费者持会员卡至门店店使用的，乙方不得以任何理由拒给。

10.7.3 门店须统一使用总部会员系统和甲方品牌微信公众号及小程序。

10.7.4 门店严禁以任何形式独立设置门店微信公众号、微博公众号、小红书公众号、大众点评账号等其他平台的官方自媒体账号。甲方组建门店粉丝群交付乙方进行日常沟通管理与推广，乙方需严格按照甲方要求进行微信群运营且不得实施有损于甲方品牌声誉的行为。乙方日常微信运营使用甲方企业微信进行（包括但不仅限于粉丝群）运营。

10.7.5 甲方将根据品牌发展和规划调整会员卡制度并及时通知乙方，乙方门店必须接受并遵照执行。

10.7.6 甲方将不定期发起门店的具体储值活动，乙方应按照甲方的通知进行配合，储值金额统一进入甲方账户，甲方将于每月2日对上月乙方储值消费进行核销结算，结算比例以具体活动的实际折扣比例为准。

10.7.7 未经甲方书面同意，乙方不得擅自发行各种形式的卡券（包括电子卡券等），包括但不限于储值卡券、兑换卡券、充值卡券、会员卡券、优惠卡券等。乙方仅可销售甲方授权发行的卡券,或向甲方申请制作特定需求的卡券,乙方卡券销售及申请应符合甲方制定的规则及标准。

10.7.8 若乙方未经甲方书面同意擅自发行卡券的、或者乙方违反甲方卡券发行或使用制度且在甲方告知后5日内日未有效整改的，视为乙方重大违约。乙方同意按照已发行卡券总金额的5倍向甲方支付违约金；已发行卡券金额难以确定的，乙方先向甲方支付不低于人民币10万元的违约金，甲方保留继续追究乙方承担5倍违约金的权利。

10.7.9 双方合作终止之前3个月内，乙方同意及时向甲方申报卡券发行及使用情况。乙方同意在终止合作之前，向顾客退还未消费卡券对应金额，或者将顾客未消费卡券对应金额支付给甲方或甲方指定的第三方并由甲方或甲方指定的第三方继续向顾客提供服务。若甲方先行代乙方向顾客退还未消费卡券对应金额/卡券余额的或向顾客提供服务或以其他任何形式代乙方先行处理的，无论双方是否已终止合作，甲方均有权要求乙方按照卡券面值的5倍赔偿，同时该赔偿不减轻或免除乙方依据本合同所应承担的违约责任。

10.7.10 甲方发布的卡券管理规则及标准属于本合同重要组成部分，甲方有权适时调整卡券规则及标准，乙方同意遵守上述规则及标准。

10.7.11 如境外（中国大陆以外地区）门店暂未开设或提供会员卡（预付卡）等相关服务，



茉莉奶白 | Molly Tea.

*Confidential & Privileged*

则届时以甲方在境外实际开通会员卡相关服务时发布的管理规则为准。

**第十一条：经营权接管、回购和转让**

11.1 门店因明显的困难而有可能发生营业中断时，或收到甲方发出的《违约通知函》后未在限期内改善的，甲方认为有必要的，可以接管门店。乙方及其门店应无条件配合甲方的接管行动，并接受甲方在接管期间发出的指令。甲方确认门店可以重新经营或双方约定的接管期限届满后，应当将门店营业权归还乙方。有关接管的具体事宜由乙方及甲方签署相关补充协议。

11.2 回购

11.2.1 本合同解除或终止后，甲方或甲方关联企业有权参照门店的净资产值和市场价协商回购乙方授权门店。

11.2.2 乙方有意转让门店的，甲方或甲方关联企业有优先回购乙方授权门店的权利。

11.2.3 违约回购

乙方因出现本协议项下约定的根本违约行为、或以下重大违约行为，或严重损害甲方的商誉的，甲方有权回购乙方门店，回购价格以甲方指定的第三方审计及评估机构对所回购门店所评估的净资产值为准；（a）未按本合同约定支付相关费用，经甲方书面催告后 10 日内仍未予支付；（b）连续 2 个月未及时准确完整地递交本合同约定的报告及资料；

