# Exhibit 9

**The LIC Food Court LLC**          Operator

and

**Genesis Brand Management LLC (d/b/a Molly Tea "茉莉奶白")**  Vendor

CONCESSION AGREEMENT

**Concession Area:**

A portion of the Food Hall
Located on the ground floor of the
Building located at
28-07 Jackson Avenue
Long Island City, New York

**Dated:** January 13, 2026

## TABLE OF CONTENTS

ARTICLE 1  BASIC CONCESSION AGREEMENT PROVISIONS ................................. 1

ARTICLE 2  CONCESSION AREA; TERM; RENT ......................................... 3

ARTICLE 3  USE AND OCCUPANCY................................................. 8

ARTICLE 4  CONDITION OF THE CONCESSION AREA ............................ 13

ARTICLE 5  ALTERATIONS ..................................................... 14

ARTICLE 6  FLOOR LOAD...................................................... 16

ARTICLE 7  REPAIRS......................................................... 16

ARTICLE 8  INTENTIONALLY OMITTED........................................... 17

ARTICLE 9  REQUIREMENTS OF LAW............................................. 17

ARTICLE 10  QUIET ENJOYMENT................................................ 18

ARTICLE 11  SUBORDINATION.................................................. 18

ARTICLE 12  BUILDING SERVICES ............................................. 20

ARTICLE 13  INSURANCE, PROPERTY LOSS OR DAMAGE:
            REIMBURSEMENT.................................................. 21

ARTICLE 14  DAMAGE OR DESTRUCTION - FIRE OR OTHER CASUALTY ........... 23

ARTICLE 15  EMINENT DOMAIN ................................................ 25

ARTICLE 16  ASSIGNMENT AND SUBCONCESSION................................... 26

ARTICLE 17  ELECTRICITY ................................................... 27

ARTICLE 18  ACCESS TO CONCESSION AREA...................................... 28

ARTICLE 19  DEFAULT ....................................................... 29

i

ARTICLE 20  REMEDIES AND DAMAGES ............................................................. 31

ARTICLE 21  OPERATOR'S RIGHT TO CURE: REIMBURSEMENT ......................... 33

ARTICLE 22  NO REPRESENTATIONS BY OPERATOR; OPERATOR'S
            APPROVAL ....................................................................................... 33

ARTICLE 23  END OF TERM ....................................................................................... 34

ARTICLE 24  NO SURRENDER: NO WAIVER............................................................. 35

ARTICLE 25  WAIVER OF TRIAL BY JURY ............................................................... 36

ARTICLE 26  ADJACENT EXCAVATION: SHORING.................................................. 36

ARTICLE 27  NOTICES................................................................................................ 36

ARTICLE 28  OPERATING MANUAL........................................................................... 37

ARTICLE 29 OPERATOR'S AGENT............................................................................ 37

ARTICLE 30  INDEMNITY ........................................................................................... 38

ARTICLE 31  MISCELLANEOUS................................................................................. 39

ARTICLE 32  SECURITY DEPOSIT............................................................................ 42

ARTICLE 33  GUARANTY............................................................................................ 42

ARTICLE 34  OPERATOR TERMINATION RIGHT...................................................... 42

ARTICLE 35 RENEWAL OPTION................................................................................ 43

EXHIBITS:

| | | |
|---|---|---|
| A-1 | - | FLOOR PLAN OF GROUND FLOOR VENDOR STALL CONCESSION AREA |
| A-2 | - | FLOOR PLAN OF STORAGE AREA |
| A-3 | - | FLOOR PLAN OF FOOD HALL |
| B | - | OPERATING MANUAL (IF ATTACHED) |
| C | - | OPERATOR'S WORK EQUIPMENT PACKAGE |
| D | - | COMMENCEMENT DATE CONFIRMATION |
| E | - | GUARANTY |
| F | - | SAMPLE MENU |
| G | - | DEFINITIONS |
| H | - | JACX FOOD HALL SUPPLIER INSURANCE AND INDEMNIFICATION AGREEMENT |

## CONCESSION AGREEMENT

**THIS CONCESSION AGREEMENT** (this "Concession Agreement" or "Agreement") is made as of the 13rd day of January, 2026 (the "Effective Date") between **The LIC Food Court LLC**,a New York State limited liability company having an office at 1500 Broadway, Ste 3305, New York, New York 10036 ("Operator"), and Genesis Brand Management LLC, a New York State Limited Liability Company having an office at 36-16 Main Street #605, Flushing, NY 11354 ("Vendor").

WHEREAS, Operator has entered into a lease or concession agreement with Tishman Speyer, as owner of the Building (the "Master Agreement"), pursuant to which Operator is permitted to operate the Food Hall within the Building.

Operator and Vendor hereby covenant and agree as follows:

### ARTICLE 1

### BASIC CONCESSION AGREEMENT PROVISIONS

All capitalized terms used in the text of this Concession Agreement without definition are defined in this Article 1 or in Exhibit G.

| | |
|---|---|
| **CONCESSION AREA** | A portion of The JACX Food Hall, substantially as shown on Exhibit A-1, and designated as Vendor 1 Stall. |
| **STORAGE AREA** | A portion of the cellar level storage area, substantially as shown on Exhibit A-2, and designated as Storage Area C. |
| **FOOD HALL** | A portion of the ground floor of the Building, substantially as shown on Exhibit A-3. |
| **BUILDING** | The building, fixtures, equipment and other improvements and appurtenances now located or hereafter erected, located or placed upon the land in Long Island City known as 28-07 Jackson Avenue, Long Island City, New York. |
| **COMMENCEMENT DATE** | The date that Operator delivers possession of the Concession Area to Vendor in the condition required hereunder. The Operator shall deliver the possession to the Vendor no later than May 31, 2026. On or about the Commencement Date, the parties shall execute the Commencement Date Confirmation Agreement annexed hereto as Exhibit D, acknowledging that the Commencement Date has occurred. |
| **RENT COMMENCEMENT DATE** | Base Rent will commence at a date which is the earlier of (a) the date Tenant opens for business in the Premises to the general public or (b) Three (3) months following the Lease Commencement Date.. |

1

| EXPIRATION DATE | The date which is the last day of the calendar month in which occurs the tenth anniversary of the Rent Commencement Date. |
|---|---|
| **TERM** | The period commencing on the Commencement Date and ending on the Expiration Date. |
| **PERMITTED USES** | Operation of a first-class, high-quality food stall, in keeping with high quality food halls and Vendor's other locations in New York City, for the sale only of the beverage items described on the sample menu attached hereto as Exhibit F, serving bubble tea and for no other purpose. Without limitation, in no event may the Concession Area be used for a Prohibited Use or any of the uses identified in Exhibit G attached hereto. Vendor's business must at all times comport with a best in class food stall establishment in a food hall and shall not detract from the character or appearance of the Building or Food Hall. Vendor shall use and operate the Concession Area in accordance with the draft Operating Manual attached as Exhibit B, or otherwise made available to Vendor, which may be supplemented or amended by Vendor from time to time as provided in Article 28 (as so supplemented or amended, the "Operating Manual"). Without in any way modifying any other provisions of this Agreement, the sample menu attached as Exhibit F reflects the type, assortment, price point and quality of food beverages anticipated to be offered at the Concession Area.<br><br>Notwithstanding anything to the contrary contained in this Agreement, the Storage Area may only be used for storage of inventory and other items used in connection with Vendor's Permitted Uses at the Concession Area. |
| **VENDOR'S TRADE NAME** | Molly Tea "茉莉奶白" |
| **CONCESSION YEAR** | "Concession Year 1" shall mean the 12 month period commencing on the Rent Commencement Date and ending on the day immediately preceding the first anniversary of the Rent Commencement Date. "Concession Year 2" shall mean the next succeeding 12 month period.  Any "Concession Year" thereafter shall mean the next succeeding 12 month period. |

| FIXED RENT | *Period* | *Per Annum* | *Per Month* |
|---|---|---|---|
| | Concession Year 1 | $194,400.00 | $16,200.00 |

2

|  | Concession Year 2 | $202,176.00 | $16,848.00 |
|---|---|---|---|
|  | Concession Year 3 | $210,263.04 | $17,521.92 |
|  | Concession Year 4 | $218,673.60 | $18,222.80 |
|  | Concession Year 5 | $227,420.52 | $18,951,71 |
| **PERCENTAGE** | 10%. | | |
| **BASE GROSS SALES** | $162,000.00 per Year. | | |
| **ADDITIONAL RENT** | All sums other than Fixed Rent payable by Vendor to Vendor under this Agreement, including Percentage Rent, payments on account of services, late charges, overtime or excess service charges, and interest and other costs related to Vendor's failure to perform any of its obligations under this Agreement. | | |
| **RENT** | Fixed Rent and Additional Rent, collectively. | | |
| **Intentionally Omitted** | | | |
| **SECURITY DEPOSIT** | Six (6) months' base rent with One (1) month returned after Vendor completes build out and obtains all permit sign offs and another One (1) month returned after 12-months of on-time lease payments. | | |
| **GUARANTOR** | Xiaozhe Liu, Meihui Lin, Ben Xu and MOLLY TEA NYC INC | | |

## ARTICLE 2

## CONCESSION AREA; TERM; RENT

Section 2.1 **Demise of Concession Area.** Upon the Effective Date, the terms and provisions hereof shall be fully binding on Operator and Vendor prior to the occurrence of the Commencement Date. Subject to the terms of this Agreement Operator demises the Concession Area to Vendor, and Vendor accepts the demise of the Concession Area from Operator, for the Term, excepting and reserving to Operator the exterior walls of the Concession Area and further reserving to Operator the right to place above the dropped ceiling and below the floor in the Concession Area (in such reasonable manner so as to minimize interference with Vendor's use of the Concession Area) utility lines, pipes and the like, to serve premises other than the Concession Area, and to replace and maintain and repair such utility lines, pipes and the like in, over and upon the Concession Area as may have been or may be installed by Operator in the Building.

Section 2.2 **Outdoor Area.** Operator hereby grants Vendor the exclusive right to use that certain outdoor area currently used by the existing vendor (the "Outdoor Area"), subject to the terms and conditions of this Agreement and all applicable laws, rules and regulations. The Outdoor Area is not included in the demised premises. Vendor's use of the Outdoor Area shall be solely for purposes incidental to Vendor's operation of the Concession Area and shall at all times be subject to Operator's reasonable rules and regulations applicable thereto.

Section 2.3 **Payment of Rent.**

(a) Vendor shall pay to Operator, without notice or demand, and without any set-off, counterclaim, abatement or deduction whatsoever, except as may be expressly set forth in this Agreement, in lawful money of the United States by wire transfer of funds to Operator's account, or by check drawn upon a bank reasonably approved by Operator, to such place as Operator shall from time to time designate in writing: (i) Fixed Rent in equal monthly installments, in advance, on the first day of each calendar month during the Term, commencing on the Rent Commencement Date, and (ii) Additional Rent, including Percentage Rent, utility charges and operating charges at the times and in the manner set forth in this Agreement.

(b)     Vendor shall pay to Operator, as advanced Fixed Rent, a payment of $ 16,200.00 simultaneously with delivery of Vendor's executed counterpart of this Agreement to Operator, said payment to be applied to the first Fixed Rent payment(s) following the Rent Commencement Date. In addition, simultaneously with delivery of Vendor's executed counterpart of this Agreement to Operator, Vendor shall provide Operator with a completed IRS Form W-9, Request for Taxpayer Number and Certification (a "Form W-9").

Section 2.4 **Utilities and Operating Charges.**

(a)     **Utility Charge.** Vendor shall pay to Operator, without notice or demand and without any set-off, counterclaim, abatement or deduction whatsoever, as Additional Rent, Vendor's proportionate share of the monthly utility costs incurred by Operator for utilities serving the Concession Area, which may include, without limitation, electricity, water, gas, HVAC, condensate water (and related BTU charges) (the "Utility Charge"). The Utility Charge shall be calculated by allocating such utility costs among the food hall vendors then operating within the Building on an equal, per-vendor basis, as reasonably determined by Operator from time to time.The Utility Charge shall be payable monthly in advance, together with Fixed Rent, on the first day of each calendar month during the Term, commencing on the Rent Commencement Date, or at such other times as Operator may reasonably designate in writing.

(b)     **Operating Charge.** Vendor shall pay to Operator, without notice or demand and without any set-off, counterclaim, abatement or deduction whatsoever, as Additional Rent , which may include, without limitation, costs associated with common area cleaning, security services, waste and recycling services, and other similar operational services provided by or on behalf of Operator for the benefit of the Food Hall generally (the "Operating Charge"). Operating Charge shall initially be in the amount of One Thousand Eight Hundred Dollars ($1,800.00) per month, and Operator reserves the right to increase the Operating Charge from time to time, provided that Operator shall afford Vendor the right of reasonable prior notice. The Operating Charge shall be payable monthly in advance, together with Fixed Rent, on the first day of each calendar month during the Term, commencing on the Rent Commencement Date, or at such other times as Operator may reasonably designate in writing.

4

Section 2.5 **Real Estate Taxes.** Tenant shall pay to Operator, as Additional Rent, without notice or demand and without any set-off, counterclaim, abatement or deduction whatsoever, Tenant's pro rata share of real estate taxes assessed against the Food Hall. The base year Real Estate Taxes attributable to the Premises shall be Three Hundred Dollars ($300.00) per month, representing Tenant's pro rata share of the Real Estate Taxes for the base year, which amount shall be payable monthly together with Fixed Rent.

Commencing after the first year of the Term, Tenant shall also pay, as Additional Rent, Tenant's pro rata share of any increases in Real Estate Taxes over the base year, as such increases are determined on an annual basis, and such amounts shall be payable at such time or times as reasonably designated by Operator.

Section 2.6 **Late Charge and Late Interest.** Without limitation to any rights of Operator's under this Agreement, if any payment of the Fixed Rent, Additional Rent or other sums due shall not have been paid by Vendor on the date when due, Vendor shall pay (i) as a late fee to cover Operator's administrative expenses, $500.00, in consideration of such late payment and (ii) interest at the Interest Rate (as hereinafter defined) per annum on all Rent which are then outstanding until paid. Such amounts shall be deemed Additional Rent hereunder.

Section 2.7 **Percentage Rent.**

(c)      **Amount**. Vendor shall pay to Operator, without notice or demand from Operator, within 10 days after the end of each month during the Term from and after the Rent Commencement Date, a payment ("Percentage Rent") equal to amount by which the Percentage multiplied by the applicable Gross Sales during each such month exceeds the applicable Monthly Base Gross Sales Figure, as set forth in Article 1. For any Required Business Day (as hereinafter defined) or part thereof with respect to which Vendor fails to be fully-stocked and open for business to the public, (each, an "Operation Failure") the Gross Sales shall be deemed increased by the Per Diem Rate (as hereinafter defined). The term "Required Business Days" shall mean all days that Vendor is required to be open for business pursuant to Section 3.1(g) notwithstanding the fact that Vendor may not be required to be fully-stocked and open for business during some of those days pursuant to other provisions of this Agreement, including but not limited to following a casualty, for Operator's Private Events. The term "Per Diem Rate" shall mean (I) so long as Vendor shall have operated for the regular conduct of business during all days and times required under this Concession Agreement for the 30 day period immediately prior to such Operation Failure (each, an "Imputation Period"), the Percentage multiplied by the average of the daily of the Gross Sales for the Imputation Period, or (II) if Vendor shall have failed to operate for the regular conduct of business during all days and times required under this Concession Agreement for the 30 day period immediately prior to such Operation Failure, then $1,000.00 per day.

Operator shall endeavor to deliver to Vendor within 5 Business Days after the end of each month during the Term a report based on the point-of-sale system ("POS") serving the Concession Area, to which POS and all information generated therefrom Operator shall have access at all times, of the Gross Sales generated from the Concession Area during such month and the Percentage Rent (i.e., the applicable Percentage multiplied by Gross Sales during such month) payable in respect of such month, such report, if delivered by Operator, "Operator's Monthly Report"). Whether or not Operator delivers such statement, Vendor shall, without notice or demand from Operator, within 10 days after the end of the month during the Term (accompanied by a monthly statement showing Gross Sales for such preceding month), pay to Operator a sum equal to the Percentage Rent payable with respect to such month.

(d)      **Intentionally Omitted**.

5

(e)   **Gross Sales.** "Gross Sales" shall mean the dollar aggregate of:

(y)   the sales prices of all food, beverages, goods, wares and merchandise sold, leased, and licensed and the charges for all services performed by Vendor at, in, on or from the Concession Area, whether made for cash, on credit, or otherwise, without reserve or deduction for inability or failure to collect, including such sales and services (i) made where the orders therefor originate at and are accepted by Vendor in the Concession Area but delivery or performance thereof is made from or at any place other than the Concession Area (including via delivery platforms), (ii) made pursuant to mail, telegraph, telephone, computer, video or other electronic system now or hereafter existing, or however the same may be received or filled at or from the Concession Area, (iii) made by means of mechanical and other vending devices in the Concession Area (except for those used in the non-sales area of the Concession Area exclusively by Vendor's employees), (iv) made as a result of transactions originating upon the Concession Area, and (v) that Vendor, in the normal and customary course of its operations, would credit or attribute to its business upon the Concession Area, or any part or parts thereof; a

(z)   all moneys or other things of value received by Vendor from its operations at, in, on or from the Concession Area that are not expressly excluded from Gross Sales by the other provisions of this definition.

"Gross Sales" shall not include (i) the exchange of merchandise among stores and warehouses of Vendor where such exchanges are made solely for the convenient operation of Vendor's business and not for the purpose of consummating a sale that has theretofore been made at, in, on or from the Concession Area or for the purpose of depriving Operator of the benefit of a sale that otherwise would have been made at, in, on or from the Concession Area, or (ii) returns to shippers or manufacturers, or (iii) sales of fixtures, machinery or equipment owned by Vendor after use thereof in the conduct of Vendor's business in the Concession Area, or (iv) the sales prices of merchandise sold from the Concession Area to Vendor's employees of the Concession Area at discounts substantially below the non-discounted prices charged therefor to the shopping public, provided in no event shall such corresponding non-discounted prices therefor exceed in the aggregate 2% of Gross Sales during any Concession Year, or (v) charges imposed by Vendor on customers of the Concession Area for delivery of merchandise sold from the Concession Area that are separately stated on Vendor's sales slips, or (vi) the proceeds of property insurance received by Vendor for loss or damage to Vendor's merchandise or equipment while located in the Concession Area, or (vii) the proceeds received by Vendor of bona fide, close-out bulk sales to jobbers at or below Vendor's costs, where the items so sold are removed from and not thereafter sold to the public from the Concession Area (but this exclusion shall not be construed to permit any such sales in violation of any other provisions of this Agreement), or (viii) lay-a-way sales until Vendor delivers merchandise sold thereby to the customer. Further, there shall be deducted from Gross Sales (x) cash or credit refunds made upon transactions included within Gross Sales, not exceeding the selling price of merchandise returned by the purchaser and accepted by Vendor, and (y) the amount of any city, county, state or federal sales, luxury, or excise or value added tax on such sales that is both (A) added to the selling price or absorbed therein, and (B) paid to the taxing authority by Vendor.

"Gross Sales" shall include such Gross Sales made by any subtenant, concessionaire, licensee or otherwise at, in, on or from the Concession Area. Such Gross Sales made by

subtenants, concessionaires, licensees, or otherwise, shall be included in the reports provided for in this Agreement (but the foregoing shall not be construed to give Vendor the right to sublease, sublicense or subconcession, which right shall be governed by the provisions of Article 16).

(f)    **Percentage Rent Payment and Reports**. Vendor shall, without notice or demand from Operator, deliver to Operator, within 10 days after the end of each month during the Term, a complete, uncertified statement signed by an executive officer of Vendor or the store manager of the Concession Area, showing Gross Sales for the preceding month. Vendor shall use (and shall not modify) the POS to record all Gross Sales. Vendor shall maintain accounting controls and books of account, in a form adequate for auditing purposes, in accordance with generally accepted accounting principles to assure the proper recording of all Gross Sales and the exclusions and deductions therefrom provided in Section 2.4(c) hereof. Vendor shall provide Operator with access to the POS system, or otherwise share account access, as reasonably necessary for Operator to review and understand Gross Sales data.

Vendor shall, without notice or demand from Operator, within 60 days after the end of each Concession Year, cause a statement of the Gross Sales made at, in, on and from the Concession Area for such Concession Year to be certified by an executive officer of Vendor and delivered to Operator, accompanied by a check from Vendor for the balance of Percentage Rent, if any, payable with respect to such Concession Year.  Said statement shall be subject to further verification as provided in Section 2.4(e).  In the event that Vendor's monthly payments of Percentage Rent for and with respect to a Concession Year shall in the aggregate exceed the Percentage Rent payable by Vendor for such Concession Year, Operator shall credit any such excess against the Rent next due under this Agreement; provided if such excess is greater than the amount of Rent due hereunder for the remainder of the Term, Operator shall pay to Vendor the amount by which such excess exceeds the remaining Rent, if any, promptly following the delivery of such statement.  All statements deliverable by Vendor to Operator under this Agreement shall be delivered to Operator The LIC Food Court LLC, 1500 Broadway, Ste 3305, New York, New York 10036, Attention: Director of Finance, or such place or places as Operator may from time to time direct by notice to Vendor.

