# EXHIBIT "C"

# LIMITED LIABILITY COMPANY AGREEMENT

contract No. MLNB-OS-986013

This Limited Liability Company Agreement (this "**Agreement**") is made as of Jul 3, 2025, by and between MollyTea Shops LLC ("**Molly Partner**") and MHL NY LLC ("**Business Partner**") (each a "**Member**," and collectively, the "**Members**").

WHEREAS, the Certificate of Formation (the "**Certificate of Formation**") for MOLLY TEA BK INC. (the "**Company**"), a limited liability company under the laws of the State of New York, was filed on May 31, 2024, with the New York Secretary of State.

WHEREAS, Members desire to adopt and approve a limited liability company agreement for Company under the New York  Limited Liability Company Act  (the "**Act**").

**NOW**, **THEREFORE**, Members by this Agreement set forth the limited liability company agreement for Company upon the terms and subject to the condition of this Agreement.

## Article I. DEFINITIONS.

Capitalized terms used in this Agreement have the meanings specified in this Article or elsewhere in this Agreement and when not so defined shall have the meanings set forth in Section 18-101 of the Act.

"**Act**" means the New York Limited Liability Company Act , including amendments thereto from time to time.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Limited Liability Company Agreement, as originally executed and as amended from time to time.

"**Additional Member**" means any Person admitted as a Member of Company after the date of this Agreement pursuant to Section 4.7.

"**Available Profits**" means, for any fiscal year, Company's Net Profit less reasonable reserves for: (a) working capital; (b) anticipated capital expenditures; and (c) reasonably anticipated contingent liabilities, in each case as determined by Financial Manager in accordance with Company's past practices and reasonable business judgment.

"**Book Value**" means, with respect to any asset of Company, such asset's adjusted basis for federal income tax purposes, except that: (a) the initial Book Value of any asset contributed by a Member shall be its gross fair market value at the time of contribution; and (b) the Book Value of all Company assets shall be adjusted to equal their respective gross fair market values upon the occurrence of any event described in Treasury Regulations Section 1.704-1(b)(2)(iv)(f).

1

"**Brand Manager**" means the individual appointed by Molly Partner who is responsible for overseeing product quality, operating standards, and brand compliance, with specific duties and appointment procedures as set forth in Section 4.1(a).

"**Business Partner**" means MHL NY LLC, a New York Limited Liability Company.

"**Capital Account**" has the meaning set forth in Section 3.3.

"**Capital Contributions**" means, with respect to any Member, the aggregate amount of (a) cash and (b) the fair market value of any property or services contributed to Company by such Member, including but not limited to intellectual property rights, operational systems, training services and other non-cash contributions as described in Section 3.2.

"**Cash Capital Contribution**" means, with respect to any Member, the amount of cash contributed or deemed contributed to Company by such Member, as specified in Exhibit A.

"**Certificate of Formation**" has the meaning set forth in the preamble.

"**Company**" means MOLLY TEA BK INC., a New York limited liability company.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Company Minimum Gain**" shall have the meaning ascribed to the term "Partnership Minimum Gain" in the Treasury Regulations Section 1.704-2(d).

"**Deadlock**" has the meaning set forth in Section 4.5(a).

"**External Event**" means: (a) the entry of a judicial decree of dissolution; (b) the loss of necessary permits or licenses; or (c) any event making the continued operation of the business unlawful.

"**Emergency Circumstances**" means any condition or situation described in Section 4.6 that requires immediate action, including without limitation any food safety incident posing immediate risk, any serious health code violation, any material breach of quality standards, any financial irregularity exceeding $10,000, any unauthorized brand or trade secret use, any criminal activity or regulatory investigation, or any event risking material brand damage.

"**Force Majeure**" means any act, event or condition beyond a party's reasonable control that prevents or materially impairs such party's performance of its obligations under this Agreement, including but not limited to: (a) acts of God, including earthquakes, floods, hurricanes, or other natural disasters; (b) war, riot, civil unrest, terrorism, or similar events; (c) fire, explosion, or other casualties; (d) epidemics, pandemics, or public health emergencies; (e) governmental actions, including changes in law or regulations; (f) national or regional emergency; (g) strikes, lockouts, or other labor disputes (excluding those solely affecting a party's own employees); (h) significant supply chain disruptions; or (i) utility or infrastructure failures affecting a substantial portion of the Territory.

"**Financial Manager**" means the individual appointed by Molly Partner who is responsible for overseeing Company's financial operations and maintaining its books and records, with specific duties and appointment procedures as set forth in Section 4.1(b).

"**IPO Related Event**" means any of the following: (a) an initial public offering of shares in any entity that owns or controls, directly or indirectly, the Molly Tea brand or any of its affiliates; (b) any transaction resulting in a public listing of any such entity (including without limitation,

2

through a special purpose acquisition company (SPAC) merger, direct listing or other similar transaction); (c) any reorganization, restructuring, or other corporate transaction in preparation for or in contemplation of any transaction described in clauses (a) or (b); (d) any pre-IPO private placement or other equity financing round conducted in contemplation of a potential IPO; (e) any merger, acquisition, joint venture or similar transaction involving a publicly listed company or its affiliates that would result in the Molly Tea brand becoming part of a public company structure; or (f) any other transaction or series of related transactions that Molly Partner reasonably determines could lead to or is in preparation for any of the foregoing events. For clarity, an IPO Related Event includes not only the actual public offering or listing transaction, but also any preparatory or related transactions that Molly Partner determines are part of the overall IPO process or strategy.

"**Joint Approval Matters**" means those matters requiring mutual written approval of both Members as set forth in Section 4.2 of this Agreement.

"**License Agreement**" means the license agreement between Company and Molly Tea Franchising LLC or Molly Tea Affiliates pursuant to which Company is authorized to use the Molly Tea Brand and Molly Tea System.

"**Mandatory Distribution**" means the annual distribution required under Section 5.3(b).

"**Member**" means either the Molly Partner or the Business Partner.

"**Membership Interest**" means a Member's entire interest in Company including such Member's: (a) right to share in profits, losses and distributions; (b) right to participate in management as set forth in this Agreement; and (c) all other rights, benefits and privileges enjoyed by that Member under this Agreement or the Act by virtue of owning an interest in Company.

"**Molly Tea**" means the retail beverage business and brand operated under the name "Molly Tea" in the United States.

"**Molly Tea Affiliates**" means any Affiliate of Molly Tea that owns, uses, licenses, or controls the Molly Tea Brand or any part of the Molly Tea System in any jurisdiction.

"**Molly Tea Brand**" means the "Molly Tea" name, trademarks, service marks, trade names, logos, designs, recipes, operational procedures, and related intellectual property used in the operation of Molly Tea branded stores in the United States.

"**Molly Tea Franchising LLC**" means the Delaware limited liability company that licenses the Molly Tea Brand and Molly Tea System in the United States.

"**Molly Tea System**" means the comprehensive business system for operating Molly Tea branded stores, including all intellectual property, operational procedures, and brand standards as further detailed in Section 8.2(a).

"**Molly Partner**" means MollyTea Shops LLC, a Delaware limited liability company established for the purpose of forming joint ventures to operate Molly Tea branded stores in the United States.

"**Molly Partner Reserved Matters**" means those matters over which Molly Partner has sole and exclusive authority as set forth in Section 4.4, including without limitation all matters relating to

3

operating standards and quality control, training and staff development, brand and marketing, store design and systems, supply chain, and key personnel.

"**Member Nonrecourse Debt**" shall have the meaning ascribed to the term "Partner Nonrecourse Debt" in Treasury Regulations Section 1.704-2(b)(4).

"**Member Meeting**" means the meeting to discuss and approve business performance, strategic matters and Joint Approval Matters, which is attended by both Members and key management personnel.

"**Member Nonrecourse Deductions**" shall mean items of Company loss, deduction or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

"**Net Profit**" and "**Net Loss**" means, for each fiscal year or other period, an amount equal to Company's taxable income or loss for that period, determined under Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code will be included in taxable income or loss), with the following adjustments: (a) Any income of Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss will be added to such taxable income or loss; (b) Any expenditures of Company described in Section 705(a)(2)(b) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profit or Net Loss will be subtracted from such taxable income or loss; (c) Compensation to any Member for services to Company will be treated either as payroll or as "guaranteed payments" pursuant to Section 707(c) of the Code and will be deducted in calculating Net Profit and Net Loss; and (d) If Capital Accounts of Members have been adjusted pursuant to an event described in Treasury Regulations § 1.704-1(b)(2)(iv)(f)(5), gain or loss resulting from any disposition of assets (whether for sale of a single asset or all of Company's assets) will be computed by reference to the most recent value of those assets used in adjusting Capital Accounts pursuant to such event, rather than the adjusted tax basis of those assets.

"**Nonrecourse Liability**" shall have the meaning set forth in Treasury Regulations Section 1.752-1(a)(2).

"**Operating Manual**" means the confidential manual and related materials provided by Molly Tea Franchising LLC or Molly Tea Affiliates to Company that contain the operating standards, procedures, specifications and requirements for operating a Molly Tea branded store.

"**Operations Review Meeting**" meeting held periodically to review the Company's operational performance.

"**Percentage Interest**" means, with respect to any Member, such Member's ownership percentage in Company as set forth in Exhibit A, which is based on the agreed allocation between Members notwithstanding the type or value of their respective Capital Contributions.

"**Repurchase Valuation Amount**" means a repurchase price calculated based on a price-to-earnings valuation equal to three (3) times the Company's average Net Profit for the trailing twelve (12) months, as determined in accordance with GAAP and subject to review by the Financial Manager. If the Book Value of the relevant Membership Interest exceeds the Repurchase Valuation Amount, the Business Partner may elect to use the Book Value as the repurchase price instead.

"**Restricted Activities**" means any business activities that compete with Molly Tea branded stores or utilize Company's confidential information, as specifically detailed in Section 8.4(b).

"**ROFR Notice**" has its meaning set forth in Section 6.2(a).

"**ROFR Period**" has its meaning set forth in Section 6.2(b).

"**Sale Event**" means the sale, transfer, lease, exchange, or other disposition of all or substantially all of Company's assets.

"**Strategic Transaction Event**" means any of the following: (a) any sale, transfer, merger, consolidation, or other disposition of all or substantially all of Molly Partner's or its affiliates' assets or interests (other than in connection with an IPO Related Event); (b) any acquisition of Molly Partner or its affiliates by a third party; (c) any material reorganization of Molly Partner's or its affiliates' business operations that results in or may result in a material change to Company's operations, management structure, business model or relationship with the Molly Tea brand; (d) any transaction or series of transactions that results in a change of control of Molly Partner or its affiliates; or (e) any other transaction that Molly Partner determines could materially affect the Molly Tea brand or its strategic position in the market. For clarity, any transaction that qualifies as an IPO Related Event shall be governed by the IPO Related Event provisions of this Agreement rather than the Strategic Transaction Event provisions.

"**Store Manager**" means the individual nominated by Business Partner and approved by Molly Partner pursuant to Section 4.1(c) who is responsible for managing daily store operations.

"**Special Meeting**" means any meeting convened by either Member upon twenty-four (24) hour notice upon occurrence of any material events or circumstances as specified in Section 4.3(c).

"**Tax Filing Obligations**" means all obligations to prepare, file, and pay any federal, state, local or foreign income, franchise, sales, use, property, or other tax returns or reports, and to pay any required taxes, related to Company's business operations.

"**Treasury Regulations**" shall mean the final or temporary regulations that have been issued by the U.S. Department of the Treasury pursuant to its authority under the Code, and any successor regulations.

"**Trade Secrets**" has its meaning set forth in Section 8.1(a).

"**Tax Provision**" means the amount set aside by Company on its financial statements to cover estimated income tax liabilities for the current period and future periods, calculated in accordance with applicable accounting standards and tax regulations.

"**Territory**" means the geographic area described in Exhibit A within which Company is authorized to develop and operate Molly Tea branded stores.

"**Third Party Offer**" has its meaning set forth in Section 6.2(a).

"**Unit**" means one unit of Membership Interest, with each Unit representing a fractional ownership interest in the Company and having a value of $1 per Unit as set forth in Section 3.1. The aggregate number of authorized Units represents 100% of the Membership Interests in the Company.

## Article II. ORGANIZATIONAL MATTERS

2.1.   **Formation**. Company was formed pursuant to the Act upon the filing of the Certificate of Formation with the Secretary of State of New York on May 31, 2024. The rights and obligations of Members shall be as provided in the Act except as otherwise expressly provided in this Agreement.

2.2.   **Name.** The name of Company shall be "MOLLY TEA BK INC." Company shall operate under the trade name "Molly Tea BK" pursuant to the rights granted under this Agreement.

2.3.   **Purpose and Scope.** Company is formed for the purposes of:

    (a)   operating retail beverage stores under the Molly Tea Brand pursuant to License Agreement;

    (b)   developing and operating stores within Brooklyn NY;

    (c)   engaging in any and all activities necessary, related or incidental to these purposes; and

    (d)   engaging in any other lawful business that may be conducted in limited liability company form and approved by both Members.

2.4.   **Term.** The term of Company commenced as of the date of the filling of the Certificate of Formation and shall continue until dissolved pursuant to Article X of this Agreement or by operation of law.

2.5.   **Principle Office.** The principal office of Company shall be at 5909 8th Ave Brooklyn NY11220, or such location as Members may determine. Company may maintain additional offices and store locations as determined by Members.

2.6.   **Office and Agent.** Company shall continuously maintain a registered agent in New York as required by the Act. The registered agent shall be as stated in the Certificate of Formation or as otherwise determined by Members.

2.7.   **Filings**. Members shall execute and file any certificates and documents as may be necessary or appropriate for: (a) the formation, operation, and qualification of an LLC; (b) amendments to the Certificate of Formation required by the Act; and (c) operating stores in relevant jurisdictions.

2.8.   **Operating Requirements**. Company shall:

    (a)   obtain and maintain all required licenses and permits;

    (b)   comply with applicable food safety and health regulations;

    (c)   maintain appropriate insurance coverage; and

    (d)   comply with all terms and conditions of the License Agreement;

    (e)   follow operating standards established by Molly Tea Franchising LLC;

    (f)   utilize only the point-of-sale and payment processing systems designated by Molly Tea Franchising LLC for all transactions; and

(g)   maintain all financial accounts and records in accordance with the standard formats and accounting practices designated by Molly Tea Franchising LLC.

2.9.   **Fiscal Year**. The fiscal year of Company shall be the calendar year unless otherwise determined by Members.

2.10.  **Title to Property**. All property owned by Company shall be owned by Company as an entity. Each Member's interest in Company shall be personal property for all purposes.

## Article III. CAPITAL CONTRIBUTIONS AND OWNERSHIP

3.1.   **Unit Issuance.** The Company hereby authorizes and issues a total of 10,000 Units of membership interests, of which 1,990 Units shall be issued to Molly Partner and 8,010 Units shall be issued to Business Partner, as specified in Exhibit A.

3.2.   **Initial Capital Contributions.**

(a)   Members shall make the following initial Capital Contributions to Company:

(1)   Molly Partner shall make a Cash Capital Contribution in the amount of One Thousand Nine Hundred Ninty Dollars ($1,990) in exchange for 1,990 Units at a price of $1 per Unit.

(2)   Business Partner shall make a Cash Capital Contribution in the amount of Eight Thousand and Ten Dollars ($8,010) in exchange for 8,010 Units at a price of $1 per Unit.

(b)   The initial Capital Contributions set forth in Section 3.2 shall be made in full within 5 business days upon execution of this Agreement.

3.3.   **Ownership Interests and Economic Rights.**

(a)   Based on the Capital Contributions set forth in Section 3.2, ownership of Company shall be allocated as follows:

(1)   Molly Partner shall own a 19.9% ownership interest in the Company, represented by 1,990 Units; and

(2)   Business Partner shall own an 80.1% ownership interest in the Company, represented by 8,010 Units.

(b)   Each ownership interest shall represent:

(1)   a proportional right to share in the profits, losses and distributions of Company as set forth in Article V;

(2)   management rights as specifically set forth in Article IV; and

(3)   such other rights expressly provided under this Agreement or required by the Act.

3.4.   **Capital Accounts.** Company shall establish an individual capital account ("**Capital Account**") for each Member in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv). Company shall determine and maintain each Capital Account. Each Member's Capital Account shall be determined and maintained throughout the term of Company in accordance with the requirements of Section 704(b) of the Internal

Revenue Code of 1986, as amended from time to time, and the applicable Treasury Regulations thereunder. Financial Manager shall review all Capital Accounts annually and make such adjustments as necessary to reflect Company's operations and any distributions made during such period.

**3.5.** **Default in Initial Capital Contributions**.

(a) **Default by Business Partner**. If Business Partner fails to make its required initial Capital Contribution as specified in Section 3.2:

(1) Molly Partner shall provide written notice of default to Business Partner;

(2) Business Partner shall have ten (10) business days to cure such default;

(3) if not cured within such period, Molly Partner shall have the right to:

(i) terminate this Agreement;

(ii) seek specific performance of Business Partner's obligation;

(iii) admit a substitute Business Partner; or

(iv) pursue any other remedies available at law or equity.

(4) During any period of default by Business Partner, Business Partner's voting and management rights shall be suspended, and any distributions otherwise payable to Business Partner shall be applied first to the unpaid Capital Contribution amount.

(b) **Default by Molly Partner**. If Molly Partner fails to make its required initial Capital Contribution as specified in Section 3.2:

(1) Business Partner shall provide written notice of default to Molly Partner;

(2) Molly Partner shall have ten (10) business days to cure such default;

(3) if not cured within such period, Business Partner shall have the right to:

(i) terminate this Agreement and receive a full refund of any Capital Contributions made;

(ii) seek specific performance of Molly Partner's obligation; or

(iii) pursue any other remedies available at law or equity.

(c) In either case of default, the defaulting Member shall be liable for all costs and expenses incurred by Company due to such default, and any damages suffered by Company or the non-defaulting Member.

**3.6.** **Additional Capital Contributions**.

(a) **No obligation**. No Member shall be required to make any additional Capital Contributions beyond their initial Capital Contributions as set forth in Section 3.2, except as otherwise provided in this Section 3.5.

(b) **Capital Calls**. Molly Partner shall have the right, but not the obligation, to issue a capital call for additional funding necessary for Company's operations, expansion,

or other business needs. Any such capital call shall be made in writing and specify the required amount and purpose.

(c) **Member Contribution Rights**. Upon a capital call, each Member shall contribute additional capital in proportion to their existing Percentage Interest within 30 business days. If a Member does not contribute its pro-rata share, the other Member may contribute to the shortfall, and the Percentage Interests shall be adjusted accordingly to reflect the additional contribution.

(d) **Dilution**. If Business Partner fails to meet a capital call and Molly Partner elects to fund the shortfall, Business Partner's Percentage Interest shall be reduced on a pro-rata basis, and Molly Partner's Percentage Interest shall increase accordingly. Any such adjustment shall be documented in an amendment to Exhibit A, signed by both Members.

(e) **Authorization to Issue Additional Units**. The Company may, from time to time, authorize and issue additional Units; provided, however, that any such authorization and/or issuance shall require the unanimous approval of all Members holding 100% of the outstanding Units. Notwithstanding the foregoing, this requirement shall not apply to the issuance of Units pursuant to obligations incurred by the Company pursuant to written agreements in effect as of the date of this Agreement. Any such issuance shall be documented by an amendment to Exhibit A reflecting the updated Unit ownership and Percentage Interests.

3.7. **No Interest on Capital Contributions.** Company shall not pay any interest on Capital Contributions.

3.8. **Return of Capital Contributions**. No Member shall have the right to withdraw or reduce their Capital Contributions except as provided in this Agreement.

3.9. **Member Loans**. No Member shall be required to loan funds to Company. Any Member loans shall be documented in writing and require approval of both Members.

## Article IV. MANAGEMENT AND OPERATIONS

4.1. **Management Structure**.

(a) **Brand Manager.** Molly Partner shall appoint a Brand Manager who shall be primarily responsible for: (1) conducting quality control periodic audits and reviewing compliance with operating standards; (2) requiring corrective actions if quality standards are not met; and (3) providing guidance on brand protection matters when reasonably necessary to protect the Molly Tea Brand. Brand Manager shall conduct routine audits once per quarter; provided, however, that in Emergency Circumstances, Brand Manager shall have the right to conduct additional audits as reasonably necessary. For clarity, the Brand Manager shall not be involved in day-to-day operations.

(b) **Financial Manager.** Molly Partner shall appoint a Financial Manager with audit and oversight rights over all financial records and transactions of Company. Financial Manager shall have the right to review accounting records, monitor compliance with budgets, oversee internal controls, and conduct periodic audits.

Business Partner shall be responsible for maintaining all financial and accounting documentation, preparing financial statements and reports, managing cash control procedures, handling day-to-day financial operations, and fulfilling all Tax Filing Obligations as defined in Section 4.9. Business Partner shall provide Financial Manager with full access to all financial records and respond promptly to any inquiries or requests for information from Financial Manager. Financial Manager shall review quarterly financial statements and may require corrections of any material errors or deficiencies identified during such review.

(c) **Store Manager.** Business Partner shall nominate a Store Manager, subject to Molly Partner's approval with discretion, who shall be responsible for managing daily store operations, supervising store personnel, implementing quality control procedures, managing inventory and supplies, ensuring customer satisfaction, maintaining store appearance, executing local marketing, and reporting to both the Brand Manager and Financial Manager regarding their respective areas of oversight. Store Manager shall operate in accordance with the operating standards and implement all quality control and operational procedures as specified in the Operating Manual.

4.2. **Joint Approval Matters.** The following matters shall require the mutual written approval of both Members:

(a) major financial decisions, including but not limited to:

(1) approval of annual operating and capital budgets;

(2) capital expenditures exceeding Two Thousand Dollars ($20,000);

(3) incurrence of debt exceeding Two Thousand Dollars ($20,000);

(4) distribution of available cash flow;

(5) establishment of reserves;

(6) material changes to accounting methods;

(7) selection or removal of outside auditors; and

(8) annual marketing budget, which exceeding five percent (5%) of gross revenue.

(b) store development and operations, including but not limited to:

(1) opening or closing of any stores;

(2) material modifications to the business plan;

(3) expansion of the Territory;

(4) entry into new markets;

(5) major renovations exceeding Twenty-Five Thousand Dollars ($25,000); and

(6) entry into contracts with a term exceeding one (1) year or value exceeding Fifty Thousand Dollars ($50,000).

(c) strategic corporate actions, including but not limited to:

(1) any amendment to this Agreement or the Certificate of Formation;

10

(2)  admission of new Members;

(3)  corporate restructuring including mergers or reorganizations;

(4)  sale of material assets;

(5)  filing of bankruptcy or dissolution; and

(6)  settlement of material litigation.

4.3.  **Meeting and Decision-Making Procedures.**

(a)  **Member Meetings.**

(1)  Business Partner shall convene Member Meetings once per two weeks.

(2)  Both Members shall attend such meetings. Brand Manager and Financial may attend at their discretion.

(3)  All Joint Approval Matters shall be discussed and decided at such meetings.

(4)  If a Member fails to attend a scheduled Member Meeting:

(i)  The meeting shall be rescheduled once with three (3) business days' notice.

(ii)  If the Member fails to attend the rescheduled meeting without reasonable cause, the attending Member may proceed with voting on the Joint Approval Matters.

(iii)  Any decisions made by the attending Member in such circumstances shall be binding on the Company.

(5)  All Molly Partner Reserved Matters shall be discussed at Member Meetings, and Molly Partner shall inform Business Partner of its decisions within three (3) business days.

(6)  Business Partner shall maintain minutes of all such meetings and distribute to all Members and relevant managers within three (3) business days.

(b)  **Operations Review Meetings.** Company shall conduct Operations Review Meetings subject to the following requirements:

(1)  Brand Manager shall convene weekly Operations Review Meetings.

(2)  Store Manager shall attend such meetings. Brand Manager and Financial Manager may attend at their discretion.

(3)  Business Partner shall prepare an agenda covering operational performance, quality metrics, and financial results.

(4)  Business Partner shall ensure meeting minutes are distributed to both Members within three (3) business days.

(c)  **Special Meetings.**

(1)  **Triggering Events.** Either Member shall have the right to convene a Special Meeting upon twenty-four (24) hour notice to the other Member upon occurrence of any of the following:

11

(i)      monthly revenue declines by fifteen percent (15%) or more;

(ii)     material breach of operating standards occurs;

(iii)    food safety or quality control incident arises;

(iv)    regulatory investigation commences;

(v)     material litigation is threatened or filed;

(vi)    Emergency Circumstances exist; or

(vii)   any pending Joint Approval Matter that requires immediate resolution for business continuity.

(2) **Requirements.** For all Special Meetings:

(i)      The convening Member shall state the purpose and agenda in the notice.

(ii)     Both Members shall make good faith efforts to attend such meetings.

(iii)    Store Manager shall attend unless excused by both Members. Brand Manager and Financial Manager may attend at Molly Partner's discretion.

(iv)    Business Partner shall maintain minutes of all such meetings and distribute such minutes within three (3) business days.

4.4.   **Molly Partner Reserved Matters.** Notwithstanding any other provision of this Agreement, Molly Partner shall have sole and exclusive authority over the following matters:

(a) **Operating Standards and Quality Control.** All matters relating to operating standards, product specifications, recipe requirements, equipment specifications, customer service standards, food safety requirements, and quality control procedures, including the right to conduct inspections and require corrective actions.

(b) **Training and Staff Development.** Molly Partner, in accordance with the training and personnel development guidelines established by Molly Tea Franchising LLC, shall oversee all aspects of personnel training within Company. This includes the development and enforcement of training programs, conducting certification assessments, and ensuring compliance with operational and service standards as required under License Agreement.

(c) **Brand and Marketing.** Molly Partner, as the designated operational representative of Molly Tea Franchising LLC within the Company, shall oversee all brand-related matters in accordance with License Agreement. Such matters include approval of marketing materials, adherence to brand guidelines, management of brand protection efforts, and oversight of public communications regarding the Molly Tea brand.

(d) **Store Design and Systems.** All matters related to store design, equipment specifications, maintenance standards, store modifications, and technology requirements including POS systems.

(e) **Supply Chain.** Molly Partner shall oversee all aspects of supply chain management within the Company to ensure compliance with the quality and brand standards established under License Agreement with Molly Tea Franchising LLC. This includes vendor selection and termination, ingredient specifications, supplier quality standards, and purchasing procedures, all of which shall be conducted in alignment with the supply chain policies set forth by Molly Tea Franchising LLC.

(f) **Key Personnel.** All decisions regarding key management positions, including:

    (1) the appointment and removal of Brand Manager and Financial Manager;

    (2) approval of Store Manager nominations and any subsequent termination, provided that such termination shall require prior consultation with Business Partner except in cases involving material breach of operating standards, food safety requirements, or brand protection measures;

    (3) setting qualification requirements; and

    (4) establishing compensation ranges for key positions, provided, however, that with respect to the Store Manager position, Business Partner shall propose the compensation and Molly Partner shall have approval rights over such proposal.

**4.5. Deadlock Resolution.**

(a) **Deadlock.** A "Deadlock" shall be deemed to exist if any of the following conditions occurs:

    (1) Any Joint Approval Matter receiving explicit disagreement from either Member at a Member Meeting;

    (2) Any Joint Approval Matter formally presented at a Member Meeting failing to receive explicit approval from both Members within two (2) weeks after being formally presented at a Member Meeting;

    (3) Any Joint Approval Matter that involves Emergency Circumstances failing to receive both Members' approval within forty-eight (48) hours after a Special Meeting; or

    (4) Business Partner raises a material objection to Molly Partner's implementation of Reserved Matters that: (i) identifies specific material adverse effects on the Company's operations or Business Partner's interests; (ii) proposes specific alternative approaches or modifications; and (iii) remains unresolved for two (2) weeks after being formally raised at a Member Meeting.