（c）违反本合同项下的任何约定，在接到甲方书面更正通知后 10 日内仍未予以更正；

（d）其他甲方认为可回购的情形。

11.3 转让限制

11.3.1 除非经甲方事先书面同意，乙方不得以转让、承包、租赁或其他任何方式转让 （或变相转让）全部或部分本合同项下的经营权。

11.3.2 乙方通过另行专门设立经济组织设立并经营门店的，不得以任何方式转让（或变相转让）该经济组织所有权、股权、经营权，除非经甲方事先书面同意。

11.3.3 未经甲方事先同意，乙方（作为企业）不得与其他第三方合并、变更股东、 或对资产进行重组。

11.3.4 除非事前得到甲方书面同意，乙方及授权门店不得以经营权及门店所有权设定担保。

11.4 转让时乙方义务

11.4.1 乙方向甲方书面申请转让门店时，应附相关资料，以证明受让人具备运营 "茉莉奶白" 授权经营体系的资格。

11.4.2 如甲方书面同意乙方将门店转让给上述受让人，则乙方有义务和受让人共同签署相关承诺书如附件《实际经营者确认书》及《门店加入协议》，承诺：

（a）受让人同意接受甲方培训，并需在甲方培训取得合格证书后正式接受乙方转让。

（b）对各类费用的结清，货款及其他债务的结清，以及品牌保证金的补足等事宜负有连带责任。

（c）如乙方同受让人之间的转让协议被认定为无效或被解除的，不影响上述终止协议和合同的效力，受让人也不得据此要求解除同甲方之间的合同。

（d）本合同项下的品牌保证金转为甲方同受让人之间的授权经营合同项下的品牌保证金，甲方不向乙方退还品牌保证金。

（f）同意甲方同受让人之间的合同所约定的授权经营期限为本合同授权期限的剩余期限。

（g）受让人必须遵守届时的 《营运手册》的所有条款，并在门店经营上完全符合届时的《营运手册》的所有要求。这些要求包括但不限于可能的建筑改装、设备更新，标志、产品或服务的改变、操作方法和时间的变化或电脑结算与报告的改革更新，所有这些费用均由乙方负责承担。

11.4.3 乙方应切实履行上述承诺，并有义务敦促受让人履行上述承诺。在甲方与受让人签



茉莉奶白 | Molly Tea.

*Confidential & Privileged*

订合同之前，不与乙方签订终止协议，乙方仍受本合同约束。

11.4.4 乙方必须向甲方支付人民币 1000 元作为转让服务费。

11.4.5 甲方与受让人重新签订合同或补充协议前，无论原乙方经营状况如何，乙方仍应履行本合同约定的一切义务。

**第十二条：合同解除或终止**

12.1 经甲乙双方共同同意，可提前解除本合同。

12.2 以下情况下，甲方有权选择提前单方解除本合同：

12.2.1 乙方根本违约、重大违约、严重损害甲方品牌形象或者严重损害甲方利益的；

12.2.2 乙方在甲方定期/不定期食品安全稽查中得分低于 60 分的；

12.2.3 乙方授权门店收入下降，且低于前一年度/前一个经营周期（考核经营周期不低于 6 个月，具体周期期限以甲方届时通知为准）80%的；

12.2.4 乙方经营不规范或者未履行本合同项下义务，经甲方书面告知后十日内仍未能按照甲方要求及时履行或者有效整改的。

12.3 乙方同意本合同解除或终止，甲方有权按照每个门店人民币 5000-20000 元（具体以甲方实际扣款为准）的标准，从乙方代收款项中扣留乙方人民币 5000-20000 元（具体以甲方实际扣款金额为准）作为担保金。若乙方在本合同解除或终止后 30 日内完成拆除或销毁带有甲方品牌形象标志的装修、招牌、物料等，且此期间乙方无其他侵犯甲方权益之情形，甲方须在本合同解除或终止 30 日届满后 10 日内将该担保金退还乙方，否则该担保金不予退还。

**第十三条： 合同终止清算**

13.1 无论任何情形导致本合同终止，不免除双方之间债务的偿还义务，双方之间的债务无论是否附条件或者附期限，均视为已到期或者已符合偿还条件，须在本合同终止时一并偿清或达成分期偿还协议。

13.2 双方终止合作清算时，若乙方尚存在未清偿债务，乙方同意甲方有权处置乙方授权门店所有经营设施设备以及库存物料等并优先受偿。乙方同意向甲方/甲方指定供应商统一采购的尚能正常运行的设备以 5 年为折旧摊销期，以摊销折旧后余额转让给甲方或直接抵扣未清偿甲方债务；乙方同意将授权甲方将门店内非向甲方/甲方指定供应商采购的设备、超过 5 年折旧期的设备以及不能正常运行的设备进行变卖，变卖金额优先用于清偿甲方债务。