(g)    **Operator's Audit Rights**.  Operator shall have the right, upon 10 days' prior notice and at any time within 36 months after receipt of the annual statement of Gross Sales required to be furnished pursuant to Section 2.4(d), to audit all of the books of account, documents, records, returns, papers, tax returns, original sales records (including cash register tapes, sales slips, bank statements and deposit slips, credit-card records, mail orders, telephone orders, computer records and such other sales records, if any, that would normally be examined by an independent accountant pursuant to generally accepted auditing standards in performing an audit of Vendor's Gross Sales) and files of Vendor relating to Gross Sales for any Concession Year (collectively, the "Sales Records"); and Vendor, on request of Operator, shall make all such Sales Records available for such examination at the Building, or, at Vendor's option, at Vendor's home office, provided the same is located in the eastern United States.  Vendor shall retain the Sales Records with respect to each Concession Year for not less than 36 months after the delivery of the annual statement of Gross Sales for the respective Concession Year or for such longer period as may be necessary to resolve all then outstanding audit issues and disputes.  If Operator shall have such an audit made for any Concession Year, and (i) Gross Sales shown by Vendor's statement for such Concession Year shall be found to be understated by more than 3% or (ii) Vendor fails to maintain sufficient records of its Gross Sales to enable Operator to perform such audit in accordance with generally accepted auditing standards, Vendor shall pay to Operator on demand the reasonable cost of such audit.  In any event, Vendor shall promptly pay to Operator any deficiency in Percentage Rent plus interest at the Interest Rate from the date such payment

7

should have been made to the date of payment. If Gross Sales shown by Vendor's statement for any three Concession Years shall be found to have been understated by more than 3% in each instance, or for any single Concession Year shall be found to have been understated by more than 10%, then Operator, in addition to all other remedies available at law or in equity or pursuant to the other provisions of this Agreement, shall have the right to terminate this Agreement upon notice to Vendor; provided, however, if the first such understatement is greater than 8%, Vendor shall have the opportunity to prove to Operator (to its reasonable satisfaction) that such understatement was due to a non-deliberate, clerical error, which proof shall be delivered to Operator within 20 days of Operator's notice to Vendor of such termination. If Operator is so reasonably satisfied, Operator shall notify Vendor that such termination notice is null and void. Vendor's opportunity to prove such error shall be applicable only to the first instance of any such understatement by more than 10% during the Term; thereafter, Operator shall have such termination right upon 30 days prior notice to Vendor without affording Vendor the opportunity to prove any such error.  Such examination and audit may be made by Operator's agent or employees or by any accountant designated by Operator from time to time. Unless there shall be bona fide cause, there shall be no more than one such audit by Operator of Gross Sales during any Concession Year.

Operator agrees to use reasonable efforts to hold in confidence any Gross Sales information obtained by Operator as a result of (i) any audit or inspection of Gross Sales, (ii) receipt of any statement of Gross Sales, or (iii) any other method, except Operator may disclose such information to Operator's employees, agents, attorneys and accountants, and to any prospective or then existing lender, purchaser or other transferee with respect to the Building or the Center or any part thereof, or as required by law, or in connection with any tax abatement proceedings, legal process or request of any court or Governmental Authority.

(h)      **Independent Calculations.**  Except as otherwise provided in this Agreement, computation of the Percentage Rent specified herein shall be made separately with regard to each Concession Year.  The Gross Sales of any Concession Year and the Percentage Rent due thereon shall have no bearing on, or connection with, the Gross Sales of any other Concession Year.  Operator shall in no event be construed or held to be a partner or associate of Vendor in the conduct of Vendor's business, nor shall Operator be liable for any debts incurred by Vendor in the conduct of Vendor's business and the relationship between them is and at all times shall remain that of independent contracting parties.

(d)      **Survival.**  The obligations of Vendor and Operator's right to audit under this Section 2.4 shall survive the Expiration Date or any sooner termination of this Agreement.

Section 2.8 **Subordination to Master Agreement**

This Agreement and all of Vendor's rights hereunder are and shall at all times be subject and subordinate to the Master Agreement. In the event of any conflict between this Agreement and the Master Agreement, the terms of the Master Agreement shall control.

## ARTICLE 3

## USE AND OCCUPANCY

Section 3.1 **Permitted Uses; General Standards.** (a) Vendor shall use and occupy the Concession Area for the Permitted Uses and for no other purpose or purposes. Vendor shall not use or occupy or suffer the use or occupancy of any part of the Concession Area in a manner

8

constituting a Prohibited Use.  Neither Vendor nor any transferee, assignee or subconcessionaire may change the Permitted Use without the prior consent of Operator, which consent may be withheld in Operator's sole and absolute discretion.  Vendor acknowledges and agrees that Vendor's use of the Concession Area for the Permitted Uses and for no other purpose is an integral component of (a) the Building's tenant and occupant mix, (b) the services provided to Building tenants and/or occupants, and (c) the best in class character of the Building. Vendor therefore agrees to strictly adhere to the Permitted Uses and acknowledges that Operator will incur actual and substantial detriment if a deviation in use occurs.  If Vendor uses or suffers the use of the Concession Area for a purpose that constitutes a Prohibited Use, violates any Requirement, or causes the Building to be in violation of any Requirement, Vendor shall promptly discontinue such use upon notice of such violation.  Without limitation, Vendor shall conduct and operate its business in the Concession Area in a best in class, reputable manner, consistent with the highest standards of practice of superior food and beverage establishment in the Borough of Queens.  Without limitation, in no event shall Vendor permit the Concession Area or any portion thereof to be used for any purpose which would tend to (i) create unreasonable or excessive floor loads, (ii) impair or interfere with any Building operations or the proper and economic heating, ventilation, air-conditioning, cleaning or other servicing of the Building, (iii) constitute a public or private nuisance, (iv) interfere with, annoy or disturb any other tenant, occupant, concessionaire or Operator, (v) or impair the appearance of the Building or Food Hall.

(b)      **Licenses and Permits**.  Operator shall, at no cost to Vendor, obtain all licenses and permits required for the lawful conduct of the Permitted Uses in the Concession Area (such licenses and permits being herein referred to as the "Operating Permits").  The Operating Permits required to be obtained by Operator and necessary for Vendor to operate in the Concession Area on the Commencement Date have been obtained.  Vendor shall reasonably cooperate with Operator to obtain the Operating Permits (which cooperation shall include, but not be limited to, executing, acknowledging and delivering such applications and other documents and instruments as may reasonably be required by Operator and/or other Persons, including Governmental Authorities and utility companies).  After Operator obtains the Operating Permits, Vendor, at its expense, shall at all times comply with the terms and conditions of all Operating Permits.  For avoidance of doubt, "Operating Permits " shall not include agreements such as franchise agreements or licenses to use, or operate the Concession Area under, any copyrights, trademarks, tradenames or other intellectual property, all of which shall be Vendor's obligation to enter into.

(c)      **Trade Name**.  Vendor shall conduct its operations in the Concession Area under the trade name Molly Tea "茉莉奶白" (the "Trade Name") and shall not change or operate under any other trade name without Operator's prior written consent.

(d)      **Sales**.  No sales or promotions may be conducted within the Concession Area other than in the normal course of Vendor's continuing business operations therein.  Without limiting the generality of the foregoing, no auction, fire, bankruptcy, "lost our lease" or "going out of business" sales or similar sales may be conducted within the Concession Area. Vendor shall display, sell and advertise only first-quality merchandise and not any seconds or damaged goods, and shall never conduct any so-called outlet, warehouse or similar discount operations in or from the Concession Area.

(e)      **Signs and Displays**.  Vendor shall not place anywhere in the Concession Area, the Food Hall or the Building, interior or exterior, (x) any signs, lettering, announcements, price schedules, or any other kinds or forms of inscriptions, including menu boards (collectively, "Signs") other than those Signs (including the design, number, and location of such Signs and

9

any replacements thereof) that shall have been approved by Operator or (y) any displays and exhibits (collectively, "Displays") other than those Displays (including the design, number, and location of such Displays and any replacements thereof) that shall have been approved by Operator. All Signs and Displays installed by or on behalf of Vendor at the Concession Area shall comply with Requirements and shall not contain Prohibited Content. If at any time Vendor installs any Sign or Display without Operator's prior approval or a Sign or Display previously approved by Operator becomes dilapidated, Vendor shall remove, alter, or refurbish such Sign or Display in such manner and within such reasonable time as may be specified by Operator in a notice to Vendor. All Signs proposed by Vendor shall be indicated in Vendor's plans and specifications to be submitted to Operator for approval. All Signs and Displays must be consistent with the standards applicable to a best in class, mixed use (office and retail) buildings in the Borough of Queens, professionally prepared, and reasonable in number. In the event of a breach by Vendor of any of the foregoing provisions of this Section 3.1(e), Operator, without having to give any notice to Vendor, may enter the Concession Area at any time and from time to time and remove the Signs and Displays that violate such provisions without any liability to Vendor or any other party and may charge the expense incurred by such entry and removal to Vendor, which payment shall become due and payable to Operator within 5 Business Days following demand therefor. In the event that there exists on the Commencement Date or at any time thereafter any blade sign(s) on the exterior of the Food Hall or the Building, Vendor shall, promptly after Operator's request, and solely at Vendor's cost and expense, cause a contractor (the "Sign Contractor") to install Vendor's logo and/or name ("Vendor's Logo") on such blade sign(s). Vendor's Logo shall be deemed a Sign for all purposes of this Agreement, and Vendor's Logo and the Sign Contractor shall each be subject to Operator's prior approval pursuant to, and in accordance with, the provisions of this Agreement. Upon the expiration or earlier termination of this Agreement, Vendor shall remove all of its signage and, at Operator's option, shall either repair, or reimburse Operator for, any damage to the Building or the Concession Area resulting from the erection, maintenance, or removal of Vendor's signage. If at any time Vendor installs any Sign or Display without Operator's prior approval or a Sign or Display previously approved by Operator becomes dilapidated, Vendor shall remove, alter, or refurbish such Sign or Display in such manner and within such reasonable time as may be specified by Operator in a notice to Vendor.

(f)    **Nuisance.** Vendor shall not perform any act or carry on any practice that may injure the Concession Area or any other part of the Building. Vendor shall not cause or permit any offensive odor or vibrations to be emitted from the Concession Area. Vendor shall not use, play or permit any sound making or sound reproducing in or from the Concession Area, and observe, comply with and adopt such means and precautions as Operator may request in connection therewith.

(g)    **Continuous Operation.** The Concession Area shall be kept open for business to the public at least during the following hours ("Required Operating Hours"): _10:00 A.M. to 10:00 P.M., each and every Sunday through Thursday and 10:00 A.M. to 11:00 P.M., each and every Friday and Saturday, 7 days per week, 365 days per year, other than days and/or times that Vendor is required by Operator to be closed for Private Events (as hereinafter defined).

(h)    **Private Events.** Operator contemplates that all or any portion of the Food Hall may be closed to the public by Operator from time to time to accommodate private events ("Private Events"). Consequently, Operator may cause Vendor to close for any such Private Event by notifying Vendor thereof no later than forty-eight (48) hours prior thereto. Unless Operator has separately reached agreement with Vendor to remain open for such Private Event, Operator shall pay to Vendor, within thirty (30) days after such Private Event, a fee (a "Private Event Fee") equal to the average Gross Sales that Vendor shall have achieved in the three (3) weeks prior to such

10

Private Event on the same day of the week and during the hours that the Private Event takes place as measured by the POS system installed in the Food Hall. To illustrate, if a Private Event occurs on a Thursday during the hours of 12:00 p.m. and 3:00 p.m., the Private Event Fee for such Private Event shall equal (i) the aggregate Gross Sales achieved by Vendor for the three Thursdays immediately prior to such Private Event during the hours of 12:00 p.m. to 3:00 p.m. divided by (iii) three (3). There shall be no reduction in any Fixed Rent, Percentage Rent or other Additional Rent due to Operator under this Agreement, including, without limitation, Article 8 of this Agreement, as a result of the occurrence of a Private Event.

(i)      **Operational and Fixtured**. Vendor shall at all times keep the Concession Area fully and adequately stocked and fixtured, so as to promote and facilitate maximum sales. Vendor shall devote the maximum possible floor area of the Concession Area to selling space, and shall not use any portion of the Concession Area for storage or other services, except for its operations in the Concession Area.

(j)      **Personnel**. At all times Vendor shall employ a full staff, in its reasonable business judgment, in the Concession Area in order to conduct business properly, including a qualified manager headquartered and working full-time at the Concession Area to manage and control the operations of the Concession Area. Vendor shall furnish Operator with the name, address and telephone number of such store manager of the Concession Area.

(k)      **Hazardous Materials**. Vendor shall not use, handle or store or dispose of any Hazardous Materials in or about the Building. Vendor shall be responsible, at its expense, for all matters directly or indirectly based on, or arising or resulting from the actual or alleged presence of Hazardous Materials in the Concession Area or the Building that is caused or permitted by any Vendor Party.  If the transportation, storage, use or disposal of any Hazardous Materials anywhere in the Building in connection with Vendor's use of the Concession Area results in (1) contamination of the soil or surface or ground water or (2) loss or damage to person(s) or property, Vendor shall (i) notify Operator immediately of any contamination, claim of contamination, loss or damage, (ii) after consultation and approval by Operator, clean up the contamination in full compliance with all applicable Requirements, and (iii) indemnify, defend and hold Operator harmless from and against any Losses (as hereinafter defined) arising from or connected with any such contamination, claim of contamination, loss or damage. No consent or approval of Operator shall in any way be construed as imposing upon Operator any liability for the means, methods, or manner of removal, containment or other compliance with applicable Requirements for and with respect to the foregoing. Vendor shall immediately notify Operator upon Vendor's receipt of any inquiry, notice, or threat to give notice by any Governmental Authority or any other third party with respect to any Hazardous Materials.

(l)      **Outside Sales, etc.** Vendor shall not in any area outside of the Concession Area (i) place or maintain any merchandise or other articles of any kind, (ii) vend, peddle or solicit orders for the sale or distribution of any merchandise, device, service, periodical, book, pamphlet or other matter whatsoever, (iii) exhibit or distribute any sign, placard, banner, menu, pamphlet, handbill, notice or other written material, (iii) solicit membership in any organization, group, association or any contribution for any purpose, (iv) throw, discard or deposit any paper, glass or extraneous matter of any kind, except in designated receptacles, or create litter or hazards of any kind, or (v) distribute any samples of any merchandise, product or other item offered for sale at the Concession Area.  Vendor shall not (A) receive or ship articles of any kind outside the designated loading areas for the Concession Area or (B) permit the parking of vehicles so as to interfere with the use of any driveway, corridor, footwalk, parking area, street or other Common Areas.

11

(m)    **Fire Extinguishers, etc.**  Vendor shall maintain the automatic, non-toxic, dry chemical fire extinguishing devices provided by Operator, and if gas is used in the Concession Area, suitable gas cut-off devices (manual and automatic).

(n)    **Dishwasher Pods**. Vendor shall be required to purchase dishwasher pods from Operator's preferred vendor.

(o)    **Cleaning**. Vendor shall keep the Concession Area in a neat, clean, sanitary and safe condition, in accordance with all applicable Requirements.  Vendor shall repaint and refurbish the Concession Area and any part or portion thereof, from time to time, to assure that the same are kept in a best in class, tenantable and attractive condition.

(p)    **Receipt and Delivery**. Vendor shall receive and deliver goods and merchandise only in the manner, at such times, and in such areas as may reasonably be designated by Operator.

(q)    **Animals**. Vendor, at Vendor's sole cost and expense, shall, to the reasonable satisfaction of Operator, keep the Concession Area free from animals, other than guide dogs, service animals and other animals approved by Operator (such animals, other than those approved by Operator, being herein collectively, "Unapproved Animals"). If at any time during the Term, or any other period that Vendor or any Person claiming by, through or under Vendor is in occupancy of any portion of the Concession Area, Unapproved Animals are present in the Concession Area or Unapproved Animals of Vendor or any Person claiming by, through or under Vendor (other than patrons of the Concession Area) are present elsewhere in the Food Hall, Vendor, at Vendor's sole cost and expense, shall immediately (i) eliminate the presence of such Unapproved Animals and (ii) prevent the spread of such Unapproved Animals to any other portions of the Building (including but not limited to walls, hallways, common areas and any other tenants' or occupants' premises in the Building).

(r)    **Alcoholic Beverages**. Vendor shall not sell or serve any wine, beer or any other alcoholic beverage from, at or in the Concession Area.

(s)    **Sampling**. Vendor shall not be permitted to offer or pass out tastes or samples in any area outside the Concession Area.

(t)    **Grade of "A"**. Vendor shall endeavor to and use all appropriate efforts to maintain for the Concession Area at all times during the Term a New York City Board of Health letter grade of "A" applicable to the sanitary operation of restaurants.  In the event that the grading for the Concession Area falls below a restaurant letter grade of "A", Vendor shall commence to take such steps necessary to obtain a restaurant letter grade of "A" within thirty days of notification to Vendor by the Board of Health or any other Governmental Authority that Vendor has failed to maintain a restaurant letter grade of "A" and shall thereafter diligently take all appropriate steps necessary to obtain an "A" grade.

Section 3.2 **Delivery of Concession Area**. Operator shall be deemed to have delivered possession of the Concession Area to Vendor upon the giving of notice by Operator to Vendor (which notice may be oral) stating that the Concession Area is vacant, in the condition required hereunder and available for Vendor's occupancy.  There shall be no postponement of the Commencement Date (or the Rent Commencement Date) for any delay in the delivery of possession of the Concession Area to Vendor that results from any Vendor Delay.  The provisions

12

of this Article are intended to constitute "an express provision to the contrary" within the meaning of Section 223-a of the New York Real Property Law or any successor Requirement.

Section 3.3 **Operator's Intellectual Property and Name of the Concession Area**. Vendor acknowledges and agrees that all uses of Operator's intellectual property, including but not limited to, logos and any and all trademarks and tradenames, for any advertising, marketing, promotional, or any other purpose, shall only be with the prior written approval of Operator, at Operator's sole discretion. Vendor shall during the Term operate its business in the Concession Area exclusively under Vendor's Trade Name "Molly Tea '茉莉奶白'" and not change Vendor's Trade Name without Operator's prior written permission, and all advertising, marketing, promotional, and invitational literature shall consistently refer to such name. Exact placement and design of Vendor's signage/logo shall require advance approval from Operator in writing. Vendor shall not use the name or likeness of the Building in any advertising (by whatever medium) without Operator's prior written consent. Operator shall have the right to use any or all of Vendor's trade name and other intellectual property for any legitimate and bona fide purpose in connection with its marketing efforts of the Food Hall, at no cost to Operator. Vendor shall not use any other Building Vendors', tenants' or occupants' intellectual property.

Section 3.4 **Radius Restriction**. During the period commencing on the date hereof and ending on the Expiration Date, Vendor agrees that neither it nor its affiliates shall, directly or indirectly, operate, manage, own, concession, subconcession, lease, license, develop, redevelop, finance, serve as a consultant to, provide any services to or for the benefit of or have any other interest in, any store or food service establishment within the Restricted Area (as hereinafter defined). For purposes of this Agreement, "Restricted Area" shall mean the area within a radius of three (3) miles from the Concession Area.

## ARTICLE 4

## CONDITION OF THE CONCESSION AREA

Section 4.1 **Condition**. The Concession Area is being delivered to Vendor, and Vendor has inspected the Concession Area and agrees to accept the Concession Area, in its "as is" condition as of the Commencement Date with the items shown on Exhibit C in place. Operator does not have any obligation to perform any work or otherwise prepare the Concession Area or the Building for Vendor's use and occupancy. Vendor has inspected the Concession Area and agrees (a) to accept possession of the Concession Area in the "as is" condition existing on the Commencement Date, and (b) that neither Operator nor Operator's agents have made any representations or warranties with respect to the Concession Area, the Food Hall or the Building except as expressly set forth herein. Vendor's occupancy of any part of the Concession Area shall be conclusive evidence, as against Vendor, that (A) Operator has Substantially Completed Operator's Work, (B) Vendor has accepted possession of the Concession Area in their then current condition, and (C) the Concession Area, the Food Hall and the Building are in a good and satisfactory condition as required by this Agreement.

Section 4.2 **Vendor's Work.** Promptly after the Commencement Date, Vendor shall, at its own cost and expense, perform or cause to be performed any and all work necessary to prepare the Concession Area for Vendor's initial occupancy (collectively, the "Vendor's Work"), in accordance with and subject to the terms and provisions of this Agreement, such as the furnishing and installation of Operator approved Signs, to the end that Vendor must be fully operational in its business in accordance with this Agreement within 60 days following the Commencement Date (such day by which Vendor must open being the "Opening Date").