(b) **Resolution Procedures.**

    (1) Upon occurrence of a Deadlock:

        (i) Either Member may provide written notice to the other Member declaring a Deadlock;

        (ii) Members shall engage in good faith negotiations for a period of two (2) weeks from such notice;

        (iii) If the Deadlock remains unresolved after such two-week negotiation period: Members may mutually agree in writing to continue

negotiations for a specified period; or if Members cannot reach agreement to continue negotiations as described above, then:

    (A)    For Deadlocks regarding annual operating and capital budgets under Section 4.2(a)(1), the Special Procedures for Annual Budget Deadlocks set forth in Section 4.5(c) shall apply; or

    (B)    For all other Deadlocks, either Member may elect to trigger an administrative dissolution of the Company.

(2)    If the Deadlocked matter requires immediate action to: (i) prevent material harm to the Company's business; (ii) comply with applicable laws or regulations; or (iii) protect the health and safety of employees or customers, then Brand Manager, Financial Manager and Store Manager shall jointly determine and implement temporary measures necessary to address the urgent situation for a period not to exceed two (2) weeks, provided that:

    (i)    such measures shall be limited to those strictly necessary to address the immediate urgent situation;

    (ii)    both Members shall be immediately notified of any measures taken;

    (iii)    such measures shall be documented in writing and shared with both Members within twenty-four (24) hours;

    (iv)    neither Member shall unreasonably interfere with such temporary measures during the two-week period;

    (v)    Members shall continue good faith negotiations during such period; and

    (vi)    any measures taken shall automatically expire after two (2) weeks unless extended by mutual written agreement of both Members.

(c)    **Special Budget Deadlock Procedures**. If a Deadlock occurs with respect to the approval of annual operating and capital budgets under Section 4.2(a)(1):

(1)    Section 4.5(b)(1)(iii)(A) regarding administrative dissolution shall not apply.

(2)    Members shall continue good faith negotiations until an agreement is reached.

(3)    During the negotiation period, the following interim budget measures shall apply:

    (i)    Company shall operate using the prior fiscal year's approved budget on a pro-rata monthly basis; and

    (ii)    Essential expenditures required for regulatory compliance, safety, protection of the Molly Tea Brand, or preventing material harm to the business may be approved jointly by Brand Manager and Financial Manager regardless of budget status.

(4)    If, after ninety (90) days, Members have not reached agreement:

    (i)    Members shall meet in person to make a final good faith attempt to resolve the budget Deadlock; and

(ii)    If no agreement is reached within fourteen (14) days after such meeting, either Member may then exercise any rights available under Section 4.5(b)(1)(iii), including the right to trigger administrative dissolution.

**4.6.   Emergency Circumstances and Brand Protection.**

(a)   **Actions Upon Occurrence of Emergency Circumstances**. Upon occurrence of Emergency Circumstances:

(1)   Store Manager shall immediately implement necessary safety and containment measures, and promptly notify Brand Manager and Financial Manager.

(2)   Brand Manager shall assess the situation and may implement temporary measures necessary to protect the business, brand, and customer safety.

(3)   Brand Manager shall notify both Members within two (2) hours and convene a Special Meeting in accordance with Section 4.3(c).

(b)   **Interim Authority of Brand Manager**. Prior to the Special Meeting, Brand Manager shall have temporary authority to suspend operations, remove personnel, engage necessary professionals, or take other protective actions as reasonably required to address the emergency. Such actions shall be: (1) limited to measures necessary to address the immediate emergency; (2) promptly reported to Members; and (3) subject to modification or termination by both Members at the Special Meeting.

(c)   **Actions at the Special Meeting**. At the Special Meeting, Members shall review the Emergency Circumstances and management's response, determine whether additional measures are needed, and establish any necessary remedial or preventive measures. All actions taken under this Section 4.6 shall be documented in writing and shall not affect ownership interests or economic rights under this Agreement.

**4.7.   Financial Reporting.**

(a)   Business Partner shall provide the following financial reports to all Members:

(1)   Monthly financial statements, including income statement and balance sheet, within fifteen (15) days following the end of each month;

(2)   Quarterly financial statements, including income statement, balance sheet, and cash flow statement, within thirty (30) days following the end of each fiscal quarter; and

(3)   Annual financial statements within sixty (60) days following the end of each fiscal year.

(b)   If Business Partner fails to provide required financial reports within the specified timeframes:

(1)   Molly Partner shall provide written notice of such failure;

(2)   Business Partner shall have ten (10) business days to cure such failure; and

(3)   If not cured within such period, Molly Partner may engage a third-party accounting professional to prepare such reports at Business Partner's expense.

4.8.    **Admission of Additional Members.** Additional Members may be admitted only with the mutual written approval of both Members. Upon admission of any Additional Member, Members shall amend Exhibit A of this Agreement accordingly and such Additional Member shall execute all documents required by the Company.

4.9.    **Tax Responsibilities.**

(a)    Business Partner shall be solely responsible for all Tax Filing Obligations of Company, including but not limited to:

(1)    preparation and timely filing of all required tax returns and reports;

(2)    payment of all taxes due from Company;

(3)    maintaining all tax-related records and documentation;

(4)    responding to any tax audits or inquiries from tax authorities; and

(5)    providing Molly Partner with copies of all filed tax returns and confirmation of tax payments within fifteen (15) days of filing or payment.

(b)    Business Partner shall ensure all tax returns are prepared in accordance with applicable laws and regulations.

(c)    Business Partner shall consult with Molly Partner prior to taking any tax positions that could materially affect Company or Molly Partner.

(d)    Company shall bear all costs associated with preparing and filing Company's tax returns, including accounting and tax preparation fees.

(e)    If Business Partner fails to fulfill its tax responsibilities:

(1)    Molly Partner shall provide written notice of such failure;

(2)    Business Partner shall have ten (10) business days to cure such failure; and

(3)    If not cured within such period, Molly Partner may engage a tax professional to fulfill such responsibilities at Company's expense.

## Article V. ALLOCATIONS AND DISTRIBUTIONS

5.1.    **Allocations of Net Profit and Net Loss.**

(a)    **Net Profit**. Net Profit shall first be applied to offset any Net Loss previously allocated to Members, in proportion to their prior Net Loss allocations and to the extent of such losses. Any remaining Net Profit shall be allocated to Members in accordance with their respective Percentage Interests.

(b)    **Net Loss**. Net Loss shall be allocated to Members in accordance with Treasury Regulations Section 1.704-1(b).

5.2.    **Regulatory Allocations.** Company shall make special allocations as required by Treasury Regulations Section 1.704-2 to comply with the "minimum gain chargeback" requirements.

16

**5.3.** **Distributions.**

(a) **Distribution Determination**. Molly Partner, shall determine the timing and amount of all distributions, taking into consideration:

    (1) Company's current and projected working capital needs;

    (2) anticipated capital expenditures and operational requirements;

    (3) required reserves for business operations and contingencies;

    (4) compliance with any debt covenants or other contractual obligations; and

    (5) general market and business conditions affecting Company.

(b) **Mandatory Quarterly Distribution**. Notwithstanding Section 5.3(a), Company shall make distributions to the Members on a quarterly basis. The total amount distributed for each fiscal year shall not be less than at least ninety percent (90%) of Company's Available Profits for that year (the "**Mandatory Distribution**"). Company shall make the Mandatory Distribution within ninety (90) days after the end of each fiscal year. If cumulative quarterly distributions fall short of ninety percent (90%) of the Company's Available Profits, the Company shall distribute the shortfall as part of the final quarterly distribution or through a separate true-up distribution within the same period.

(c) **Mandatory Conditions**. Notwithstanding Sections 5.3(a) and (b), no distributions shall be made unless:

    (1) all operating expenses and liabilities then due and owing have been paid;

    (2) sufficient working capital reserves are maintained as determined by Molly Partner;

    (3) all required maintenance and quality control standards are met; and

    (4) such distribution would not violate applicable law.

(d) **Tax Provisions.** Prior to determining Available Profits, Company shall:

    (1) establish and maintain adequate Tax Provisions on its financial statements;

    (2) review and adjust Tax Provisions quarterly based on Company's financial performance and applicable tax rates; and

    (3) ensure Tax Provisions are properly reflected as current or deferred tax liabilities on Company's balance sheet.

(e) **Distribution of Available Funds**. Subject to Sections 5.3(a) and (b), when Molly Partner determines that funds are available for distribution, such funds shall be distributed to Members in proportion to their respective Percentage Interests.

(f) **Distribution Payment Instructions**. All distributions shall be made pursuant to written instructions jointly provided by the Members from time to time. The Company shall not be obligated to disburse any distribution unless and until such joint written instructions are received, and may rely on the most recent instructions signed by both Members.

(g) **Suspension of Distributions**. Molly Partner may suspend distributions if, in its reasonable business judgment:

    (1)    Company requires additional working capital;

    (2)    Capital expenditures are needed for store maintenance or improvements;

    (3)    Company experiences material adverse business conditions;

    (4)    Quality control or operational issues require additional investment; or

    (5)    Suspension is necessary to protect Company's financial stability or brand standards.

(h) **Distribution Notices.** At least five (5) business days prior to any distribution, Financial Manager shall provide Members with a written notice detailing:

    (1)    the total amount to be distributed;

    (2)    the calculation method; and

    (3)    the anticipated distribution date.

(i) **Objection to Distribution Decisions.** If Business Partner disagrees with Molly Partner's determination regarding distributions under Sections 5.3(a) or (f): (1)

    (1)    Business Partner may raise an objection at a Member Meeting by: (i) identifying specific concerns regarding the determination; (ii) providing supporting financial analysis; and (iii) proposing alternative distribution arrangements.

    (2)    Such objection shall be subject to the Deadlock resolution procedures set forth in Section 4.5.

    (3)    During any Deadlock resolution period: (i) The disputed distribution shall be held in escrow if already declared; (ii) No new distributions shall be made except for the Mandatory Distribution required under Section 5.3(b); and (iii) All Tax Provisions shall continue to be maintained as required under Section 5.3(d).

5.4.   **Tax Allocations.**

(a) Items of income, gain, loss, deduction, and credit shall be allocated among Members in the same manner as Net Profits and Net Losses are allocated under Section 5.1.

(b) For tax purposes, all items of income, gain, loss, deduction or credit with respect to any property contributed to Company shall be allocated among Members so as to take account of any variation between the adjusted tax basis of such property and its fair market value at the time of contribution in accordance with Section 704(c) of the Code.

(c) Tax allocations shall be made consistently with Treasury Regulations Section 1.704-1(b), and in accordance with Section 704(c) of the Code.

5.5.   **Tax Withholding.**

(a) Company acting through Business Partner, is authorized to withhold from distributions or with respect to allocations to Members and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law.

(b) Any amounts so withheld shall be treated as having been distributed to such Member under this Agreement.

(c) Each Member will, as applicable:

    (1) provide any tax documentation reasonably requested by Company;

    (2) pay Company the amount of any liability of Company for taxes that is attributable to such Member; and

    (3) indemnify and hold harmless Company and other Members from and against any and all liability for taxes and associated penalties or interest with respect to income attributable to or distributions or other payments to such Member.

### Article VI. TRANSFER OF MEMBERSHIP INTERESTS

**6.1.**     **General Restrictions on Transfer**.

(a) Except as expressly provided in Section 7.2 regarding IPO Related Events, no Member shall transfer any Membership Interest unless such transfer satisfies all of the following conditions:

    (1) the transfer has received prior written approval from Molly Partner, which may be withheld in Molly Partner's sole and absolute discretion;

    (2) the transfer complies with all provisions set forth in this Article VI; and

    (3) the transfer complies with all applicable securities laws.

(b) Any attempted transfer that fails to satisfy all conditions set forth in Section 6.1(a) shall be void ab initio and shall have no force or effect. For clarity, no rights whatsoever shall pass to the purported transferee under such void transfer.

(c) Except as permitted under Section 6.2 or Section 7.2, no Member shall transfer less than all of such Member's Membership Interest in a single transaction, and any attempted partial transfer not complying with Section 6.2 or Section 7.2 shall be void ab initio.

(d) In the event of Business Partner's death, if Business Partner is an individual:

    (1) Membership Interest shall be inheritable by Business Partner's heir(s), provided Molly Partner may reject such inheritance transfer based on reasonable factors including but not limited to the heir(s)' business experience, operational capability and ability to contribute to Company's operations.

    (2) If Molly Partner exercises such right of rejection, Molly Partner shall purchase the Membership Interest at Book Value within 180 days.

**6.2.**     **Right of First Refusal (ROFR)**.

(a)   If Business Partner receives a bona fide written offer from a third party to purchase any or all of such Member's Membership Interest (a "**Third Party Offer**"), such Member shall provide written notice ("**ROFR Notice**") to Molly Partner, which notice shall:

    (1)   attach a complete copy of the Third Party Offer;

    (2)   state the identity of the proposed purchaser;

    (3)   set forth all material terms and conditions of the proposed transfer; and

    (4)   constitute an irrevocable offer to sell such Membership Interest to Molly Partner on the same terms.

(b)   Molly Partner shall have thirty (30) days following receipt of the ROFR Notice ("**ROFR Period**") to elect to:

    (1)   purchase all of the offered Membership Interest;

    (2)   purchase any portion of the offered Membership Interest; or

    (3)   decline to purchase any of the offered Membership Interest, by delivering written notice of such election to Business Partner.

(c)   If Molly Partner exercises its ROFR:

    (1)   the purchase price per percentage point of Membership Interest and other terms shall be as set forth in the Third Party Offer;

    (2)   closing shall occur within sixty (60) days after the exercise notice; and

    (3)   Business Partner may only transfer to the third party the portion of Membership Interest not purchased by Molly Partner.

(d)   For any portion of the Membership Interest not purchased by Molly Partner:

    (1)   Business Partner may transfer such portion to the proposed purchaser strictly in accordance with the Third Party Offer;

    (2)   such transfer must close within ninety (90) days after expiration of the ROFR Period; and

    (3)   the proposed purchaser must comply with Sections 6.1 and 6.5.

(e)   If Business Partner receives multiple Third Party Offers, or wishes to transfer portions of its Membership Interest to different purchasers, each such proposed transfer shall trigger a separate ROFR process under this Section 6.2.

(f)   The ROFR provisions of this Section 6.2 shall not apply to any transfers made pursuant to Section 7.2 (IPO Related Events) or Section 7.3 (Strategic Transaction Events).

**6.3.**   **Permitted Transfers.**  Subject to compliance with Sections 6.1 and 6.5, a Member may transfer Membership Interest to an Affiliate if:

(a)   the Member retains control of the Affiliate; and

(b)   the Affiliate agrees to return the Membership Interest if it ceases to be an Affiliate.

6.4.    **Transfer Price.**  For any permitted transfer of Membership Interest, the purchase price shall be determined as follows:

(a)    **For Third Party Offers.** The price set forth in the Third Party Offer.

(b)    **For Permitted Transfers.** Book Value of the Membership Interest as determined by the most recent quarterly financial statements.

6.5.    **Transfer Procedures and Effect**.

(a)    **Required Documentation**. A transfer of Membership Interest shall require all of the following:

(1)    prior written consent from both Members in accordance with Section 6.1;

(2)    written acceptance and adoption of this Agreement by the transferee;

(3)    payment by transferee of all reasonable admission expenses;

(4)    execution of:

(i)    transfer agreements in Company's standard form;

(ii)    mutual releases between the transferring Member and Company; and

(iii)    confidentiality agreements binding the transferee.

(b)    **Effect of Transfer**. Upon completion of a valid transfer:

(1)    The transferee shall be admitted as a substitute Member, assume all rights and obligations under this Agreement arising after the transfer and be bound by all terms of this Agreement.

(2)    The transferring Member shall cease to be a Member as to the transferred interest but remain liable for all obligations arising before the transfer. The transferring Member shall continue to be bound by Article VIII and have no further rights or obligations except as expressly provided in this Agreement.

(3)    Company shall update its books and records to reflect the transfer, adjust all future allocations and distributions accordingly, and provide notice of the transfer to all Members.

6.6.    **Regulatory Compliance**. All transfers of Membership Interest must comply with applicable securities laws, including filing all required notices and disclosures.


## Article VII. REPURCHASE RIGHTS

7.1.    **Molly Partner's Repurchase Rights**.

(a)    **Trigger Events**. Molly Partner may purchase all or any portion of Business Partner's Membership Interest upon the occurrence of any of the following events:

(1)    Business Partner's material breach of this Agreement that remains uncured for thirty (30) days after written notice;

(2)    any act or omission by Business Partner that causes material harm to the Molly Tea Brand;

(3)    loss of any permit or license required for store operations due to Business Partner's acts or omissions;

(4)    Business Partner's unauthorized use or disclosure of the Molly Tea Brand or Trade Secrets;

(5)    Business Partner's abandonment or closure of store operations without Molly Partner's prior written consent, except for Force Majeure events;

(6)    any change in control of Business Partner without Molly Partner's prior written consent;

(7)    upon Molly Partner's election, at any time after the third anniversary of Company's commencement of operations; or

(8)    occurrence or reasonable likelihood of an IPO Related Event, as determined by Molly Partner in its reasonable discretion;

(9)    occurrence or reasonable likelihood of a Strategic Transaction Event, as determined by Molly Partner in its reasonable discretion.

(10)    upon non-renewal of the Molly Tea Brand usage rights, provided that:

    (i)    Molly Partner has provided notice of non-renewal at least 180 days prior to the expiration of the then-current term; and

    (ii)    Molly Partner shall purchase Business Partner's Membership Interest at 100% of Book Value.

(b)    **Exercise Period**.

(1)    For events under Section 7.1(a), Molly Partner shall:

    (i)    exercise its repurchase rights by written notice within sixty (60) days after becoming aware of the triggering event; and

    (ii)    specify in such notice the percentage of Membership Interest to be purchased.

(2)    For IPO Related Events or Strategic Transaction Events, the timing shall be governed by Sections 7.2 and 7.3 respectively.

(c)    **Purchase Price**.

(1)    Unless otherwise agreed in writing by both Members, the repurchase price for any Membership Interest under this Section shall be the Repurchase Valuation Amount, as defined herein.

(2)    Notwithstanding the foregoing, the Members may, by mutual written agreement, adopt alternative pricing mechanisms for specific triggering events, including but not limited to:

(i)      or events under 7.1(a)(1)-(6): 70% of Book Value;

(ii)      For event under 7.1(a)(7): 100% of Book Value;

(iii)      For Dissolution Events: 80% of Book Value; and

(iv)      Such pricing as determined under Section 7.2 (IPO Related Events) or 7.3 (Strategic Transaction Events).

**7.2.**     **IPO Related Rights**.

(a)    **Drag-Along Rights**. Upon an IPO Related Event:

(1)    Molly Partner shall have the right to:

(i)      require Business Partner to sell its Membership Interest to Molly Partner to the extent that Molly will have a 51% interest in the Company;

(ii)      require Business Partner to sell part of its Membership Interest to a third party designated by Molly Partner to the extent that Molly and the third party combined interests will be more than 50% interest in the Company; or

(iii)      require Business Partner to participate in any corporate restructuring in preparation for the IPO.

(2)    Any such action shall be upon written notice to Business Partner at least sixty (60) days prior to the required closing date.

(3)    Business Partner shall be obligated to take all necessary actions to effect such sale or restructuring, including:

(i)      voting its Membership Interest in favor of any corporate reorganization;

(ii)      executing all required documentation; and

(iii)      providing customary representations and warranties.

(4)    These rights shall apply to any transaction or series of transactions that Molly Partner determines constitute an IPO Related Event, including preparatory or related transactions.

(b)    **Brand Protection Measures**. In connection with an IPO Related Event:

(1)    Molly Partner shall have sole discretion to implement any measures it deems necessary to protect and enhance the Molly Tea brand;

(2)    Business Partner shall comply with any operational changes, quality control measures, or other requirements imposed by Molly Partner;

(3)    Business Partner shall not take any action that could adversely affect the IPO Related Event or the Molly Tea brand.

(c)    **Purchase Price**. Molly Partner shall pay Business Partner Book Value or such other valuation method as reasonably determined by Molly Partner from time to time.

23

**7.3.**    **Strategic Transaction Repurchase**.

(a)    **Early Transaction Protection**. During the first three (3) years of Company's operations, Molly Partner shall consider the Company's operational stability and development status when evaluating any Strategic Transaction Event. If a Strategic Transaction Event becomes necessary during such period, Molly Partner shall first consult with Business Partner to explore alternatives or accommodations that could preserve Business Partner's interests.

(b)    **Information Rights**. Upon the occurrence of a Strategic Transaction Event, Molly Partner shall provide Business Partner with:

(1)    written notice at least sixty (60) days before the anticipated closing date;

(2)    description of the proposed transaction and strategic rationale;

(3)    identity and background of any strategic buyer or partner;

(4)    anticipated impact on Company's operations;

(5)    proposed timeline and transition plan; and

(6)    any alternative arrangements or opportunities available to Business Partner.

(c)    **Negotiation Rights**. Following such notice:

(1)    Business Partner shall have thirty (30) days to:

(i)    request additional information about the transaction;

(ii)    propose alternative arrangements; and

(iii)    discuss potential ongoing roles or relationships.

(2)    Molly Partner shall engage in good faith discussions regarding:

(i)    potential continuing involvement of Business Partner;

(ii)    transition arrangements; and

(iii)    future business opportunities.

(d)    **Purchase Terms**.

(1)    **Purchase Price**. Molly Partner shall pay Business Partner Book Value of Business Partner's Membership Interest.

(2)    **Alternative Arrangements**. Where commercially feasible, Molly Partner shall consider:

(i)    offering Business Partner a role in the post-transaction structure;

(ii)    providing Business Partner rights to participate in future opportunities; and

(iii)    maintaining Business Partner's relationship with the Molly Tea system.

(e)    **Cooperation**. Both Members shall work together in good faith to:

(1)    preserve the value of Company during any transition;

24

(2)    maintain positive relationships with employees, customers and suppliers; and

(3)    ensure smooth implementation of any Strategic Transaction.

**7.4.    General Provisions for All Repurchases**.

(a)    **Closing**.

(1)    Molly Partner and Business Partner shall complete the closing of any repurchase within ninety (90) days after Molly Partner delivers its exercise notice (unless the parties otherwise specify in writing).

(2)    Business Partner shall, at such closing:

(i)    execute all transfer documentation as Molly Partner may reasonably require for the transfer of the specified Membership Interest;

(ii)    provide representations regarding title to the Membership Interest and Business Partner's authority to transfer such interest; and

(iii)    cooperate with Molly Partner in all reasonable respects to facilitate the repurchase process and any necessary amendments to this Agreement.

(b)    **Effect of Repurchase**.

(1)    Upon Molly Partner's partial repurchase of Business Partner's Membership Interest:

(i)    Business Partner shall retain its economic rights in proportion to its remaining Membership Interest.

(ii)    Except in the case of repurchase pursuant to Section 7.2, Business Partner's management rights and voting arrangements shall be subject to mutual agreement of both Members, which shall be documented in an amendment to this Agreement.

(iii)    In the case of repurchase pursuant to Section 7.2, Molly Partner shall have sole control over management decisions while Business Partner retains economic rights proportional to its remaining interest.

(iv)    The parties shall amend this Agreement as necessary to reflect the new ownership structure and adjusted rights.

(2)    Upon Molly Partner's complete repurchase of Business Partner's Membership Interest (if applicable):

(i)    Business Partner's status as a Member shall terminate.

(ii)    All of Business Partner's management rights shall terminate immediately.

(3)    The confidentiality and non-compete obligations under Section VIII shall survive any repurchase under this Agreement. The Company shall update its records to reflect the transfer.

(c) **Costs**. (1) Company shall bear all valuation and appraisal costs. (2) Each party shall bear its own legal and professional fees. (3) Molly Partner and Business Partner shall split transfer taxes equally unless they agree otherwise in writing.

(d) **Event Classification and Priority**.

(1) Molly Partner shall have sole discretion to determine whether a transaction or series of transactions constitutes an IPO Related Event, a Strategic Transaction Event, or both.

(2) If a transaction or series of transactions could be classified as both an IPO Related Event and a Strategic Transaction Event, the IPO Related Event provisions shall take precedence.

(3) Molly Partner's determination regarding the classification of any transaction shall be final and binding.

## Article VIII. CONFIDENTIALITY AND NON-COMPETE

**8.1.    Confidential Information.**

(a) The term "**Trade Secrets**" shall mean any and all trade secrets, proprietary information, and confidential know-how developed, acquired, or used by Company in the course of its operations, including but not limited to recipes, formulas, preparation methods, and operational procedures.

(b) The term "**Confidential Information**" shall include all non-public information relating to Company's business operations, including without limitation:

(1) the Operating Manual and all operational procedures contained therein;

(2) all beverage recipes, ingredient specifications, preparation methods, and quality control standards;

(3) all supplier information, including pricing, terms, and contact information;

(4) all customer data, including transaction history, preferences, and contact information;

(5) all financial data of Company, including costs, margins, and pricing strategies;

(6) all store development plans and market analysis;

(7) all marketing strategies and promotional materials, whether implemented or under development; and

(8) any information related to potential or actual IPO Related Events or Strategic Transaction Events.

**8.2.    Intellectual Property Rights.**

(a) The "**Molly Tea System**" shall consist of:

(1) all trademarks, trade names, and logos of Molly Tea;

(2) all recipes, formulas, and preparation methods;

(3) all operational procedures and training materials;

(4) all store design elements and visual merchandising standards; and

(5) all marketing materials and promotional strategies.

(b) Ownership and usage of intellectual property shall be governed as follows:

(1) Company shall own all local customer data and market research; and

(2) Any improvements or modifications to the Molly Tea System developed during operations shall be promptly disclosed to Molly Partner and shall become part of the Molly Tea System.

8.3. **Protection of Confidential Information.** Each Member shall:

(a) maintain strict confidentiality using security measures no less rigorous than those used to protect their own confidential information;

(b) use Confidential Information solely for the operation of Company's business;

(c) limit access to Confidential Information to employees and representatives with a legitimate need to know;

(d) ensure all persons with access to Confidential Information execute confidentiality agreements;

(e) return or destroy all materials containing Confidential Information upon termination of involvement with Company; and

(f) in the event of any IPO Related Event or Strategic Transaction Event, comply with any additional confidentiality requirements imposed by Molly Partner or required by applicable securities laws and regulations.

8.4. **Non-Competition Obligations.**

(a) **Geographic Restrictions**. During the term of this Agreement and for the period specified in Section 8.4(d), except as expressly permitted in writing by Molly Partner, Business Partner shall NOT engage in Restricted Activities within:

(1) For jurisdictions where non-competition agreements are void or unenforceable as a matter of law:

(i) No geographic restrictions shall apply to Business Partner's activities, provided however that:

(A) Business Partner shall remain fully bound by all obligations regarding trade secrets as defined in Section 8.1;

(B) Business Partner shall not, for a period of two (2) years following termination, directly or indirectly solicit or attempt to solicit any Company customers or employees; and

(C) The obligations under Sections 8.1 and 8.3 shall remain in full force and effect.

(2) For stores in jurisdictions with statutory restrictions on non-competition covenants:

27

(i)    A base radius of three (3) miles from any then-existing Molly Tea branded store; and

(ii)    Molly Partner may, upon written notice to Business Partner, adjust such base radius by up to one (1) mile upon demonstration of:

    (A)    customers overlap between stores exceeding twenty percent (20%);

    (B)    population density exceeding two thousand (2,000) persons per square mile; or

    (C)    Company's market share in the Territory exceeding thirty percent (30%).

(3)    For stores in all other jurisdictions:

(i)    A base radius of five (5) miles from any then-existing Molly Tea branded store;

(ii)    Molly Partner may extend such base radius up to four (4) miles upon demonstration of:

    (A)    marketing expenditures exceeding Fifty Thousand Dollars ($50,000) annually; or

    (B)    proximity to high-traffic venues as determined by Molly Partner.