13.3 在乙方已经清偿甲方债务或者双方就清偿债务签署协议的前提下，自本合同终止之日起 30 天为清货期，清货期内乙方有权继续销售甲方授权产品，清货期内本合同项下权利义务仍然适用于甲乙双方。

13.4 清货期届满后，乙方应立即停止以任何方式使用含有甲方授权品牌的包装、广告宣传物料等，不得继续使用本合同授权商标、商号、专利、商业秘密等，不得再生产销售甲方授权产品，停止以任何方式继续使用基于本合同而开通的相关系统、软件、平台等账号与密码。

13.5 本合同终止后，不影响任何一方根据本合同之约定追究另一方之违约或侵权责任。

**第十四条：甲方权利和义务**

14.1 甲方向乙方提供本合同项下所有服务，有权按照本合同约定向乙方收取服务费用，并从代收款项中直接扣除服务费用以及乙方应付的其他款项。

14.2 甲方有权制定、修改以及适时更新授权品牌规范运营相关的标准、规则、手册、指引、政策或制度，并通过电子邮箱、快递、甲方自有平台（官网、App、小程序、超级导购等）公示、微信、短信、电话、传真等方式告知乙方，乙方同意遵守执行。



茉莉奶白 | Molly Tea.
*Confidential & Privileged*

14.3 甲方有权随时进入乙方经营场所，监督与检查乙方生产、品控、仓管、物控、运营、卫生等方面的标准执行情况。对于不符合甲方要求标准的，甲方有权视情况选择给予乙方警告、罚款、暂停结算、关闭线上销售渠道、产品下架、限期整改、停业整顿、关闭授权门店等处罚，直至终止合作。

14.4 甲方有权针对乙方违反法律法规，或违反本合同、或未规范执行甲方品牌经营相关制度或标准，或违反甲方平台公示规则，或存在其他损害授权品牌形象或顾客合法权益的行为，采取包括但不限于警告、罚款、暂停结算、关闭线上销售渠道、产品下架、限期整改、停业整顿、关闭授权门店等措施，直至终止与乙方的合作。

14.5 甲方有权根据市场实际情况，适时制定、修改或更新推广、营销政策，或开展专项优惠或促销活动，并要求乙方参与。同时，甲方有权制定、修改或更新产品售价政策，未经甲方书面同意乙方不得擅自变更产品价格。

14.6 对于顾客已下单并完成支付但乙方未确认接受顾客要约的订单，甲方有权代收、留存上述订单款项，并根据顾客诉求处置上述款项；对于客户订单，未经甲方书面同意乙方不得拒接客户订单、不得拒接甲方分派的客户订单。

14.7 甲方有权要求乙方履行本合同项下义务，有权要求乙方执行甲方品牌运营规范以及标准，并有权要求乙方限期整改。

14.8 本合同未约定但乙方经营行为不符合法律法规或未达到国家或行业标准的，乙方同意甲方有权利要求乙方遵守法律法规或执行国家或行业标准。

14.9 甲方有权制定并适时更新《动态评估分级管理制度》或相关制度，有权从价值观、业绩指标、经营指标等多个维度考核乙方，并根据考核结果确定乙方级别。

14.10 甲方有权直接从代收款与品牌保证金中扣除乙方应付的罚款以及其他费用；若品牌保证金不足时，乙方同意甲方有权从代收款中直接扣除。

**第十五条：　乙方权利和义务**

15.1 乙方有权根据本合同约定，要求甲方将扣除服务费用或其他费用后的代收款项余额支付给乙方。

15.2 乙方有义务履行本合同项下义务，同意执行甲方品牌规范运营与推广相关的所有制度、标准、规则、手册等，以保证所有经营活动符合国家法律规定。

15.3 乙方同意根据甲方要求向甲方或甲方指定供应商购买生产所需设施设备以及主要原材料，以确保食品安全可控。其他辅助设备、原材料等可由乙方采购，但乙方须保存购销合同、发票凭证、进货证明等，以备甲方、工商与税务部门等适时核查。

15.4 乙方须合法经营严格执行甲方品控制度与标准，保证不使用非法添加剂，不使用过期原材料，不销售不符合甲方或国家质量标准的产品，不损害顾客权益，不从事任何非法经营活动。