13

**Section 4.3  Submission of Plans for Approval.** Vendor shall, at its sole cost and expense, prepare and submit to Operator for approval complete plans and specifications for all of Vendor's Work, including, without limitation, layout, storefront design, signage, finishes, fixtures, equipment, and all mechanical, electrical and plumbing plans (collectively, the "Vendor's Plans"). All Vendor's Plans shall be prepared in compliance with this Agreement, all applicable laws, codes, rules and regulations, and Operator's reasonable construction and design criteria. Vendor shall submit one (1) reproducible set and two (2) sets of black-line prints (or such other format as Operator may reasonably require) of the Vendor's Plans to Owner for review and approval prior to the commencement of Vendor's Work. Vendor shall be responsible for and shall pay all costs, fees and expenses relating to the review and approval of the Vendor's Plans, including any design review fees charged by the Owner.

Operator's review or approval of the Vendor's Plans shall not be deemed a representation or warranty as to the adequacy, accuracy or completeness of the Vendor's Plans, nor shall such approval relieve Vendor of its obligations under this Agreement. Vendor shall not commence any portion of Vendor's Work unless and until Operator has approved the applicable Vendor's Plans in writing.

Section 4.4  **Signage.** All interior and exterior signage for the Concession Area shall be subject to the prior written approval of Operator and, if applicable, the Building owner, and shall comply with this Agreement, all applicable laws, rules and regulations, Operator's signage criteria and all requirements of The JACX. Vendor shall be solely responsible, at its sole cost and expense, for the design, installation, maintenance, repair, replacement, operation and removal of all such signage throughout the Term.

## ARTICLE 5

## ALTERATIONS

Section 5.1  **Vendor's Alterations.** Any work, alterations, improvements, upgrades or other changes Vendor desires to perform at the Concession Area, including removal, replacement or addition of any equipment therein (collectively, "Alterations") shall require the prior written approval of Operator and the Owner/Tishman Speyer. Prior to performing any Alterations, Vendor shall submit plans and specifications to Operator, in form and substance satisfactory to Operator, for Operator's approval. Operator may submit such plans and specifications to Owner on Vendor's behalf in connection with any required Owner approval. Operator's approval shall not relieve Vendor of the obligation to obtain any required approval from Owner. Operator's approval shall not be unreasonably withheld if the proposed Alteration is (i) consistent with the Permitted Use of the Concession Area and the best in class, upscale nature of the Food Hall, (ii) does not affect the structure of the Concession Area, the Food Hall or the Building or any building systems, including, without limitation, mechanical, electrical, plumbing, sprinkler, life safety, (iii) does not affect the certificate of occupancy issued for the Building, the Food Hall or the Concession Area, (iv) is consistent with the design, construction and equipment of the Food Hall, including, without limitation, with any Design Guidelines approved or established by Operator, (v) is consistent with the uses then being made of the Food Hall by other occupants or Vendors and (vi) are performed only by Operator's designated contractors or by contractors approved by Operator to perform such Alterations. Any changes requested by Operator to any plans and specifications submitted by Vendor shall be promptly made by Vendor, at its expense, in revised plans submitted for Operator's subsequent approval. Any Alterations shall remain the property of Operator, even though paid for by Vendor, and shall remain in the Concession Area upon expiration or earlier termination of this Agreement, provided, however, that Operator may elect to cause Vendor to

14

remove any such Alterations at the expiration or earlier termination of the Term upon prior notice by Operator to Vendor. Such removal shall be at Vendor's sole cost and expense and shall be subject to Section 5.3 below.

Section 5.2 **Manner and Quality of Alterations.** All Alterations shall be performed (i) in a good and workmanlike and best in class manner and free from defects, (ii) under the supervision of a licensed architect reasonably satisfactory to Operator, and (iii) in compliance with all Requirements, the terms of this Agreement, all procedures and regulations then prescribed by Operator for work performed in the Building, and the Operating Manual. All materials and equipment to be used in the Concession Area shall be of best in class quality and at least equal to the applicable standards for the Food Hall then established by Operator and applicable to other Vendors in the Food Hall, and no such materials or equipment shall be subject to any lien or other encumbrance.

Section 5.3 **Removal of Vendor's Property.** Vendor, on or before the Expiration Date or any earlier termination of this Agreement, shall quietly and peaceably vacate the Concession Area pursuant to the Move-Out Procedure set forth in the Operating Manual, and remove therefrom its inventory (including dishes, pots, pans, utensils, glassware, silverware, trays and other tabletop items, tabletop and other small appliances and equipment (including mixers and food processors), linens, uniforms, kitchen small wares, and items that are similar to the foregoing items) other than those provided by Operator, which must remain in the Concession Area unless Operator notifies Vendor otherwise, and other personal property (collectively, the "Vendor's Property") and its employees, servants and agents, it being agreed that Vendor shall promptly repair and restore any and all damage to the Concession Area caused by Vendor and/or its agents, employees, contractors or invitees. All Vendor's Property and approved Alterations or additions which remain after Vendor leaves the Food Hall may either be retained by Operator as Operator's property or be removed by Operator, at Operator's expense. This Section 5.3 shall survive the Expiration Date or earlier termination of this Agreement.

Section 5.4 **Hood System Removal and Restoration.** Notwithstanding anything to the contrary contained herein, if Vendor removes, relocates or modifies any existing hood or exhaust system serving the Concession Area (the "Hood System") as part of Vendor's Alterations, Vendor shall, at its sole cost and expense, restore and reinstall the Hood System to its original condition (or to a condition reasonably approved by Operator) upon the expiration or earlier termination of this Agreement. All such restoration and reinstallation work shall be performed in a good and workmanlike manner and in strict compliance with all applicable laws, rules, regulations and codes, including, without limitation, all requirements of the New York City Fire Department (FDNY) and any other applicable governmental authorities. Vendor shall obtain all required permits, approvals and sign-offs and shall deliver evidence of same to Operator upon completion. If Vendor fails to perform such restoration and reinstallation work in a timely manner, Operator shall have the right, but not the obligation, to engage a qualified contractor to perform such work on Vendor's behalf. Vendor shall reimburse Operator upon demand for all costs and expenses incurred in connection therewith, plus an additional administrative fee equal to fifteen percent (15%) of such costs, which amounts shall constitute Additional Rent under this Agreement. Vendor's obligations under this Section shall survive the expiration or earlier termination of this Agreement.

Section 5.5 **Mechanic's Liens.** Vendor, at its expense, shall discharge any lien or charge filed against the Concession Area or the Real Property that may arise out of or result from any work claimed or determined in good faith by Operator to have been done by or on behalf of, or materials claimed or determined in good faith by Operator to have been furnished to, Vendor,

15

within 20 days after Vendor's receipt of notice thereof by payment, filing the bond required by law or otherwise in accordance with law.

Section 5.6 **Labor Relations**. Vendor shall not employ, or permit the employment of, any vendor, service contractor, contractor or laborer, or permit any materials to be delivered to or used in the Building, if, in Operator's sole judgment, such employment, delivery or use will interfere or cause any conflict or disharmony with other contractors or laborers engaged in the construction, maintenance or operation of the Building by Operator, Vendor or others, or the use and enjoyment of the Building by other Vendors, tenants or occupants. In the event of such interference, conflict or disharmony, upon Operator's request, Vendor shall cause all contractors and laborers causing such interference or conflict to leave the Building immediately.

Section 5.7 **Vendor's Costs.** Vendor shall pay to Operator or its designee, within 10 days after demand, all out-of-pocket costs actually incurred by Operator in connection with any Alterations (including Vendor's Work), including costs incurred in connection with (i) Owner(Tishman)'s review of the Alterations (including review of requests for approval thereof), and any other costs and fees imposed by or payable to Owner (Tishman). Under no circumstance shall Operator be responsible or liable for any costs, fees or expenses incurred in connection therewith, all of which shall be borne solely by Vendor.

Section 5.8 **Vendor's Equipment**. Vendor shall not move any heavy machinery, heavy equipment, freight, bulky matter or fixtures into or out of the Building without Operator's prior consent and payment to Operator of Operator's reasonable charges in connection therewith. If any such machinery, equipment, or other items require special handling, Vendor agrees (i) to employ only persons holding a Master Rigger's License to perform such work, and (ii) such work shall be done only during hours reasonably designated by Operator.

Section 5.9 **Legal Compliance**. The approval of plans or specifications, or the consent by Operator to the making of any Alterations, does not constitute Operator's agreement or representation that such plans, specifications or Alterations comply with any Requirements or the certificate of occupancy issued for the Building. Operator shall have no liability to Vendor or any other party in connection with Operator's approval of plans and specifications for any Alterations, or Operator's consent to Vendor's performing any Alterations. If, as the result of any Alterations made by or on behalf of Vendor, Operator is required to make any alterations or improvements to any part of the Building in order to comply with any Requirements, whether or not in the Concession Area, Vendor shall pay all costs and expenses incurred by Operator in connection with such alterations or improvements as provided in Article 21. Without limiting any other provision of this Agreement, Vendor shall be and remain responsible for (x) any testing, refiling and drawings updates that are required to be submitted to the FDNY in the event any equipment is removed, replaced and or added, and (y) all costs and expenses in connection with any fire suppression alteration related to or based on any Alterations with respect to the Concession Area, including performance of, and costs and expenses associated with, testing, refiling, preparation and/or modification of drawings, and submission of drawings.

Section 5.10 **Alterations Reporting**. Notwithstanding anything in this Agreement to the contrary, in addition to any other requirements by Vendor herein regarding Alterations, Vendor shall deliver to Operator, within thirty (30) days after the end of each Concession Year during the Term, (a) the nature of any Alterations (including Vendor's Work, if applicable) performed or to be performed by Vendor, (b) a reasonably detailed description of the work completed in connection with such Alterations and (c) reasonable evidence of all amounts expended (including for "soft costs") for such Alterations, in each case during the immediately preceding Concession Year.

16

## ARTICLE 6

## FLOOR LOAD

Vendor shall not place a load upon any floor of the Concession Area that exceeds 100 pounds per square foot.  Operator reserves the right to reasonably designate the position of all heavy machinery, equipment and fixtures that Vendor wishes to place within the Concession Area, and to place limitations on the weight thereof, in accordance with the Operating Manual.

## ARTICLE 7

## REPAIRS

Section 7.1  **Operator's Repair and Maintenance**.  Operator shall not be required to make any repairs, maintenance or replacements to the interior, non-structural portions of the Concession Area, all of which repairs, maintenance and replacements shall be performed by Vendor at its sole expense.

Section 7.2  **Vendor's Repair and Maintenance**.  At all times during the Term, Vendor shall, at its cost and expense, maintain the Concession Area (including all equipment, furniture and fixtures therein, regardless of whether same were furnished or installed by Operator) in good and proper operating condition, in compliance with all Requirements, and in good repair and condition.  Vendor shall at its cost be responsible to replace any and all light bulbs, tubes and ballasts as necessary during the Term.  Vendor shall promptly repair and restore any damage to the Concession Area, and/or any other property owned, used or maintained by Operator, to the extent such damage is caused by, or is otherwise due to the acts, or omissions, negligence or willful misconduct of Vendor and/or any of its agents, representatives, employees, contractors, subcontractors or invitees.  If Vendor fails to promptly repair and restore such damage within seven (7) days after notice from Operator, Operator may, in its sole discretion, repair and restore such damage and Vendor shall reimburse Operator as Additional Rent hereunder for all costs and expenses reasonably incurred in performing such repair or refinishing, within fifteen (15) days after written demand therefor.  Vendor shall be required, at Vendor's cost and expanse, to maintain in good condition and repair and in a neat, organized and best in class appearance the Concession Area, including, without limitation, all display cases and FF&E therein.  Operator, in its sole discretion, and without Vendor's consent, may, from time to time, inspect the Concession Area and all display cases and FF&E therein, including, without limitation, any Operator-supplied FF&E.

Section 7.3  **Interruptions Due to Repairs**.  Operator reserves the right to make all changes, alterations, additions, improvements, repairs or replacements to the Building, or any parts thereof, including to the Building Systems that provide services to Vendor, all as Operator deems necessary or desirable. Without limiting or otherwise adversely affecting Operator's rights under the preceding sentence, Operator shall use reasonable efforts to minimize interference with Vendor's use and occupancy of the Concession Area during the making of such changes, alterations, additions, improvements, repairs or replacements, provided Operator shall have no obligation to employ contractors or labor at overtime or other premium pay rates, or to incur any other overtime costs or additional expenses whatsoever.  There shall be no Rent abatement or allowance to Vendor for a diminution of rental value, no actual or constructive eviction of Vendor, in whole or in part, no relief from any of Vendor's other obligations under this Agreement, and no liability on the part of Operator and no right on the part of Vendor to equitable relief, by reason of inconvenience, annoyance or injury to business arising from Operator, Vendor or others making,

17

or failing to make, any repairs, alterations, additions or improvements in or to any portion of the Building or the Concession Area, or in or to fixtures, appurtenances or equipment therein.

## ARTICLE 8

## INTENTIONALLY OMITTED

## ARTICLE 9

## REQUIREMENTS OF LAW

Section 9.1  (a) **Vendor's Compliance**.  Vendor, at its expense, shall comply (or cause to be complied) with all Requirements applicable to the Concession Area, regardless of whether imposed by their terms upon Operator or Vendor.  If Vendor obtains knowledge of any failure to comply with any Requirements applicable to the Concession Area, Vendor shall give Operator prompt notice thereof.

(b)      **Operator's Insurance**.  Vendor shall not cause or permit any action or condition that would (i) invalidate or conflict with Operator's insurance policies, (ii) violate applicable rules, regulations and guidelines of the Fire Department, Fire Insurance Rating Organization or any other authority having jurisdiction over the Building, (iii) cause an increase in the premiums for any insurance then covering the Building over that payable with respect to comparable first-class mixed use (office and retail) buildings, or (iv) result in insurance companies of good standing refusing to insure the Building or any property therein in amounts and against risks as reasonably determined by Operator.  If any insurance premiums increase as a result of Vendor's failure to comply with the provisions of this Article, then Vendor shall promptly cure such failure and shall reimburse Operator for the increased insurance premiums paid by Operator as a result of such failure by Vendor.  In any action or proceeding to which Operator and Vendor are parties, a schedule or "make up" of rates for the Building or the Concession Area issued by the appropriate Fire Insurance Rating Organization, or other body fixing such insurance rates, shall be conclusive evidence of the insurance rates then applicable to the Building.

## ARTICLE 10

## QUIET ENJOYMENT

Provided this Agreement is in full force and effect and no Event of Default then exists, Vendor may peaceably and quietly enjoy the Concession Area without hindrance by Operator or any Person lawfully claiming through or under Operator, subject to the terms and conditions of this Agreement.

## ARTICLE 11

## SUBORDINATION

Section 11.1  **Subordination and Attornment**.  (a) This Concession Agreement and Vendor's rights hereunder are subject and subordinate to all Mortgages and Superior Leases.  At the request of any Mortgagee or Lessor, Vendor shall attorn to such Mortgagee or Lessor, its successors in interest or any purchaser in a foreclosure sale.

18

(b)    If a Lessor or Mortgagee or any other Person shall succeed to the rights of Operator under this Agreement, whether through possession or foreclosure action, or the delivery of a new concession agreement, lease or deed or otherwise, then at the request of the successor Operator and upon such successor Operator's written agreement to accept Vendor's attornment and to recognize Vendor's interest under this Agreement, Vendor shall be deemed to have attorned to and recognized such successor Operator as Operator under this Agreement. The provisions of this Article 11 are self-operative and require no further instruments to give effect hereto; provided, however, Vendor shall promptly execute and deliver any instrument that such successor Operator may reasonably request (1) evidencing such attornment, (2) setting forth the terms and conditions of Vendor's tenancy, and (3) containing such other terms and conditions as may be required by such Mortgagee or Lessor, provided such terms and conditions do not increase the Rent, materially increase Vendor's non-Rent obligations or materially and adversely affect Vendor's rights under this Agreement. Upon such attornment, this Agreement shall continue in full force and effect as a direct agreement between such successor Operator and Vendor upon all of the terms, conditions and covenants set forth in this Agreement except that such successor Operator shall not be:

(i)    liable for any act or omission of Operator (except to the extent such act or omission is a default under this Agreement and continues beyond the date when such successor Operator succeeds to Operator's interest and Vendor gives notice of such act or omission to such successor Operator);

(ii)    subject to any defense, claim, counterclaim, set-off or offset that Vendor may have against Operator or any prior Operators

(iii)    bound by any prepayment of more than one month's Rent to Operator or any prior Operator;

(iv)    bound by any obligation to make any payment to Vendor that was required to be made prior to the time such successor Operator succeeded to Operator's interest;

(v)    bound by any obligation to perform any work or to make improvements to the Concession Area except for (A) repairs and maintenance required to be made by Operator under this Agreement, and (B) repairs to the Concession Area as a result of damage by fire or other casualty, or partial condemnation, pursuant to the provisions of this Agreement, but only to the extent that such repairs can reasonably be made from the net proceeds of any insurance or condemnation awards actually made available to such successor Operator; or

(vi)    bound by any modification, amendment or renewal of this Agreement made without the consent of any Lessor or Mortgagee of which Vendor has been provided notice.

(c)    Any Mortgagee may elect that this Agreement shall have priority over the Mortgage that it holds and, upon notification to Vendor by such Mortgagee, this Agreement shall be deemed to have priority over such Mortgage, regardless of the date of this Agreement. In connection with any financing of the Real Property or the Building, or of the interest of the lessee under any Superior Lease, Vendor shall consent to any reasonable modifications of this Agreement requested by any lender, provided such modifications do not increase the Rent, materially

19

increase Vendor's non-Rent obligations or materially and adversely affect Vendor's rights under this Agreement.

Section 11.2 **Termination by Vendor.** As long as any Superior Lease or Mortgage shall exist, Vendor shall not seek to terminate this Agreement by reason of any act or omission of Operator (i) until Vendor shall have given notice of such act or omission to all Lessors and Mortgagees, and (ii) until a reasonable period of time shall have elapsed following the giving of notice of such default and the expiration of any applicable notice or grace periods (unless such act or omission is not capable of being remedied within a reasonable period of time) during which period such Lessors and Mortgagees shall each have the right, but not the obligation, to remedy such act or omission. If any Lessor or Mortgagee elects to remedy such act or omission of Operator, Vendor shall not seek to terminate this Agreement so long as such Lessor or Mortgagee is proceeding with reasonable diligence to effect such remedy.

Section 11.3 **Applicability.** The provisions of this Article shall (i) inure to the benefit of Operator, any future Operator of the Real Property, any Lessor or Mortgagee and any sublessor thereof, and (ii) apply notwithstanding that, as a matter of law, this Agreement may terminate upon the termination of any Superior Lease or the foreclosure of any Mortgage.

## ARTICLE 12

## BUILDING SERVICES

Section 12.1 **Services.** Operator shall provide the following services:

(I)    to the ground floor Vendor Stall portion of the Concession Area:

(i)    HVAC, as indicated in the utility allocation shown on Exhibit A-1 (the "Ground Floor Utility Allocation");

(ii)    Heated and cold water as indicated in the Ground Floor Utility Allocation;

(iii)    Gas as indicated in the Ground Floor Utility Allocation to ansul cooking spaces only;

(iv)    Grease trap sized properly for the stalls OR connection to central trap;

(v)    Electricity and plumbing as indicated in the Ground Floor Utility Allocation; and

(vi)    Cleaning and extermination to the stalls and common areas of the Food Hall and security in such manner as Operator shall reasonably determine.

(II) to the cellar Storage Area portion of the Concession Area:

(i)    HVAC, as indicated in the utility allocation shown on Exhibit A-2 (the "Storage Area Utility Allocation");

(ii)    Heated and cold water as indicated in the Storage Area Utility Allocation;

20

(iii)     Electricity and plumbing as indicated in the Storage Area Utility Allocation; and

(iv) Cleaning and extermination to the common storage areas for the Food Hall and security in such manner as Operator shall reasonably determine.

Section 12.2 **No Liability.** Operator shall in no way be liable to Vendor, by means of any abatement of any Rent payable hereunder or otherwise, for Operator's failure to furnish such services and/or utilities and the terms and conditions of this Agreement shall in no way be affected because of such failure except that Operator shall use commercially reasonable diligence to restore such services and/or utilities. Such typical services shall be at Operator's sole cost and expense. In no event shall Operator be responsible for any failure of any security service or system, or any injury or damage caused by any failure of security.