(b)    **Restricted Activities.** Business Partner shall NOT:

(1)    operate, invest in, own an interest in, or provide services to any business whose primary revenue is derived from the sale of bubble tea, milk tea, or similar specialty tea beverages for retail consumption;

(2)    serve as an officer, director, employee, consultant, or advisor to any business that primarily engages in the retail sale of bubble tea or similar specialty tea beverages; or

(3)    utilize any of Company's confidential recipes, brewing methods, or operational procedures in any other business, or

(4)    directly or indirectly solicit any customers of any Molly Tea branded store within the applicable restricted geographic area.

(c)    **General Limitations**. The restrictions in Section 8.4(a) shall:

(1)    apply only to businesses that directly compete with Molly Tea branded stores in the specialty tea beverage market;

(2)    not prohibit ownership of less than two percent (2%) of the outstanding stock of any publicly traded corporation;

(3)    not apply to any specific business activities or investments for which Business Partner has received prior written exemption from Molly Partner, which exemption may be granted or withheld in Molly Partner's sole discretion and may be subject to such conditions as Molly Partner may specify;

28

(4) be automatically modified to comply with applicable state wage thresholds, notice requirements, or other state-specific requirements;

(5) be subject to reduction in scope by a court of competent jurisdiction to the extent necessary to make them enforceable under applicable law; and

(6) if any geographic restriction is found to be unenforceable in any jurisdiction, be automatically modified to the most restrictive limitation permitted by applicable law in such jurisdiction.

(d) **Duration of Restrictions.** The non-competition obligations shall continue during the term of this Agreement and for a period following termination or expiration of this Agreement of two (2) years.

8.5. **Non-Solicitation and Non-Interference.** During the term of this Agreement and for two (2) years thereafter, Business Partner shall NOT:

(a) hire or attempt to hire any person employed by Company or any other Molly Tea branded store;

(b) solicit or attempt to divert any customer of Company to a competing business;

(c) induce any supplier, vendor, or landlord to cease or modify their relationship with Company; or

(d) assist any third party in engaging in any of the above activities.

8.6. **Survival of Obligations.** The obligations set forth in this Article shall:

(a) survive the termination of this Agreement for any reason;

(b) continue following any transfer of Units;

(c) remain binding following the dissolution of Company; and

(d) be independently enforceable from other provisions of this Agreement.

## Article IX. REPRESENTATIONS AND WARRANTIES

9.1. **Mutual Representations and Warranties**. Each Member hereby represents and warrants to Company and each other Member that:

(a) **Organization and Good Standing**. If such Member is an entity, it is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and has all requisite power and authority to own its properties and carry on its business.

(b) **Authority**. Such Member has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The execution, delivery, and performance of this Agreement have been duly authorized by all necessary action on the part of such Member.

(c) **No Conflicts**. The execution, delivery, and performance of this Agreement by such Member will not:

(1) violate any provision of its organizational documents if an entity;

29

(2) conflict with, result in a breach of, or constitute a default under any material agreement to which it is a party;

(3) violate any law, rule, regulation, judgment, or order applicable to such Member; or

(4) require any consent or approval of any third party that has not been obtained.

(d) **Binding Agreement**. This Agreement constitutes the legal, valid, and binding obligation of such Member, enforceable against such Member in accordance with its terms.

(e) **No Bankruptcy**. Such Member is not subject to any pending or threatened bankruptcy, reorganization, insolvency, or similar proceedings.

9.2. **Investment Representations**. Each Member hereby represents and warrants to, and agrees with, the Company and each other Member that:

(a) **Investment Purpose**. Such Member is acquiring its Membership Interest for its own account, for investment purposes only and not with a view to, or for sale in connection with, any distribution thereof.

(b) **Business Experience and Capacity**. Such Member, either alone or together with its representatives, has:

(1) sufficient knowledge and experience in business matters to evaluate the merits and risks of entering into this joint venture;

(2) adequate financial capacity to perform its obligations under this Agreement, including making its required Capital Contributions; and

(3) conducted appropriate due diligence regarding the business venture contemplated by this Agreement.

(c) **Access to Information**. Such Member:

(1) has been given access to all information requested regarding the Company and its business;

(2) has utilized such access to its satisfaction for the purpose of obtaining information; and

(3) has had the opportunity to ask questions of and receive answers from representatives of the Company.

(d) **Independent Investigation**. Such Member has:

(1) conducted its own independent investigation and evaluation of the Company;

(2) made its own investment decision based on its own analysis; and

(3) not relied on any representations other than those contained in this Agreement.

(e) **Transfer Restrictions**. Such Member understands that:

(1) any transfer of Membership Interests is subject to the restrictions set forth in Article VI of this Agreement;

(2)    Membership Interests represent an interest in a closely-held business venture;

(3)    there are significant limitations on the ability to transfer Membership Interests; and

(4)    in case of inheritance transfer, Molly Partner has the right to reject such transfer based on the heir(s)' qualifications, provided that Molly Partner shall purchase the Membership Interest at Book Value upon such rejection.

9.3.    **Additional Representations of Business Partner**. Business Partner hereby represents and warrants to the Company and Molly Partner that:

(a)    **Financial Capacity**. Business Partner has sufficient financial resources to make its required Capital Contributions.

(b)    **No Competing Interests**. Business Partner:

(1)    does not own or operate any competing business;

(2)    has no interests that conflict with the Company's business; and

(3)    will dedicate sufficient time and resources to the Company.

## Article X. TERMINATION AND DISSOLUTION

10.1.    **Events Causing Dissolution**. Company shall be dissolved upon the occurrence of any of the following events (each a "**Dissolution Event**"):

(a)    mutual written agreement of both Members;

(b)    upon Molly Partner's election following Business Partner's material breach, which shall include any of the following events: (1) Business Partner's failure to make its required Capital Contributions that remains uncured for thirty (30) days after written notice; (2) Business Partner's operation of the store in a manner that causes repeated or serious food safety violations, as documented by regulatory authorities; (3) Business Partner's unauthorized disclosure of Trade Secrets or Confidential Information; (4) Business Partner's abandonment of store operations for more than five (5) consecutive business days without proper cause; (6) Business Partner's engagement in activities that cause material damage to the brand or reputation of the Company; (7) Business Partner's failure to maintain required licenses or permits resulting in store closure; or (8) Business Partner's misappropriation or misuse of Company funds exceeding Ten Thousand Dollars ($10,000), provided that: (1) Molly Partner shall provide written notice specifying the material breach in detail; (2) Business Partner shall have fifteen (15) days to cure such breach if capable of cure; (3) if not cured within such period, Molly Partner may elect to dissolve the Company by providing written notice; and (4) such dissolution shall proceed according to Section 10.3;

(c)    a Sale Event;

(d)    an External Event;

31

(e)     election by either Member to trigger administrative dissolution following an unresolved Deadlock pursuant to Section 4.5, provided that: (1) proper notice of Deadlock has been given; (2) the two-week negotiation period has expired without resolution; and (3) written notice of election for administrative dissolution has been provided; or

(f)     termination or non-renewal of License Agreement between Company and Molly Tea Franchising LLC, whereupon if Members fail to agree in writing to continue Company's operations under a different brand or arrangement within 60 days.

**10.2. Pre-Dissolution Rights.**

(a)     Upon the occurrence of a Dissolution Event, Molly Partner shall have the exclusive right to elect either:

      (1)    to exercise its repurchase rights pursuant to Article VII;

      (2)    to proceed with dissolution pursuant to Section 10.4; or

      (3)    require Business Partner to sell its Membership Interest to a third party designated by Molly Partner at a purchase price as determined by Molly Partner.

(b)     If Molly Partner elects to require a sale to a third party, Business Partner shall cooperate in good faith and execute all documents reasonably required to complete such sale. If the designated purchaser fails to complete the purchase, Molly Partner may designate an alternative purchaser or shall purchase the Membership Interest itself at the specified price.

(c)     Molly Partner shall have the right to assume control of Company operations to protect brand standards during any pre-dissolution period.

**10.3. Dissolution Procedures.**

(a)     Upon commencement of dissolution, Company shall:

      (1)    cease all business operations except those necessary for winding up;

      (2)    notify all relevant parties;

      (3)    complete or terminate existing obligations;

      (4)    collect receivables;

      (5)    liquidate assets; and

      (6)    pay liabilities.

(b)     Company shall immediately cease all use of Molly Tea intellectual property.

**10.4. Asset Distribution.**

(a)     The assets of Company shall be distributed in the following priority:

      (1)    wind-down costs;

      (2)    third-party creditors;

      (3)    amounts owed to Members;

(4)    return of Capital Contributions; and

(5)    remaining amounts to Members according to their respective Percentage Interests.

(b)    Any non-cash assets shall be liquidated unless otherwise agreed by both Members.

(c)    Molly Partner shall have the right to offset any amounts owed to it against distributions otherwise payable to Business Partner.

## Article XI. INDEMNIFICATION

**11.1.    General Indemnification**.

(a)    Company shall indemnify and hold harmless each Member and their respective officers, directors, employees and agents (each, an "**Indemnified Party**", and Company in such case, the "**Indemnifying Party**") from and against any losses, damages, claims, costs and expenses (including reasonable attorneys' fees) (collectively, "**Losses**") arising from:

(1)    any third-party claim relating to Company's business operations; or

(2)    any regulatory investigation or proceeding against Company.

(b)    Each Member (in such case, the "**Indemnifying Party**") shall indemnify and hold harmless Company and the other Member (each in such case, an "**Indemnified Party**") from any Losses arising from:

(1)    such Member's breach of this Agreement;

(2)    such Member's violation of law; or

(3)    such Member's unauthorized acts exceeding their authority under this Agreement.

(c)    Notwithstanding anything to the contrary in this Agreement, Molly Partner's aggregate liability for indemnification under Section 11.1(b) shall not exceed the total amount of Cash Capital Contributions made by Molly Partner.

**11.2.    Limitations on Indemnification**.

(a)    No indemnification shall be provided for Losses arising from

(1)    Indemnified Party's gross negligence or willful misconduct;

(2)    Indemnified Party's material breach of this Agreement; or

(3)    matters for which Indemnified Party agreed to be solely responsible under this Agreement.

(b)    The amount of indemnification shall be reduced by:

(1)    any insurance proceeds actually received; and

(2)    any amounts recovered from third parties.

**11.3.    Indemnification Procedures**.

33

(a) Indemnified Party shall promptly notify the indemnifying party of any claim, providing:

   (1) reasonably detailed description of the claim;

   (2) copies of relevant documents; and

   (3) the amount of Losses claimed.

(b) Indemnifying party shall have the right to:

   (1) control the defense of any third-party claim;

   (2) select and instruct defense counsel; and

   (3) settle any claim with the Indemnified Party's consent, not to be unreasonably withheld.

(c) Indemnified Party shall:

   (1) cooperate in the defense;

   (2) provide access to relevant documents and witnesses; and

   (3) not settle without the indemnifying party's consent.

11.4. **Survival**. The indemnification obligations under this Article shall:

(a) survive the termination of this Agreement;

(b) be binding upon any successors or assigns; and

(c) be in addition to any other rights or remedies under this Agreement or applicable law.

## Article XII. JURISDICTION AND DISPUTE RESOLUTION

12.1. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to any choice or conflict of law provision or rule that would cause the application of laws of any jurisdiction other than those of the State of New York.

12.2. **Arbitration.**

(a) Any dispute, controversy or claim arising out of or relating to this Agreement, including the formation, interpretation, breach or termination thereof, shall be referred to and finally resolved by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules.

(b) The arbitration shall be conducted:

   (1) by three arbitrators;

   (2) in the city where Company's store is located;

   (3) in the English language; and

   (4) in accordance with New York law.

(c)    The award rendered by the arbitrators shall be final and binding upon all parties, and judgment upon the award may be entered by any court having jurisdiction thereof.

**12.3.    Injunctive Relief.**

(a)    Notwithstanding Section 12.2, any party shall be entitled to seek interim or provisional relief, including a temporary restraining order, preliminary injunction or permanent injunction in any court of competent jurisdiction to:

(1)    prevent any actual or threatened breach of this Agreement;

(2)    specifically enforce the provisions of this Agreement; or

(3)    otherwise avoid immediate and irreparable harm.

(b)    The parties hereby acknowledge that damages would be an inadequate remedy for any breach of Articles VII, VIII or X of this Agreement.

**12.4.    Costs and Attorneys' Fees.** The prevailing party in any arbitration or court proceeding shall be entitled to recover its reasonable attorneys' fees, arbitrator fees, expert witness fees and other costs incurred in connection with such proceeding, in addition to any other relief to which such party may be entitled.

**12.5.    Waiver of Jury Trial.** Each party hereby irrevocably waives its rights to trial by jury in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

**12.6.    Continued Performance.** The existence of any dispute shall not excuse either party from continuing to perform its obligations under this Agreement or prevent Molly Partner from exercising any of its rights hereunder.

<div align="center">

**Article XIII. MISCELLANEOUS.**

</div>

**13.1.    Entire Agreement.** This Agreement and the Certificate of Formation constitute the complete and exclusive statement of agreement among Members with respect to the subject matter herein and replace and supersede all prior written and oral agreements among Members.

**13.2.    Binding Effect.** Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and inure to the benefit of Members and their respective heirs, legal representatives, successors and permitted assigns.

**13.3.    Notices.**

(a)    Any notice required or permitted under this Agreement shall be in writing and shall be deemed duly given when sent by any of the following methods:

(1)    electronic mail with confirmation of receipt;

(2)    facsimile with confirmation of transmission;

(3)    personal delivery;

(4)    nationally recognized overnight courier; or

    (5)   certified or registered mail, postage prepaid.

(b)   All notices must be addressed as follows:

    (1)   If to Company:

    MOLLY TEA BK INC.

    5909 8tH Ave Brooklyn NY11220

    Email: nyc@mollyteany.com

    Attention: Xiaozhe Liu

    (2)   If  to Molly Partner:

    MollyTea Shops LLC

    8 The Green, Suite B, Dover, DE 19901

    Email: mollyteausa@mollytea.com

    Attention: JIE XIAO

    (3)   If to Business Partner:

    MHL NY LLC

    152-15 Jewel Ave 175B Flushing NY 11367

    Email: mhlny.info@gmail.com

    Attention: Xiaozhe Liu

(c)   Notices shall be effective upon: (1) confirmation of receipt if sent by email or fax; (2) personal delivery; (3) the first business day after sending by overnight courier; or (4) the third business day after mailing.

(d)   Any party may change its contact information by giving notice to the other parties in accordance with this Section.

**13.4.**  **Waiver.** No waiver by any party of any default, breach, or violation of this Agreement shall be deemed to be a waiver of any subsequent default, breach, or violation thereof. No waiver shall be effective unless in writing and signed by the party making such waiver.

**13.5.**  **Force Majeure**.

(a)   **Notice Requirements**. A party claiming Force Majeure shall:

    (1)   provide written notice to the other party within forty-eight (48) hours of becoming aware of the Force Majeure event;

    (2)   specify in reasonable detail the nature of the Force Majeure event;

    (3)   estimate the expected duration of the Force Majeure event; and

    (4)   keep the other party regularly informed of its efforts to resume performance.

(b)   **Effect of Force Majeure**.

(1)　Neither party shall be liable for any delay or failure to perform its obligations under this Agreement to the extent such delay or failure is caused by a Force Majeure event.

(2)　The party affected by Force Majeure shall:

(i)　use commercially reasonable efforts to mitigate the impact of the Force Majeure event;

(ii)　resume performance as soon as reasonably possible; and

(iii)　keep the other party informed of all mitigation efforts.

(3)　If a Force Majeure event continues for more than one hundred and twenty (120) consecutive days:

(i)　either party may terminate this Agreement upon written notice;

(ii)　such termination shall not be considered a breach of this Agreement; and

(iii)　the parties shall work together in good faith to wind down operations in an orderly manner.

(c)　**Limitations**. Force Majeure shall not:

(1)　excuse any payment obligations under this Agreement;

(2)　extend the term of this Agreement; or

(3)　excuse any obligations that arose prior to the Force Majeure event.

**13.6.　Severability.** If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

**13.7.　Amendments.** All amendments to this Agreement will be in writing and require the approval of both Members.

**13.8.　Multiple Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

**13.9.　No Third-Party Beneficiaries.** Nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any person not a party to this Agreement, except for the indemnification rights of Indemnified Parties under Article XI.

**13.10.　Interpretation.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. Unless the context requires otherwise: words in the singular include the plural and vice versa; the word "including" means "including without limitation"; and references to Articles and Sections refer to Articles and Sections of this Agreement.

**13.11.　Further Assurances.** Each party shall execute and deliver such additional documents and take such additional actions as may be necessary or desirable to carry out the purposes of this Agreement.

**INTENDING TO BE BOUND**, all of Members of MOLLY TEA BK INC., a New York limited liability company, have executed this Agreement, effective as of the date written above.

MEMBERS

MollyTea Shops LLC                     MHL NY LLC

By:      Name:                                  Name:

         Title:                                 Title:

         Date:                                  Date:

# EXHIBIT A

# INITIAL CAPITAL CONTRIBUTIONS AND OWNERSHIP INTERESTS

## AS OF Jul 3,2025

1. UNIT STRUCTURE AND MEMBERSHIP INTERESTS

The Company is authorized to issue a total of 10,000 Units.

| Member | Address | Cash Capital Contribution | Units Held | Initial Percentage Interest |
|---|---|---|---|---|
| MollyTea Shops LLC | 8 The Green, Suite B, Dover, DE 19901 | $1,990 | 1,990 | 19.9% |
| MHL NY LLC | 152-15 Jewel Ave 175B Flushing NY 11367 | $8,010 | 8,010 | 80.1% |
| **TOTAL** | | **$10,000** | **10,000** | **100%** |

2. TERRITORY AND DEVELOPMENT

| Item | Description |
|---|---|
| Territory | Brooklyn NY |
| Store Location | 5909 8th Ave Brooklyn NY11220 |
| Projected Opening Date | Dec 12, 2024 |
| Store Development Deadline | Dec 12, 2027 |

Note: The Company may issue additional Units from time to time in accordance with the Operating Agreement. Any such issuance shall be reflected in amendments to this Exhibit as approved by the Members.

The undersigned Members hereby confirm the accuracy of the information set forth above as of the date of this Agreement.

MEMBERS:

MollyTea Shops LLC

By: _____

Name: BIAO ZHANG

Title:

Date:

MHL NY LLC

By: _____

Name:  XIAOZHE LIU

Title:  Authorized signer

Date:  2025/7/3

41

# LIMITED LIABILITY COMPANY AGREEMENT

contract No. MLNB-OS-986014

This Limited Liability Company Agreement (this "**Agreement**") is made as of Jul 3, 2025, by and between MollyTea Shops LLC ("**Molly Partner**") and MHL NY LLC ("**Business Partner**") (each a "**Member**," and collectively, the "**Members**").

WHEREAS, the Certificate of Formation (the "**Certificate of Formation**") for MOLLY TEA MANHATTAN CHINATOWN INC. (the "**Company**"), a limited liability company under the laws of the State of New York, was filed on July 29, 2024, with the New York Secretary of State.

WHEREAS, Members desire to adopt and approve a limited liability company agreement for Company under the New York Limited Liability Company Act (the "**Act**").

**NOW**, **THEREFORE**, Members by this Agreement set forth the limited liability company agreement for Company upon the terms and subject to the condition of this Agreement.

## Article I. DEFINITIONS.

Capitalized terms used in this Agreement have the meanings specified in this Article or elsewhere in this Agreement and when not so defined shall have the meanings set forth in Section 18-101 of the Act.

"**Act**" means the New York Limited Liability Company Act , including amendments thereto from time to time.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Limited Liability Company Agreement, as originally executed and as amended from time to time.

"**Additional Member**" means any Person admitted as a Member of Company after the date of this Agreement pursuant to Section 4.7.

"**Available Profits**" means, for any fiscal year, Company's Net Profit less reasonable reserves for: (a) working capital; (b) anticipated capital expenditures; and (c) reasonably anticipated contingent liabilities, in each case as determined by Financial Manager in accordance with Company's past practices and reasonable business judgment.

"**Book Value**" means, with respect to any asset of Company, such asset's adjusted basis for federal income tax purposes, except that: (a) the initial Book Value of any asset contributed by a Member shall be its gross fair market value at the time of contribution; and (b) the Book Value of all Company assets shall be adjusted to equal their respective gross fair market values upon the occurrence of any event described in Treasury Regulations Section 1.704-1(b)(2)(iv)(f).

1

"**Brand Manager**" means the individual appointed by Molly Partner who is responsible for overseeing product quality, operating standards, and brand compliance, with specific duties and appointment procedures as set forth in Section 4.1(a).

"**Business Partner**" means MHL NY LLC, a New York Limited Liability Company.

"**Capital Account**" has the meaning set forth in Section 3.3.

"**Capital Contributions**" means, with respect to any Member, the aggregate amount of (a) cash and (b) the fair market value of any property or services contributed to Company by such Member, including but not limited to intellectual property rights, operational systems, training services and other non-cash contributions as described in Section 3.2.

"**Cash Capital Contribution**" means, with respect to any Member, the amount of cash contributed or deemed contributed to Company by such Member, as specified in Exhibit A.

"**Certificate of Formation**" has the meaning set forth in the preamble.

"**Company**" means MOLLY TEA MANHATTAN CHINATOWN INC., a New York limited liability company.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Company Minimum Gain**" shall have the meaning ascribed to the term "Partnership Minimum Gain" in the Treasury Regulations Section 1.704-2(d).

"**Deadlock**" has the meaning set forth in Section 4.5(a).

"**External Event**" means: (a) the entry of a judicial decree of dissolution; (b) the loss of necessary permits or licenses; or (c) any event making the continued operation of the business unlawful.

"**Emergency Circumstances**" means any condition or situation described in Section 4.6 that requires immediate action, including without limitation any food safety incident posing immediate risk, any serious health code violation, any material breach of quality standards, any financial irregularity exceeding $10,000, any unauthorized brand or trade secret use, any criminal activity or regulatory investigation, or any event risking material brand damage.

"**Force Majeure**" means any act, event or condition beyond a party's reasonable control that prevents or materially impairs such party's performance of its obligations under this Agreement, including but not limited to: (a) acts of God, including earthquakes, floods, hurricanes, or other natural disasters; (b) war, riot, civil unrest, terrorism, or similar events; (c) fire, explosion, or other casualties; (d) epidemics, pandemics, or public health emergencies; (e) governmental actions, including changes in law or regulations; (f) national or regional emergency; (g) strikes, lockouts, or other labor disputes (excluding those solely affecting a party's own employees); (h) significant supply chain disruptions; or (i) utility or infrastructure failures affecting a substantial portion of the Territory.

"**Financial Manager**" means the individual appointed by Molly Partner who is responsible for overseeing Company's financial operations and maintaining its books and records, with specific duties and appointment procedures as set forth in Section 4.1(b).

"**IPO Related Event**" means any of the following: (a) an initial public offering of shares in any entity that owns or controls, directly or indirectly, the Molly Tea brand or any of its affiliates; (b)

2

any transaction resulting in a public listing of any such entity (including without limitation, through a special purpose acquisition company (SPAC) merger, direct listing or other similar transaction); (c) any reorganization, restructuring, or other corporate transaction in preparation for or in contemplation of any transaction described in clauses (a) or (b); (d) any pre-IPO private placement or other equity financing round conducted in contemplation of a potential IPO; (e) any merger, acquisition, joint venture or similar transaction involving a publicly listed company or its affiliates that would result in the Molly Tea brand becoming part of a public company structure; or (f) any other transaction or series of related transactions that Molly Partner reasonably determines could lead to or is in preparation for any of the foregoing events. For clarity, an IPO Related Event includes not only the actual public offering or listing transaction, but also any preparatory or related transactions that Molly Partner determines are part of the overall IPO process or strategy.

"**Joint Approval Matters**" means those matters requiring mutual written approval of both Members as set forth in Section 4.2 of this Agreement.

"**License Agreement**" means the license agreement between Company and Molly Tea Franchising LLC or Molly Tea Affiliates pursuant to which Company is authorized to use the Molly Tea Brand and Molly Tea System.

"**Mandatory Distribution**" means the annual distribution required under Section 5.3(b).

"**Member**" means either the Molly Partner or the Business Partner.

"**Membership Interest**" means a Member's entire interest in Company including such Member's: (a) right to share in profits, losses and distributions; (b) right to participate in management as set forth in this Agreement; and (c) all other rights, benefits and privileges enjoyed by that Member under this Agreement or the Act by virtue of owning an interest in Company.

"**Molly Tea**" means the retail beverage business and brand operated under the name "Molly Tea" in the United States.

"**Molly Tea Affiliates**" means any Affiliate of Molly Tea that owns, uses, licenses, or controls the Molly Tea Brand or any part of the Molly Tea System in any jurisdiction.

"**Molly Tea Brand**" means the "Molly Tea" name, trademarks, service marks, trade names, logos, designs, recipes, operational procedures, and related intellectual property used in the operation of Molly Tea branded stores in the United States.

"**Molly Tea Franchising LLC**" means the Delaware limited liability company that licenses the Molly Tea Brand and Molly Tea System in the United States.

"**Molly Tea System**" means the comprehensive business system for operating Molly Tea branded stores, including all intellectual property, operational procedures, and brand standards as further detailed in Section 8.2(a).

"**Molly Partner**" means MollyTea Shops LLC, a Delaware limited liability company established for the purpose of forming joint ventures to operate Molly Tea branded stores in the United States.

"**Molly Partner Reserved Matters**" means those matters over which Molly Partner has sole and exclusive authority as set forth in Section 4.4, including without limitation all matters relating to

3

operating standards and quality control, training and staff development, brand and marketing, store design and systems, supply chain, and key personnel.

"**Member Nonrecourse Debt**" shall have the meaning ascribed to the term "Partner Nonrecourse Debt" in Treasury Regulations Section 1.704-2(b)(4).

"**Member Meeting**" means the meeting to discuss and approve business performance, strategic matters and Joint Approval Matters, which is attended by both Members and key management personnel.

"**Member Nonrecourse Deductions**" shall mean items of Company loss, deduction or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

"**Net Profit**" and "**Net Loss**" means, for each fiscal year or other period, an amount equal to Company's taxable income or loss for that period, determined under Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code will be included in taxable income or loss), with the following adjustments: (a) Any income of Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss will be added to such taxable income or loss; (b) Any expenditures of Company described in Section 705(a)(2)(b) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profit or Net Loss will be subtracted from such taxable income or loss; (c) Compensation to any Member for services to Company will be treated either as payroll or as "guaranteed payments" pursuant to Section 707(c) of the Code and will be deducted in calculating Net Profit and Net Loss; and (d) If Capital Accounts of Members have been adjusted pursuant to an event described in Treasury Regulations § 1.704-1(b)(2)(iv)(f)(5), gain or loss resulting from any disposition of assets (whether for sale of a single asset or all of Company's assets) will be computed by reference to the most recent value of those assets used in adjusting Capital Accounts pursuant to such event, rather than the adjusted tax basis of those assets.

"**Nonrecourse Liability**" shall have the meaning set forth in Treasury Regulations Section 1.752-1(a)(2).

"**Operating Manual**" means the confidential manual and related materials provided by Molly Tea Franchising LLC or Molly Tea Affiliates to Company that contain the operating standards, procedures, specifications and requirements for operating a Molly Tea branded store.

"**Operations Review Meeting**" meeting held periodically to review the Company's operational performance.

"**Percentage Interest**" means, with respect to any Member, such Member's ownership percentage in Company as set forth in Exhibit A, which is based on the agreed allocation between Members notwithstanding the type or value of their respective Capital Contributions.

"**Repurchase Valuation Amount**" means a repurchase price calculated based on a price-to-earnings valuation equal to three (3) times the Company's average Net Profit for the trailing twelve (12) months, as determined in accordance with GAAP and subject to review by the Financial Manager. If the Book Value of the relevant Membership Interest exceeds the Repurchase Valuation Amount, the Business Partner may elect to use the Book Value as the repurchase price instead.