15.5 乙方同意其经营活动不超出甲方授权范围，任何情况下不以甲方名义从事借贷、赊销、融资、担保等活动。

15.6 乙方须在甲方授权范围内合理使用甲方品牌，维护甲方品牌形象。乙方运营过程中，必须使用、展示甲方的品牌标志或品牌形象，乙方工作人员须按照甲方品牌规范统一着装。乙方须按照授权品牌对顾客的服务承诺，向顾客履行减免、退换、退款、赠送或赔付等服务承诺。

15.7 乙方通过甲方自有平台进行销售，视为乙方同意并遵守甲方自有平台公示的相关规则，甲方有权根据已公示的规则行使相关权利。

15.8 乙方不得在甲方指定平台之外售卖甲方品牌产品或用于兑换产品的各种形式的卡券，或在甲方指定平台售卖非甲方授权产品。

15.9 乙方同意严格遵守本合同第六条至第十六条之约定，并同意在乙方运营不规范或未完全履行本合同项下义务的前提下，甲方有权给予乙方警告、处罚、暂停结算、关闭线上销售渠道、



产品下架、限期整改、停业整顿、关闭授权门店等措施，直至终止与乙方的合作。

15.10 乙方不得擅自将本合同项下的部分或全部权利义务转让给任何第三方，不得在授权经营期间以及本合同终止后三年内以自营、与他人合营、代持股等方式直接或间接从事与甲方存在相同、相似或竞争关系的业务，不会另行提供其他与甲方品牌相似产品/服务，不会加入或自行成立与甲方品牌或装饰装潢等相同或相类似的连锁/加盟机构，不会从事与本合同目标一致或类似的任何商业活动。

15.11 乙方不得擅自暂停接单、暂停关闭部分渠道、暂停经营或终止营业，不得从事任何侵害甲方合法权益以及损害甲方品牌形象的行为、以及不得从事任何有损顾客利益或顾客消费体验的行为。

15.12 乙方不以任何方式逃避或试图逃避向甲方支付服务费用，以及不得以任何方式逃避应付甲方的其他任何款项。

15.13 乙方同意遵守甲方制定并适时更新的《动态评估分级管理制度》或相关制度，同意甲方有权从价值观、业绩指标、经营指标等多个维度考核乙方，并同意甲方根据考核结果确定的乙方级别。

15.14 乙方如在本合同签署之前已投资/开办或与他人共同经营/管理（包括但不限于自营、与他人合营、代持股等方式）其他茶饮门店（即除甲方品牌以外的茶饮门店），乙方必须在签订本合同时向甲方如实说明有关情况；如未能如实披露，则构成根本违约。

**第十六条： 违约责任**

16.1 任何一方不履行或不完全履行本合同项下义务即视为违约，违约方应立即采取补救措施，并赔偿守约方因此遭受的损失。

16.2 乙方未履行本合同项下义务或者未执行甲方品牌规范运营之标准，甲方有权视情节给予乙方警告、罚款、暂停结算、关闭线上销售渠道、产品下架、限期整改、停业整顿等处罚措施，并有权视情况部分或全部暂停提供本合同项下服务，直至终止与乙方的合作。

16.3 乙方发生本合同项下根本违约、重大违约行为时，甲方有权单方面采取暂停结算、要求乙方停业整顿、提前终止本合同等措施，并要求乙方承担不低于叁拾万元的违约金。除本合同其他条款约定的重大违约外，乙方存在下列情况之一的亦视为乙方重大违约：

16.3.1 乙方未履行本合同项下义务或者未执行甲方品牌规范运营之标准，且经甲方告知后十日内仍未能按照甲方要求如期整改、履行义务、消除不利影响或者采取有效补救措施的；

16.3.2 乙方未经甲方书面同意擅自设立、变更（包括但不限于变更注册资本、注册地址、经营地址、股东、法定代表人、经营范围、实际经营者等）、注销授权门店法人主体的，或者甲方连续15日无法联系上乙方实际经营者以及主要负责人的，或者乙方擅自停业超过3日，或未在甲方要求的期限内营业的；

16.3.3 未经甲方书面许可，销售非甲方授权品类的产品，或通过非甲方指定平台（或渠道）销售甲方品牌产品的；或者乙方、乙方实际经营者及其近亲属以自营、与他人合营、代持股等方式直接或间接经营与授权品牌有相同、相似或竞争关系的业务的；