## ARTICLE 13

## INSURANCE, PROPERTY LOSS OR DAMAGE: REIMBURSEMENT

Section 13.1    **Vendor's Insurance.**

(a) Vendor, at its expense, shall obtain and keep in full force and effect during the Term:

(i)     a policy of commercial general liability insurance, on an occurrence basis against claims for personal injury, death and property damage occurring in or about the Concession Area or the Building, provided on the latest version of ISO form CG 00 01 or its equivalent, under which Vendor is named as the insured and Operator, Operator's managing agent, the Operator of the Building and/or any condominium unit containing the Concession Area, any Lessors, any Mortgagees and any other parties whose names shall have been furnished by Operator to Vendor from time to time are named as additional insureds, which insurance shall provide primary coverage without contribution from any other insurance carried by or for the benefit of Operator, Operator's managing agent or any Lessors or Mortgagees named as additional insureds, and Vendor agrees to obtain broad-form contractual liability coverage to insure its indemnity obligations set forth in Article 30. The minimum limits of liability applying exclusively at the Concession Area shall be an amount of not less than $5,000,000.00 per occurrence and general aggregate, which may be met by any combination of primary and excess policies; provided, however, Operator may require Vendor to increase such coverage, from time to time, to that amount of insurance that in Operator's reasonable judgment is then being customarily required by operators for similar types of operations in first-class mixed use buildings in New York City. There will shall be no exclusions for sexual abuse, molestation, assault, or battery. If the aggregate limit applying to the Concession Area is reduced by the payment of a claim or establishment of a reserve equal to or greater than 50% of the annual aggregate, Vendor shall immediately notify Operator of such occurrence and shall arrange to have the aggregate limit restored by endorsement to the existing policy or the purchase of an additional insurance policy unless, in Operator's reasonable judgment, Vendor maintains sufficient excess liability insurance to satisfy the liability requirements of this Agreement without the reinstatement of the aggregate limit;

(ii)     insurance against loss or damage by fire, and such other risks and hazards as are insurable under then available standard forms of "Causes of Loss Special Form"

21

property insurance policies with extended coverage, insuring Vendor's Property, Inventory and Equipment all of Vendor's Signs and Displays, and all Alterations and improvements (if any) to the Concession Area performed by Vendor for the replacement cost value thereof, having a deductible amount no greater than $5,000.00 per annum;

(iii)    during the performance of any Alteration, until completion thereof, builder's risk insurance on a "Causes of Loss Special Form" basis and on a completed value form including a "permission to complete and occupy endorsement", for full replacement cost, covering the interest of Operator and Vendor (and their respective contractors and subcontractors), any Mortgagee and any Lessor, in all work incorporated in the Building and all materials and equipment in or about the Concession Area;

(iv)    workers' compensation insurance, in amounts and with coverages as required by law and New York Statutory Disability (DBL) and Paid Family Leave (PFL) Insurance;

(v)    Employers' Liability Insurance with limits not less than $1,000,000 each accident, $1,000,000 each employee by disease and $1,000,000 policy limit by disease;

(vi)    Commercial Automobile Liability insurance covering owned, non-owned and hired vehicles with limits not less $1,000,000 Combined Single Limit naming Operator, Operator's managing agent, any Lessors, any Mortgagees and any other parties whose names shall have been furnished by Operator to Vendor from time to time as Additional Insureds;

(vii)    Employment Practices Liability Insurance, including third party coverage, with limits not less than $1,000,000 per claim and aggregate, with Operator endorsed as a Co-Defendant;

(viii)    such other insurance in such amounts as any one or more of Operator, any Mortgagee or any Lessor may reasonably require from time to time.

(b)    All insurance required to be carried by Vendor pursuant to the terms of this Agreement (i) shall contain a provision that (A) no act or omission of Vendor shall affect or limit the obligation of the insurance company to pay the amount of any loss sustained, (B) the policy shall be non-cancelable and no material change in coverage shall be made thereto unless Operator, Lessors and Mortgagees shall have received 30 days' prior notice of the same by certified mail, return receipt requested, and (C) Vendor shall be solely responsible for the payment of all premiums under such policies and Operator, Lessors and Mortgagees shall have no obligation for the payment thereof, and (ii) shall be effected under valid and enforceable policies issued by reputable and independent insurers authorized to do business in the State of New York, and rated in Best's Insurance Guide, or any successor thereto (or if there be none, an organization having a national reputation) as having a Best's Rating of "A-" and a "Financial Size Category" of at least "VII" or if such ratings are not then in effect, the equivalent thereof or such other financial rating as Operator may at any time consider appropriate.

(c)    On or prior to the Commencement Date, Vendor shall deliver to Operator appropriate policies of insurance, including evidence of waivers of subrogation, required to be carried by Vendor pursuant to this Article. Evidence of each renewal or replacement of a policy shall be delivered by Vendor to Operator at least 10 days prior to the expiration of such policy. In lieu of the policies of insurance required to be delivered to Operator pursuant to this Article 13

22

and that the Insured Parties are named as additional insureds (collectively, the "Policies"), Vendor may deliver to Operator a certification or certifications from Vendor's insurance company or companies (on the form currently designated "Acord 27" (Evidence of Property Insurance) and "Acord 25-S" (Certificate of Liability Insurance, or the equivalent, provided that attached thereto is an endorsement to Vendor's commercial general liability policy and automobile liability naming the Insured Parties as additional insureds) that shall be binding on Vendor's insurance company and shall expressly provide that such certification (i) conveys to Operator and any other named insured and additional insureds thereunder (the "Insured Parties") all the rights and privileges afforded under the applicable Policies as primary insurance, and (ii) contains an unconditional obligation of the insurance company to advise all Insured Parties in writing by certified mail, return receipt requested, at least 30 days in advance of any termination of or change to the applicable Policies that would affect the interest of any of the Insured Parties.

(d)  Operator shall keep the Building insured against damage and destruction by fire, vandalism, and other perils under "all risk" property insurance written on a replacement cost basis. In addition, Operator shall maintain a policy of commercial general liability insurance for claims for personal injury, death and/or property damage occurring in or about the Building that is consistent with the insurance maintained by Operators of first-class mixed use buildings (office and retail) in the Borough of Queens. Notwithstanding the foregoing, in the event Operator is an Institutional Operator, then Operator may elect to self-insure with respect to the insurance coverages required by the terms of this Section 13.1(d).

Section 13.2  **Waiver of Subrogation**.  Operator and Vendor shall each procure an appropriate clause in or endorsement to any property and liability insurance covering the Concession Area, the Building and personal property, fixtures and equipment located therein, wherein the insurance companies shall waive subrogation or consent to a waiver of right of recovery, and Operator and Vendor agree not to make any claim against, or seek to recover from, the other for any loss or damage to its property or the property of others resulting from fire or other hazards.  Vendor acknowledges that Operator shall not be obligated to carry insurance on, and shall not be responsible for, (i) damage to any Alterations or improvements to the Concession Area (including Vendor's Work), (ii) Vendor's Property, and (iii) any loss suffered by Vendor due to interruption of Vendor's business.

Section 13.3  **Vendor Supplier Insurance and Indemnification**.  Vendor shall require each supplier of goods to the Concession Area to execute the Jacx Food Hall Supplier Insurance and Indemnification Agreement annexed hereto as Exhibit "H.

## ARTICLE 14

## DAMAGE OR DESTRUCTION - FIRE OR OTHER CASUALTY

Section 14.1  **Termination**.  (a) If the Concession Area or any material part thereof shall be damaged or destroyed by fire or other casualty Operator shall reasonably determine the period of time necessary for Operator to Substantially Complete the restoration of the Concession Area to substantially the same condition (the "Restoration Condition") same was in on the Commencement Date , including the equipment, furniture and fixtures shown on Exhibit C (such period being herein referred to as the "Estimated Restoration Period") and provide notice thereof to Vendor (such notice being herein referred to as the "Estimated Restoration Notice").  If the Estimated Restoration Period is more than sixty (60) days from the date of such fire or other

23

casualty, then either Operator, in the Estimated Restoration Notice, or (provided (x) such casualty was not caused by the acts, omissions or willful misconduct of Vendor or any of its agents, employees, representatives, contractors or invitees, and (y) Operator did not elect to terminate this Agreement in the Estimated Restoration Notice) Vendor, within ten (10) days after the giving of the Estimated Restoration Notice to Vendor **(TIME BEING OF THE ESSENCE)**, may elect to terminate this Agreement, in either case, effective on a date set forth in the notice of termination that is not less than ten (10) days' after the giving of the notice of termination. If Operator or Vendor so elects to terminate this Agreement, then (i) at the end of the period set forth in the notice of termination (which period shall not be less than ten (10) days after the giving of such notice), this Agreement and the possessory interest granted hereunder to Vendor shall automatically, and without any further action on the part of Operator or Vendor to be performed, immediately cease, terminate and come to an end and Vendor shall quit, vacate and surrender the Concession Area in the manner required herein without prejudice, however, to Operator's rights and remedies against Vendor under the provisions of this Agreement in effect prior to such termination, (ii) any Fixed Rent and Additional Rent (including, without limitation, Percentage Rent) and other charges owing hereunder shall be paid up to the date of termination, (iii) any payments made by Vendor which were on account of any period subsequent to such date shall be returned to Vendor, and (iv) Operator shall be entitled to collect all insurance proceeds of policies held by Operator and Vendor providing coverage for Alterations and other improvements to the Concession Area. Operator shall retain such proceeds from Vendor's insurance only to the extent that Operator performed or paid for such Alterations and improvements, whether by contribution, offset or otherwise, and the balance, if any, of such proceeds from Vendor's insurance, shall be paid to Vendor.

(b)    In addition to Operator's rights pursuant to Section 14.1(a) above, if more than twenty percent (20%) of the Food Hall shall be damaged or destroyed by fire or other casualty, Operator may elect to terminate this Agreement and the possessory interest granted hereunder to Vendor upon not less ten (10) days' written notice to Vendor. If Operator so elects to terminate this Agreement, then the last sentence of Section 14.1(a) above shall apply.

Section 14.2 **Restoration.** (a) If neither Operator nor Vendor terminate this Agreement, then Operator shall repair the Concession Area substantially to the Restoration Condition, subject to the provisions of this Article 14, and of any Mortgage or Superior Lease. Operator shall have no obligation to repair or restore, and Vendor shall at its cost and expense, repair and replace Vendor's Property, and any Alterations or improvements to the Concession Area (including Vendor's Work), to substantially the condition prior to the fire or other casualty. So long as Vendor is not in default beyond applicable grace or notice periods in the payment or performance of its obligations under this Agreement, if Vendor is unable to operate, and is not operating, its business in the Concession Area as a result of the damage to the Concession Area caused by such fire or other casualty, then until the earlier of (i) the restoration to the Restoration Condition is Substantially Completed or would have been Substantially Completed but for Vendor Delay, and (ii) the date on which Vendor reopens the Concession Area for the conduct of business, Fixed Rent shall be abated. Nothing set forth in this Section 14.2 shall be interpreted to limit Operator's right to repair or restore all or any portion of the Concession Area at such time and in such manner as Operator deems appropriate in Operator's sole judgment, and no such repair or restoration shall constitute a waiver by Operator of any of Operator's rights set forth in this Section 14.2 or elsewhere in this Agreement.

(b)    Unless this Agreement is terminated as provided in this Article 14, if the Concession Area shall be damaged by fire or other casualty, then Vendor shall (i) repair and restore all portions of the Concession Area not required to be restored by Operator pursuant to

24

this Article 14 to substantially the condition immediately prior to the fire or other casualty, (ii) equip the Concession Area with all Vendor's Property and other personal property necessary or proper for the operation of Vendor's business, and (iii) open for business in the Concession Area as soon thereafter as possible.

Section 14.3 **Waiver of Real Property Law § 227**. This Article constitutes an express agreement governing any case of damage or destruction of the Concession Area or the Building by fire or other casualty, and Section 227 of the Real Property Law of the State of New York, which provides for such contingency in the absence of an express agreement, and any other law of like nature and purpose now or hereafter in force, shall have no application in any such case.

Section 14.4 **Inability to Collect**. Notwithstanding any of the foregoing provisions of this Article 14, if Operator or any Lessor or Mortgagee shall be unable to collect all of the insurance proceeds (including rent insurance proceeds) applicable to damage or destruction of the Concession Area or the Building by reason of any action or inaction on the part of Vendor or any Vendor Party, then, without prejudice to any other remedies that may be available against Vendor, (i) there shall be no abatement of Rent as otherwise provided in this Article 14, and (ii) Operator shall have no restoration obligation.

Section 14.5 **Operator's Liability.** Any Building employee to whom any property shall be entrusted by or on behalf of Vendor shall be deemed to be acting as Vendor's agent with respect to such property and neither Operator nor any of the Indemnitees shall be liable for any damage to such property, or for the loss of or damage to any property of Vendor by theft or otherwise. Neither Operator nor any of the other Indemnitees shall be liable for any injury or damage to persons or property or interruption of Vendor's business resulting from fire or other casualty, any damage caused by other tenants, occupants or persons in the Building or by construction of any private, public or quasi-public work, or any latent defect in the Concession Area or in the Building (except that Operator shall be required to repair the same to the extent expressly provided in Article 7). Without limitation, Vendor agrees to use and occupy the Concession Area at its own risk, and neither Operator nor any Indemnitees shall have any responsibility or liability for any loss of or damage to Vendor's Property or other personal property of any Vendor Party or those claiming by, through or under any Vendor Party. No penalty shall accrue for delays that may arise by reason of adjustment of insurance on the part of Operator or Vendor, or Unavoidable Delays, or in connection with any repair or restoration of any portion of the Concession Area or of the Building. Operator shall use reasonable efforts to minimize interference with Vendor's use and occupancy of the Concession Area during the performance of any such repair or restoration; provided, however, Operator shall have no obligation to employ contractors or labor at overtime or other premium pay rates or to incur any other overtime costs or additional expenses whatsoever. Nothing in this Section 14.5 shall affect any right of Operator to be indemnified by Vendor pursuant to the provisions of Article 32 for payments made to compensate for losses of third parties.

## ARTICLE 15

## EMINENT DOMAIN

Section 15.1 (a) **Termination**. If the Concession Area or any material part thereof shall be shall be acquired or condemned for any public or quasi-public purpose, this Agreement shall terminate and the Term shall end as of the date of the vesting of title, with the same effect as if such date were the Expiration Date, without any further action on the part of Operator or Vendor to be performed, immediately cease, terminate and come to an end and Vendor shall quit, vacate

25

and surrender the Concession Area in the manner required herein without prejudice, however, to Operator's rights and remedies against Vendor under the provisions of this Agreement in effect prior to such termination, (ii) any Fixed Rent and Additional Rent (including, without limitation, Percentage Rent) and other charges owing hereunder shall be paid up to the date of termination, and (iii) any payments made by Vendor which were on account of any period subsequent to such date shall be returned to Vendor.

(b)      In addition to Section 15.1(a) above, if more than twenty percent (20%) of the Food Hall shall be shall be shall be acquired or condemned for any public or quasi-public purpose, Operator may elect to terminate this Agreement and the possessory interest granted hereunder to Vendor upon not less ten (10) days' written notice to Vendor. If Operator so elects to terminate this Agreement, then the last sentence of Section 15.1(a) above shall apply.

Section 15.2 **Restoration by Vendor.** If this Agreement and the Term shall not be terminated in accordance with this Section 15.1, if a part of the Concession Area shall be so acquired or condemned, then Vendor shall (i) repair and restore all portions of the Concession Area that remain to substantially the same condition immediately prior to such acquisition or condemnation, (ii) equip the Concession Area with trade fixtures and all personal property necessary or proper for the operation of Vendor's business, and (iii) open for business in the Concession Area as soon thereafter as possible.

Section 15.3 **Awards.** Upon any acquisition or condemnation of all or any part of the Concession Area, the Food Hall, the Building or the Real Property, Operator shall receive the entire award for any such acquisition or condemnation, and Vendor shall have no claim against Operator or the condemning authority for the value of any unexpired portion of the Term or for the possessory interest created hereby or for the Alterations or other improvements; and Vendor hereby assigns to Operator all of its right in and to such award. Nothing contained in this Article shall be deemed to prevent Vendor from making a separate claim in any condemnation proceedings for the then value of any Vendor's Property included in such taking and for any moving expenses, provided any such award is in addition to, and does not result in a reduction of, the award made to Operator.

## ARTICLE 16

## ASSIGNMENT AND SUBCONCESSION

Section 16.1 **No Assignment, Subletting, Etc.** Vendor expressly covenants that it shall not at any time assign, mortgage, transfer or encumber this Agreement, the Concession Area or any of Vendor's rights hereunder, nor sublease or subconcession the Concession Area or the use of the Concession Area (or any part thereof) or any of Vendor's rights or obligations hereunder, to any person, entity or other party at any time and/or otherwise permit any person or entity to use and/or occupy any portion of the Concession Area. Any such transfer shall, at Operator's option, constitute an immediate termination of this Agreement. Operator may assign this Agreement, at its option, at any time, including, but not limited to, a substitute food hall Vendor. The provisions of the foregoing sentence are self-operative and require no further instruments to give effect hereto; provided, however, Vendor shall promptly execute and deliver any instrument that Operator and/or such successor Operator may reasonably request (1) evidencing such assignment, (2) setting forth the terms and conditions of the relevant agreement, and (3) containing such other terms and conditions as may be required by such successor, provided such terms and conditions do not increase the Rent or, materially and adversely increase Vendor's non-Rent obligations or materially and adversely affect Vendor's rights under this Agreement.

26

Section 16.2 **Deemed Assignments**. (a)  For the purposes of this Agreement, the entering into by Vendor of any management, franchise or operating agreement, or any agreement in the nature thereof transferring control of the Concession Area (or any portion thereof), including the use, occupancy and/or disposition thereof, or control of the operation or management of the business being conducted in the Concession Area or any portion thereof, to a person other than Vendor, or transferring control of any substantial percentage of the profits and losses from the business operations in the Concession Area (or any portion thereof) to a person other than Vendor, or otherwise having substantially the same effect, including a so-called "take-over agreement" in respect of the Concession Area or Vendor's interest therein or in this Agreement, shall not be permitted.  In addition, under no circumstances shall a partial assignment of Vendor's interest in the Concession Area or in this Agreement be permitted.

(b)     In addition, for the purposes of this Agreement, the following shall be deemed assignments of this Agreement by Vendor to which the provisions of this Article   16 shall apply: (i) The issuance, transfer or acquisition of interests in Vendor or any guarantor of any of Vendor's obligations under this Agreement (a "**Guarantor**") or any person (a "**Parent**") that directly or indirectly controls Vendor or any Guarantor (whether stock, partnership interests, interests in a limited liability company or otherwise) to a person or group of related or unrelated persons, whether in a single transaction or a series of related or unrelated transactions, in such quantities that after such issuance, transfer or acquisition, control of Vendor, such Guarantor or Parent (as it shall be constituted after giving effect to such issuance, transfer or acquisition of interests in Vendor, Guarantor or Parent, as the case may be), directly or indirectly, shall have changed, (ii) the merger or consolidation of Vendor, a Guarantor or a Parent into or with any other entity, or (iii) the acquisition by a third-party, of all or substantially all of the assets of Vendor, a Guarantor or a Parent.  Any person or legal representative of Vendor, to whom Vendor's interest under this Agreement passes by operation of law, or otherwise, shall be bound by the provisions of this Article.  As used in this Article, the word "control," (including the derivations of the word "control," such as "controlling" "controlled by" or "under common control with" or words of like import) shall mean:  (i) Operatorship of more than 50% of the outstanding voting capital stock of a corporation or more than 50% of the beneficial interests of any other entity or (ii) the ability effectively to control or direct the business decisions of such corporation or entity.

Section 16.3 **Assignment Profits**. In the event that Operator consents to any assignment of this Agreement or subleasing of the Concession Area, Vendor shall pay to Operator, as Additional Rent, any and all consideration, rent or other amounts received by Vendor in excess of the Rent payable by Vendor under this Agreement in connection with such assignment or subletting.

Section 16.4 **Change of Control.** For purposes of this Agreement, any direct or indirect transfer, sale, assignment, pledge or other disposition of any equity interests in Vendor, or any change in the power to direct or control the management or policies of Vendor (whether by ownership of voting interests, contract or otherwise), which results in a change of Control of Vendor (a "Change of Control"), shall be deemed an assignment of this Agreement. Vendor shall not permit any Change of Control without the prior written consent of Operator, which consent may be granted or withheld in Operator's sole and absolute discretion. For the avoidance of doubt, (i) any transfer of a majority of the direct or indirect ownership interests in Vendor, or (ii) any transaction resulting in a change in the ultimate beneficial ownership or control of Vendor, shall constitute a Change of Control. Any purported Change of Control effected without such prior written consent shall be null and void and shall constitute an Event of Default under this Agreement.

27

## ARTICLE 17

## ELECTRICITY

Section 17.1 **Use of Electricity**. Vendor shall at all times comply with the rules and regulations of the utility company supplying electricity to the Building. Vendor shall not use any electrical equipment that, in Operator's judgment, would exceed 100 amps of 208V 3 phase (60 amps in the Storage Area) electrical service or interfere with electrical service to other Vendors, tenants or occupants of the Building. Vendor shall not make or perform, or permit the making or performance of, any Alterations to wiring installations or other electrical facilities in or serving the Concession Area, or make any additions to the equipment or other appliances in the Concession Area that utilize electrical energy without the prior consent of Operator, in each instance, and in compliance with this Agreement.

Section 17.2 **Service Disruption**. Subject to the express provisions of Section 12.3, Operator shall not be liable in any way to Vendor for any failure, defect or interruption of, or change in the supply, character or quantity of, electric service furnished to the Concession Area for any reason, nor shall there be any allowance to Vendor for a diminution of rental value, nor shall the same constitute an actual or constructive eviction of Vendor, in whole or in part, or relieve Vendor from any of its obligations under this Agreement, and no liability shall arise on the part of Operator by reason of inconvenience, annoyance or injury to business, whether electricity is provided by public or private utility or by any electricity generation system owned and operated by Operator.