4

"**Restricted Activities**" means any business activities that compete with Molly Tea branded stores or utilize Company's confidential information, as specifically detailed in Section 8.4(b).

"**ROFR Notice**" has its meaning set forth in Section 6.2(a).

"**ROFR Period**" has its meaning set forth in Section 6.2(b).

"**Sale Event**" means the sale, transfer, lease, exchange, or other disposition of all or substantially all of Company's assets.

"**Strategic Transaction Event**" means any of the following: (a) any sale, transfer, merger, consolidation, or other disposition of all or substantially all of Molly Partner's or its affiliates' assets or interests (other than in connection with an IPO Related Event); (b) any acquisition of Molly Partner or its affiliates by a third party; (c) any material reorganization of Molly Partner's or its affiliates' business operations that results in or may result in a material change to Company's operations, management structure, business model or relationship with the Molly Tea brand; (d) any transaction or series of transactions that results in a change of control of Molly Partner or its affiliates; or (e) any other transaction that Molly Partner determines could materially affect the Molly Tea brand or its strategic position in the market. For clarity, any transaction that qualifies as an IPO Related Event shall be governed by the IPO Related Event provisions of this Agreement rather than the Strategic Transaction Event provisions.

"**Store Manager**" means the individual nominated by Business Partner and approved by Molly Partner pursuant to Section 4.1(c) who is responsible for managing daily store operations.

"**Special Meeting**" means any meeting convened by either Member upon twenty-four (24) hour notice upon occurrence of any material events or circumstances as specified in Section 4.3(c).

"**Tax Filing Obligations**" means all obligations to prepare, file, and pay any federal, state, local or foreign income, franchise, sales, use, property, or other tax returns or reports, and to pay any required taxes, related to Company's business operations.

"**Treasury Regulations**" shall mean the final or temporary regulations that have been issued by the U.S. Department of the Treasury pursuant to its authority under the Code, and any successor regulations.

"**Trade Secrets**" has its meaning set forth in Section 8.1(a).

"**Tax Provision**" means the amount set aside by Company on its financial statements to cover estimated income tax liabilities for the current period and future periods, calculated in accordance with applicable accounting standards and tax regulations.

"**Territory**" means the geographic area described in Exhibit A within which Company is authorized to develop and operate Molly Tea branded stores.

"**Third Party Offer**" has its meaning set forth in Section 6.2(a).

"**Unit**" means one unit of Membership Interest, with each Unit representing a fractional ownership interest in the Company and having a value of $1 per Unit as set forth in Section 3.1. The aggregate number of authorized Units represents 100% of the Membership Interests in the Company.

## Article II. ORGANIZATIONAL MATTERS

2.1.    **Formation**. Company was formed pursuant to the Act upon the filing of the Certificate of Formation with the Secretary of State of New York on July 29, 2024. The rights and obligations of Members shall be as provided in the Act except as otherwise expressly provided in this Agreement.

2.2.    **Name.** The name of Company shall be "MOLLY TEA MANHATTAN CHINATOWN INC." Company shall operate under the trade name "Molly Tea MANHATTAN CHINATOWN " pursuant to the rights granted under this Agreement.

2.3.    **Purpose and Scope.** Company is formed for the purposes of:

(a)    operating retail beverage stores under the Molly Tea Brand pursuant to License Agreement;

(b)    developing and operating stores within New York;

(c)    engaging in any and all activities necessary, related or incidental to these purposes; and

(d)    engaging in any other lawful business that may be conducted in limited liability company form and approved by both Members.

2.4.    **Term.** The term of Company commenced as of the date of the filling of the Certificate of Formation and shall continue until dissolved pursuant to Article X of this Agreement or by operation of law.

2.5.    **Principle Office.** The principal office of Company shall be at 63 Mott St. New York NY 10013, or such location as Members may determine. Company may maintain additional offices and store locations as determined by Members.

2.6.    **Office and Agent.** Company shall continuously maintain a registered agent in New York as required by the Act. The registered agent shall be as stated in the Certificate of Formation or as otherwise determined by Members.

2.7.    **Filings**. Members shall execute and file any certificates and documents as may be necessary or appropriate for: (a) the formation, operation, and qualification of an LLC; (b) amendments to the Certificate of Formation required by the Act; and (c) operating stores in relevant jurisdictions.

2.8.    **Operating Requirements**. Company shall:

(a)    obtain and maintain all required licenses and permits;

(b)    comply with applicable food safety and health regulations;

(c)    maintain appropriate insurance coverage; and

(d)    comply with all terms and conditions of the License Agreement;

(e)    follow operating standards established by Molly Tea Franchising LLC;

(f)    utilize only the point-of-sale and payment processing systems designated by Molly Tea Franchising LLC for all transactions; and

(g)    maintain all financial accounts and records in accordance with the standard formats and accounting practices designated by Molly Tea Franchising LLC.

2.9.    **Fiscal Year**. The fiscal year of Company shall be the calendar year unless otherwise determined by Members.

2.10.    **Title to Property**. All property owned by Company shall be owned by Company as an entity. Each Member's interest in Company shall be personal property for all purposes.

## Article III. CAPITAL CONTRIBUTIONS AND OWNERSHIP

3.1.    **Unit Issuance.** The Company hereby authorizes and issues a total of 10,000 Units of membership interests, of which 1,990 Units shall be issued to Molly Partner and 8,010 Units shall be issued to Business Partner, as specified in Exhibit A.

3.2.    **Initial Capital Contributions.**

(a)    Members shall make the following initial Capital Contributions to Company:

(1)    Molly Partner shall make a Cash Capital Contribution in the amount of One Thousand Nine Hundred Ninty Dollars ($1,990) in exchange for 1,990 Units at a price of $1 per Unit.

(2)    Business Partner shall make a Cash Capital Contribution in the amount of Eight Thousand and Ten Dollars ($8,010) in exchange for 8,010 Units at a price of $1 per Unit.

(b)    The initial Capital Contributions set forth in Section 3.2 shall be made in full within 5 business days upon execution of this Agreement.

3.3.    **Ownership Interests and Economic Rights.**

(a)    Based on the Capital Contributions set forth in Section 3.2, ownership of Company shall be allocated as follows:

(1)    Molly Partner shall own a 19.9% ownership interest in the Company, represented by 1,990 Units; and

(2)    Business Partner shall own an 80.1% ownership interest in the Company, represented by 8,010 Units.

(b)    Each ownership interest shall represent:

(1)    a proportional right to share in the profits, losses and distributions of Company as set forth in Article V;

(2)    management rights as specifically set forth in Article IV; and

(3)    such other rights expressly provided under this Agreement or required by the Act.

3.4.    **Capital Accounts.** Company shall establish an individual capital account ("**Capital Account**") for each Member in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv). Company shall determine and maintain each Capital Account. Each Member's Capital Account shall be determined and maintained throughout the term of Company in accordance with the requirements of Section 704(b) of the Internal

7

Revenue Code of 1986, as amended from time to time, and the applicable Treasury Regulations thereunder. Financial Manager shall review all Capital Accounts annually and make such adjustments as necessary to reflect Company's operations and any distributions made during such period.

**3.5.** **Default in Initial Capital Contributions**.

(a) **Default by Business Partner**. If Business Partner fails to make its required initial Capital Contribution as specified in Section 3.2:

(1) Molly Partner shall provide written notice of default to Business Partner;

(2) Business Partner shall have ten (10) business days to cure such default;

(3) if not cured within such period, Molly Partner shall have the right to:

(i) terminate this Agreement;

(ii) seek specific performance of Business Partner's obligation;

(iii) admit a substitute Business Partner; or

(iv) pursue any other remedies available at law or equity.

(4) During any period of default by Business Partner, Business Partner's voting and management rights shall be suspended, and any distributions otherwise payable to Business Partner shall be applied first to the unpaid Capital Contribution amount.

(b) **Default by Molly Partner**. If Molly Partner fails to make its required initial Capital Contribution as specified in Section 3.2:

(1) Business Partner shall provide written notice of default to Molly Partner;

(2) Molly Partner shall have ten (10) business days to cure such default;

(3) if not cured within such period, Business Partner shall have the right to:

(i) terminate this Agreement and receive a full refund of any Capital Contributions made;

(ii) seek specific performance of Molly Partner's obligation; or

(iii) pursue any other remedies available at law or equity.

(c) In either case of default, the defaulting Member shall be liable for all costs and expenses incurred by Company due to such default, and any damages suffered by Company or the non-defaulting Member.

**3.6.** **Additional Capital Contributions**.

(a) **No obligation**. No Member shall be required to make any additional Capital Contributions beyond their initial Capital Contributions as set forth in Section 3.2, except as otherwise provided in this Section 3.5.

(b) **Capital Calls**. Molly Partner shall have the right, but not the obligation, to issue a capital call for additional funding necessary for Company's operations, expansion,

8

or other business needs. Any such capital call shall be made in writing and specify the required amount and purpose.

(c) **Member Contribution Rights**. Upon a capital call, each Member shall contribute additional capital in proportion to their existing Percentage Interest within 30 business days. If a Member does not contribute its pro-rata share, the other Member may contribute to the shortfall, and the Percentage Interests shall be adjusted accordingly to reflect the additional contribution.

(d) **Dilution**. If Business Partner fails to meet a capital call and Molly Partner elects to fund the shortfall, Business Partner's Percentage Interest shall be reduced on a pro-rata basis, and Molly Partner's Percentage Interest shall increase accordingly. Any such adjustment shall be documented in an amendment to Exhibit A, signed by both Members.

(e) **Authorization to Issue Additional Units**. The Company may, from time to time, authorize and issue additional Units; provided, however, that any such authorization and/or issuance shall require the unanimous approval of all Members holding 100% of the outstanding Units. Notwithstanding the foregoing, this requirement shall not apply to the issuance of Units pursuant to obligations incurred by the Company pursuant to written agreements in effect as of the date of this Agreement. Any such issuance shall be documented by an amendment to Exhibit A reflecting the updated Unit ownership and Percentage Interests.

3.7. **No Interest on Capital Contributions.** Company shall not pay any interest on Capital Contributions.

3.8. **Return of Capital Contributions**. No Member shall have the right to withdraw or reduce their Capital Contributions except as provided in this Agreement.

3.9. **Member Loans**. No Member shall be required to loan funds to Company. Any Member loans shall be documented in writing and require approval of both Members.

### Article IV. MANAGEMENT AND OPERATIONS

4.1. **Management Structure**.

(a) **Brand Manager.** Molly Partner shall appoint a Brand Manager who shall be primarily responsible for: (1) conducting quality control periodic audits and reviewing compliance with operating standards; (2) requiring corrective actions if quality standards are not met; and (3) providing guidance on brand protection matters when reasonably necessary to protect the Molly Tea Brand. Brand Manager shall conduct routine audits once per quarter; provided, however, that in Emergency Circumstances, Brand Manager shall have the right to conduct additional audits as reasonably necessary. For clarity, the Brand Manager shall not be involved in day-to-day operations.

(b) **Financial Manager.** Molly Partner shall appoint a Financial Manager with audit and oversight rights over all financial records and transactions of Company. Financial Manager shall have the right to review accounting records, monitor compliance with budgets, oversee internal controls, and conduct periodic audits.

9

Business Partner shall be responsible for maintaining all financial and accounting documentation, preparing financial statements and reports, managing cash control procedures, handling day-to-day financial operations, and fulfilling all Tax Filing Obligations as defined in Section 4.9. Business Partner shall provide Financial Manager with full access to all financial records and respond promptly to any inquiries or requests for information from Financial Manager. Financial Manager shall review quarterly financial statements and may require corrections of any material errors or deficiencies identified during such review.

(c) **Store Manager.** Business Partner shall nominate a Store Manager, subject to Molly Partner's approval with discretion, who shall be responsible for managing daily store operations, supervising store personnel, implementing quality control procedures, managing inventory and supplies, ensuring customer satisfaction, maintaining store appearance, executing local marketing, and reporting to both the Brand Manager and Financial Manager regarding their respective areas of oversight. Store Manager shall operate in accordance with the operating standards and implement all quality control and operational procedures as specified in the Operating Manual.

4.2. **Joint Approval Matters.** The following matters shall require the mutual written approval of both Members:

(a) major financial decisions, including but not limited to:

(1) approval of annual operating and capital budgets;

(2) capital expenditures exceeding Two Thousand Dollars ($20,000);

(3) incurrence of debt exceeding Two Thousand Dollars ($20,000);

(4) distribution of available cash flow;

(5) establishment of reserves;

(6) material changes to accounting methods;

(7) selection or removal of outside auditors; and

(8) annual marketing budget, which exceeding five percent (5%) of gross revenue.

(b) store development and operations, including but not limited to:

(1) opening or closing of any stores;

(2) material modifications to the business plan;

(3) expansion of the Territory;

(4) entry into new markets;

(5) major renovations exceeding Twenty-Five Thousand Dollars ($25,000); and

(6) entry into contracts with a term exceeding one (1) year or value exceeding Fifty Thousand Dollars ($50,000).

(c) strategic corporate actions, including but not limited to:

(1) any amendment to this Agreement or the Certificate of Formation;

10

(2)   admission of new Members;

(3)   corporate restructuring including mergers or reorganizations;

(4)   sale of material assets;

(5)   filing of bankruptcy or dissolution; and

(6)   settlement of material litigation.

**4.3.**   **Meeting and Decision-Making Procedures.**

(a)   **Member Meetings.**

(1)   Business Partner shall convene Member Meetings once per two weeks.

(2)   Both Members shall attend such meetings. Brand Manager and Financial may attend at their discretion.

(3)   All Joint Approval Matters shall be discussed and decided at such meetings.

(4)   If a Member fails to attend a scheduled Member Meeting:

(i)   The meeting shall be rescheduled once with three (3) business days' notice.

(ii)   If the Member fails to attend the rescheduled meeting without reasonable cause, the attending Member may proceed with voting on the Joint Approval Matters.

(iii)   Any decisions made by the attending Member in such circumstances shall be binding on the Company.

(5)   All Molly Partner Reserved Matters shall be discussed at Member Meetings, and Molly Partner shall inform Business Partner of its decisions within three (3) business days.

(6)   Business Partner shall maintain minutes of all such meetings and distribute to all Members and relevant managers within three (3) business days.

(b)   **Operations Review Meetings.** Company shall conduct Operations Review Meetings subject to the following requirements:

(1)   Brand Manager shall convene weekly Operations Review Meetings.

(2)   Store Manager shall attend such meetings. Brand Manager and Financial Manager may attend at their discretion.

(3)   Business Partner shall prepare an agenda covering operational performance, quality metrics, and financial results.

(4)   Business Partner shall ensure meeting minutes are distributed to both Members within three (3) business days.

(c)   **Special Meetings.**

(1)   **Triggering Events.** Either Member shall have the right to convene a Special Meeting upon twenty-four (24) hour notice to the other Member upon occurrence of any of the following:

11

(i)     monthly revenue declines by fifteen percent (15%) or more;

(ii)    material breach of operating standards occurs;

(iii)   food safety or quality control incident arises;

(iv)    regulatory investigation commences;

(v)     material litigation is threatened or filed;

(vi)    Emergency Circumstances exist; or

(vii)   any pending Joint Approval Matter that requires immediate resolution for business continuity.

(2)  **Requirements.** For all Special Meetings:

(i)     The convening Member shall state the purpose and agenda in the notice.

(ii)    Both Members shall make good faith efforts to attend such meetings.

(iii)   Store Manager shall attend unless excused by both Members. Brand Manager and Financial Manager may attend at Molly Partner's discretion.

(iv)    Business Partner shall maintain minutes of all such meetings and distribute such minutes within three (3) business days.

**4.4.  Molly Partner Reserved Matters.** Notwithstanding any other provision of this Agreement, Molly Partner shall have sole and exclusive authority over the following matters:

(a)  **Operating Standards and Quality Control.** All matters relating to operating standards, product specifications, recipe requirements, equipment specifications, customer service standards, food safety requirements, and quality control procedures, including the right to conduct inspections and require corrective actions.

(b)  **Training and Staff Development.** Molly Partner, in accordance with the training and personnel development guidelines established by Molly Tea Franchising LLC, shall oversee all aspects of personnel training within Company. This includes the development and enforcement of training programs, conducting certification assessments, and ensuring compliance with operational and service standards as required under License Agreement.

(c)  **Brand and Marketing.** Molly Partner, as the designated operational representative of Molly Tea Franchising LLC within the Company, shall oversee all brand-related matters in accordance with License Agreement. Such matters include approval of marketing materials, adherence to brand guidelines, management of brand protection efforts, and oversight of public communications regarding the Molly Tea brand.

(d)  **Store Design and Systems.** All matters related to store design, equipment specifications, maintenance standards, store modifications, and technology requirements including POS systems.

(e) **Supply Chain.** Molly Partner shall oversee all aspects of supply chain management within the Company to ensure compliance with the quality and brand standards established under License Agreement with Molly Tea Franchising LLC. This includes vendor selection and termination, ingredient specifications, supplier quality standards, and purchasing procedures, all of which shall be conducted in alignment with the supply chain policies set forth by Molly Tea Franchising LLC.

(f) **Key Personnel.** All decisions regarding key management positions, including:

    (1) the appointment and removal of Brand Manager and Financial Manager;

    (2) approval of Store Manager nominations and any subsequent termination, provided that such termination shall require prior consultation with Business Partner except in cases involving material breach of operating standards, food safety requirements, or brand protection measures;

    (3) setting qualification requirements; and

    (4) establishing compensation ranges for key positions, provided, however, that with respect to the Store Manager position, Business Partner shall propose the compensation and Molly Partner shall have approval rights over such proposal.

**4.5.** **Deadlock Resolution.**

(a) **Deadlock.** A "Deadlock" shall be deemed to exist if any of the following conditions occurs:

    (1) Any Joint Approval Matter receiving explicit disagreement from either Member at a Member Meeting;

    (2) Any Joint Approval Matter formally presented at a Member Meeting failing to receive explicit approval from both Members within two (2) weeks after being formally presented at a Member Meeting;

    (3) Any Joint Approval Matter that involves Emergency Circumstances failing to receive both Members' approval within forty-eight (48) hours after a Special Meeting; or

    (4) Business Partner raises a material objection to Molly Partner's implementation of Reserved Matters that: (i) identifies specific material adverse effects on the Company's operations or Business Partner's interests; (ii) proposes specific alternative approaches or modifications; and (iii) remains unresolved for two (2) weeks after being formally raised at a Member Meeting.

(b) **Resolution Procedures.**

    (1) Upon occurrence of a Deadlock:

        (i) Either Member may provide written notice to the other Member declaring a Deadlock;

        (ii) Members shall engage in good faith negotiations for a period of two (2) weeks from such notice;

        (iii) If the Deadlock remains unresolved after such two-week negotiation period: Members may mutually agree in writing to continue

13

negotiations for a specified period; or if Members cannot reach agreement to continue negotiations as described above, then:

    (A)    For Deadlocks regarding annual operating and capital budgets under Section 4.2(a)(1), the Special Procedures for Annual Budget Deadlocks set forth in Section 4.5(c) shall apply; or

    (B)    For all other Deadlocks, either Member may elect to trigger an administrative dissolution of the Company.

(2)    If the Deadlocked matter requires immediate action to: (i) prevent material harm to the Company's business; (ii) comply with applicable laws or regulations; or (iii) protect the health and safety of employees or customers, then Brand Manager, Financial Manager and Store Manager shall jointly determine and implement temporary measures necessary to address the urgent situation for a period not to exceed two (2) weeks, provided that:

    (i)    such measures shall be limited to those strictly necessary to address the immediate urgent situation;

    (ii)    both Members shall be immediately notified of any measures taken;

    (iii)    such measures shall be documented in writing and shared with both Members within twenty-four (24) hours;

    (iv)    neither Member shall unreasonably interfere with such temporary measures during the two-week period;

    (v)    Members shall continue good faith negotiations during such period; and

    (vi)    any measures taken shall automatically expire after two (2) weeks unless extended by mutual written agreement of both Members.

(c)    **Special Budget Deadlock Procedures**. If a Deadlock occurs with respect to the approval of annual operating and capital budgets under Section 4.2(a)(1):

(1)    Section 4.5(b)(1)(iii)(A) regarding administrative dissolution shall not apply.

(2)    Members shall continue good faith negotiations until an agreement is reached.

(3)    During the negotiation period, the following interim budget measures shall apply:

    (i)    Company shall operate using the prior fiscal year's approved budget on a pro-rata monthly basis; and

    (ii)    Essential expenditures required for regulatory compliance, safety, protection of the Molly Tea Brand, or preventing material harm to the business may be approved jointly by Brand Manager and Financial Manager regardless of budget status.

(4)    If, after ninety (90) days, Members have not reached agreement:

    (i)    Members shall meet in person to make a final good faith attempt to resolve the budget Deadlock; and

(ii)    If no agreement is reached within fourteen (14) days after such meeting, either Member may then exercise any rights available under Section 4.5(b)(1)(iii), including the right to trigger administrative dissolution.

**4.6.    Emergency Circumstances and Brand Protection.**

(a)    **Actions Upon Occurrence of Emergency Circumstances**. Upon occurrence of Emergency Circumstances:

(1)    Store Manager shall immediately implement necessary safety and containment measures, and promptly notify Brand Manager and Financial Manager.

(2)    Brand Manager shall assess the situation and may implement temporary measures necessary to protect the business, brand, and customer safety.

(3)    Brand Manager shall notify both Members within two (2) hours and convene a Special Meeting in accordance with Section 4.3(c).

(b)    **Interim Authority of Brand Manager**. Prior to the Special Meeting, Brand Manager shall have temporary authority to suspend operations, remove personnel, engage necessary professionals, or take other protective actions as reasonably required to address the emergency. Such actions shall be: (1) limited to measures necessary to address the immediate emergency; (2) promptly reported to Members; and (3) subject to modification or termination by both Members at the Special Meeting.

(c)    **Actions at the Special Meeting**. At the Special Meeting, Members shall review the Emergency Circumstances and management's response, determine whether additional measures are needed, and establish any necessary remedial or preventive measures. All actions taken under this Section 4.6 shall be documented in writing and shall not affect ownership interests or economic rights under this Agreement.

**4.7.    Financial Reporting.**

(a)    Business Partner shall provide the following financial reports to all Members:

(1)    Monthly financial statements, including income statement and balance sheet, within fifteen (15) days following the end of each month;

(2)    Quarterly financial statements, including income statement, balance sheet, and cash flow statement, within thirty (30) days following the end of each fiscal quarter; and

(3)    Annual financial statements within sixty (60) days following the end of each fiscal year.

(b)    If Business Partner fails to provide required financial reports within the specified timeframes:

(1)    Molly Partner shall provide written notice of such failure;

(2)    Business Partner shall have ten (10) business days to cure such failure; and

(3)    If not cured within such period, Molly Partner may engage a third-party accounting professional to prepare such reports at Business Partner's expense.

15

**4.8.** **Admission of Additional Members.** Additional Members may be admitted only with the mutual written approval of both Members. Upon admission of any Additional Member, Members shall amend Exhibit A of this Agreement accordingly and such Additional Member shall execute all documents required by the Company.

**4.9.** **Tax Responsibilities.**

(a) Business Partner shall be solely responsible for all Tax Filing Obligations of Company, including but not limited to:

    (1) preparation and timely filing of all required tax returns and reports;

    (2) payment of all taxes due from Company;

    (3) maintaining all tax-related records and documentation;

    (4) responding to any tax audits or inquiries from tax authorities; and

    (5) providing Molly Partner with copies of all filed tax returns and confirmation of tax payments within fifteen (15) days of filing or payment.

(b) Business Partner shall ensure all tax returns are prepared in accordance with applicable laws and regulations.

(c) Business Partner shall consult with Molly Partner prior to taking any tax positions that could materially affect Company or Molly Partner.

(d) Company shall bear all costs associated with preparing and filing Company's tax returns, including accounting and tax preparation fees.

(e) If Business Partner fails to fulfill its tax responsibilities:

    (1) Molly Partner shall provide written notice of such failure;

    (2) Business Partner shall have ten (10) business days to cure such failure; and

    (3) If not cured within such period, Molly Partner may engage a tax professional to fulfill such responsibilities at Company's expense.

### Article V. ALLOCATIONS AND DISTRIBUTIONS

**5.1.** **Allocations of Net Profit and Net Loss.**

(a) **Net Profit**. Net Profit shall first be applied to offset any Net Loss previously allocated to Members, in proportion to their prior Net Loss allocations and to the extent of such losses. Any remaining Net Profit shall be allocated to Members in accordance with their respective Percentage Interests.

(b) **Net Loss**. Net Loss shall be allocated to Members in accordance with Treasury Regulations Section 1.704-1(b).

**5.2.** **Regulatory Allocations.** Company shall make special allocations as required by Treasury Regulations Section 1.704-2 to comply with the "minimum gain chargeback" requirements.

16

**5.3.    Distributions.**

(a)    **Distribution Determination**. Molly Partner, shall determine the timing and amount of all distributions, taking into consideration:

(1)    Company's current and projected working capital needs;

(2)    anticipated capital expenditures and operational requirements;

(3)    required reserves for business operations and contingencies;

(4)    compliance with any debt covenants or other contractual obligations; and

(5)    general market and business conditions affecting Company.

(b)    **Mandatory Quarterly Distribution**. Notwithstanding Section 5.3(a), Company shall make distributions to the Members on a quarterly basis. The total amount distributed for each fiscal year shall not be less than at least ninety percent (90%) of Company's Available Profits for that year (the "**Mandatory Distribution**"). Company shall make the Mandatory Distribution within ninety (90) days after the end of each fiscal year. If cumulative quarterly distributions fall short of ninety percent (90%) of the Company's Available Profits, the Company shall distribute the shortfall as part of the final quarterly distribution or through a separate true-up distribution within the same period.

(c)    **Mandatory Conditions**. Notwithstanding Sections 5.3(a) and (b), no distributions shall be made unless:

(1)    all operating expenses and liabilities then due and owing have been paid;

(2)    sufficient working capital reserves are maintained as determined by Molly Partner;

(3)    all required maintenance and quality control standards are met; and

(4)    such distribution would not violate applicable law.

(d)    **Tax Provisions.** Prior to determining Available Profits, Company shall:

(1)    establish and maintain adequate Tax Provisions on its financial statements;

(2)    review and adjust Tax Provisions quarterly based on Company's financial performance and applicable tax rates; and

(3)    ensure Tax Provisions are properly reflected as current or deferred tax liabilities on Company's balance sheet.

(e)    **Distribution of Available Funds**. Subject to Sections 5.3(a) and (b), when Molly Partner determines that funds are available for distribution, such funds shall be distributed to Members in proportion to their respective Percentage Interests.

(f)    **Distribution Payment Instructions**. All distributions shall be made pursuant to written instructions jointly provided by the Members from time to time. The Company shall not be obligated to disburse any distribution unless and until such joint written instructions are received, and may rely on the most recent instructions signed by both Members.

17

(g) **Suspension of Distributions**. Molly Partner may suspend distributions if, in its reasonable business judgment:

    (1)    Company requires additional working capital;

    (2)    Capital expenditures are needed for store maintenance or improvements;

    (3)    Company experiences material adverse business conditions;

    (4)    Quality control or operational issues require additional investment; or

    (5)    Suspension is necessary to protect Company's financial stability or brand standards.

(h) **Distribution Notices.** At least five (5) business days prior to any distribution, Financial Manager shall provide Members with a written notice detailing:

    (1)    the total amount to be distributed;

    (2)    the calculation method; and

    (3)    the anticipated distribution date.

(i) **Objection to Distribution Decisions.** If Business Partner disagrees with Molly Partner's determination regarding distributions under Sections 5.3(a) or (f): (1)

    (1)    Business Partner may raise an objection at a Member Meeting by: (i) identifying specific concerns regarding the determination; (ii) providing supporting financial analysis; and (iii) proposing alternative distribution arrangements.

    (2)    Such objection shall be subject to the Deadlock resolution procedures set forth in Section 4.5.