16.3.4 乙方以任何方式逃避或试图逃避向甲方支付服务费用的情形，包括但不限于引导顾客通过非甲方指定平台下单、不将订单或授权门店收入录入甲方可监控的收银系统、不使用或逃避使用甲方指定的收银系统与支付方式、虚构交易价格或录入收银系统的交易价格低于实际销售价格、以及任何其他逃避向甲方支付服务费用或其他任何隐瞒或瞒报授权门店收入的情形；

16.3.5 乙方未按照甲方标准经营门店导致重大食品安全事故的，或乙方有其他严重损害甲方利益或品牌形象的行为。

16.3.6 乙方以各种方式拒绝甲方人员进入乙方生产场所、拒绝接受甲方稽核督导，且经告



茉莉奶白 | Molly Tea.

*Confidential & Privileged*

知后仍然不配合的；乙方未经甲方书面同意在经营场所内生产非甲方品牌产品的。

16.4 若由于乙方、乙方销售产品、乙方提供服务等方面的原因，导致投诉、索赔、侵权或损害授权品牌形象，相关费用由乙方承担，甲方代乙方先行赔付或承担的，甲方有权从代收款项中直接扣除或以其他方式向乙方追偿。

16.5 对于乙方违约或侵权行为，若本合同没有明确违约或侵权责任承担标准的，乙方每次违约或侵权行为按照不低于 10 万元的标准（本合同明确属于根本违约、重大违约的情形，按照不低于 30 万元的标准）向甲方承担赔偿责任，同一行为发生多次的累计计算。

16.6 自本合同解除或合作终止之日起，对于乙方未清偿甲方之债务，在双方达成偿还协议之前或达成协议后未如期履行的，每天按照未清偿总额的千分之一计算利息。

16.7 乙方雇员、乙方对接联系人、乙方实际经营者、乙方关联方的行为视同乙方行为，乙方须承担本合同项下对应违约或侵权责任。甲方不追究乙方违约或侵权责任，不视为豁免乙方责任，也不视为乙方经营合规或规范，甲方保留继续追究乙方责任的权利。

16.8 乙方有义务保护甲方的产品知识产权，乙方不得未经甲方书面许可，以其他品牌名义生产、销售甲方的产品；乙方不得在与甲方终止合作后继续生产或销售甲方的产品。否则乙方应按照侵权产品销售额 5 倍赔偿，若产品销售额的 5 倍不足五十万元时，应按五十万元承担赔偿责任。本合同终止后本条款继续有效。

16.9 若乙方存在故意或恶意损害甲方品牌形象或利益的行为，或者存在以损害甲方品牌形象的手段要挟甲方牟取任何利益的行为，须向甲方承担不低于人民币 100 万元的赔偿金。

16.10 甲方因向乙方主张违约或侵权责任，或者向乙方追索债务而产生的所有费用均由乙方承担，包括但不限于直接损失、承包费、违约金、赔偿金、诉讼费、律师费、公证费、差旅费等。

16.11 若乙方不配合甲方执行本合同第 17.4 与 17.5 条款，乙方同意甲方有权暂停或终止给予乙方的各项扶持政策，并有权要求乙方立即偿还已获得的甲方的各种补贴、扶持等。

16.12 未经甲方书面同意，若乙方拒接客户订单、或者拒接甲方分派的客户订单，乙方同意按照客户订单价格的 3 倍向甲方赔偿，且乙方同意继续按照订单向客户交付产品。

16.13 本合同签署后 90 日内乙方授权门店未开业的、或者乙方授权门店设立后 10 日内未与甲方签署本合同附件二《门店加入协议》的、或者乙方的实际经营者（乙方门店之投资人、控制人、受益人）在本合同签署后 10 日内未与甲方签署本合同附件《实际经营者确认书》的，甲方有权终止对乙方的授权以及终止本合同，且乙方同意双倍赔偿甲方前期所有投入。

16.14 若乙方在未付清全部费用之前，未经甲方书面同意擅自转让门店经营场所、擅自处置门店设施设备，则乙方同意须按照不低于门店资产总额的 2 倍向甲方支付违约金。

## 第十七条： 不可抗力

不可抗力是指本合同签订时，双方所不能预见、并且它的发生及后果是不能克服和不能避免的客观情况。除不可抗力发生前已经违约外，一方因不可抗力不能履行合同时，根据不可抗力的影响，可以部分或全部免除责任，但该方应于事件发生后，立即以电子邮件或传真等方式通知另一方，并在事件发生后 10 天内向对方提供事件发生地相关政府部门等出具的证明，以证实不可抗力的存在。

## 第十八条： 法律适用及争议解决

本合同适用中华人民共和国（不含香港、澳门、台湾）的法律、法规等的规定。基于本合同约定而产生的违约或侵权之诉，任何一方均有权向深圳国际仲裁院（即华南国际经济贸易仲裁委员会）仲裁解决。



茉莉奶白 | Molly Tea.