## ARTICLE 18

## ACCESS TO CONCESSION AREA

Section 188.1 **Operator's Access**. (a) Vendor shall permit Operator, Operator's agents, utility companies and other service providers servicing the Building to erect, use, maintain, repair and replace concealed ducts, pipes, lines and conduits in and through the areas of Concession Area specified therefor in Section 2.1, in all cases in the manner therein provided. Operator shall promptly repair any damage to the Concession Area or Vendor's Property caused by any work performed pursuant to this Article.

(b)     Operator, any Lessor or Mortgagee and any other party designated by Operator and their respective agents shall have the right to enter the Concession Area at all reasonable times, upon reasonable notice (which notice may be oral) except in the case of emergency, (i) to examine the Concession Area, (ii) to show the Concession Area to prospective purchasers, Mortgagees or Lessors of the Building and their respective agents and representatives or others, and to prospective lessees or occupants of premises in the Building, and (iii) to make such repairs, alterations or additions to the Concession Area or the Building (A) as Operator may deem necessary or desirable, (B) that Operator may elect to perform following Vendor's failure to perform, or (C) to comply with any Requirements, and Operator shall be allowed to take all material into the Concession Area that may be required for the performance of such work without the same constituting an actual or constructive eviction of Vendor in whole or in part and without any abatement of Rent.

(c)     All parts (except surfaces facing the interior of the Concession Area) of all walls, windows and doors bounding the Concession Area, including exterior Building walls, exterior core corridor walls, and doors and entrances (other than doors and entrances solely connecting areas within the Concession Area), all balconies, terraces and roofs adjacent to the Concession Area,

28

all space in or adjacent to the Concession Area used for shafts, stacks, risers, fan rooms, electrical and communications closets, stairways, mail chutes, conduits and other mechanical facilities, Building Systems and Building facilities are not part of the Concession Area, and Operator shall have the use thereof and access thereto through the Concession Area for the purposes of Building operation, maintenance, alteration and repair.

Section 18.2 **Alterations to Building.** Operator has the right at any time or from time-to-time, in its sole discretion, to (i) change the name, number or designation by which the Building is commonly known, (ii) alter the Building to change the arrangement or location of entrances or passageways, doors and doorways, and corridors, elevators, stairs, toilets, or other public parts of the Building, or (iii) build, add to, subtract from, relocate, alter, change or otherwise use the Building or any part thereof without any such acts constituting an actual or constructive eviction and without incurring any liability to Vendor or entitling Vendor to any equitable relief, so long as such changes do not deny Vendor access to the Concession Area. Without limiting or otherwise adversely affecting Operator's rights under the preceding sentence, Operator shall use reasonable efforts to minimize interference with Vendor's use and occupancy of the Concession Area during the making of such changes or alterations, provided Operator shall have no obligation to employ contractors or labor at overtime or other premium pay rates or to incur any other overtime costs or additional expenses whatsoever.

## ARTICLE 19

## DEFAULT

Section 19.1 **Vendor's Defaults.** Each of the following events shall be an "Event of Default" hereunder:

(a)    Vendor's failure to pay when due any installment of Fixed Rent Percentage Rent or any other Additional Rent or other amount when due hereunder and such failure continues for five (5) days after Operator's notice of such failure is given to Vendor; but if Vendor shall fail in the timely payment of any of the foregoing items of Rent 2 times in any Concession Year, then, notwithstanding that such defaults shall have each been cured within the applicable period provided above, upon any further default in the timely payment of Fixed Rent or Additional Rent, Operator may serve a 3 days' notice of termination upon Vendor without affording to Vendor an opportunity to cure such further default; or

(b)    Vendor's failure to perform any of the other terms, conditions or covenants of this Agreement, except as expressly set forth herein, and such failure continues for fifteen (15) days after Operator's written notice thereof to Vendor; or if such default is of such a nature that it can be remedied but cannot be completely remedied within 15 days, Vendor fails to commence to remedy such default within 15 days after such notice; or, with respect to any such default, Vendor, having commenced such remedy within 15 days after such notice, fails to diligently prosecute to completion all steps necessary to remedy such default within 120 days; or

(c)    Excepting only those days that Vendor is prevented from remaining open by virtue of strike, fire, unavoidable casualty or other event beyond the control of Vendor, but financial inability shall never be deemed to be an event beyond Vendor's control (and Vendor agrees promptly to advise Operator of any such event and closing, and further agrees to reopen as soon thereafter as possible), failure of Vendor, to be open for business to the public for more than one day when required by this Agreement to be so

29

open in any one calendar year, or for more than an aggregate of 3 such days during the Term, or if Vendor shall otherwise abandon or vacate the Concession Area. For purposes of this Section 19.1(c), in the event Vendor fails to remain open for business to the public for more than 10% of the Required Operating Hours during any particular day, Vendor shall be deemed to be closed for the entire day. Without limitation, the failure of Vendor to have completed Vendor's Work and equipped the Concession Area and to have opened for business on the Opening Date or the closing of the Concession Area for business after Vendor has initially opened for business therein, if such failure or closing continues for more than 3 consecutive days that Vendor is required pursuant to applicable provisions of this Agreement to keep the Concession Area open for business, shall be considered for the purposes hereof to be an abandonment of the Concession Area by Vendor; or

(d)    Vendor's failure to timely replenish the Security Deposit as set forth in Article 32;

(e)    In the event that the New York City Board of Health issues less than an "A" designation against Vendor and/or the Concession Area (arising out of Vendor's use) and Vendor fails to cure such designation by causing same to be "A" or better within sixty (60) days of written notice; or

(f)    Vendor's interest in this Agreement shall devolve upon or pass to any Person, whether by operation of law or otherwise, except as expressly permitted under Article 16; or

(g)    Vendor files a voluntary petition in bankruptcy or insolvency, or is adjudicated a bankrupt or insolvent, or files any petition or answer seeking any reorganization, liquidation, dissolution or similar relief under any present or future federal bankruptcy act or any other present or future applicable federal, state or other statute or law, or makes an assignment for the benefit of creditors or seeks or consents to or acquiesces in the appointment of any trustee, receiver, liquidator or other similar official for Vendor or for all or any part of Vendor's property; or

(h)    if, within 60 days after the commencement of any proceeding against Vendor, whether by the filing of a petition or otherwise, seeking bankruptcy, insolvency, reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state or other statute or law, such proceeding shall not have been dismissed, or if, within 60 days after the appointment of any trustee, receiver, liquidator or other similar official for Vendor, or for all or any part of Vendor's property, without the consent or acquiescence of Vendor, such appointment shall not have been vacated or otherwise discharged, or if any lien, execution or attachment or other similar filing shall be made or issued against Vendor or any of Vendor's property pursuant to which the Concession Area shall be taken or occupied or attempted to be taken or occupied by someone other than Vendor; or

(i)    if Guarantor shall fail to perform any of its obligations when due under the Guaranty of Concession Agreement from the Guarantor in favor of Operator, guarantying the payment and performance by Vendor of its obligations under this Agreement; or

30

(j)      if Guarantor or any assignor or this Agreement generally does not, or is unable to, or admits in writing its inability to, pay its debts as they become due or is subject to the filing of a petition, case or proceeding in bankruptcy; or

(k)      if Vendor is found to have understated Gross Sales (as defined in Section 2.4) for any full or partial year by more than 3%; or

(l)      Vendor abandons or fails to operate in the Concession Area fully stocked during all Required Hours.

Upon any Event of Default, Operator may at any time thereafter terminate this Agreement, by giving Vendor at least three (3) days' written notice of such termination (or such longer period as may be required by applicable Requirements), and Operator may exercise any and all other rights and remedies available to a landlord under a lease for premises, at law or in equity with respect to defaults by a tenant thereunder, including, without limitation, the right to receive payment of all Fixed Rent (including any imputed Percentage Rent) that would have been paid through the expiration of the Term.  Vendor shall reimburse Operator for any expenses (including but not limited to reasonable attorneys' fees) incurred by Operator in enforcing this Agreement or any of its rights hereunder.

Section 19.2 **Vendor's Liability**.  If, at any time, (i) Vendor shall be comprised of two or more Persons, (ii) Vendor's obligations under this Agreement shall have been guaranteed by any Person other than Vendor, or (iii) Vendor's interest in this Agreement shall have been assigned, the word "Vendor," as used in Sections 19.1(g) and (h), shall be deemed to mean any one or more of the Persons primarily or secondarily liable for Vendor's obligations under this Agreement. Any monies received by Operator from or on behalf of Vendor during the pendency of any proceeding of the types referred to in this Article shall be deemed paid as compensation for the use and occupancy of the Concession Area and the acceptance of any such compensation by Operator shall not be deemed an acceptance of Rent or a waiver on the part of Operator of any rights under this Agreement.  This Concession Agreement and the obligations of Vendor to pay Rent and to perform all of the other covenants and agreements of Vendor hereunder shall not be affected, impaired or excused by any Unavoidable Delays.

## ARTICLE 20

## REMEDIES AND DAMAGES

Section 20.1  (a) **Operator's Remedies**.  If any Event of Default occurs, and this Agreement terminates as provided in Article 19:

(i)      **Surrender of Possession**.  Vendor shall quit and surrender the Concession Area to Operator, and Operator and its agents may immediately, or at any time after such Event of Default, re-enter the Concession Area or any part thereof, without notice, either by summary proceedings, or by any other applicable action or proceeding, or by force (to the extent permitted by law) or otherwise in accordance with applicable legal proceedings (without being liable to indictment, prosecution or damages therefor), and may repossess the Concession Area and dispossess Vendor and any other Persons from the Concession Area and remove any and all of their property and effects from the Concession Area.

31

(ii)    **Operator's Reletting**.  Operator, at Operator's option, may relet (all references to relet or reletting or similar words shall include reconcession and reconcessioning) all or any part of the Concession Area from time to time, either in the name of Operator or otherwise, to such Vendor, tenant or tenants, for any term ending before, on or after the Expiration Date, at such rental and upon such other conditions (which may include concessions and free rent periods) as Operator, in its sole discretion, may determine.  Operator shall have no obligation to and shall not be liable for refusal or failure to relet or, in the event of any such reletting, for refusal or failure to collect any rent due upon any such reletting; and no such refusal or failure shall relieve Vendor of, or otherwise affect, any liability under this Agreement.  Operator, at Operator's option, may make such alterations, decorations and other physical changes in and to the Concession Area as Operator, in its sole discretion, considers advisable or necessary in connection with such reletting or proposed reletting, without relieving Vendor of any liability under this Agreement or otherwise affecting any such liability.

(b)    **Other Remedies**.  Upon the breach or threatened breach by Vendor, or any Persons claiming through or under Vendor, of any term, covenant or condition of this Agreement, Operator shall have the right to enjoin such breach and to invoke any other remedy allowed by law or in equity as if re-entry, summary proceedings and other special remedies were not provided in this Agreement for such breach.  The rights to invoke the remedies set forth above are cumulative and shall not preclude Operator from invoking any other remedy allowed at law or in equity.

(c)    **Vendor's Waiver**.  Vendor, on its own behalf and on behalf of all Persons claiming through or under Vendor, including all creditors, hereby waives all rights that Vendor and all such Persons might otherwise have under any Requirement (i) to the service of any notice of intention to re-enter or to institute legal proceedings, (ii) to redeem, or to re-enter or repossess the Concession Area, or (iii) to restore the operation of this Agreement, after (A) Vendor shall have been dispossessed or ejected by judgment or by warrant of any court or judge, (B) any re-entry by Operator, or (C) any expiration or early termination of the Term of this Agreement, whether such dispossession, re-entry, Expiration Date or termination shall be by operation of law or pursuant to the provisions of this Agreement.  The words "re-enter," "re-entry" and "re-entered" as used in this Agreement shall not be deemed to be restricted to their technical legal meanings.

Section 20.2  (a) **Operator's Damages**.  If this Agreement and the Term expires and comes to an end as provided in Article 19, or by or under any summary proceeding or any other action or proceeding, or if Operator shall re-enter the Concession Area as provided in Section 20.1, then, in any of such events:

(i)    Vendor shall pay to Operator all Rent payable under this Agreement by Vendor to Operator up to the Expiration Date or to the date of re-entry upon the Concession Area by Operator, as the case may be;

(ii)    Operator shall be entitled to retain all monies, if any, paid by Vendor to Operator, whether as prepaid Rent, the Security Deposit or otherwise, which monies, to the extent not otherwise applied to amounts due and owing to Operator, shall be credited by Operator against any damages payable by Vendor to Operator;

(iii)    Vendor shall pay to Operator, in monthly installments, on the days specified in this Agreement for payment of installments of Fixed Rent, any Deficiency; it being understood that Operator shall be entitled to recover the Deficiency from Vendor each

32

month as the same shall arise, and no suit to collect the amount of the Deficiency for any month shall prejudice Operator's right to collect the Deficiency for any subsequent month by a similar proceeding; and

(iv)    whether or not Operator shall have collected any monthly payments on account of the Deficiency, Vendor shall pay to Operator, on demand, in lieu of any further payments on account of the Deficiency and as liquidated and agreed final damages, a sum equal to the Rent for the period that otherwise would have constituted the unexpired portion of the Term (assuming Additional Rent during such period to be the same as had been payable for the year immediately preceding such termination or re-entry, less the aggregate amounts on account of the Deficiency theretofore collected by Operator pursuant to the provisions of Section 20.2(a)(iii) for the same period.

(b)    **Reletting**. If the Concession Area, or any part thereof, shall be relet together with other space in the Building, the rents collected or reserved under any such reletting and the expenses of any such reletting shall be equitably apportioned for the purposes of this Section. Vendor shall not be entitled to any rents collected or payable under any reletting, whether or not such rents exceed Rent reserved in this Agreement. Nothing contained in Articles 19 or 20 shall be deemed to limit or preclude the recovery by Operator from Vendor of the maximum amount allowed to be obtained as damages under applicable Requirements, or of any sums or damages to which Operator may be entitled in addition to the damages set forth in this Section.

Section 20.3  **Default Interest: Other Rights of Operator**. Any Rent or damages payable under this Agreement and not paid when due shall bear interest at the Interest Rate from the due date until paid, and the interest shall be deemed Additional Rent. If Vendor fails to pay any Additional Rent when due, Operator, in addition to any other right or remedy, shall have the same rights and remedies as in the case of a default by Vendor in the payment of Fixed Rent. If Vendor is in arrears in the payment of Rent, Vendor waives Vendor's right, if any, to designate the items against which any payments made by Vendor are to be credited, and Operator may apply any payments made by Vendor to any items Operator sees fit, regardless of any request by Vendor. Operator reserves the right, without liability to Vendor and without constituting any claim of constructive eviction, to suspend furnishing or rendering to Vendor any overtime Building services or labor, materials or other property or services for which Vendor is obligated to pay a separate charge under this Agreement (excluding electricity and water), in the event that (but only for so long as) Vendor is in arrears in paying Operator for such items for more than 5 days after notice from Operator to Vendor demanding the payment of such arrears.

## ARTICLE 21

## OPERATOR'S RIGHT TO CURE: REIMBURSEMENT

Section 21.1  **Operator's Right to Cure**. If Vendor defaults in the performance of any of its obligations under this Agreement, Operator, without thereby waiving such default, may perform such obligation for the account and at the expense of Vendor: (i) immediately or at any time thereafter, and without notice, in the case of emergency or in case the default (A) materially interferes with the use by any other Vendor, occupant or tenant of any space in the Building, (B) materially interferes with the efficient operation of the Building, (C) will result in a violation of any Requirement, (D) will result in a default under any Mortgage or Superior Lease, or (E) will result in a cancellation of any insurance policy maintained by Operator, and (ii) in any other case if such default continues for more than 10 days from the date Operator gives notice of Operator's intention so to perform the defaulted obligation.

33

Section 21.2 **Reimbursement for Vendor's Default**. Vendor shall pay Operator, within 10 days after demand, for all costs, expenses (including reasonable out-of-pocket counsel fees and disbursements), damages or fines sustained or incurred by, Operator in connection with (i) the performance by Operator for the account of Vendor of the obligations of Vendor pursuant to Section 21.1, (ii) any action or proceeding (including any summary dispossess proceeding) brought by Operator or in which Operator is a party to enforce any obligation of Vendor under this Agreement or right of Operator in or to the Concession Area, and (iii) any default by Vendor under this Agreement. All such costs shall be paid by Vendor as aforesaid, with interest thereon at the Interest Rate from the date such expenditures were made, or damages, costs or fines incurred, until the date reimbursed by Vendor.

## ARTICLE 22

## NO REPRESENTATIONS BY OPERATOR; OPERATOR'S APPROVAL

Section 22.1 **No Representations**. Except as expressly set forth herein, Operator and Operator's agents have made no warranties, representations, statements or promises with respect to (i) the leaseable areas of the Concession Area or the Building, (ii) the compliance with applicable Requirements of the Concession Area or the Building, or (iii) the suitability of the Concession Area for any particular use or purpose. Except as expressly set forth herein, no rights, easements or licenses are acquired by Vendor under this Agreement by implication or otherwise. Vendor is entering into this Agreement after full investigation, and is not relying upon any statement or representation made by Operator not embodied in this Agreement.

Section 22.2 **Written Approval**. All references in this Agreement to the consent or approval of Operator mean the written consent or approval of Operator, duly executed by Operator. All consents or approvals of Operator may be granted or withheld in Operator's sole discretion unless specifically provided to the contrary in this Agreement.

Section 22.3 **No Money Damages**. Wherever in this Agreement Operator's consent or approval is required, if Operator refuses to grant such consent or approval, whether or not Operator expressly agreed that such consent or approval would not be unreasonably withheld, Vendor shall not make, and Vendor hereby waives, any claim for money damages (including any claim by way of set-off, counterclaim or defense) based upon Vendor's claim or assertion that Operator unreasonably withheld or delayed its consent or approval. Vendor's sole remedy shall be an action or proceeding to enforce such provision, by specific performance, injunction or declaratory judgment. In no event shall Operator be liable for, and Vendor, on behalf of itself and all other Vendor Parties, hereby waives any claim for, any indirect, consequential or punitive damages, including loss of profits or business opportunity, arising under or in connection with this Agreement.

## ARTICLE 23

## END OF TERM

Section 23.1 **Expiration**. Upon the Expiration Date or other termination of this Agreement, Vendor shall quit and surrender the Concession Area to Operator, vacant, broom clean and in good order and condition, ordinary wear and tear and damage for which Vendor is not responsible under the terms of this Agreement excepted, and Vendor shall remove all of Vendor's Property as may be required pursuant to Article 5.

34

Section 23.2 **Holdover Charges.** Vendor acknowledges and agrees that it would be difficult, if not impossible to actually assess the damages which would be suffered by Operator as a result of Vendor's failure to faithfully perform its obligation to quit and surrender the Concession Area as provided herein on or before the expiration or earlier termination of this Agreement in accordance with the terms hereof. Therefore, it is expressly understood and agreed by Vendor, that if Vendor fails for any reason whatsoever to quit and surrender the Concession Area to Operator as provided herein on or before the expiration or earlier termination of this Agreement in accordance with the terms hereof, then Vendor shall be liable and pay to Operator, as liquidated damages for the use and occupancy of the Concession Area after the Term has expired, and not as a penalty, 150% for the first 15 days and, thereafter, 200%, of the per diem average of all Fixed Rents (including Percentage Rent, including any imputed Percentage Rent) and all other Additional Rents, fees and charges paid over the Term per day for Vendor's use and occupancy of the Concession Area through and including the date Vendor surrenders actual possession of the Concession Area to Operator in the condition required hereunder. This Section 23.2 shall in no way be construed as a modification or waiver of Vendor's obligation under this Agreement to vacate the Concession Area on or before the Expiration Date or any earlier termination of this Agreement in accordance with the terms hereof. Neither the billing nor collection of such amounts as hereinabove provided, shall be deemed a waiver of any right of Operator to collect damages for Vendor's failure to vacate the Concession Area in accordance with the terms of this Agreement on or before the expiration or termination of this Agreement. This Section 23.2 shall survive the Expiration Date or earlier termination of this Agreement.

Section 23.3 **Other Holdover Remedies.** If possession of the Concession Area is not surrendered to Operator on or before the Expiration Date or sooner termination of the Term, in addition to any other rights or remedies Operator may have hereunder or at law, Vendor shall:

(a)    be liable to Operator for (i) any payment or rent concession that Operator may be required to make to any tenant or occupant obtained by Operator for all or any part of the Concession Area (a "New Vendor") in order to induce such New Vendor not to terminate its lease, concession or other occupancy agreement by reason of the holding-over by Vendor, and (ii) the loss of the benefit of the bargain if any New Vendor shall terminate its lease, concession or other occupancy by reason of the holding-over by Vendor; and

(b)    indemnify and hold harmless Operator against all claims for damages by any New Vendor.

No holding-over by Vendor, nor the payment to Operator of the amounts specified above, shall operate to extend the Term. Nothing herein contained shall be deemed to permit Vendor to retain possession of the Concession Area after the Expiration Date or sooner termination of this Agreement, and no acceptance by Operator of payments from Vendor after the Expiration Date or sooner termination of the Term shall be deemed to be other than on account of the amount to be paid by Vendor in accordance with the provisions of this Article.