    (3)    During any Deadlock resolution period: (i) The disputed distribution shall be held in escrow if already declared; (ii) No new distributions shall be made except for the Mandatory Distribution required under Section 5.3(b); and (iii) All Tax Provisions shall continue to be maintained as required under Section 5.3(d).

5.4.    **Tax Allocations.**

(a) Items of income, gain, loss, deduction, and credit shall be allocated among Members in the same manner as Net Profits and Net Losses are allocated under Section 5.1.

(b) For tax purposes, all items of income, gain, loss, deduction or credit with respect to any property contributed to Company shall be allocated among Members so as to take account of any variation between the adjusted tax basis of such property and its fair market value at the time of contribution in accordance with Section 704(c) of the Code.

(c) Tax allocations shall be made consistently with Treasury Regulations Section 1.704-1(b), and in accordance with Section 704(c) of the Code.

5.5.    **Tax Withholding.**

18

(a) Company acting through Business Partner, is authorized to withhold from distributions or with respect to allocations to Members and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law.

(b) Any amounts so withheld shall be treated as having been distributed to such Member under this Agreement.

(c) Each Member will, as applicable:

    (1) provide any tax documentation reasonably requested by Company;

    (2) pay Company the amount of any liability of Company for taxes that is attributable to such Member; and

    (3) indemnify and hold harmless Company and other Members from and against any and all liability for taxes and associated penalties or interest with respect to income attributable to or distributions or other payments to such Member.

### Article VI. TRANSFER OF MEMBERSHIP INTERESTS

**6.1.** **General Restrictions on Transfer**.

(a) Except as expressly provided in Section 7.2 regarding IPO Related Events, no Member shall transfer any Membership Interest unless such transfer satisfies all of the following conditions:

    (1) the transfer has received prior written approval from Molly Partner, which may be withheld in Molly Partner's sole and absolute discretion;

    (2) the transfer complies with all provisions set forth in this Article VI; and

    (3) the transfer complies with all applicable securities laws.

(b) Any attempted transfer that fails to satisfy all conditions set forth in Section 6.1(a) shall be void ab initio and shall have no force or effect. For clarity, no rights whatsoever shall pass to the purported transferee under such void transfer.

(c) Except as permitted under Section 6.2 or Section 7.2, no Member shall transfer less than all of such Member's Membership Interest in a single transaction, and any attempted partial transfer not complying with Section 6.2 or Section 7.2 shall be void ab initio.

(d) In the event of Business Partner's death, if Business Partner is an individual:

    (1) Membership Interest shall be inheritable by Business Partner's heir(s), provided Molly Partner may reject such inheritance transfer based on reasonable factors including but not limited to the heir(s)' business experience, operational capability and ability to contribute to Company's operations.

    (2) If Molly Partner exercises such right of rejection, Molly Partner shall purchase the Membership Interest at Book Value within 180 days.

**6.2.** **Right of First Refusal (ROFR).**

19

(a) If Business Partner receives a bona fide written offer from a third party to purchase any or all of such Member's Membership Interest (a "**Third Party Offer**"), such Member shall provide written notice ("**ROFR Notice**") to Molly Partner, which notice shall:

(1) attach a complete copy of the Third Party Offer;

(2) state the identity of the proposed purchaser;

(3) set forth all material terms and conditions of the proposed transfer; and

(4) constitute an irrevocable offer to sell such Membership Interest to Molly Partner on the same terms.

(b) Molly Partner shall have thirty (30) days following receipt of the ROFR Notice ("**ROFR Period**") to elect to:

(1) purchase all of the offered Membership Interest;

(2) purchase any portion of the offered Membership Interest; or

(3) decline to purchase any of the offered Membership Interest, by delivering written notice of such election to Business Partner.

(c) If Molly Partner exercises its ROFR:

(1) the purchase price per percentage point of Membership Interest and other terms shall be as set forth in the Third Party Offer;

(2) closing shall occur within sixty (60) days after the exercise notice; and

(3) Business Partner may only transfer to the third party the portion of Membership Interest not purchased by Molly Partner.

(d) For any portion of the Membership Interest not purchased by Molly Partner:

(1) Business Partner may transfer such portion to the proposed purchaser strictly in accordance with the Third Party Offer;

(2) such transfer must close within ninety (90) days after expiration of the ROFR Period; and

(3) the proposed purchaser must comply with Sections 6.1 and 6.5.

(e) If Business Partner receives multiple Third Party Offers, or wishes to transfer portions of its Membership Interest to different purchasers, each such proposed transfer shall trigger a separate ROFR process under this Section 6.2.

(f) The ROFR provisions of this Section 6.2 shall not apply to any transfers made pursuant to Section 7.2 (IPO Related Events) or Section 7.3 (Strategic Transaction Events).

**6.3.    Permitted Transfers.**  Subject to compliance with Sections 6.1 and 6.5, a Member may transfer Membership Interest to an Affiliate if:

(a) the Member retains control of the Affiliate; and

(b) the Affiliate agrees to return the Membership Interest if it ceases to be an Affiliate.

20

6.4.    **Transfer Price.**  For any permitted transfer of Membership Interest, the purchase price shall be determined as follows:

(a)    **For Third Party Offers.** The price set forth in the Third Party Offer.

(b)    **For Permitted Transfers.** Book Value of the Membership Interest as determined by the most recent quarterly financial statements.

6.5.    **Transfer Procedures and Effect**.

(a)    **Required Documentation**. A transfer of Membership Interest shall require all of the following:

(1)    prior written consent from both Members in accordance with Section 6.1;

(2)    written acceptance and adoption of this Agreement by the transferee;

(3)    payment by transferee of all reasonable admission expenses;

(4)    execution of:

(i)    transfer agreements in Company's standard form;

(ii)    mutual releases between the transferring Member and Company; and

(iii)    confidentiality agreements binding the transferee.

(b)    **Effect of Transfer**. Upon completion of a valid transfer:

(1)    The transferee shall be admitted as a substitute Member, assume all rights and obligations under this Agreement arising after the transfer and be bound by all terms of this Agreement.

(2)    The transferring Member shall cease to be a Member as to the transferred interest but remain liable for all obligations arising before the transfer. The transferring Member shall continue to be bound by Article VIII and have no further rights or obligations except as expressly provided in this Agreement.

(3)    Company shall update its books and records to reflect the transfer, adjust all future allocations and distributions accordingly, and provide notice of the transfer to all Members.

6.6.    **Regulatory Compliance**. All transfers of Membership Interest must comply with applicable securities laws, including filing all required notices and disclosures.

## Article VII. REPURCHASE RIGHTS

7.1.    **Molly Partner's Repurchase Rights**.

(a)    **Trigger Events**. Molly Partner may purchase all or any portion of Business Partner's Membership Interest upon the occurrence of any of the following events:

(1)    Business Partner's material breach of this Agreement that remains uncured for thirty (30) days after written notice;

21

(2)    any act or omission by Business Partner that causes material harm to the Molly Tea Brand;

(3)    loss of any permit or license required for store operations due to Business Partner's acts or omissions;

(4)    Business Partner's unauthorized use or disclosure of the Molly Tea Brand or Trade Secrets;

(5)    Business Partner's abandonment or closure of store operations without Molly Partner's prior written consent, except for Force Majeure events;

(6)    any change in control of Business Partner without Molly Partner's prior written consent;

(7)    upon Molly Partner's election, at any time after the third anniversary of Company's commencement of operations; or

(8)    occurrence or reasonable likelihood of an IPO Related Event, as determined by Molly Partner in its reasonable discretion;

(9)    occurrence or reasonable likelihood of a Strategic Transaction Event, as determined by Molly Partner in its reasonable discretion.

(10)  upon non-renewal of the Molly Tea Brand usage rights, provided that:

    (i)    Molly Partner has provided notice of non-renewal at least 180 days prior to the expiration of the then-current term; and

    (ii)   Molly Partner shall purchase Business Partner's Membership Interest at 100% of Book Value.

(b)  **Exercise Period**.

(1)    For events under Section 7.1(a), Molly Partner shall:

    (i)    exercise its repurchase rights by written notice within sixty (60) days after becoming aware of the triggering event; and

    (ii)   specify in such notice the percentage of Membership Interest to be purchased.

(2)    For IPO Related Events or Strategic Transaction Events, the timing shall be governed by Sections 7.2 and 7.3 respectively.

(c)  **Purchase Price**.

(1)    Unless otherwise agreed in writing by both Members, the repurchase price for any Membership Interest under this Section shall be the Repurchase Valuation Amount, as defined herein.

(2)    Notwithstanding the foregoing, the Members may, by mutual written agreement, adopt alternative pricing mechanisms for specific triggering events, including but not limited to:

22

(i)      or events under 7.1(a)(1)-(6): 70% of Book Value;

(ii)     For event under 7.1(a)(7): 100% of Book Value;

(iii)    For Dissolution Events: 80% of Book Value; and

(iv)    Such pricing as determined under Section 7.2 (IPO Related Events) or 7.3 (Strategic Transaction Events).

**7.2.**   **IPO Related Rights**.

(a)    **Drag-Along Rights**. Upon an IPO Related Event:

(1)    Molly Partner shall have the right to:

(i)      require Business Partner to sell its Membership Interest to Molly Partner to the extent that Molly will have a 51% interest in the Company;

(ii)     require Business Partner to sell part of its Membership Interest to a third party designated by Molly Partner to the extent that Molly and the third party combined interests will be more than 50% interest in the Company; or

(iii)    require Business Partner to participate in any corporate restructuring in preparation for the IPO.

(2)    Any such action shall be upon written notice to Business Partner at least sixty (60) days prior to the required closing date.

(3)    Business Partner shall be obligated to take all necessary actions to effect such sale or restructuring, including:

(i)      voting its Membership Interest in favor of any corporate reorganization;

(ii)     executing all required documentation; and

(iii)    providing customary representations and warranties.

(4)    These rights shall apply to any transaction or series of transactions that Molly Partner determines constitute an IPO Related Event, including preparatory or related transactions.

(b)    **Brand Protection Measures**. In connection with an IPO Related Event:

(1)    Molly Partner shall have sole discretion to implement any measures it deems necessary to protect and enhance the Molly Tea brand;

(2)    Business Partner shall comply with any operational changes, quality control measures, or other requirements imposed by Molly Partner;

(3)    Business Partner shall not take any action that could adversely affect the IPO Related Event or the Molly Tea brand.

(c)    **Purchase Price**. Molly Partner shall pay Business Partner Book Value or such other valuation method as reasonably determined by Molly Partner from time to time.

23

**7.3.**   **Strategic Transaction Repurchase**.

(a)   **Early Transaction Protection**. During the first three (3) years of Company's operations, Molly Partner shall consider the Company's operational stability and development status when evaluating any Strategic Transaction Event. If a Strategic Transaction Event becomes necessary during such period, Molly Partner shall first consult with Business Partner to explore alternatives or accommodations that could preserve Business Partner's interests.

(b)   **Information Rights**. Upon the occurrence of a Strategic Transaction Event, Molly Partner shall provide Business Partner with:

   (1)   written notice at least sixty (60) days before the anticipated closing date;

   (2)   description of the proposed transaction and strategic rationale;

   (3)   identity and background of any strategic buyer or partner;

   (4)   anticipated impact on Company's operations;

   (5)   proposed timeline and transition plan; and

   (6)   any alternative arrangements or opportunities available to Business Partner.

(c)   **Negotiation Rights**. Following such notice:

   (1)   Business Partner shall have thirty (30) days to:

      (i)   request additional information about the transaction;

      (ii)   propose alternative arrangements; and

      (iii)   discuss potential ongoing roles or relationships.

   (2)   Molly Partner shall engage in good faith discussions regarding:

      (i)   potential continuing involvement of Business Partner;

      (ii)   transition arrangements; and

      (iii)   future business opportunities.

(d)   **Purchase Terms**.

   (1)   **Purchase Price**. Molly Partner shall pay Business Partner Book Value of Business Partner's Membership Interest.

   (2)   **Alternative Arrangements**. Where commercially feasible, Molly Partner shall consider:

      (i)   offering Business Partner a role in the post-transaction structure;

      (ii)   providing Business Partner rights to participate in future opportunities; and

      (iii)   maintaining Business Partner's relationship with the Molly Tea system.

(e)   **Cooperation**. Both Members shall work together in good faith to:

   (1)   preserve the value of Company during any transition;

24

    (2)    maintain positive relationships with employees, customers and suppliers; and

    (3)    ensure smooth implementation of any Strategic Transaction.

**7.4.**    **General Provisions for All Repurchases**.

(a)    **Closing**.

    (1)    Molly Partner and Business Partner shall complete the closing of any repurchase within ninety (90) days after Molly Partner delivers its exercise notice (unless the parties otherwise specify in writing).

    (2)    Business Partner shall, at such closing:

        (i)    execute all transfer documentation as Molly Partner may reasonably require for the transfer of the specified Membership Interest;

        (ii)    provide representations regarding title to the Membership Interest and Business Partner's authority to transfer such interest; and

        (iii)    cooperate with Molly Partner in all reasonable respects to facilitate the repurchase process and any necessary amendments to this Agreement.

(b)    **Effect of Repurchase**.

    (1)    Upon Molly Partner's partial repurchase of Business Partner's Membership Interest:

        (i)    Business Partner shall retain its economic rights in proportion to its remaining Membership Interest.

        (ii)    Except in the case of repurchase pursuant to Section 7.2, Business Partner's management rights and voting arrangements shall be subject to mutual agreement of both Members, which shall be documented in an amendment to this Agreement.

        (iii)    In the case of repurchase pursuant to Section 7.2, Molly Partner shall have sole control over management decisions while Business Partner retains economic rights proportional to its remaining interest.

        (iv)    The parties shall amend this Agreement as necessary to reflect the new ownership structure and adjusted rights.

    (2)    Upon Molly Partner's complete repurchase of Business Partner's Membership Interest (if applicable):

        (i)    Business Partner's status as a Member shall terminate.

        (ii)    All of Business Partner's management rights shall terminate immediately.

    (3)    The confidentiality and non-compete obligations under Section VIII shall survive any repurchase under this Agreement. The Company shall update its records to reflect the transfer.

25

(c) **Costs**. (1) Company shall bear all valuation and appraisal costs. (2) Each party shall bear its own legal and professional fees. (3) Molly Partner and Business Partner shall split transfer taxes equally unless they agree otherwise in writing.

(d) **Event Classification and Priority**.

(1) Molly Partner shall have sole discretion to determine whether a transaction or series of transactions constitutes an IPO Related Event, a Strategic Transaction Event, or both.

(2) If a transaction or series of transactions could be classified as both an IPO Related Event and a Strategic Transaction Event, the IPO Related Event provisions shall take precedence.

(3) Molly Partner's determination regarding the classification of any transaction shall be final and binding.

## Article VIII. CONFIDENTIALITY AND NON-COMPETE

**8.1.    Confidential Information.**

(a) The term "**Trade Secrets**" shall mean any and all trade secrets, proprietary information, and confidential know-how developed, acquired, or used by Company in the course of its operations, including but not limited to recipes, formulas, preparation methods, and operational procedures.

(b) The term "**Confidential Information**" shall include all non-public information relating to Company's business operations, including without limitation:

(1) the Operating Manual and all operational procedures contained therein;

(2) all beverage recipes, ingredient specifications, preparation methods, and quality control standards;

(3) all supplier information, including pricing, terms, and contact information;

(4) all customer data, including transaction history, preferences, and contact information;

(5) all financial data of Company, including costs, margins, and pricing strategies;

(6) all store development plans and market analysis;

(7) all marketing strategies and promotional materials, whether implemented or under development; and

(8) any information related to potential or actual IPO Related Events or Strategic Transaction Events.

**8.2.    Intellectual Property Rights.**

(a) The "**Molly Tea System**" shall consist of:

(1) all trademarks, trade names, and logos of Molly Tea;

(2) all recipes, formulas, and preparation methods;

26

(3)  all operational procedures and training materials;

(4)  all store design elements and visual merchandising standards; and

(5)  all marketing materials and promotional strategies.

(b)  Ownership and usage of intellectual property shall be governed as follows:

(1)  Company shall own all local customer data and market research; and

(2)  Any improvements or modifications to the Molly Tea System developed during operations shall be promptly disclosed to Molly Partner and shall become part of the Molly Tea System.

8.3.  **Protection of Confidential Information.** Each Member shall:

(a)  maintain strict confidentiality using security measures no less rigorous than those used to protect their own confidential information;

(b)  use Confidential Information solely for the operation of Company's business;

(c)  limit access to Confidential Information to employees and representatives with a legitimate need to know;

(d)  ensure all persons with access to Confidential Information execute confidentiality agreements;

(e)  return or destroy all materials containing Confidential Information upon termination of involvement with Company; and

(f)  in the event of any IPO Related Event or Strategic Transaction Event, comply with any additional confidentiality requirements imposed by Molly Partner or required by applicable securities laws and regulations.

8.4.  **Non-Competition Obligations.**

(a)  **Geographic Restrictions**. During the term of this Agreement and for the period specified in Section 8.4(d), except as expressly permitted in writing by Molly Partner, Business Partner shall NOT engage in Restricted Activities within:

(1)  For jurisdictions where non-competition agreements are void or unenforceable as a matter of law:

(i)  No geographic restrictions shall apply to Business Partner's activities, provided however that:

(A)  Business Partner shall remain fully bound by all obligations regarding trade secrets as defined in Section 8.1;

(B)  Business Partner shall not, for a period of two (2) years following termination, directly or indirectly solicit or attempt to solicit any Company customers or employees; and

(C)  The obligations under Sections 8.1 and 8.3 shall remain in full force and effect.

(2)  For stores in jurisdictions with statutory restrictions on non-competition covenants:

27

(i)  A base radius of three (3) miles from any then-existing Molly Tea branded store; and

(ii)  Molly Partner may, upon written notice to Business Partner, adjust such base radius by up to one (1) mile upon demonstration of:

(A)  customers overlap between stores exceeding twenty percent (20%);

(B)  population density exceeding two thousand (2,000) persons per square mile; or

(C)  Company's market share in the Territory exceeding thirty percent (30%).

(3)  For stores in all other jurisdictions:

(i)  A base radius of five (5) miles from any then-existing Molly Tea branded store;

(ii)  Molly Partner may extend such base radius up to four (4) miles upon demonstration of:

(A)  marketing expenditures exceeding Fifty Thousand Dollars ($50,000) annually; or

(B)  proximity to high-traffic venues as determined by Molly Partner.

(b)  **Restricted Activities.** Business Partner shall NOT:

(1)  operate, invest in, own an interest in, or provide services to any business whose primary revenue is derived from the sale of bubble tea, milk tea, or similar specialty tea beverages for retail consumption;

(2)  serve as an officer, director, employee, consultant, or advisor to any business that primarily engages in the retail sale of bubble tea or similar specialty tea beverages; or

(3)  utilize any of Company's confidential recipes, brewing methods, or operational procedures in any other business, or

(4)  directly or indirectly solicit any customers of any Molly Tea branded store within the applicable restricted geographic area.

(c)  **General Limitations**. The restrictions in Section 8.4(a) shall:

(1)  apply only to businesses that directly compete with Molly Tea branded stores in the specialty tea beverage market;

(2)  not prohibit ownership of less than two percent (2%) of the outstanding stock of any publicly traded corporation;

(3)  not apply to any specific business activities or investments for which Business Partner has received prior written exemption from Molly Partner, which exemption may be granted or withheld in Molly Partner's sole discretion and may be subject to such conditions as Molly Partner may specify;

28

(4)  be automatically modified to comply with applicable state wage thresholds, notice requirements, or other state-specific requirements;

(5)  be subject to reduction in scope by a court of competent jurisdiction to the extent necessary to make them enforceable under applicable law; and

(6)  if any geographic restriction is found to be unenforceable in any jurisdiction, be automatically modified to the most restrictive limitation permitted by applicable law in such jurisdiction.

(d)  **Duration of Restrictions.** The non-competition obligations shall continue during the term of this Agreement and for a period following termination or expiration of this Agreement of two (2) years.

**8.5.**  **Non-Solicitation and Non-Interference.** During the term of this Agreement and for two (2) years thereafter, Business Partner shall NOT:

(a)  hire or attempt to hire any person employed by Company or any other Molly Tea branded store;

(b)  solicit or attempt to divert any customer of Company to a competing business;

(c)  induce any supplier, vendor, or landlord to cease or modify their relationship with Company; or

(d)  assist any third party in engaging in any of the above activities.

**8.6.**  **Survival of Obligations.** The obligations set forth in this Article shall:

(a)  survive the termination of this Agreement for any reason;

(b)  continue following any transfer of Units;

(c)  remain binding following the dissolution of Company; and

(d)  be independently enforceable from other provisions of this Agreement.

## Article IX. REPRESENTATIONS AND WARRANTIES

**9.1.**  **Mutual Representations and Warranties**. Each Member hereby represents and warrants to Company and each other Member that:

(a)  **Organization and Good Standing**. If such Member is an entity, it is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and has all requisite power and authority to own its properties and carry on its business.

(b)  **Authority**. Such Member has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The execution, delivery, and performance of this Agreement have been duly authorized by all necessary action on the part of such Member.

(c)  **No Conflicts**. The execution, delivery, and performance of this Agreement by such Member will not:

(1)  violate any provision of its organizational documents if an entity;

(2)   conflict with, result in a breach of, or constitute a default under any material agreement to which it is a party;

(3)   violate any law, rule, regulation, judgment, or order applicable to such Member; or

(4)   require any consent or approval of any third party that has not been obtained.

(d)   **Binding Agreement**. This Agreement constitutes the legal, valid, and binding obligation of such Member, enforceable against such Member in accordance with its terms.

(e)   **No Bankruptcy**. Such Member is not subject to any pending or threatened bankruptcy, reorganization, insolvency, or similar proceedings.

9.2.   **Investment Representations**. Each Member hereby represents and warrants to, and agrees with, the Company and each other Member that:

(a)   **Investment Purpose**. Such Member is acquiring its Membership Interest for its own account, for investment purposes only and not with a view to, or for sale in connection with, any distribution thereof.

(b)   **Business Experience and Capacity**. Such Member, either alone or together with its representatives, has:

(1)   sufficient knowledge and experience in business matters to evaluate the merits and risks of entering into this joint venture;

(2)   adequate financial capacity to perform its obligations under this Agreement, including making its required Capital Contributions; and

(3)   conducted appropriate due diligence regarding the business venture contemplated by this Agreement.

(c)   **Access to Information**. Such Member:

(1)   has been given access to all information requested regarding the Company and its business;

(2)   has utilized such access to its satisfaction for the purpose of obtaining information; and

(3)   has had the opportunity to ask questions of and receive answers from representatives of the Company.

(d)   **Independent Investigation**. Such Member has:

(1)   conducted its own independent investigation and evaluation of the Company;

(2)   made its own investment decision based on its own analysis; and

(3)   not relied on any representations other than those contained in this Agreement.

(e)   **Transfer Restrictions**. Such Member understands that:

(1)   any transfer of Membership Interests is subject to the restrictions set forth in Article VI of this Agreement;

30

(2)  Membership Interests represent an interest in a closely-held business venture;

(3)  there are significant limitations on the ability to transfer Membership Interests; and

(4)  in case of inheritance transfer, Molly Partner has the right to reject such transfer based on the heir(s)' qualifications, provided that Molly Partner shall purchase the Membership Interest at Book Value upon such rejection.

9.3.  **Additional Representations of Business Partner**. Business Partner hereby represents and warrants to the Company and Molly Partner that:

(a)  **Financial Capacity**. Business Partner has sufficient financial resources to make its required Capital Contributions.

(b)  **No Competing Interests**. Business Partner:

(1)  does not own or operate any competing business;

(2)  has no interests that conflict with the Company's business; and

(3)  will dedicate sufficient time and resources to the Company.

## Article X. TERMINATION AND DISSOLUTION

10.1.  **Events Causing Dissolution**. Company shall be dissolved upon the occurrence of any of the following events (each a "**Dissolution Event**"):

(a)  mutual written agreement of both Members;

(b)  upon Molly Partner's election following Business Partner's material breach, which shall include any of the following events: (1) Business Partner's failure to make its required Capital Contributions that remains uncured for thirty (30) days after written notice; (2) Business Partner's operation of the store in a manner that causes repeated or serious food safety violations, as documented by regulatory authorities; (3) Business Partner's unauthorized disclosure of Trade Secrets or Confidential Information; (4) Business Partner's abandonment of store operations for more than five (5) consecutive business days without proper cause; (6) Business Partner's engagement in activities that cause material damage to the brand or reputation of the Company; (7) Business Partner's failure to maintain required licenses or permits resulting in store closure; or (8) Business Partner's misappropriation or misuse of Company funds exceeding Ten Thousand Dollars ($10,000), provided that: (1) Molly Partner shall provide written notice specifying the material breach in detail; (2) Business Partner shall have fifteen (15) days to cure such breach if capable of cure; (3) if not cured within such period, Molly Partner may elect to dissolve the Company by providing written notice; and (4) such dissolution shall proceed according to Section 10.3;

(c)  a Sale Event;

(d)  an External Event;

31

(e)    election by either Member to trigger administrative dissolution following an unresolved Deadlock pursuant to Section 4.5, provided that: (1) proper notice of Deadlock has been given; (2) the two-week negotiation period has expired without resolution; and (3) written notice of election for administrative dissolution has been provided; or

(f)    termination or non-renewal of License Agreement between Company and Molly Tea Franchising LLC, whereupon if Members fail to agree in writing to continue Company's operations under a different brand or arrangement within 60 days.

**10.2.  Pre-Dissolution Rights**.

(a)    Upon the occurrence of a Dissolution Event, Molly Partner shall have the exclusive right to elect either:

(1)    to exercise its repurchase rights pursuant to Article VII;

(2)    to proceed with dissolution pursuant to Section 10.4; or

(3)    require Business Partner to sell its Membership Interest to a third party designated by Molly Partner at a purchase price as determined by Molly Partner.

(b)    If Molly Partner elects to require a sale to a third party, Business Partner shall cooperate in good faith and execute all documents reasonably required to complete such sale. If the designated purchaser fails to complete the purchase, Molly Partner may designate an alternative purchaser or shall purchase the Membership Interest itself at the specified price.

(c)    Molly Partner shall have the right to assume control of Company operations to protect brand standards during any pre-dissolution period.

**10.3.  Dissolution Procedures**.

(a)    Upon commencement of dissolution, Company shall:

(1)    cease all business operations except those necessary for winding up;

(2)    notify all relevant parties;

(3)    complete or terminate existing obligations;

(4)    collect receivables;

(5)    liquidate assets; and

(6)    pay liabilities.

(b)    Company shall immediately cease all use of Molly Tea intellectual property.

**10.4.  Asset Distribution.**

(a)    The assets of Company shall be distributed in the following priority:

(1)    wind-down costs;

(2)    third-party creditors;

(3)    amounts owed to Members;

32

(4)   return of Capital Contributions; and

(5)   remaining amounts to Members according to their respective Percentage Interests.

(b)   Any non-cash assets shall be liquidated unless otherwise agreed by both Members.

(c)   Molly Partner shall have the right to offset any amounts owed to it against distributions otherwise payable to Business Partner.

## Article XI. INDEMNIFICATION

**11.1.  General Indemnification**.

(a)   Company shall indemnify and hold harmless each Member and their respective officers, directors, employees and agents (each, an "**Indemnified Party**", and Company in such case, the "**Indemnifying Party**") from and against any losses, damages, claims, costs and expenses (including reasonable attorneys' fees) (collectively, "**Losses**") arising from:

(1)   any third-party claim relating to Company's business operations; or

(2)   any regulatory investigation or proceeding against Company.

(b)   Each Member (in such case, the "**Indemnifying Party**") shall indemnify and hold harmless Company and the other Member (each in such case, an "**Indemnified Party**") from any Losses arising from:

(1)   such Member's breach of this Agreement;

(2)   such Member's violation of law; or

(3)   such Member's unauthorized acts exceeding their authority under this Agreement.