*Confidential & Privileged*

第十九条：　通知与送达

19.1 关于本合同履行及相关事宜的书面通知，双方均应当按照本合同载明的地址寄送。如果以特快专递或者挂号信形式寄送的，自发出之日起第 7 日视为送达之日；如果当面送达，实际交付之日视为送达之日；如通过电子邮件等数据电文方式送达，自该数据电文进入对方系统之日为送达之日。

19.2 甲方通过邮箱、快递、甲方自有平台（官网、App、小程序、超级导购等）公示、微信、短信、电话、传真、邮件等方式送到乙方具有书面送达之法律效力。

19.3 双方一致同意以乙方在甲方自有平台备案的邮箱、联系人、地址，作为送达邮箱、送达联系人、送达地址。同时，双方同意本合同确定的邮箱、联系人、地址也作为送达邮箱、送达联系人、送达联系电话，具体为：

甲方联系人 1：　　　　　　，邮箱：　　　　　　，电话：　　　　　　；
甲方联系人 2：　　　　　　，邮箱：　　　　　　，电话：　　　　　　。

乙方联系人 1：刘凌钊，邮箱：dj.liu@kgenesis.com，电话：13901202592 ；
乙方联系人 2　　　　　，邮箱：　　　　　　，电话：　　　　　　；

19.4 在协议有效期内，任何一方的相关信息（如地址、邮箱、帐号、法定代表人、指定联系人等）发生变更的，应当及时通知对方，否则，应自行承担因此产生的不利后果。

第二十条：　附则

20.1 本合同如有附件，是本合同的不可分割组成部分，甲、乙双方必须全面遵守，如有违反，应承担违约责任。

20.2 本合同一式 叁 份，甲方 贰 份、乙方 壹 份。

20.3 本合同的解释权归甲方所有。

20.4 本合同自签订之日后次日，且乙方按本合同约定付款后生效。

（以下无正文）



茉莉奶白 | Molly Tea.

**Confidential & Privileged**

以下无正文，为《茉莉奶白品牌授权及技术服务合同》签署页

如乙方已详尽阅读并理解本合同及其附件所有条款，请乙方或乙方授权代表在空白方格处抄写如下内容：

"在签署本合同前，我方已详尽阅读并理解本合同及其附件所有条款，并对自身经济能力及风险承受能力进行了综合评估；我方明确知悉项目可能存在盈亏商业风险并自愿承担盈亏风险与责任。我方充分了解并清楚知晓相应的权利义务，我方愿意履行本合同约定义务并承担法律责任。"

乙方承诺：

*在签署本合同前，我方已详尽阅读并理解本合同及其附件所有条款，并对自身经济能力及风险承受能力进进行了综合评估；我方明确知悉、项目可能存在的风险并自愿承担风险与责任。我方充分了解并清楚告晓相应的权利义务，我方愿意履行本合同约定义务并承担法律责任。*

签订声明：

关于本合同的签订，甲方已详尽告知义务，乙方知晓并理解本合同的全部条款及内容。特别是对违约责任的承担及本合同关于费用的收取，乙方均无异议。

自乙方签订本合同之日起，即视为本合同对其发生效力，乙方不得以任何理由拒绝执行本合同项下的义务。

合同签订：



| 甲　方： | 乙　方：MHL NY LLC |
| --- | --- |
| 深圳市茉莉奶白餐饮管理有限公司 | |
| 代表人： | 代表人：刘清乾 |
| 电　话： | 电　话：139 0120 2592 |
| 日　期： | 日　期：12.20.2023 |
| 地　址： | 地　址：37-11 C, prince st, Flushing NY 11354 |

签订地点：深圳市宝安区茉莉奶白办公室

茉莉奶白品牌授权及技术服务合作合同