Section 23.4 **Waiver of Stay.** Vendor expressly waives, for itself and for any Person claiming through or under Vendor, any rights that Vendor or any such Person may have under the provisions of Section 2201 of the New York Civil Practice Law and Rules and of any successor law of like import then in force, in connection with any holdover summary proceedings that Operator may institute to enforce the foregoing provisions of this Article.

35

## ARTICLE 24

### NO SURRENDER: NO WAIVER

Section 24.1 **No Surrender or Release**. No act or thing done by Operator or Operator's agents or employees during the Term shall be deemed an acceptance of a surrender of the Concession Area.

Section 24.2 **No Waiver**. No provision of this Agreement shall be deemed to have been waived by any party unless such waiver is in writing and is signed by the party against whom such waiver is asserted, and any such waiver shall be effective only for the specific purpose and in the specific instance in which given. The failure of either party to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Agreement, or any of the Operating Manual, shall not be construed as a waiver or relinquishment for the future performance of such obligations of this Agreement or the Operating Manual, or of the right to exercise such election but the same shall continue and remain in full force and effect with respect to any subsequent breach, act or omission. The receipt by Operator of any Rent payable pursuant to this Agreement or any other sums with knowledge of the breach of any covenant of this Agreement shall not be deemed a waiver of such breach. No payment by Vendor or receipt by Operator of a lesser amount than the monthly Fixed Rent or Additional Rent herein stipulated shall be deemed to be other than a payment on account of the earliest stipulated Fixed Rent or Additional Rent, or as Operator may elect to apply such payment, nor shall any endorsement or acceptance of any check or other payment in the face of a statement on such check or any letter accompanying such check or payment be deemed an accord and satisfaction, and Operator may accept such check or payment without prejudice to Operator's right to recover the balance of such Fixed Rent or Additional Rent or pursue any other remedy provided in this Agreement. The existence of a right of renewal or extension of this Agreement, or the exercise of such right, shall not limit Operator's right to terminate this Agreement in accordance with the terms hereof.

## ARTICLE 25

### WAIVER OF TRIAL BY JURY

OPERATOR AND VENDOR HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER ON ANY MATTERS IN ANY WAY ARISING OUT OF OR CONNECTED WITH THIS CONCESSION AGREEMENT, THE RELATIONSHIP OF OPERATOR AND VENDOR, VENDOR'S USE OR OCCUPANCY OF THE CONCESSION AREA, OR THE ENFORCEMENT OF ANY REMEDY UNDER ANY REQUIREMENT. If Operator commences any summary proceeding against Vendor, Vendor will not interpose any counterclaim of any nature or description in any such proceeding (unless failure to impose such counterclaim would preclude Vendor from asserting in a separate action the claim that is the subject of such counterclaim), and will not seek to consolidate such proceeding with any other action that may have been or will be brought in any other court by Vendor.

## ARTICLE 26

### ADJACENT EXCAVATION: SHORING

If an excavation shall be made, or shall be authorized to be made, upon land adjacent to the Real Property, Vendor shall, upon notice, afford to the Person causing or authorized to cause

such excavation a license to enter upon the Concession Area for the purpose of doing such work as such person shall deem necessary to preserve the Building from injury or damage and to support the Building by proper foundations. In connection with such license, Vendor shall have no right to claim any damages or indemnity against Operator, or diminution or abatement of Rent, provided Vendor shall continue to have access to the Concession Area.

## ARTICLE 27

## NOTICES

Except. as otherwise expressly provided in this Agreement, all consents, notices, demands, requests, approvals or other communications given under this Agreement shall be in writing and shall be deemed sufficiently given or rendered if delivered by hand (provided a signed receipt is obtained) or if sent by registered or certified mail (return receipt requested) or by a nationally recognized overnight delivery service making receipted deliveries, addressed as follows:

If to Vendor, (i) at Vendor's address set forth on the first page of this Agreement, if given prior to Vendor's taking possession of the Concession Area, or (ii) at the Building, if given subsequent to Vendor's taking possession of the Concession Area, or

If to Operator, at Operator's address set forth on the first page of this Agreement, Attention: Property Manager – 28-07 Jackson Avenue, Long Island City, New York and with copies to (A) Office of the Center, 1500 Broadway, Ste 3305, New York, New York 10036, Attention: General Counsel, (B) Office of the Center, 1500 Broadway, Ste 3305, New York, New York 10036, Attention: Director of Finance, (C) The LIC Food Court LLC, 1500 Broadway, Ste 3305, New York, New York 10036, Attention: Chief Legal Officer, and (D) any Mortgagee or Lessor that shall have requested copies of notices, by notice given to Vendor in accordance with the provisions of this Article at the address designated by such Mortgagee or Lessor; or

to such other addresses as either Operator or Vendor or any Mortgagee or Lessor may designate as its new addresses for such purpose by notice given to the other in accordance with the provisions of this Article. Any such consent, notice, demand, request or other communication shall be deemed to have been given on the date of receipted delivery or refusal to accept delivery as provided in this Article 27, or the date delivery is first attempted but cannot be made due to a change of address of which no notice was given.

## ARTICLE 28

## OPERATING MANUAL

Vendor and all Vendor Parties shall observe and comply with the Operating Manual, as supplemented or amended from time to time, provided, that in case of any conflict or inconsistency between the provisions of this Agreement and the Operating Manual as originally promulgated or as supplemented or amended from time to time, the provisions of this Agreement shall control. Operator reserves the right, from time to time, to modify the Operating Manual and the procedures and provisions contained therein, including the adoption of additional procedures and/or amend of procedures and provisions then in effect. Nothing contained in this Agreement shall impose upon Operator any obligation to enforce the procedures and provisions of the Operating Manual or the terms, covenants or conditions in any other lease against any other Building tenant, and Operator shall not be liable to Vendor for violation of the procedures and provisions of the

37

Operating Manual by any other tenant, its employees, agents, visitors or licensees. Operator shall not enforce the procedures and provisions of the Operating Manual against Vendor in a discriminatory fashion, except where differing circumstances justify different treatments.

## ARTICLE 29

## OPERATOR'S AGENT

Section 29.1 **Brokers.** Each of Operator and Vendor represents and warrants to the other that it has not dealt with any other broker in connection with this Agreement or is entitled to any fee or commission in connection herewith. Each of Operator and Vendor shall indemnify, defend, protect and hold the other party harmless from and against any and all Losses that the indemnified party may incur by reason of any claim of or liability to any broker, finder or like agent (other than Operator's Agent) arising out of any dealings claimed to have occurred between the indemnifying party and the claimant in connection with this Agreement, or the above representation being false.

## ARTICLE 30

## INDEMNITY

Section 30.1 (a) **Indemnity.** Vendor shall not do or permit to be done any act or thing upon the Concession Area or the Building that may subject Operator to any liability or responsibility for injury, damages to persons or property or to any liability by reason of any violation of any Requirement, and shall exercise such control over the Concession Area as to fully protect the Indemnitees against any such liability. Vendor shall indemnify, defend, protect and hold harmless each of the Indemnitees from and against any and all Losses to which any Indemnitee may (except to the extent arising from the gross negligence or willful misconduct of any such Indemnitee in the operation and maintenance of the Building) be subject or suffer, whether by reason of, or by reason of any claim for, any injury to, or death of, any person or persons or damage to property (including any loss of use thereof) or otherwise arising from or in connection with the use of, or from any work or thing whatsoever done in, any part of the Concession Area (other than by such Indemnitee) or by any Vendor Party in the Building, during the Term or during the period of time, if any, prior to the commencement or following the Expiration Date of the Term that any Vendor Party may have been given access to any portion of the Concession Area for the purpose of performing work or otherwise, or as a result of any Vendor Party performing any such work or otherwise that subjects any Indemnitee to any Requirement to which such Indemnitee would not otherwise be subject, or arising from any condition of the Concession Area due to or resulting from any default by Vendor in the keeping, observance or performance of any provision contained in this Agreement or from any act or negligence of any Vendor Party.

(b)    **Indemnity Inclusions.** As used in this Agreement, the term "Losses" means any and all losses, liabilities, damages, claims, judgments, fines, suits, demands, costs, interest and expenses of any kind or nature (including reasonable attorneys' fees and disbursements) incurred in connection with any claim, proceeding or judgment and the defense thereof, and including all costs of repairing any damage to the Concession Area or the Building, or the appurtenances of any of the foregoing, to which a particular indemnity and hold harmless agreement applies.

Section 30.2 **Defense and Settlement.** If any claim, action or proceeding is made or brought against any party entitled to indemnification hereunder, then, upon demand by the

indemnified party, the indemnifying party, at its sole cost and expense, shall resist or defend such claim, action or proceeding in the indemnified party's name (if necessary), by attorneys approved by the indemnified party, which approval shall not be unreasonably withheld or conditioned. Attorneys for the indemnifying party's insurer shall hereby be deemed approved for purposes of this Section 30.2. Notwithstanding the foregoing, an indemnified party may retain its own attorneys to participate or assist in defending any claim, action or proceeding involving potential liability equal to or greater than the actual amount of the combined single limit with respect to each occurrence of the policy of commercial general liability insurance that is available to cover such potential liability, provided the indemnifying party shall control the defense and the indemnifying party shall pay the reasonable fees and disbursements of such attorneys. Notwithstanding anything herein contained to the contrary, the indemnifying party may direct the indemnified party to settle any claim, suit or other proceeding provided (i) such settlement shall involve no obligation on the part of the indemnified party other than the payment of money, (ii) any payments to be made pursuant to such settlement shall be paid in full exclusively by the indemnifying party at the time such settlement is reached, (iii) such settlement shall not require the indemnified party to admit any liability or wrongdoing, and (iv) the indemnified party shall have received an unconditional release from the other parties to such claim, suit or other proceeding.

## ARTICLE 31

## MISCELLANEOUS

Section 31.1 **Delivery.** This Concession Agreement shall not be binding upon Operator or Vendor unless and until (i) Operator shall have executed and delivered a fully executed copy of this Agreement to Vendor, and (ii) to the extent required hereunder, the following items shall have been delivered to Operator: the Security Deposit, prepaid Fixed Rent for the first month following the Rent Commencement Date, completed Form W-9, an original counterpart of the Guaranty of Concession Agreement in the form attached hereto as Exhibit E executed by Meihui Lin, Ben Xu and Molly Tea NYC Inc and any other monies or documents required to be delivered to Operator simultaneously with or prior to the execution of this Agreement.

Section 31.2 **Transfer of Real Property.** Operator's obligations under this Agreement shall not be binding upon the Operator named herein after the sale, conveyance, assignment, transfer or lease of Operator's interest (collectively, a "Transfer") by Operator (or upon any subsequent Operator after the Transfer by such subsequent Operator) of its interest in the Building or the Real Property, as the case may be, and in the event of any such Transfer, Operator (and any such subsequent Operator) shall be entirely freed and relieved of all covenants and obligations of Operator hereunder, and the transferee of Operator's interest (or that of such subsequent Operator) in the Building or the Real Property, as the case may be, shall be deemed to have assumed all obligations under this Agreement.

Section 31.3 **Liens.** Vendor agrees promptly to discharge of record (either by payment or by filing of the necessary bond, or otherwise) any mechanics', materialmen's or other lien or like filing including any notice of contract against the Concession Area, the Building, or Operator's interest in them or any of them that may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to, for or for the benefit of Vendor in, upon, on or about the Concession Area.

Section 31.4 **Limitation on Liability.** The liability of Operator for Operator's obligations under this Agreement shall be limited to Operator's interest from time to time in the Real Property and Vendor shall not look to any other property or assets of Operator or the property or assets of

39

any of the Indemnitees in seeking either to enforce Operator's obligations under this Agreement or to satisfy a judgment for Operator's failure to perform such obligations; and none of the Indemnitees shall be personally liable for the performance of Operator's obligations under this Agreement.

Section 31.5 **Rent.** Notwithstanding anything to the contrary contained in this Agreement, all amounts payable by Vendor to or on behalf of Operator under this Agreement, whether or not expressly denominated Fixed Rent, Percentage Rent, Additional Rent or Rent, shall constitute rent for the purposes of Section 502(b)(6) of the United States Bankruptcy Code and other Requirements.

Section 31.6 **Entire Agreement.** This Concession Agreement (including any Schedules and Exhibits referred to herein and all supplementary agreements provided for herein) contains the entire agreement between the parties and all prior negotiations and agreements are merged into this Agreement. All of the Schedules and Exhibits attached hereto are incorporated in and made a part of this Agreement. In the event of any inconsistency between the terms and provisions of this Agreement and the terms and provisions of the Schedules and Exhibits hereto, the terms and provisions of this Agreement shall control. All Article and Section references set forth herein shall, unless the context otherwise requires, be deemed references to the Articles and Sections of this Agreement.

Section 31.7 **Governing Law.** This Concession Agreement shall be governed in all respects by the laws of the State of New York.

Section 31.8 **Partial Unenforceability.** If any provision of this Agreement, or its application to any Person or circumstance, shall ever be held to be invalid or unenforceable, then in each such event the remainder of this Agreement or the application of such provision to any other Person or any other circumstance (other than those as to which it shall be invalid or unenforceable) shall not be thereby affected, and each provision hereof shall remain valid and enforceable to the fullest extent permitted by law.

Section 31.9 **Consent to Jurisdiction.** (a) Vendor agrees that all disputes arising, directly or indirectly, out of or relating to this Agreement, and all actions to enforce this Agreement, shall be dealt with and adjudicated in the state courts of the State of New York or the federal courts for the Southern District of New York; and for that purpose Vendor expressly and irrevocably submits itself to the jurisdiction of such courts. Vendor agrees that so far as is permitted under applicable law, this consent to personal jurisdiction shall be self-operative and no further instrument or action, other than service of process in one of the manners specified in this Agreement, or as otherwise permitted by law, shall be necessary in order to confer jurisdiction upon it in any such court. Vendor further agrees that judgment against it in any such action or proceeding shall be conclusive and, to the extent permitted by applicable law, may be enforced in any other jurisdiction within or outside the United States of America by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and of the amount of its indebtedness.

(b)    To the extent that Vendor has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, Vendor irrevocably waives such immunity in respect of its obligations under this Agreement.

40

Section 31.10 **Survival.** All obligations and liabilities of Operator or Vendor to the other that accrued before the Expiration Date or earlier termination of this Agreement, and all such obligations and liabilities that by their nature or under the circumstances can be, or by the provisions of this Agreement may be, performed after such Expiration Date or earlier termination, shall survive the Expiration Date or earlier termination of this Agreement. Without limiting the generality of the foregoing, the rights and obligations of the parties with respect to any indemnity under this Agreement, and with respect to Fixed Rent, Percentage Rent and any other Additional Rent, and any other amounts payable under this Agreement, shall survive the Expiration Date or earlier termination of this Agreement.

Section 31.11 **Estoppels.** Within 7 days following request from Operator, any Mortgagee or any Lessor, Vendor shall deliver to Operator a statement executed and acknowledged by Vendor, in form satisfactory to Operator, (i) stating the Commencement Date, the Rent Commencement Date and the Expiration Date, and that this Agreement is then in full force and effect and has not been modified (or if modified, setting forth all modifications), (ii) setting forth the date to which Fixed Rent and any Additional Rent have been paid, together with the amount of monthly Fixed Rent, Percentage Rent then payable, (iii) stating whether or not, to the best of Vendor's knowledge, Operator is in default under this Agreement, and, if Vendor asserts that Operator is in default, setting forth the specific nature of any such defaults, (iv) stating whether Operator has failed to complete any work required to be performed by Operator under this Agreement, (v) stating whether there are any sums payable to Vendor by Operator under this Agreement, (vi) stating the amount of the Security Deposit, if any, under this Agreement, (vii) stating whether there are any subleases affecting the Concession Area, (viii) stating the address of Vendor to which all notices and communications under this Agreement shall be sent, and (ix) responding to any other matters reasonably requested by Operator, such Mortgagee or such Lessor. Vendor acknowledges that any statement delivered pursuant to this Section 31.11 may be relied upon by any purchaser or Operator of the Real Property or the Building, or all or any portion of Operator's interest in the Real Property or the Building or under any Superior Lease, or by any Mortgagee or assignee thereof, or by any Lessor or assignee thereof.

Section 31.12 **Certain Rules of Interpretation.** For purposes of this Agreement, whenever the words "include", "includes", or "including" are used, they shall be deemed to be followed by the words "without limitation", and, whenever the circumstances or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine or the neuter and vice versa. This Concession Agreement shall be interpreted and enforced without the aid of any canon, custom or rule of law requiring or suggesting construction against the party drafting or causing the drafting of the provision in question.

Section 31.13 **Captions.** The captions and paragraph headings in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

Section 31.14 **Parties Bound.** The terms, covenants, conditions and agreements contained in this Agreement shall bind and inure to the benefit of Operator and Vendor and, except as otherwise provided in this Agreement, to their respective legal representatives, successors, and assigns.

Section 31.15 **Memorandum.** Neither this Agreement nor a memorandum hereof shall be recorded.

41

Section 31.16 **Counterparts**. This Concession Agreement may be executed in duplicate counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument. An executed counterpart of this Agreement transmitted by facsimile, email or other electronic transmission shall be deemed an original counterpart and shall be as effective as an original counterpart of this Agreement and shall be legally binding upon the parties hereto to the same extent as delivery of an original counterpart.

Section 31.17 **Employee Population Reports.** Vendor shall, within 30 days after the first day of each calendar year, deliver to Operator a written statement setting forth the reasonably estimated population of employees employed by Vendor that maintain a full-time office within the Concession Area. To the extent that an employee does not maintain a full-time office therein, such employee shall be included in Vendor's estimate proportionately, based on the equivalent to a full-time employee (i.e. two employees each spending 50% of their time at the Concession Area are the equivalent of one full-time employee). Such estimate shall be calculated as of the first day of each calendar year and shall include any such other information as Operator shall reasonably request.

## ARTICLE 32

## SECURITY DEPOSIT

Section 32.1 **Security Deposit**. Vendor has deposited with Operator in cash the sum of $97,200.00 upon execution of this Agreement (the "Security Deposit") as security for the faithful performance and observances by Vendor of the terms, provisions and conditions of this Agreement. It is agreed that in the event that Vendor defaults in respect of any terms, provisions and conditions of this Agreement, including but not limited to, the payment of the Fixed Rent, Percentage Rent or any Additional Rent or other sum or fee as to which Vendor is in default or for any sum in which Operator may expend or may be required to expend by reason of Vendor's default in respect of any of the terms of this Agreement, Operator may without notice as reimbursement for said sums draw down on the Security Deposit and use, apply or retain the whole or any part thereof towards payment of any such Rent, sums, fees or expenditures. Vendor shall, upon five (5) days' written notice, replenish the Security Deposit to the full amount required herein. In the event that Vendor shall fully comply with the terms of this Agreement, the then unapplied portion of the Security Deposit shall be returned to Vendor within ninety (90) days after expiration or termination of this Agreement and after delivery of possession of the entire Concession Area to Operator in the condition required hereunder.

## ARTICLE 33

## GUARANTY

Vendor acknowledges that Xiaozhe Liu, Meihui Lin, Ben Xu and MOLLY TEA NYC INC has provided a guaranty in the form attached hereto as Exhibit E.

## ARTICLE 34

## OPERATOR TERMINATION RIGHT

Section 34.1 (a) Without modifying any other provision of this Agreement and/or any right of Operator contained herein, Operator may, by written notice to Vendor (the "Operator's Article 34 Termination Notice"), terminate this Agreement (the "Article 34 Termination Option") as of the

42

date specified in Operator's Article 34 Termination Notice (the "Article 34 Termination Option Date"), which date shall be not less than 90 days following the date on which Operator shall give Operator's Article 34 Termination Notice, in which event (i) this Agreement shall terminate and the Term shall end and expire upon the date set forth in Operator's Article 34 Termination Notice with the same effect as if such date were the Expiration Date (unless sooner terminated pursuant to any other term, covenant or condition of this Agreement or pursuant to law) and (ii) Vendor shall vacate and surrender the Concession Area on or before the date set forth in Operator's Article 34 Termination Notice in the condition required under this Agreement for surrender of the Concession Area on the Expiration Date (or sooner termination thereof) and with respect to such surrender, Vendor shall be subject to all applicable provisions of this Agreement, including without limitation, Section 23.2 hereof. Notwithstanding anything contained herein to the contrary, in the event that Operator shall exercise the Article 34 Termination Option such that the Article 34 Termination Option Date shall not be effective prior to January 1, 2028 but shall prior to the end of fifth anniversary of the Commencement Date, and provided (1) that Vendor shall not at any time have defaulted in its obligations under this Agreement, Guarantor shall not have defaulted under its obligations under the Guaranty, and no default under this Agreement or the Guaranty shall then exist, and (2) Vendor actually vacates the Concession Area when and as required, then upon Vendor's vacating the Concession Area when and as required, Operator shall pay Vendor the then unamortized cost of Vendor's performance of Vendor's Work, not to exceed $100,000.00, in the aggregate (which amount shall be amortized on a straight line basis commencing on the Opening Date and continuing over the Term). The Termination Fee shall phase down on an annual basis over the three (3) years following January 1, 2028, through the Lease Expiration Date, and shall be calculated on a pro rata basis based on the applicable Lease anniversary date. Except as expressly set forth above, Operator shall have no further liability to Vendor in connection with any termination pursuant to this Section 34.1.