(c)   Notwithstanding anything to the contrary in this Agreement, Molly Partner's aggregate liability for indemnification under Section 11.1(b) shall not exceed the total amount of Cash Capital Contributions made by Molly Partner.

**11.2.  Limitations on Indemnification**.

(a)   No indemnification shall be provided for Losses arising from

(1)   Indemnified Party's gross negligence or willful misconduct;

(2)   Indemnified Party's material breach of this Agreement; or

(3)   matters for which Indemnified Party agreed to be solely responsible under this Agreement.

(b)   The amount of indemnification shall be reduced by:

(1)   any insurance proceeds actually received; and

(2)   any amounts recovered from third parties.

**11.3.  Indemnification Procedures**.

(a)  Indemnified Party shall promptly notify the indemnifying party of any claim, providing:

    (1)  reasonably detailed description of the claim;

    (2)  copies of relevant documents; and

    (3)  the amount of Losses claimed.

(b)  Indemnifying party shall have the right to:

    (1)  control the defense of any third-party claim;

    (2)  select and instruct defense counsel; and

    (3)  settle any claim with the Indemnified Party's consent, not to be unreasonably withheld.

(c)  Indemnified Party shall:

    (1)  cooperate in the defense;

    (2)  provide access to relevant documents and witnesses; and

    (3)  not settle without the indemnifying party's consent.

**11.4.  Survival**.  The indemnification obligations under this Article shall:

(a)  survive the termination of this Agreement;

(b)  be binding upon any successors or assigns; and

(c)  be in addition to any other rights or remedies under this Agreement or applicable law.

## Article XII. JURISDICTION AND DISPUTE RESOLUTION

**12.1.  Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to any choice or conflict of law provision or rule that would cause the application of laws of any jurisdiction other than those of the State of New York.

**12.2.  Arbitration.**

(a)  Any dispute, controversy or claim arising out of or relating to this Agreement, including the formation, interpretation, breach or termination thereof, shall be referred to and finally resolved by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules.

(b)  The arbitration shall be conducted:

    (1)  by three arbitrators;

    (2)  in the city where Company's store is located;

    (3)  in the English language; and

    (4)  in accordance with New York law.

(c)   The award rendered by the arbitrators shall be final and binding upon all parties, and judgment upon the award may be entered by any court having jurisdiction thereof.

**12.3.   Injunctive Relief.**

(a)   Notwithstanding Section 12.2, any party shall be entitled to seek interim or provisional relief, including a temporary restraining order, preliminary injunction or permanent injunction in any court of competent jurisdiction to:

(1)   prevent any actual or threatened breach of this Agreement;

(2)   specifically enforce the provisions of this Agreement; or

(3)   otherwise avoid immediate and irreparable harm.

(b)   The parties hereby acknowledge that damages would be an inadequate remedy for any breach of Articles VII, VIII or X of this Agreement.

**12.4.   Costs and Attorneys' Fees.** The prevailing party in any arbitration or court proceeding shall be entitled to recover its reasonable attorneys' fees, arbitrator fees, expert witness fees and other costs incurred in connection with such proceeding, in addition to any other relief to which such party may be entitled.

**12.5.   Waiver of Jury Trial.** Each party hereby irrevocably waives its rights to trial by jury in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

**12.6.   Continued Performance.** The existence of any dispute shall not excuse either party from continuing to perform its obligations under this Agreement or prevent Molly Partner from exercising any of its rights hereunder.

## Article XIII. MISCELLANEOUS.

**13.1.   Entire Agreement.** This Agreement and the Certificate of Formation constitute the complete and exclusive statement of agreement among Members with respect to the subject matter herein and replace and supersede all prior written and oral agreements among Members.

**13.2.   Binding Effect.** Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and inure to the benefit of Members and their respective heirs, legal representatives, successors and permitted assigns.

**13.3.   Notices.**

(a)   Any notice required or permitted under this Agreement shall be in writing and shall be deemed duly given when sent by any of the following methods:

(1)   electronic mail with confirmation of receipt;

(2)   facsimile with confirmation of transmission;

(3)   personal delivery;

(4)   nationally recognized overnight courier; or

35

(5)   certified or registered mail, postage prepaid.

(b)   All notices must be addressed as follows:

    (1)   If to Company:

    MOLLY TEA MANHATTAN CHINATOWN INC.

    63 Mott St. New York NY 10013

    Email: nyc@mollyteany.com

    Attention: Xiaozhe Liu

    (2)   If  to Molly Partner:

    MollyTea Shops LLC

    8 The Green, Suite B, Dover, DE 19901

    Email: mollyteausa@mollytea.com

    Attention: JIE XIAO

    (3)   If to Business Partner:

    MHL NY LLC

    152-15 Jewel Ave 175B Flushing NY 11367

    Email: mhlny.info@gmail.com

    Attention: Xiaozhe Liu

(c)   Notices shall be effective upon: (1) confirmation of receipt if sent by email or fax; (2) personal delivery; (3) the first business day after sending by overnight courier; or (4) the third business day after mailing.

(d)   Any party may change its contact information by giving notice to the other parties in accordance with this Section.

**13.4.   Waiver.** No waiver by any party of any default, breach, or violation of this Agreement shall be deemed to be a waiver of any subsequent default, breach, or violation thereof. No waiver shall be effective unless in writing and signed by the party making such waiver.

**13.5.   Force Majeure**.

(a)   **Notice Requirements**. A party claiming Force Majeure shall:

    (1)   provide written notice to the other party within forty-eight (48) hours of becoming aware of the Force Majeure event;

    (2)   specify in reasonable detail the nature of the Force Majeure event;

    (3)   estimate the expected duration of the Force Majeure event; and

    (4)   keep the other party regularly informed of its efforts to resume performance.

(b)   **Effect of Force Majeure**.

36

(1)    Neither party shall be liable for any delay or failure to perform its obligations under this Agreement to the extent such delay or failure is caused by a Force Majeure event.

(2)    The party affected by Force Majeure shall:

    (i)    use commercially reasonable efforts to mitigate the impact of the Force Majeure event;

    (ii)    resume performance as soon as reasonably possible; and

    (iii)    keep the other party informed of all mitigation efforts.

(3)    If a Force Majeure event continues for more than one hundred and twenty (120) consecutive days:

    (i)    either party may terminate this Agreement upon written notice;

    (ii)    such termination shall not be considered a breach of this Agreement; and

    (iii)    the parties shall work together in good faith to wind down operations in an orderly manner.

(c)    **Limitations**. Force Majeure shall not:

(1)    excuse any payment obligations under this Agreement;

(2)    extend the term of this Agreement; or

(3)    excuse any obligations that arose prior to the Force Majeure event.

**13.6.    Severability.** If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

**13.7.    Amendments.** All amendments to this Agreement will be in writing and require the approval of both Members.

**13.8.    Multiple Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

**13.9.    No Third-Party Beneficiaries.** Nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any person not a party to this Agreement, except for the indemnification rights of Indemnified Parties under Article XI.

**13.10.    Interpretation.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. Unless the context requires otherwise: words in the singular include the plural and vice versa; the word "including" means "including without limitation"; and references to Articles and Sections refer to Articles and Sections of this Agreement.

**13.11.    Further Assurances.** Each party shall execute and deliver such additional documents and take such additional actions as may be necessary or desirable to carry out the purposes of this Agreement.

37

**INTENDING TO BE BOUND**, all of Members of MOLLY TEA MANHATTAN CHINATOWN INC., a New York limited liability company, have executed this Agreement, effective as of the date written above.

MEMBERS

MollyTea Shops LLC                          MHL NY LLC

By:   Name:                                 Name:

      Title:                                 Title:

      Date:                                  Date:

38

# EXHIBIT A
## INITIAL CAPITAL CONTRIBUTIONS AND OWNERSHIP INTERESTS
## AS OF Jul 3,2025

1.  UNIT STRUCTURE AND MEMBERSHIP INTERESTS

The Company is authorized to issue a total of 10,000 Units.

| Member | Address | Cash Capital Contribution | Units Held | Initial Percentage Interest |
|---|---|---|---|---|
| MollyTea Shops LLC | 8 The Green, Suite B, Dover, DE 19901 | $1,990 | 1,990 | 19.9% |
| MHL NY LLC | 152-15 Jewel Ave 175B Flushing NY 11367 | $8,010 | 8,010 | 80.1% |
| **TOTAL** | | **$10,000** | **10,000** | **100%** |

2.  TERRITORY AND DEVELOPMENT

| Item | Description |
|---|---|
| Territory | CHINATOWN，MANHATTAN |
| Store Location | 63 Mott St. New York NY 10013 |
| Projected Opening Date | Mar 14, 2025 |
| Store Development Deadline | Mar 14, 2028 |

39

Note: The Company may issue additional Units from time to time in accordance with the Operating Agreement. Any such issuance shall be reflected in amendments to this Exhibit as approved by the Members.

The undersigned Members hereby confirm the accuracy of the information set forth above as of the date of this Agreement.

MEMBERS:

MollyTea Shops LLC

By: _____

Name: BIAO ZHANG

Title:

Date:

MHL NY LLC

By: _____

Name:   XIAOZHE LIU

Title:   Authorize signer

Date:   2025/7/3

41

# LIMITED LIABILITY COMPANY AGREEMENT

contract No. MLNB-OS-986012

This Limited Liability Company Agreement (this "**Agreement**") is made as of Jul 3, 2025, by and between MollyTea Shops LLC ("**Molly Partner**") and MHL NY LLC ("**Business Partner**") (each a "**Member**," and collectively, the "**Members**").

WHEREAS, the Certificate of Formation (the "**Certificate of Formation**") for MOLLY TEA NYC INC. (the "**Company**"), a limited liability company under the laws of the State of New York, was filed on October 12, 2023, with the New York Secretary of State.

WHEREAS, Members desire to adopt and approve a limited liability company agreement for Company under the New York Limited Liability Company Act (the "**Act**").

**NOW**, **THEREFORE**, Members by this Agreement set forth the limited liability company agreement for Company upon the terms and subject to the condition of this Agreement.

## Article I. DEFINITIONS.

Capitalized terms used in this Agreement have the meanings specified in this Article or elsewhere in this Agreement and when not so defined shall have the meanings set forth in Section 18-101 of the Act.

"**Act**" means the New York Limited Liability Company Act , including amendments thereto from time to time.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Limited Liability Company Agreement, as originally executed and as amended from time to time.

"**Additional Member**" means any Person admitted as a Member of Company after the date of this Agreement pursuant to Section 4.7.

"**Available Profits**" means, for any fiscal year, Company's Net Profit less reasonable reserves for: (a) working capital; (b) anticipated capital expenditures; and (c) reasonably anticipated contingent liabilities, in each case as determined by Financial Manager in accordance with Company's past practices and reasonable business judgment.

"**Book Value**" means, with respect to any asset of Company, such asset's adjusted basis for federal income tax purposes, except that: (a) the initial Book Value of any asset contributed by a Member shall be its gross fair market value at the time of contribution; and (b) the Book Value of all Company assets shall be adjusted to equal their respective gross fair market values upon the occurrence of any event described in Treasury Regulations Section 1.704-1(b)(2)(iv)(f).

1

"**Brand Manager**" means the individual appointed by Molly Partner who is responsible for overseeing product quality, operating standards, and brand compliance, with specific duties and appointment procedures as set forth in Section 4.1(a).

"**Business Partner**" means MHL NY LLC, a New York Limited Liability Company.

"**Capital Account**" has the meaning set forth in Section 3.3.

"**Capital Contributions**" means, with respect to any Member, the aggregate amount of (a) cash and (b) the fair market value of any property or services contributed to Company by such Member, including but not limited to intellectual property rights, operational systems, training services and other non-cash contributions as described in Section 3.2.

"**Cash Capital Contribution**" means, with respect to any Member, the amount of cash contributed or deemed contributed to Company by such Member, as specified in Exhibit A.

"**Certificate of Formation**" has the meaning set forth in the preamble.

"**Company**" means MOLLY TEA NYC INC., a New York limited liability company.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Company Minimum Gain**" shall have the meaning ascribed to the term "Partnership Minimum Gain" in the Treasury Regulations Section 1.704-2(d).

"**Deadlock**" has the meaning set forth in Section 4.5(a).

"**External Event**" means: (a) the entry of a judicial decree of dissolution; (b) the loss of necessary permits or licenses; or (c) any event making the continued operation of the business unlawful.

"**Emergency Circumstances**" means any condition or situation described in Section 4.6 that requires immediate action, including without limitation any food safety incident posing immediate risk, any serious health code violation, any material breach of quality standards, any financial irregularity exceeding $10,000, any unauthorized brand or trade secret use, any criminal activity or regulatory investigation, or any event risking material brand damage.

"**Force Majeure**" means any act, event or condition beyond a party's reasonable control that prevents or materially impairs such party's performance of its obligations under this Agreement, including but not limited to: (a) acts of God, including earthquakes, floods, hurricanes, or other natural disasters; (b) war, riot, civil unrest, terrorism, or similar events; (c) fire, explosion, or other casualties; (d) epidemics, pandemics, or public health emergencies; (e) governmental actions, including changes in law or regulations; (f) national or regional emergency; (g) strikes, lockouts, or other labor disputes (excluding those solely affecting a party's own employees); (h) significant supply chain disruptions; or (i) utility or infrastructure failures affecting a substantial portion of the Territory.

"**Financial Manager**" means the individual appointed by Molly Partner who is responsible for overseeing Company's financial operations and maintaining its books and records, with specific duties and appointment procedures as set forth in Section 4.1(b).

"**IPO Related Event**" means any of the following: (a) an initial public offering of shares in any entity that owns or controls, directly or indirectly, the Molly Tea brand or any of its affiliates; (b) any transaction resulting in a public listing of any such entity (including without limitation,

through a special purpose acquisition company (SPAC) merger, direct listing or other similar transaction); (c) any reorganization, restructuring, or other corporate transaction in preparation for or in contemplation of any transaction described in clauses (a) or (b); (d) any pre-IPO private placement or other equity financing round conducted in contemplation of a potential IPO; (e) any merger, acquisition, joint venture or similar transaction involving a publicly listed company or its affiliates that would result in the Molly Tea brand becoming part of a public company structure; or (f) any other transaction or series of related transactions that Molly Partner reasonably determines could lead to or is in preparation for any of the foregoing events. For clarity, an IPO Related Event includes not only the actual public offering or listing transaction, but also any preparatory or related transactions that Molly Partner determines are part of the overall IPO process or strategy.

"**Joint Approval Matters**" means those matters requiring mutual written approval of both Members as set forth in Section 4.2 of this Agreement.

"**License Agreement**" means the license agreement between Company and Molly Tea Franchising LLC or Molly Tea Affiliates pursuant to which Company is authorized to use the Molly Tea Brand and Molly Tea System.

"**Mandatory Distribution**" means the annual distribution required under Section 5.3(b).

"**Member**" means either the Molly Partner or the Business Partner.

"**Membership Interest**" means a Member's entire interest in Company including such Member's: (a) right to share in profits, losses and distributions; (b) right to participate in management as set forth in this Agreement; and (c) all other rights, benefits and privileges enjoyed by that Member under this Agreement or the Act by virtue of owning an interest in Company.

"**Molly Tea**" means the retail beverage business and brand operated under the name "Molly Tea" in the United States.

"**Molly Tea Affiliates**" means any Affiliate of Molly Tea that owns, uses, licenses, or controls the Molly Tea Brand or any part of the Molly Tea System in any jurisdiction.

"**Molly Tea Brand**" means the "Molly Tea" name, trademarks, service marks, trade names, logos, designs, recipes, operational procedures, and related intellectual property used in the operation of Molly Tea branded stores in the United States.

"**Molly Tea Franchising LLC**" means the Delaware limited liability company that licenses the Molly Tea Brand and Molly Tea System in the United States.

"**Molly Tea System**" means the comprehensive business system for operating Molly Tea branded stores, including all intellectual property, operational procedures, and brand standards as further detailed in Section 8.2(a).

"**Molly Partner**" means MollyTea Shops LLC, a Delaware limited liability company established for the purpose of forming joint ventures to operate Molly Tea branded stores in the United States.

"**Molly Partner Reserved Matters**" means those matters over which Molly Partner has sole and exclusive authority as set forth in Section 4.4, including without limitation all matters relating to

3

operating standards and quality control, training and staff development, brand and marketing, store design and systems, supply chain, and key personnel.

"**Member Nonrecourse Debt**" shall have the meaning ascribed to the term "Partner Nonrecourse Debt" in Treasury Regulations Section 1.704-2(b)(4).

"**Member Meeting**" means the meeting to discuss and approve business performance, strategic matters and Joint Approval Matters, which is attended by both Members and key management personnel.

"**Member Nonrecourse Deductions**" shall mean items of Company loss, deduction or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

"**Net Profit**" and "**Net Loss**" means, for each fiscal year or other period, an amount equal to Company's taxable income or loss for that period, determined under Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code will be included in taxable income or loss), with the following adjustments: (a) Any income of Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss will be added to such taxable income or loss; (b) Any expenditures of Company described in Section 705(a)(2)(b) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profit or Net Loss will be subtracted from such taxable income or loss; (c) Compensation to any Member for services to Company will be treated either as payroll or as "guaranteed payments" pursuant to Section 707(c) of the Code and will be deducted in calculating Net Profit and Net Loss; and (d) If Capital Accounts of Members have been adjusted pursuant to an event described in Treasury Regulations § 1.704-1(b)(2)(iv)(f)(5), gain or loss resulting from any disposition of assets (whether for sale of a single asset or all of Company's assets) will be computed by reference to the most recent value of those assets used in adjusting Capital Accounts pursuant to such event, rather than the adjusted tax basis of those assets.

"**Nonrecourse Liability**" shall have the meaning set forth in Treasury Regulations Section 1.752-1(a)(2).

"**Operating Manual**" means the confidential manual and related materials provided by Molly Tea Franchising LLC or Molly Tea Affiliates to Company that contain the operating standards, procedures, specifications and requirements for operating a Molly Tea branded store.

"**Operations Review Meeting**" meeting held periodically to review the Company's operational performance.

"**Percentage Interest**" means, with respect to any Member, such Member's ownership percentage in Company as set forth in Exhibit A, which is based on the agreed allocation between Members notwithstanding the type or value of their respective Capital Contributions.

"**Repurchase Valuation Amount**" means a repurchase price calculated based on a price-to-earnings valuation equal to three (3) times the Company's average Net Profit for the trailing twelve (12) months, as determined in accordance with GAAP and subject to review by the Financial Manager. If the Book Value of the relevant Membership Interest exceeds the Repurchase Valuation Amount, the Business Partner may elect to use the Book Value as the repurchase price instead.

4

"**Restricted Activities**" means any business activities that compete with Molly Tea branded stores or utilize Company's confidential information, as specifically detailed in Section 8.4(b).

"**ROFR Notice**" has its meaning set forth in Section 6.2(a).

"**ROFR Period**" has its meaning set forth in Section 6.2(b).

"**Sale Event**" means the sale, transfer, lease, exchange, or other disposition of all or substantially all of Company's assets.

"**Strategic Transaction Event**" means any of the following: (a) any sale, transfer, merger, consolidation, or other disposition of all or substantially all of Molly Partner's or its affiliates' assets or interests (other than in connection with an IPO Related Event); (b) any acquisition of Molly Partner or its affiliates by a third party; (c) any material reorganization of Molly Partner's or its affiliates' business operations that results in or may result in a material change to Company's operations, management structure, business model or relationship with the Molly Tea brand; (d) any transaction or series of transactions that results in a change of control of Molly Partner or its affiliates; or (e) any other transaction that Molly Partner determines could materially affect the Molly Tea brand or its strategic position in the market. For clarity, any transaction that qualifies as an IPO Related Event shall be governed by the IPO Related Event provisions of this Agreement rather than the Strategic Transaction Event provisions.

"**Store Manager**" means the individual nominated by Business Partner and approved by Molly Partner pursuant to Section 4.1(c) who is responsible for managing daily store operations.

"**Special Meeting**" means any meeting convened by either Member upon twenty-four (24) hour notice upon occurrence of any material events or circumstances as specified in Section 4.3(c).

"**Tax Filing Obligations**" means all obligations to prepare, file, and pay any federal, state, local or foreign income, franchise, sales, use, property, or other tax returns or reports, and to pay any required taxes, related to Company's business operations.

"**Treasury Regulations**" shall mean the final or temporary regulations that have been issued by the U.S. Department of the Treasury pursuant to its authority under the Code, and any successor regulations.

"**Trade Secrets**" has its meaning set forth in Section 8.1(a).

"**Tax Provision**" means the amount set aside by Company on its financial statements to cover estimated income tax liabilities for the current period and future periods, calculated in accordance with applicable accounting standards and tax regulations.

"**Territory**" means the geographic area described in Exhibit A within which Company is authorized to develop and operate Molly Tea branded stores.

"**Third Party Offer**" has its meaning set forth in Section 6.2(a).

"**Unit**" means one unit of Membership Interest, with each Unit representing a fractional ownership interest in the Company and having a value of $1 per Unit as set forth in Section 3.1. The aggregate number of authorized Units represents 100% of the Membership Interests in the Company.

5

**Article II. ORGANIZATIONAL MATTERS**

2.1.    **Formation**. Company was formed pursuant to the Act upon the filing of the Certificate of Formation with the Secretary of State of New York on October 12, 2023. The rights and obligations of Members shall be as provided in the Act except as otherwise expressly provided in this Agreement.

2.2.    **Name.** The name of Company shall be "MOLLY TEA NYC INC." Company shall operate under the trade name "Molly Tea NYC" pursuant to the rights granted under this Agreement.

2.3.    **Purpose and Scope.** Company is formed for the purposes of:

(a)    operating retail beverage stores under the Molly Tea Brand pursuant to License Agreement;

(b)    developing and operating stores within Flushing NY;

(c)    engaging in any and all activities necessary, related or incidental to these purposes; and

(d)    engaging in any other lawful business that may be conducted in limited liability company form and approved by both Members.

2.4.    **Term.** The term of Company commenced as of the date of the filling of the Certificate of Formation and shall continue until dissolved pursuant to Article X of this Agreement or by operation of law.

2.5.    **Principle Office.** The principal office of Company shall be at 37-11 #C Prince Street Flushing NY 11354, or such location as Members may determine. Company may maintain additional offices and store locations as determined by Members.

2.6.    **Office and Agent.** Company shall continuously maintain a registered agent in New York as required by the Act. The registered agent shall be as stated in the Certificate of Formation or as otherwise determined by Members.

2.7.    **Filings**. Members shall execute and file any certificates and documents as may be necessary or appropriate for: (a) the formation, operation, and qualification of an LLC; (b) amendments to the Certificate of Formation required by the Act; and (c) operating stores in relevant jurisdictions.

2.8.    **Operating Requirements**. Company shall:

(a)    obtain and maintain all required licenses and permits;

(b)    comply with applicable food safety and health regulations;

(c)    maintain appropriate insurance coverage; and

(d)    comply with all terms and conditions of the License Agreement;

(e)    follow operating standards established by Molly Tea Franchising LLC;

(f)    utilize only the point-of-sale and payment processing systems designated by Molly Tea Franchising LLC for all transactions; and

6

(g)  maintain all financial accounts and records in accordance with the standard formats and accounting practices designated by Molly Tea Franchising LLC.

2.9.  **Fiscal Year**. The fiscal year of Company shall be the calendar year unless otherwise determined by Members.

2.10.  **Title to Property**. All property owned by Company shall be owned by Company as an entity. Each Member's interest in Company shall be personal property for all purposes.

## Article III. CAPITAL CONTRIBUTIONS AND OWNERSHIP

3.1.  **Unit Issuance.** The Company hereby authorizes and issues a total of 10,000 Units of membership interests, of which 1,990 Units shall be issued to Molly Partner and 8,010 Units shall be issued to Business Partner, as specified in Exhibit A.

3.2.  **Initial Capital Contributions.**

(a)  Members shall make the following initial Capital Contributions to Company:

(1)  Molly Partner shall make a Cash Capital Contribution in the amount of One Thousand Nine Hundred Ninty Dollars ($1,990) in exchange for 1,990 Units at a price of $1 per Unit.

(2)  Business Partner shall make a Cash Capital Contribution in the amount of Eight Thousand and Ten Dollars ($8,010) in exchange for 8,010 Units at a price of $1 per Unit.

(b)  The initial Capital Contributions set forth in Section 3.2 shall be made in full within 5 business days upon execution of this Agreement.

3.3.  **Ownership Interests and Economic Rights.**

(a)  Based on the Capital Contributions set forth in Section 3.2, ownership of Company shall be allocated as follows:

(1)  Molly Partner shall own a 19.9% ownership interest in the Company, represented by 1,990 Units; and

(2)  Business Partner shall own an 80.1% ownership interest in the Company, represented by 8,010 Units.

(b)  Each ownership interest shall represent:

(1)  a proportional right to share in the profits, losses and distributions of Company as set forth in Article V;

(2)  management rights as specifically set forth in Article IV; and

(3)  such other rights expressly provided under this Agreement or required by the Act.

3.4.  **Capital Accounts.** Company shall establish an individual capital account ("**Capital Account**") for each Member in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv). Company shall determine and maintain each Capital Account. Each Member's Capital Account shall be determined and maintained throughout the term of Company in accordance with the requirements of Section 704(b) of the Internal

Revenue Code of 1986, as amended from time to time, and the applicable Treasury Regulations thereunder. Financial Manager shall review all Capital Accounts annually and make such adjustments as necessary to reflect Company's operations and any distributions made during such period.

**3.5.** **Default in Initial Capital Contributions**.

(a) **Default by Business Partner**. If Business Partner fails to make its required initial Capital Contribution as specified in Section 3.2:

(1) Molly Partner shall provide written notice of default to Business Partner;

(2) Business Partner shall have ten (10) business days to cure such default;

(3) if not cured within such period, Molly Partner shall have the right to:

(i) terminate this Agreement;

(ii) seek specific performance of Business Partner's obligation;

(iii) admit a substitute Business Partner; or

(iv) pursue any other remedies available at law or equity.

(4) During any period of default by Business Partner, Business Partner's voting and management rights shall be suspended, and any distributions otherwise payable to Business Partner shall be applied first to the unpaid Capital Contribution amount.

(b) **Default by Molly Partner**. If Molly Partner fails to make its required initial Capital Contribution as specified in Section 3.2:

(1) Business Partner shall provide written notice of default to Molly Partner;

(2) Molly Partner shall have ten (10) business days to cure such default;

(3) if not cured within such period, Business Partner shall have the right to:

(i) terminate this Agreement and receive a full refund of any Capital Contributions made;

(ii) seek specific performance of Molly Partner's obligation; or

(iii) pursue any other remedies available at law or equity.

(c) In either case of default, the defaulting Member shall be liable for all costs and expenses incurred by Company due to such default, and any damages suffered by Company or the non-defaulting Member.

**3.6.** **Additional Capital Contributions**.

(a) **No obligation**. No Member shall be required to make any additional Capital Contributions beyond their initial Capital Contributions as set forth in Section 3.2, except as otherwise provided in this Section 3.5.

(b) **Capital Calls**. Molly Partner shall have the right, but not the obligation, to issue a capital call for additional funding necessary for Company's operations, expansion,

or other business needs. Any such capital call shall be made in writing and specify the required amount and purpose.

(c) **Member Contribution Rights**. Upon a capital call, each Member shall contribute additional capital in proportion to their existing Percentage Interest within 30 business days. If a Member does not contribute its pro-rata share, the other Member may contribute to the shortfall, and the Percentage Interests shall be adjusted accordingly to reflect the additional contribution.

(d) **Dilution**. If Business Partner fails to meet a capital call and Molly Partner elects to fund the shortfall, Business Partner's Percentage Interest shall be reduced on a pro-rata basis, and Molly Partner's Percentage Interest shall increase accordingly. Any such adjustment shall be documented in an amendment to Exhibit A, signed by both Members.