## ARTICLE 34
## RENEWAL OPTION

Section 34.1 **Exercise of Option**. Provided and on the condition that (x) Vendor is not in arrears with respect to the payment of any Fixed Rent or Additional Rent (including Percentage Rent) payable under this Agreement either on the date the Renewal Notice (as hereinafter defined) is given or on the Renewal Term Commencement Date (as hereinafter defined), (y) no Event of Default exists either on the date the Renewal Notice is given or on the Renewal Term Commencement Date and (z) Vendor shall have operated as required under this Agreement during all Required Operating Hours, Vendor shall have the right to renew the Term for all of the Concession Area for a single renewal term (the "Renewal Term") of 3 years by notice (the "Renewal Notice") delivered to Operator not less than 6 months prior to the Expiration Date of the initial Term. Upon the giving of the Renewal Notice, this Agreement shall be deemed renewed for the Renewal Term with the same force and effect as if the Renewal Term had originally been included in the Term. The Renewal Term shall commence on the day after the Expiration Date (the "Renewal Term Commencement Date") of the initial Term and shall terminate on the last day of the calendar month in which occurs the 5th anniversary of such Expiration Date. *TIME IS OF THE ESSENCE WITH RESPECT TO THE GIVING OF THE RENEWAL NOTICE BY VENDOR.*

Section 35.2 **Terms**. All of the terms, covenants and conditions of this Agreement shall continue in full force and effect during the Renewal Term, except (a) the Fixed Rent for the Renewal Term shall be the greater of (x) the annual Fair Market Value (as hereinafter defined) as of the Renewal Term Commencement Date and (y) 103 multiplied by the rate of Fixed Rent payable during the final Concession Year of the initial Term, which Fixed Rent payable during the Renewal Term shall increase by 3% on each anniversary date of the Renewal Term

43

Commencement Date (and which Fixed Rent shall reflect a Monthly Base Gross Sales Figure for purposes of Section 2.4), and (b) after the sending of the Renewal Notice, Vendor shall no longer have a right to renew the Term. Any termination, cancellation or surrender of the entire interest of Vendor under this Agreement at any time during the Term shall terminate any right of renewal of Vendor hereunder. The provisions of this Article 35 shall be self-operative; however, Operator and Vendor, at either party's request, shall promptly execute and deliver an amendment to this Agreement confirming the Renewal Term in a mutually satisfactory form.

Section 35.3  **Fair Market Value**.  "Fair Market Value" shall mean the fair market annual rental value of the Concession Area as of the Renewal Term Commencement Date for a term equal to the Renewal Term, based on comparable space in the Building, or on comparable space in Comparable Buildings, including all of Operator's services provided for in this Agreement, and with the Concession Area considered as vacant, and in "as is" condition existing on the Renewal Term Commencement Date.  The calculation of Fair Market Value shall also take into account all other relevant factors.  Operator shall advise Vendor (the "Rent Notice") of Operator's determination of Fair Market Value prior to the Renewal Term Commencement Date.  If Vendor disputes Operator's determination of Fair Market Value, the dispute shall be resolved by arbitration as provided in Section 35.4.  If the Fixed Rent payable during the Renewal Term is not determined prior to the Renewal Term Commencement Date, Vendor shall pay Fixed Rent in an amount equal to the Fair Market Value for the Concession Area as determined by Operator (the "Interim Rent").  Upon final determination of the Fixed Rent for the Renewal Term, Vendor shall commence paying such Fixed Rent as so determined, and within 10 days after such determination Vendor shall pay any deficiency in prior payments of Fixed Rent or, if the Fixed Rent as so determined shall be less than the Interim Rent, Vendor shall be entitled to a credit against the next succeeding installments of Fixed Rent in an amount equal to the difference between each installment of Interim Rent and the Fixed Rent as so determined which should have been paid for such installment until the total amount of the over payment has been recouped.

Section 35.4  **Arbitration**.  If Vendor disputes Operator's determination of Fair Market Value pursuant to Section 35.3, Vendor shall give notice to Operator of such dispute within 10 Business Days after delivery of the Rent Notice, and such dispute shall be determined by arbitration in accordance with the then prevailing Expedited Procedures of the Arbitration Rules for the Real Estate Industry of the American Arbitration Association or its successor for arbitration of commercial disputes, except that the rules shall be modified as follows:

(a)      In its demand for arbitration Vendor shall specify the name and address of the person to act as the arbitrator on Vendor's behalf. The arbitrator shall be a real estate broker with at least 10 years full-time commercial brokerage experience who is familiar with the fair market value of first-class retail space in Long Island City, New York, New York. Failure on the part of Vendor to make the timely and proper demand for such arbitration shall constitute a waiver of the right thereto and the Fixed Rent shall be as set forth in the Rent Notice. Within 10 Business Days after the service of the demand for arbitration, Operator shall give notice to Vendor specifying the name and address of the person designated by Operator to act as arbitrator on its behalf, which arbitrator shall be similarly qualified. If Operator fails to notify Vendor of the appointment of its arbitrator within such 10 Business Day period, and such failure continues for 3 Business Days after Vendor delivers a second notice to Operator, then the arbitrator appointed by Vendor shall be the arbitrator to determine the Fair Market Value for the Concession Area.

(b)      If two arbitrators are chosen pursuant to Section 35.4(a), the arbitrators so chosen shall meet within 10 Business Days after the second arbitrator is appointed and shall seek to reach agreement on Fair Market Value. If within 20 Business Days after the second arbitrator is

44

appointed the two arbitrators are unable to reach agreement on Fair Market Value then the two arbitrators shall appoint a third arbitrator, who shall be a competent and impartial person with qualifications similar to those required of the first two arbitrators pursuant to Section 35.4(a). If they are unable to agree upon such appointment within 5 Business Days after expiration of such 20 Business Day period, the third arbitrator shall be selected by the parties themselves. If the parties do not agree on the third arbitrator within 5 Business Days after expiration of the foregoing 5 Business Day period, then either party, on behalf of both, may request appointment of such a qualified person by the then president of the Real Estate Board of New York. The third arbitrator shall decide the dispute, if it has not been previously resolved, by following the procedures set forth in Section 35.4(c). Each party shall pay the fees and expenses of its respective arbitrator and both shall share the fees and expenses of the third arbitrator. Attorneys' fees and expenses of counsel and of witnesses for the respective parties shall be paid by the respective party engaging such counsel or calling such witnesses.

(c)    Fair Market Value shall be fixed by the third arbitrator in accordance with the following procedures. Concurrently with the appointment of the third arbitrator, each of the arbitrators selected by the parties shall state, in writing, his or her determination of the Fair Market Value supported by the reasons therefor. The third arbitrator shall have the right to consult experts and competent authorities for factual information or evidence pertaining to a determination of Fair Market Value, but any such determination shall be made in the presence of both parties with full right on their part to cross-examine. The third arbitrator shall conduct such hearings and investigations as he or she deem appropriate and shall, within 30 days after being appointed, select which of the two proposed determinations most closely approximates his or her determination of Fair Market Value. The third arbitrator shall have no right to propose a middle ground or any modification of either of the two proposed determinations. The determination he or she chooses as that most closely approximating his or her determination of the Fair Market Value shall constitute the decision of the third arbitrator and shall be final and binding upon the parties. The third arbitrator shall render the decision in writing with counterpart copies to each party. The third arbitrator shall have no power to add to or modify the provisions of this Agreement. Promptly following receipt of the third arbitrator's decision, the parties shall enter into an amendment to this Agreement evidencing the extension of the Term for the Renewal Term and confirming the Fixed Rent for the Renewal Term, but the failure of the parties to do so shall not affect the effectiveness of the third arbitrator's determination.

(d)    In the event of a failure, refusal or inability of any arbitrator to act, his or her successor shall be appointed by him or her, but in the case of the third arbitrator, his or her successor shall be appointed in the same manner as that set forth herein with respect to the appointment of the original third arbitrator.

[Remainder of Page Intentionally Left Blank]

45

**IN WITNESS WHEREOF**, Operator and Vendor have executed this Agreement as of the day and year first above written.

OPERATOR:

**The LIC Food Court LLC**

By: _____

Name: Minghao Zheng
Title: President
Date: 1/13/2026

VENDOR

**Genesis Brand Management LLC**

By: _____

Name: Zhexiao Liu
Title: President
Date: 1-13, 2026

Vendor's Federal Identification Number:

82-2876814

46

## EXHIBIT A-1

## FLOOR PLAN OF CONCESSION AREA

The floor plan that follows is intended solely to identify the general location of the ground floor Vendor Stall Concession Area, and should not be used for any other purpose. All areas, dimensions, square footage references and locations are approximate, and any physical conditions indicated may not exist as shown.



1

## EXHIBIT A-2

## FLOOR PLAN OF STORAGE AREA

The floor plan that follows is intended solely to identify the general location of the Storage Area, and should not be used for any other purpose. All areas, dimensions square footage references and locations are approximate, and any physical conditions indicated may not exist as shown.



- 3 -

## EXHIBIT A-3

## FLOOR PLAN OF THE FOOD HALL

The floor plan that follows is intended solely to identify the general location of the Food Hall, and should not be used for any other purpose. All areas, dimensions and locations are approximate, and any physical conditions indicated may not exist as shown.

- 3 -

## EXHIBIT B

**IF ATTACHED, OPERATING MANUAL**

## EXHIBIT C

## OPERATOR WORK EQUIPMENT PACKAGE

Vendor Stall has been designed and outfitted substantially with kitchen equipment described below.

## EXHIBIT D

## COMMENCEMENT DATE CONFIRMATION

The LIC Food Court LLC
1500 Broadway, Ste 3305
New York, New York 10036

_____, 2026

BY FEDERAL EXPRESS

_____

New York, New York ____
Attn: _____

Re:    Concession Agreement dated as of _____ ___, 2026 (the "Concession Agreement ") between **The LIC Food Court LLC**, as Operator, and _____, as Vendor, covering a portion of the Food Hall located at 28-07 Jackson Avenue, Long Island City, New York

Dear _____:

This letter shall confirm that the Commencement Date of the Concession Agreement was _____ ___, 202_ and the Expiration Date is _____ ___, 20__.

All capitalized terms used and not otherwise defined in this letter will have the respective meanings ascribed to them in the Concession Agreement. This letter may be executed in counterparts, which when taken together shall constitute but one original.

While we request that you acknowledge your agreement with the above by signing the enclosed copy of this letter in the space provided below and returning the same to me, the foregoing shall be binding whether or not you sign and return the same.

Very truly yours,

_____

By: _____
    Name:
    Title:

ACKNOWLEDGED AND AGREED TO:

_____

By: _____
    Name:
    Title:

## EXHIBIT E

### GUARANTY OF CONCESSION AGREEMENT

THIS GUARANTY is made as of the 13rd day of January, 2026 by Xiaozhe Liu, Meihui Lin, Ben Xu and MOLLY TEA NYC INC (collectively, the "**Guarantor**"), individuals and a Delaware corporation, having an address at c/o 36-16 Main Street #605, Flushing NY 11354 in favor of **The LIC Food Court LLC**, a New York limited liability company having an office at 1500 Broadway, Ste 3305, New York, New York 10036 ("**Operator**") , with respect to, in consideration of, and as inducement for, the demising of certain premises (the "**Concession Area**") located in the building located at 28-07 Jackson Avenue, Long Island City, New York (the "**Building**") by Operator to **Genesis Brand Management LLC** (together with any assigns or successor thereto, "**Vendor**") pursuant to that certain concession agreement (as such concession agreement may be amended, restated, supplemented, extended, renewed or otherwise modified from time to time, the "**Concession Agreement** " or "**Agreement**"), executed on or about the date hereof between Operator and Vendor.

Guarantor represents and warrants to Operator that Guarantor will derive material direct and indirect benefits from Operator's decision to enter into the Concession Agreement with Vendor and acknowledges that Operator would not have entered into the Concession Agreement with Vendor if Guarantor had not executed and delivered this Guaranty of Vendor's obligations under the Concession Agreement to Operator concurrently with the execution and delivery of the Concession Agreement. Capitalized terms used but not defined in this Guaranty have the meanings given to them in the Concession Agreement.

    1.    Guarantor hereby represents and warrants to Operator as follows:

    (a)    The making and performance by Guarantor of this Guaranty does not and will not result in a breach of, or require any consent under, any applicable law or regulation, or any other order, writ, injunction or decree of any court or other governmental authority, or result in the creation or imposition of any lien upon any property of Guarantor. The execution, delivery and performance by Guarantor of this Guaranty do not and will not result in a breach of, or require any consent under, any agreement, document or instrument to which Guarantor is a party or by which Guarantor or its property is bound.

    (b)    This Guaranty has been duly and validly executed and delivered by Guarantor and constitutes its legal, valid and binding obligation, enforceable against Guarantor in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or similar laws of general applicability affecting the enforcement of creditors' rights and (ii) the application of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

    (c)    There are no conditions precedent to the effectiveness of this Guaranty that have not been either satisfied or waived.

    (d)    None of Guarantor's assets are or shall, during the Term, be subject to community property laws.

- 8 -

2.      Guarantor hereby unconditionally and irrevocably guarantees to Operator, its successors and/or assigns (i) the full and prompt payment of all Rent, including sums that would be due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a), (ii) the full and prompt performance of all other obligations owed by Vendor pursuant to the Concession Agreement  and (iii) all amounts, damages, costs and expenses arising from the holding over by Vendor (or any person or entity claiming by, through or under Vendor) in the Concession Area (or any portion thereof) (the payment of Rent and all other obligations referred to in clauses (i), (ii) and (iii) of this sentence are hereinafter referred to as the "**Obligations**"). If Vendor shall fail to pay or perform any Obligation as required pursuant to the terms of the Concession Agreement , then, irrespective of any defense or any right of set-off, credit or claim that Guarantor may have against Operator, Guarantor shall forthwith upon demand by Operator pay or perform such Obligation.

Notwithstanding anything to the contrary contained in this Guaranty, the obligations of Guarantor hereunder shall constitute a full and unconditional guaranty of all obligations of Vendor under the Concession Agreement for the first thirty-six (36) months of the Term. Upon the expiration of such initial thirty-six (36) month period, this Guaranty shall automatically convert to a "good guy" guaranty, pursuant to which Guarantor's liability shall be limited to the payment of all Rent and other sums due under the Concession Agreement for a period of one hundred eighty (180) days following Vendor's surrender and delivery of the Concession Area to Operator in accordance with the terms of the Concession Agreement, together with compliance with all conditions required for such surrender.

3.      This Guaranty is absolute, unconditional and irrevocable. Notwithstanding (i) any agreement or stipulation between Operator and Vendor or their successors or assigns extending the time of performance, increasing the size of the Concession Area subject to the Concession Agreement  or modifying any of the terms, covenants or conditions contained in the Concession Agreement  on the part of Vendor to be performed, (ii) any renewal or extension of the Concession Agreement , whether or not pursuant to an option granted in the Concession Agreement , (iii) any waiver by or failure of Operator to enforce any of the terms, covenants or conditions contained in the Concession Agreement  or any of the terms, covenants or conditions contained in any modifications thereof, (iv) any assignment of the Concession Agreement  or any sub-concession of all or any part of the Concession Area, (v) any holdover by Vendor beyond the term of the Concession Agreement , (vi) any consent, indulgence or other action, inaction or omission under or in respect of the Concession Agreement , or (vii) any bankruptcy, insolvency, reorganization, arrangement, assignment for the benefit of creditors, receivership or trusteeship affecting Vendor or Operator or their respective successors or assigns whether or not notice thereof is given to Guarantor, Guarantor shall continue to be liable under this Guaranty and Guarantor hereby expressly consents to and approves all of the foregoing.

4.      The liability of Guarantor under this Guaranty shall be an absolute, direct, immediate and unconditional guaranty of payment and performance and not of collectability, and shall not be conditional or contingent upon the genuineness, validity, regularity or enforceability of the Concession Agreement or other documents or instruments relating to the obligations hereby guaranteed or the pursuit by Operator of any remedies Operator may have.

5.      Guarantor hereby waives (i) diligence, presentment, demand of payment and protest; (ii) all notices to Guarantor, Vendor or any other person (whether of nonpayment, termination, acceptance of this Guaranty, default under the Concession Agreement  or any other matters relating to the Concession Agreement , the Concession Area or related matters, whether or not referred to herein, and including any and all notices of the creation, renewal, extension, modification or accrual of any Obligations contained in the Concession Agreement ) and (iii) all demands whatsoever. Guarantor agrees that its obligations hereunder shall not be affected by any circumstances which might otherwise constitute a legal or equitable discharge of a guarantor or surety.

6.      No failure or delay on the part of Operator in exercising any right, power or privilege under this Guaranty shall operate as a waiver of or otherwise affect any such right, power or privilege nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

7.      Any notice to or demand of Guarantor hereunder shall be delivered by hand or overnight courier service, mailed by certified or registered mail, to Guarantor at the address set forth above or to such other address as Guarantor shall furnish in writing to Operator.  Any such notice or demand shall be deemed to have been given on the date of receipted delivery or refusal to accept delivery as provided herein or the date delivery is first attempted but cannot be made due to a change of address of which no notice was given.

8.      This Guaranty may be enforced by Operator without the necessity at any time of resorting to or exhausting any other security or collateral and without the necessity at any time of having recourse to the remedy provisions of the Concession Agreement  or otherwise, and Guarantor hereby waives the right to require Operator to proceed against Vendor, to exercise its rights and remedies under the Concession Agreement , or to pursue any other remedy or enforce any other right at law or in equity. Nothing herein contained shall prevent Operator from suing on the Concession Agreement or from exercising any other rights available to it under the Concession Agreement , and the exercise of any of the aforesaid rights shall not constitute a legal or equitable discharge of Guarantor. Guarantor understands that the exercise by Operator of certain rights and remedies contained in the Concession Agreement  may affect or eliminate Guarantor's right of subrogation against Vendor and that Guarantor may therefore incur partially or totally non-reimbursable liability hereunder; nevertheless Guarantor hereby authorizes and empowers Operator to exercise in its sole discretion, any rights and remedies, or any combination thereof, which may then be available, it being the purpose and intent of Guarantor that its obligations hereunder shall be absolute, independent and unconditional.

9.      Whenever Guarantor shall make any payment to Operator hereunder on account of any liability hereunder, Guarantor shall notify Operator in writing that such payment is made under this Guaranty for such purpose. It is understood that Operator, without impairing this Guaranty, may, subject to the terms of the Concession Agreement , apply payments from Vendor or from any reletting of the Concession Area upon a default by Vendor, to any due and unpaid Rent or other charges or to such other obligations owed by Vendor to Operator pursuant to the Concession Agreement  in such amounts and in such order as Operator, in its sole and absolute discretion, determines, provided that any amount so paid and applied reduces the aggregate outstanding liabilities of Vendor under the Concession Agreement  by such amount.

10.     Until the Obligations shall have been indefeasibly paid in full, Guarantor shall withhold exercise of (a) any right of subrogation against Vendor, (b) any right of contribution Guarantor may have against any other guarantor of the Obligations, (c) any right to enforce any remedy which Operator now has or may hereafter have against Vendor or (d) any benefit of, and any right to participate in, any security now or hereafter held by Operator or the Concession Agreement . Guarantor further agrees that, to the extent the waiver of its rights of subrogation and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation Guarantor may have against Vendor or against any collateral or security, and any rights of contribution Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights Operator may have against Vendor, to all right, title and interest Operator may have in any such collateral or security, and to any rights Operator may have against such other guarantor. Operator may use, sell or dispose of any item of collateral or security as it sees fit without regard to any subrogation rights Guarantor may have, and upon any such disposition or sale any rights of subrogation Guarantor may have as the result of the payment or performance of Vendor's obligations under the Concession Agreement shall terminate.   If any amount shall be paid to Guarantor on account of any such subrogation rights at any time when all Obligations shall not have been paid in full, such amount shall be held in trust for Operator and shall forthwith be paid over to Operator to be credited and applied against the Obligations, whether matured or unmatured, in accordance with the terms of the Concession Agreement  or any applicable security agreement.

11.     This Guaranty is a continuing guaranty and shall remain in effect until all of the Obligations shall have been indefeasibly paid in full in accordance with the terms of the Concession Agreement and Vendor shall have no further obligations under, pursuant to, or in connection with, the Concession Agreement .

12.     This Guaranty shall continue in full force and be binding upon Guarantor, its successors and assigns.

13.     This Guaranty shall inure to the benefit of Operator and its successors and assigns and to any mortgagee or beneficiary under a deed of trust to which the Concession Agreement  has been assigned and their respective successors and assigns.

14.     Guarantor agrees that it will, at any time and from time to time, within seven (7) days following written request by Operator, execute, acknowledge and deliver to Operator or to such persons as Operator may direct, a statement certifying that this Guaranty is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating such modifications). Guarantor agrees that such certificates may be relied on by any person holding or proposing to acquire any direct or indirect interest in the Concession Agreement  or making a loan to Operator.