(e) **Authorization to Issue Additional Units**. The Company may, from time to time, authorize and issue additional Units; provided, however, that any such authorization and/or issuance shall require the unanimous approval of all Members holding 100% of the outstanding Units. Notwithstanding the foregoing, this requirement shall not apply to the issuance of Units pursuant to obligations incurred by the Company pursuant to written agreements in effect as of the date of this Agreement. Any such issuance shall be documented by an amendment to Exhibit A reflecting the updated Unit ownership and Percentage Interests.

3.7. **No Interest on Capital Contributions.** Company shall not pay any interest on Capital Contributions.

3.8. **Return of Capital Contributions**. No Member shall have the right to withdraw or reduce their Capital Contributions except as provided in this Agreement.

3.9. **Member Loans**. No Member shall be required to loan funds to Company. Any Member loans shall be documented in writing and require approval of both Members.

## Article IV. MANAGEMENT AND OPERATIONS

4.1. **Management Structure**.

(a) **Brand Manager.** Molly Partner shall appoint a Brand Manager who shall be primarily responsible for: (1) conducting quality control periodic audits and reviewing compliance with operating standards; (2) requiring corrective actions if quality standards are not met; and (3) providing guidance on brand protection matters when reasonably necessary to protect the Molly Tea Brand. Brand Manager shall conduct routine audits once per quarter; provided, however, that in Emergency Circumstances, Brand Manager shall have the right to conduct additional audits as reasonably necessary. For clarity, the Brand Manager shall not be involved in day-to-day operations.

(b) **Financial Manager.** Molly Partner shall appoint a Financial Manager with audit and oversight rights over all financial records and transactions of Company. Financial Manager shall have the right to review accounting records, monitor compliance with budgets, oversee internal controls, and conduct periodic audits.

9

Business Partner shall be responsible for maintaining all financial and accounting documentation, preparing financial statements and reports, managing cash control procedures, handling day-to-day financial operations, and fulfilling all Tax Filing Obligations as defined in Section 4.9. Business Partner shall provide Financial Manager with full access to all financial records and respond promptly to any inquiries or requests for information from Financial Manager. Financial Manager shall review quarterly financial statements and may require corrections of any material errors or deficiencies identified during such review.

(c) **Store Manager.** Business Partner shall nominate a Store Manager, subject to Molly Partner's approval with discretion, who shall be responsible for managing daily store operations, supervising store personnel, implementing quality control procedures, managing inventory and supplies, ensuring customer satisfaction, maintaining store appearance, executing local marketing, and reporting to both the Brand Manager and Financial Manager regarding their respective areas of oversight. Store Manager shall operate in accordance with the operating standards and implement all quality control and operational procedures as specified in the Operating Manual.

4.2. **Joint Approval Matters.** The following matters shall require the mutual written approval of both Members:

(a) major financial decisions, including but not limited to:

(1) approval of annual operating and capital budgets;

(2) capital expenditures exceeding Two Thousand Dollars ($20,000);

(3) incurrence of debt exceeding Two Thousand Dollars ($20,000);

(4) distribution of available cash flow;

(5) establishment of reserves;

(6) material changes to accounting methods;

(7) selection or removal of outside auditors; and

(8) annual marketing budget, which exceeding five percent (5%) of gross revenue.

(b) store development and operations, including but not limited to:

(1) opening or closing of any stores;

(2) material modifications to the business plan;

(3) expansion of the Territory;

(4) entry into new markets;

(5) major renovations exceeding Twenty-Five Thousand Dollars ($25,000); and

(6) entry into contracts with a term exceeding one (1) year or value exceeding Fifty Thousand Dollars ($50,000).

(c) strategic corporate actions, including but not limited to:

(1) any amendment to this Agreement or the Certificate of Formation;

    (2)    admission of new Members;

    (3)    corporate restructuring including mergers or reorganizations;

    (4)    sale of material assets;

    (5)    filing of bankruptcy or dissolution; and

    (6)    settlement of material litigation.

**4.3.**    **Meeting and Decision-Making Procedures.**

(a)    **Member Meetings.**

    (1)    Business Partner shall convene Member Meetings once per two weeks.

    (2)    Both Members shall attend such meetings. Brand Manager and Financial may attend at their discretion.

    (3)    All Joint Approval Matters shall be discussed and decided at such meetings.

    (4)    If a Member fails to attend a scheduled Member Meeting:

        (i)    The meeting shall be rescheduled once with three (3) business days' notice.

        (ii)    If the Member fails to attend the rescheduled meeting without reasonable cause, the attending Member may proceed with voting on the Joint Approval Matters.

        (iii)    Any decisions made by the attending Member in such circumstances shall be binding on the Company.

    (5)    All Molly Partner Reserved Matters shall be discussed at Member Meetings, and Molly Partner shall inform Business Partner of its decisions within three (3) business days.

    (6)    Business Partner shall maintain minutes of all such meetings and distribute to all Members and relevant managers within three (3) business days.

(b)    **Operations Review Meetings.** Company shall conduct Operations Review Meetings subject to the following requirements:

    (1)    Brand Manager shall convene weekly Operations Review Meetings.

    (2)    Store Manager shall attend such meetings. Brand Manager and Financial Manager may attend at their discretion.

    (3)    Business Partner shall prepare an agenda covering operational performance, quality metrics, and financial results.

    (4)    Business Partner shall ensure meeting minutes are distributed to both Members within three (3) business days.

(c)    **Special Meetings.**

    (1)    **Triggering Events.** Either Member shall have the right to convene a Special Meeting upon twenty-four (24) hour notice to the other Member upon occurrence of any of the following:

11

(i)     monthly revenue declines by fifteen percent (15%) or more;

(ii)    material breach of operating standards occurs;

(iii)   food safety or quality control incident arises;

(iv)    regulatory investigation commences;

(v)     material litigation is threatened or filed;

(vi)    Emergency Circumstances exist; or

(vii)   any pending Joint Approval Matter that requires immediate resolution for business continuity.

(2)  **Requirements.** For all Special Meetings:

(i)     The convening Member shall state the purpose and agenda in the notice.

(ii)    Both Members shall make good faith efforts to attend such meetings.

(iii)   Store Manager shall attend unless excused by both Members. Brand Manager and Financial Manager may attend at Molly Partner's discretion.

(iv)    Business Partner shall maintain minutes of all such meetings and distribute such minutes within three (3) business days.

4.4.  **Molly Partner Reserved Matters.** Notwithstanding any other provision of this Agreement, Molly Partner shall have sole and exclusive authority over the following matters:

(a)  **Operating Standards and Quality Control.** All matters relating to operating standards, product specifications, recipe requirements, equipment specifications, customer service standards, food safety requirements, and quality control procedures, including the right to conduct inspections and require corrective actions.

(b)  **Training and Staff Development.** Molly Partner, in accordance with the training and personnel development guidelines established by Molly Tea Franchising LLC, shall oversee all aspects of personnel training within Company. This includes the development and enforcement of training programs, conducting certification assessments, and ensuring compliance with operational and service standards as required under License Agreement.

(c)  **Brand and Marketing.** Molly Partner, as the designated operational representative of Molly Tea Franchising LLC within the Company, shall oversee all brand-related matters in accordance with License Agreement. Such matters include approval of marketing materials, adherence to brand guidelines, management of brand protection efforts, and oversight of public communications regarding the Molly Tea brand.

(d)  **Store Design and Systems.** All matters related to store design, equipment specifications, maintenance standards, store modifications, and technology requirements including POS systems.

12

(e) **Supply Chain.** Molly Partner shall oversee all aspects of supply chain management within the Company to ensure compliance with the quality and brand standards established under License Agreement with Molly Tea Franchising LLC. This includes vendor selection and termination, ingredient specifications, supplier quality standards, and purchasing procedures, all of which shall be conducted in alignment with the supply chain policies set forth by Molly Tea Franchising LLC.

(f) **Key Personnel.** All decisions regarding key management positions, including:

    (1) the appointment and removal of Brand Manager and Financial Manager;

    (2) approval of Store Manager nominations and any subsequent termination, provided that such termination shall require prior consultation with Business Partner except in cases involving material breach of operating standards, food safety requirements, or brand protection measures;

    (3) setting qualification requirements; and

    (4) establishing compensation ranges for key positions, provided, however, that with respect to the Store Manager position, Business Partner shall propose the compensation and Molly Partner shall have approval rights over such proposal.

**4.5.   Deadlock Resolution.**

(a) **Deadlock.** A "Deadlock" shall be deemed to exist if any of the following conditions occurs:

    (1) Any Joint Approval Matter receiving explicit disagreement from either Member at a Member Meeting;

    (2) Any Joint Approval Matter formally presented at a Member Meeting failing to receive explicit approval from both Members within two (2) weeks after being formally presented at a Member Meeting;

    (3) Any Joint Approval Matter that involves Emergency Circumstances failing to receive both Members' approval within forty-eight (48) hours after a Special Meeting; or

    (4) Business Partner raises a material objection to Molly Partner's implementation of Reserved Matters that: (i) identifies specific material adverse effects on the Company's operations or Business Partner's interests; (ii) proposes specific alternative approaches or modifications; and (iii) remains unresolved for two (2) weeks after being formally raised at a Member Meeting.

(b) **Resolution Procedures.**

    (1) Upon occurrence of a Deadlock:

        (i) Either Member may provide written notice to the other Member declaring a Deadlock;

        (ii) Members shall engage in good faith negotiations for a period of two (2) weeks from such notice;

        (iii) If the Deadlock remains unresolved after such two-week negotiation period: Members may mutually agree in writing to continue

13

negotiations for a specified period; or if Members cannot reach agreement to continue negotiations as described above, then:

(A) For Deadlocks regarding annual operating and capital budgets under Section 4.2(a)(1), the Special Procedures for Annual Budget Deadlocks set forth in Section 4.5(c) shall apply; or

(B) For all other Deadlocks, either Member may elect to trigger an administrative dissolution of the Company.

(2) If the Deadlocked matter requires immediate action to: (i) prevent material harm to the Company's business; (ii) comply with applicable laws or regulations; or (iii) protect the health and safety of employees or customers, then Brand Manager, Financial Manager and Store Manager shall jointly determine and implement temporary measures necessary to address the urgent situation for a period not to exceed two (2) weeks, provided that:

(i) such measures shall be limited to those strictly necessary to address the immediate urgent situation;

(ii) both Members shall be immediately notified of any measures taken;

(iii) such measures shall be documented in writing and shared with both Members within twenty-four (24) hours;

(iv) neither Member shall unreasonably interfere with such temporary measures during the two-week period;

(v) Members shall continue good faith negotiations during such period; and

(vi) any measures taken shall automatically expire after two (2) weeks unless extended by mutual written agreement of both Members.

(c) **Special Budget Deadlock Procedures**. If a Deadlock occurs with respect to the approval of annual operating and capital budgets under Section 4.2(a)(1):

(1) Section 4.5(b)(1)(iii)(A) regarding administrative dissolution shall not apply.

(2) Members shall continue good faith negotiations until an agreement is reached.

(3) During the negotiation period, the following interim budget measures shall apply:

(i) Company shall operate using the prior fiscal year's approved budget on a pro-rata monthly basis; and

(ii) Essential expenditures required for regulatory compliance, safety, protection of the Molly Tea Brand, or preventing material harm to the business may be approved jointly by Brand Manager and Financial Manager regardless of budget status.

(4) If, after ninety (90) days, Members have not reached agreement:

(i) Members shall meet in person to make a final good faith attempt to resolve the budget Deadlock; and

14

       (ii)     If no agreement is reached within fourteen (14) days after such meeting, either Member may then exercise any rights available under Section 4.5(b)(1)(iii), including the right to trigger administrative dissolution.

**4.6.**    **Emergency Circumstances and Brand Protection.**

(a)   **Actions Upon Occurrence of Emergency Circumstances**. Upon occurrence of Emergency Circumstances:

   (1)   Store Manager shall immediately implement necessary safety and containment measures, and promptly notify Brand Manager and Financial Manager.

   (2)   Brand Manager shall assess the situation and may implement temporary measures necessary to protect the business, brand, and customer safety.

   (3)   Brand Manager shall notify both Members within two (2) hours and convene a Special Meeting in accordance with Section 4.3(c).

(b)   **Interim Authority of Brand Manager**. Prior to the Special Meeting, Brand Manager shall have temporary authority to suspend operations, remove personnel, engage necessary professionals, or take other protective actions as reasonably required to address the emergency. Such actions shall be: (1) limited to measures necessary to address the immediate emergency; (2) promptly reported to Members; and (3) subject to modification or termination by both Members at the Special Meeting.

(c)   **Actions at the Special Meeting**. At the Special Meeting, Members shall review the Emergency Circumstances and management's response, determine whether additional measures are needed, and establish any necessary remedial or preventive measures. All actions taken under this Section 4.6 shall be documented in writing and shall not affect ownership interests or economic rights under this Agreement.

**4.7.**    **Financial Reporting.**

(a)   Business Partner shall provide the following financial reports to all Members:

   (1)   Monthly financial statements, including income statement and balance sheet, within fifteen (15) days following the end of each month;

   (2)   Quarterly financial statements, including income statement, balance sheet, and cash flow statement, within thirty (30) days following the end of each fiscal quarter; and

   (3)   Annual financial statements within sixty (60) days following the end of each fiscal year.

(b)   If Business Partner fails to provide required financial reports within the specified timeframes:

   (1)   Molly Partner shall provide written notice of such failure;

   (2)   Business Partner shall have ten (10) business days to cure such failure; and

   (3)   If not cured within such period, Molly Partner may engage a third-party accounting professional to prepare such reports at Business Partner's expense.

**4.8.**    **Admission of Additional Members.** Additional Members may be admitted only with the mutual written approval of both Members. Upon admission of any Additional Member, Members shall amend Exhibit A of this Agreement accordingly and such Additional Member shall execute all documents required by the Company.

**4.9.**    **Tax Responsibilities.**

(a)    Business Partner shall be solely responsible for all Tax Filing Obligations of Company, including but not limited to:

(1)    preparation and timely filing of all required tax returns and reports;

(2)    payment of all taxes due from Company;

(3)    maintaining all tax-related records and documentation;

(4)    responding to any tax audits or inquiries from tax authorities; and

(5)    providing Molly Partner with copies of all filed tax returns and confirmation of tax payments within fifteen (15) days of filing or payment.

(b)    Business Partner shall ensure all tax returns are prepared in accordance with applicable laws and regulations.

(c)    Business Partner shall consult with Molly Partner prior to taking any tax positions that could materially affect Company or Molly Partner.

(d)    Company shall bear all costs associated with preparing and filing Company's tax returns, including accounting and tax preparation fees.

(e)    If Business Partner fails to fulfill its tax responsibilities:

(1)    Molly Partner shall provide written notice of such failure;

(2)    Business Partner shall have ten (10) business days to cure such failure; and

(3)    If not cured within such period, Molly Partner may engage a tax professional to fulfill such responsibilities at Company's expense.

## Article V. ALLOCATIONS AND DISTRIBUTIONS

**5.1.**    **Allocations of Net Profit and Net Loss.**

(a)    **Net Profit**. Net Profit shall first be applied to offset any Net Loss previously allocated to Members, in proportion to their prior Net Loss allocations and to the extent of such losses. Any remaining Net Profit shall be allocated to Members in accordance with their respective Percentage Interests.

(b)    **Net Loss**. Net Loss shall be allocated to Members in accordance with Treasury Regulations Section 1.704-1(b).

**5.2.**    **Regulatory Allocations.** Company shall make special allocations as required by Treasury Regulations Section 1.704-2 to comply with the "minimum gain chargeback" requirements.

16

**5.3.    Distributions.**

(a)    **Distribution Determination**. Molly Partner, shall determine the timing and amount of all distributions, taking into consideration:

(1)    Company's current and projected working capital needs;

(2)    anticipated capital expenditures and operational requirements;

(3)    required reserves for business operations and contingencies;

(4)    compliance with any debt covenants or other contractual obligations; and

(5)    general market and business conditions affecting Company.

(b)    **Mandatory Quarterly Distribution**. Notwithstanding Section 5.3(a), Company shall make distributions to the Members on a quarterly basis. The total amount distributed for each fiscal year shall not be less than at least ninety percent (90%) of Company's Available Profits for that year (the "**Mandatory Distribution**"). Company shall make the Mandatory Distribution within ninety (90) days after the end of each fiscal year. If cumulative quarterly distributions fall short of ninety percent (90%) of the Company's Available Profits, the Company shall distribute the shortfall as part of the final quarterly distribution or through a separate true-up distribution within the same period.

(c)    **Mandatory Conditions**. Notwithstanding Sections 5.3(a) and (b), no distributions shall be made unless:

(1)    all operating expenses and liabilities then due and owing have been paid;

(2)    sufficient working capital reserves are maintained as determined by Molly Partner;

(3)    all required maintenance and quality control standards are met; and

(4)    such distribution would not violate applicable law.

(d)    **Tax Provisions.** Prior to determining Available Profits, Company shall:

(1)    establish and maintain adequate Tax Provisions on its financial statements;

(2)    review and adjust Tax Provisions quarterly based on Company's financial performance and applicable tax rates; and

(3)    ensure Tax Provisions are properly reflected as current or deferred tax liabilities on Company's balance sheet.

(e)    **Distribution of Available Funds**. Subject to Sections 5.3(a) and (b), when Molly Partner determines that funds are available for distribution, such funds shall be distributed to Members in proportion to their respective Percentage Interests.

(f)    **Distribution Payment Instructions**. All distributions shall be made pursuant to written instructions jointly provided by the Members from time to time. The Company shall not be obligated to disburse any distribution unless and until such joint written instructions are received, and may rely on the most recent instructions signed by both Members.

17

(g) **Suspension of Distributions**. Molly Partner may suspend distributions if, in its reasonable business judgment:

    (1)    Company requires additional working capital;

    (2)    Capital expenditures are needed for store maintenance or improvements;

    (3)    Company experiences material adverse business conditions;

    (4)    Quality control or operational issues require additional investment; or

    (5)    Suspension is necessary to protect Company's financial stability or brand standards.

(h) **Distribution Notices.** At least five (5) business days prior to any distribution, Financial Manager shall provide Members with a written notice detailing:

    (1)    the total amount to be distributed;

    (2)    the calculation method; and

    (3)    the anticipated distribution date.

(i) **Objection to Distribution Decisions.** If Business Partner disagrees with Molly Partner's determination regarding distributions under Sections 5.3(a) or (f): (1)

    (1)    Business Partner may raise an objection at a Member Meeting by: (i) identifying specific concerns regarding the determination; (ii) providing supporting financial analysis; and (iii) proposing alternative distribution arrangements.

    (2)    Such objection shall be subject to the Deadlock resolution procedures set forth in Section 4.5.

    (3)    During any Deadlock resolution period: (i) The disputed distribution shall be held in escrow if already declared; (ii) No new distributions shall be made except for the Mandatory Distribution required under Section 5.3(b); and (iii) All Tax Provisions shall continue to be maintained as required under Section 5.3(d).

**5.4.    Tax Allocations.**

(a) Items of income, gain, loss, deduction, and credit shall be allocated among Members in the same manner as Net Profits and Net Losses are allocated under Section 5.1.

(b) For tax purposes, all items of income, gain, loss, deduction or credit with respect to any property contributed to Company shall be allocated among Members so as to take account of any variation between the adjusted tax basis of such property and its fair market value at the time of contribution in accordance with Section 704(c) of the Code.

(c) Tax allocations shall be made consistently with Treasury Regulations Section 1.704-1(b), and in accordance with Section 704(c) of the Code.

**5.5.    Tax Withholding.**

18

(a) Company acting through Business Partner, is authorized to withhold from distributions or with respect to allocations to Members and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law.

(b) Any amounts so withheld shall be treated as having been distributed to such Member under this Agreement.

(c) Each Member will, as applicable:

(1) provide any tax documentation reasonably requested by Company;

(2) pay Company the amount of any liability of Company for taxes that is attributable to such Member; and

(3) indemnify and hold harmless Company and other Members from and against any and all liability for taxes and associated penalties or interest with respect to income attributable to or distributions or other payments to such Member.

### Article VI. TRANSFER OF MEMBERSHIP INTERESTS

**6.1.** **General Restrictions on Transfer**.

(a) Except as expressly provided in Section 7.2 regarding IPO Related Events, no Member shall transfer any Membership Interest unless such transfer satisfies all of the following conditions:

(1) the transfer has received prior written approval from Molly Partner, which may be withheld in Molly Partner's sole and absolute discretion;

(2) the transfer complies with all provisions set forth in this Article VI; and

(3) the transfer complies with all applicable securities laws.

(b) Any attempted transfer that fails to satisfy all conditions set forth in Section 6.1(a) shall be void ab initio and shall have no force or effect. For clarity, no rights whatsoever shall pass to the purported transferee under such void transfer.

(c) Except as permitted under Section 6.2 or Section 7.2, no Member shall transfer less than all of such Member's Membership Interest in a single transaction, and any attempted partial transfer not complying with Section 6.2 or Section 7.2 shall be void ab initio.

(d) In the event of Business Partner's death, if Business Partner is an individual:

(1) Membership Interest shall be inheritable by Business Partner's heir(s), provided Molly Partner may reject such inheritance transfer based on reasonable factors including but not limited to the heir(s)' business experience, operational capability and ability to contribute to Company's operations.

(2) If Molly Partner exercises such right of rejection, Molly Partner shall purchase the Membership Interest at Book Value within 180 days.

**6.2.** **Right of First Refusal (ROFR)**.

19

(a)  If Business Partner receives a bona fide written offer from a third party to purchase any or all of such Member's Membership Interest (a "**Third Party Offer**"), such Member shall provide written notice ("**ROFR Notice**") to Molly Partner, which notice shall:

   (1)  attach a complete copy of the Third Party Offer;

   (2)  state the identity of the proposed purchaser;

   (3)  set forth all material terms and conditions of the proposed transfer; and

   (4)  constitute an irrevocable offer to sell such Membership Interest to Molly Partner on the same terms.

(b)  Molly Partner shall have thirty (30) days following receipt of the ROFR Notice ("**ROFR Period**") to elect to:

   (1)  purchase all of the offered Membership Interest;

   (2)  purchase any portion of the offered Membership Interest; or

   (3)  decline to purchase any of the offered Membership Interest, by delivering written notice of such election to Business Partner.

(c)  If Molly Partner exercises its ROFR:

   (1)  the purchase price per percentage point of Membership Interest and other terms shall be as set forth in the Third Party Offer;

   (2)  closing shall occur within sixty (60) days after the exercise notice; and

   (3)  Business Partner may only transfer to the third party the portion of Membership Interest not purchased by Molly Partner.

(d)  For any portion of the Membership Interest not purchased by Molly Partner:

   (1)  Business Partner may transfer such portion to the proposed purchaser strictly in accordance with the Third Party Offer;

   (2)  such transfer must close within ninety (90) days after expiration of the ROFR Period; and

   (3)  the proposed purchaser must comply with Sections 6.1 and 6.5.

(e)  If Business Partner receives multiple Third Party Offers, or wishes to transfer portions of its Membership Interest to different purchasers, each such proposed transfer shall trigger a separate ROFR process under this Section 6.2.

(f)  The ROFR provisions of this Section 6.2 shall not apply to any transfers made pursuant to Section 7.2 (IPO Related Events) or Section 7.3 (Strategic Transaction Events).

**6.3.  Permitted Transfers.**  Subject to compliance with Sections 6.1 and 6.5, a Member may transfer Membership Interest to an Affiliate if:

(a)  the Member retains control of the Affiliate; and

(b)  the Affiliate agrees to return the Membership Interest if it ceases to be an Affiliate.

20

**6.4.    Transfer Price.** For any permitted transfer of Membership Interest, the purchase price shall be determined as follows:

(a)    **For Third Party Offers.** The price set forth in the Third Party Offer.

(b)    **For Permitted Transfers.** Book Value of the Membership Interest as determined by the most recent quarterly financial statements.

**6.5.    Transfer Procedures and Effect.**

(a)    **Required Documentation.** A transfer of Membership Interest shall require all of the following:

(1)    prior written consent from both Members in accordance with Section 6.1;

(2)    written acceptance and adoption of this Agreement by the transferee;

(3)    payment by transferee of all reasonable admission expenses;

(4)    execution of:

(i)    transfer agreements in Company's standard form;

(ii)    mutual releases between the transferring Member and Company; and

(iii)    confidentiality agreements binding the transferee.

(b)    **Effect of Transfer.** Upon completion of a valid transfer:

(1)    The transferee shall be admitted as a substitute Member, assume all rights and obligations under this Agreement arising after the transfer and be bound by all terms of this Agreement.

(2)    The transferring Member shall cease to be a Member as to the transferred interest but remain liable for all obligations arising before the transfer. The transferring Member shall continue to be bound by Article VIII and have no further rights or obligations except as expressly provided in this Agreement.

(3)    Company shall update its books and records to reflect the transfer, adjust all future allocations and distributions accordingly, and provide notice of the transfer to all Members.

**6.6.    Regulatory Compliance.** All transfers of Membership Interest must comply with applicable securities laws, including filing all required notices and disclosures.

<div align="center">

**Article VII. REPURCHASE RIGHTS**

</div>

**7.1.    Molly Partner's Repurchase Rights.**

(a)    **Trigger Events.** Molly Partner may purchase all or any portion of Business Partner's Membership Interest upon the occurrence of any of the following events:

(1)    Business Partner's material breach of this Agreement that remains uncured for thirty (30) days after written notice;

<div align="center">21</div>

(2) any act or omission by Business Partner that causes material harm to the Molly Tea Brand;

(3) loss of any permit or license required for store operations due to Business Partner's acts or omissions;

(4) Business Partner's unauthorized use or disclosure of the Molly Tea Brand or Trade Secrets;

(5) Business Partner's abandonment or closure of store operations without Molly Partner's prior written consent, except for Force Majeure events;

(6) any change in control of Business Partner without Molly Partner's prior written consent;

(7) upon Molly Partner's election, at any time after the third anniversary of Company's commencement of operations; or

(8) occurrence or reasonable likelihood of an IPO Related Event, as determined by Molly Partner in its reasonable discretion;

(9) occurrence or reasonable likelihood of a Strategic Transaction Event, as determined by Molly Partner in its reasonable discretion.

(10) upon non-renewal of the Molly Tea Brand usage rights, provided that:

    (i) Molly Partner has provided notice of non-renewal at least 180 days prior to the expiration of the then-current term; and

    (ii) Molly Partner shall purchase Business Partner's Membership Interest at 100% of Book Value.

(b) **Exercise Period**.

(1) For events under Section 7.1(a), Molly Partner shall:

    (i) exercise its repurchase rights by written notice within sixty (60) days after becoming aware of the triggering event; and

    (ii) specify in such notice the percentage of Membership Interest to be purchased.

(2) For IPO Related Events or Strategic Transaction Events, the timing shall be governed by Sections 7.2 and 7.3 respectively.

(c) **Purchase Price**.

(1) Unless otherwise agreed in writing by both Members, the repurchase price for any Membership Interest under this Section shall be the Repurchase Valuation Amount, as defined herein.

(2) Notwithstanding the foregoing, the Members may, by mutual written agreement, adopt alternative pricing mechanisms for specific triggering events, including but not limited to:

22

<div style="margin-left: 2em;">

(i)     or events under 7.1(a)(1)-(6): 70% of Book Value;

(ii)    For event under 7.1(a)(7): 100% of Book Value;

(iii)   For Dissolution Events: 80% of Book Value; and

(iv)   Such pricing as determined under Section 7.2 (IPO Related Events) or 7.3 (Strategic Transaction Events).

</div>

**7.2.**   **IPO Related Rights**.

(a)   **Drag-Along Rights**. Upon an IPO Related Event:

(1)   Molly Partner shall have the right to:

(i)     require Business Partner to sell its Membership Interest to Molly Partner to the extent that Molly will have a 51% interest in the Company;

(ii)    require Business Partner to sell part of its Membership Interest to a third party designated by Molly Partner to the extent that Molly and the third party combined interests will be more than 50% interest in the Company; or

(iii)   require Business Partner to participate in any corporate restructuring in preparation for the IPO.