15.     Guarantor shall pay all the reasonable attorneys' fees, charges and expenses and all other costs and expenses which are incurred by or on behalf of Operator in the enforcement of this Guaranty whether or not a lawsuit or other proceeding is commenced. Fees based on the rates customarily paid by Operator to its counsel shall be deemed to be reasonable for purposes of this Guaranty.

- 11 -

16.    All rights, duties, benefits, and privileges arising hereunder shall be construed according to the internal laws of the State of New York without reference to its conflicts of laws provisions.

17.    Guarantor is not entitled to immunity from judicial proceedings and agrees that, should Operator or any of its successors or assigns bring any suit, action or proceeding in the State of New York or any other jurisdiction to enforce any obligation or liability of Guarantor arising, directly or indirectly, out of or relating to this Guaranty, no immunity from such suit, action or proceeding will be claimed by or on behalf of Guarantor.

18.    Every provision of this Guaranty is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Guaranty.

19.    (a)    Guarantor acknowledges and agrees that any interest on any portion of the Obligations which accrues after the commencement of any bankruptcy, reorganization or insolvency proceeding of or against Vendor (or, if interest on any portion of the Obligations ceases to accrue by operation of law by reason of the commencement of said proceeding, such interest as would have accrued on such portion of the Obligations if said proceedings had not been commenced) shall be included in the Obligations because it is the intention of Guarantor and Operator that the Obligations which are guaranteed by Guarantor pursuant to this Guaranty shall be determined without regard to any rule of law or order which may relieve Vendor of any portion of such Obligations. Guarantor will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay Operator, or allow the claim of Operator in respect of, any such interest accruing after the date on which such proceeding is commenced.

(b)    Guarantor's obligations under this Guaranty shall be unaffected by any discharge or release of Vendor, its successors or assigns, or any of their debts, in connection with any bankruptcy, reorganization, or other insolvency proceeding or assignment for the benefit of creditors, any rejection or disaffirmation of the Concession Agreement  in any bankruptcy, reorganization or other insolvency proceeding or assignment for the benefit of creditors, or any reduction, modification, impairment or limitation of the liability of Vendor, its successors or assigns, or of Operator's remedies under the Concession Agreement , in connection with any bankruptcy, reorganization or other insolvency proceeding or any assignment for the benefit of creditors.

(c)    In the event that all or any portion of the Obligations are paid by Vendor, the obligations of Guarantor hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from Operator as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Obligations for all purposes under this Guaranty.

20.    Guarantor acknowledges and agrees that all disputes arising, directly or indirectly, out of or relating to this Guaranty, and all actions to enforce this Guaranty, may be dealt with and adjudicated in the courts of the State of New York or the Federal courts sitting in the State of New York, as Operator may elect; and hereby expressly and irrevocably submits to the jurisdiction of such courts in any suit, action or proceeding arising, directly or indirectly, out of or relating to this Guaranty. So far as is permitted under

- 12 -

applicable law, this consent to personal jurisdiction shall be self-operative and no further instrument or action, other than service of process in a manner permitted by law or permitted herein, shall be necessary in order to confer jurisdiction upon Guarantor in any such court.

21.    Provided that service of process is effected upon Guarantor in a manner permitted by law or as otherwise permitted herein, Guarantor irrevocably waives, to the fullest extent permitted by law, and agrees not to assert, by way of motion, as a defense or otherwise, (a) any objection which it may have or may hereafter have to the laying of the venue of any such suit, action or proceeding brought in such a court as is mentioned in the previous paragraph, (b) any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum, or (c) any claim that it is not personally subject to the jurisdiction of the above-named courts. Provided that service of process is effected upon Guarantor in a manner permitted by law or as otherwise permitted herein, Guarantor agrees that final judgment (a certified copy of which shall be conclusive evidence of the fact and amount of any indebtedness) from which it has not appealed or may not appeal or further appeal in any such suit, action or proceeding brought in such a court of competent jurisdiction shall be conclusive and binding upon it and may, so far as is permitted under the applicable law, be enforced in the courts of any state or any Federal court and in any other courts to the jurisdiction of which it is subject, by a suit upon such judgment and that it will not assert any defense, counterclaim or set off in any such suit upon such judgment.

22.    Guarantor agrees to execute, deliver and file all such further instruments as may be necessary under the laws of the State of New York in order to make effective, the consent of Guarantor to the jurisdiction of the courts of the State of New York and the Federal courts sitting in the State of New York and the other provisions of this Guaranty.

23.    Guarantor irrevocably consents to service of process in the manner provided for delivery of notices in this Guaranty. Nothing in this Guaranty will affect the right of Operator to serve process in any other manner permitted by law. In addition, Guarantor irrevocably appoints Vendor or, if Vendor is more than one person, then any one of them, as its agent for purposes of receiving service of process in any action against Guarantor arising out of this Guaranty at Vendor's address set forth in the Concession Agreement  for the giving of notices.  Any such service shall be deemed to have been given on the date of receipted delivery, refusal to accept delivery or when delivery is first attempted but cannot be made due to a change of address for which no notice is given.

24.    If Guarantor is more than one person, Guarantor's obligations are joint and several and are independent of Vendor's obligations. A separate action may be brought or prosecuted against any Guarantor whether the action is brought or prosecuted against any other Guarantor or Vendor, or all, or whether any other Guarantor or Vendor, or all, are joined in the action.

25.    **AS A FURTHER INDUCEMENT TO OPERATOR TO ENTER INTO THE CONCESSION AGREEMENT AND IN CONSIDERATION THEREOF, GUARANTOR HEREBY WAIVES TRIAL BY JURY AND THE RIGHT THERETO IN ANY ACTION OR PROCEEDING OF ANY KIND OR NATURE, ARISING ON, UNDER OR BY REASON OF OR RELATING TO, THIS GUARANTY OR ANY AGREEMENT COLLATERAL HERETO.**

- 13 -

- 14 -

[Remainder of Page Intentionally Left Blank]

- 14 -

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date first above written.

GUARANTOR:

SSN: ███████████
Date: 1.13.2026

SSN:
Date:

SSN:
Date:

Attest: _____

**AND**

**MOLLY TEA NYC INC**

By: _____
Name: Meihui Lin
Date:



State of _New York_

County of _New York_ ) ss.:

On the ___13rd___ day of _January_ in the year 202_0_ before me, the undersigned, a Notary Public in and for said State, personally appeared _Xiaozhe Liu_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public
[Notarial Seal]

**SIRUI HUANG**
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01HU6417227
QUALIFIED IN NEW YORK COUNTY
MY COMMISSION EXPIRES MAY 10, 2029

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date first above written.

**GUARANTOR:**

_____

**SSN:**
**Date:**

_____

**SSN:** ██████████
**Date:** 1-14/26

_Meihui Lin_

**SSN:** ██████████
**Date:** 1/14/26

Attest: _____

**AND**

**MOLLY TEA NYC INC**

By: _Meihui Lin_
Name: **Meihui Lin**
Date: 1/14/26

- 15 -





State of _New York_

County of _New York_ ) ss.:

On the ___14th___ day of ___January___ in the year 2025 before me, the undersigned, a Notary Public in and for said State, personally appeared _Meihui Lin & Ben Xu_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public
[Notarial Seal]

SIRUI HUANG
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01HU6417227
QUALIFIED IN NEW YORK COUNTY
MY COMMISSION EXPIRES MAY 10, 2029

## EXHIBIT F

## SAMPLE MENU

## EXHIBIT G

## DEFINITIONS

**Affiliate**: With respect to any Person, any other Person that, directly or indirectly (through one or more intermediaries), Controls, is Controlled by, or is under common Control with, such first Person.

**Base Rate**: The annual rate of interest publicly announced from time to time by Citibank, N.A., or its successor, in New York, New York as its "base rate" (or such other term as may be used by Citibank, N.A., from time to time, for the rate presently referred to as its "base rate").

**Building Systems**: The mechanical, electrical, plumbing, sanitary, sprinkler, heating, ventilation and air conditioning, security, life-safety, elevator and other service systems or facilities of the Building up to (but not including) the point of localized distribution to the Concession Area (excluding any systems or facilities exclusively serving the Concession Area).

**Business Days**: All days, excluding Saturdays, Sundays and all days observed by either the State of New York, the Federal Government or the labor unions servicing the Building as legal holidays.

**Code**: The Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, as amended.

**Common Areas**: All public and common areas of the Building, such as, but not in limitation thereof, elevator lobbies, lobbies, elevators, stairways, corridors, toilets, and service halls.

**Comparable Buildings**: First-class mixed use (office and retail) buildings of comparable age and quality in the Borough of Queens, City of New York, State of New York.

**Deficiency**: The difference between (i) Fixed Rent, Percentage (including any imputed Percentage Rent) and any other Additional Rent for the period that otherwise would have constituted the unexpired portion of the Term, and (ii) the net amount, if any, of rents collected under any reletting effected pursuant to the provisions of this Agreement for any part of such period (after first deducting from such rents all costs and expenses incurred by Operator in connection with the termination of this Agreement, Operator's re-entry upon the Concession Area and such reletting, including repossession costs, brokerage commissions, attorney's fees and disbursements, and alteration costs).

**Governmental Authority (Authorities)**: The United States of America, the City, County or State of New York or any political subdivision, agency, department, commission, board, bureau or instrumentality of any of the foregoing, or any landmarks preservation agency (or other entity designated or accepted for such purpose by any Governmental Authority or landmarks preservation agency), now existing or hereafter created, having jurisdiction over the Real Property.

**Hazardous Materials**: Any substances, materials or wastes currently or in the future deemed or defined in any Requirements as "hazardous substances", "toxic substances", "contaminants", "pollutants" or words of similar import.

**HVAC System**:  The Building System designed to provide heating, ventilation and air conditioning.

**Indemnitees**:  Operator, Operator's Agent, each Mortgagee and Lessor, and each of their respective direct and indirect partners, officers, shareholders, directors, members, trustees, beneficiaries, employees, principals, contractors, licensees, invitees, servants, agents and representatives, and each of their respective successors, assigns and heirs.

**Institutional Operator**:  (a) Any bank, savings and loan association, savings institution, trust company or national banking association, acting for its own account or in a fiduciary capacity, (b) any insurance company or pension and/or annuity company, (c) any pension, retirement or profit sharing trust or fund, (d) any government, any public employees' pension or retirement system, or any other government agency supervising the investment of public funds, (e) any investment banking, merchant banking or brokerage firm, (f) any college or university or (f) any other entity all of the equity Operators of which are Institutional Operators.

**Interest Rate**:  The lesser of (i) 2% per month and (ii) the maximum rate permitted by applicable Requirements.

**Lessor**:  A lessor under a Superior Lease.

**Mortgage(s)**:  Any mortgage, trust indenture or other financing document that may now or hereafter be secured, in whole or in part, by the Concession Area or real estate of which the Concession Area are a part or any Superior Lease and the possessory interest created thereby, and all renewals, extensions, supplements, amendments, modifications, consolidations and replacements thereof or thereto, substitutions therefor, and advances made thereunder.

**Mortgagee**:  Any mortgagee, trustee or other holder of a Mortgage.

**Person**:  Any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, business trust, tenancy-in-common or other entity, or any Governmental Authority.

**Prohibited Content**:  Content which would (i) have prurient appeal or otherwise be pornographic, sexually·explicit or obscene, or (ii) constitute a reasonable basis for other tenants or occupants of the Building or passersby to be offended, physically protest, picket or otherwise cause a civil disturbance at the Building.

**Prohibited Use**:  Any use or occupancy of the Concession Area that in Operator's reasonable judgment would be likely to: (i) cause damage to the Building, the Concession Area or any equipment, facilities or other systems therein; (ii) impair the appearance of the Concession Area or the Building; (iii) interfere with the efficient and economical maintenance, operation and repair of the Concession Area or the Building or the equipment, facilities or systems thereof; (iv) adversely affect any service provided to, or the use and occupancy by, any Building Vendors, tenants or occupants; (v) violate the certificate of occupancy issued for the Concession Area or the Building; (vi) adversely affect the image of the Building as a first-class mixed use (office and retail) building in New York City; or (vii) include any Prohibited Content in Signs and/or Displays or otherwise in connection with the use or occupancy of the Concession Area.  Prohibited Use also includes any illegal activity or any activity constituting a nuisance.

**Real Property**:  The Building, together with the plot of land upon which it stands.

**Requirements**:  All present and future laws, rules, orders, ordinances, regulations, statutes, requirements, codes and executive orders, extraordinary and ordinary of (i) all Governmental Authorities, including the Americans With Disabilities Act, 42 U.S.C. §12101 *(et seq.)*, New York City Local Law 58 of 1987, and any law of like import, and all rules, regulations and government orders with respect thereto, and any of the foregoing relating to Hazardous Materials, environmental matters, public health and safety matters, and landmarks preservation, (ii) any applicable fire rating bureau or other body exercising similar functions, affecting the Real Property or the Building or the maintenance, use or occupation thereof, and (iii) all insurance bodies affecting the Concession Area.

**Substantial Completion**:  As to any construction performed by any party in the Concession Area, including Vendor's Work or any Alterations, "Substantial Completion" or "Substantially Completed" means that such work has been completed, as reasonably determined by Operator's architect, in accordance with (i) the provisions of this Agreement applicable thereto, (ii) the plans and specifications for such work, and (iii) all applicable Requirements, excepting only details of construction and mechanical adjustment, the non-completion of which do not materially interfere with Vendor's use of the Concession Area or that, in accordance with good construction practice, should be completed after the completion of other work to be performed in the Concession Area (collectively, "Punch List Items").

**Superior Lease(s)**:  Any ground or underlying lease of the Building, the Real Property or any part thereof heretofore or hereafter made by Operator and all renewals, extensions, supplements, amendments, modifications, consolidations, and replacements thereof.

**Vendor Delay**:  Any delay that results from any act or omission of any Vendor Party, including delays due to changes in or additions to, or interference with, any work to be done by Operator, or delays by Vendor in submission of information, approving working drawings or estimates or giving authorizations or approvals.

**Vendor Party**:  Any of Vendor, any Affiliate of Vendor, any subVendor, concessionaire, subconcessionaire or any other occupant of the Concession Area, or any of their respective direct or indirect partners, officers, shareholders, directors, members, trustees, beneficiaries, employees, principals, contractors, licensees, invitees, servants, agents or representatives.

**Vendor's Property**:  Vendor's movable fixtures and movable partitions, telephone and other equipment, computer systems, trade fixtures, furniture, furnishings, and other items of personal property that are removable without material damage to the Concession Area or Building.

**Unavoidable Delays**:  Operator's inability to fulfill or delay in fulfilling any of its obligations under this Agreement to be performed by Operator (whether expressed or implied), or Operator's inability to make or delay in making any repairs, additions, alterations, improvements or decorations, or Operator's inability to supply or delay in supplying any equipment or fixtures, if Operator's inability or delay is due to or arises by reason of strikes, labor troubles or by accident, or by any cause whatsoever beyond Operator's reasonable control, including Requirements, governmental preemption in connection with a national emergency, shortages, or unavailability of labor, fuel, steam, water, electricity or materials, Vendor Delay, delays caused by other Vendors, tenants or other occupants of the Building, acts of God, enemy action, civil commotion, fire or other casualty.

**EXHIBIT H**

**JACX FOOD HALL**
**SUPPLIER INSURANCE AND INDEMNIFICATION AGREEMENT**

This Supplier Insurance and Indemnification Agreement (this "Agreement"), dated as of the ___ day of ____, 202_, is between ____ ("Vendor") and ____ ("Supplier") in respect of Supplier's insurance coverage and indemnification obligations relating to Supplier's manufacture and/or supply of products ("Products") at Jacx Food Hall located at 28-07 Jackson Avenue, Long Island City, New York.

**INSURANCE REQUIREMENTS**

1.  For each Product manufactured and/or supplied by Supplier for Vendor, Supplier shall maintain insurance coverage on the following minimum terms:

    a.  Commercial General Liability coverage on the latest version of ISO form CG 00 01 or its equivalent. There shall be no products liability or completed operations exclusion. Limits shall be not less than $1,000,000 per occurrence, $2,000,000 general aggregate.

    b.  If vehicles are used in connection with the manufacture and/or supply of the Product(s); Automobile Liability coverage, covering any liabilities of Supplier and Vendor with respect to the Operatorship, maintenance, or use of any auto used in connection with the manufacture and/or supply of the Product(s); on a form equal to the latest version of ISO form CA 00 01 with a limit at least equal to $1,000,000 Combined Single Limit.

    c.  Umbrella Liability or Excess Liability coverage, at least following the form of the underlying Commercial General Liability policy, with limits of $2,000,000 per occurrence and $2,000,000 general aggregate.

    d.  Workers' Compensation insurance in an amount no less than required by law, and Employers' Liability insurance coverage in the amount of $1,000,000 each accident, each employee by disease and policy limit by disease.

    e.  All other insurance required by law or that Vendor may reasonably request.

2.  Additional Insured status shall be granted by use of the latest versions of ISO endorsements CG 2010 and CG 2037 or equivalent endorsements providing Additional Insured status for both Ongoing Operations and Completed Operations for all parties required in this Agreement. The endorsements shall name Vendor, THE LIC FOOD COURT LLC, all of their affiliates and subsidiaries, whether currently existing or hereafter formed, and all of their respective Operators, managers, officers, directors, employees and agents, and, if applicable, Building Operators and Property Managers as additional insureds ("Additional Insureds"). Additional Insured status shall apply to the Commercial General Liability, Umbrella Liability or Excess Liability and Automobile Liability insurance policies.

    The coverage afforded to the Additional Insureds shall be written on a primary basis, and shall not require or contemplate contribution by any other policy or policies obtained by, or available to, any Additional Insured; any other such coverage shall be excess over the coverage to be provided by Supplier. Supplier's insurance policies shall include a Waiver of Subrogation in favor of the Additional Insureds.

3. All policies shall be written with insurance companies authorized to do business by the state where each Product is being supplied to and rated by A.M. Best Company at least A minus (policyholders rating) and IX (financial rating).

4. All policies shall be endorsed to require at least 30 days' advance notice, certified mail, to 1500 Broadway, Ste 3305, New York, New York 10036. Attn: General Counsel, of cancellation, non-renewal, or reduction in coverage (or ten (10) days' advance notice in the case of non-payment of premium).

5. As soon as possible before the supply of the Product(s), Supplier must provide proof of the insurance coverages required herein by way of a current and acceptable Certificate of Insurance (and a complete copy of each of the insurance policies upon request).

6. Any and all subcontractors used must also agree to the above insurance requirements and it is the responsibility of Supplier to monitor the subcontractor's insurance.

## INDEMNIFICATION REQUIREMENTS

7. Supplier covenants and agrees that, to the fullest extent permitted by law, it shall indemnify, defend and hold harmless the Additional Insureds from and against and in respect of any demands, claims, actions, causes of action, assessments, losses, damages, liabilities, interests and penalties, costs and expenses (including reasonable legal fees) based upon, arising out of or otherwise in respect of:

    a. The failure of any Product to conform to the agreed upon product specifications;

    b. Any accident, sickness, disease, bodily injury or damage to any third party (including any of Vendor's customers and any of Supplier's agents, servants, employees, licensees or invitees) or property arising out of or resulting from Supplier's supply of the Product(s) (including Supplier's production, packaging, or storage of the Product(s));

    c. Any negligence on the part of Supplier or its agents, servants, subcontractors, employees, licensees or invitees; or

    d. The breach of any agreement between the parties.

## GENERAL CONDITIONS

8. Vendor and Supplier agree that this Agreement is  part of the contract for the Product(s) to be manufactured and/or supplied by Supplier; and that the obligations of Supplier to Vendor under this Agreements hall survive the completion of the manufacture and/or supply of the Product(s) by Supplier.

9. Supplier agrees that failure of Vendor to enforce any of the terms of this Agreement shall not waive the responsibility of Supplier to comply with these conditions and requirements.

10. The obligations set out in this Agreement shall be in addition to all other obligations assumed by Supplier, shall not be construed to negate, diminish or otherwise reduce any

other rights of Vendor, and all liability for breach of performance shall survive the termination of this Agreement and the approval by Vendor of the manufacture and/or supply of the Product(s).

11. This Agreement supplements, and does not supersede or replace, any current or future master distribution agreement, pricing arrangement or other agreement between Supplier and Vendor. To the extent of any conflict, however, the terms of this Agreement shall govern.

12. This Agreement shall be governed by, construed under and interpreted in accordance with the laws of the State of New York, without giving effect to conflict of laws principles. The parties consent to the jurisdiction of any state or federal court located within New York County, State of New York, and irrevocably agree that all actions or proceedings arising out of or relating to this Agreement shall be litigated in such courts.

13. If any portion of this Agreement is judicially held invalid, the remainder shall survive such declaration and be valid and enforceable.

**IN WITNESS WHEREOF,** the parties have executed this Supplier Insurance and Indemnification Agreement as of the dates set forth below.

By: _____
(LEGAL NAME OF SUPPLIER)

By: _____
(LEGAL NAME OF VENDOR)

Printed Name: _____

Printed Name: _____

Title: _____

Title: _____

Date: _____

Date: _____