(2)   Any such action shall be upon written notice to Business Partner at least sixty (60) days prior to the required closing date.

(3)   Business Partner shall be obligated to take all necessary actions to effect such sale or restructuring, including:

(i)     voting its Membership Interest in favor of any corporate reorganization;

(ii)    executing all required documentation; and

(iii)   providing customary representations and warranties.

(4)   These rights shall apply to any transaction or series of transactions that Molly Partner determines constitute an IPO Related Event, including preparatory or related transactions.

(b)   **Brand Protection Measures**. In connection with an IPO Related Event:

(1)   Molly Partner shall have sole discretion to implement any measures it deems necessary to protect and enhance the Molly Tea brand;

(2)   Business Partner shall comply with any operational changes, quality control measures, or other requirements imposed by Molly Partner;

(3)   Business Partner shall not take any action that could adversely affect the IPO Related Event or the Molly Tea brand.

(c)   **Purchase Price**. Molly Partner shall pay Business Partner Book Value or such other valuation method as reasonably determined by Molly Partner from time to time.

<div style="text-align: center;">23</div>

**7.3.    Strategic Transaction Repurchase**.

(a)    **Early Transaction Protection**. During the first three (3) years of Company's operations, Molly Partner shall consider the Company's operational stability and development status when evaluating any Strategic Transaction Event. If a Strategic Transaction Event becomes necessary during such period, Molly Partner shall first consult with Business Partner to explore alternatives or accommodations that could preserve Business Partner's interests.

(b)    **Information Rights**. Upon the occurrence of a Strategic Transaction Event, Molly Partner shall provide Business Partner with:

(1)    written notice at least sixty (60) days before the anticipated closing date;

(2)    description of the proposed transaction and strategic rationale;

(3)    identity and background of any strategic buyer or partner;

(4)    anticipated impact on Company's operations;

(5)    proposed timeline and transition plan; and

(6)    any alternative arrangements or opportunities available to Business Partner.

(c)    **Negotiation Rights**. Following such notice:

(1)    Business Partner shall have thirty (30) days to:

(i)    request additional information about the transaction;

(ii)    propose alternative arrangements; and

(iii)    discuss potential ongoing roles or relationships.

(2)    Molly Partner shall engage in good faith discussions regarding:

(i)    potential continuing involvement of Business Partner;

(ii)    transition arrangements; and

(iii)    future business opportunities.

(d)    **Purchase Terms**.

(1)    **Purchase Price**. Molly Partner shall pay Business Partner Book Value of Business Partner's Membership Interest.

(2)    **Alternative Arrangements**. Where commercially feasible, Molly Partner shall consider:

(i)    offering Business Partner a role in the post-transaction structure;

(ii)    providing Business Partner rights to participate in future opportunities; and

(iii)    maintaining Business Partner's relationship with the Molly Tea system.

(e)    **Cooperation**. Both Members shall work together in good faith to:

(1)    preserve the value of Company during any transition;

      (2)    maintain positive relationships with employees, customers and suppliers; and

      (3)    ensure smooth implementation of any Strategic Transaction.

**7.4.**    **General Provisions for All Repurchases**.

    (a)    **Closing**.

      (1)    Molly Partner and Business Partner shall complete the closing of any repurchase within ninety (90) days after Molly Partner delivers its exercise notice (unless the parties otherwise specify in writing).

      (2)    Business Partner shall, at such closing:

          (i)    execute all transfer documentation as Molly Partner may reasonably require for the transfer of the specified Membership Interest;

          (ii)    provide representations regarding title to the Membership Interest and Business Partner's authority to transfer such interest; and

          (iii)    cooperate with Molly Partner in all reasonable respects to facilitate the repurchase process and any necessary amendments to this Agreement.

    (b)    **Effect of Repurchase**.

      (1)    Upon Molly Partner's partial repurchase of Business Partner's Membership Interest:

          (i)    Business Partner shall retain its economic rights in proportion to its remaining Membership Interest.

          (ii)    Except in the case of repurchase pursuant to Section 7.2, Business Partner's management rights and voting arrangements shall be subject to mutual agreement of both Members, which shall be documented in an amendment to this Agreement.

          (iii)    In the case of repurchase pursuant to Section 7.2, Molly Partner shall have sole control over management decisions while Business Partner retains economic rights proportional to its remaining interest.

          (iv)    The parties shall amend this Agreement as necessary to reflect the new ownership structure and adjusted rights.

      (2)    Upon Molly Partner's complete repurchase of Business Partner's Membership Interest (if applicable):

          (i)    Business Partner's status as a Member shall terminate.

          (ii)    All of Business Partner's management rights shall terminate immediately.

      (3)    The confidentiality and non-compete obligations under Section VIII shall survive any repurchase under this Agreement. The Company shall update its records to reflect the transfer.

25

(c)  **Costs**. (1) Company shall bear all valuation and appraisal costs. (2) Each party shall bear its own legal and professional fees. (3) Molly Partner and Business Partner shall split transfer taxes equally unless they agree otherwise in writing.

(d)  **Event Classification and Priority**.

(1)  Molly Partner shall have sole discretion to determine whether a transaction or series of transactions constitutes an IPO Related Event, a Strategic Transaction Event, or both.

(2)  If a transaction or series of transactions could be classified as both an IPO Related Event and a Strategic Transaction Event, the IPO Related Event provisions shall take precedence.

(3)  Molly Partner's determination regarding the classification of any transaction shall be final and binding.

## Article VIII. CONFIDENTIALITY AND NON-COMPETE

**8.1.**  **Confidential Information.**

(a)  The term "**Trade Secrets**" shall mean any and all trade secrets, proprietary information, and confidential know-how developed, acquired, or used by Company in the course of its operations, including but not limited to recipes, formulas, preparation methods, and operational procedures.

(b)  The term "**Confidential Information**" shall include all non-public information relating to Company's business operations, including without limitation:

(1)  the Operating Manual and all operational procedures contained therein;

(2)  all beverage recipes, ingredient specifications, preparation methods, and quality control standards;

(3)  all supplier information, including pricing, terms, and contact information;

(4)  all customer data, including transaction history, preferences, and contact information;

(5)  all financial data of Company, including costs, margins, and pricing strategies;

(6)  all store development plans and market analysis;

(7)  all marketing strategies and promotional materials, whether implemented or under development; and

(8)  any information related to potential or actual IPO Related Events or Strategic Transaction Events.

**8.2.**  **Intellectual Property Rights.**

(a)  The "**Molly Tea System**" shall consist of:

(1)  all trademarks, trade names, and logos of Molly Tea;

(2)  all recipes, formulas, and preparation methods;

(3)  all operational procedures and training materials;

(4)  all store design elements and visual merchandising standards; and

(5)  all marketing materials and promotional strategies.

(b)  Ownership and usage of intellectual property shall be governed as follows:

(1)  Company shall own all local customer data and market research; and

(2)  Any improvements or modifications to the Molly Tea System developed during operations shall be promptly disclosed to Molly Partner and shall become part of the Molly Tea System.

8.3.  **Protection of Confidential Information.** Each Member shall:

(a)  maintain strict confidentiality using security measures no less rigorous than those used to protect their own confidential information;

(b)  use Confidential Information solely for the operation of Company's business;

(c)  limit access to Confidential Information to employees and representatives with a legitimate need to know;

(d)  ensure all persons with access to Confidential Information execute confidentiality agreements;

(e)  return or destroy all materials containing Confidential Information upon termination of involvement with Company; and

(f)  in the event of any IPO Related Event or Strategic Transaction Event, comply with any additional confidentiality requirements imposed by Molly Partner or required by applicable securities laws and regulations.

8.4.  **Non-Competition Obligations.**

(a)  **Geographic Restrictions**. During the term of this Agreement and for the period specified in Section 8.4(d), except as expressly permitted in writing by Molly Partner, Business Partner shall NOT engage in Restricted Activities within:

(1)  For jurisdictions where non-competition agreements are void or unenforceable as a matter of law:

(i)  No geographic restrictions shall apply to Business Partner's activities, provided however that:

(A)  Business Partner shall remain fully bound by all obligations regarding trade secrets as defined in Section 8.1;

(B)  Business Partner shall not, for a period of two (2) years following termination, directly or indirectly solicit or attempt to solicit any Company customers or employees; and

(C)  The obligations under Sections 8.1 and 8.3 shall remain in full force and effect.

(2)  For stores in jurisdictions with statutory restrictions on non-competition covenants:

27

(i)     A base radius of three (3) miles from any then-existing Molly Tea branded store; and

(ii)     Molly Partner may, upon written notice to Business Partner, adjust such base radius by up to one (1) mile upon demonstration of:

    (A)     customers overlap between stores exceeding twenty percent (20%);

    (B)     population density exceeding two thousand (2,000) persons per square mile; or

    (C)     Company's market share in the Territory exceeding thirty percent (30%).

(3)     For stores in all other jurisdictions:

(i)     A base radius of five (5) miles from any then-existing Molly Tea branded store;

(ii)     Molly Partner may extend such base radius up to four (4) miles upon demonstration of:

    (A)     marketing expenditures exceeding Fifty Thousand Dollars ($50,000) annually; or

    (B)     proximity to high-traffic venues as determined by Molly Partner.

(b)     **Restricted Activities.** Business Partner shall NOT:

(1)     operate, invest in, own an interest in, or provide services to any business whose primary revenue is derived from the sale of bubble tea, milk tea, or similar specialty tea beverages for retail consumption;

(2)     serve as an officer, director, employee, consultant, or advisor to any business that primarily engages in the retail sale of bubble tea or similar specialty tea beverages; or

(3)     utilize any of Company's confidential recipes, brewing methods, or operational procedures in any other business, or

(4)     directly or indirectly solicit any customers of any Molly Tea branded store within the applicable restricted geographic area.

(c)     **General Limitations**. The restrictions in Section 8.4(a) shall:

(1)     apply only to businesses that directly compete with Molly Tea branded stores in the specialty tea beverage market;

(2)     not prohibit ownership of less than two percent (2%) of the outstanding stock of any publicly traded corporation;

(3)     not apply to any specific business activities or investments for which Business Partner has received prior written exemption from Molly Partner, which exemption may be granted or withheld in Molly Partner's sole discretion and may be subject to such conditions as Molly Partner may specify;

28

(4) be automatically modified to comply with applicable state wage thresholds, notice requirements, or other state-specific requirements;

(5) be subject to reduction in scope by a court of competent jurisdiction to the extent necessary to make them enforceable under applicable law; and

(6) if any geographic restriction is found to be unenforceable in any jurisdiction, be automatically modified to the most restrictive limitation permitted by applicable law in such jurisdiction.

(d) **Duration of Restrictions.** The non-competition obligations shall continue during the term of this Agreement and for a period following termination or expiration of this Agreement of two (2) years.

8.5. **Non-Solicitation and Non-Interference.** During the term of this Agreement and for two (2) years thereafter, Business Partner shall NOT:

(a) hire or attempt to hire any person employed by Company or any other Molly Tea branded store;

(b) solicit or attempt to divert any customer of Company to a competing business;

(c) induce any supplier, vendor, or landlord to cease or modify their relationship with Company; or

(d) assist any third party in engaging in any of the above activities.

8.6. **Survival of Obligations.** The obligations set forth in this Article shall:

(a) survive the termination of this Agreement for any reason;

(b) continue following any transfer of Units;

(c) remain binding following the dissolution of Company; and

(d) be independently enforceable from other provisions of this Agreement.

### Article IX. REPRESENTATIONS AND WARRANTIES

9.1. **Mutual Representations and Warranties**. Each Member hereby represents and warrants to Company and each other Member that:

(a) **Organization and Good Standing**. If such Member is an entity, it is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and has all requisite power and authority to own its properties and carry on its business.

(b) **Authority**. Such Member has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The execution, delivery, and performance of this Agreement have been duly authorized by all necessary action on the part of such Member.

(c) **No Conflicts**. The execution, delivery, and performance of this Agreement by such Member will not:

(1) violate any provision of its organizational documents if an entity;

29

    (2)    conflict with, result in a breach of, or constitute a default under any material agreement to which it is a party;

    (3)    violate any law, rule, regulation, judgment, or order applicable to such Member; or

    (4)    require any consent or approval of any third party that has not been obtained.

(d)    **Binding Agreement**. This Agreement constitutes the legal, valid, and binding obligation of such Member, enforceable against such Member in accordance with its terms.

(e)    **No Bankruptcy**. Such Member is not subject to any pending or threatened bankruptcy, reorganization, insolvency, or similar proceedings.

**9.2.**    **Investment Representations**. Each Member hereby represents and warrants to, and agrees with, the Company and each other Member that:

(a)    **Investment Purpose**. Such Member is acquiring its Membership Interest for its own account, for investment purposes only and not with a view to, or for sale in connection with, any distribution thereof.

(b)    **Business Experience and Capacity**. Such Member, either alone or together with its representatives, has:

    (1)    sufficient knowledge and experience in business matters to evaluate the merits and risks of entering into this joint venture;

    (2)    adequate financial capacity to perform its obligations under this Agreement, including making its required Capital Contributions; and

    (3)    conducted appropriate due diligence regarding the business venture contemplated by this Agreement.

(c)    **Access to Information**. Such Member:

    (1)    has been given access to all information requested regarding the Company and its business;

    (2)    has utilized such access to its satisfaction for the purpose of obtaining information; and

    (3)    has had the opportunity to ask questions of and receive answers from representatives of the Company.

(d)    **Independent Investigation**. Such Member has:

    (1)    conducted its own independent investigation and evaluation of the Company;

    (2)    made its own investment decision based on its own analysis; and

    (3)    not relied on any representations other than those contained in this Agreement.

(e)    **Transfer Restrictions**. Such Member understands that:

    (1)    any transfer of Membership Interests is subject to the restrictions set forth in Article VI of this Agreement;

(2)   Membership Interests represent an interest in a closely-held business venture;

(3)   there are significant limitations on the ability to transfer Membership Interests; and

(4)   in case of inheritance transfer, Molly Partner has the right to reject such transfer based on the heir(s)' qualifications, provided that Molly Partner shall purchase the Membership Interest at Book Value upon such rejection.

9.3.   **Additional Representations of Business Partner**. Business Partner hereby represents and warrants to the Company and Molly Partner that:

(a)   **Financial Capacity**. Business Partner has sufficient financial resources to make its required Capital Contributions.

(b)   **No Competing Interests**. Business Partner:

(1)   does not own or operate any competing business;

(2)   has no interests that conflict with the Company's business; and

(3)   will dedicate sufficient time and resources to the Company.

### Article X. TERMINATION AND DISSOLUTION

10.1.   **Events Causing Dissolution**. Company shall be dissolved upon the occurrence of any of the following events (each a "**Dissolution Event**"):

(a)   mutual written agreement of both Members;

(b)   upon Molly Partner's election following Business Partner's material breach, which shall include any of the following events: (1) Business Partner's failure to make its required Capital Contributions that remains uncured for thirty (30) days after written notice; (2) Business Partner's operation of the store in a manner that causes repeated or serious food safety violations, as documented by regulatory authorities; (3) Business Partner's unauthorized disclosure of Trade Secrets or Confidential Information; (4) Business Partner's abandonment of store operations for more than five (5) consecutive business days without proper cause; (6) Business Partner's engagement in activities that cause material damage to the brand or reputation of the Company; (7) Business Partner's failure to maintain required licenses or permits resulting in store closure; or (8) Business Partner's misappropriation or misuse of Company funds exceeding Ten Thousand Dollars ($10,000), provided that: (1) Molly Partner shall provide written notice specifying the material breach in detail; (2) Business Partner shall have fifteen (15) days to cure such breach if capable of cure; (3) if not cured within such period, Molly Partner may elect to dissolve the Company by providing written notice; and (4) such dissolution shall proceed according to Section 10.3;

(c)   a Sale Event;

(d)   an External Event;

31

(e)    election by either Member to trigger administrative dissolution following an unresolved Deadlock pursuant to Section 4.5, provided that: (1) proper notice of Deadlock has been given; (2) the two-week negotiation period has expired without resolution; and (3) written notice of election for administrative dissolution has been provided; or

(f)    termination or non-renewal of License Agreement between Company and Molly Tea Franchising LLC, whereupon if Members fail to agree in writing to continue Company's operations under a different brand or arrangement within 60 days.

**10.2. Pre-Dissolution Rights**.

(a)    Upon the occurrence of a Dissolution Event, Molly Partner shall have the exclusive right to elect either:

(1)    to exercise its repurchase rights pursuant to Article VII;

(2)    to proceed with dissolution pursuant to Section 10.4; or

(3)    require Business Partner to sell its Membership Interest to a third party designated by Molly Partner at a purchase price as determined by Molly Partner.

(b)    If Molly Partner elects to require a sale to a third party, Business Partner shall cooperate in good faith and execute all documents reasonably required to complete such sale. If the designated purchaser fails to complete the purchase, Molly Partner may designate an alternative purchaser or shall purchase the Membership Interest itself at the specified price.

(c)    Molly Partner shall have the right to assume control of Company operations to protect brand standards during any pre-dissolution period.

**10.3. Dissolution Procedures**.

(a)    Upon commencement of dissolution, Company shall:

(1)    cease all business operations except those necessary for winding up;

(2)    notify all relevant parties;

(3)    complete or terminate existing obligations;

(4)    collect receivables;

(5)    liquidate assets; and

(6)    pay liabilities.

(b)    Company shall immediately cease all use of Molly Tea intellectual property.

**10.4. Asset Distribution**.

(a)    The assets of Company shall be distributed in the following priority:

(1)    wind-down costs;

(2)    third-party creditors;

(3)    amounts owed to Members;

32

(4)    return of Capital Contributions; and

(5)    remaining amounts to Members according to their respective Percentage Interests.

(b)    Any non-cash assets shall be liquidated unless otherwise agreed by both Members.

(c)    Molly Partner shall have the right to offset any amounts owed to it against distributions otherwise payable to Business Partner.

## Article XI. INDEMNIFICATION

**11.1.    General Indemnification**.

(a)    Company shall indemnify and hold harmless each Member and their respective officers, directors, employees and agents (each, an "**Indemnified Party**", and Company in such case, the "**Indemnifying Party**") from and against any losses, damages, claims, costs and expenses (including reasonable attorneys' fees) (collectively, "**Losses**") arising from:

(1)    any third-party claim relating to Company's business operations; or

(2)    any regulatory investigation or proceeding against Company.

(b)    Each Member (in such case, the "**Indemnifying Party**") shall indemnify and hold harmless Company and the other Member (each in such case, an "**Indemnified Party**") from any Losses arising from:

(1)    such Member's breach of this Agreement;

(2)    such Member's violation of law; or

(3)    such Member's unauthorized acts exceeding their authority under this Agreement.

(c)    Notwithstanding anything to the contrary in this Agreement, Molly Partner's aggregate liability for indemnification under Section 11.1(b) shall not exceed the total amount of Cash Capital Contributions made by Molly Partner.

**11.2.    Limitations on Indemnification**.

(a)    No indemnification shall be provided for Losses arising from

(1)    Indemnified Party's gross negligence or willful misconduct;

(2)    Indemnified Party's material breach of this Agreement; or

(3)    matters for which Indemnified Party agreed to be solely responsible under this Agreement.

(b)    The amount of indemnification shall be reduced by:

(1)    any insurance proceeds actually received; and

(2)    any amounts recovered from third parties.

**11.3.    Indemnification Procedures**.

33

(a) Indemnified Party shall promptly notify the indemnifying party of any claim, providing:

    (1) reasonably detailed description of the claim;

    (2) copies of relevant documents; and

    (3) the amount of Losses claimed.

(b) Indemnifying party shall have the right to:

    (1) control the defense of any third-party claim;

    (2) select and instruct defense counsel; and

    (3) settle any claim with the Indemnified Party's consent, not to be unreasonably withheld.

(c) Indemnified Party shall:

    (1) cooperate in the defense;

    (2) provide access to relevant documents and witnesses; and

    (3) not settle without the indemnifying party's consent.

**11.4.** **Survival**. The indemnification obligations under this Article shall:

(a) survive the termination of this Agreement;

(b) be binding upon any successors or assigns; and

(c) be in addition to any other rights or remedies under this Agreement or applicable law.

## Article XII. JURISDICTION AND DISPUTE RESOLUTION

**12.1.** **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to any choice or conflict of law provision or rule that would cause the application of laws of any jurisdiction other than those of the State of New York.

**12.2.** **Arbitration.**

(a) Any dispute, controversy or claim arising out of or relating to this Agreement, including the formation, interpretation, breach or termination thereof, shall be referred to and finally resolved by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules.

(b) The arbitration shall be conducted:

    (1) by three arbitrators;

    (2) in the city where Company's store is located;

    (3) in the English language; and

    (4) in accordance with New York law.

(c)   The award rendered by the arbitrators shall be final and binding upon all parties, and judgment upon the award may be entered by any court having jurisdiction thereof.

**12.3.   Injunctive Relief.**

(a)   Notwithstanding Section 12.2, any party shall be entitled to seek interim or provisional relief, including a temporary restraining order, preliminary injunction or permanent injunction in any court of competent jurisdiction to:

(1)   prevent any actual or threatened breach of this Agreement;

(2)   specifically enforce the provisions of this Agreement; or

(3)   otherwise avoid immediate and irreparable harm.

(b)   The parties hereby acknowledge that damages would be an inadequate remedy for any breach of Articles VII, VIII or X of this Agreement.

**12.4.   Costs and Attorneys' Fees.** The prevailing party in any arbitration or court proceeding shall be entitled to recover its reasonable attorneys' fees, arbitrator fees, expert witness fees and other costs incurred in connection with such proceeding, in addition to any other relief to which such party may be entitled.

**12.5.   Waiver of Jury Trial.** Each party hereby irrevocably waives its rights to trial by jury in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

**12.6.   Continued Performance.** The existence of any dispute shall not excuse either party from continuing to perform its obligations under this Agreement or prevent Molly Partner from exercising any of its rights hereunder.

<div align="center">

**Article XIII. MISCELLANEOUS.**

</div>

**13.1.   Entire Agreement.** This Agreement and the Certificate of Formation constitute the complete and exclusive statement of agreement among Members with respect to the subject matter herein and replace and supersede all prior written and oral agreements among Members.

**13.2.   Binding Effect.** Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and inure to the benefit of Members and their respective heirs, legal representatives, successors and permitted assigns.

**13.3.   Notices.**

(a)   Any notice required or permitted under this Agreement shall be in writing and shall be deemed duly given when sent by any of the following methods:

(1)   electronic mail with confirmation of receipt;

(2)   facsimile with confirmation of transmission;

(3)   personal delivery;

(4)   nationally recognized overnight courier; or

<div align="center">35</div>

       (5)    certified or registered mail, postage prepaid.

   (b)   All notices must be addressed as follows:

       (1)    If to Company:

              MOLLY TEA NYC INC.

              637-11 #C Prince Street Flushing NY 11354

              Email: nyc@mollyteany.com

              Attention: Xiaozhe Liu

       (2)    If to Molly Partner:

              MollyTea Shops LLC

              8 The Green, Suite B, Dover, DE 19901

              Email: mollyteausa@mollytea.com

              Attention: JIE XIAO

       (3)    If to Business Partner:

              MHL NY LLC

              152-15 Jewel Ave 175B Flushing NY 11367

              Email: mhlny.info@gmail.com

              Attention: Xiaozhe Liu

   (c)   Notices shall be effective upon: (1) confirmation of receipt if sent by email or fax; (2) personal delivery; (3) the first business day after sending by overnight courier; or (4) the third business day after mailing.

   (d)   Any party may change its contact information by giving notice to the other parties in accordance with this Section.

**13.4.**   **Waiver.** No waiver by any party of any default, breach, or violation of this Agreement shall be deemed to be a waiver of any subsequent default, breach, or violation thereof. No waiver shall be effective unless in writing and signed by the party making such waiver.

**13.5.**   **Force Majeure**.

   (a)   **Notice Requirements**. A party claiming Force Majeure shall:

       (1)    provide written notice to the other party within forty-eight (48) hours of becoming aware of the Force Majeure event;

       (2)    specify in reasonable detail the nature of the Force Majeure event;

       (3)    estimate the expected duration of the Force Majeure event; and

       (4)    keep the other party regularly informed of its efforts to resume performance.

   (b)   **Effect of Force Majeure**.

    (1)    Neither party shall be liable for any delay or failure to perform its obligations under this Agreement to the extent such delay or failure is caused by a Force Majeure event.

    (2)    The party affected by Force Majeure shall:

        (i)    use commercially reasonable efforts to mitigate the impact of the Force Majeure event;

        (ii)    resume performance as soon as reasonably possible; and

        (iii)    keep the other party informed of all mitigation efforts.

    (3)    If a Force Majeure event continues for more than one hundred and twenty (120) consecutive days:

        (i)    either party may terminate this Agreement upon written notice;

        (ii)    such termination shall not be considered a breach of this Agreement; and

        (iii)    the parties shall work together in good faith to wind down operations in an orderly manner.

    (c)    **Limitations**. Force Majeure shall not:

    (1)    excuse any payment obligations under this Agreement;

    (2)    extend the term of this Agreement; or

    (3)    excuse any obligations that arose prior to the Force Majeure event.

**13.6.    Severability.** If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

**13.7.    Amendments.** All amendments to this Agreement will be in writing and require the approval of both Members.

**13.8.    Multiple Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

**13.9.    No Third-Party Beneficiaries.** Nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any person not a party to this Agreement, except for the indemnification rights of Indemnified Parties under Article XI.

**13.10.    Interpretation.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. Unless the context requires otherwise: words in the singular include the plural and vice versa; the word "including" means "including without limitation"; and references to Articles and Sections refer to Articles and Sections of this Agreement.

**13.11.    Further Assurances.** Each party shall execute and deliver such additional documents and take such additional actions as may be necessary or desirable to carry out the purposes of this Agreement.

**INTENDING TO BE BOUND**, all of Members of MOLLY TEA NYC INC., a New York limited liability company, have executed this Agreement, effective as of the date written above.

MEMBERS

|  | MollyTea Shops LLC | MHL NY LLC |
|--|--|--|
| By: | Name: | Name: |
|  | Title: | Title: |
|  | Date: | Date: |

# EXHIBIT A

## INITIAL CAPITAL CONTRIBUTIONS AND OWNERSHIP INTERESTS

## AS OF Jul 3,2025

1.  UNIT STRUCTURE AND MEMBERSHIP INTERESTS

The Company is authorized to issue a total of 10,000 Units.

| Member | Address | Cash Capital Contribution | Units Held | Initial Percentage Interest |
|---|---|---|---|---|
| MollyTea Shops LLC | 8 The Green, Suite B, Dover, DE 19901 | $1,990 | 1,990 | 19.9% |
| MHL NY LLC | 152-15 Jewel Ave 175B Flushing NY 11367 | $8,010 | 8,010 | 80.1% |
| **TOTAL** | | **$10,000** | **10,000** | **100%** |

2.  TERRITORY AND DEVELOPMENT

| Item | Description |
|---|---|
| Territory | Flushing NY |
| Store Location | 37-11 #C Prince Street Flushing NY 11354 |
| Projected Opening Date | Apr 06, 2024 |
| Store Development Deadline | Apr 06, 2027 |

39

Note: The Company may issue additional Units from time to time in accordance with the Operating Agreement. Any such issuance shall be reflected in amendments to this Exhibit as approved by the Members.

The undersigned Members hereby confirm the accuracy of the information set forth above as of the date of this Agreement.

MEMBERS:

MollyTea Shops LLC

By: _____

Name: BIAO ZHANG

Title:

Date:

MHL NY LLC

By: _____

Name: XIAOZHE LIU

Title: Authorized signer

Date: 2025/7/3

41