# EXHIBIT "D"

**FRANCHISE DISCLOSURE DOCUMENT**

Molly Tea | 茉莉奶白

**MOLLYTEA Franchising LLC**
**6 Kilmer Road, Suite B**
**Edison, New Jersey 08817**
**Tel: (347) 561-4066**
**Website:**
**www.MollyTeausa.com**

You will establish and operate a retail store (the "Molly Tea Store") that sells a variety of milk tea drinks, whipped cream drinks, fruit teas, oat milk teas, tea-based beverages, coffees, pastries and compatible food products developed or approved by us, to the general public.

The total investment necessary to begin operation of a Molly Tea franchised business is between $527,500 and $1,108,000. This includes between $71,000 and $81,000 that must be paid to the franchisor or our affiliate. The total investment necessary to begin the operation of a Molly Tea multi-unit development franchise, which requires a minimum of two Molly Tea Stores to be developed, is $547,500 to $1,128,000. This includes between $91,000 and $101,000 that must be paid to the franchisor or our affiliates.

This Disclosure Document summarizes certain provisions of your Franchise Agreement and other information in plain English.  Read this Disclosure Document and all accompanying agreements carefully. You must receive this Disclosure Document at least 14 calendar days before you sign a binding agreement with, or make any payment, to us or an affiliate in connection with the proposed franchise sale.  **Note, however, that no governmental agency has verified the information contained in this document**.

You may wish to receive your Disclosure Document in another format that is more convenient for you.  To discuss the availability of disclosures in different formats, contact Jie Xiao at (347) 561-4046, mollyteausa@mollytea.com or at 6 Kilmer Road, Suite B, Edison, New Jersey 08817.

The terms of your contract will govern your franchise relationship.  Don't rely on the Disclosure Document alone to understand your contract.  Read all of your contract carefully.  Show your contract and this Disclosure Document to an advisor, such as a lawyer or an accountant.

Buying a franchise is a complex investment.  The information in this Disclosure Document can help you make up your mind.  More information on franchising, such as "A Consumer's Guide to Buying a Franchise," which can help you understand how to use this Disclosure Document, is available from the Federal Trade Commission.  You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, D.C. 20580.  You can also visit the FTC's home page at www.ftc.gov for additional information.  Call your state agency listed on Exhibit G or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state. Ask your state agencies about them.

Issuance Date: July 15, 2025.

## How to Use This Franchise Disclosure Document

Here are some questions you may be asking about buying a franchise and tips on how to find more information:

| QUESTION | WHERE TO FIND INFORMATION |
|---|---|
| How much can I earn? | Item 19 may give you information about outlet sales, costs, profits or losses. You should also try to obtain this information from others, like current and former franchisees. You can find their names and contact information in Item 20 or Exhibit F. |
| How much will I need to invest? | Items 5 and 6 list fees you will be paying to the franchisor or at the franchisor's direction. Item 7 lists the initial investment to open. Item 8 describes the suppliers you must use. |
| Does the franchisor have the financial ability to provide support to my business? | Item 21 and Exhibit D include financial statements. Review these statements carefully. |
| Is the franchise system stable, growing, or shrinking? | Item 20 summarizes the recent history of the number of company-owned and franchised outlets. |
| Will my business be the only Molly Tea business in my area? | Item 12 and the "territory" provisions in the franchise agreement describe whether the franchisor and other franchisees can compete with you. |
| Does the franchisor have a troubled legal history? | Items 3 and 4 tell you whether the franchisor or its management have been involved in material litigation or bankruptcy proceedings. |
| What's it like to be a Molly Tea franchisee? | Item 20 or Exhibit F lists current and former franchisees. You can contact them to ask about their experiences. |
| What else should I know? | These questions are only a few things you should look for. Review all 23 Items and all Exhibits in this Disclosure Document to better understand this franchise opportunity. See the table of contents. |

## What You Need To Know About Franchising *Generally*

**<u>Continuing responsibility to pay fees</u>.** You may have to pay royalties and other fees even if you are losing money.

**<u>Business model can change</u>.** The franchise agreement may allow the franchisor to change its manuals and business model without your consent. These changes may require you to make additional investments in your franchise business or may harm your franchise business.

**<u>Supplier restrictions</u>.** You may have to buy or lease items from the franchisor or a limited group of suppliers the franchisor designates. These items may be more expensive than similar items you could buy on your own.

**<u>Operating restrictions</u>.** The franchise agreement may prohibit you from operating a similar business during the term of the franchise. There are usually other restrictions. Some examples may include controlling your location, your access to customers, what you sell, how you market, and your hours of operation.

**<u>Competition from franchisor</u>.** Even if the franchise agreement grants you a territory, the franchisor may have the right to compete with you in your territory.

**<u>Renewal</u>.** Your franchise agreement may not permit you to renew. Even if it does, you may have to sign a new agreement with different terms and conditions in order to continue to operate your franchise business.

**<u>When your franchise ends</u>.** The franchise agreement may prohibit you from operating a similar business after your franchise ends even if you still have obligations to your landlord or other creditors.

### Some States Require Registration

Your state may have a franchise law, or other law, that requires franchisors to register before offering or selling franchises in the state. Registration does not mean that the state recommends the franchise or has verified the information in this document. To find out if your state has a registration requirement, or to contact your state, use the agency information in Exhibit G.

Your state also may have laws that require special disclosures or amendments be made to your franchise agreement. If so, you should check the State Specific Addenda. See the Table of Contents for the location of the State Specific Addenda (Exhibit I).

**SPECIAL RISKS TO CONSIDER ABOUT *THIS* FRANCHISE**

Certain states require the following risks be highlighted:

1.    **<u>Out-of-State Dispute Resolution</u>**.  The Franchise Agreement requires you to resolve most disputes with us by mediation, arbitration or litigation only in New York. Out of state mediation, arbitration or litigation may force you to accept a less favorable settlement for disputes. It may also cost you more to mediate, arbitrate or litigate with us in New York than in your own state.

2.    **<u>Short Operating History</u>**.  We, as franchisor, are at an early stage of development and have a limited operating history. This franchise is likely to be a riskier investment than a franchise in a system with a longer operating history.

3.    **<u>Spousal Liability</u>**.  Your spouse must sign a document that makes your spouse liable for all financial obligations under the Franchise Agreement even though your spouse has no ownership interest in the franchise.  This guarantee will place both your and your spouse's marital and personal assets, perhaps including your house, at risk if your franchise fails.

4.    **<u>Unregistered Trademarks</u>**.  The primary trademark that you will use in your business is not federally registered. If the franchisor's right to use this trademark in your area is challenged, you may have to identify your business and its products or services with a name that differs from that used by other franchisees or the franchisor.  This change can be expensive and may reduce brand recognition of the products or services you offer.

5.    **<u>Financial Condition</u>**.  The franchisor's financial condition, as reflected in its financial statements (See Item 21), calls into question the franchisor's financial ability to provide services and support to you.

**<u>Inventory/Supplier Control</u>**. You must purchase all or nearly all of the inventory or supplies that are necessary to operate your business from the franchisor, its affiliates, or suppliers that the franchisor designates, at prices the franchisor or they set. These prices may be higher than prices you could obtain elsewhere for the same or similar goods. This may reduce the anticipated profit of your franchise business.Certain states may require other risks to be highlighted.  Check the "State Specific Addenda," (if any), to see whether your state requires other risks to be highlighted.

## <u>NOTE: THE FOLLOWING PROVISIONS APPLY ONLY TO TRANSACTIONS GOVERNED BY THE MICHIGAN FRANCHISE INVESTMENT LAW</u>

THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU.

(a)    A prohibition on the right of a franchisee to join an association of franchisees.

(b)    A requirement that a franchisee assent to a release, assignment, novation, waiver, or estoppel which deprives a franchisee of rights and protections provided in this Michigan Franchise Investment Law act. This will not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

(c)    A provision that permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause. Good cause will include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than thirty (30) days, to cure such failure.

(d)    A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures and furnishings. Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation. This subsection applies only if: (i) the term of the franchise is less than five years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least six months' advance notice of franchisor's intent not to renew the franchise.

(e)    A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances. This section does not require a renewal provision.

(f)    A provision requiring that arbitration or litigation be conducted outside this state. This will not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

(g)    A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause. This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise. Good cause will include, but is not limited to:

   i.    The failure of the proposed transferee to meet the franchisor's then current, reasonable qualifications or standards.

        ii.      The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

        iii.      The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

        iv.      The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

(h)      A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor. This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

(i)      A provision which permits the franchisor to directly or indirectly convey, assign or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000, the franchisor will, at the request of a franchisee, arrange for the escrow of initial investment and other funds paid by the franchisee until the obligations to provide real estate, improvements, equipment, inventory, training or other items included in the franchise offering are fulfilled. At the option of the franchisor, a surety bond may be provided in place of escrow.

THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENFORCEMENT BY THE ATTORNEY GENERAL.

**THE NAME AND ADDRESS OF FRANCHISOR'S AGENT IN THIS STATE AUTHORIZED TO RECEIVE SERVICE OF PROCESS IS: MICHIGAN DEPARTMENT OF COMMERCE, CORPORATIONS AND SECURITIES BUREAU, 6546 MERCANTILE WAY, P.O. BOX 30222, LANSING, MICHIGAN 48910.**

Any questions regarding this notice should be directed to:
State of Michigan Consumer Protection Division, Attn: Franchise
670 G. Mennen Williams Building
525 West Ottawa
Lansing, Michigan 48933
(517) 373-7117

**TABLE OF CONTENTS**

ITEM 1    THE FRANCHISOR AND ANY PARENTS, PREDECESSORS, AND AFFILIATES ............... 3

ITEM 2    BUSINESS EXPERIENCE .............................................................................. 6

ITEM 3    LITIGATION .............................................................................................. 7

ITEM 4    BANKRUPTCY .......................................................................................... 7

ITEM 5    INITIAL FEES ........................................................................................... 7

ITEM 6    OTHER FEES ............................................................................................ 8

ITEM 7    ESTIMATED INITIAL INVESTMENT ............................................................ 14

ITEM 8    RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES ........................ 19

ITEM 9    FRANCHISEE'S OBLIGATIONS ................................................................... 24

ITEM 10   FINANCING ............................................................................................. 25

ITEM 11   FRANCHISOR'S ASSISTANCE, ADVERTISING,
          COMPUTER SYSTEMS AND TRAINING ....................................................... 26

ITEM 12   TERRITORY ............................................................................................. 36

ITEM 13   TRADEMARKS ......................................................................................... 39

ITEM 14   PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION ....................... 42

ITEM 15   OBLIGATION TO PARTICIPATE IN THE
          ACTUAL OPERATION OF THE FRANCHISE BUSINESS ................................... 43

ITEM 16   RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL .............................. 44

ITEM 17   RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION ............. 45

ITEM 18   PUBLIC FIGURES ..................................................................................... 48

ITEM 19   FINANCIAL PERFORMANCE REPRESENTATIONS .......................................... 48

ITEM 20   OUTLETS AND FRANCHISEE INFORMATION ............................................... 48

ITEM 21   FINANCIAL STATEMENTS ......................................................................... 51

ITEM 22   CONTRACTS ............................................................................................ 51

ITEM 23   RECEIPTS ............................................................................................... 69

Exhibits

Exhibit A        -        Franchise Agreement, including Exhibits and State
                         Addendum

Exhibit B        -        Multi-Unit Development Agreement and State Addendum

Exhibit C                 Operating Manual Table of Contents

Exhibit D        -        Form of General Release

Exhibit E        -        Financial Statements

Exhibit F        -        List of Current Franchisees

Exhibit G        -        List of State Administrators

Exhibit G-1      -        State Specific Addenda to the FDD

Exhibit G-2      -        State Specific Addenda to the Franchise Agreement

Exhibit H        -        Agents for Service of Process

Exhibit I        -        State Effective Dates

Exhibit J        -        Receipts

## ITEM 1

## THE FRANCHISOR AND ANY PARENTS, PREDECESSORS, AND AFFILIATES

To simplify the language in this disclosure document the term "we," "us" or "our" means MOLLYTEA Franchising LLC, the franchisor.  You" means the individual, corporation, limited liability company or partnership who buys the franchise, the Franchisee.  If Franchisee is a corporation, limited liability or partnership, then "you" also includes Franchisee's shareholders, members or partners. The term "Principals" refers to any individual or entity with a beneficial ownership in the franchisee (including shareholders of a corporation, members of a limited liability company, general and limited partners of a limited partnership, and etc.), and "Operating Principal" refers to a Principal who has decision-making authority on behalf of a franchisee. When you sign a Franchise Agreement, you will be required to designate an Operating Principal.

Franchisor

We are a Delaware limited liability company formed on January 16, 2025. We do business under the name "Molly Tea." Our principal business address is 6 Kilmer Road, Suite B, Edison, New Jersey 08817. Our telephone number is (347) 561-4066 and our email address is MollyTeausa@MollyTea.com. Our agents for service of process in the states whose franchise laws require us to name a state agency as agent for service of process are shown on Exhibit G. Our agents for service of process in the states that require franchise registration are listed in Exhibit H.

We have no predecessor.

We first began offering franchises for the operation of a Molly Tea Store as of the date of this disclosure document. We have not offered franchises in any other line of business. We do not currently operate any business of the kind described in this disclosure document.  We do not operate any other type of business.

Parent and Affiliates

Our direct parent is Molly Tea IP Inc., a Delaware corporation formed on January 14, 2025. It does business under the name Molly Tea. Its principal place of business is located at 104-16 150th Street, Queens, New York 11435. Molly Tea IP Inc. does not participate in any business activity nor has it offered any franchises for sale (whether a Molly Tea franchise or otherwise).

Molly Tea IP Inc. is owned by Molly Tea International Investment Limited, a British Virgin Island corporation formed on August 8, 2024. It does business under the name Molly Tea. Its principal place of business is located at Craigmuir Chambers, Road Town, Tortola, VG 1110, British Virgin Islands. Molly Tea International Investment Limited does not participate in any business activity nor has it offered any franchises for sale (whether a Molly Tea franchise or otherwise).

Molly Tea International Investment Limited is owned by Molly Tea International Limited, a Cayman corporation formed on July 16, 2024. It does business under the name Molly Tea. Its principal place of business is located at 4th Floor, Harbour Place, 103 South Church Street, P.O. Box 10240, Grand Cayman KY1-1002. Molly Tea International Limited does not participate in any business activity nor has it offered any franchises for sale (whether a Molly Tea franchise or otherwise).

Molly Tea International Limited is owned by Molly Tea Limited, Cayman corporation. It does business under the name Molly Tea. Its principal place of business is located at 3-212 Governors Square, 23 Lime TreeBay Avenue, P.O. Box 30746, Seven Mile Beach, Grand Cayman KY1-1203, Cayman Islands.  Molly Tea Limited does not participate in any business activity nor has it offered any franchises for sale (whether a Molly Tea franchise or otherwise).

Our affiliate, MollyTea USA Inc. is a New York corporation formed on August 19, 2024. It does business under the name Molly Tea. Its principal place of business is located at 104-16 150th Street, Queens, New York 11435. MollyTea USA Inc. manages the operations of Molly Tea locations in the United States. MollyTea USA Inc. has not offered any franchises for sale (whether a Molly Tea franchise or otherwise).

Our affiliate, MollyTea Shops LLC is a Delaware limited liability company formed on January 22, 2025. It does business under the name Molly Tea. Its principal place of business is located at 104-16 150th Street, Queens, New York 11435. MollyTea Shops LLC owns subsidiaries which operate Molly Tea company owned locations. As of May 1, 2025, these company owned locations include: Ice Max Company, an Illinois company, Molly Tea BK Inc., a New York corporation and Molly Tea NYC LLC, a New York limited liability company). MollyTea Shops LLC has not offered any franchises for sale (whether a Molly Tea franchise or otherwise).

Our affiliate, MollyTea Holding LLC is a Delaware limited liability company formed on December 27, 2024. It does business under the name Molly Tea. Its principal place of business is located at 104-16 150th Street, Queens, New York 11435. MollyTea Holding LLC owns a subsidiary which operates a Molly Tea company owned location. MollyTea Holding LLC has not offered any franchises for sale (whether a Molly Tea franchise or otherwise).

Our affiliate, MollyTea Supplychain LLC is a Delaware limited liability company formed on February 27, 2025. It does business under the name Molly Tea. Its principal place of business is located at 104-16 150th Street, Queens, New York 11435. MollyTea Supplychain LLC is an approved supplier of certain Molly Tea-branded products in the United States. See Item 8 for more information. MollyTea Supplychain LLC has not offered any franchises for sale (whether a Molly Tea franchise or otherwise).

Our affiliate, Molly Tea (Hong Kong) Limited is a Hong Kong corporation. It does business under the name Molly Tea. Its principal place of business is located at Flat 1512, 15/F, Lucky Centre, No. 165–171 Wan Chai Road, Wan Chai, Hong Kong. Molly Tea (Hong Kong) Limited operates tea beverage shops, oversees product development and brand operations for the Molly Tea brand outside the United States, and is responsible for managing overseas operations outside of China and the United States. Molly Tea (Hong Kong) Limited has not offered any franchises for sale (whether a Molly Tea franchise or otherwise).

Our affiliate, Shenzhen Molly Tea Food and Beverage Management Co., Ltd., whose principal business address is Room 301, Building 2, Industrial Workshop, Zone 28, Dalang Community, Xin 'an Street, Baoan District. Shenzhen Molly Tea Food and Beverage Management Co., Ltd. offers Molly Tea franchises internationally since 2021. As of the date of this disclosure document, it has 1,016 franchised units in China and 14 franchised units elsewhere internationally.

We do business under the name "Molly Tea" and the trade name "Molly Tea."  We license franchisees to operate under the trade name "Molly Tea."

Except as set forth above, our affiliates have not offered Molly Tea franchises or provided products or services to franchisees.  Neither we nor our affiliates have offered franchises in any other line of business.

Description of the Molly Tea Store

We franchise the right to operate a Molly Tea Store that sells a variety of milk tea drinks, whipped cream drinks, fruit teas, oat milk teas, tea-based beverages, coffees, pastries and compatible food products developed or approved by us, to the general public.

As a result of the expenditure of time, skill, effort and money, we have developed and own a proprietary business format and system (the "System"), which includes our methods and procedures for the establishment, management and operation of Molly Tea Stores.  The distinguishing characteristics of the System include, without limitation, distinctive exterior and interior design, layout, décor, furnishings and color schemes; uniform standards, specifications and policies and procedures for operations; service techniques; quality and uniformity of the products and services offered; procedures for inventory, management and financial control; training and assistance; and advertising and promotional programs, all of which we may change, improve, further develop or otherwise modify.

We identify the System and Molly Tea Stores by means of certain names and marks, including "Molly Tea 茉莉奶白" and other names, marks, logos, insignias, slogans, emblems, symbols and designs (collectively, the "Marks"), which we have designated, or may in the future designate, for use with the System.  The Molly Tea Stores are identified by our unique System. We will provide you a copy of our written standards, procedures, rules, regulations and policies for the operation of the Molly Tea Store under the System we issue from time to time (the "Operating Manual"), which will be provided to you upon signing of the Franchise Agreement.

When you sign a Franchise Agreement (the "Franchise Agreement") in the form attached as Exhibit A to this disclosure document, you have the right to establish a franchised Molly Tea Store that uses the System and the Marks within a particular market (the "Territory"), which is described in the Franchise Agreement. You may operate only one Molly Tea Store in the Territory at a specific location. See Item 12.

We may also offer a Multi-Unit Development Agreement (the "Development Agreement") in the form attached as Exhibit B to this disclosure document granting rights for you to establish multiple Molly Tea Stores within a particular area (the "Development Area") described in the Development Agreement. You must enter into the then-current franchise agreement with us for each Molly Tea Store you establish under the terms of the development schedule set forth in the Development Agreement.  The number of Molly Tea Stores to be developed under each Development Agreement varies depending on factors such as the size, affluence and population density in the Development Area.  We grant Development Agreements in our sole discretion. The fact that you may meet the eligibility requirements does not mean that we will enter into a Development Agreement with you. We are under no obligation to offer you or anyone else that opportunity.

Market and Competition

The market for bubble milk tea and related beverage products is well established and competitive. Franchisees will compete with established local, regional and national retail outlets that offer other beverage products.  These competitors may have greater financial resources and longer operating histories than us. Your ability to compete in this market depends in large part on the geographical area, specific site location and general economic conditions.

Applicable Laws and Regulations

You must comply with federal and state health and sanitations laws, rules and regulations. The U.S. Food and Drug Administration, the U.S. Department of Agriculture and state and local health departments administer and enforce laws and regulations that govern food preparation and service and restaurant sanitary conditions. These include licensing, health, sanitation, safety, fire, insecticides, packaging and use, storage and disposal of waste (including laws requiring recycling and regulating the use of certain types of containers and other materials potential harmful to the environment). State and local agencies inspect food outlets to ensure that they comply with these laws and regulations. You will be responsible for obtaining any applicable real estate permits (*e.g.*, zoning), real estate licenses, and operational licenses. In addition, the Americans with Disabilities Act of 1990 requires readily accessible accommodations for disabled people and may affect your building construction, site design, entrance ramps, doors, seating, bathrooms, drinking facilities, etc. You must also comply with the Occupational Safety & Health Administration's regulations and applicable employment laws and regulations, including wage and hour laws, Equal Employment Opportunity Commission, Fair Labor Standards Act and Family Medical Leave Act. You must comply with laws prohibiting discrimination and sexual harassment, environment laws and laws on citizenship and immigration status. Some states require that employees' citizenship/immigration status be verified through the Department of Homeland Security's E-Verify program. Increases in minimum wage requirements can increase your labor costs and affect your bottom line. Additionally, the Patient Protection and Affordable Health Care Act requires employers of a certain size to provide health insurance to its employees. The Payment Card Industry Data Security Standard ("*PCI*") requires that all companies that process, store or transmit credit or debit card information maintain a secure environment. PCI applies to all organizations or merchants, regardless of size or number of transactions, that accepts, transmits or stores any cardholder data. You must also be sure to comply with applicable state and federal laws regulating the privacy and security of sensitive consumer and employee information. Additional details can be found at https://www.pcisecurity standards.org/merchants for additional information. Compliance resources are available from the Federal Trade Commission. You can contact the FTC at (202) 326-2222 or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, D.C. 20580. You can also visit the FTC's business center on privacy and security at http://www.business.ftc.gov/privacy-and-security/ for additional information.

**ITEM 2**

**<u>BUSINESS EXPERIENCE</u>**

**<u>Biao Zhang (Zhang Biao)</u>**

Mr. Zhang is our Manager and Chief Executive Officer since our formation in January 2025. Mr. Zhang is also the Founder of the Molly Tea brand and currently oversees brand strategy, system development, and operational standards across all Molly Tea locations. While he is not an officer or employee of MOLLYTEA Franchising LLC, he will be managing the franchise system and establishing the brand's core operating model. Since June 2020, he has served as the Founder of Shenzhen Molly Tea Catering Management Co., Ltd. Since December 2016 and continuing to date, he founded and continues to operate Shenzhen Bocheng Duoyi Catering Management Co., Ltd. in Shenzhen, Guangdong, China. Since June 2014 and continuing to date, he also founded and continues to operate Shenzhen Queen Catering Management Co., Ltd. in Shenzhen, Guangdong, China.

**<u>Jie Xiao (Xiao Jie)</u>**

Mr. Xiao has served as Operating Officer of MOLLYTEA Franchising LLC since June 15, 2025. He has been an Angel Investor in restaurant chain brands since October 2021, where he has successfully incubated

three profitable restaurant concepts: Fu Tian Beef Brisket Pot (13 stores, annual revenue of 100 million RMB), Ai Chao Yogurt (90 stores, annual revenue of 50 million RMB), and Xiangtoto (4 stores, annual revenue of 20 million RMB). From October 2020 to September 2021, Mr. Xiao was Executive Assistant to the CEO at Schindler Group. From October 2018 to September 2020, he served as Executive Assistant to the Asia Pacific CEO at GSI China, where he helped evaluate 50 suppliers and expanded cooperation channels.

**Dongyuan Lin**

Mr. Lin has served as R&D Manager of MOLLYTEA Franchising LLC since June 15, 2025. From February 2020 to the present, Mr. Lin has been the Head of Integrated Operations Management Center at Shenzhen Bocheng Duoyi Catering Management Co., Ltd., located in Shenzhen, Guangdong, China. From August 2018 to February 2020, he was a Partner at Shenzhen Black Vinyl Record Co., Ltd.'s Nanshan store, where he developed creative cocktails and managed bar operations.

**Jason Wen (Wen Duo Gao)**

Mr. Wen has served as the Administrative Manager of MOLLYTEA Franchising LLC since June 15, 2025. From January 2016 to September 2024, he worked as General Manager of three family restaurants including Chakra Japanese, Cauldron Chicken, and Hana & Rosa located in New York City and Huntington, New York.

## ITEM 3

## LITIGATION

No litigation is required to be disclosed in this Item.

## ITEM 4

## BANKRUPTCY

Neither we nor any parent, affiliate, officer or general partner of ours, nor any other person who will have management responsibility relating to the sale or operation of the franchises offered by this disclosure document has been involved as a debtor in proceedings under the U.S. Bankruptcy Code or any foreign bankruptcy laws required to be disclosed in this Item.

## ITEM 5

## INITIAL FEES

**Initial Franchise Fee**

You must pay to us an initial franchise fee of $50,000 upon execution of the Franchise Agreement. You will pay the initial franchise fee in a lump sum payment. The initial franchise fee is fully earned at the time you make the payment to us and is not refundable.

**Initial Training Fee.**

You must pay to us an initial training fee of $6,000 per person, for up to two (2) individuals, upon execution of the Franchise Agreement. You will pay the initial training fee in a lump sum payment. The

initial training fee is fully earned at the time you make the payment to us and is not refundable.

## Schematic Drawing Fee.

You must pay to us a schematic drawing fee of $5,000 after we approve your proposed site and begin preparing the schematic layout for your Molly Tea Store. You will pay the schematic drawing fee in a lump sum payment. The schematic drawing fee is fully earned at the time you make the payment to us and is not refundable.

## Technology Fee

You are also required to pay us a technology fee between $10,000 to $20,000 per year, which we may increase upon written notice to you. See Item 6 for more information. The technology fee is fully earned at the time you make the payment to us and is not refundable.

You are not required to make any other payments to us for goods or services prior to opening your Franchised Business.

## Development Fee:

We may provide you with the option to sign a Multi-Unit Development Agreement ("Development Agreement") for the development of two (2) or more Franchised Businesses. If you sign a Development Agreement, we will grant you the right to build a mutually agreed upon number of Franchised Businesses in an Area in accordance with a specified development schedule. For the second and each subsequent Franchised Business to be developed, you must pay a Development Fee in an amount equal to $10,000 per Franchised Business. The Development Fee is paid when you sign the Development Agreement. The Development Fee is fully earned at the time you make the payment to us and is not refundable regardless of whether you open any or all of your Franchised Businesses. The Development Fee will be credited against initial franchise fees at the time initial franchise fees become due for each Franchised Business to be developed, after the first franchised business, in an amount of $10,000 per Franchised Business.

| Number of Franchised Businesses | Area Development Fee |
|---|---|
| First Franchised Business | We do not count your first Franchised Business when calculating the Development Fee, as you will sign your first franchise agreement and pay us the initial franchise fee at that time. |
| Each additional Franchised Business | $10,000 per Franchised Business |

## ITEM 6

## OTHER FEES

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Royalty Fee[1,2&3] | 8% of Gross Sales. | Payable monthly before the 10th day of each month. | You must pay the Royalty Fee through electronic funds transfer. Service fees will be deducted by the Platform for its payment processing services and by us for the Royalty Fee. |

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Advertising Fund Contribution[4] | Up to 2% of Gross Sales. | Same as Royalty Fee. | Collected by us and payable to the Advertising Fund.[5]<br><br>May be deducted from your Franchise Commissions |
| Minimum Local Advertising Expenditure[5] | Currently, $0. May be required in the future up to $3,000 per quarter. | Periodically. | Spent by you quarterly if required in the future. Any Advertising Cooperative contributions are credited to this requirement. |
| Advertising Cooperative[6] | The amount is determined by the Advertising Cooperative. This amount will be credited to your Minimum Local Advertising expenditure. | Same as the Royalty Fee. | Payable to the Advertising Cooperative, if applicable. |
| Technology Fee[7] | $10,000 to $20,000 per year. | Annually | Payable to us when you use the required POS, and other technology systems. May be deducted from your Franchise Commissions |
| Renewal Fee | 75% of the then initial franchise fee at the time of renewal. | Upon execution of the renewal franchise agreement. | Payable to us when you notify us of your intent to renew the Franchise Agreement. May be deducted from your Franchise Commissions |
| Transfer Fee[8] | 75% of the then current Franchise Fee plus out of pocket costs and expenses. | Upon invoice. | Payable to us when you request our consent to transfer the franchise or your ownership. |
| Additional Trainings/Retraining[9] | $2,500 per person, plus reimbursement for travel expenses, lodging and food and a reasonable fee (currently $300 a day). | Upon invoice. | Payable to us when we provide additional training or retraining to you. May be deducted from your Franchise Commissions |
| Late Fee | $250 for each delinquent report or payment. | Automatically upon next electronic funds transfer. | You must pay this fee in addition to interest for any payment or report received by us after the prescribed due date. May be deducted from your Franchise Commissions |

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Interest[10] | 18% per annum or the maximum lawful rate, whichever is less. | Upon demand. | Interest is charged monthly when any of the Royalty Fees, Advertising Fund Contributions, Transfer or Renewal Fee or any other sum due to us is not paid when due or when an audit reveals under- payments based on incorrect Gross Sales.<br><br>May be deducted from your Franchise Commissions |
| Additional On-Site Assistance[11] | Reimbursement for travel expenses, lodging and food and, at our option, a reasonable fee, not to exceed $1,000. | Upon invoice. | The reimbursement and the fee (if any) are payable to us<br><br>May be deducted from your Franchise Commissions |
| Background Search | Reimbursement for our cost of a third-party background search. | Upon invoice. | We may order background search on you from a third-party service provider<br><br>May be deducted from your Franchise Commissions |
| Customer Complaint Fee | Reimbursement of our expenses. | Upon invoice. | We may take any action we deem appropriate to resolve a customer complaint about your business. If we respond to a customer complaint, we may require you to reimburse us for our expenses incurred in resolving the complaint.<br><br>May be deducted from your Franchise Commissions |
| Insurance[12] | Reimbursement, plus a 10% administrative fee. | Upon invoice. | Payable to us only if you fail to obtain the required insurance and we do so on your behalf.<br><br>May be deducted from your Franchise Commissions |
| Inspection and Testing for Unapproved Suppliers, Products or Equipment | Cost of inspection, if applicable, and cost of any test. | Upon invoice. | Before approving a new supplier, product or equipment, we may require you to pay the cost of testing the supplier's products and/or equipment |

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| | | | and inspecting its facilities. May be deducted from your Franchise Commissions |
| Relocation Fee | Reimbursement to us for our reasonable costs and expenses. | Upon invoice. | If you move your Molly Tea Store, we will charge a relocation fee to cover the costs of moving, which can include: moving costs, marketing to a new customer base, and potential disruptions to the business. May be deducted from your Franchise Commissions |
| Tax Payment | Reimbursement. | Upon invoice. | You must reimburse us for any sales tax, gross receipts tax or similar tax imposed on us for any payments to us required by the Franchise Agreement. May be deducted from your Franchise Commissions |
| Audits | Reimbursement of our audit expenses. | Upon invoice. | Payable only if an audit reveals an underpayment of 2% or more. May be deducted from your Franchise Commissions |
| Indemnification[13] | Varies depending upon the claim and its resolution. | Upon billing. | You must indemnify us and certain related parties from certain losses and expenses. May be deducted from your Franchise Commissions |
| Costs and Legal Fees | Actual legal fees and expenses. | Upon billing. | Incurred only if a court determines that you have breached the Franchise Agreement. Legal fees and expenses will vary depending on factors such as the nature of the legal matter, venue and the complexity of the legal matter. |

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| | | | May be deducted from your Franchise Commissions |
| Prohibited Product or Service Fee | $1,500 a day for each day the infraction occurs. | Upon demand | Payable if you sell a product or offers a service not authorized by us. May be deducted from your Franchise Commissions |
| Unauthorized Advertising Fee | $10,000 per infraction. | Upon demand | Payable if you use any advertising or advertising medium not authorized by us and will be deposited into the Advertising Fund. May be deducted from your Franchise Commissions |

NOTES:

(1)    Except as otherwise described, all fees are payable to us, are not refundable and are uniformly imposed.

(2)    "Gross Sales" means the total selling price of all products, goods, services and supplies sold in or from your Molly Tea Store (regardless of whether such products or services are performed at your Molly Tea Store), delivery fees charged to customers, including delivery fees paid to third party delivery services (such as UberEats, GrubHub and DoorDash) and all other revenue and income of every kind or nature received by you from any other business (including, but not limited to, all revenues from any permitted mechanical or other device, such as vending machines), whether for cash, cash equivalents or credit (and, if for credit, whether or not payment is received therefor) related to your Molly Tea Store, less applicable sales or other excise or similar taxes collected by you and valid credits deducted from revenues initially recorded as Gross Sales. Merchant fees for credit card services may not be deducted from Gross Sales. Proceeds from the sale of coupons, gift cards, gift certificates or vouchers will not be included in Gross Sales when the coupons, gift cards, gift certificates or vouchers are sold; rather, the retail prices of services and products purchased with the coupons, gift cards, gift certificates or vouchers will be included in Gross Sales when the coupon, gift card, gift certificate or voucher is redeemed.

Alternatively, we have the right to require you to enter into a Revenue Allocation Agreement. If we require you to enter into a Revenue Allocation Agreement with us, then on a monthly basis, our designated third-party platform for payment processing (the "Platform Provider") will calculate your Gross Sales for the prior month and will retain a certain percentage of your Gross Sales as its service fees, as defined in the Revenue Allocation Agreement. Upon collecting the service fees, Platform Provider will remit the balance of the Gross Sales to us in accordance with the Revenue Allocation Agreement. We will then deduct the Royalty Fee from the balance of Gross Sales, which is currently eight percent (8%) of Gross Sales.

The amount remaining from Gross Sales after the deduction of the service fees and the

Royalty (the "Franchise Commissions") will then be subject to all other deductions due to us and/or our affiliates before remitting the balance to you. Typically, we will remit the balance of the Franchise Commissions to you within two weeks of our receipt from the Platform of your Gross Sales for the prior month. Our obligation to remit the Franchise Commissions to you is subject to our receipt of payment from the Platform. If after deducting the Royalty Fee and all other charges due to us and/or our affiliates, there is a balance due to us or an affiliate, the balance will be deducted from your proceeding month's Franchise Commissions until the balance is paid in full. You will not be entitled to any portion of the Gross Sales or Franchise Commissions until after all deductions have been made and all charges due to us or an affiliate are paid in full.

(3)    The Royalty Fee for any successor term will be that royalty fee provided in the Franchise Agreement signed for the successor term.

(4)     The Franchise Agreement provides that the Advertising Fund Contributions are uniformly applied and can be charged up to two percent (2%) of Gross Sales. "Advertising Fund" means the fund that may be established by us for the maintenance, administration, direction, preparation, purchasing and placement of advertising for the System, Intellectual Property, and the operation of one or more sites on the Internet. If established, the Advertising Fund Contribution will be deposited on a monthly basis. Currently, we are not collecting the Advertising Fund Contribution at this time. If implemented, we may deduct Advertising Fund Contributions from your Franchise Commissions.

(5)    You are not required to spend a minimum amount towards local advertising and promotion in your Territory, however, we reserve the right to implement a minimum local advertising requirement in an amount up to $3,000 of for local advertising and promotion in your Territory. If implemented, your obligation to make expenditures on local advertising will be reduced by an amount equal to your contributions to any Advertising Cooperative, if any, as discussed in Item 11.

(6)    We may require that you participate in an approved local or regional Advertising Cooperative with certain other franchisees and sign our then-current form of cooperative advertising agreement.  There is no Advertising Cooperative established as of the date of this Disclosure Document so no amount of contribution by a Molly Tea Store has been determined. If and when an Advertising Cooperative is established, the Advertising Cooperative will determine the contribution amount required by each Molly Tea Store in the Advertising Cooperative.  The voting power of Franchisor-owned Molly Tea Stores will be the same as franchised Molly Tea Stores.  If an Advertising Cooperative is established, any amounts you contribute to the Advertising Cooperative will be credited against your Minimum Local Advertising expenditure up to the maximum contribution then required for the Minimum Local Advertising expenditure, if the Minimum Local Advertising expenditure is implemented.

(7)    The technology fee represents our cost for maintaining the Molly Tea website or causing a third party to maintain the Molly Tea website and incorporating information relating to your Franchised Business, as well as SaaS subscriptions, supply chain platforms, and remote technical support. This fee also includes the cost of supporting and developing technology for use in connection with the System. You will be charged our then-current fee for technology support and development which as of the date of this disclosure document is between $10,000 and $20,000 per year. We may deduct the technology fee from your Franchise Commissions.

PAGE 13

(8)     The Transfer Fee is nonrefundable even if the proposed transfer does not occur for any reason (including if we disapprove of the transfer), in which case the Transfer Fee you paid us for the failed transfer will not be applied to any future requests for our consent to transfer. We may deduct the Transfer Fee from your Franchise Commissions.

(9)     Other than the training fee we charge for the initial training for you or your Operating Principal and your Molly Tea Store's original manager, we may charge a fee for any other training (including additional training and/or remedial training), seminars and materials, whether required or optional.

(10)     The highest interest rate allowed in California for late payments is 10% annually. We may deduct the late payments fees including interest the rate from your Franchise Commissions.

(11)     Payable only for additional opening assistance and supervision which we may require, or you may request. We may deduct costs related to additional on-site assistance from your Franchise Commissions.

(12)     If you, for any reason, fail to obtain or maintain the insurance required by each Franchise Agreement entered into between us and you, as these requirements may be revised by us in the Operating Manual or otherwise in writing, we have the right and authority (but not the obligation), to immediately obtain such insurance and to charge the same to you, which charges, together with a reasonable fee for our expenses in so acting, will be payable by you immediately upon notice. Insurance costs are non-refundable. Insurance coverage requirements are uniformly imposed on all new franchisees. However, the costs of this coverage may not be uniform for all franchisees because premiums may vary according to the insurer, marketplace conditions, the location of the insured's premises, the insurance requirements of applicable law and other factors. These costs will not be collected or imposed in whole or in part on behalf of any third party by us, and are payable to the applicable insurer or agent. We may deduct these costs from your Franchise Commissions.

(13)     You are required to pay us for all losses and expenses incurred by us in connection with any third-party claim for which you are required to indemnify us under the Franchise Agreement, including compensatory, exemplary or punitive damages, mediation costs, settlement amounts, judgments, court costs, fines, charges, costs and expenses, including, without limitation, reasonable legal fees, and damages and injury that result from your negligent performance of or other breach of the Franchise Agreement, including lost profits and compensation for damages to reputation and goodwill, which may be deducted from your Franchise Commissions.

## ITEM 7

## ESTIMATED INITIAL INVESTMENT

### YOUR ESTIMATED INITIAL INVESTMENT - MOLLY TEA STORE

| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment is to be Made |
|---|---|---|---|---|
| Initial Franchise Fee[1] | $50,000 | Lump sum. | When you sign the Franchise Agreement. | Us |

| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment is to be Made |
|---|---|---|---|---|
| Pre-Opening Travel, Lodging, and Meals for Initial Training[2] | $15,000 to $30,000 | As arranged. | As arranged. | Suppliers |
| Lease Deposit (3 months' rent)[3] | $15,000 to $75,000 | As arranged. | As arranged. | Landlord |
| Leasehold Improvements[4] | $50,000 to $200,000 | As arranged. | Pre-opening. | Suppliers |
| Point of Sale Systems and Computer Hardware and Software[5] | $3,000 to $10,000 | As arranged. | Pre-opening. | Us and Suppliers |
| Initial Inventory and Supplies (3 months) | $150,000 to $250,000 | As arranged. | As arranged. | Us and Suppliers |
| Business Store Licenses, Permits, etc. (first year) | $15,000 | Lump sum. | Pre-opening. | Licensing Authorities |
| Equipment, Furniture and Fixtures[6] | $150,000 to $300,000 | As arranged. | Pre-opening. | Us and Suppliers |
| Signage[7] | $5,000 to $15,000 | As arranged. | As arranged. | [Us and] Suppliers |
| Insurance Premiums (first 3 months)[8] | $2,500 to $5,000 | Lump sum. | Pre-opening. | Insurers |
| Security and Utility Deposits | $5,000 to $20,000 | As arranged. | Pre-opening | Us |
| Architect, Engineer and Other Professional Fees[9] | $2,000 to $8,000 | As arranged. | As arranged. | Architect, Engineer Accountant, Attorney, etc. |
| Advertising and Promotion/Grand Opening (3 months)[10] | $15,000 to $30,000 | As arranged. | As arranged. | Suppliers, Media, etc. |
| Additional Funds (3 months)[11] | $50,000 to $100,000 | As incurred. | As incurred. | Employees, Suppliers |
| Totals[12] | $527,500 to $1,108,000 | | | |

NOTES:

(1)    The initial franchise fee is the same for all similarly situated franchisees. The initial franchise fee is fully earned at the time you make the payment to us and is not refundable regardless of whether you open your Franchised Business.

(2)    We will provide initial training for five to ten people, which will be mandatory for you or your Operating Principal and a manager, for a fee of $3,000 per person. See Item 11 for our initial training program. Additionally, you will be responsible for all expenses related to travel, lodging, meals and wages during this training. At your option and expense, we will also make available initial training to additional employees, at a fee of $3,000 per person. Your costs will depend on the number of people attending training, their point of origin, method of travel, class of accommodation and living expenses (food, transportation, etc.).  The duration of the training program is ten (10) days.

(3)     You may lease a building for your Molly Tea Store. The building may be either newly constructed or renovated and either free-standing or located in a mall or shopping center. Our estimates in this table for a Molly Tea Store assume you pay one month's rent plus a security deposit equal to one month rent when you sign your lease, and that you begin regular paying rent after you open for business. For this to occur, you would need to negotiate a "free rent" period for the time it takes to finish out your Molly Tea Store. You may be able to negotiate additional free rent or reduced rent periods after opening as well.

(4)     This estimate is for the costs for the development of a Franchised Business with between 600 and 1,000 square feet of space. In certain instances, you may be able to get the landlord to contribute toward renovation or improvement of the real estate. Real estate expenses (including, but not limited to, construction and remodeling costs and broker commissions) will vary widely, depending on the geographic region, the type of Molly Tea Store, the site location, the size of the building, design, configuration and condition of the premises for the Molly Tea Store, the condition and configuration of existing services and any existing facilities, such as air conditioning, electrical, plumbing, and the terms of your lease, among other factors. The estimates assume that the landlord will provide connections to adequate electrical, gas, water and sewage service. These estimates may vary substantially based on your ability to negotiate with your landlord and your financial creditworthiness, as well as on local commercial leasing and labor rates and other local conditions. A Molly Tea Store will be approximately 600 to 1000 square feet. We have based our estimates on the historical experience of our officers in developing affiliated stores as well as on information obtained from architects and contractors. The difference in the low and the high improvement cost estimates is due to the difference in size of the location. These estimates are applicable to a site which has been obtained in the "vanilla box" stage, which refers to the interior condition of either a new or existing building in which the improvements generally consist of heating/cooling with delivery systems, essential lighting, electrical switches and outlets, lavatories, a finished ceiling, walls that are prepped for painting and a concrete slab floor. These numbers are not inclusive of any architect fees or other fees charged by licensed professionals (other than general contractors and licensed tradesmen), to perform subsequent installation of electrical, plumbing, and HVAC (heating, ventilation, air conditioning) suitable to the requirements of this food service concept and do not include any financial contributions by a landlord. As in development of any restaurant locations, there are many variables that may impact your overall costs including landlord contribution, the size of your location, rates for construction, personnel, freight, vendor pricing and taxes, overall costs and efficiencies in your market. Your cost for developing your location may be higher or lower than the estimates provided. Third-party financing may be available for qualified candidates for some of the leasehold improvement costs, however with such financing comes associated costs and fees which will cause the cost to exceed what is indicated in this chart. We anticipate that you will lease rather than build your restaurant and therefore, we have not included any costs for land, building construction or related costs in our estimates.

(5)     The low estimate is for the cost to lease your computer hardware, software and POS system for three (3) months and the high estimate is for the cost to purchase your computer hardware, software and POS system. The estimate also includes the payment of the technology support and development fee for a period of three (3) months. If your lease your computer hardware, software and POS system equipment, we estimate that your monthly payments will range from $150 to $500 per month. If you purchase your own computer hardware, software and POS system equipment, your costs will be higher and could increase your initial investment anywhere between $3,000 and $10,000 depending on the computer hardware, software and POS system equipment that you purchase. The cost is also determined by the number of screens and stations that a franchisee may install for its location, depending upon the square footage allocated to the front counter. See Item 11 for more information about point-of-sale equipment and computer hardware and software requirements.

(6)    This includes the cost of fixtures, furniture and equipment, which is estimated to range between $150,000 and $300,000. The costs of the furniture and fixtures may differ depending on the material quality and on other factors. Furniture consists of the tables and chairs necessary to fit out the customer dining area. The figures listed here are indicative of standard commercial pricing within New York, New York as well as other information that we have obtained.

(7)    This signage amount includes the cost for exterior and interior signage required for your Molly Tea Store.

(8)    The insurance requirements are described in Item 8.  The costs of insurance may vary substantially depending on the insurer, the location and type of Molly Tea Store, the value of the equipment and improvements and your claims history. You should check with your local carrier for actual premium quotes and costs, as well as the actual cost of the deposit. You should also check with your insurance agent or broker regarding any additional insurance that you may want to carry.

(9)    You must hire an architect or other qualified professional approved by us to adapt our standard plans and specifications to your location and to local and state laws, regulations and ordinances.  An engineer ordinarily will be required only for new construction, surveying, soil tests and electrical and mechanical engineering.  An architect or engineer also may be required to supervise the construction and improvements of your Molly Tea Store premises. You also may require accounting and legal services in connection with the signing of the agreements with us and related matters in establishing the new business (e.g., lease negotiation, financing and tax planning). We strongly recommend that you seek the assistance of professional advisors when evaluating this franchise opportunity, this disclosure document and the Franchise Agreement.  It is also advisable to consult these professionals to review any lease or other contracts that you will enter into as part of starting your Franchised Business. The estimated rates in this chart are based upon professional fees in the area of New York City. The accounting and legal fees will vary, depending upon factors such as locality, the extent of the assistance you require and other local circumstances.

(10)    This amount includes pre-opening and grand opening advertising to promote the opening of the Molly Tea Store. Franchisee must spend a minimum of $15,000 for pre-opening and grand opening advertising and promotion due to us thirty (30) days before the Molly Tea Store is opened. The grand opening advertising and promotion will begin two weeks prior to opening and ending six weeks after the Molly Tea Store is opened, but depending on the location of the Premises, the cost could range from $15,000 to $30,000. If your grand opening advertising and promotion is not approved by us twenty (20) days prior to the opening of your Molly Tea Store, then you will pay the grand opening advertising directly to us to spend on your behalf.

(11)    This amount includes the amount of working capital that will be used by you to cover costs and expenses such as wages, rent (or mortgage), and other operating expenses during the initial three months of operations but do not account for any estimates for debt service.  These amounts may vary depending (and we consider these factors in establishing the range of additional funds) upon your sales volume, your management skills, how closely you follow our methods and procedures, local economic conditions and wage rates, competition, your financing costs and upon other circumstances. These amounts are estimates.  Additional working capital may be required if sales are low or fixed costs are high.  You should review these figures carefully with your business advisor. We cannot guarantee that you will not incur additional expenses in starting the business that may exceed this estimate.  This estimate also includes such items as initial payroll taxes (including payroll to cover the pre-opening training period for some of your staff), additional advertising, marketing and/or promotional activities, health and workers' compensation insurance, repairs and maintenance, bank charges, miscellaneous supplies and equipment, initial staff recruiting expenses, state tax and license

fees, deposits and prepaid expenses (if applicable) and other miscellaneous items as offset by the revenue you take into the Franchised Business. These items are by no means all-inclusive of the extent of the expense categorization.  The expenses you incur during the initial start-up period will depend on factors such as the time of the year that you open, both local economic and market conditions, as well as whether your Franchised Business is located in a new or mature market and your business experience.

(12)   This total amount is based upon the historical experience of our principals in developing affiliated Molly Tea Stores, as well as on information obtained from architects and contractors. Your costs may vary based on a number of factors including but not limited to the geographic area in which you open, local market conditions, the location selected, the time it takes to build sales of the establishment and your skills at operating a business. We strongly recommend that you use these categories and estimates as a guide to develop your own business plan and budget and investigate specific costs in your area.  This figure does not include the expenditures (discussed in note 2) required in connection with execution of an ADA.  These estimates do not take into account the cost of any real estate purchase, construction costs, development fees or finance charges, interest and related costs you may incur if any portion of the initial investment is financed. Unless otherwise stated above, these estimates are subject to increases based on changes in market conditions, our cost of providing services and future policy changes. At the present time, we have no plans to increase payments we control.  We do not offer any financing for your initial franchise fee, any development fee or any portion of your initial investment.  Unless otherwise stated, the amounts described above are not refundable.

YOUR  ESTIMATED  INITIAL  INVESTMENT – MOLLY  TEA  STORE  AREA  DEVELOPMENT AGREEMENT FOR THREE (3) FRANCHISED UNITS

| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment is to be Made |
|---|---|---|---|---|
| Area Development Fee[1] | $20,000 | Lump sum | When you sign the ADA | Us |
| Other Expenditures for First Franchised Business | $527,500 to $1,108,000 | As per the table above | As per the table above | As per the table above |
| **Total[2]** | **$547,500 to $1,128,000** | | | |

(1)   ADA Fee. You must pay an Area Development Fee based on the number of franchise agreements to be signed under the development schedule. The Area Development Fee for each Franchised Business is $10,000. You must pay the Area Development Fee when you sign the ADA. We do not count your first Franchised Business when calculating the ADA Fee as you will sign your first Franchise Agreement and pay us the initial franchise fee for your first Franchised Business when you sign the ADA. The ADA Fee is fully earned at the time you make the payment to us and is not refundable regardless of whether you open any or all of your Franchised Businesses. The Area Development Fee will be credited against initial franchise fees at the time initial franchise fees become due for each Franchised Business to be developed (after the initial Franchised Business). The table above assumes the purchase of an Area Development franchise for three (3) Franchised Businesses, however, the minimum number of Molly Tea Stores to be developed under a Development Agreement is two (2) Franchised Businesses. There is no maximum number of Molly Tea Stores to be developed.

(2)   Initial Franchised Business Development. These are the estimates to develop and open your first Franchised Business, based on the estimated investments disclosed in this Item 7. If we grant you the right to develop more than one Molly Tea Store under a Development Agreement, the costs described in this Item 7 will be the same for each Molly Tea Store you develop and

operate under the Development Agreement.  However, costs associated with developing and opening additional Molly Tea Stores in the future are subject to factors that we cannot estimate or control, such as inflation, increased labor costs or increased materials costs.

## ITEM 8

## RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

To ensure that you maintain the highest degree of consistency, quality and service, you must obtain certain goods, services, supplies, materials, fixtures, furnishings, equipment (including computer hardware and software) and other products used only from our designated or approved suppliers, vendors, manufacturers, printers, contractors, and distributors ("Suppliers"), including an affiliated entity or us who demonstrate to our continuing reasonable satisfaction, the ability to meet our then-current standards. We will disclose to you in writing in the Operating Manual or otherwise any specifications by designating approved brands, types, compositions, performance qualities or Suppliers.

Without limitation, you must purchase from Suppliers: (1) fixtures, furniture, equipment (including but not limited to sealing machines, tea brewing machines, sugar dispensers, ice makers, refrigerated cabinets, worktables, signage and digital menu displays) and computer systems, interior and exterior signage, graphics and decor; (2) products which must be purchased from us, namely, tea leaves, syrup, fruit juice, coffee beverage concentrated cream, cup packaging materials and products which are to be purchased from Suppliers we approve, namely, fresh milk, fresh fruits, whip cream, oat milk, nitrous oxide chargers, white granulated sugar, disinfectant chemicals; (3) uniforms, memorabilia, and all merchandise and items intended for retail sale (whether or not bearing our Marks); (4) advertising, point-of-purchase materials, and other printed promotional materials; (5) stationery, contracts, and forms; (6) paper cups, paper bags, packaging, and supplies bearing our Marks; and (7) all other goods and/or services as we may require. Information concerning approved and designated suppliers will be communicated to you via the Operating Manual.  Neither we, nor any person affiliated with us, currently is an approved supplier.

You must sell and offer for sale all products and services required by us in the manner and style we require. You may only sell and offer for sale products and services authorized by us. All products must be prepared in accordance with our recipes and must use all ingredients we specify. You must not deviate from our standards and specifications without obtaining our written consent first. We may direct you in writing at any time to discontinue selling and offering for sale any items, products and services. We can and expect to modify our standards and specifications, as we deem necessary. We will provide you with notice of any changes as they occur. We may also require you from time to time to participate in the test marketing of products and services at your expense.

We reserve the right to have items sourced exclusively from our Suppliers including a single Supplier (which may be us or one of our affiliates) or a limited number of Suppliers, in order to achieve uniformity or better pricing, simplify inventory and purchasing or for other legitimate business reasons.

If we have designated an approved Supplier for a product, we do not permit franchisees to contract with any alternative suppliers for those product(s), nor do we issue specifications for these items. You may purchase items and services for which we have not identified approved suppliers, from any supplier if the items and services meet our specifications.  These specifications may include brand requirements.  If brand requirements have been identified, you must purchase and use only approved brands.

We currently do not permit you to purchase items from unapproved suppliers. If we permit purchases from unapproved suppliers, and you desire to purchase items from an unapproved supplier(s), you must submit to us a written request for approval or must request the supplier itself do so.  We may

condition our approval of a supplier on requirements relating to product quality, prices, consistency, reliability, financial compatibility, labor relations, client relations, frequency of delivery, concentration of purchases, standards of service (including prompt attention to complaints) or other criteria.  We will have the right to require that our representatives be permitted to inspect the supplier's facilities and that samples from the supplier be delivered, at our option, either to us or to an independent, certified laboratory designated by us for testing.  You or the supplier must pay cost of the inspection and testing.  We may, at our option, re-inspect the facilities and products of any approved supplier and revoke our approval upon the supplier's failure to continue to meet any of our criteria.  We will notify you within thirty (30) days of approval or disapproval of an alternative supplier.

You must purchase POS hardware (including iPads, receipt printers, and barcode scanners), credit card processing equipment or other credit card processing equipment set forth in the Operating Manual, as amended from time to time and other computer systems, software and equipment that we prescribe. Item 11 of this Disclosure Document provides more detailed information about our computer hardware and software requirements.

In addition, we may require you to purchase and utilize any upgrades, additions, enhancements or replacements of the hardware or software, some of which may be developed and licensed by or on behalf of us or an affiliate, or otherwise required by us at such cost as we or our approved vendors make such upgrades, additions, enhancements, and replacements available to franchisees (See Items 6 or 11). We do not permit franchisees to contract with any alternative suppliers of computer hardware or software for use with or in the Molly Tea Store, nor do we issue specifications for these items. You may use standard, off the shelf general business applications software such as Microsoft Office obtained from an authorized reseller.

We reserve the right to use "mystery shoppers", who are trained and paid customers that visit your franchises to evaluate the performance of your Molly Tea Store based on predefined criteria. Mystery shoppers can provide you with valuable feedback and insights on how your franchises are meeting our standards and expectations.  If we implement a mystery shopper program, we will notify you in writing.  If your Molly Tea Store fails an evaluation by a mystery shopper, you will be required to pay the then-current fees associated with such failed evaluation plus the amount of the mystery shopper's services and any items purchased at your Molly Tea Store.

<u>Advertising</u>

All of your advertising must be conducted in a dignified manner and must conform to the standards and requirements that we specify in writing and as required by federal, state and local regulations.  Advertising programs and requirements are further described in Item 11.

<u>Furniture, Fixtures, Equipment and Inventory</u>

Before opening your Molly Tea Store and throughout the term of the Franchise Agreement, you must purchase or lease and maintain at your Molly Tea Store the equipment which we specify.  You must obtain our written approval before installing any equipment or other furniture at your Molly Tea Store which we have not previously approved in writing.  If any of the equipment to be installed at your Molly Tea Store is leased, the lease must permit you to substitute equipment subject to the lease.

You must purchase and install, at your expense, all fixtures, furnishings, signs and equipment as we may reasonably direct in our Operating Manual or otherwise in writing, and refrain from installing or permitting to be installed on or about your Molly Tea Store premises, without our prior written consent,

any fixtures, furnishings, signs, equipment or other improvements not previously approved as meeting our standards and specifications.

Upon sixty (60) years written notice, but no more often than once every twelve (12) months, you, at your own expense, must upgrade and refurbish your Molly Tea Store.  The upgrades and refurbishment may include, without limitation, those necessary to conform your Molly Tea Store decor, floor plan, trade dress, exterior signage and decor, color schemes and equipment with the then current standards and public image of new or remodeled Molly Tea Store operated by us or our other franchisees or as necessary to protect the System.  The upgrade and renovation must be completed within sixty (60) years of notice.

You must maintain in sufficient supply and use at all times only the products, materials, ingredients, supplies and paper goods which conform with our standards and specifications, and must refrain from deviating from them by using nonconforming items without our prior written consent.

You must permit us or our agents, at any reasonable time, to take from the premises of your Molly Tea Store, at our option, samples of any inventory items, without payment, in amounts reasonably necessary for testing by us or an independent, certified laboratory to determine whether the samples meet our then-current standards and specifications.  We may require you to bear the cost of the testing if we have not previously approved the supplier of the item or if the sample fails to conform to our specifications.

You must also maintain the Molly Tea Store in the highest degree of cleanliness, sanitation, repair and condition. Within ten (10) days after receipt of notice from us, you agree to make any additions, alterations, repairs and replacements that we reasonably require, including, without limitation, such periodic repainting, equipment repairs and replacement of obsolete signs, equipment and floor coverings (including carpet and tile) as we may reasonably direct. In the event that you fail or refuse to implement repair or maintain, we shall have the right, but not the obligation, to enter upon the Molly Tea Store for the purpose of making or causing to be made such corrections as may be required, with all costs to be paid by you.

<u>Insurance</u>

Within thirty (30) days after the execution of the lease or purchase of the premises for your Molly Tea Store you must obtain all required insurance policies solely from insurance agents/brokers or other providers approved by us or that meet our criteria as described below. We may or may not receive compensation or other economic benefits from approved insurance agents/brokers or other providers.

Such policy or policies will be written by an insurance carrier or insurance carriers that have received and maintain an A.M. Best Rating of "(A) V" or better and an A.M. Best Class Rating of VIII, and will include, at a minimum, the following for each Molly Tea Store:

A.    Commercial General Liability.  The commercial general liability policy will be written on an occurrence basis and will include coverage for products/completed operations on your Molly Tea Store premises through ISO form CG 24 07 or equivalent coverage and must not include an exclusion or sublimit for assault and battery. The commercial general liability policy will have a minimum per occurrence liability limit of $1,000,000 and a general aggregate liability limit of $2,000,000.  The commercial general liability policy also will have the following endorsements: the additional insured coverage for us and our affiliates and their respective principals, directors, managers, officers, employees, agents, successors and assignees (collectively, the "***Franchisor Indemnitees***") which will include premises-operations, contractual liability, independent contractors, and products and completed operations. The additional insured coverage will not be limited to our vicarious liability, and will include coverage for liability arising out of, or occurring upon, or in connection with the condition, operation, use or occupancy of your Molly Tea Store.

B.      Crime (inside/outside) and Employee Dishonesty Insurance.  Crime (moneys and securities) inside/outside coverage will have a minimum per occurrence liability limit of $100,000 for inside crime and a minimum per occurrence liability limit of $100,000 for outside crime. Employee dishonesty coverage will have a minimum per occurrence liability limit of $100,000.

C.      Worker's Compensation Insurance.    Worker's compensation insurance in amounts provided by applicable law or, if permissible under applicable law, any legally appropriate alternative providing substantially similar compensation for injured workers satisfactory to us, provided that you conduct and maintain a risk management and safety program for your employees as you deem appropriate.

D.      Automobile Liability Insurance.  Automobile liability insurance coverage for owned, non-owned and hired vehicles with a liability limit of not less than $1,000,000 combined single limit.

E.      Building and Personal Property Insurance.  Property coverage for physical loss or damage to personal property and real property including leasehold improvements, at each Molly Tea Store location. The policy will include all risk replacement cost property insurance for your Molly Tea Store and its contents, including, without limitation, awnings, equipment, signs, glass, additions under construction, outdoor fixtures, personal property, as well as business interruption insurance for income loss for at least twelve (12) months and Royalty Fees due under your Franchise Agreement for the applicable Molly Tea Store, equipment breakdown, business ordinance, debris removal, preservation of property, fire department service charges, pollutant clean up and removal, newly acquired or constructed property, property of others, property off premises and stock. This policy will include us as a loss payee for equipment and supplies financed by us either by a loan, line of credit or an open account if we offer such financing to you.

F.      Umbrella Liability Insurance.    Umbrella coverage over the above-described general commercial liability, automobile liability and employer's liability insurance policies listed above, and which provides coverage at least as broad as these underlying policies.  Such coverage will be written on a per occurrence basis.  The policy must provide coverage of at least a $1,000,000 per occurrence limit and $1,000,000 aggregate limit.  The umbrella liability insurance will also have the following endorsements: the additional insured coverage for Franchisor Indemnitees will not be limited to our vicarious liability, and will include coverage for liability arising out of or occurring upon or in connection with the condition, operation, use or occupancy of the franchised business.

G.      Insurance Required Under Applicable Law.  Any insurance which may be required by statute or rule of the state or locality in which your Molly Tea Store will be operated.

The insurance coverages described above may not have any deductible, self-insured retention, self-funded retention or any similar provision unless prior written consent is given by us.

Within thirty (30) days after the execution of the lease for your Molly Tea Store and, thereafter, at least sixty (60) years prior to the expiration of any such policy, you will deliver to us certificates of insurance indicating the insurance coverages contracted for as well as the description of special provisions (e.g., additional named insured status). As noted above, certain policies must name Franchisor Indemnitees as additional insureds; include a waiver of subrogation provision or endorsement in favor of Franchisor Indemnitees; be primary and non-contributory to any other insurance that any of Franchisor Indemnitees has procured itself; provide for thirty (30) days' prior written notice to us of any material modification, cancellation or expiration of such policy; and include such other provisions as we may require from time to time. You will also provide a binder, declarations page or confirmation of insurance, describing and confirming the coverages afforded by the required policies described above upon request.

Should you, for any reason, fail to procure or maintain the insurance required by the Franchise Agreement, we will have the right and authority (without any obligation to do so) immediately to procure the insurance and to charge you for it. You must pay these charges and any costs we incur, together with a 10% administrative fee, immediately upon notice.

<u>Revenue from Franchisee Purchases and Payments from Designated Suppliers</u>

Molly Tea Supplychain LLC is an approved Supplier. The officers listed in Item 2 own an interest in Molly Tea Supplychain LLC. We currently do not receive money from or on account of the sale of goods or services to franchisees. We anticipate that Molly Tea Supplychain LLC will derive revenue from your purchases. We or our affiliates may enter into certain agreements with Suppliers to receive rebates or other consideration on account of your purchases and based on certain percentages of the purchases you make from Suppliers. None of our affiliates currently receive rebates, overrides or other consideration from Suppliers as a result of purchases by our franchisees; however, we (and they) reserve the right to do so in the future.

<u>Percentage of Total Purchases Represented by Required Purchases</u>

We anticipate that the required purchases and leases from approved suppliers will constitute the substantial majority of all purchases by you for the development and operation of your Molly Tea Store. We estimate that up to 30% to 40% of your initial investment to establish and open your Molly Tea Store will be applied to required purchases and leases from approved suppliers, and that approximately 75% to 85% of your expenditures to operate your Molly Tea Store will be applied to required purchases and leases in the operation of your Molly Tea Store.

<u>Cooperatives</u>

There are no purchasing or distribution cooperatives, although we retain the right to establish them.

<u>Negotiated Purchases</u>

We may negotiate volume discount arrangements with certain designated suppliers for our franchisees (including pricing and payment terms), based upon volume purchases by the System. These suppliers may require you to enter into separate contracts with them. However, we cannot guaranty that any Supplier will offer or continue any particular pricing, warranty or other terms of sale. We will attempt to negotiate a continued supply of products from various Suppliers, but cannot guaranty a continuing supply from any particular Supplier. We are not under any obligation to you with respect to the terms negotiated or the terms of any Supplier. We cannot guarantee that Suppliers will offer or continue to offer you any trade credit terms as that is solely up to the Supplier and their credit standards.

<u>Material Benefits</u>

We do not provide any material benefits to franchisees based upon their use of designated or approved suppliers. We reserve the right not to grant franchises or confer other benefits to any franchisee, for any reason or no reason, which may include the failure to follow and support our System, including its recommended purchase of particular products or services or use of particular supplies.

**ITEM 9**

**FRANCHISEE'S OBLIGATIONS**

This table lists your principal obligations under the franchise and other agreements.  It will help you find more detailed information about your obligations in these agreements and in other items of this Disclosure Document.

| Obligation | Section in Agreements | Disclosure Document Item |
|---|---|---|
| a.  Site selection and acquisition/lease | Section 5 of the Franchise Agreement. Not applicable to the Development Agreement. | Items 11 and 12 |
| b.  Pre-opening purchases/leases | Sections 5, 7 and 8 of the Franchise Agreement.  Not applicable to the Development Agreement. | Items 7, 8, 11 and 12 |
| c.  Site development and other pre-opening requirements | Sections 5 and 6 of the Franchise Agreement.  Sections 4 and 5 of the Development Agreement. | Items 5, 6, 7, 8 and 11 |
| d.  Initial and ongoing training | Section 7 of the Franchise Agreement. Not applicable to the Development Agreement. | Items 6 and 11 |
| e.  Opening | Sections 6 and 10(h) of the Franchise Agreement.  Not applicable to the Development Agreement. | Item 11 |
| f.  Fees | Section 4 of the Franchise Agreement. Section 3 of the Development Agreement. | Items 5, 6, 7 and 17 |
| g.  Compliance with standards and policies/operating manual | Section 8 of the Franchise Agreement. Not applicable to the Development Agreement. | Items 8 and 11 |
| h.  Trademarks and proprietary information | Section 9 of the Franchise Agreement. Section 7 of the Development Agreement. | Items 13 and 14 |
| i.  Restrictions on products/services offered | Section 8 of the Franchise Agreement. Not applicable to the Development Agreement. | Items 11 and 16 |
| j.  Warranty and customer service requirements | Not applicable. | Not Applicable |
| k.  Territorial development and sales quotas | Not applicable to Franchise Agreement. Section 1 of the Development Agreement. | Item 12 |
| l.  Ongoing product/service purchases | Section 8 of the Franchise Agreement. Not applicable to the Development Agreement. | Item 8 |

| | Obligation | Section in Agreements | Disclosure Document Item |
|---|---|---|---|
| m. | Maintenance, appearance and remodeling requirements | Sections 6 and 8 of the Franchise Agreement. Not applicable to the Development Agreement. | Items 6 and 17 |
| n. | Insurance | Section 17 of the Franchise Agreement. Not applicable to the Development Agreement. | Items 6, 7 and 8 |
| o. | Advertising | Section 10 of the Franchise Agreement. Not applicable to the Development Agreement. | Items 6 and 11 |
| p. | Indemnification | Section 16 of the Franchise Agreement. Section 10 of the Development Agreement. | Items 6, 14 and 17 |
| q. | Owner's participation/management/ staffing | Section 8 of the Franchise Agreement. Not applicable to the Development Agreement. | Item 15 |
| r. | Records and reports | Section 13 of the Franchise Agreement. Not applicable to the Development Agreement. | Items 6 and 17 |
| s. | Inspections and audits | Sections 6, 8 and 13 of the Franchise Agreement. Not applicable to the Development Agreement. | Items 6, 8 and 11 |
| t. | Transfer | Section 18 of the Franchise Agreement. Section 11 of the Development Agreement. | Items 6 and 17 |
| u. | Renewal | Section 3 of the Franchise Agreement. Section 3 of the Development Agreement. | Items 6 and 17 |
| v. | Post-termination obligations | Section 20 of the Franchise Agreement. Section 12 of the Development Agreement. | Item 17 |
| w. | Non-competition covenants | Section 15 of the Franchise Agreement. Section 9 of the Development Agreement. | Items 12, 15 and 17 |
| x. | Dispute resolution | Section 21 of the Franchise Agreement. Section 13 of the Development Agreement. | Item 17 |

## ITEM 10

## FINANCING

We do not offer, either directly or indirectly, any financing. We do not guarantee your note, lease or other obligation.

**ITEM 11**

**FRANCHISOR'S ASSISTANCE, ADVERTISING,
COMPUTER SYSTEMS AND TRAINING**

**Except as listed below, we are not required to provide you with any assistance**.

Pre-Opening Obligations

Before you open your Molly Tea Store, we will provide the following services for you:

Training

We will provide initial training, which will be mandatory for you or your Operating Principal and your manager. At your option and expense, we also will make available initial training to additional employees, at a fee of $3,000 per person. As part of the initial training, we will provide you with a copy of our Operating Manual (Franchise Agreement Section 8(b)).  We will also make available other required or optional training as we deem appropriate.  (Franchise Agreement Section 7).

We may (in our sole discretion) provide a representative to provide on-site assistance and supervision in conjunction with the grand opening of your Molly Tea Store at no charge to you except reimbursement of our travel, lodging and food expenses.  (Franchise Agreement Section 7).

For any additional on-site evaluations, we may charge you a reasonable fee, not to exceed $1,000, and you must reimburse us for our reasonable expenses, including travel, lodging and food expenses. (Franchise Agreement Section 7).

Location Approval

Before or within thirty (30) days after the signing of the Franchise Agreement, you must locate, and obtain our approval for, a location within the Territory set forth in the Franchise Agreement for the establishment and operation of your Molly Tea Store.

You must submit to us: (i) a completed location review form that we designate, which will include, among other things, demographic information, a site plan and traffic-related information; (ii) satisfactory evidence that the lessor will agree to the minimum requirements set forth in the Franchise Agreement; (iii) a pro forma profit and loss statement; (iv) an estimate of capital expenditures for the Molly Tea Store; and (v) any other information or materials as we reasonably require, such as a letter of intent or other document which confirms your favorable prospects for obtaining the proposed location.

We will notify you of our approval or disapproval in writing within a period of thirty (30) days after our receipt of the complete information requested.  We will act in a commercially reasonable manner when approving or disapproving any proposed location.  However, we will have absolute discretion to approve any proposed location and you must accept our decisions as final. Our approval of a location does not constitute an assurance, representation or warranty of any kind, express or implied, as to the suitability of the location for your Molly Tea Store or for any other purpose or of the financial success of operating your Molly Tea Store at the location. (Franchise Agreement Section 5)

For all on-site evaluations requested by you or required by us, you must reimburse us for our reasonable expenses, including travel, lodging and food expenses. Additionally, we may charge a reasonable fee per evaluation, not to exceed $1,000. (Franchise Agreement Section 5).

Among the factors we consider when approving a location are demographics, the general location and neighborhood, traffic patterns, visibility to traffic, parking availability, size and layout of the building and lease characteristics. We will also approve locations for Molly Tea Stores opened pursuant to Development Agreement using our then-current standards for approving a location.

You must provide us a lease for your Molly Tea Store premises within ten (10) days after preliminary location approval from us and sign the lease within five days after receipt of lease approval from us.

Once your Molly Tea Store is established at the approved location in accordance with the Franchise Agreement, you may not relocate your Molly Tea Store without our prior written consent. We will not unreasonably withhold our consent of such relocation. (Franchise Agreement Section 5(d)).

If we and you cannot agree on a location within the time limit contained in the Franchise Agreement, we may terminate the Franchise Agreement. (Franchise Agreement Section 5(e)).

Before commencing any construction/refurbishment at the location, you at your own cost, must submit to us for our prior written approval: (i) complete plans and specifications for your Molly Tea Store in accordance with local or state laws, regulations or ordinances, and which conform to our general design and specifications, and when approved by us, may not be modified without our prior written consent; (ii) a statement in the form prescribed by us and signed by you certifying that you have complied with all local or state laws, regulations or ordinances in preparing its plans and specifications; that you have employed a qualified architect or engineer approved by us to prepare construction/renovation documents and supervise the construction/ renovation of your Molly Tea Store and completion of all improvements, and that all such permits and certifications required for lawful construction/ renovation and operation of your Molly Tea Store, including zoning, access, sign and fire requirements and licenses, have been obtained; and (iii) a construction/ renovation schedule acceptable to us. Upon receipt of the documents described above, we will notify you of our approval or disapproval in writing within fifteen (15) days. Given that the construction/ renovation and appearance of your Molly Tea Store is critical to the continued success and viability of the System, we will have absolute discretion in making such decision and you must accept our decisions as final. (Franchise Agreement § 6(a)).

<u>Construction/Renovation</u>

Within ten (10) days of receipt of our approval of the pre-construction/renovation proposal, you must commence construction and provide us with written notice of such commencement within two days of such commencement of construction/renovation.

You must complete construction/renovation, including, as applicable, all exterior and interior carpentry, electrical, painting and finishing work and installation of all fixtures, equipment and signs, in accordance with the approved plans and specifications for the approved location within one hundred and eighty (180) days of the execution of the Franchise Agreement.

We and our representatives will have the right to inspect the construction/refurbishment at all reasonable times. You must cooperate fully with us and provide us and our representatives with full access to the site. (Franchise Agreement Section 6(d)).

Beginning with the calendar month after the pre-construction/refurbishment approval is issued by us and each following calendar month thereafter until one calendar month after the construction/ refurbishment is completed, you must provide us, on or before the first Monday of each such month, with

Docusign Envelope ID: EEECDDA2-E407-4D86-8F2B-FF55B78422C4

a statement in the form prescribed by us and signed by you, certifying your continued compliance with and maintenance of the construction/refurbishment requirements of the Franchise Agreement.

Once construction/refurbishment is completed and within five (5) days after obtaining our written approval for opening, you must open your Molly Tea Store to the public.  However, you must not open your Molly Tea Store to the public unless we have granted our written approval to do so.

We will provide the names of approved suppliers for equipment, signs, fixtures, opening inventory and supplies and/or written specifications for these items.

The Development Agreement does not require us to provide any pre-opening services to you.

Time to Open a Molly Tea Store

We estimate that the typical time from the signing of the Franchise Agreement to the opening of a Molly Tea Store will be from six (6) to nine (9) months, and the Molly Tea Store must be opened within twelve months of execution of your Franchise Agreement.  The actual time required may vary depending upon the time necessary to locate and then approve a location, financing, the permits and licenses necessary for the finish-out or renovation of your Molly Tea Store and the operation of your Molly Tea Store's finish-out or renovation as it may be affected by weather conditions, shortages, delivery schedules and other similar factors, preparation of the interior and exterior of your Molly Tea Store, including decorating, purchasing and installing fixtures, equipment and signs, and landscaping (if necessary), and complete preparation for the operation of your Molly Tea Store, including purchasing inventory and supplies. (Franchise Agreement Section 6(f)).

Approval of Advertising

Currently, we do not approve any advertising materials for your use because all franchisees throughout the system are currently not required to conduct local advertising. In the event that we implement a minimum local advertising spend requirement, we will review and approve all opening promotional materials and advertising. Unless approved by in writing, you may not use that promotional material or advertising. We will approve or disapprove your request within thirty (30) days after submission. If you do not receive written approval within thirty (30) days after submission of your request for approval, such request will be deemed denied. We may withhold our approval of your use of any promotional materials and advertising for any reason and no reason at all. We have the right to revoke our prior approval of your use of any promotional materials and advertising. You must promptly discontinue use of any promotional materials and advertising, whether or not previously approved, on notice from us. We have the right to require you to stop, revise, delete or remove any objectionable promotional materials and advertising, as determined by us in our sole discretion, including but not limited to any previously approved promotional materials and advertising.

Continuing Obligations

During your operation of your Molly Tea Store, we will provide the following services:

i.We will notify you of any additions, replacements or other changes regarding the types of products and services offered to clients or pricing of products and services approved for sale by us.

ii.We will provide additional initial training programs for successor and replacement managers and Molly Tea Store management personnel as we deem appropriate. We will not provide any

assistance in hiring any of your employees, but all employees must be able to perform the job responsibilities for the position.

iii. We will conduct, at our option, meetings, seminars, inspections and other related activities regarding the operation of Molly Tea Store for franchisees generally, which you must attend. Except as approved by us, any costs incurred by you or your Molly Tea Store personnel in attending such events will be your responsibility. In the event that we conduct an inspection, we will have the right to collect samples of any inventory items to determine whether you are in compliance with our System Standards.

iv. We will inspect your Molly Tea Store and evaluate its products and services at such times as we may deem advisable to maintain the high standards of quality, appearance and service of the System, in person or remotely by telephone where possible.

v. We will provide, as we deem appropriate, advice and written materials concerning techniques of managing and operating your Molly Tea Store, including new developments and improvements in equipment, products, packaging, preparation and operational systems.

vi. We will provide you with suggested retail prices for products and services and menus for which reflect such prices. Prices must be in compliance with our general guidelines on pricing policies as set forth in the Operating Manual or otherwise provided by us in writing (and, with respect to retail products offered for resale, subject to any applicable manufacturers' minimum advertised pricing policies and applicable law). Subject to applicable legal constraints, you must participate in and comply with all sales and promotional programs and any gift certificate, gift card, stored value card, customer loyalty or customer retention program promulgated by us.

vii. We may offer from time to time to provide local advertising and promotional plans and materials. All such advertising must be placed in or distributed through such media or channel of communication as approved by us. (Franchise Agreement Section 10(b)).

viii. We will provide other continuing advisory assistance, as we deem advisable, to you in the operation of your Molly Tea Store. (Franchise Agreement Section 7).

ix. If you enter into a Revenue Allocation Agreement, we will remit Franchise Commissions to you after deductions are made for service fees, Royalty Fees, and other charges due to us. Our obligation to remit Franchise Commissions to you is subject to our receipt of payment from the Platform. (Franchise Agreement Sections 4(b), 4(i), and 8(r)).

Advertising Programs

We have no obligation to conduct advertising.

All of your advertising must be conducted in a commercially acceptable manner and must conform to such standards and requirements as we may specify from time to time in writing. However, franchisees are currently not required to conduct local advertising.

Samples of all advertising, not previously approved by us, must be submitted to us for our prior approval. We will review and approve all opening promotional materials and advertising. Unless approved by in writing, you may not use that promotional material or advertising. We will approve or disapprove your request within thirty (30) days after submission. If you do not receive written approval within thirty (30) days after submission of your request for approval, such request will be deemed denied. We may

withhold our approval of your use of any promotional materials and advertising for any reason and no reason at all. We have the right to revoke our prior approval of your use of any promotional materials and advertising. You must promptly discontinue use of any promotional materials and advertising, whether or not previously approved, on notice from us. We have the right to require you to stop, revise, delete or remove any objectionable promotional materials and advertising, as determined by us in our sole discretion, including but not limited to any previously approved promotional materials and advertising. All such advertising must be placed in or distributed through such media or channel of communication as approved by us.  (Franchise Agreement Section 10(c)).

You are not required to spend a minimum amount towards local advertising and promotion in your designated market area, however, if we decide to in the future, require a minimum local advertising expenditure, you will be required to spend during each $3,000 per quarter toward local advertising and promotion in your designated market area. If implemented, although you are not required to spend the same amount per quarter, it is recommended that you attempt to spend an equal amount each quarter in order to promote the Molly Tea Store consistently. We have the right to audit your records to verify such expenditures have been made.

Your contributions toward an Advertising Cooperative, if applicable, will count toward  your required expenditures toward local advertising and promotion (if required).

The location and telephone number of your Molly Tea Store will be posted on the website maintained by us or our supplier. We are currently developing the capability to permit online ordering by customers through our website for delivery services (where applicable) and pick-up services at all Molly Tea Store locations. When this service is fully functional, you will be offered the opportunity to participate on the same terms and conditions as other franchisees. You may not establish or maintain any other website for your Molly Tea Store or use the Marks or other proprietary information in any way other than as provided in the Franchise Agreement, including on the Internet. You will have no rights to market any products or services on the Internet without our permission and it is unlikely at this time that such permission will be granted. You are prohibited from establishing or utilizing your own URL website, mobile apps appearing on smartphones or other electronic devices (including, for example, Android Marketplace or the Apple Store), or social media accounts to promote your Molly Tea Store except as described in the Operating Manual. (Franchise Agreement – Sections 10 and 12).

If we establish an Advertising Fund, you will contribute to the Advertising Fund the amount we designate as described in Item 6. Contributions to the Advertising Fund will be paid on the tenth calendar day of each month, and will be subject to the late payment charges described in Item 6. (Franchise Agreement §10). If you enter into a Revenue Allocation Agreement with us, and if we implement the Advertising Fund, we will withhold your Advertising Fund Contributions before remitting the balance of your Franchise Commissions to you.

There is no advertising council composed of franchisees.

<u>Advertising Fund</u>

We may designate that an Advertising Fund will be maintained and administered by us or our designee (Franchise Agreement Section 10(d)).

If established, the Advertising Fund is intended to maximize general public recognition and acceptance of the Marks, to enhance the collective success of all Molly Tea Stores and to further develop and maintain the System.  We and/or our designees will direct all advertising and other programs produced using the Advertising Fund, and will have sole discretion to approve or disapprove the creative concepts,

materials and media used in those programs and their geographic market and media placement, and the allocation of the money in the Advertising Fund to production, placement or other costs. In administering the Advertising Fund, we and our designees undertake no obligation to make expenditures for you that are equivalent or proportionate to your contribution, or to ensure that you or any particular Molly Tea Stores benefits directly or pro rata from the placement of advertising or the expenditure of Advertising Fund monies.

The Advertising Fund may be used to satisfy or defray any and all costs of maintaining, administering, directing, preparing, purchasing and placing marketing campaigns, promotions and advertising (including, without limitation, the cost of preparing and conducting national, regional or local television, radio, magazine, newspaper, Internet web-based and electronic media advertising campaigns and direct mail and outdoor billboard advertising); public relations activities; developing, implementing and maintaining one or more electronic commerce websites and/or related strategies; the cost of market research, administering customer loyalty programs, product and operations-related research and development costs associated with gift card programs; costs of maintaining customer service lines and/or franchisee service telephone numbers if we elect to establish such service, including the cost of outside agencies; and other marketing and advertising services we choose to provide or conduct or contract for from time to time. All Advertising Fund Contributions made by you will be deposited into the Advertising Fund and will be maintained in a separate account or accounts by us and/or our designees. Funds in the Advertising Fund may be used to defray any of our reasonable operating costs and overhead that we incur in activities reasonably related to the administration or direction of the Advertising Fund and advertising programs for franchisees and the System. These costs may include the proportionate salary share of Franchisor's employees that devote time to the advertising and promotion or administration of the Advertising Fund, including without limitation, administrative costs, salaries and overhead expenses. The Advertising Fund and its earnings will not otherwise inure to our benefit. The Advertising Fund is operated solely as a conduit for collecting and expending the Advertising Fund Contributions. We and our designees have no fiduciary duty to you, or any other franchisees, or their respective principals, including your Principals, with regard to the operation or administration of the Advertising Fund. We reserve the right to require that a portion of the Advertising Fund Contributions are put in a fund used for special events advertising worldwide.

We will, with respect to any Molly Tea Store operated by us or any affiliate, contribute to the Advertising Fund on the same basis as you. If the Advertising Fund Contribution rate for the System is reduced at any time, we will have the right to reduce Advertising Fund Contributions from company-owned locations to the rate specified for franchisees.

We have not yet established an Advertising Fund fees, therefore, no funds have been collected as of the date of this disclosure document.

Once established, we will make an unaudited annual account available to you once a year upon request within one hundred twenty (120) days after our fiscal year ends.

If we establish an Advertising Fund, it will be intended to be of perpetual duration, however, we may terminate the Advertising Fund at any time. The Advertising Fund will not be terminated, however, until all monies in the Advertising Fund have been expended or returned to contributing Molly Tea Stores (whether franchised or operated by us or our affiliates), without interest, on the basis of their respective contributions. We will have no fiduciary duty with respect to Advertising Fund proceeds and are administering these funds as an accommodation to franchisees and the System only.

We reserve the right to structure the Advertising Fund's organization and administration in ways that, in our judgment, most effectively and efficiently accomplish the Advertising Fund's objectives. We

may therefore organize or reorganize the Advertising Fund as a separate non-profit corporation or other appropriate entity and transfer the Advertising Fund's assets to the entity to administer the Advertising Fund. You must become a member of the entity and, in that regard, sign a participation agreement and take such other steps as we reasonably specify.

If our designee maintains or administers the Advertising Fund, neither we nor our officers, directors, employees or agents will be liable to you for any act, error or omission committed by such designee or in connection with the designation of such designee(s). We will have no fiduciary duty with respect to Advertising Fund proceeds and are administering these funds as an accommodation to franchisees and the System only.

The Advertising Fund will be no more than two percent (2%) of Gross Sales of the Molly Tea Store and will be uniformly applied.

Except as described above, neither we nor any affiliate receives payment or provides goods or services to the Advertising Fund.

See Item 6 for additional information concerning the Advertising Fund.

Advertising Cooperative

We will have the right, in our discretion, to designate any geographic area as a region for purposes of establishing an advertising and promotion cooperative ("*Advertising Cooperative*") and to determine whether your Molly Tea Store is required to participate in an Advertising Cooperative. If an Advertising Cooperative applicable to your Molly Tea Store is established at any later time during the term of the Franchise Agreement, you must become a member of the Advertising Cooperative immediately upon our request. As of the date of this Disclosure Document, no Advertising Cooperative has been established; therefore, the amount of contribution to the Advertising Cooperative has not been determined. The Advertising Cooperative will designate the amount of contribution to the Advertising Cooperative by each Molly Tea Store. An Advertising Cooperative will be composed of any two (2) or more Molly Tea Stores, whether the Molly Tea Store are operated by us, you or other franchisees. If an Advertising Cooperative has been established for the geographic area in which your Molly Tea Store is located at the time you start your business, you must immediately become a member of the Advertising Cooperative. If your Molly Tea Store is within the geographic area of more than one Advertising Cooperative, you must be a member of only one Advertising Cooperative, as we designate.

Except as otherwise indicated, each of the programs described above may place advertising in print, radio, television or in electronic media. The source of advertising may be our in-house advertising department, or a regional or national advertising agency.

We are not required to spend any amount on advertising in the area where you are located.

Neither the Advertising Fund nor any Advertising Cooperative will expend funds for advertising that principally is a solicitation for the sale of a franchise. However, we may advertise on the website that franchises are available or make other similar statements on the website.

See Items 6, 8, and 9.

Point of Sales Systems and Computer Systems

Before the commencement of the operation of your Molly Tea Store, you must purchase and install at your expense the required computer hardware, software, internet connections and service, required dedicated telephone and power lines and other related accessories, peripherals, consoles and equipment required to operate our then-current mandatory credit card processing and/or point of sale system, each with the capacity and capability required to operate your Molly Tea Store in accordance with the Systems Standards and as set forth in the Operating Manual.

We may require you to purchase, license and use credit card processing and/or point of sale systems, operations, on-line booking, back office, accounting, customer service, loyalty program processing and other hardware and software in the operation of your Molly Tea Store, including additions, upgrades, enhancements and replacements of the current software and hardware (including point of sale systems). Some or all of these may be developed, supplied or licensed by or on behalf of us or an affiliate, at such cost as we or our approved vendors make such systems, hardware, software, upgrades, enhancements and replacements available to franchisees. We have the right to require new, replacement or upgraded hardware and software (including, without limitation, the point-of-sale system) at any time, which must be purchased and be in operation by you at the Molly Tea Store within sixty (60) days of notice of such requirement (or such other date as required by us).

We require that our franchisees use a specific point of sale/credit card processing system(s) including Resto and Chowbus. We may change the required point-of-sale systems and IT systems, from time to time, in our discretion. The point of sale/credit card processing system(s) and IT systems are available from our approved supplier set forth in the Operating Manual.

Your point-of-sale system is critical to the day-to-day operations and management of your franchise. The system will help to track, manage and analyze the key areas of operations – employee management, inventory management, payment processing, client management, reporting and automated marketing. We require that your Molly Tea Store maintain one point of sale terminal.

We require that you implement and use a reporting system as approved by us and may also require you to purchase and maintain remote servers, off-site electronic repositories and broadband or other high speed Internet connections. You may be required to pay a software license fee for some or all software we require you to use. You must acquire, install, and maintain such anti-virus and anti-spyware software as we require and must comply with such data security and consumer privacy policies as we may prescribe from time to time as set forth in the Operating Manual.

We estimate the initial cost of purchasing all required computer hardware and software systems to be approximately $5,000 depending on the equipment chosen. You must maintain, upgrade, update, and/or replace the point-of-sale systems and other required technology and keep them in good repair at your sole cost. The cost of maintaining, updating, upgrading or replacing your point-of-sale system, and other required technology cannot be estimated at this time because it will depend on your repair history, local costs of computer maintenance and service in your area and technological advances which we cannot predict.

The point-of-sale system will store information concerning your sales, inventory, accounting and other operations. You may not further modify or manipulate (except for pricing) the database for the computer software systems without our prior consent. We will have independent access, or will require the supplier to give us access, to review and retrieve from your point-of-sale system and other technology any and all information we consider necessary, desirable or appropriate. There is no contractual limitation on our right to access information from your point-of-sale system or other required technology. If necessary,

we may utilize remote access to provide required upgrades and installation of hardware your point-of-sale system.  You will have independent access to the information that will be generated or stored in the point of sale and reporting system, but you may not manipulate the data that is generated or block or restrict our access to the data.  (Franchise Agreement – Sections 8 and 11).

You must enter into all software license agreements, "terms of use" agreements, and software maintenance agreements, in the form and manner prescribed by our approved vendors, and pay all fees imposed under the agreements.  (Franchise Agreement – Sections 8 and 11).

Operating Manual

The table of contents of our current Operating Manual is attached to this Disclosure Document as Exhibit C.

There are a total of 189 pages in the Operating Manual.  We do not offer you the opportunity to view the Operating Manual before signing the Franchise Agreement.

Training Program

No later than four weeks before the opening of the Molly Tea Store, you or your Operating Principal and your manager must attend and complete, to our satisfaction, initial training conducted by us.  You may, at your option and expense, send additional employees to our initial training.  All subsequent personnel employed by you in the position of manager, before assuming the position, must attend and successfully complete our initial training.  We may periodically make other required or optional training available to your employees, as well as other programs, seminars and materials, and you must ensure that all employees, as we may direct, satisfactorily complete any required training within the time specified.  All training will be provided at a location we designate, and you will be responsible for your employees' room, board and travel expenses and wages during the training.  Other than the training fee we charge for the initial training for you or your Operating Principal and your Molly Tea Store's initial manager, we reserve the right to charge a reasonable fee to you for training, seminars and materials, whether required or optional.  We may require that, as a condition of providing training, your manager and employees sign confidentiality and non-competition agreements approved by us.  We may control the frequency of any optional training.  If you renew your Franchise Agreement, we will not provide additional training to you.

The initial training program will consist of an initial seven (7) day training program at our corporate office and/or business location in Room 311, 3F, building 2, Baoyi Creative Park, Xin'an street, Bao'an District, Shenzhen, or such other location as we may designate, such as  and twenty (20) day on location training at Molly Milk Tea store in Qinchengda and Kexing Science Park, China.  We may provide (as determined in our sole discretion) on-site training at your Molly Tea Store in conjunction with the grand opening of your Molly Tea Store after the training at our corporate office at no cost to you, except reimbursement of our costs of travel, lodging and meals.  The training program will be conducted as needed throughout the year by us under the supervision of qualified personnel including managers, supervisors, and consultants who are familiar with the operations of the business.

We will determine whether you or your Operating Principal and your manager have satisfactorily completed initial training. If any of your designated participants fail to meet the admission requirements for the initial training program, if the initial training program is not satisfactorily completed by your trainees after meeting the admission requirements, or if we, in our reasonable business judgment based upon the performance of your trainees, determine that the initial training program cannot be satisfactorily completed by such person(s), you must immediately designate a replacement trainee(s), as applicable, to apply for and complete such training before the opening date of your Molly Tea Store. We reserve the right to charge you

a training fee for training any additional or replacement management personnel.  (Franchise Agreement – Section 7).

If you fail to designate replacement trainee(s) who have satisfied the admission requirements, if the initial training program is not satisfactorily completed by any replacement trainee (or the initial trainee, if no replacement is designated) by the deadline set forth above, or if we determine that the training program cannot be satisfactorily completed by such person(s), and you fail to satisfy the initial training program requirements within thirty (30) days following notice from us, we may, at our sole option, delay the opening of your Molly Tea Store or terminate the Franchise Agreement upon notice to you and retain the initial franchise fee and any other fees paid by you under the Franchise Agreement. (Franchise Agreement – Section 7).

Your management personnel may attend such additional or remedial training programs and seminars as we may offer. We may require that certain of your management personnel complete such additional training (including on-site remedial training). For all such training, we will provide the instructors and training materials; however, we reserve the right to impose a reasonable fee for such training, including costs of travel, lodging, meals and compensation for our representatives. You are responsible for any and all expenses incurred by you or your trainees in connection with such additional training including the costs of travel, lodging, meals, and wages. (Franchise Agreement – Section 7).

The subjects in the initial training program are described below:

### TRAINING PROGRAM

| Subject | Hours of Classroom Training | Hours of On-the-Job Training | Location |
|---|---|---|---|
| Standard Operating Procedure Theoretical Training | 40 hours | 40 hours | Room 311, 3F, building 2, Baoyi Creative Park, Xin'an street, Bao'an District, Shenzhen |
| Management and Sales Techniques | 8 hours | 8 hours | Room 311, 3F, building 2, Baoyi Creative Park, Xin'an street, Bao'an District, Shenzhen |
| Employee Management | 8 hours | 8 hours | Room 311, 3F, building 2, Baoyi Creative Park, Xin'an street, Bao'an District, Shenzhen |
| Back Office Lessons | 56 hours | 4 hours | Room 311, 3F, building 2, Baoyi Creative Park, Xin'an street, Bao'an District, Shenzhen |
| Practical Operation of Posts. | | 120 hours | at the Molly Milk Tea store in Qinchengda and Kexing Science Park, China |
| Software Training | | 4 hours | at the Molly Milk Tea store in Qinchengda and Kexing Science Park, China |

| Subject | Hours of Classroom Training | Hours of On-the-Job Training | Location |
|---|---|---|---|
| Operations Setup | | 8 hours | at the Molly Milk Tea store in Qinchengda and Kexing Science Park, China |
| Operations | | 8 hours | at the Molly Milk Tea store in Qinchengda and Kexing Science Park, China |
| Support and etc | | 8 hours | at the Molly Milk Tea store in Qinchengda and Kexing Science Park, China |
| **Total Hours:** | **56 hours** | **160 of hours** | **216 Hours** |

## Item 12

## TERRITORY

Franchise Agreement

Your Franchise Agreement will grant you certain limited rights with respect to a specific Territory. That Territory will be identified on an attachment to the Franchise Agreement. You will not receive an exclusive territory. You may face competition from other franchisees, from Molly Tea Stores that we own, or from other channels of distribution or competitive brands that we control.

The Territory will be identified on an attachment to the Franchise Agreement. We will agree not to grant another franchise, open a company and/or affiliate-owned restaurant or permit any Molly Tea Store, whether owned by a franchisee, us or an affiliate to solicit sales within your Territory during the term of your Franchise Agreement, except to the extent that an advertisement, marketing promotion or web promotion may include publication within your Territory.

The Territory may be located within specific zip codes, counties or other natural boundaries. Your Territory may be based in part on population density, number of restaurants within the Territory, current and projected market demand, potential customer base, the population base, growth trends of population, demographics of the surrounding area, apparent degree of affluence of population, access and visibility, the density of residential and business entities, traffic patterns and other economic, demographic and geographic factors determined by us in our sole discretion. We will assign you a Territory as we deem appropriate for your Franchised Business in our sole discretion. The minimum Territory granted to a franchisee may be the franchisee's business location with no corresponding geographic protection. If the Territory has not been designated when you sign the Franchise Agreement, we will designate a Territory shortly thereafter and a Territory Attachment will be attached at that time. Other than the right to develop a franchised business in the Territory, you will not be granted any other right with respect to the Territory, including but not limited to the right to sell products through alternative channels of distribution or develop franchised businesses in non-traditional locations (defined below). If we develop alternative channels of distribution, we do not guarantee that those alternative channels of distribution will be offered as franchises and we are not obligated to offer to you the right to sell products or services through any alternative channels of distribution.

Your use of the Marks or any other element of the System in the operation of a business at any other location or in any other channel of distribution without our express written authorization will constitute willful infringement of our rights. Within thirty (30) days after you have signed the Franchise Agreement, you must have obtained, and we must have approved, a location for your Molly Tea Store. You must lease or acquire a location, subject to our approval, as provided in the Franchise Agreement.

Your rights to the Territory do not depend upon achieving a certain sales volume, market penetration or contingency other than compliance with the Franchise Agreement.

We retain all rights not expressly granted under the Franchise Agreement. Specifically, we may (or may authorize an affiliate or other third party to) conduct, among other things, the following activities:

     x.     Advertise and promote sales of our products at any location, including within the Territory;

     xi.     Develop, own, establish, acquire, promote and/or operate and grant others the right to develop, own, establish, acquire, promote and/or operate a Molly Tea Store anywhere outside of the Territory, regardless of proximity or financial impact to your Molly Tea Store;

     xii.     Except for the restriction against establishing another Molly Tea Store in the Territory, offer and sell, and grant others the right to offer and sell, private label or other collateral products, including those offered and sold at Molly Tea Store under the Marks or other marks at any location or through any channel of distribution (including, but not limited to, hotels, motels, resorts, club stores, wholesale, health care facilities, business or industry locations, military installations, military commissaries, the Internet (or any other existing or future form of electronic commerce) anywhere inside or outside of the Territory, regardless of proximity or financial impact to your Molly Tea Store;

     xiii.     Operate one or more sites on the Internet that advertise a Molly Tea Store or sell our products or services anywhere inside or outside the Territory;

     xiv.     Develop, own, acquire, establish and/or operate and grant others the right to develop, own and operate other methods and channels of distribution utilizing the Marks and the System, whether inside or outside of the Territory, including, without limitation, using toll-free telephone numbers, domain names, URLs, on-line computer networks and services, kiosks, carts, concessions, satellite units, other mobile, remote, limited services or non-permanent facilities or other retail operations as a part of larger retail venues such as department stores, supermarkets or in public areas such as amusement parks, airports, train stations, public facilities, college and school campuses, arenas, stadiums, hospitals, office buildings, convention centers, airlines (in-flight service) and military bases or at special events, such as sporting events, conventions or concerts; and

     xv.     Purchase, merge, or acquire any business, or be acquired by or sell our assets or equity interests to, any business which sells products and/or services, whether or not such products or services are the same or similar to our products or services and whether or not it is competitive with any franchisee, Molly Tea Store or the System, inside or outside the Territory.

We are not required to and will not compensate you in any way for offering or selling in your Territory any of the products or services described in (a)-(f) above or soliciting or accepting orders in the Territory.

You may solicit or accept orders outside the Territory provided you only use the System and the methods of advertising we require.  No other channels of distribution may be used.

You may not use other alternative channels of distribution, including the Internet, catalog sales, telemarketing or other direct marketing, to make sales outside the Territory.

You may not relocate the Franchised Business without our prior written consent. We consider the following factors in approving your relocation: if you are in compliance with the Franchise Agreement; you have paid all monies to us and our affiliates; the proposed location meets our site selection criteria; and you comply with our lease requirements.

To maintain your Territory you must continue to meet the requirements of the Franchise Agreement.  There are no specific financial performance requirements imposed upon you to maintain your Territory.

You are not granted any options, rights of first-refusal or similar rights to acquire additional franchises within the Territory or contiguous territories.

## Development Agreement

The Development Agreement grants you the right to establish and operate multiple Molly Tea Stores under separate Franchise Agreements within a defined development area (the "***Development Area***") and according to a specific development schedule (the "***Development Schedule***").

So long as you comply with the Development Agreement, any Franchise Agreement and any other agreement we have with you, we will not, without your prior written consent, establish or operate nor grant anyone other than you the right to establish or operate a Molly Tea Store which is physically located in the Development Area during the term of the Development Agreement.  You will not receive an exclusive territory. You may face competition from other franchisees, from Molly Tea Stores that we own, or from other channels of distribution or competitive brands that we control.

Your rights within the Development Area do not depend upon achieving a certain sales volume, market penetration or contingency other than compliance with the Development Agreement.  We retain all other rights not expressly granted under the Development Agreement. We, our affiliates, and their respective franchisees and licensees may, among other things, operate other types of facilities besides Molly Tea Stores in the Development Area, including facilities that are identified by some or all of the Marks. We may also (or may authorize a third party to), among other things, conduct the following activities:

(a)     Advertise and promote sales of our products and services or a Molly Tea Store, at any location, including within the Development Area;

(b)     Develop, own, establish, acquire, promote and/or operate and grant others the right to develop, own, establish, acquire, promote and/or operate a Molly Tea Store anywhere outside of the Development Area, regardless of proximity or financial impact to any Molly Tea Store in the Development Area;

(c)     Develop, own, establish, acquire, promote and/or operate and grant others the right to develop, own, establish, acquire, promote and/or operate a business (i) not using the System and/or (ii) which offers and sells, private label or other collateral products, including those offered and sold at Molly Tea Store under the Marks or other marks at any location or through any channel of distribution (including, but not limited to, hotels, motels, resorts, club stores, wholesale, health care facilities, business

or industry locations, military installations, military commissaries, the Internet (or any other existing or future form of electronic commerce) anywhere inside or outside of the Development Area, regardless of proximity or financial impact to any Molly Tea Store;

(d)    Operate one or more sites on the Internet that advertises a Molly Tea Store or sells our products and services anywhere inside or outside the Development Area;

(e)    Develop, own, acquire, establish and/or operate and grant others the right to develop, own and operate other methods and channels of distribution utilizing the Marks and the System, whether inside or outside of the Development Area, including, without limitation, using toll-free telephone numbers, domain names, URLs, on-line computer networks and services, kiosks, carts, concessions, satellite units, other mobile, remote, limited services or non-permanent facilities or other retail operations as a part of larger retail venues such as department stores, supermarkets, shopping malls or in public areas such as amusement parks, airports, train stations, public facilities, college and school campuses, arenas, stadiums, hospitals, office buildings, convention centers, airlines (in-flight service) and military bases or at special events, such as sporting events, conventions or concerts; and

(f)    Purchase, merge, or acquire any business, or be acquired by or sell our assets or equity interests to, any business which sells products and/or services, whether or not such products are the same or similar to our products and whether or not it is competitive with any developer, Molly Tea Store or the System, inside or outside the Development Area.

If you fail to comply with the Development Schedule, we may, among other things, (i) terminate the Development Agreement, (ii) modify your Development Area rights including but not limited to terminating any protection right or granting protection to the Area to another party; (iii) re-designate the boundaries of the Development Area; (iv) reduce the number of franchised businesses you may establish; (v) permit you to extend the Development Schedule; (vi) terminate or modify any right of first refusal we grant you; or (vii) pursue any other remedy we may have at law or in equity including but not limited to a suit for non-performance. If we reduce the number of Molly Tea Stores that you were given the right to develop, or terminate or reduce the Development Area granted to you, you must continue to sign Franchise Agreements under the amended Development Schedule.  We will also be entitled to establish, and license others to establish, Molly Tea Stores under the System in the Development Area or in the portion no longer part of the Development Area, or according to any other modifications of your territorial exclusivity (except as provided under any Franchise Agreement which has been signed by you and us and which remains in full force and effect).  You do not have any options, rights of first refusal or similar rights to acquire additional franchises under the Development Agreement.

### Item 13

### TRADEMARKS

The Franchise Agreement grants you the right to establish and operate your Molly Tea Store at an approved location under the Marks.  The Development Agreement does not grant you any right to use the Marks, but you will be granted this right under Franchise Agreements signed under the Development Agreement.

Our affiliate, Shenzhen Molly Tea Food and Beverage Management Co., Ltd. owns and has registered (or is in the process of registering) with the Principal Register of the United States Patent and Trademark Office, the Marks listed below.  Our rights to the Marks are derived from a nonexclusive 10-year automatic renewable license agreement ("Intercompany License") between us and our affiliate.  The Intercompany License grants us the right to use the Marks, including without limitation, for the purpose of

Docusign Envelope ID: EEECDDA2-E407-4D86-852B-EF55B78422C4

licensing them to our franchisees and fulfilling our obligations under the Franchise Agreement. The Intercompany License is terminable only for material breach of the Intercompany License and only if we do not cure or begin to cure the breach within ninety (90) days after notice. We know of no other agreements currently in effect which significantly limit our rights to use or license the use of the Marks in any manner material to you. Shenzhen Molly Tea Food and Beverage Management Co., Ltd. has licensed others to use the Marks.

| **Pending Marks** | **Serial Number** | **Filing Date** |
|---|---|---|
| Molly Tea ｜ 茉莉奶白 | 98360430 | January 17, 2024 |
| Molly Tea ｜ 茉莉奶白 | 98360425 | January 17, 2024 |

WE DO NOT HAVE A FEDERAL REGISTRATION FOR OUR PRINCIPAL TRADEMARK. THEREFORE, OUR TRADEMARK DOES NOT HAVE MANY LEGAL BENEFITS AND RIGHTS AS A FEDERALLY-REGISTERED TRADEMARK. IF OUR RIGHT TO USE THE TRADEMARK IS CHALLENGED, YOU MAY HAVE TO CHANGE TO AN ALTERNATIVE TRADEMARK, WHICH MAY INCREASE YOUR EXPENSES.

We or our licensor have filed all required affidavits. Affidavits of use for certain trademarks and service marks have not been filed because they are not yet due. We or our licensor claim common law rights to the Marks.

The Marks have not registered in any state.

There are no currently effective determinations of the United States Patent and Trademark Office, the Trademark Trial and Appeal Board, the trademark administrator of any state or any court, and no pending interference, opposition or cancellation proceedings or litigation of a material nature involving the Marks relevant to their use in any state.

We know of no prior superior rights or infringing uses that could materially affect your use of the Marks; however, we have not conducted an exhaustive search of users of names which may be the same or similar to the Marks. Although we are not aware of anyone other than us or our affiliates, licensees or franchisees who are using "Molly Tea," as a trademark or service mark, it is possible that the name "Molly Tea" has been used by others in the business; and we cannot represent with certainty that we have exclusive or superior rights to the name "Molly Tea" in all geographic areas. There may be similar uses to our Marks of which we are unaware, which could arise from prior users.

We will defend you against any third-party claim, suit or demand arising out of your authorized use of the Marks pursuant to the Franchise Agreement. You must provide any assistance in the litigation that our counsel requires. If we determine in our sole discretion, that you have not used the Marks in accordance with the Franchise Agreement, we are not obligated to participate in your defense and/or indemnify you for expenses or damages if you are a party to an administrative or judicial proceeding involving the Marks or if the proceeding is resolved unfavorably to you.

From time to time, we may become aware of businesses or other establishments that are making unauthorized and infringing use of one or more of the Marks. We retain the right to take or not take any

action against infringers as we deem appropriate to the circumstances.  There are no infringers that we actually know of that could materially affect your use of the Marks in any state.

You must promptly notify us of any infringement of the Marks or of any challenge to the use of any of the Marks or claim by any person of any rights in any of the Marks. You and your Principals must agree not to communicate with any person other than us, any designated affiliate, and our or their counsel about any infringement, challenge or claim. We or our affiliates have sole discretion to take any action we deem appropriate and the right to exclusively control any litigation or U.S. Patent and Trademark Office (or other) proceeding from any infringement, challenge, or claim concerning any of the Marks.  You must sign all instruments and documents and give us any assistance that, in our counsel's opinion, may be necessary or advisable to protect and maintain our interests or those of our affiliates in any litigation or proceeding or to otherwise protect and maintain our or their interest in the Marks.

You must neither, directly nor indirectly, infringe, contest nor otherwise impair our exclusive ownership of, and/or license, with respect to the Marks either during or after the termination or expiration of the Franchise Agreement.

You may use only the Marks that we designate, must use them only in the manner that we authorize and permit, and must use them with the symbols, "®", "™", or "SM", as appropriate.  You may use the Marks only in connection with the operation and promotion of your Molly Tea Store(s), and only in the manner we prescribe in the Franchise Agreement or otherwise by written notification from us. You may not use any of the Marks as part of your corporate or other name.  You must also follow our instructions for identifying yourself as a franchisee and for filing and maintaining the requisite trade name or fictitious name registrations.  You must sign any documents we or our counsel determine are necessary to obtain protection for the Marks or to maintain their continued validity and enforceability.  Neither you nor your Principals may take any action that would prejudice or interfere with the validity of our rights with respect to the Marks and may not contest the validity of our interest in the Marks or assist others to do so.

You may not use the Marks or any part or derivative of the Marks on the Internet, except as expressly permitted by us in writing.  This prohibition includes use of the Marks, or any derivative of the Marks, as part of any URL or domain name, including but not limited to, any gaming website, social networking website, mobile application or marketing/discounting website; as part of any username, or as part of any email address unless expressly approved by us in writing.

We have the right to substitute different trade names, service marks, trademarks and indicia of origin for the Marks if the Marks can no longer be used, or if we determine that the substitution will be beneficial to the System.  If we do, we may require you to discontinue or modify your use of any Mark or use one or more additional or substitute Marks at your expense.

Except for the non-exclusive license to use granted in the Franchise Agreement, you and your Principals acquire no right, title or interest in (or any goodwill associated with) the System or the Marks.

Upon the expiration or termination of the Franchise Agreement, no monetary amount will be assigned as attributable to any goodwill associated with your use of the System or the Marks, and all goodwill associated with your use of the System and the Marks will inure to our or our affiliates' benefit.

The license to use the Marks is nonexclusive, and we have the right (i) to grant other franchises for the Marks, in addition to those franchises already granted to existing franchisees, (ii) to use the Marks in connection with the sale of products and services through the Internet or at wholesale and/or retail outlets in the Territory, and (iii) to develop and establish other systems for the same or similar products and services

utilizing the same Marks, or any similar or other Marks, and to grant licenses thereto without providing you any right.

## Item 14

### PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION

Patents

We own no rights in or to any patents nor do we have any pending patents to be registered on the Principal Register of the United States Patent and Trademark Office or that are material to the franchise.

Copyrights

The Franchise Agreement grants you the right to use our copyrights in certain components of the System. We do claim copyright protection and proprietary rights in the original materials used in the System, including our Operating Manual, bulletins, correspondence and communications with our franchisees, training, advertising and promotional materials, and other written materials relating to the operation of the System. We have not registered any of our copyrights. We have no pending copyright applications.

There are no currently effective determinations with the United States Patent and Trademark Office, the U.S. Copyright Office, the Library of Congress or any court pertaining to or affecting any of our copyrights. As of the date of this Disclosure Document, there are no infringing uses actually known to us that could materially affect your use of the copyrights. There are no agreements currently in effect that significantly limit our rights to your use and/or license of our copyrights.

Your and our obligations to protect your rights to use our copyrights are the same as the obligations for the Marks in Item 13.

Confidential Information

"***Confidential Information***" means all proprietary and confidential information relating to the development and operation of Molly Tea Stores, including, without limitation, all information, knowledge, know-how, trade secrets, methodologies, techniques, procedures, applications, research and materials, in whatever form, used in or related to the System and the operation of a Molly Tea Store, either in writing, orally or in electronic format, which we provide to you, or which you or your affiliates or your respective employees develop or have access to, in connection with the Franchise Agreement or the development and operation of your Molly Tea Store thereunder, including, without limitation, any products and services; product sourcing, manufacturing, inventory management and control, supply and distribution standards and procedures; pricing; standards for site selection, general contractors, architects, architectural and construction plans, and trade dress (i.e. the unique, distinctive, and non-functional overall appearance and image of your Molly Tea Store in the marketplace, including our standards related thereto); technology, point of sale and related computer software; advertising, marketing and promotional programs including any gift card, loyalty and customer reward programs; the Operating Manual; recipes and formulas; customer lists; pricing data; financial data and statements; training and management programs; product ordering and sales data; and Customer Data, and any other information or data regarding our or any of our affiliates' business that would reasonably be considered the proprietary or Confidential Information of ours or our affiliates, however learned or received. Confidential Information includes, but is not limited to, information (i) designated as confidential, (ii) known by a franchisee to be considered confidential by us, or (iii) by its nature inherently or reasonably to be considered confidential. "***Customer Data***" includes any personally

identifiable information, such as a person's or entity's name, address, phone number, fax number, email address, passport number, financial profile, credit card information or any other information by which one is reasonably able to personally identify one or more persons or entities.

Except as expressly provided in the Franchise Agreement, you have no right, title or interest in our Confidential Information.

You and your Principals must maintain the confidentiality of all Confidential Information and only communicate, disclose or use the Confidential Information as expressly permitted in such agreements or as required by law.  You and your Principals may disclose the Confidential Information only to such of your employees, agents or independent contractors who must have access to it in connection with their employment.

You must cause your employees having access to the Confidential Information to sign confidentiality agreements containing the covenants set forth in the Franchise Agreement stating that they will preserve in confidence all Confidential Information.  Neither you, your Principals or their respective employees may at any time, without our prior written consent, copy, duplicate, record or otherwise reproduce the Confidential Information, in whole or in part, nor otherwise make it available to any unauthorized person.

If you make any improvements (as determined by us) to the Confidential Information or the System, you and your Principals must each sign such documents reflecting such improvements and our exclusive ownership thereof.  All such improvements will be considered Confidential Information.

There are no infringing uses actually known to us that could materially affect your use of the Confidential Information.  There are no agreements currently in effect which could limit our rights to use or license the Confidential Information in any manner.

The Operating Manual (i) must at all times be kept in a secure place on the premises of your Molly Tea Store and (ii) remains our sole property.  You and your Principals must at all times ensure that your copy of the Operating Manual is kept current and up-to-date, and in the event of any dispute as to the contents of the Operating Manual, the terms of the version of the Operating Manual maintained by us at our home office will be controlling.  Every detail of your Molly Tea Store is important to you, us and other franchisees in order to develop and maintain the high standards and public image of the System, to increase the demand for the products and services sold by all Molly Tea Store and to protect our reputation and goodwill.  As such, you must operate your Molly Tea Store in accordance with the Operating Manual to ensure that the highest degree of quality and service is uniformly maintained.  If amended or modified by us, you must fully implement our amended Operating Manual within the period of time prescribed by us.

### Item 15
### OBLIGATION TO PARTICIPATE IN THE
### ACTUAL OPERATION OF THE FRANCHISE BUSINESS

Under the Franchise Agreement, your or your Operating Principal or a fully-trained manager must devote his or her full time and best efforts to the management of your Molly Tea Store.  Under the Franchise Agreement, you or your Operating Principal are not required to devote your full time to your Molly Tea Store if you have a fully-trained manager who will devote his/her full time to the management of the Molly Tea Store. We recommend that either you or your manager always supervise your Molly Tea Store. The manager may be any person qualified and experienced to manage a Molly Tea Store and must satisfactorily complete the required initial training program. The manager must have an equity interest  or a profit interest

of not less than ten percent (10%) in you (if the Franchisee is an entity) or in your Molly Tea Store. You and your principals will jointly and severally guaranty the performance of your obligations, covenants, and agreements under the Franchise Agreement and the Guaranty and Undertaking of Obligations attached as Exhibit G.

You or your Operating Principal or your manager must attend all meetings requested by us relating to new products or services, new operational procedures or programs, training, management, sales or sales promotion or similar topics, at your own expense. If you are a legal entity, the Operating Principal will be deemed to have decision-making authority on behalf of you and will be primarily responsible for your operation of the franchise.

The manager and any other of your employees having access to Confidential Information or other materials or information furnished or disclosed to you by us (including all managers, assistant managers, and directors of operations) must sign a form of confidentiality and non-competition agreement approved by us. The confidentiality and non-compete provisions of the Franchise Agreement and in the form of agreement to be signed by your employees may prohibit, among other things (i) disclosure of any information that we designate as confidential and (ii) competition with other Molly Tea Stores in the System for two (2) years after expiration, termination or the approved transfer of the Franchise Agreement, and require return of any information that we designate as confidential.

Your Principals will jointly and severally bound by all your obligations and guarantee your performance under the Franchise Agreement and must sign a Guaranty and Undertaking of Obligations.

## Item 16
## RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You may sell or offer for sale only those services and products which meet our uniform standards of quality and quantity, which we have expressly approved in writing. These are described in the Operating Manual. You must sell or offer for sale all approved services and products, refrain from any deviation from our standards and specifications for selling them without our prior written consent, and must discontinue selling and offering for sale any product or service as we may, in our discretion, disapprove in writing at any time. You may not offer and sell any products and/or services that we have not specifically authorized. You will not engage in any activities that divert any business or customers to non-affiliated locations, including those owned by you.

We may periodically eliminate certain products and/or services, or add additional products and/or services, in either case in our sole discretion and without the necessity of further notice to you. We have the right to change the types of authorized goods and services in our sole discretion and there is no limit on our right to change the types of authorized goods and services. These changes in the types of authorized goods and services may result in higher costs to you in the operation of your business.

You must open and operate the Molly Tea Store during the hours we specify in the Operating Manual or otherwise in writing.

You must participate in all market research programs that we require, which includes test-marketing new products and services, purchasing a reasonable quantity of new products for test-marketing, promoting the sale of the new products and services. You must provide us with timely reports and test results for all such programs.

You may not advertise, promote, post or list information relating to the Molly Tea Store on the Internet or mobile application (through the creation of a website, social media accounts or otherwise), without our prior written consent.

You may not offer the products and services from any location other than your Molly Tea Store.

From time-to-time, we may choose to test new products, sales strategies, equipment, programs, services or other elements of our intellectual property. Upon such an occurrence, you will be required to participate in any testing, at our request, and may also be required to make capital expenditures and incur operating and other costs as part of their participation in the test. We are not obligated to reimburse you for those expenditures. You may be required to maintain records and submit reports to us, as part of the test, in a timely manner.

You will not use the premises for the sale or displaying of any items that promote illegal activity or any other product or service that we decide in our sole discretion may offend an appreciable segment of the public or may adversely affect the public's acceptance, favorable reputation or extensive goodwill associated with the Molly Tea name, brands and Marks.

## Item 17

## RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION

This table lists certain important provisions of the Franchise Agreement and other related agreements.  You should read these provisions in the agreements attached to this Disclosure Document.

## THE FRANCHISE RELATIONSHIP

| Provision | Section in Franchise or Other Agreement | Summary |
|---|---|---|
| a. Length of the franchise term. | Section 3 of the Franchise Agreement.  Section 2 of the Development Agreement. | Initial term of the Franchise Agreement is one (1) year. |
| b. Renewal or extension of the term. | Section 3 of the Franchise Agreement.  Section 2 of the Development Agreement. | Indefinite successive periods of one (1) year each upon mutual agreement.  If you renew, the terms may differ from those rights contained in your existing franchise agreement. |
| c. Requirements for franchisee to renew or extend. | Section 3 of the Franchise Agreement. | The term "renew" means that you continue to operate your Molly Tea Store at the existing location for an additional three years provided, in part, that you are in good standing and have met the renewal conditions, you have given proper notice, you modernize, sign our then-current form of franchise agreement which may contain materially different terms from the original franchise agreement and pay a fee. |
| d. Termination by franchisee. | Not Applicable. | Not applicable. |
| e. Termination by franchisor without cause. | Not Applicable. | Not applicable. |
| f. Termination by franchisor with cause. | Section 19 of the Franchise Agreement. Section 12 of the Development Agreement. | We can terminate the Franchise Agreement or Development Agreement only if you default in the performance of your obligations. The Franchise Agreement and the Development |

| Provision | Section in Franchise or Other Agreement | Summary |
|---|---|---|
| | | Agreement provide for cross default provisions upon a breach of such Agreement. |
| g. "Cause" defined – curable defaults. | Section 19(d) of the Franchise Agreement.  Section 12 of the Development Agreement. | Under the Franchise Agreement, you have five days to cure a monetary default.  You have five business days to cure a default relating to food, health and safety issues.  You have thirty (30) days to cure all other defaults which can be cured under the Franchise Agreement.  Under the Development Agreement you have thirty (30) days to cure certain defaults. |
| h. "Cause" defined – noncurable defaults. | Sections 19(b), (c) and (d) of the Franchise Agreement.  Section 12 of the Development Agreement. | Includes your bankruptcy; appointment of a receiver for the Molly Tea Store; assignment for the benefit of creditors; three or more defaults within a consecutive 12-month period; failure to acquire Premises within the required time period; if you are convicted of or plead no contest to a felony or other unlawful act; breaches of competition, non-solicitation and confidentiality covenants; your misrepresentations or omissions; a loss of possession or control of the Premises; violation of transfer restrictions; libel or defamation of us; cessation of operations for more than two consecutive days; cross-termination; engaging in any act which is likely to materially and unfavorably affect the System or the Marks, including, without limitation, any damage to or disparagement of our brand or reputation; or any other breach of Franchise Agreement which by its nature cannot be cured. |
| i. Franchisee's obligations on termination/non-renewal. | Section 20 of the Franchise Agreement.  Section 12 of the Development Agreement. | You must pay us past due amounts, stop using our Marks, return our materials, and stop representing that you are still associated with us, and other requirements. |
| j. Assignment of contract by franchisor. | Section 18(a) of the Franchise Agreement.  Section 11 of the Development Agreement. | We have the right to transfer and assign. |
| k. "Transfer" by franchisee – defined. | Section 18(b) of the Franchise Agreement.  Section 11 of the Development Agreement. | Includes transfer of the Franchise Agreement, an ownership interest in you and/or your interest in substantially all of your assets. |
| l. Franchisor approval of transfer by franchisee. | Section 18(b) of the Franchise Agreement.  Section 11 of the Development Agreement. | We have the right to approve all transfers as determined in our sole and absolute discretion. No transfers are permitted without our prior written approval. |
| m. Conditions for franchisor approval of transfer. | Section 18(c) of the Franchise Agreement.  Section 11 of the Development Agreement. | Except as permitted under state law, you must be in good standing.  You must disclose the names of transferee's principals and sign a release.  The proposed transferee must pay a transfer fee, sign |

PAGE 46

| | Provision | Section in Franchise or Other Agreement | Summary |
|---|---|---|---|
| | | | the then-current franchise agreement, sign a personal guaranty and met other conditions. |
| n. | Franchisor's right of first refusal to acquire franchisee's business. | Section 18(d) of the Franchise Agreement. | We have the right of first refusal to purchase some components of your Molly Tea Store.  We have thirty (30) days after receipt of notice of proposed transfer to purchase your business on similar terms. |
| o. | Franchisor's option to purchase franchisee's business. | Section 20(k) of the Franchise Agreement. | We have the right to purchase your business following termination. |
| p. | Death or disability of franchisee. | Section 18(e) of the Franchise Agreement. | Third-party transfer restrictions apply. |
| q. | Non-competition covenants during the term of the franchise. | Section 15 of the Franchise Agreement.  Section 9 of the Development Agreement. | You must not be associated with a competing business to your Molly Tea Store or divert business to any competitor. |
| r. | Non-competition covenants after the franchise is terminated or expires. | Section 15 of the Franchise Agreement.  Section 9 of the Development Agreement. | Applicable for two (2) years after termination, expiration or transfer. |
| s. | Modification of the agreement. | Section 22(n) of the Franchise Agreement.  Section 14(l) of the Development Agreement. | No modification or amendment of the Franchise Agreement will be effective unless it is in writing and signed by both parties. This provision does not limit our right to modify the Operating Manual or System specifications. |
| t. | Integration/merger clause. | Section 22(m) of the Franchise Agreement.  Section 14(k) of the Development Agreement. | Only the terms of the Franchise Agreement, Exhibits and Operating Manual (and if applicable, the Development Agreement) are binding (subject to state law).  Any representations or promises made outside of this franchise disclosure statement and Franchise Agreement may not be enforceable. |
| u. | Dispute resolution by arbitration or mediation. | Section 21 of the Franchise Agreement.  Section 13 of the Development Agreement. | The parties must generally mediate and arbitrate any dispute, except disputes over the Marks and Confidential Information, in New York, New York; we can seek injunctive relief in court. |
| v. | Choice of forum. | Section 21 of the Franchise Agreement.  (See FDD Addendum and State Addendum to these Agreements).  Section 13 of the Development Agreement. | Arbitration in New York, New York and New York County courts. (See FDD Addendum and State Addendums to the Agreements) |
| w. | Choice of law. | Section 21 of the Franchise Agreement.  Section 20(a) of the Development Agreement.  (See FDD Addendum and State Addendum to these Agreements).  Section 13 of the Development Agreement. | The laws of the State of New York govern the Franchise Agreement. However, if the Franchised Business is located outside of New York and a provision of the Franchise Agreement or Development Agreement, as applicable, is not enforceable under the laws of New York but is enforceable under the laws of the state in which the Franchised Business is located, then that provision (and only that provision) will be |

| Provision | Section in Franchise or Other Agreement | Summary |
|---|---|---|
| | | interpreted and construed under the laws of the state where the Franchised Business is located. (See FDD Addendum and State Addendums to the Agreements) |

## Item 18

## PUBLIC FIGURES

We do not pay or use any public figure to promote our franchise. No public figure has invested in us or involved in the management or control of us.

## Item 19
## FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and the information is included in the Disclosure Document. Financial performance information that differs from that included in Item 19 may be given only if: (i) a franchisor provides the actual records of an existing outlet you are considering buying; or (ii) a franchisor supplements the information provided in this Item 19, for example, by providing information about performance at a particular location or under particular circumstances.

We do not make any representations about a franchisee's future financial performance or the past financial performance of company-owned or franchised outlets. We also do not authorize our employees or representatives to make any such representations either orally or in writing. If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet. If you receive any other financial performance information or projections of your future income, you should report it to the Franchisor's management by contacting our Xiao Jie, at (347) 561-4046, or at 6 Kilmer Road, Suite B, Edison, New Jersey 08817, the Federal Trade Commission and the appropriate state regulatory agencies.

## Item 20
## OUTLETS AND FRANCHISEE INFORMATION

## Table 1
## System Wide Outlet Summary
## for fiscal years 2022 to 2024

| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Change |
|---|---|---|---|---|
| Franchised | 2022 | 0 | 0 | 0 |
| | 2023 | 0 | 0 | 0 |
| | 2024 | 0 | 0 | 0 |
| | 2022 | 0 | 0 | 0 |
| | 2023 | 0 | 0 | 0 |

| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Change |
|---|---|---|---|---|
| Company- | 2024 | 0 | 4 | +4 |
| Total Outlets | 2022 | 0 | 0 | 0 |
| | 2023 | 0 | 0 | 0 |
| | 2024 | 0 | 4 | +4 |

**Table 2**
**Transfers of Outlets from Franchisees**
**to New Owners (other than the Franchisor)**
**for years 2022 to 2024**

| State | Year | Number of Transfers |
|---|---|---|
| All States | 2022 | 0 |
| | 2023 | 0 |
| | 2024 | 0 |
| **Totals** | **2022** | **0** |
| | **2023** | **0** |
| | **2024** | **0** |

**Table 3**
**Status of Franchised Outlets**
**For years 2022 to 2024**

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Outlets Reacquired by Franchisee | Ceased Operations | Outlets at End of Year |
|---|---|---|---|---|---|---|---|
| **Totals** | **2022** | **0** | **0** | **0** | **0** | **0** | **0** |
| | **2023** | **0** | **0** | **0** | **0** | **0** | **0** |
| | **2024** | **0** | **0** | **0** | **0** | **0** | **0** |

**Table 4**
**Status of Company-Owned Outlets**
**For years 2022 to 2024**

| State | Year | Outlets at Start of Year | Outlets Opened | Outlets Reacquired From Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of Year |
|---|---|---|---|---|---|---|---|
| California | 2022 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2023 | 0 | 0 | 0 | 0 | 0 | 0 |

| State | Year | Outlets at Start of Year | Outlets Opened | Outlets Reacquired From Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of Year |
|---|---|---|---|---|---|---|---|
|  | 2024 | 0 | 1 | 0 | 0 | 0 | 1 |
| New York | 2022 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2023 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2024 | 0 | 3 | 0 | 0 | 0 | 3 |
| **Totals** | **2022** | **0** | **0** | **0** | **0** | **0** | **0** |
|  | **2023** | **0** | **0** | **0** | **0** | **0** | **0** |
|  | **2024** | **0** | **4** | **0** | **0** | **0** | **4** |

**Table 5**
**Projected Openings**
**as of December 31, 2024**

| State | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlet In the Next Fiscal Year | Projected New Company-Owned Outlet In the Next Fiscal Year |
|---|---|---|---|
| California | 0 | 0 | 2 |
| Colorado | 0 | 1 | 0 |
| Connecticut | 0 | 1 | 0 |
| Florida | 0 | 1 | 2 |
| Georgia | 0 | 0 | 0 |
| Hawaii | 0 | 1 | 0 |
| Illinois | 0 | 1 | 0 |
| Indiana | 0 | 1 | 0 |
| Massachusetts | 0 | 1 | 0 |
| Maryland | 0 | 1 | 0 |
| Michigan | 0 | 1 | 0 |
| Minnesota | 0 | 1 | 0 |
| Nevada | 0 | 1 | 0 |
| New Jersey | 0 | 1 | 1 |
| New York | 0 | 0 | 2 |
| North Carolina | 0 | 1 | 0 |
| Oregon | 0 | 1 | 0 |
| Pennsylvania | 0 | 1 | 0 |
| Rhode Island | 0 | 1 | 0 |
| South Carolina | 0 | 1 | 0 |
| Texas | 0 | 1 | 0 |
| Utah | 0 | 0 | 0 |

| State | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlet In the Next Fiscal Year | Projected New Company-Owned Outlet In the Next Fiscal Year |
|---|---|---|---|
| Virginia | 0 | 1 | 0 |
| Washington | 0 | 1 | 0 |
| Wisconsin | 0 | 1 | 0 |
| **Total:** | 0 | 21 | 7 |

See Exhibit F for a list of current franchisees. No franchisee has had an outlet terminated, cancelled, not renewed or otherwise voluntarily or involuntarily ceased to do business under the Franchise Agreement during the most recently completed fiscal year. No franchisee has not communicated with us within 10 weeks of this Disclosure Document issuance date.

During the last three fiscal years, no current or former franchisees have signed confidentiality clauses that restrict them from discussing with you their experiences as a franchisee in our franchise system.

If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

There are no trademark-specific franchisee organizations that need to be disclosed in this Disclosure Document.

## Item 21

## FINANCIAL STATEMENTS

Attached to this disclosure document as Attachment E are our audited financial statements for the period of January 16, 2025 through April 30, 2025, as well as unaudited financial statements as of August 2025. Our fiscal year end is December 31. We have not been in business for 3 years or more and therefore cannot include all financial statements required in paragraphs (u)(i)(i) and (ii) of the FTC Franchise Rule.

## Item 22

## CONTRACTS

The following contracts are attached to this Disclosure Document as Exhibits A, B and D, respectively. These are the only contracts that we will require you to enter into:

Exhibit A – Franchise Agreement (with Guaranty and Undertaking of Obligations and Exhibits)

Exhibit B – Multi-Unit Development Agreement

Exhibit D – Form of General Release

**ITEM 23**

**<u>RECEIPTS</u>**

See Attachment K attached.

# EXHIBIT A

# FRANCHISE AGREEMENT

**FRANCHISE AGREEMENT**

**BETWEEN**

**MOLLYTEA FRANCHISING LLC**

**AND**

_____
**(Name of Franchisee)**

**SUMMARY PAGE**

This page summarizes certain provisions of the attached Franchise Agreement and is incorporated therein by reference.  The Franchise Agreement's provisions will control in the event of any conflict.

| | |
|---|---|
| **Effective Date:** | [_____] |
| **Territory:** | [_____] |
| **Initial Franchise Fee:** | $50,000 |
| **Royalty Fee:** | 8% of Gross Sales |
| **Advertising Fund Contribution** | Up to 2% of Gross Sales |
| **Minimum Local Advertising Expenditure:** | Currently not required. |
| **Grand Opening Advertising Amount:** | Minimum of $15,000 due thirty (30) days prior to store opening |
| **Renewal Fee:** | The renewal fee is equal to 75% of the initial franchise fee being charged by Franchisor at the time of renewal. |
| **Transfer Fee:** | 75% of the then current Franchise Fee plus expenses |

**Franchisee:**             [_____], a [_____]
**Address for Notices:**    [_____]
**Attention:**              [_____]
**Email:**                  [_____]

**Manager:**                [_____]

**Operating Principal:**    [_____]

**Operator:**               [_____]

**Opening Deadline:**       [_____]

**Franchisor:**  MOLLYTEA Franchising LLC, a Delaware limited liability company.

**Address for Notices:**    MOLLYTEA Franchising LLC
6 Kilmer Road, Suite B
Edison, New Jersey 08817
Attention: Xiao Jie
Email: MollyTeausa@MollyTea.com

**With a copy to:**
**(which shall not**        iLead Law Group, P.C.
**constitute notice)**      99 Park Avenue, Suite 830
New York, NY 10016
(212) 836-6053
Attention: Harry Yang, Esq.
Email: Hyang@iLeadLaw.com

i

**TABLE OF CONTENTS**

1.      Definitions ........................................................................................................... 1

2.      Grant of Franchise ............................................................................................ 4

      (a)      Grant ................................................................................................ 4

      (b)      Territory ........................................................................................... 5

      (c)      Reserved Rights ............................................................................... 5

      (d)      Waiver .............................................................................................. 5

      (e)      Modification to the System and Operating Manual ........................... 6

3.      Term of Franchise ............................................................................................. 6

      (a)      Initial Term ..................................................................................... 6

      (b)      Successor Term ............................................................................... 6

4.      Fees ................................................................................................................... 7

      (a)      Franchise Fee ................................................................................... 7

      (b)      Royalty Fee ...................................................................................... 7

      (c)      Advertising Fund Contribution ....................................................... 7

      (d)      Other Fees ....................................................................................... 8

      (e)      Remittances ..................................................................................... 8

      (f)      Electronic Transfer of Funds ......................................................... 8

      (g)      Reports ............................................................................................ 8

      (h)      Interest and Fees on Late Payments ............................................... 8

      (i)      Application of Payments ................................................................. 9

      (j)      Currency .......................................................................................... 9

      (k)      Taxes ............................................................................................... 9

5.      Site Selection ................................................................................................... 9

      (a)      Site Approval ................................................................................... 9

      (b)      Preliminary Review by Franchisor .................................................. 9

i

(c)    Approval of Lease..................................................................................... 10

(d)    Relocation ................................................................................................. 10

(e)    Failure to Acquire the Premises................................................................ 10

6.    Construction or Renovation of the Molly Tea Store.................................................. 10

(a)    Pre-Construction/Renovation Approval Criteria ....................................... 10

(b)    Construction/Renovation .......................................................................... 11

(c)    Insurance During Construction.................................................................. 11

(d)    Inspection.................................................................................................. 11

(e)    Zoning, Permits, Clearances, and ADA Compliance.................................. 11

(f)    Approval for Opening ............................................................................... 11

7.    Training...................................................................................................................... 11

(a)    Minimum Training..................................................................................... 11

(b)    Location and Expenses .............................................................................. 12

(c)    Completion of Training ............................................................................. 12

(d)    Additional Training.................................................................................... 12

(e)    Meetings and Conferences......................................................................... 12

8.    Operations.................................................................................................................. 13

(a)    Management of Molly Tea Store ............................................................... 13

(b)    Operating Manual ..................................................................................... 13

(c)    Adherence to System Standards................................................................. 13

(d)    Approved Suppliers ................................................................................... 14

(e)    Operating Assets ....................................................................................... 15

(f)    Group or Cooperative Buying.................................................................... 15

(g)    General Maintenance ................................................................................. 15

(h)    Scheduled Renovations.............................................................................. 15

(i)    Inspection.................................................................................................. 15

|       | (j)  | Participation in Promotions .................................................................................. 16 |
|       | (k)  | Coupons, Gift Cards, and Loyalty Programs ..................................................... 16 |
|       | (l)  | Personnel ............................................................................................................. 16 |
|       | (m)  | Credit Card and Other Methods of Payment ....................................................... 16 |
|       | (n)  | Privacy Laws ....................................................................................................... 17 |
|       | (o)  | Customer Data ..................................................................................................... 17 |
|       | (p)  | Trade Accounts .................................................................................................... 17 |
|       | (q)  | System Changes ................................................................................................... 17 |
|       | (r)  | Franchise Commissions.. ..................................................................................... 17 |
| 9.    |      | Intellectual Property Rights ............................................................................................ 18 |
|       | (a)  | Ownership of Intellectual Property ..................................................................... 18 |
|       | (b)  | Limitations on Franchisee's Use of Intellectual Property ................................... 18 |
|       | (c)  | Intellectual Property Rights ................................................................................ 18 |
|       | (d)  | Innovations .......................................................................................................... 18 |
|       | (e)  | Infringement ........................................................................................................ 19 |
|       | (f)  | Non-Exclusive ..................................................................................................... 19 |
|       | (g)  | Change in Intellectual Property .......................................................................... 19 |
|       | (h)  | Irreparable Harm ................................................................................................. 20 |
| 10.   |      | Advertising and Marketing ............................................................................................. 20 |
|       | (a)  | General Requirements .......................................................................................... 20 |
|       | (b)  | Pre-Approved Advertising ................................................................................... 20 |
|       | (c)  | Approval of Advertising ...................................................................................... 20 |
|       | (d)  | Advertising Fund ................................................................................................. 20 |
|       | (e)  | Minimum Local Advertising Expenditures ......................................................... 21 |
|       | (f)  | Electronic and Digital Marketing and Advertising ............................................. 22 |

(g)  Grand Opening Advertising and Public Relations ............................................ 22

(h)  Special Promotions ......................................................................................... 22

(i)  Press Releases ................................................................................................. 23

(j)  Pricing Policies ............................................................................................... 23

(k)  Truthful Advertising, Marketing and Promotion ............................................ 23

(l)  Advertising Cooperative ................................................................................. 23

11.  Technology Systems and POS System ...................................................................... 24

(a)  Technology Systems ....................................................................................... 24

(b)  POS System .................................................................................................... 24

(c)  Intranet Site .................................................................................................... 24

(d)  Systems Access ............................................................................................... 25

12.  Franchisor's Website ................................................................................................ 25

(a)  Website ........................................................................................................... 25

(b)  Replicated Website ......................................................................................... 25

(c)  Policies ........................................................................................................... 25

(d)  Electronic Commerce ...................................................................................... 26

(e)  Termination of Use ......................................................................................... 26

13.  Accounting and Records ........................................................................................... 26

(a)  Accounting and Records .................................................................................. 26

(b)  Accounting Statements .................................................................................... 26

(c)  Inspection of Accounting and Records ............................................................ 27

(d)  General Accounting Principles ........................................................................ 27

14.  Representations and Warranties ................................................................................ 27

(a)  Representations and Warranties of Franchisee ................................................ 27

(b)  Franchisee's Principals ................................................................................... 28

(c)  Guaranty and Undertaking of Obligations ...................................................... 29

iv

|       | (d) | Employment Matters | 29 |
| 15. | | Restrictive Covenants | 29 |
|       | (a) | Confidential Information | 29 |
|       | (b) | Non-Competition/Non-Solicitation | 29 |
|       | (c) | Independent Covenants | 30 |
|       | (d) | Enforceability Not Affected by Franchisee Claims | 30 |
|       | (e) | Reasonableness | 30 |
|       | (f) | Additional Covenants | 30 |
|       | (g) | Non-Liability | 30 |
|       | (h) | Irreparable Injury | 30 |
|       | (i) | Non-Disparagement | 30 |
| 16. | | Indemnification | 31 |
|       | (a) | Indemnification | 31 |
|       | (b) | Settlement and Remedial Actions | 32 |
|       | (c) | Expenses | 32 |
|       | (d) | Third Party Recovery | 32 |
|       | (e) | Survival | 32 |
| 17. | | Insurance | 32 |
|       | (a) | Types of Insurance | 32 |
|       | (b) | Requirements | 32 |
|       | (c) | Evidence | 33 |
|       | (d) | Additional Insurance | 33 |
| 18. | | Transfer of Interest | 33 |
|       | (a) | Transfer by Franchisor | 33 |
|       | (b) | Transfer by Franchisee | 33 |
|       | (c) | Conditions for Approval of Transfer | 34 |

|       | (d) | Right of First Refusal | 35 |
|       | (e) | Death or Disability | 35 |
|       | (f) | Granting of a Security Interest by Franchisee | 36 |
|       | (g) | Consent to Option | 36 |
| 19.   |     | Default and Termination | 36 |
|       | (a) | Events of Default | 36 |
|       | (b) | Termination for Insolvency | 36 |
|       | (c) | Termination for Repeated Default | 37 |
|       | (d) | Other Events of Default | 37 |
|       | (e) | Cross-Default | 39 |
|       | (f) | Notice Required by Law | 39 |
|       | (g) | No Exclusive Remedy | 39 |
| 20.   |     | Obligations Upon Termination or Expiration | 39 |
|       | (a) | Obligations upon Termination or Expiration | 39 |
|       | (b) | Payment of Amounts Owed | 39 |
|       | (c) | General Operations | 39 |
|       | (d) | Confidential Information and Intellectual Property | 40 |
|       | (e) | Franchisor Software | 40 |
|       | (f) | Marks | 40 |
|       | (g) | Disassociation in Communication Methods | 40 |
|       | (h) | Assumed Name | 40 |
|       | (i) | Costs | 40 |
|       | (j) | Confidentiality and Non-Competition | 40 |
|       | (k) | Purchase Option | 41 |
|       | (l) | Assignment of Lease | 41 |
|       | (m) | Modification of Premises | 41 |

21.      Dispute Resolution.................................................................................... 41

        (a)      Non-Binding Mediation................................................................... 41

        (b)      Arbitration...................................................................................... 42

        (c)      Governing Law ............................................................................... 42

        (d)      Limitations of Claims .................................................................... 42

        (e)      Limitation on Damages................................................................... 42

        (f)      Rights of Parties Are Cumulative .................................................. 42

        (g)      Costs and Legal Fees ..................................................................... 43

        (h)      WAIVER OF JURY TRIAL............................................................ 43

        (i)      Individual Capacity........................................................................ 43

        (j)      Injunctions and Emergency Relief................................................. 43

        (k)      Intellectual Property, Confidential Information and Security Interests ........................... 43

22.      Miscellaneous ........................................................................................... 43

        (a)      Independent Contractors ................................................................ 43

        (b)      No Fiduciary Relationship .............................................................. 44

        (c)      Compliance with Laws ................................................................... 44

        (d)      Force Majeure ................................................................................ 44

        (e)      Further Assurances ........................................................................ 45

        (f)      Judgment; Discretion ..................................................................... 45

        (g)      Approvals....................................................................................... 45

        (h)      No Waiver....................................................................................... 45

        (i)      Notice............................................................................................. 45

        (j)      Severability .................................................................................... 45

        (k)      Counterparts................................................................................... 46

        (l)      References and Headings................................................................ 46

        (m)      Entire Agreement........................................................................... 46

|  | (n) | Amendments ................................................................................................ | 46 |
|  | (o) | Survival ........................................................................................................ | 46 |
| 23. |  | Acknowledgments ........................................................................................ | 46 |
|  | (a) | Receipt of Disclosure Document ................................................................ | 46 |
|  | (b) | Commercial Relationship ........................................................................... | 47 |
|  | (c) | Certain Profits, Consideration and Charges............................................... | 47 |
|  | (d) | Compliance with Anti-Corruption and Anti-Money Laundering Laws and Anti-Terrorism Laws........................................................................... | 47 |
|  | (e) | No Claims .................................................................................................... | 47 |
|  | (f) | No Waiver.................................................................................................... | 47 |

Exhibits:

A.    Equity Interests and Principals
B.    Molly Tea Store Location and Territory
C.    Release
D.    Electronic Transfer of Funds Authorization Form
E.    Lease Rider Terms
F-1.   Confidentiality and Noncompete Agreement
F-2.   Confidentiality Agreement
G.    Guaranty and Undertaking of Obligations
H.    Insurance Requirements
I.    Consent to Option

State Addenda to Franchise Agreement

# FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** ("*Agreement*") is executed and entered into on this _____ day of _____, 20_____ ("*Effective Date*") by and between MOLLYTEA Franchising LLC, a Delaware limited liability company, with its principal place of business at 6 Kilmer Road, Suite B, Edison, New Jersey 08817 ("*Franchisor*"), and ____a_____ *(insert state and type of entity)* with its principal place of business at _____ ("*Franchisee*").

## RECITALS

A.      Franchisor, as a result of the expenditure of time, skill, effort and money, has developed and continues to develop, a distinctive system (the "*System*") relating to the sale of a variety of milk tea drinks, whipped cream drinks, fruit teas, oat milk teas, tea-based beverages, coffees, pastries and compatible food products through the establishment and operation of a retail store (the "*Molly Tea Store*").

B.      The System includes, without limitation, Products and Services which incorporate Franchisor's trade secrets and Confidential Information; distinctive exterior and interior design, layout, décor, color scheme, furnishings and signage; specially designed equipment and fixtures; unique and uniform standards, specifications and policies and procedures for operations and quality control, management and training; and advertising and promotional programs, all of which may be changed, improved and further developed by Franchisor from time to time.

C.      The System is identified by certain trademarks, service marks, trade names, trade dress, logos, symbols, emblems and other indicia of origin including, but not limited to, the mark "Molly Tea 茉莉奶白", that are now or later designated by Franchisor in writing for use in the operation of the Molly Tea Store and the System (the "*Marks*"), and which Franchisor may license others to use.

D.      Franchisor desires to grant to Franchisee the right to operate a Molly Tea Store using the System pursuant to the terms of this Agreement.

## AGREEMENT

**NOW THEREFORE**, Franchisor and Franchisee, in consideration of the undertakings and commitments set forth herein, agree as follows:

1.      **Definitions**.  Any term not expressly defined in this Agreement is defined in this <u>Section 1</u>.

"*Advertising Fund Contribution*" means the continuing monthly contribution that Franchisee must remit to the Franchisor as set forth in <u>Section 4</u> and in the amount set forth on the Summary Page.

"*Affiliate(s)*" means as to any person or Entity, any other person or Entity that, directly or indirectly, Controls, or is under the Control of such person or Entity.

"*Applicable Law*" means any federal, state, and local laws, ordinances and codes, together with all rules, regulations, policies and guides related thereto, applicable to the subject matter of this Agreement, including the development, construction and/or operation of the Molly Tea Store pursuant to the terms hereof, including, without limitation, all laws and regulations related to health and safety, labor, consumer privacy and data security in the United States, and those governing public accommodations for persons with disabilities.

"**_Business Day_**" means any calendar day other than Saturdays, Sundays and national holidays in the United States.

"**_Confidential Information_**" means all proprietary and confidential information relating to the development and operation of Molly Tea Stores, including, without limitation, all information, knowledge, know-how, trade secrets, methodologies, techniques, procedures, applications, research and materials, in whatever form, used in or related to the System, either in writing, orally or in electronic format, which Franchisor provides to Franchisee, or which Franchisee or its Affiliates or Franchisee's respective employees develop or have access to, in connection with this Agreement or the development and operation of Franchisee's Molly Tea Store thereunder, including, without limitation, any products and services; product sourcing, manufacturing, inventory management and control, supply and distribution standards and procedures; pricing; standards for site selection, general contractors, architects, architectural and construction plans and trade dress (i.e. the unique, distinctive, and non-functional overall appearance and image of Franchisee's Molly Tea Store in the marketplace including the System Standards related thereto); technology; point of sale equipment and related computer software; advertising, marketing and promotional programs including gift card, loyalty and customer reward programs; the Operating Manual; receipts and formulas; customer lists; pricing data; financial data; and Customer Data, however learned or received. Confidential Information includes, but is not limited to, information (i) designated as confidential, (ii) known by Franchisee to be considered confidential by Franchisor, or (iii) by its nature inherently or reasonably to be considered confidential.

"**_Consequential Damages_**" mean damages and injury that result from a Party's negligent performance of or other breach of this Agreement for lost profits or compensation for damages to reputation and goodwill including, without limitation, costs of or resulting from delays, financing, marketing materials and media time and space, and costs of changing, substituting or replacing the same.

"**_Control_**" or "**_Controlling Interest_**" means the power, directly or indirectly, to direct or cause the direction of the management and policies of an Entity, whether by contract or otherwise.

"**_Customer Data_**" includes any personally identifiable information, such as a person's or Entity's name, address, phone number, fax number, email address, passport number, financial profile, credit card information or any other information by which one is reasonably able to personally identify one or more persons or Entities; financial data and statements; training and management programs; product ordering and sales data; and any other information or data regarding Franchisor's or any of its Affiliates' business that would reasonably be considered the proprietary or Confidential Information of Franchisor or its Affiliates.

"**_Entity_**" means a corporation, general or limited partnership, limited liability company, trust or other legal entity.

"**_Equity Interest_**" means any direct or indirect stock, unit, membership, partnership or other legal, equitable or beneficial ownership interest or other voting rights, in an Entity, but does not include direct or indirect ownership solely as an investment of securities of any Entity traded on any securities exchange if the owner is not a Controlling Person (or a member of an Entity that Controls) of such Entity and does not, directly or indirectly, own 10% or more of any class of securities of such Entity.

"**_Force Majeure_**" means acts of God (such as tornadoes, hurricanes, floods, fire or other natural catastrophe); strikes, lockouts or other industrial disturbances; war (declared or undeclared), riot, terrorist act, cyber security incident or other civil disturbance; epidemics or pandemics, including COVID-19; acts of governments, such as the exercise of eminent domain rights and condemnation (if caused by reasons beyond a Party's control); or other forces, that materially and adversely affect the ability of a Party hereto

to perform, provided that in all events they are not within the reasonable control of the Party affected thereby.  Financial inability of a Party will not constitute an event of Force Majeure.

"***Franchisor Indemnitees***" means Franchisor, its Affiliates and their respective owners, directors, managers, officers, employees, agents, successors and assignees.

"***Gross Sales***" mean the total selling price of all Products and Services, goods and supplies sold in or from a Molly Tea Store (regardless of whether such Products and Services are performed at a Molly Tea Store), delivery fees charged to customers, including third party delivery fees (such as UberEats, GrubHub or DoorDash) and all other revenue and income of every kind or nature received by Franchisee from any other business (including, but not limited to, all revenues from any permitted mechanical or other device, such as vending machines), whether for cash, cash equivalents or credit (and, if for credit, whether or not payment is received therefor) related to Franchisee's Molly Tea Store, less applicable sales or other excise or similar taxes collected by Franchisee and valid refunds and credits deducted from revenues initially recorded as Gross Sales.  Merchant fees for credit card services are not deducted from Gross Sales. Proceeds from the sale of coupons, gift cards, gift certificates or vouchers will not be included in Gross Sales when the coupons, gift cards, gift certificates or vouchers are sold; rather, the retail prices of Products and Services purchased with coupons, gift cards, gift certificates or vouchers will be included in Gross Sales when the coupon, gift card, gift certificate or voucher is redeemed.

"***Intellectual Property***" means all intellectual property or other proprietary rights throughout the world, whether existing under contract, statutes, convention, civil law, common law or any law whatsoever, now or hereafter in force or recognized, including (i) patents and rights to inventions; (ii) trademarks, service marks, logos, trade dress and design rights, including the Marks; (iii) works of authorship, including, without limitation, copyrights, source codes, moral rights and neighboring rights; (iv) trade secrets; (v) ideas and concepts; (vi) publicity and privacy rights; (vii) any rights analogous to those set forth herein and any other intellectual property and proprietary rights; (viii) any application or right to apply for any of the rights referred to in subsections (i) through (vii) above; and (ix) any and all renewals, divisions, continuations, continuations-in-part, re-issuances, re-examinations, extensions and restorations of any of the foregoing (as applicable).

"***Losses and Expenses***" mean all losses, compensatory, exemplary or punitive damages, mediation or arbitration costs, fines, penalties, charges, costs, expenses, lost profits, assessments and fees (including reasonable attorneys', experts', accountants' and consultants' fees), interest, court costs, settlement or judgment amounts, compensation for damages to reputation and goodwill, costs of or resulting from delays or financing costs and Consequential Damages, whether or not foreseeable, and whether or not based in contract, tort, warranty claims or otherwise, suffered or incurred in connection with this Agreement.

"***Manager***" means the fulltime employee of Franchisee responsible for managing Franchisee's Molly Tea Store who has met the requirements for managerial personnel set forth in the Operating Manual.

"***Operating Manual***" means Franchisor's confidential written or electronic instructions and manual and the proprietary technology, programs, appliances and materials including, but not limited to, written standards, procedures, rules, regulations and policies for the System and the operation of a Molly Tea Store, including the System Standards, provided in whatever manner and all bulletins, supplements and ancillary and additional manuals and directives established by Franchisor from time to time, and all amendments and supplements thereto.

"***Operating Principal***" means a Principal who has decision-making authority on behalf of Franchisee, at least a ten percent (10%) Equity Interest in Franchisee and who will represent the Franchisee in its dealings with Franchisor.

"*Party*" or "*Parties*" means either Franchisor or Franchisee, individually or collectively.

"*Principals*" means Franchisee's spouse, if Franchisee is an individual, and all holders, direct or indirect, of an Equity Interest in Franchisee and any Entity directly or indirectly Controlling Franchisee, all as listed on Exhibit A, attached hereto and incorporated herein by reference.

"*Products and Services*" mean the products and services offered by and sold at or through a Molly Tea Store, including, without limitation, variety of milk tea drinks, whipped cream drinks, fruit teas, oat milk teas, tea-based beverages, coffees, pastries and compatible food products developed or approved by us as specified from time to time by Franchisor in the Operating Manual or otherwise in writing.

"*Royalty Fee*" means the continuing monthly fee Franchisee must pay Franchisor as set forth in Section 4 and in the amount set forth on the Summary Page.

"*System Standards*" mean the standards, requirements, specifications, techniques, methods, policies and procedures for the development and operation of Molly Tea Stores, as specified from time to time by Franchisor in the Operating Manual or otherwise in writing.

"*Summary Page*" means the Summary Page of this Agreement that directly precedes the Table of Contents of this Agreement.

"*Term*" means the Initial Term and any Successor Term.

"*Territory*" means the geographic area referred to in Section 2(b) and described on the Summary Page and on Exhibit 2, attached hereto and incorporated herein by reference.

"*Transfer*" means and includes any voluntary, involuntary, direct or indirect assignment, transfer, sale, conveyance, disposition, gift, encumbrance, pledge, hypothecation or mortgage by Franchisee or any of its Principals of all or any part of its rights, interests or obligations in this Agreement, Franchisee, the Molly Tea Store (including the Premises as defined in Section 2(a)), its assets or any Equity Interest, directly or indirectly, in Franchisee to any person or Entity, or any other transaction that would, alone or together with other previous, simultaneous or proposed Transfers, have the effect of transferring Control of, this Agreement or substantially all of the assets of the business operated pursuant to this Agreement. Any Transfer of an Equity Interest in Franchisee or the ownership, possession or Control of the Molly Tea Store may be made only in conjunction with a Transfer of this Agreement.

2.    **Grant of Franchise**.

(a)    Grant. Subject to the terms, conditions and limitations of this Agreement, Franchisor hereby grants to Franchisee the right, and Franchisee undertakes the obligation, to establish and operate one Molly Tea Store using the System, including the Marks and other Intellectual Property at the location set forth on Exhibit B (the "*Premises*"). During the Term of this Agreement, Franchisee may not sell Products and Services through any other means of distribution other than from or through the Molly Tea Store at the Premises including, without limitation, through the use of toll-free telephone numbers, mail order catalogs, direct mail advertising, domain names, URLs, on-line computer networks and services, the Internet, kiosks, carts, concessions, satellite units, or other mobile, remote, limited service or non-permanent facilities, unless expressly authorized by Franchisor in writing. In addition, all sales by Franchisee shall be for retail consumption only and Franchisee shall not engage in wholesale sales of any kind, including, without limitation, the direct or indirect sale or distribution of Products and Services to any third party for resale, retail sale or further distribution without Franchisor's prior written consent.

(b)      Territory.  Except as set forth in this Agreement, so long as Franchisee is in full compliance with this Agreement or any other agreement between Franchisee and/or its Principals and Franchisor and/or its Affiliates entered into in connection with this Agreement ("**Ancillary Agreements**"), Franchisor will not establish or operate, or license anyone other than Franchisee the right to establish or operate, a Molly Tea Store during the Term which is physically located within the Designated Area described on Exhibit B. Except as expressly provided for in this Section 2(b), the license granted to Franchisee under this Agreement is nonexclusive, and Franchisee shall have no territorial or protective rights.

(c)      Reserved Rights.  Franchisor retains all rights not expressly granted in this Agreement. Franchisor, its Affiliates, and their respective franchisees and licensees may, among other things, operate other types of facilities besides a Molly Tea Store in the Territory, including facilities that are identified by some or all of the Marks.  Without limiting any rights described in this Section 2(c), Franchisor may (or may authorize an Affiliate or other third party to) conduct, among other things, the following activities:

(i)      Advertise and promote sales of the Products and Services at any location, including within the Territory;

(ii)      Develop, own, establish, acquire, promote and/or operate and grant others the right to develop, own, establish, acquire, promote and/or operate a Molly Tea Store anywhere outside of the Territory, regardless of the proximity or financial impact to the Molly Tea Store;

(iii)      Except for the restriction against establishing another Molly Tea Store in the Territory, offer and sell, and grant others the right to offer and sell, private label or other collateral products, including those offered and sold at Molly Tea Stores under the Marks or other marks at any location or through any channel of distribution, including, but not limited to, hotels, motels, resorts, club stores, wholesale, health care facilities, business or industry locations, military installations, military commissaries, the Internet (or any other existing or future form of electronic commerce) anywhere inside or outside of the Territory, regardless of proximity or financial impact to Franchisee's Molly Tea Store;

(iv)      Operate one or more sites on the Internet that advertises a Molly Tea Store or sells Products and Services anywhere inside or outside the Territory;

(v)      Develop, own, acquire, establish and/or operate, and grant others the right to develop, own and operate, other methods and channels of distribution utilizing the Marks and the System, whether inside or outside of the Territory, including, without limitation, using toll-free telephone numbers, domain names, URLs, on-line computer networks and services, kiosks, carts, concessions, satellite units, other mobile, remote, limited services or non-permanent facilities or other retail operations as a part of larger retail venues such as department stores, supermarkets or in public areas such as amusement parks, airports, train stations, public facilities, college and school campuses, arenas, stadiums, hospitals, office buildings, convention centers, airlines (in-flight service) and military bases or at special events, such as sporting events, conventions or concerts; and

(vi)      Purchase, merge, or acquire any business, or be acquired by or sell its assets or Equity Interests to, any business which sells products and/or services, whether or not such products are the same or similar to the Products and Services and whether or not it is competitive with Franchisee, its Molly Tea Store or the System, inside or outside the Territory.

(d)      Waiver.  Franchisor also may waive, defer or permit, in its sole discretion or judgment, variations from the System Standards or the applicable agreement to any franchisee or prospective franchisee based on the peculiarities of a particular location or circumstance, density of population, business potential, population of trade area, existing business practices or any other conditions or circumstances

**FRANCHISE AGREEMENT**                                                                                    **PAGE 5**

which Franchisor reasonably determines, in its sole discretion, to be of importance to the successful operation of a Molly Tea Store. Franchisor shall have the right, in its sole discretion or judgment, to deny any such request that Franchisor believes would not be in the best interests of the System. Franchisee has no recourse against Franchisor on account of any variation from the System Standards and practices agreed to, required or refused by Franchisor with any other Molly Tea Store or Franchisor's refusal to agree to a like or similar variation under this Agreement.

(e)     Modification to the System and Operating Manual. Franchisee acknowledges that the System, the Operating Manual and the Products and Services offered by a Molly Tea Store may be modified (including, but not limited to, by the addition, deletion, and modification of items, operating procedures, Products and Services) from time to time by Franchisor. Franchisee agrees to comply, at its expense, with all such modifications, including, without limitation, all requirements to implement the modifications, including replacement or renovation of equipment, remodeling, redecoration and modifications to existing improvements and structural changes. Franchisor shall notify Franchisee of any such System changes and Franchisee shall implement any System changes upon receipt of notice thereof from Franchisor, and shall complete such implementation within the time from Franchisor may reasonably specify.

3.     **Term of Franchise**.

(a)     Initial Term. The initial term of this Agreement will commence upon the Effective Date and will expire one (1) year thereafter ("***Initial Term***"), unless sooner terminated as provided in Section 19.

(b)     Successor Term. Franchisee may, upon mutual consent between Franchisor and Franchisee, continue to operate the Molly Tea Store under this Agreement for additional periods of one (1) year each ("***Successor Term***"), upon written notice to Franchisor by Franchisee of not less than six (6) months nor more than twelve (12) months prior to the end of the then current Term, provided each of the following conditions have been satisfied:

(i)     Franchisee is in compliance with all of the terms of this Agreement and any Ancillary Agreement and has not failed on two or more separate occasions during any twelve (12) consecutive month period during any Term or more than three times during any Term, as applicable, to comply with its obligations under this Agreement or any Ancillary Agreement, whether or not Franchisee has cured any such failure after receipt of written notice;

(ii)     Franchisee has provided satisfactory evidence to Franchisor that Franchisee has the right to occupy the Premises for the Successor Term;

(iii)     Franchisee has completed, to Franchisor's satisfaction, all maintenance, refurnishing, renovating and remodeling of the Premises at Franchisee's expense as Franchisor requires in order to meet Franchisor's then-current System Standards for a Molly Tea Store, including, without limitation, new Products and Services which may be reasonably required by Franchisor for Franchisee to offer and sell and such additional items needed to modernize the Molly Tea Store to reflect the then-current System Standards and image of the System as contained in the Operating Manual or as otherwise provided in writing by Franchisor;

(iv)     Franchisee has executed Franchisor's then-current form of franchise agreement (which agreement may have different terms from this Agreement including, without limitation, different Royalty Fees and Advertising Fund Contributions and other monetary terms) and any other Ancillary Agreements as Franchisor may then require and pays Franchisor's then current renewal fee, plus all amounts necessary to reimburse Franchisor for its reasonable out-of-pocket costs and expenses associated with renewing the franchise, including, without limitation, legal and accounting fees;

(v)       Franchisee must comply with Franchisor's then-current qualification and training requirements; and

(vi)       Franchisee and its Principals have executed a general release in a form satisfactory to Franchisor, of any and all claims against Franchisor and its Affiliates, and their successors and assigns, and their respective owners, managers, directors, officers, agents, representatives, independent contractors and employees, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and federal, state and local laws, rules and regulations, in a form similar to the Release, attached hereto as Exhibit C and incorporated herein by reference.

## 4.       Fees.

(a)       Franchise Fee.  Prior to or upon the execution of this Agreement, Franchisee will pay to Franchisor a franchise fee of $50,000 (the "**Franchise Fee**") in readily available funds.  The Franchise Fee will be fully earned by Franchisor and non-refundable upon execution of this Agreement.

(b)       Royalty Fee.  Beginning the end of the first month in which the Molly Tea Store is opened for business, Franchisee will pay to Franchisor before the 10th day of each month, by automatic transfer of funds, the nonrefundable monthly Royalty Fee.

(i)       Alternatively, Franchisor has the right to require Franchisee to enter into a Revenue Allocation Agreement. If Franchisor require Franchisee to enter into a Revenue Allocation Agreement with Franchisor, then on a MONTHLY basis, the designated third-party vendor designated by Franchisor that provides the preferred platform for payment processing (the "Platform Provider") shall calculate Franchisee's Gross Sales for the prior MONTH. The Platform Provider shall retain a certain percentage of Franchisee's Gross Sales as payment of its service fees, as defined in the Revenue Allocation Agreement. Upon collecting the service fees, the Platform Provider shall remit the balance of the Gross Sales to Franchisor in accordance with the Revenue Allocation Agreement. Franchisor shall then deduct the Royalty Fee from the balance of Gross Sales.

(ii)       The term "Franchise Commissions shall mean the amount remaining from the Franchisee's Gross Sales from each Molly Tea Shop that Franchisee operates, less the service fees and Royalty Fee.

(iii)       The Franchise Commissions shall be subject to all other deductions due to Franchisor and/or its Affiliates prior to remitting the balance to Franchisee. The balance of the Franchise Commissions shall be remitted to Franchisee within TWO WEEKS of Franchisor's receipt from the Platform Provider of Franchisee's Gross Sales for the prior MONTH.

(iv)       Franchisor's obligation to remit the Franchise Commissions to Franchisee shall be subject to Franchisor's receipt of payment from the Platform Provider. If, after deducting the Royalty Fee and all other charges due to Franchisor and/or its Affiliates, there is a balance due to Franchisor and/or an Affiliate, the balance shall be deducted from Franchisee's proceeding MONTH's Franchise Commissions until the balance is paid in full. Franchisee shall not be entitled to any portion of the Gross Sales or Franchise Commissions until after all deductions have been made and all charges due to Franchisor or an Affiliate are paid in full.

(c)       Advertising Fund Contribution.  Beginning the end of the first month in which the Molly Tea Store is opened for business, Franchisor may require Franchisee to remit to Franchisor before the 10th day of each month, by automatic transfer of funds, the nonrefundable monthly Advertising Fund Contribution.  Franchisor reserves the right to increase or decrease the Advertising Fund Contribution as

determined in its sole discretion upon thirty (30) days' notice provided, however, the Advertising Fund Contribution rate will not be greater than two percent (2%) of Gross Sales.

(d)     Other Fees.  Franchisee must pay such other fees or amounts described in this Agreement.

(e)     Remittances.  The Royalty Fee, Advertising Fund Contribution and any other periodic fees required by this Agreement will be due and payable each month based on the Gross Sales for the preceding month and must be paid so that they are received by Franchisor on or before the 10th day of each month, provided that such day is a Business Day.  If the date on which such payments would otherwise be due is not a Business Day, then payment will be due on the next Business Day.

(f)     Electronic Transfer of Funds.  Upon execution of this Agreement and at any time thereafter as Franchisor may require, Franchisee must sign the electronic transfer of funds authorization, attached to this Agreement as Exhibit D and incorporated herein by reference, and all other documents and instruments necessary to permit Franchisor to withdraw by electronic funds transfer from Franchisee's designated bank account the Royalty Fee, Advertising Fund Contribution and any other amounts owed to Franchisor or its Affiliates on the date or dates that such amounts are due.  Franchisee must maintain a balance in such account sufficient to allow Franchisor and its Affiliates to collect the amounts owed when due.  Franchisee is responsible for any penalties, fines or other similar expenses associated with the transfer of funds described herein.

(g)     Reports.  Franchisee must submit the Gross Sales monthly via Franchisor's Intranet system or through other electronic data interfaces that Franchisor may require from time to time.  Franchisee must verify the accuracy of the Gross Sales figure by the first Monday at midnight (Central Time) of the month for the preceding month.  Franchisee must submit to Franchisor all reports with respect to the operation of the Molly Tea Store during the preceding month by the 10th day of the following month (or such other date specified by Franchisor) and in the form and content as Franchisor periodically prescribes.  The reports Franchisor shall require include, without limitation, the following information for the preceding reporting period:

(i)     The amount of Gross Sales and gross receipts of the Molly Tea Store, the amount of sales tax and the computation of the Royalty Fee and Advertising Fund Contribution, if applicable;

(ii)     Quantities of Products and Services purchased and the sources from which each Products and Services were obtained;

(iii)     If requested by Franchisor, copies of Franchisee's most recent sales tax return and monthly cash register sales summaries or details;

(iv)     Monthly balance sheets and statements of profits and losses, including a summary of Franchisee's costs for utilities, labor, rent and other material cost items; and

(v)     If requested by Franchisor to verify Franchisee's Gross Sales, all such books and records as Franchisor may require.

Within thirty (30) days after the opening of the Molly Tea Store, Franchisee shall provide a report of final capital expenditures for the Molly Tea Store.

(h)     Interest and Fees on Late Payments.  Any payment not actually received by Franchisor on or before the date due will be deemed overdue.  Time is of the essence with respect to all payments to be made by Franchisee to Franchisor.  Any and all amounts that Franchisee owes to Franchisor or any of its

Affiliates will bear interest at the rate of 18% per annum or the maximum contract rate of interest permitted by Applicable Law, whichever is less, from and after the date of accrual. Any failure to pay when due all or any fees or other amounts due to Franchisor or any of its Affiliates will constitute a material breach of this Agreement. In addition to interest charges on late payments due pursuant to this Section 4(h), Franchisee must pay to Franchisor a late fee in the amount of $250 for each report that Franchisee fails to timely submit to Franchisor pursuant to Section 4(g) and each payment not received by Franchisor by the prescribed due date. This late fee is not interest or a penalty as the late fee will compensate Franchisor for the administrative and management costs associated with collecting late payments and reports.

(i)    Application of Payments. Franchisee will not be entitled to withhold payments due Franchisor under this Agreement on grounds of alleged nonperformance by Franchisor hereunder. Franchisor may, at its sole option, apply Franchisee's payments, or any portion thereof, to any of Franchisee's past due indebtedness to Franchisor or its Affiliates. Franchisor has the right to set off any amounts Franchisee owes to Franchisor or its Affiliates against any amounts Franchisor may owe to Franchisee. If Franchisee and Franchisor have entered into a Revenue Allocation Agreement, then Franchisor shall have the right to withhold the Franchise Commissions until all payments and debts owed to Franchisor or its Affiliates have been paid in full.

(j)    Currency. All amounts payable by Franchisee to Franchisor under this Agreement will be in United States dollars.

(k)    Taxes. Any and all amounts expressed as being payable pursuant to this Agreement are exclusive of any applicable taxes. Franchisee is obligated to pay all federal, state and local taxes, including without limitation, sales, use and other taxes, fees, duties and similar charges assessed against Franchisee. Franchisee is responsible for and must indemnify and hold Franchisor Indemnitees harmless against any penalties, interest and expenses incurred by or assessed against us as a result of Franchisee's failure to withhold such taxes or to timely remit them to the appropriate taxing authority. Franchisee agrees to fully and promptly cooperate with Franchisor to provide any information or records it requests in connection with any application by Franchisor to any taxing authority with respect to Franchisee.

5.    Site Selection.

(a)    Site Approval. Franchisee shall operate the Molly Tea Store only at and through the Premises. If the Premises have not been obtained by the Effective Date, Franchisee shall within thirty (30) days after the Effective Date, locate one or more proposed sites which must meet Franchisor's then current standards and specifications and be approved by Franchisor within thirty (30) days of the Effective Date. Franchisee assumes all cost, liability, expense and responsibility for locating, obtaining and developing the Premises for the Molly Tea Store within the Territory and for finish-out or renovation and equipping the Molly Tea Store at the Premises. Franchisee must submit to Franchisor (i) a completed site review form designated by Franchisor, which will include, among other things, demographic information, a site plan and parking and traffic-related information; (ii) a pro forma profit and loss statement and a summary of estimated capital expenditures for the Molly Tea Store; and (iii) any other information or materials as Franchisor reasonably requires, such as proximity to and nature of other businesses, other commercial and physical characteristics, and a letter of intent or other document which confirms Franchisee's favorable prospects for obtaining the proposed Premises.

(b)    Preliminary Review by Franchisor. Franchisor will notify Franchisee of its approval or disapproval of the proposed Premises in writing within a period of thirty (30) days after receipt and review of all requested documentation. For all on-site evaluations requested by Franchisee or required by Franchisor, Franchisee agrees to reimburse Franchisor for its reasonable expenses, including, without

**FRANCHISE AGREEMENT**                                                                    **PAGE 9**

limitation, travel, lodging, meals and other related expenses. Additionally, Franchisor shall have the right to charge a reasonable fee, not to exceed $1,000.

(c)    Approval of Lease.  If Franchisor grants its preliminary approval for the Premises, Franchisee shall negotiate and submit to Franchisor a lease (the "*Lease*") with such terms as set forth on Exhibit E, attached hereto and incorporated herein by reference, within ten (10) days after receipt of preliminary site approval from Franchisor.  Franchisee will execute and provide Franchisor with a fully executed copy of the Lease within five (5) days after receipt of Franchisor's approval of the Lease. Franchisee agrees that Franchisor will have absolute discretion in approving any proposed site, and Franchisee agrees to accept any of Franchisor's decisions as final.  Franchisee agrees that Franchisor's approval of the Premises does not constitute an assurance, representation or warranty of any kind, express or implied, as to the suitability of the Premises for the Molly Tea Store or for any other purpose or of the financial success of operating the Molly Tea Store at such site.  Franchisor assumes no liability or responsibility for: (i) evaluation of a proposed site's soil for hazardous substances; (ii) inspection of any structure on the proposed site for asbestos or other toxic or hazardous materials; or (iii) compliance with the Americans with Disabilities Act ("*ADA*") and any other Applicable Laws.  Franchisee is solely responsible for obtaining satisfactory evidence and/or assurances that the proposed site and any structures thereon are free from environmental contamination and in complete compliance with all Applicable Laws.

(d)    Relocation.  Once the Molly Tea Store is established at the Premises in accordance with this Agreement, Franchisee may not relocate the Molly Tea Store without the prior written consent of Franchisor.  If Franchisor consents to any relocation, Franchisee shall de-identify the former Molly Tea Store in the manner described in this Agreement with respect to Franchisor's obligations upon termination or expiration, and reimburse Franchisor for any costs and expenses incurred in connection with such approval of the relocation.

(e)    Failure to Acquire the Premises.  If Franchisee fails to acquire the Premises pursuant to a Lease within the time limit contained in this Section 5, Franchisor may terminate this Agreement. Franchisor is not obligated to return the initial Franchise Fee or any other fees paid by Franchisee under this Agreement.

**6.    Construction or Renovation of the Molly Tea Store**.

(a)    Pre-Construction/Renovation Approval Criteria.  Following the Effective Date and before any construction of the Molly Tea Store, Franchisee, at its own cost, shall submit to Franchisor for its prior written approval (i) complete plans and specifications for the Molly Tea Store in accordance with all Applicable Laws, which conform to Franchisor's designs and specifications (which, once approved by Franchisor, shall not be modified without the prior written consent of Franchisor); (ii) a statement in the form prescribed by Franchisor and signed by Franchisee certifying that Franchisee has complied with all Applicable Laws in preparing its plans and specifications; employed a qualified architect, engineer or other professional approved by Franchisor to prepare the construction/renovation documents and supervise the construction/renovation of the Molly Tea Store and completion of all improvements; and obtained all such permits and certifications required for lawful construction/renovation of the Molly Tea Store, including, without limitation, zoning, access, sign and fire requirements; and (iii) a construction/renovation schedule acceptable to Franchisor.  Upon receipt of the above documents, Franchisor will notify Franchisee of its approval or disapproval in writing within fifteen (15) days.  Franchisee agrees that Franchisor will have absolute discretion in making such decision and Franchisee agrees to accept any of Franchisor's decisions

**FRANCHISE AGREEMENT**                                                                                      **PAGE 10**

as final.  All construction must be in accordance with the plans and specifications approved by Franchisor and comply with Applicable Laws and the applicable Lease.

(b)    Construction/Renovation.    Once the pre-construction/renovation approval has been obtained, Franchisee will commence construction within ten (10) days and provide Franchisor with written notice of such commencement within two days of such commencement of construction.  Franchisee shall complete the construction, including, as applicable, all exterior and interior carpentry, electrical, plumbing, heating, air conditioning, painting and finishing work, and installation of all fixtures, equipment and signs, in accordance with the plans and specifications for the approved Premises within one hundred and eighty (180) days after the Effective Date.  Beginning with the month after the pre-construction/renovation approval is issued by Franchisor and each month until one month after the construction/refurbishment is completed, Franchisee shall provide Franchisor, on or before the first Monday of each such month, with a statement in the form prescribed by Franchisor and signed by Franchisee, certifying Franchisee's continued compliance with and maintenance of the requirements of this Section 6.

(c)    Insurance During Construction.  Franchisee shall procure, prior to the commencement of any construction or the renovation of the Molly Tea Store, and shall maintain in full force and effect at all times during such construction or renovation, at Franchisee's expense, insurance policies protecting Franchisee, Franchisor and its Affiliates, and their respective partners, shareholders, members, directors, managers, agents, and employees, against any demand or claim with respect to personal or bodily injury, death, or property damage, or any loss, liability or expense whatsoever arising or occurring upon or in connection with the construction or renovation of the Molly Tea Store.  Such policies shall be written by responsible insurers acceptable to Franchisor and shall comply with the requirements prescribed by Franchisor, including those provisions of Section 17 of this Agreement.  Franchisee shall provide Franchisor with copies of the certificates of such insurance.

(d)    Inspection.  Franchisor may, in its sole discretion, make on-site construction/renovation visits, at Franchisor's expense, to verify compliance with its System Standards.  Franchisee shall fully cooperate with Franchisor and provide Franchisor and its representatives with full access to the Premises in connection therewith.  Franchisee agrees that Franchisor and its agents shall have the right to inspect the construction/refurbishment at all reasonable times.  Franchisee shall cooperate fully with Franchisor and provide Franchisor and its representatives with full access to the Premises in connection therewith.

(e)    Zoning, Permits, Clearances, and ADA Compliance.  Franchisee shall be responsible, at Franchisee's expense, for obtaining all zoning classifications, permits and clearances, including certificates of occupancy, as may be required by Applicable Laws, and must comply with the ADA.

(f)    Approval for Opening.  Once construction/renovation is completed and a certificate of occupancy is obtained, and within five days after Franchisor's written approval for opening, Franchisee shall open the Molly Tea Store to the public.  Franchisee shall not open the Molly Tea Store to the public without Franchisor's express written approval.  The Molly Tea Store must be opened to the public within twelve (12) months of the Effective Date.

7.    **Training**.

(a)    Minimum Training.  No later than four (4) weeks prior to opening the Molly Tea Store, Franchisee or its Operating Principal and its Manager, and any replacements or successors thereto, shall attend and complete, to Franchisor's satisfaction, an initial seven (7) day training program conducted by Franchisor at Franchisor's parent corporate office and/or Molly Tea Store locations in China and a twenty (20) day on location training at the Molly Milk Tea store in Qinchendga and Kexing Science Park, China, or such other location as Franchise may designate. After the training at Franchisor's corporate office,

**FRANCHISE AGREEMENT**                                                                                    **PAGE 11**

Franchisor (as determined in its sole discretion) may provide on-site training at the Premises in conjunction with the grand opening of the Molly Tea Store, and, if provided, Franchisee shall reimburse Franchisor for all travel, lodging and food expenses incurred by it.  As part of this initial training, Franchisor shall provide Franchisee with a copy of the Operating Manual, which must be returned to Franchisor upon termination of this Agreement.

(b)  Location and Expenses.  Franchisor will not charge Franchisee any fee for the training of Franchisee or the Operating Principal and its first Manager.  Franchisor reserves the right to charge a reasonable fee to Franchisee for any additional required or optional training.  All subsequent personnel employed by Franchisee in the position of Manager, before assuming the position, must attend and successfully complete Franchisor's initial training.  All training shall be provided at a Molly Milk Tea store owned and operated by the Franchisor and/or its affiliate, or such other location as Franchisor may designate, and Franchisee shall be responsible for all expenses for travel, lodging, food and wages during such training.

(c)  Completion of Training.  Franchisor will determine whether Franchisee or its Operating Principal and the initial Manager have satisfactorily completed initial training. If any designated participant fails to meet the admission requirements for the initial training program, if the initial training program is not satisfactorily completed by Franchisee's trainees after meeting the admission requirements, or if Franchisor, in its reasonable business judgment based upon the performance of Franchisee's trainees, determines that the initial training program cannot be satisfactorily completed by such person(s), Franchisee must immediately designate a replacement trainee(s), as applicable, to apply for and complete such training before the opening date of Franchisee's Molly Tea Store.  Franchisor reserves the right to charge Franchisee a training fee for training any additional or replacement management personnel.  If Franchisee fails to designate replacement trainee(s) who have satisfied the admission requirements, if the initial training program is not satisfactorily completed by any replacement trainee (or the initial trainee, if no replacement is designated) by the deadline set forth above, or if Franchisor determines that the training program cannot be satisfactorily completed by such person(s), and Franchisee fails to satisfy the initial training program requirements within ten (10) days following notice from Franchisor, Franchisor may, at its sole option, delay the opening of the Molly Tea Store or terminate the Franchise Agreement and retain the initial Franchise Fee and any other fees paid by Franchisee under the Franchise Agreement.

(d)  Additional Training.  Franchisor may periodically make other mandatory or optional training available to Franchisee's employees as well as other programs, seminars and materials and may charge for such training, and Franchisee shall ensure that all employees, as Franchisor may direct, satisfactorily complete any required training within the time specified.  Franchisor reserves the right to charge a fee for such additional training as set forth in the Operating Manual in addition to obtaining reimbursement for any related travel meals and lodging expenses.  Franchisee shall be responsible for all expenses incurred by it for travel, lodging, food and wages incurred during such training.

(e)  Meetings and Conferences.  Franchisor may from time to time hold periodic system-wide or personal meetings at locations designated by Franchisor to address matters of interest to the System.  If required by Franchisor, Franchisee's Operating Principal and/or Manager will attend any such meetings and conferences, subject, at times, to Franchisee's payment of a reasonable fee if requested or required by Franchisor.  Franchisee will be solely responsible for all costs and expenses incurred by Franchisee and its personnel in connection with attending such meetings and conferences, including, without limitation, costs of obtaining any required certifications, compensation, travel, lodging, meals and miscellaneous expenses.

FRANCHISE AGREEMENT                                                                                      PAGE 12

8.      **Operations**.

(a)      Management of Molly Tea Store.  Franchisee shall at all times either manage the Molly Tea Store personally or through its Operating Principal or employ a Manager (the "***Operator***").  Any Operator or Manager must execute the Confidentiality and Noncompete Agreement attached to this Agreement as Exhibit F-1, and incorporated herein by reference and must have at least a ten percent (10%) ownership interest in the Franchisee. The Operator will supervise the employees and the operations of the Molly Tea Store.  The Operator may not be involved in or supervise any other business or business concept outside of the Molly Tea Store.  If, during the Term of this Agreement, the Operator is not able to continue to serve in such capacity, Franchisee must promptly notify Franchisor in writing and designate a replacement within thirty (30) days after the Operator ceases to serve.  Franchisee must provide for interim management of the Molly Tea Store until such replacement is so designated, such interim supervision to be conducted in accordance with the terms of this Agreement.

(b)      Operating Manual.  Franchisor shall provide the Operating Manual to Franchisee.  The Operating Manual shall at all times be kept in a secure place on the Premises of the Molly Tea Store and remains the sole property of Franchisor.  Franchisee and its Principals shall at all times ensure that Franchisee's copy of the Operating Manual is kept current and up to date.  If amended or modified by Franchisor, Franchisee agrees that it will fully implement Franchisor's amended Operating Manual within the period of time prescribed by Franchisor.  In the event of any dispute as to the contents of the Operating Manual, the terms of the version of the Operating Manual maintained at Franchisor's home office shall be controlling.

(c)      Adherence to System Standards.  Franchisee acknowledges that every detail of the Molly Tea Store is important to Franchisee, Franchisor and other franchisees in order to develop and maintain uniformity among all Molly Tea Stores and the high System Standards, to increase the demand for the Products and Services sold by all Molly Tea Stores, and to protect Franchisor's reputation and goodwill. As such, Franchisee agrees to:

(i)      Operate the Molly Tea Store in accordance with the Operating Manual to ensure that the highest degree of quality and service is uniformly maintained;

(ii)      Devote the requisite time, energy and best efforts to the management and operation of the Molly Tea Store;

(iii)      Maintain the Molly Tea Store's interior and exterior and surrounding area in good condition and repair;

(iv)      Sell or offer for sale and maintain in stock quantities to meet consumer demand, the Products and Services, materials, equipment and supplies as meet Franchisor's uniform system and standards of quality and quantity, as have been expressly approved for sale in writing by Franchisor, and as have been prepared in accordance with Franchisor's methods and techniques.  Franchisee must refrain from any deviation from Franchisor's System Standards without Franchisor's prior written consent and must discontinue selling and offering for sale any such items as Franchisor, in its sole discretion, may disapprove at any time;

(v)      Use equipment and supplies purchased only from Franchisor or the suppliers approved in writing by Franchisor, in its sole discretion;

(vi)      Allow Franchisor to obtain information concerning Franchisee's accounts with any supplier and advise such supplier of any default by Franchisee under this Agreement;

**FRANCHISE AGREEMENT**                                                                                    **PAGE 13**

(vii)    Purchase, install and update, at Franchisee's expense, all fixtures, furnishings, décor, signs and equipment (including, without limitation, point-of-sale computer hardware and software systems) as Franchisor may reasonably direct from time to time in the Operating Manual or otherwise in writing;

(viii)    Provide Franchisor with access, through any means designated by Franchisor, to Franchisee's point-of-sale computer hardware and software systems;

(ix)    Employ at least the minimum number of other employees as may be prescribed by Franchisor and to comply with all Applicable Laws with respect to such employees;

(x)    Ensure that all employees are dressed in required apparel and conduct themselves during business hours in a manner that is consistent with the identity and reputation of the System, including wearing uniforms of the color, style and design as may be prescribed by Franchisor;

(xi)    Use the Premises only for the operation of the Molly Tea Store as well as keep and maintain the Molly Tea Store open and operational during the time and for the minimum number of hours and days as required by Franchisor;

(xii)    Ensure that it maintains the goodwill of the System, including, but not limited to, by responding promptly to customer complaints, comments and concerns; and

(xiii)    Meet and maintain the highest governmental standards and ratings applicable to the operation of the Molly Tea Store and immediately advise Franchisor in writing of any violations of any Applicable Law applicable to the operation of the Molly Tea Store.

If Franchisee sells a product or offers a service that is not authorized in writing by Franchisor, then Franchisor will impose a fee of $1,500 a day for each day the product is sold or the service is offered, payable upon demand by Franchisor.

(d)    Approved Suppliers.  Franchisee shall purchase all (i) Products, equipment, fixtures, furniture, equipment and computer systems, interior and exterior signage, graphics and décor; (ii) uniforms, memorabilia, and all merchandise and items intended for retail sale (whether or not bearing the Marks); (iii) advertising, point-of-purchase materials and other printed promotional materials; (iv) gift certificates and stored value cards; (v) stationery, contracts, and forms; (vi) bags, packaging, and supplies bearing the Marks; and (vii) all other goods and/or services as Franchisor requires from suppliers Franchisor approves or designates (which can include Franchisor or its Affiliates).  Information concerning approved and designated suppliers will be communicated to Franchisee via the Operating Manual or otherwise in writing by Franchisor.  If Franchisee wants to purchase from a supplier not previously approved by Franchisor, Franchisee must submit to Franchisor a written request for approval.  Franchisor may condition its approval of a supplier on requirements relating to product quality, prices, consistency, reliability, financial compatibility, labor relations, client relations, frequency of delivery, concentration of purchases, standards of service (including prompt attention to complaints) or other criteria.  Franchisor shall have the right to require that its representatives be permitted to inspect such supplier's facilities and that samples from such supplier be delivered, at Franchisor's option, either to Franchisor or to an independent, certified laboratory designated by Franchisor for testing.  Franchisee shall pay the reasonable costs of the inspection and of any testing.  Franchisor reserves the right, at its option, to re-inspect the facilities and products of any such approved supplier and to revoke its approval upon the supplier's failure to continue to meet, in Franchisor's sole discretion, any of Franchisor's criteria.  Franchisor shall not be responsible for the delivery or the condition of goods ordered from any supplier. Although approved or designated by franchisor, franchisor and its affiliates make no warranty and expressly disclaim all warranties, including warranties of

**FRANCHISE AGREEMENT**                                                                                       **PAGE 14**

merchantability and fitness for any particular purpose, with respect to services, products, equipment, supplies, fixtures, furnishings or other approved items provided by any approved or designated supplier. In addition, franchisor disclaims any liability arising out of or in connection with the services rendered or products furnished by any supplier approved or designated by franchisor. Franchisor's approval or consent to any services, goods, suppliers or any other individual, entity or any item will not create any liability to franchisor.

(e)     Operating Assets.  Except for express written warranties made by Franchisor or its Affiliates with respect to the Products and Services or any other products or services sold by Franchisor or its Affiliates, neither Franchisor nor its Affiliates, as applicable, make any warranty of merchantability or of the fitness of these items for any particular purpose. Any model or sample shown to Franchisee is provided solely to illustrate the general type, nature and quality of such items and not to represent or warrant that any such item would conform to such model or sample.

(f)     Group or Cooperative Buying.  If Franchisor or its Affiliates establish a group buying program or purchasing cooperative for the purpose of obtaining improved and sustainable pricing for Products and Services or any equipment or supplies, including the retention of a third-party purchasing agent to facilitate such buying program or purchasing cooperative, upon Franchisor's request, Franchisee will become a member of such group buying program or purchasing cooperative, pay reasonable dues and payments for the services of such group buying program or purchasing cooperative and execute all documentation reasonably required by Franchisor to facilitate the foregoing.

(g)     General Maintenance.  Franchisee shall at all times maintain the Molly Tea Store in the highest degree of cleanliness, sanitation, repair and condition. Within ten (10) days after receipt of notice from Franchisor, Franchisee agrees to make any additions, alterations, repairs and replacements that Franchisor reasonably requires, including, without limitation, such periodic repainting, equipment repairs and replacement of obsolete signs, equipment and floor coverings (including carpet and tile) as Franchisor may reasonably direct. In the event Franchisee fails or refuses to implement repair or maintenance, Franchisor shall have the right, but not the obligation, to enter upon the Molly Tea Store for the purpose of making or causing to be made such corrections as may be required, with all costs to be paid by Franchisee.

(h)     Scheduled Renovations.  Upon sixty (60) days written notice from Franchisor, but no more often than once every twelve (12) months, Franchisee, at its own expense, must upgrade and refurbish the Molly Tea Store. Such upgrades and refurbishment shall include, without limitation, those necessary to conform to the Molly Tea Store decor, floor plan, trade dress, exterior signage and decor, color schemes, equipment, food service, and presentation of the Marks consistent with the then current standards and public image of new or remodeled Molly Tea Stores operated by Franchisor or its other franchisees and necessary to protect the System. Each such upgrade and renovation shall be completed by Franchisee within sixty (60) days of notice. If Franchisee fails to make any repair or improvement, Franchisor may, in addition to its other rights in this Agreement, effect such improvement and maintenance, and Franchisee shall reimburse Franchisor for the costs it incurs.

(i)     Inspection.  Franchisor will provide such continuing advisory assistance, as it deems advisable, in the operation of the Molly Tea Store. Franchisee agrees to permit Franchisor or its agents, at any reasonable time, access to the Molly Tea Store to conduct inspections to ensure compliance with Franchisor's then-current System Standards. In conducting its inspections, Franchisor will have the right to obtain samples of any inventory items without payment therefor, in amounts reasonably necessary for testing by Franchisor or an independent certified laboratory to determine whether said samples meet Franchisor's then-current standards and specifications. Franchisor may require Franchisee to bear the cost of such inspections and testing if the sample fails to conform to Franchisor's specifications. Franchisee acknowledges that Franchisor or its agents will have the authority to make immediate recommendations

**FRANCHISE AGREEMENT**                                                                 **PAGE 15**

and resolutions to correct any deficiencies detected during such inspections (including ceasing of the use of the non-conforming equipment, advertising materials, products or supplies).

(j)    Participation in Promotions.  Franchisee shall at all times cooperate and shall actively participate in any and all sales, public relations, advertising, purchasing or promotional programs which may be developed and implemented by Franchisor.  Franchisee shall participate in market research programs and the test-marketing of new Products and Services.  Franchisee shall purchase a reasonable quantity of new Products and Services for test-marketing, promote the sale of the tested Products and Services and provide Franchisor with timely reports and test results of such programs for its review, analysis and compilation.

(k)    Coupons, Gift Cards, and Loyalty Programs.  Franchisee must, at Franchisee's expense, participate in, and comply with the requirements of, any gift certificate, gift card, stored value card, customer loyalty or customer retention program (e.g., customer e-mail card) that Franchisor or its Affiliates may choose to implement for all or part of the System and must sign the forms and take any other action that Franchisor or its Affiliates require in order for Franchisee to participate in such programs.  Without limitation, Franchisee must honor coupons, stored value cards, gift certificates, gift cards, or vouchers sold or distributed by other Molly Tea Store locations and include the related proceeds in Gross Sales strictly in accordance with the System Standards.  Franchisee will not issue or offer any gift certificate, gift card, stored value card, customer loyalty or retention program without Franchisor's prior written approval. Franchisee will utilize a vendor approved by Franchisor or its Affiliates for gift card processing.  Any coupon offer proposed by Franchisee must be approved by Franchisor in writing prior to being extended. Franchisee may participate in third-party discount voucher programs (i.e., Groupon or Living Social) that Franchisor pre-approves in writing.

(l)    Personnel.  Franchisee will be solely responsible for all employment and personnel decisions involving its employees, including but not limited to, the hiring, firing, discipline, supervision, direction, scheduling and compensation of such additional managers and support personnel for the Molly Tea Store.  Franchisee will ensure that each such employee receives the required training.  Franchisor will not be involved in, or responsible for, training, employment, compensation or any other personnel matters and decisions made by Franchisee.  Franchisee acknowledges that it is an independent business and responsible for the control and management of the day-to-day operations of the Molly Tea Store, its employees and the employees of its Affiliates in the development and operation of the Molly Tea Store, including, without limitation, the hiring and discharging of Franchisee's and its Affiliates' employees and the setting and paying wages and benefits and the payment and/or withholding of all taxes of Franchisee's and its Affiliates' employees.  Franchisee acknowledges that Franchisor has no power, responsibility or liability in any respect to the hiring, discharging, setting and paying of wages or related matters, as the sole power, responsibility and liability for such matters rest exclusively with Franchisee and its Affiliates. Franchisee further acknowledges that none of its employees will be deemed to be an employee of Franchisor or its Affiliates for any purpose whatsoever, and no act by Franchisor to protect the System or Marks shifts any employee or employment-related responsibility from Franchisee to Franchisor.

(m)    Credit Card and Other Methods of Payment.  Franchisor may, at its option, designate in writing credit and debit card issuers, check or credit verification services, financial center services, and electronic funds transfer systems, and upon any such designation by Franchisor, Franchisee must maintain credit card relationships with such credit and debit card issuers or check or credit verification services, financial center services, and/or electronic funds transfer systems in connection with the operation of the Molly Tea Store and refrain from using any services or providers that Franchisor has not approved in writing or for which Franchisor has revoked its approval.  Franchisor may modify its requirements and designate additional approval or required methods of payment and vendors for processing such payment.  Franchisee must comply with the Payment Card Industry Data Security Standards ("*PCI DSS*") as they may be revised

and modified by the Payment Card Industry Data Security Standards Council, or any successor or replacement organization and/or in accordance with other standards Franchisor may specify, and the Fair and Accurate Credit Transactions Act ("**FACTA**").  Franchisee also must upgrade periodically its Technology Systems (as defined in Section 11(a)), at Franchisee's expense, to maintain compliance with PCI DSS, FACTA and all Applicable Law.  Franchisee must notify Franchisor immediately if it is notified of a credit card breach related to the Molly Tea Store and Franchisee's business related thereto and must cooperate with applicable authorities fully with respect to the investigation.  Further, Franchisee must cooperate with Franchisor fully with respect to media statements (if any) and other items related to managing an event that Franchisor determines may materially affect the Marks, System and goodwill associated therewith for the purpose of protecting the Marks and System.

(n)     Privacy Laws.  Franchisee will abide by all privacy laws and comply with Franchisor's policies pertaining to privacy laws at all times during the Term.  If there is a conflict between Franchisor's policies pertaining to privacy laws and applicable statutory privacy laws, Franchisee will comply with the requirements of the applicable statutory privacy laws, immediately provide Franchisor with written notice of said conflict and promptly and fully cooperate with Franchisor and its counsel in determining the most effective way, if possible, to satisfy Franchisor's policies within the bounds of applicable statutory privacy laws.

(o)     Customer Data.  All information, mailing lists and data bases of Customer Data from whatever source derived, will be Franchisor's property. Franchisee will not use such information, except in connection with the Molly Tea Store in accordance with this Agreement. Franchisee will not use, process, copy, display, publish, store or transfer the Customer Data without Franchisor's written approval. Franchisee will fully comply with all Applicable Laws with respect to Customer Data.

(p)     Trade Accounts.  With respect to any supplier, Franchisee will maintain its trade accounts in a current status and will seek to resolve any disputes with such suppliers promptly.  If Franchisee fails to maintain such trade accounts on a current status, to timely pay any amounts owing to any other third parties providing services, Franchisor may, but is not required to, pay any such amounts and/or perform such obligations on Franchisee's behalf.  If Franchisor elects to pay any such amounts, then Franchisee must promptly reimburse Franchisor, upon receipt of Franchisor's invoice, for such amounts and its administrative services in doing so.  Franchisor may also set off the amount of any such reimbursement against any payments due to Franchisee at its sole option.

(q)     System Changes.  Franchisee must, at its sole cost and expense, promptly and fully comply with any changes made to the System by Franchisor, including, without limitation, changes in preparation, operations and appearance of the Molly Tea Store (including any remodeling and renovation to the interior or exterior of the Molly Tea Store) or purchases of assets as are required by Franchisor in writing. Franchisee may be required to attend meetings, at its own cost and expense, to discuss any System changes. If Franchisor requests that changes be made to the Molly Tea Store, Franchisor will provide Franchisee with a sample layout for the interior and exterior changes to be made and a set of typical preliminary plans. Franchisee will, at its sole cost and expense, employ architects, designers, engineers, contractors and others as may be necessary to complete, adapt, modify or substitute the sample plans for the Molly Tea Store. Franchisee must obtain Franchisor's prior written approval of any and all changes in the plans before commencing construction or implementing such changes.  Franchisor will have access to the Molly Tea Store while work is in progress and may require such reasonable alterations or modifications of the construction at the Molly Tea Store, at Franchisee's sole cost and expense, as Franchisor deems necessary to conform to its System Standards.

(r)     Franchise Commissions.  Franchisor shall remit Franchise Commissions to Franchisee after deductions are made for service fees related to the Platform Provider's services, the Royalty Fee, and

**FRANCHISE AGREEMENT**                                                          **PAGE 17**

other charges due to Franchisor and its Affiliates. Franchisor's obligation to remit Franchise Commissions to Franchisee is subject to Franchisor's receipt of payment from the Platform Provider.

**9.    Intellectual Property Rights.**

(a)    <u>Ownership of Intellectual Property</u>.    Franchisee and its Principals acknowledge Franchisor's and/or its Affiliates' exclusive ownership of and right to use the Marks and all other Intellectual Property, some of which also constitutes Confidential Information.    Except for the non-exclusive license to use granted herein, Franchisee and its Principals acquire no right, title or interest in (or any goodwill associated with) the System or the Intellectual Property.    All goodwill associated with Franchisee's use of the System and Intellectual Property will inure solely to the benefit of Franchisor or Franchisor's licensors, as the case may be.    Upon the expiration or termination of this Agreement, no monetary amount will be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Intellectual Property.

(b)    <u>Limitations on Franchisee's Use of Intellectual Property</u>.    The Intellectual Property will only be used by Franchisee in connection with the operation of the Molly Tea Store and only in the manner authorized and prescribed by Franchisor herein or otherwise in writing by Franchisor.    Franchisee will operate, advertise and promote the Molly Tea Store under the Marks designated by Franchisor from time to time, without prefix or suffix, and will use no other name or mark and will refrain from using any of the Marks in conjunction with any word or symbol without Franchisor's prior written consent.    Franchisee will not use the Marks as part of its corporate or other legal name, domain name or email address, without Franchisor's prior written approval.    Franchisee may not use any Mark in connection with the performance of any unauthorized services or sale of any unauthorized products, as part of any domain name, electronic address, metatag, or otherwise on the Internet or in connection with any website (unless expressly authorized in writing by Franchisor), or in any other manner that Franchisor has not expressly authorized in writing.    Franchisee will display the Marks in the manner Franchisor prescribes on supplies or materials Franchisor designates, and in connection with forms and advertising and marketing materials.    Franchisee's unauthorized use of Marks will be an Event of Default (as defined in <u>Section 19</u>) and an infringement of Franchisor's rights in and to Marks.

(c)    <u>Intellectual Property Rights</u>.    Franchisor will be the sole owner of all right, title and interest in and to any Intellectual Property created as a result of or related to the operation of the Molly Tea Store and any improvements, modifications or derivative works of Franchisee's operation of the Molly Tea Store in compliance with the System Standards or other activities under this Agreement. Franchisor does not grant Franchisee any ownership right with respect to any Intellectual Property created as a result of Franchisee's operation of the Molly Tea Store.

(d)    <u>Innovations</u>.    Franchisee agrees to promptly disclose to Franchisor all ideas, concepts, methods, techniques and products conceived or developed by Franchisee and/or any of its Affiliates, Principals, agents, representatives, contractors or employees during the Term relating to the development or operation of a Molly Tea Store ("***Innovations***"), whether or not protectable intellectual property and whether created by Franchisee or its Principals or employees. All Innovations will be deemed Franchisor's sole and exclusive property and works made-for-hire for Franchisor.    Franchisee may not use any Innovation in operating the Molly Tea Store or otherwise without Franchisor's prior written approval. Franchisor has the right to incorporate Innovations into the System and may use them and authorize Franchisee and others to use them in the operation of the Molly Tea Store.    Innovations will then also constitute Confidential Information. Franchisor and its Affiliates have no obligation to make any payments to Franchisee or any other person with respect to any Innovations.    Franchisee hereby does and will cause its Principals, Affiliates and its and their respective personnel, without reservation, to irrevocably sell, assign, transfer and convey to Franchisor, its successors, assigns and legal representatives, all right, title

**FRANCHISE AGREEMENT**                                                      **PAGE 18**

and interest (past, present, future, and throughout the world) in and to all Innovations, and any and all claims, of any nature whatsoever, for past, present or future infringement or violation of any right to such Innovations. Franchisee agrees to sign (and to cause its Principals, employees, and contractors to sign) whatever assignment or other documents Franchisor requests to evidence its ownership or to help Franchisor obtain intellectual property rights in the Innovations. If Franchisee, its Principals or Affiliates or its and their respective personnel have any rights to Innovations that cannot be assigned to Franchisor, Franchisee, its Principals and Affiliates and its and their respective personnel, as applicable, unconditionally and irrevocably waive the enforcement of such rights, and if such rights cannot be waived, Franchisee, on behalf of itself, its Principals and Affiliates and its and their respective personnel, hereby grants to Franchisor a fully paid-up, exclusive, irrevocable, perpetual, worldwide license to display, copy, distribute, perform or use in any manner and to make derivative works of the Innovations. Franchisee will assist Franchisor to register and record (as may be required by Applicable Laws or requested by Franchisor) and, from time to time enforce, all rights in the Intellectual Property, and other rights and protections relating to the Innovations in any and all countries. Franchisee will execute (and cause its Principals, Affiliates and its and their respective personnel) any documents and take any other actions reasonably necessary to effectuate the purposes of this Section 9. Franchisor's rights in the Innovations will not be impacted by any default under or termination of this Agreement. Franchisee will include the requirements of this Section 9 in all agreements with its Principals, Affiliates and personnel.

(e)    Infringement. Franchisee will neither directly nor indirectly, infringe, contest or otherwise impair Franchisor's exclusive ownership of, and/or license to, the Intellectual Property either during or after the termination or expiration of this Agreement. Franchisee and its Principals will execute all documents requested by Franchisor or its counsel that are necessary to obtain protection for the Intellectual Property or to maintain their continued validity or enforceability and will take no action that would jeopardize the validity or enforceability thereof. Franchisee and its Principals will promptly notify Franchisor of any use by any third party of the Intellectual Property of which the Franchisee or its Principals know or have reason to know is unauthorized or of any action or proceeding instituted by any person or Entity against Franchisor or its Affiliates, Franchisee or its Principals or any other franchisee involving the Intellectual Property. Franchisor has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Intellectual Property. Franchisee will execute any and all documents and render such assistance as may, in the opinion of Franchisor's counsel, be reasonably requested to carry out any defense or prosecution. Franchisee acknowledges that Franchisor has the right to direct and control any proceeding or litigation involving the Intellectual Property, including any settlement thereof. Franchisor shall defend Franchisee against any third-party claim, suit or demand arising out of Franchisee's authorized use of the Intellectual Property. If Franchisor, in its sole discretion, determines that Franchisee has used the Intellectual Property in accordance with this Agreement, the cost of such defense, including the cost of any judgment or settlement, shall be borne by Franchisor. If Franchisor, in its sole discretion, determines that Franchisee has not used the Intellectual Property in accordance with this Agreement, the cost of such defense, including the cost of any judgment or settlement, shall be borne by Franchisee.

(f)    Non-Exclusive. This limited license to use the Intellectual Property is non-exclusive, and Franchisor has the right to grant other franchisees and others the right to use the Intellectual Property.

(g)    Change in Intellectual Property. Franchisor may, at any time, at its sole option, require Franchisee to use any additional or alternative Marks or other Intellectual Property. If Franchisor deems it advisable to modify or discontinue the use of any Mark or other Intellectual Property and/or use one or more additional, alternative or substitute trade or service marks, Franchisee will comply with Franchisor's directions within a reasonable time after receiving written notice from Franchisor. All costs and expenses relating to the modification or discontinuance of the use of any Mark, other Intellectual Property and/or the use of one or more additional, alternative or substitute trade or service marks will be paid by Franchisee. All provisions of this Agreement applicable to Marks and other Intellectual Property apply to any

FRANCHISE AGREEMENT                                                                                    PAGE 19

additional, alternative or substitute trade and service marks or other commercial symbols that Franchisor authorizes Franchisee to use pursuant to this Agreement.

(h)    Irreparable Harm.  Franchisee acknowledges and agrees that the failure to comply with the requirements of this Section 9 would result in irreparable harm and any damages would be both incalculable and an insufficient remedy so that Franchisor would have no adequate remedy at law.  Accordingly, Franchisor, in addition to any other remedies provided for in this Agreement or at law or in equity, shall be entitled to seek in any court of competent jurisdiction, equitable relief, including injunctive relief and specific performance, without the requirement of posting bond or security.  Franchisee shall pay all court costs and attorneys' fees incurred by Franchisor in obtaining such relief.

## 10.    **Advertising and Marketing**.

(a)    General Requirements.  Recognizing the importance of the standardization of advertising programs to the furtherance of the goodwill, identity and reputation of the System, Franchisee agrees that all advertising by Franchisee will be conducted in a commercially acceptable manner and will conform to such standards and requirements as Franchisor, as applicable, may provide in writing. Notwithstanding the above, Franchisee is currently not required to conduct local advertising.

(b)    Pre-Approved Advertising.  Franchisor may offer from time-to-time approved advertising and promotional plans and materials, including, without limitation, newspaper slicks, promotional leaflets and coupons.  All such advertising will be placed in or distributed through such media or channel of communication as approved in writing by Franchisor. In the event Franchisee uses advertising or advertises in a medium not authorized or approved in writing by Franchisor, then Franchisor will impose a fee of $1,000 per occurrence payable upon demand by Franchisor which amount will be contributed to the Advertising Fund.

(c)    Approval of Advertising.  Samples of any advertising not previously approved by Franchisor must be submitted to Franchisor, for Franchisor's prior written approval.  Upon receipt of such advertising, Franchisor will notify Franchisee within fifteen (15) days after receipt whether such advertising has been approved, with no response constituting as approval of the proposed advertising.  Franchisee will not utilize any advertising which has not been approved in writing by Franchisor or which has been disapproved by Franchisor.

(d)    Advertising Fund.

(i)    As applicable, all Advertising Fund Contributions will be deposited in an advertising fund (the "Advertising Fund") maintained and administered by Franchisor or its designee.  The Advertising Fund, and any earnings therefrom, shall be used to pay any and all costs of maintaining, administering, directing, preparing, purchasing and placing advertising, including the cost of preparing and conducting television, radio, Internet, magazine, and newspaper advertising campaigns, direct mail and outdoor billboard advertising; public relations activities and employing advertising agencies to assist in those activities; developing and developing and purchasing promotional items, including sales aids and point of sale materials and conducting and administering in store promotions; purchasing, leasing, and installing software programs and maintenance and further development of the Website (as defined in Section 12(a)), including Electronic Sales (as defined in Section 12(d)), and the Intranet Site (as defined in Section 11(c)); and any other marketing, promotion and advertising activities that Franchisor believes, in its sole discretion, would enhance the System, the Intellectual Property or the Products and Services.  These costs may include the proportionate salary share of Franchisor's employees that devote time and reader

FRANCHISE AGREEMENT                                                                                    PAGE 20

series for advertising and promotion or administration of the Advertising Fund, including without limitation, administrative costs, salaries and overhead expenses.

(ii)    Franchisor and/or its designees will direct all advertising and other programs produced using the Advertising Fund, and will have sole discretion to approve or disapprove the creative concepts, materials and media used in those programs, the placement of advertisements and the allocation of the money in the Advertising Fund.  In administering the Advertising Fund, Franchisor and its designees undertake no obligation to make expenditures for Franchisee which is equivalent or proportionate to Franchisee's contribution, or to ensure that Franchisee or any Molly Tea Store benefits directly or *pro rata* from the placement of advertising of the expenditure of Advertising Fund monies.

(iii)    All sums deposited into the Advertising Fund will be maintained in a separate account or accounts by Franchisor and/or its designees and may be used to defray any of Franchisor's reasonable operating costs and overhead that Franchisor incurs in activities reasonably related to the administration or direction of the Advertising Fund and the advertising programs for franchisees and the System.  No part of the Advertising Fund shall be used by Franchisor to defray its general operating expenses, other than those activities reasonable to the advertising, administration and other activities described in this Section.

(iv)    Franchisor and its designees have no fiduciary duty to Franchisee, any other franchisees or their Principals with regard to the operation or administration of the Advertising Fund.

(v)    Franchisor will, with respect to any Molly Tea Store operated by Franchisor or any Affiliate, contribute to the Advertising Fund on the same basis as Franchisee.

(vi)    Franchisor may, in its sole discretion, elect to accumulate monies in the Advertising Fund for such periods of time, as it deems necessary or appropriate, with no obligation to expend all monies received in any fiscal year during that fiscal year.  In the event Franchisor's expenditures for the Advertising Fund in any one fiscal year shall exceed the total amount contributed to the Advertising Fund during such fiscal year, Franchisor shall have the right to be reimbursed to the extent of such excess contributions from any amounts subsequently contributed to the Advertising Fund or to use such excess as a credit against its future contributions.  The Parties do not intend that the Advertising Fund be deemed a trust.  An unaudited statement of the operations of the Advertising Fund will be prepared annually and will be made available to Franchisee upon written request.

(vii)    Although the Advertising Fund is intended to be of perpetual duration, Franchisor may modify the terms of or terminate the Advertising Fund at any time in its sole discretion.  Franchisor will give Franchisee at least thirty (30) days' written notice of the establishment of a new or modified Advertising Fund, any change in the Advertising Fund Contribution or the termination thereof.  The Advertising Fund will not be terminated, however, until all monies in the Advertising Fund have been expended or returned to contributing Molly Tea Stores (whether franchised or operated by Franchisor or its Affiliates), without interest, on the basis of their respective contributions.

(viii)    If Franchisee and Franchisor have entered into a Revenue Allocation Agreement, then Franchisor shall withhold Franchisee's Advertising Fund Contributions prior to remitting the balance of the Franchise Commissions to Franchisee.

(e)    <u>Minimum Local Advertising Expenditures</u>.  Franchisee is currently not required to spend the Minimum Local Advertising expenditure requirement set forth in this Agreement, however, Franchisor reserves the right to implement Minimum Local Advertising in the future. Franchisee shall not advertise or promote the Franchised Business without Franchisor's prior written consent and approval of the marketing

**FRANCHISE AGREEMENT**                                                                                          **PAGE 21**

materials. If implemented, Franchisee will throughout the Term engage in local advertising, marketing and promotional activities and campaigns in accordance with Franchisor's System Standards and the Operating Manual, as amended from time to time by Franchisor.  All such local advertising, marketing and promotional activities and campaigns must be approved by Franchisor in advance in writing.  Franchisor may withdraw its approval at any time if any such activity or campaign fails to comply with Franchisor's then-current System Standards and Operating Manual.  The Minimum Local Advertising expenditures will be used to pay for the cost of implementing local marketing plans developed by Franchisor and adapted and implemented by Franchisee with Franchisor's approval or developed by Franchisee and approved in writing by Franchisor.  For these purposes, advertising expenditures include amounts spent by Franchisee for advertising media and community relations, such as television, radio, Internet, newspaper, billboards, posters, direct mail, collateral and promotional items, advertising on public vehicles (transit and aerial) and the cost of producing approved materials necessary to participate in these media.  Minimum Local Advertising expenditures do not include amounts spent for items which Franchisor, in its sole judgment, deems inappropriate for meeting the minimum requirement for Minimum Local Advertising, including permanent on-site signs, point of purchase materials and store hours, complimentary charges, donations, lighting, Products and Services list, personnel salaries or administrative costs, transportation vehicles (even though such vehicles may display the Marks), discounts, free offers and personnel or crew member incentive programs.  Franchisor has the right to audit Franchisee's books and records to ensure that the Minimum Local Advertising expenditures are being made in accordance with the terms of this Agreement.

(f)      Electronic and Digital Marketing and Advertising.  Without Franchisor's prior written consent, which may be withheld in the Franchisor's sole discretion, neither Franchisee nor its Affiliates shall (nor shall they permit any third party representatives or digital marketing agencies to) develop, create, contribute to, distribute, disseminate or use any electronic or Internet communication, including blogs, instant message services such as X or Snapchat, social media sites such as Facebook, X, Pinterest or Instagram, or any electronic communications methods or ad word purchasing program or any multimedia, telecommunications, mass electronic mail messages, facsimile or audio/visual advertising, promotional or marketing materials ("*Electronic Advertising*"), directly or indirectly related to the Marks, the System, other franchisees, Franchisor, its employees and Affiliates.  Franchisee acknowledges and agrees that it will not post a blog, create or contribute to a website, engage in any type of social networking or conduct any type of Internet communication that refers to the Marks, the System, Franchisor, its Affiliates and employees, any Molly Tea Store or other franchisees without Franchisor's prior written permission.  Franchisor shall retain the exclusive right to develop, publish and control the content of all Electronic Advertising for all Molly Tea Stores.

(g)      Grand Opening Advertising and Public Relations. Immediately preceding and following the opening of the Molly Tea Store, Franchisee shall conduct an initial local advertising and public relations promotion program in the form and manner prescribed by Franchisor.  Franchisee shall spend a minimum of $15,000 on pre-opening and on grand opening advertising and public relations to publicize the opening of the Molly Tea Store beginning fifteen (15) days prior to the grand opening of the Molly Tea Store and ending three months after the Molly Tea Store's opening all of which must be approved in writing by Franchisor prior to use.  If Franchisee's grand opening advertising has not been approved by Franchisor twenty (20) days prior to the opening of Franchisee's Molly Tea Store, then Franchisee will pay the grand opening advertising amount directly to Franchisor, and Franchisor will spend the grand opening advertising amount to implement a grand opening program on Franchisee's behalf.

(h)      Special Promotions.  In addition to the regional and local advertising described in this Section 10, Franchisor may from time to time develop and administer advertising, marketing and sales promotional programs in which Franchisee will participate upon such terms and conditions established by Franchisor.  Such programs are in addition to Franchisee's Minimum Local Advertising expenditure requirements and may include, without limitation, specialized Products or Services, marketing promotions,

**FRANCHISE AGREEMENT**                                                                **PAGE 22**

specialized offerings and similar programs.  All phases of such advertising, marketing and promotion, including the type, quantity, timing, placement, choice of media, market areas, promotional programs and advertising agencies will be determined solely by Franchisor.

(i)    <u>Press Releases</u>.  No public communication, press release or announcement regarding this Agreement, the transactions contemplated hereby, the operation of the Molly Tea Store, or any other event will be made by Franchisee to the media or other third parties without written notice to Franchisor and Franchisor's prior written approval of such communication, press release or announcement, which approval can be withheld in Franchisor's sole discretion.  Franchisee will not disclose the substance of this Agreement to any third party except as necessary to obtain a lease or renewal or obtain any permit, license or other approvals, or to the extent required by the lawful order of any court of competent jurisdiction having jurisdiction over Franchisee or for any public disclosure otherwise required by Applicable Laws or by the regulations of a stock exchange in which the shares of capital stock of Franchisee or of any Entity that controls Franchisee are traded (in which case, Franchisee will consult with Franchisor reasonably in advance of such public disclosure unless Franchisee determines in good faith that such consultation is reasonably likely to result in a delay with respect to such public disclosure with material and adverse consequences to Franchisee in which case Franchisee will provide written notice of such public disclosure as soon as is practicable under the circumstances).

(j)    <u>Pricing Policies</u>.  Franchisor will provide retail prices for Products and Services in its menus and Operating Manual.  Pricing must be in compliance with the terms of this Agreement, the Operating Manual and Applicable Law.  In addition, Franchisee will honor the terms of all promotional or discount programs that Franchisor may offer to customers of Molly Tea Stores.

(k)    <u>Truthful Advertising, Marketing and Promotion</u>.  In the event that Franchisor conducts any advertising, promotion and marketing, then Franchisee conducts must be factually accurate and not misleading and conform to the highest standards of ethical marketing and the promotional policies which Franchisor prescribes from time to time, including, but limited to, the System Standards.  Samples of all advertising, promotional and marketing materials which Franchisor has not prepared or previously approved in writing within the prior twelve (12) months must be submitted to Franchisor for approval before Franchisee may use them.  Franchisee may not use any advertising or promotional materials or engage in any advertising or promotional campaigns that Franchisor has not approved in writing.  Franchisor will own the copyrights to any materials so submitted, whether approved by Franchisor or not.  In all cases, Franchisor has control over any profiles that use or relate to the Molly Tea Store, that display the Marks, or that are maintained on social media websites and applications and all other similar websites and applications that may exist in the future.  Franchisor may (but need not) establish guidelines pursuant to which Franchisee may establish profiles or otherwise establish a presence on such social media websites and platforms.  In such event, Franchisee must comply with the System Standards imposed from time to time on such use.  Franchisee will sign over control of any social media accounts or profiles, with fan bases intact, and provide access to reports and history of promotion performance, upon Franchisor's request.

(l)    <u>Advertising Cooperative</u>.  Franchisor will have the right, in its sole discretion, to designate any geographic area as a region for purposes of establishing a group of two or more Molly Tea Stores, as determined by Franchisor, for the purpose of funding, administering and developing regional advertising and promotion programs ("***Advertising Cooperative***") to which Franchisee will be a member.  The Advertising Cooperative will be established and operated in accordance with an advertising cooperative agreement prepared by Franchisor.  If Franchisee is required to participate in a Franchisor-approved advertising cooperative, Franchisee will be required to execute Franchisor's then-current standard advertising cooperative agreement.  Franchisor may terminate any advertising cooperative pursuant to the terms of the applicable cooperative advertising agreement. Franchisor may require advertising cooperatives to be formed, changed, dissolved or merged.

**FRANCHISE AGREEMENT**                                                          **PAGE 23**

**11.** **Technology Systems and POS System**.

(a) Technology Systems. Franchisee shall purchase and maintain the (i) computer system, software, data, telephone, voice messaging, retrieval and transmission system; (ii) customer relationship management systems; (iii) printers and other peripheral devices; (iv) archival back-up systems; (v) Internet access mode (e.g., form of telecommunications connection) and speed; and (vi) front of the house WiFi and other Internet services for customers (the "***Technology Systems***") required by Franchisor. Franchisor may periodically modify, upgrade or change the System Standards for the Technology Systems, and, if so, Franchisee will acquire at its sole cost, and have in operation, such modified, upgraded or new Technology Systems, and the computer hardware and software comprising part of the Technology Systems, within **[60]** days from the date of notice from Franchisor, or within such other time frame required by Franchisor. Franchisor may, at its sole option, charge Franchisee for any computer usage costs that Franchisor incurs as a result of Franchisee's use of the Technology Systems, including but not limited to, a systems fee for modifications of and enhancements made to any proprietary software that Franchisor licenses to Franchisee and other maintenance and support services that Franchisor or its Affiliates furnish to Franchisee related to the Technology Systems. Franchisee will have sole and complete responsibility for the acquisition, operation, maintenance, and upgrading of the Technology Systems and all costs relating thereto. If a data security breach occurs, Franchisee must immediately notify Franchisor and comply with all investigation and remediation efforts related to such breach consistent with Franchisor's standards and specifications. Franchisee authorizes vendors designated or approved by Franchisor to conduct periodic data security and compliance audits and to perform remediation measures pursuant to Franchisor's standards and specifications, or Franchisee shall provide proof of compliance to Franchisor.

(b) POS System. Franchisee shall purchase, use and maintain the computerized point of sale cash collection system (including all related hardware and software systems) as specified in the Operating Manual or otherwise by Franchisor in writing for use in connection with the Molly Tea Store (the "***POS System***"). The POS System must be connected to a communications medium specified by Franchisor or at all times and be capable of accessing the Internet via a designated third-party network for the purpose of implementing software, transmitting and receiving data and accessing the Internet and maintaining the POS System. Upon notice from Franchisor at Franchisee's cost and expense, the POS System shall be electronically linked to Franchisor's or its designated Affiliate's Intranet Site. Franchisee will provide Franchisor access (and/or Franchisor may require the supplier to grant Franchisor access) to any POS System information at such times and in such manner as established by Franchisor, with or without notice, and allow Franchisor independent access to review and retrieve such information including, without limitation, customary sales, sales mix, usage and other operations data as Franchisor deems appropriate. Franchisee will apply for and maintain debit cards, credit cards, and other noncash systems existing or developed in the future as specified by Franchisor. Franchisee will record all sales by, at, from or through the Molly Tea Store on the POS System. Franchisor may require Franchisee to update, upgrade or replace the POS System, from time to time upon written notice, and Franchisee shall purchase, at its sole cost, and have in operation, such updated, upgraded or new POS System within sixty (60) years of such notice (or within such other time frame as Franchisor designates). Franchisor may develop certain proprietary software and upgrades or replacements thereto to be used in the operation of the POS System. Franchisee shall at Franchisor's request license or sublicense such software from Franchisor or its designee.

(c) Intranet Site. Franchisor may, at its option, establish and maintain an intranet site (the "***Intranet Site***") through which Franchisee and Franchisor may communicate with each other. Franchisor will have sole discretion and control over the Intranet Site, including the content and functionality thereof. However, Franchisor has no control over the stability or maintenance of the Intranet Site generally, and is not responsible for damage or loss caused by errors of the Intranet Site. Franchisor will establish policies and procedures for the Intranet Site's use, if established, and Franchisee must strictly comply with such policies and procedures. Franchisee acknowledges that, as administrator of the Intranet Site, Franchisor

**FRANCHISE AGREEMENT**                                                                 **PAGE 24**

can technically access and view any communication that any person posts on the Intranet Site and all communications that are posted to it will become Franchisor's property, free of any claims of privacy or privilege that Franchisee or any other person may assert.  At Franchisor's option, Franchisor may post, update and disseminate the Operating Manual and other Confidential Information through the Intranet Site. Any passwords or other digital identifications necessary to access the Operating Manual on the Intranet Site will be deemed to be part of Confidential Information.  If established, Franchisee will have the mere privilege to use the Intranet Site, subject to Franchisee's strict compliance with the System Standards.  If Franchisee is in default under this Agreement, any Ancillary Agreement or any other agreement with Franchisor or its Affiliates, Franchisor may, in addition to, and without limiting any other rights and remedies available to Franchisor, disable or terminate Franchisee's access to the Intranet Site without any liability to Franchisee.  Franchisor has no obligation to maintain the Intranet Site indefinitely, and may modify or discontinue it at any time without liability to Franchisee.

(d)    Systems Access.  Franchisee may be provided access to all types of computer or electronic systems (or any substitute thereof), including, without limitation, any third-party computer or electronic systems to which Franchisee may be given access.  Franchisee will be responsible for all of Franchisee's actions relating to such system, including use of any logon IDs, passwords or other authentication methods provided to Franchisee.  All of Franchisee's connectivity or attempted connectivity to Franchisor's computing systems will be only through Franchisor's security gateways or Franchisor's firewalls. Franchisee will not access, and will not permit unauthorized persons or entities within its control to access, Franchisor's computing systems without Franchisor's express written authorization, and any such actual or attempted access will be consistent with any such authorization.  Franchisee will fully comply with Franchisor's systems access requirements and related System Standards with respect to the Technology System.

12.    **Franchisor's Website**.

(a)    Website.  Franchisor may establish and, if established, will maintain a website. Franchisor will have sole discretion and control over the Website design and contents and can amend or modify the Website at any time.  The Website may identify Franchisee's Molly Tea Store by name, geographic region, address, telephone number, email address or by other identifying features.  Franchisor may link the Website to the websites of third parties, including, electronic service providers and other providers of goods and services.  Franchisor also may permit third parties to link to the Website or any replicated Website. Franchisor may place the Marks, corporate logos and slogans, advertisements, endorsements, disclaimers and other identifying information on the Website.  Franchisor may establish or participate in programs whereby Franchisor refers end-users to other websites, or Franchisor receives referrals from other websites. All consideration (monetary or non-monetary) received by Franchisor on account of the placement or sale of advertisements, endorsements and sponsorships on the Website (including any replicated Website), will belong only to Franchisor.  Franchisor may discontinue the Website at any time without liability to Franchisee.

(b)    Replicated Website.  Franchisor may provide Franchisee with a replicated Website and permit Franchisee to customize or post certain information about the Molly Tea Store subject to Franchisor's prior written approval and written policies, as amended from time to time.  Any content posted on the replicated Website by Franchisee will be deemed a "work for hire" and owned by Franchisor. Franchisor may charge a fee for the privilege of using the replicated Website.  Franchisor shall have the right to disable Franchisee's replicated Website if it fails to follow Franchisor's policies and procedures.

(c)    Policies.  Franchisor will establish written policies and procedures for the use of the Website and any replicated Website.

(d)    <u>Electronic Commerce</u>.  Franchisor may, at its discretion, use the Website for the purpose of offering and selling its Products and Services and accepting orders and payment for its Products and Services directly or indirectly through means of electronic communication, including the Internet ("***Electronic Sales***").  If Franchisor decides to engage in Electronic Sales, it will (i) establish uniform procedures, policies and protocols to govern electronic communications between Franchisor and its customers and the use and dissemination of customer information; and (ii) establish the terms and conditions, if any, under which franchisees may participate in Franchisor's Electronic Sales including the terms, if any, on which Franchisor and participating franchisees may share program revenues and expenses.  Franchisor shall have no liability to Franchisee or its customers for theft or disclosure of confidential customer information or breach of Franchisor's privacy standards.

(e)    <u>Termination of Use</u>.  If Franchisee is in default under this Agreement, any Ancillary Agreement or any other agreement with Franchisor or its Affiliates, Franchisor may, in addition to, and without limiting any other rights and remedies available to Franchisor, disable or terminate Franchisee's access to the Website and any replicated Website without any liability to Franchisee.

**13.    <u>Accounting and Records</u>**.

(a)    <u>Accounting and Records</u>.  Franchisee will obtain and be solely responsible for its own accounting services and any required hardware or software related thereto.  Franchisee will at all times maintain accurate and complete records as specified in the Operating Manual, including without limitation, sales, inventory and expense information, in order to generate the reports requested by Franchisor. To the extent that Franchisor may provide support for accounting software used by Franchisee, such support will only be provided with respect to the accounting software then used by Franchisor in the operation of its own Molly Tea Store.

(b)    <u>Accounting Statements</u>.  In addition to the general accounting and reporting requirements, at Franchisee's cost, Franchisee will submit to Franchisor all in the form prescribed by Franchisor:

(i)    Unaudited monthly profit and loss statements and showing the sources of all income and the amount expended each month during the period on local advertising and balance sheet within twenty (20) days of the end of each month during the Term;

(ii)    Unaudited annual profit and loss and source of use of funds statements and a balance sheet as of the end of such fiscal year prepared in conformity with generally accepted accounting principles applied on a consistent basis, as well as a schedule of capital expenditures and a schedule of advertising expenditures, within sixty (60) days of the end of each fiscal year during the Term;

(iii)    Copies of Franchisee's quarterly state sales tax returns and federal and state income tax returns within five days after filing;

(iv)    Weekly statements reporting all revenue and expense activity during the week and such other information as Franchisor may require; and

(v)    Such other financial statements, reports and records as Franchisor prescribes.

Each such statement shall be signed by Franchisor attesting that it is true and correct.  Franchisee hereby irrevocably consents to Franchisor's use of information in its financial statements in Franchisor's Franchise Disclosure Document.

**F**RANCHISE **A**GREEMENT                                                                                            **P**AGE 26

(c)    <u>Inspection of Accounting and Records</u>.    Franchisor and its designated agents or representatives will have the right at any time, provided Franchisor will use reasonable efforts to avoid any disruption of or interference with the operation of the Molly Tea Store during normal business hours, to:

(i)    obtain samples of any Products and Services, ingredients and supplies for testing and analysis (including without limitation analysis of the conditions of sanitation and cleanliness of the storage, production, handling and serving of such Products, ingredients and supplies);

(ii)    enter the Premises, observe, photograph and videotape the operations of the Molly Tea Store for such consecutive or intermittent periods as Franchisor deems necessary and otherwise inspect the Molly Tea Store, including without limitation, inspections by third parties retained by Franchisor to perform as "mystery shoppers." In the event the Molly Tea Store fails any such mystery shopper inspection, Franchisee will reimburse Franchisor for all costs and fees associated with such mystery shopper, including, without limitation, the fees of the mystery shopper and the cost of the mystery shopper's services purchased at the Molly Tea Store;

(iii)    consult with personnel and customers of the Molly Tea Store;

(iv)    perform assessments of Franchisor's performance and advise Franchisee of corrective actions that must be taken for any key performance level described in the Operating Manual that Franchisee fails to satisfy upon any such assessment; and

(v)    inspect, examine, audit and copy any books and records relating to the operation of the Molly Tea Store.

Franchisee will fully cooperate with Franchisor in connection with any of the above such activities. Franchisee shall present to its customers such evaluation forms that Franchisor periodically prescribes and participate and/or request its customers to participate in any surveys performed by Franchisor or on its behalf. Franchisor will notify Franchisee in writing of any unsatisfactory conditions discovered as it deems appropriate, and, if notified, Franchisee will promptly correct and repair, as applicable, any such conditions. Any audit, examination or inspection will be at Franchisor's cost and expense unless Franchisor is conducting the audit, examination or inspection due to Franchisee's failure to submit reports, or unless the reports submitted by Franchisee for the reporting period show an understatement of Gross Sales by 2% or more and/or a corresponding underpayment of Royalty Fees, Advertising Fund Contribution and/or Minimum Local Advertising expenditure, in which cases all reasonable and necessary costs and expenses related to such examination will be paid by Franchisee (including, without limitation, reasonable accounting and attorneys' fees). Franchisee will immediately pay Franchisor upon demand any deficiency in any fees plus interest as specified in <u>Section 4(h)</u>. These remedies will be in addition to any other remedies Franchisor may have at law or in equity.

(d)    <u>General Accounting Principles</u>.    Franchisee will maintain for at least five years from the dates of preparation, full, complete and accurate books, records and accounts in accordance with generally-accepted accounting principles in the United States and in the form and manner prescribed by Franchisor from time to time in the Operating Manual or otherwise in writing.

**14.    <u>Representations and Warranties</u>**.

(a)    <u>Representations and Warranties of Franchisee</u>.    If Franchisee is an Entity, then Franchisee and each of its Principals represent, warrant and covenant to Franchisor that:

(i)        it is duly formed and organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite power and authority to enter into this Agreement and the Ancillary Agreements and perform the obligations contained herein and therein;

(ii)       it has the necessary consents, approvals, licenses and/or permits to carry out the business activities contemplated by this Agreement, and it will furnish such other information about its organization or formation as Franchisor may reasonably request to confirm the same;

(iii)      the execution, delivery and performance by Franchisee of this Agreement and the Ancillary Agreements have been duly authorized by all requisite actions on the part of Franchisee and no further actions are necessary to make this Agreement and the Ancillary Agreements valid and binding upon it and enforceable against it in accordance with their respective terms;

(iv)      Franchisee's governing documents will at all times provide that Franchisee's activities are confined exclusively to the operation of the Molly Tea Store unless otherwise consented to in writing by Franchisor;

(v)       neither the execution, delivery nor performance by Franchisee of this Agreement or the Ancillary Agreements will conflict with, or result in a breach of any term or provision of Franchisee's charter, by-laws, articles of organization or formation, partnership agreement and/or other governing documents and any amendments thereto, any indenture, mortgage, deed of trust or other material contract or agreement to which Franchisee is a party or by which it or any of its assets are bound, or breach any order, writ, injunction or decree of any court, administrative agency or governmental body;

(vi)      certified copies of Franchisee's organizational and/or other governing documents and any amendments thereto, including all resolutions authorizing this Agreement and the Ancillary Agreements have been delivered to Franchisor, and any amendments or changes to such governing subsequent to the date of this Agreement will not be undertaken without Franchisor's prior written consent;

(vii)     all Equity Interests in Franchisee are accurately and completely described in Exhibit A; and

(viii)    if Franchisee is a corporation, Franchisee will maintain stop-transfer instructions against the transfer on Franchisee's records of any of its equity securities and each stock certificate will have conspicuously endorsed upon it a statement in a form satisfactory to Franchisor that it is held subject to all restrictions imposed by this Agreement, and if Franchisee is a partnership or limited liability company, its written partnership or limited liability company agreement (and, if applicable, any certificates issued in connection therewith) will provide that ownership of an interest in the partnership or limited liability company is held subject to all restrictions imposed by this Agreement.

If Franchisee is an individual, then Franchisee represents, warrants and covenants that neither the execution, delivery nor performance by Franchisee of this Agreement or the Ancillary Agreements conflicts with, or results in a breach of any contract or agreement to which Franchisee is a party or a breach of any order, writ, injunction or decree of any court, administrative agency or governmental body.

(b)       Franchisee's Principals.  Franchisee will notify Franchisor within ten (10) days following the date that any person or Entity previously identified as a Principal ceases to qualify as such or that any new person or Entity succeeds to or otherwise comes to occupy a position which would qualify such person or Entity as one of Franchisee's Principals.  That person or Entity will immediately execute all documents and instruments (including, without limitation, a consent to a background check at such person's or Entity's cost and this Agreement) required by Franchisor to be executed by Principals.

(c)      <u>Guaranty and Undertaking of Obligations</u>.  Franchisee's Principals will, jointly and severally, guaranty the performance of Franchisee's obligations, covenants and agreements under this Agreement pursuant to the terms and conditions of the Guaranty and Undertaking of Obligations, attached as <u>Exhibit G</u> and incorporated herein by reference, and will otherwise bind themselves to the terms of this Agreement as stated herein.

(d)      <u>Employment Matters</u>.  Franchisee will comply with all of Franchisor's policies relating to ethical and professional conduct.  Franchisee will provide wages and benefits that are in compliance with all Applicable Laws. Franchisee will maintain employee work hours in compliance with Applicable Laws. Franchisee will not utilize forced, prison or child labor.  No Person may be employed at an age younger than that permitted by Applicable Laws, and regardless of such Applicable Law, all employees of Franchisee must be at least 16 years of age, and such age appropriately documented.  For purposes of this <u>Section 14</u>, Franchisee includes Franchisee's Affiliates and Principals and each of their employees, agents and representatives, and Franchisee will ensure that its Affiliates and Principals comply with all of the terms hereof.

15.      <u>**Restrictive Covenants**</u>.

(a)      <u>Confidential Information</u>.  Franchisee and Franchisee's Principals will have no right, title or interest in the Confidential Information except as expressly provided for in this Agreement.  All Confidential Information is proprietary to Franchisor or its Affiliates.  Franchisee and its Principals will only communicate, disclose or use the Confidential Information as expressly permitted herein solely in connection with the Molly Tea Store or as required by Applicable Laws.  Franchisee and its Principals will keep the Confidential Information confidential and will disclose the Confidential Information only to such of Franchisee's employees, agents or independent contractors who must have access to it in connection with their employment or the operation of the Molly Tea Store.  Neither Franchisee nor its Principals or employees will copy, reproduce or duplicate in whole or in part any Confidential Information, make Confidential Information available to any unauthorized person or assign, sell, trade or otherwise profit in any way from the Confidential Information.  Franchisor will adopt and implement reasonable procedures to prevent unauthorized use or disclosure of Confidential Information.  The covenant in this <u>Section 15(a)</u> will survive the expiration, termination or transfer of this Agreement and will be perpetually binding upon Franchisee and its Principals.   Franchisee will cause Franchisee's employees having access to the Confidential Information to execute confidentiality agreements stating that they will preserve in confidence all Confidential Information in the form attached hereto as <u>Exhibit F-2</u> and incorporated herein by reference.

(b)      <u>Non-Competition/Non-Solicitation</u>.  In consideration of the training described herein and disclosure to Franchisee of the System and the Confidential Information, during the Term of this Agreement and for a continuous uninterrupted period of two (2) years following its expiration, termination or an approved Transfer, and, with respect to a Principal, following the date the Principal ceases to be a Principal under this Agreement, Franchisee and its Principals will not, directly or indirectly for itself, himself or herself or through, on behalf of, or in conjunction with any other person or Entity:

(i)      divert or attempt to divert any present or prospective business or customer of the Molly Tea Store or any Molly Tea Store to any other person or Entity, or do or perform any other act injurious or prejudicial to the goodwill associated with the Intellectual Property or the System; or

(ii)      own, maintain, advise, operate, engage in, or be employed by, make loans to or have an Equity Interest in a business that is the same or similar to a Molly Tea Store or which offers products or services similar to the Products and Services (a "***Competitive Business***"); provided that this provision will not apply to any minority interest collectively held by Franchisee or its Principals in any publicly-held

corporation listed on a national stock exchange. During the Term, this restriction applies to any business located within the United States. Following the expiration of the Term, earlier termination of this Agreement, or an approved Transfer of this Agreement and, with respect to a Principal, following the date the Principal ceases to be a Principal under this Agreement, this restriction will apply to any business located: (i) within the Territory; (ii) at or within a 10-mile radius of the Molly Tea Store; or (iii) within a 10-mile radius of any Molly Tea Store then operating or under construction in the United States or outside the United States, except as otherwise approved in writing by Franchisor.

(c)    Independent Covenants. If any part of these restrictions is found to be unreasonable in time or distance, each month of time or mile of distance may be deemed a separate unit so that the time or distance may be reduced by appropriate order of the court to that deemed reasonable. If, at any time during the two-year period following the expiration, termination or approved Transfer of this Agreement or the date any Principal ceases to be a Principal under this Agreement, Franchisee or any of its Principals fail to comply with its obligations under this Section 15, that period of non-compliance will not be credited toward satisfaction of the two-year period.

(d)    Enforceability Not Affected by Franchisee Claims. Franchisee and each of its Principals expressly agree that the existence of any claims they may have against Franchisor, whether or not arising from this Agreement, will not constitute a defense to the enforcement by Franchisor of the covenants in Section 15.

(e)    Reasonableness. Franchisee and each of its Principals acknowledge that the covenants contained in this Section 15 are reasonable and necessary to protect the business and goodwill of the System and to avoid misappropriation or other unauthorized use of the System and Franchisor's other Confidential Information. Franchisee and each of its Principals acknowledge that Franchisee and its Principals possess the education, training and experience necessary to earn a reasonable livelihood apart from operating a Competitive Business.

(f)    Additional Covenants. Franchisee will require and obtain for the benefit of Franchisor execution of written covenants similar to those set forth in this Section 15 (and approved by Franchisor) from any and all of its Principals and the directors, officers and Managers of Franchisee and any employees having access to materials or information furnished or disclosed to Franchisee by Franchisor. Franchisor shall be an express third-party beneficiary of such covenants with the independent right to enforce them.

(g)    Non-Liability. Franchisee acknowledges and agrees that Franchisor will not, by virtue of any approvals, advice or services provided to Franchisee, assume responsibility or liability to Franchisee or any third parties to which it would not otherwise be subject.

(h)    Irreparable Injury. Franchisee acknowledges and agrees that the failure to comply with the requirements of this Section 15 would result in irreparable harm and any damages would be both incalculable and an insufficient remedy so that Franchisor would have no adequate remedy at law. Accordingly, Franchisor, in addition to any other remedies provided for in this Agreement or at law or in equity, shall be entitled to seek in any court of competent jurisdiction, equitable relief, including injunctive relief and specific performance, without the requirement of posting bond or security. Franchisee shall pay all court costs and attorneys' fees incurred by Franchisor in obtaining such relief.

(i)    Non-Disparagement. Neither Franchisee nor its Principals or employees shall make any negative, disparaging, untrue or misleading comments about Franchisor or its members, officers, managers or employees or the System. Franchisee may not, by any act or omission, harm or impair the value of the goodwill associated with the Marks and the System.

FRANCHISE AGREEMENT                                                      PAGE 30

**16.** **Indemnification**.

(a)     Indemnification.  Franchisee and each of its Principals agree to and hereby, jointly and severally, indemnify, defend (by counsel chosen by Franchisor) and agree to hold harmless Franchisor and Franchisor Indemnitees from all Losses and Expenses incurred as a result of, directly or indirectly, from any action, suit, proceeding, claim, investigation or inquiry ("*Action*") arising, directly or indirectly, from or in connection with a claim by a third party against one or more Franchisor Indemnitees in connection with:

(i)     Franchisee's or any of its Principal's alleged infringement or alleged violation of any trademark or other proprietary name, mark or right allegedly owned or controlled by a third party;

(ii)     The violation, breach or asserted violation or breach by Franchisee or any of its Principals, of any Applicable Laws;

(iii)     Libel, slander or any other form of defamation of Franchisor, the System or any franchisee operating under the System by Franchisee or by any of its Principals;

(iv)     Franchisee's failure to perform or the violation or breach by Franchisee or any of its Principals of any warranty, representation, agreement or obligation in this Agreement, any Ancillary Agreement or in any other agreement between Franchisee and Franchisor or its Affiliates or a third party;

(v)     The marketing, promotion or advertisement of the Molly Tea Store or products and services or the sale of any Products and Services offered by the Molly Tea Store, including unfair or fraudulent advertising claims (whether in print advertising or electronic media), and product liability claims;

(vi)     Franchisee's, its Principal's or its Affiliate's development, ownership, operation and/or closing of any Molly Tea Store; or

(vii)     Any allegedly unauthorized service or act rendered or performed in connection with this Agreement, and regardless of whether it resulted from any strict or vicarious liability imposed by law on Franchisor Indemnitees.

The foregoing indemnity will apply even if it is determined that any of Franchisor Indemnitees' negligence caused such loss, liability or expense, in whole or in part; provided, however, that this indemnity will not apply to any liability arising from a breach of this Agreement by Franchisor Indemnitees or the gross negligence or willful acts of Franchisor Indemnitees (except to the extent that joint liability is involved, in which event the indemnification provided herein will extend to any finding of comparative or contributory negligence attributable to Franchisee).  Franchisor will give Franchisee reasonable notice of any such indemnified matter of which Franchisor becomes aware and for which indemnification may be required, and Franchisor may elect (but is not obligated) to direct the defense thereof, including the selection of appropriate counsel at Franchisor's sole determination.  Franchisor may, at Franchisor's sole option, take such actions as it deems necessary and appropriate to investigate, defend, or settle any event or take other remedial or corrective actions with respect thereto as may be necessary for the protection of Franchisor Indemnitees or Molly Tea Stores generally.  Further, notwithstanding the foregoing, if the insurer on a policy or policies obtained in compliance with this Agreement agrees to undertake the defense of an indemnified matter, Franchisor agrees not to exercise Franchisor's right to select counsel to defend the event if such would cause Franchisee's insurer to deny coverage.  Franchisor reserves the right to retain counsel to represent it with respect to any such indemnified matter at Franchisee's cost and expense.

(b)    Settlement and Remedial Actions.  In order to protect persons or property, or its reputation or goodwill, or the reputation or goodwill of others, Franchisor may, at any time and without notice, as it, in its sole judgment, deems appropriate, consent or agree to settlements or take such other remedial or corrective actions it deems expedient with respect to any Action.  Franchisor's election to settle will not diminish Franchisee's and each of its Principal's obligations to defend, indemnify and hold the Franchisor Indemnitees harmless from all Losses and Expenses.

(c)    Expenses.  All Losses and Expenses incurred under this Section 16 will be chargeable to and paid by Franchisee or any of its Principals regardless of any actions, activity or defense undertaken by Franchisor or the subsequent success or failure of such actions, activity or defense.

(d)    Third Party Recovery.  Under no circumstances will Franchisor Indemnitees be required or obligated to seek recovery from third parties or otherwise mitigate their losses in order to maintain a claim against Franchisee or any of its Principals.  Franchisee and each of its Principals agree that the failure to pursue such recovery or mitigate loss will in no way reduce the amounts recoverable from Franchisee or any of its Principals by Franchisor Indemnitees.

(e)    Survival.  Franchisee and its Principals expressly agree that the terms of this Section 16 will survive the termination, expiration or Transfer of this Agreement or any interest herein.

**17.    Insurance.**

(a)    Types of Insurance.  Prior to the commencement of construction of the Molly Tea Store and for the entire Term, Franchisee will obtain and maintain insurance protecting Franchisee and Franchisor Indemnitees against any demand or claim arising or occurring in connection with the construction and operation of the Molly Tea Store.  Franchisee must obtain and maintain in effect for the Molly Tea Store (i) comprehensive and general liability insurance, including personal and advertising injury coverage, products liability insurance, and coverages for fire, legal liability and medical expenses; (ii) all risk property insurance, including fire, and extended coverage, vandalism, and malicious mischief insurance for the replacement value of the Molly Tea Store and its contents; (iii) crime insurance, including employee dishonesty and loss of money and securities (both inside and outside the Premises); (iv) business interruption insurance that covers Franchisee's loss of income and Franchisor's Royalty Fees, (v) automobile, employers' liability and unemployment insurance and workers' compensation (including terrorism) insurance or substantial equivalent coverages; and (vi) such other insurance policies Franchisor may require, or as required by applicable law.

(b)    Requirements.  All insurance policies must (i) be issued by a responsible carrier or carriers that have received and maintain an A.M. Best Rating of "(A) V" or better and an A.M. Best Class Rating of VIII (or comparable ratings from a reputable insurance rating service, in the event such A.M. Best ratings are discontinued or materially altered), and otherwise approved by Franchisor; (ii) contain such types and minimum amounts of coverage, exclusions and maximum deductibles set forth in Exhibit H, attached hereto and incorporated herein by reference, as such may be amended by Franchisor from time to time; (iii) name Franchisor and its Affiliates, successors and assigns as additional insureds; (iv) include a waiver of subrogation provision or endorsement in favor of Franchisor Indemnitees; (v) be primary and non-contributory to any other insurance that any of Franchisor Indemnitees has procured itself; (vi) provide for thirty (30) days' prior written notice to Franchisor of any material modification, cancellation, or expiration of such policy; and (vii) include such other provisions as Franchisor may require from time to time.  Such endorsements must not contain language that limits the liability afforded to Franchisor and its Affiliates to any amount less than stated on the declarations page of each policy.  No insurance policy will contain a provision that in any way limits or reduces coverage for Franchisee in the event of a claim by Franchisor Indemnitees.  Such insurance coverage will not include an insured versus insured exclusion or any exclusion

**FRANCHISE AGREEMENT**                                                                                          **PAGE 32**

that prevents coverage of a claim by one insured against another. All insurance coverage will include a separation of insureds provision.

(c)     Evidence.  Within thirty (30) days after the execution of the Lease and, thereafter, at least sixty (60) days prior to the expiration of any such policy, Franchisee will deliver to Franchisor evidence of such insurance in the form of certificates evidencing such coverage as well as endorsements reflecting the requirements of this Section 17 and all language wherever found in the policies that relate to the determination of who is an additional insured, and the scope of the additional insured's coverage. Franchisor has the right, but not the obligation, to inspect any actual policies required under this Agreement for compliance with all specified coverage, terms, conditions, endorsements, and limits relative to this Agreement.  If Franchisee fails or refuses to maintain any required insurance coverage, or to furnish satisfactory evidence thereof, Franchisor, at Franchisor's sole option and in addition to Franchisor's other rights and remedies hereunder, may obtain such insurance coverage on Franchisee's behalf.  If Franchisor obtains such insurance coverage, Franchisee must fully cooperate with Franchisor in Franchisor's effort to obtain such insurance policies and must pay Franchisor any costs and premiums that Franchisor incurs, plus a 10% administrative fee.

(d)     Additional Insurance.  Franchisee's obligation to maintain insurance coverage is not diminished in any manner by reason of any separate insurance Franchisor may choose to maintain, nor does it relieve Franchisee of any of its obligations under this Section 17.  Franchisee acknowledges and agrees that the coverages required by Franchisor are the minimum amounts of coverage that Franchisee must procure under this Agreement.  Franchisee is free to buy additional insurance coverage or increase the amounts of coverage as Franchisee deems appropriate based on Franchisee's investigation as to whether additional coverages or higher amounts are necessary.  Franchisee further acknowledges and agrees that Franchisee is not relying upon Franchisor to determine the amount or type of insurance coverage necessary for Franchisee.   FRANCHISEE RELEASES FRANCHISOR FROM ANY AND ALL CLAIMS RELATING TO THE PROCUREMENT OF INSURANCE INCLUDING CLAIMS THAT FRANCHISOR DID NOT REQUIRE FRANCHISEE TO PROCURE ADEQUATE INSURANCE.

18.     **Transfer of Interest**.

(a)     Transfer by Franchisor.  Franchisor will have the right to sell, transfer, convey or assign this Agreement, its rights to the Intellectual Property, its Equity Interests, its assets and all or any part of its rights, interests or obligations herein and therein to any person or Entity without the consent of Franchisee or its Principals.  Upon such transfer by Franchisor, any transferee or assignee of Franchisor will become solely responsible for all such obligations of Franchisor under this Agreement from the date of transfer. Without limiting the foregoing, Franchisee acknowledges that Franchisor may sell its assets (including its rights in the Intellectual Property and the System) to a third party, may offer its securities privately or publicly, may merge, acquire other Entities or be acquired by another Entity or person, and may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring.  With regard to any or all of the above transfers, Franchisee expressly and specifically waives any claims, demands or damages against Franchisor or its Affiliates arising from or related to Franchisor's transfer of its rights in this Agreement, the Intellectual Property or the System to any other party.  Nothing contained in this Agreement will require Franchisor to remain in the business of operating or licensing the operation of Molly Tea Stores or other businesses or to offer any services or products to Franchisee, whether or not bearing or not bearing the Intellectual Property if Franchisor transfers its rights in or obligations under this Agreement.

(b)     Transfer by Franchisee. Franchisee and its Principals understand and acknowledge that the rights and duties set forth in this Agreement are personal to Franchisee and are granted, in part, in reliance upon the skill, aptitude, business and financial capacity of Franchisee and its Principals.  Accordingly, no Transfer by Franchisee or its Principals is permitted or authorized without the prior written approval of

FRANCHISE AGREEMENT                                                                                                    PAGE 33

Franchisor, which can be withheld in its sole and absolute discretion. Any such attempted Transfer not approved in writing by Franchisor pursuant to the terms of this Agreement will be null and void from its purported inception.

(c)      Conditions for Approval of Transfer. If the proposed Transfer by Franchisee is of this Agreement, Control of Franchisee or substantially all of Franchisee's assets, or is one of a series of Transfers (regardless of the time period over which such Transfers occur) which in the aggregate constitute the Transfer of this Agreement or Control of Franchisee, and if Franchisor has not exercised its right of first refusal under Section 18(d), Franchisor will consider approval of a Transfer only if all of the following conditions as specified by Franchisor are met prior to or concurrently with the proposed effective date of the Transfer to Franchisor's satisfaction (as determined in its sole discretion):

(i)      Franchisee is in full compliance with all of the terms and conditions of this Agreement, all Ancillary Agreements and any other agreement between Franchisee and Franchisor or its Affiliates and pays all amounts due to Franchisor and its Affiliates;

(ii)      Franchisee and its Principals remain liable for the performance of their obligations contained in this Agreement through the date of Transfer and for all acts, events and omissions which occurred prior to the effective date of the Transfer and execute all instruments reasonably requested by Franchisor to evidence such liability;

(iii)      The proposed transferee (and its direct and indirect owners): (i) has sufficient business experience, aptitude, assets and financial resources to operate the Molly Tea Store; (ii) is an individual of good character and otherwise meets Franchisor's then-applicable System Standards for Molly Tea Store franchisees; (iii) is not engaged and will not engage in the operation or ownership of a Competitive Business, and will engage only in the operation of the Molly Tea Store; and (iv) will cooperate with reasonable due diligence requests made by Franchisor (including, without limitation, the consent to a background check at transferee's sole cost) promptly thereafter and, if additional time is reasonably needed, then prior to the proposed effective date of the Transfer;

(iv)      The transferee and all owners of any record or beneficial interest in the Equity Interest of the transferee execute all instruments (including a new franchise agreement and guaranty) reasonably requested by Franchisor to evidence acceptance and assumption of all of the terms and conditions of this Agreement. Such new franchise agreement may contain terms materially different from this Agreement, including higher fees and will be for a term equal to the then unexpired Term hereof;

(v)      Franchisee assigns all of its right, title and interest in the Lease to the transferee with the written consent of the landlord and obtains all other consents required for such Transfer;

(vi)      Franchisee and its Principals execute a general release of any and all claims against Franchisor Indemnitees from any and all claims arising under this Agreement and any other Ancillary Agreement and the operation of the Molly Tea Store in a form substantially similar to the Release attached as Exhibit C;

(vii)      Franchisee delivers to the transferee all Confidential Information, the Operating Manual, materials containing trade secrets, Intellectual Property and all copies of each of the preceding documents and materials;

(viii)      Franchisee pays a transfer fee equal to seventy-five percent (75%) of Franchisor's then current franchise fee plus reimbursement of Franchisor's costs and expenses;

**FRANCHISE AGREEMENT**                                                                                      **PAGE 34**

(ix)    The transferee complies with Franchisor's then-current application requirements for a new franchise, including, but not limited to, being provided with Franchisor's current form of Franchise Disclosure Document, and a receipt evidencing the date of delivery of the Franchise Disclosure Document(s) to the transferee has been delivered to Franchisor, provided, however, Franchisor will not be liable for any representations other than those contained in the Franchise Disclosure Document(s); and

(x)    Franchisee and each Principal must have complied with any other conditions that Franchisor reasonably requires from time to time as part of its Transfer policies, provided that such conditions will not be more stringent than any conditions otherwise imposed on new franchisees signing the then-current franchise agreement.

Franchisor's consent to any Transfer shall not constitute a waiver or release of any conditions to such Transfer or any claims Franchisor has against Franchisee or any Principal.

(d)    <u>Right of First Refusal</u>. In the event that Franchisee and/or any of Franchisee's Principals (a "*Seller*") desire to effectuate a Transfer, Franchisor or its assignee will have the right and option, exercisable within thirty (30) days after Franchisor's receipt of all materials and information described in this <u>Section 18(d)</u>, to purchase the interest (the "*Interest*") proposed to be Transferred. Franchisee will notify Franchisor in writing of any bona fide proposed Transfer and set forth a complete description of the Interest to be Transferred and all terms and fees of the proposed Transfer in the manner prescribed by the Franchisor, including the prospective transferee's name, address, financial qualifications and previous five (5) years business experience. Franchisee will provide the Franchisor with any additional information, agreements, certifications or documents Franchisor requests for use in its evaluation of whether to exercise its first refusal right. Once Franchisor has received and reviewed all materials, Franchisor will notify Franchisee and Seller whether or not it will exercise its right to acquire the Interest within such thirty (30) day period. If Franchisor exercises its option to purchase, Franchisor is entitled to purchase the Interest subject to all representations and warranties, releases, non-competition covenants, closing documents and indemnities as Franchisor reasonably may require and such other material terms to which Seller and the proposed transferee have agreed. In the event the consideration, terms, and/or conditions offered by the proposed transferee are such that Franchisor or its assignee may not reasonably be able to furnish the same consideration, terms and/or conditions, then Franchisor or its assignee may purchase the Interest for the reasonable equivalent in cash. If the parties cannot agree, within a reasonable time, on the reasonable equivalent in cash of the consideration, terms and/or conditions offered by the third party, an independent appraiser will be designated by Franchisor, and such appraiser's determination will be binding. If Franchisor or its assignee elects to purchase the Interest, Franchisor or its assignee shall have sixty (60) days from its written election to close the purchase. If Franchisor declines to exercise its first refusal right, Seller may Transfer the Interest to the transferee on the same terms and conditions offered to Franchisor within thirty (30) days after receipt of written notice from Franchisor declining such right. Failure to Transfer the Interest within the thirty (30) day period or any changes in the terms of the offer shall constitute a new offer subject to the right of first refusal in this <u>Section 18</u>. Franchisor's failure to exercise its first refusal right shall not constitute a waiver or release of any conditions to such Transfer or any claims Franchisor has against Franchisee or any Principal. An approved Transfer by a Principal to a member(s) of his or her immediate family, to one or more trusts for the benefit of such immediate family members or one or more partnerships where such immediate family members are the only partners and Franchisee does not receive any consideration in any form for the Transfer will not trigger Franchisor's right of first refusal. For purposes of this Agreement, "*immediate family*" means the children, grandchildren or spouse of Franchisee.

(e)    <u>Death or Disability</u>. Within fifteen (15) days after the death or Permanent Disability (as defined below) of Franchisee or any of its Principals, Franchisee or a representative of Franchisee must notify Franchisor in writing. Any Transfer upon death or Permanent Disability will be subject to the same

terms and conditions as described in this Section 18 for any *inter vivos* Transfer. Upon the death of Franchisee (if a natural person) or any Principal who is a natural person, the executor, administrator or other person representative of the deceased will Transfer the interest of the deceased to Franchisor or a third party approved by Franchisor within six (6) months after the date of death. Upon the Permanent Disability of Franchisee (if a natural person) or any of Franchisee's Principals who is a natural person, Franchisor may require the interest to be Transferred to Franchisor or a third party in accordance with the conditions described in this Section 18 within six months after notice to Franchisor. For purposes of this Section 18(e), "***Permanent Disability***" means any physical, emotional, or mental injury, illness or incapacity that would prevent Franchisee or any Principal holding a Controlling Interest in Franchisee from performing his or her obligations under this Agreement or Ancillary Agreement for at least ninety (90) consecutive days, and from which condition recovery within ninety (90) days from the date of determination of disability is unlikely. If the Parties disagree as to whether a person is permanently disabled, the existence of Permanent Disability will be determined by a licensed practicing physician selected by Franchisor, upon examination of the person; or if the person refuses to submit to an examination, then the person automatically will be considered permanently disabled as of the date of refusal. The costs of any examination will be paid by Franchisor. If an interest is not Transferred upon death or Permanent Disability as required in this Section 18(e), then the failure will constitute an Event of Default under this Agreement.

(f)     Granting of a Security Interest by Franchisee. Franchisee shall not grant a security interest in the Molly Tea Store, in any of the assets of the Molly Tea Store or in any Equity Interest of Franchisee without first obtaining the prior written consent of Franchisor. Franchisor's consent or refusal to consent may be made in its sole discretion. Franchisor shall not consent to the granting of any such security interest unless the security interest is granted only for the purpose of securing a loan in favor of Franchisee, which proceeds shall solely be for the benefit of and used only in connection with the Molly Tea Store, and Franchisor shall have the right at its sole option (but not the obligation) to cure any default under any documents in any way relating to the security interest or the loan.

(g)     Consent to Option. Upon execution of this Agreement, each spouse of a Principal will execute a consent to the provisions of Section 18(d) and Section 20(k), the form of which is attached hereto as Exhibit I and incorporated herein by reference. Such consent will subject any interest they may have in this Agreement, in the Molly Tea Store or in Franchisee (whether a separate property interest, joint ownership property interest, community property interest or otherwise) to the right of first refusal and other provisions of those Sections, as applicable.

19.    **Default and Termination**.

(a)     Events of Default. The occurrence of any of the events set forth in Sections 19(b), (c) or (d) below will adversely and substantially affect the interests of Franchisor and will be deemed an event of default (an "***Event of Default***") constituting just cause for exercising any of the remedies set forth herein.

(b)     Termination for Insolvency. Franchisee will be in default under this Agreement, and all rights granted by this Agreement will automatically terminate without notice to Franchisee if:

(i)     Franchisee (or any Affiliate or Principal) becomes insolvent or makes a general assignment for the benefit of creditors;

(ii)     Franchisee files a voluntary petition under any section or chapter of the federal bankruptcy laws or under any similar Applicable Laws or statute of the United States or any state, or admits in writing its inability to pay its debts when due;

**FRANCHISE AGREEMENT**                                                                          **PAGE 36**

(iii)    Franchisee is adjudicated bankrupt or insolvent in proceedings filed against Franchisee under any section or chapter of the federal bankruptcy laws or under any similar Applicable Laws of the United States or any state; or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee; or if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or

(iv)    The Molly Tea Store or its assets are attached, seized, subject to a writ or distress warrant or levied upon, unless such attachment, writ or distress warrant or levy is vacated within thirty (30) days after notice from Franchisor.

(c)    <u>Termination for Repeated Default</u>.  This Agreement will terminate immediately upon delivery of written notice to Franchisee if Franchisee (or any of its Principals) fails on two or more separate occasions within any period of twelve (12) consecutive months to do any one or more or combination of the following:  (i) submit when due reports or other data, information or supporting record; (ii) pay when due any amounts due to Franchisor or its Affiliates; or (iii) otherwise materially comply with this Agreement, whether or not such failures are corrected after written notice of such failure is delivered to Franchisee.

(d)    <u>Other Events of Default</u>.  Franchisor may terminate this Agreement upon delivery to Franchisee of written notice as a result of the occurrence of any of the following Events of Default and Franchisee's failure to cure such Event of Default within the cure period described below, if any, and absent a stated cure period, immediately upon Franchisor's written notice of such Event of Default to Franchisee:

(i)    Franchisee (or any of its Principals or Affiliates) has made any material misrepresentation or omission in connection with this Agreement that negatively impacts Franchisor;

(ii)    Franchisee fails to acquire the Premises in accordance with <u>Section 5</u>;

(iii)    Franchisee fails to develop and finish out the Molly Tea Store in accordance with <u>Section 6</u> and the System Standards and fails to cure such default within thirty (30) days after written notice of such Event of Default is delivered to Franchisee;

(iv)    Franchisee fails to begin operating the Molly Tea Store as of the opening deadline required in <u>Section 6(f)</u>, and fails to cure such default within thirty (30) days after written notice of such Event of Default is delivered to Franchisee;

(v)    Franchisee fails to maintain at all times during the operation of the Molly Tea Store an Operator that has completed initial training, and fails to cure such default within thirty (30) days after written notice of such Event of Default is delivered to Franchisee;

(vi)    Franchisee abandons or fails actively to operate the Molly Tea Store for two or more consecutive calendar days or on any federally recognized United States holiday (except those holidays on which all Molly Tea Stores will be closed to the public, as set forth in the Operating Manual), unless the Molly Tea Store has been closed for a purpose Franchisor has approved or because of a Force Majeure event;

(vii)    Franchisee fails to cure any default relating to a threat to public health and safety from the construction or operation of the Molly Tea Store within five days after written notice of such default;

(viii)    Franchisee surrenders or transfers Control of the operation of the Molly Tea Store without Franchisor's prior written consent;

(ix)    Franchisee (or any of its Principals or Affiliates) is or has been held liable or convicted by a court of law, pleads or has pleaded no contest to, a felony, indictable offense or other unlawful act, engages in any dishonest or unethical conduct or otherwise engages in any act or conduct which Franchisor believes will materially and adversely affect the reputation of the System, the Molly Tea Store, any other Molly Tea Stores or the goodwill associated with Marks;

(x)    Franchisee's misuse or unauthorized use of the Marks, including without limitation, Franchisee's misuse or unauthorized use of the Marks on its social media pages or other Internet site or registration of a domain name incorporating the Marks;

(xi)    Franchisee, by act or omission, materially and unfavorably impairs the value of, or the goodwill associated with the System or the Marks, including without limitation, any damage or disparagement of Franchisor's brand or reputation;

(xii)    Franchisee (or any of its Principals or Affiliates) attempts an unauthorized Transfer pursuant to Section 18;

(xiii)    Franchisee (or any of its Principals or Affiliates or Operator) makes any unauthorized use or disclosure of any Confidential Information or uses, duplicates or discloses any portion of the Operating Manual in violation of this Agreement;

(xiv)    Franchisee, any of its Principals or its Manager fails to comply with or perform its covenants, representations and warranties in this Agreement, including, without limitation, the representations, warranties and covenants set forth in Section 14, the representations and warranties with respect to anti-corruption, anti-boycott and anti-terrorism laws set forth in Section 23 and the restrictive covenants against competition set forth in Section 15;

(xv)    Franchisee fails to pay any fees or other amounts due hereunder to Franchisor within five days after written notice of nonpayment is delivered to Franchisee;

(xvi)    Franchisee understates Gross Sales or fails to accurately report Gross Sales, and does not correct such failure within five days after written notice of such failure is delivered to Franchisee;

(xvii)    Franchisor has delivered written notice of termination of another Franchise Agreement with Franchisee in accordance with its terms and conditions, or Franchisee has terminated a Franchise Agreement without cause;

(xviii)    Franchisee suffers cancellation or termination of the Lease or fails to materially perform or observe any provision of any Lease and to cure such failure within the applicable cure period under such Lease, if any; and

(xix)    Franchisee fails to pay when due any income, withholding, service, sales or any other applicable taxes due on the Molly Tea Store's operations, unless it is in good faith contesting its liability for such taxes and has effectively stayed the enforcement of liability for such taxes.

Without limiting the foregoing, Franchisor may terminate this Agreement for failure by Franchisee (or any of its Principals) to comply with any other material provision of this Agreement, including, without limitation, the representations and warranties contained in this Agreement, or any System Standards

**FRANCHISE AGREEMENT**                                                                 **PAGE 38**

material to operation of the Molly Tea Store within thirty (30) days after written notice of such Event of Default is delivered to Franchisee.

(e)     Cross-Default.  Any default by Franchisee under the terms and conditions of any Ancillary Agreement or any other agreement between Franchisor and/or its Affiliates and Franchisee and/or its Affiliates shall be deemed to be a default of this Agreement.  In the event of the termination of this Agreement or any Ancillary Agreement for any cause, Franchisor and its Affiliates may, at their option and as determined in their sole discretion, terminate any or all of such other agreements.

(f)     Notice Required by Law.  Notwithstanding anything to the contrary contained in this Section 19, in the event any valid Applicable Law having jurisdiction over this Agreement shall limit Franchisor's rights of termination hereunder or shall require longer notice periods or restrictions upon termination required by such laws and regulations, such Applicable Laws shall apply.  Franchisor shall not, however, be precluded from contesting the validity, enforceability or application of such Applicable Laws in any action, arbitration, hearing or dispute relating to this Agreement or the termination thereof.

(g)     No Exclusive Remedy.  The rights and remedies provided in this Agreement shall not be exclusive of any other rights or remedies, whether by contract, at law or in equity.  The rights and remedies provided in this Agreement are cumulative and are in addition to any and all other rights and remedies provided by law or in equity.  The exercise of one right or remedy by any Franchisor shall not preclude or constitute a waiver of in equity or its right to exercise any and all other rights or remedies to which it is entitled.

## 20.     **Obligations Upon Termination or Expiration**.

(a)     Obligations upon Termination or Expiration.  Upon termination or expiration of this Agreement for any reason, all rights of Franchisee under this Agreement will immediately terminate and Franchisee will have the duties set forth in this Section 20 which will survive termination of this Agreement.

(b)     Payment of Amounts Owed.  Franchisee will pay to Franchisor and its Affiliates within fifteen (15) days after the effective date of expiration or earlier termination of this Agreement or such later date that the amounts are determined, all sums due under this Agreement and all Ancillary Agreements, including, without limitation, all interest, damages, costs, expenses and reasonable attorneys' fees incurred by Franchisor by reason of default on the part of Franchisee, whether or not the expenses occur before or after the termination or expiration of this Agreement.  If this Agreement is terminated by Franchisor following the occurrence of an Event of Default and Franchisee's failure to cure within any applicable cure period, Franchisee will within thirty (30) days following the effective date of such termination to pay Franchisor in a single lump sum payment, as liquidated damages and not as a penalty, an amount equal to the average monthly Royalty Fee paid by Franchisee during the previous two (2) years of operation of the Molly Tea Store, or if the Molly Tea Store has operated for less than two (2) years, the average Royalty Fee paid by Franchisee during the Term up to the date of termination of this Agreement, multiplied by the number of months remaining in the Initial Term or Successor Term, if applicable.  Franchisee acknowledges and agrees that the liquidated damages provided for in this Section 20(b) are a fair and reasonable approximation of the amount of damages sustained by Franchisor.  Payment to Franchisor of such liquidated damages will not constitute an election of remedies by Franchisor or excuse performance of Franchisee's post-termination obligations hereunder.  Any payments received will be in addition to and not in lieu of any other remedies available to Franchisor at law or in equity.

(c)     General Operations.  Franchisee will immediately cease to operate the Molly Tea Store and cease to use the Intellectual Property, the System and the Operating Manual in any manner including any advertising, equipment, format, confidential methods, procedures and techniques associated with the

**FRANCHISE AGREEMENT**                                                          **PAGE 39**

System, the Intellectual Property and the Operating Manual, and shall not thereafter hold itself out as a current or former franchisee of Franchisor.  Franchisee shall also notify each authorized supplier that it is no longer authorized to purchase any Products.

(d)      Confidential Information and Intellectual Property.  Franchisee shall immediately cease using of all Confidential Information and return the Confidential Information to Franchisor, including the Operating Manual, and all materials containing any Intellectual Property, and shall retain no copy or record of any of the foregoing, except Franchisee's copy of this Agreement and of any correspondence between the Parties, and any other documents which Franchisee and its Principals reasonably need for compliance with any provision of Applicable Law.

(e)      Franchisor Software.  Franchisee must remove any proprietary computer software specified by Franchisor from any computer hardware Franchisee retains.  Franchisee must provide evidence to Franchisor that Franchisee has destroyed all back up and other copies of any part or all of any such software and returned to Franchisor any documentation provided to Franchisee with respect to the use of any such software.  Franchisee will not retain a copy or record of any of the items above listed.

(f)      Marks.  Franchisee may not, directly or indirectly, at any time or in any manner use any Mark, including any use of Marks in a derogatory, negative, or other inappropriate manner in any media, including, but not limited to, print or electronic media; use any colorable imitation of a Mark in any manner or for any purpose; utilize for any purpose any trade name, trade or service mark or other commercial symbol or other indicia that indicates or suggests a connection or association with Franchisor or the Molly Tea Store; identify any business as a former Molly Tea Store; or identify itself as one of Franchisor's licensees or franchisees (except with respect to other Molly Tea Store Franchisee owns and operates under continuing agreements with Franchisor).  Franchisee will take such action as may be required to cancel all fictitious or assumed names or equivalent registrations relating to its use of any Mark.

(g)      Disassociation in Communication Methods.  Franchisee will assign to Franchisor (or its designee) or cancel any electronic mail address, domain name, search engine, website or social media account that associates Franchisee with Franchisor, the Molly Tea Store, the System or the Marks.  Franchisee will notify the telephone company and all telephone directory publishers of the expiration or earlier termination of Franchisee's right to use any telephone or other numbers and any telephone directory listings associated with any Mark, authorize the transfer of such numbers and directory listings to Franchisor, or, at Franchisor's direction, instruct the telephone company to forward all calls made to Franchisee's telephone numbers to numbers Franchisor specifies.

(h)      Assumed Name.  Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains any of the Marks, and Franchisee and its Principals shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement.  Franchisee hereby appoints Franchisor its true and lawful agent and attorney-in-fact with full power and authority for the sole purpose of taking such action as is necessary to complete these cancellations.  This power of attorney will survive the expiration or termination of this Agreement.

(i)      Costs.  Franchisee and its Principals will pay to Franchisor all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor in connection with obtaining any remedy available to Franchisor for any violation of this Agreement.

(j)      Confidentiality and Non-Competition.  Franchisee and its Principals will comply with the covenants and the restrictions on Confidential Information contained in this Agreement.  Any other person required to execute similar covenants pursuant to Section 15 will also comply with those covenants.

**FRANCHISE AGREEMENT**                                                                                          **PAGE 40**

(k)    Purchase Option.  Franchisor will have the option (but not the obligation), to be exercised within sixty (60) years from the date of termination or expiration of this Agreement (unless appraisals are needed as described below, in which case such option shall be exercised within sixty (60) years after such appraisals are provided), to purchase from Franchisee any or all of the furnishings, equipment, signs, fixtures, motor vehicles, supplies and inventory of Franchisee related to the operation of the Molly Tea Store, at Franchisee's original cost (less an allowance for depreciation based upon the length of the life of the item and its length of use) or its fair market value, whichever is less.  Franchisor will purchase Franchisee's assets only and will assume no liabilities whatsoever, unless otherwise agreed to in writing by the Parties.  If the Parties cannot agree on the fair market value within thirty (30) days after Franchisor's exercise of its option, fair market value will be determined by two appraisers, with each Party selecting one appraiser, and the average of their determinations will be binding.  In the event of such appraisal, each Party will bear its own legal and other costs and will split the appraisal fees equally.  Within thirty (30) days after Franchisor's receipt of such appraisal, the Parties' agreement as to fair market value or Franchisor's receipt of such information and materials from Franchisee as Franchisor may prescribe evidencing Franchisee's cost, as applicable, Franchisor shall have the right to rescind its exercise of such option.  If Franchisor elects to exercise its option to purchase, it will have the right to set off all amounts due from Franchisee to Franchisor or any of its Affiliates (including any costs for the appraisal) against any payment therefor and will pay the remaining amount in cash.  Franchisee will deliver to Franchisor, in a form satisfactory to Franchisor, such warranties, deeds, releases of lien, bills of sale, assignments any other documents and instruments necessary in order to perfect Franchisor's title and possession in and to the properties being purchased or assigned and to meet the requirements of all tax and government authorities.  Closing of such purchase will take place at Franchisor's corporate offices or at such other location as Franchisor may designate.

(l)    Assignment of Lease.  Franchisee will, at Franchisor's option, assign to Franchisor any interest that Franchisee has in the Lease.  Franchisor may exercise this option at any time within thirty (30) days from and including either the date of termination or expiration of this Agreement.

(m)    Modification of Premises.  If Franchisor does not elect to exercise the options under Section 20(k) or Section 20(l), then Franchisee will make all modifications or alterations to the Molly Tea Store Premises that are necessary to distinguish the appearance of the Molly Tea Store from that of other Molly Tea Store and will make any specific additional changes that Franchisor reasonably requests within thirty (30) days from and including either the date of termination or expiration of this Agreement.  If Franchisee fails or refuses to comply with the requirements of this Section 20, then Franchisor may enter upon the Premises of the Molly Tea Store, without being guilty of trespass or any other crime or tort, to make or cause to be made the changes required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

## 21.    Dispute Resolution.

(a)    Non-Binding Mediation.  Except as otherwise set forth in this Agreement, the Parties will use their best efforts to resolve and settle by direct, private negotiation any dispute, claim or issue which arises under or in relation to this Agreement or which concerns the relationship created by this Agreement.  Both Parties may seek the advice and assistance of legal counsel in connection with any such negotiation.  If the Parties cannot resolve and settle a dispute by private negotiation within ten (10) days after one Party gives the other notice that a dispute exists, the Parties mutually agree to submit the dispute to non-binding mediation in New York, New York, before a single mediator, using the facilities and Commercial Rules of the American Arbitration Association.  The Parties will jointly select a mediator from the panel of mediators maintained by the American Arbitration Association.  The mediator must be a person experienced in franchising and who has no prior business or professional relationship with either Party.  Mediation must be concluded within thirty (30) days of the date the mediator is selected or such longer period as agreed to

**FRANCHISE AGREEMENT**                                                      **PAGE 41**

by the Parties.  The Parties will share the mediation filing fee equally but will otherwise separately bear their own costs and expenses (including legal fees) of participating in the mediation process.  Each Party agrees to send at least one representative to the mediation conference who has authority to enter into binding contracts on that Party's behalf.  All aspects of the mediation process will be treated as confidential, will not be disclosed to others, and will not be offered or admissible in any other proceeding or legal action whatever.

(b)    Arbitration.  If the Parties cannot fully resolve and settle a dispute through mediation, except as otherwise set forth in this Agreement, within thirty (30) days after the mediation, the dispute will be submitted to binding arbitration.  Either Party may make a demand for arbitration which will be conducted in New York, New York, before a single arbitrator, using the facilities and the Commercial Rules of the American Arbitration Association.  The Parties will jointly select an arbitrator from the panel of arbitrators maintained by the American Arbitration Association.  The arbitrator must be an attorney experienced in the practice of franchise law and who has no prior business or professional relationship with either Party and who agrees to follow and apply the express provisions of this Agreement in determining his or her award.  The arbitrator's award will be final and binding on all Parties, and neither Party will have any right to contest or appeal the arbitrator's award except on the grounds expressly provided by the Commercial Rules of the American Arbitration Association.  The Party who demands arbitration will pay the arbitration filing fee, but the Parties will otherwise separately bear their own costs and expenses (including legal fees) of participating in the arbitration process.  Responsibility for the arbitrator's fees and expenses will be determined as part of the arbitrator's award.

(c)    Governing Law.  Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §§ 1051 *et seq.*) or other federal law, this Agreement and any and all controversies, disputes or claims arising out of this Agreement or the relationship between Franchisor and Franchisee, any of their respective Affiliates or Principals (regardless of the form of the cause of action asserted) will be governed by and construed in accordance with the laws of the State of New York, provided, however, that if the Territory is located in a state with a franchise statute that requires application of such state's law, this Agreement and any and all controversies, disputes or claims arising out of this Agreement or the relationship between the Parties (regardless of the form of the cause of action asserted) will be governed by and construed in accordance with the laws of the state in which the Territory is located.

(d)    Limitations of Claims.  Any and all claims arising out of or relating to this Agreement or the relationship among the Parties will be barred unless a judicial or arbitration proceeding is commenced within two (2) years from the date on which the Party asserting such claim knew or should have known of the facts giving rise to such claims.

(e)    Limitation on Damages.  Except with respect to: (i) Franchisee's obligation to indemnify Franchisor and its Affiliates pursuant to Section 16; (ii) claims for Franchisee's unauthorized use of the Marks or unauthorized use or disclosure of any Confidential Information in Sections 9 and 15; (iii) payment or recovery of liquidated damages described in Section 20(b); and (iv) lost profits incurred by Franchisor as a result of early termination of this Agreement under Section 20, FRANCHISOR AND FRANCHISEE WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE, EXEMPLARY, SPECIAL AND CONSEQUENTIAL DAMAGES AGAINST THE OTHER AND AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN FRANCHISOR AND FRANCHISEE, THE PARTY MAKING A CLAIM WILL BE LIMITED TO EQUITABLE RELIEF AND TO RECOVERY OF ANY DIRECT OR GENERAL DAMAGES THE PARTY SUSTAINS.

(f)    Rights of Parties Are Cumulative.  Franchisor's and Franchisee's rights under this Agreement are cumulative, and their exercise or enforcement of any right or remedy under this Agreement

**FRANCHISE AGREEMENT**                                                                                           **PAGE 42**

will not preclude their exercise or enforcement of any other right or remedy under this Agreement which they are entitled by Applicable Laws to enforce.

(g)     Costs and Legal Fees.  If Franchisor incurs expenses in connection with the Franchisee's failure to pay when due any monies owed, to submit when due any reports, information, or supporting records, or otherwise to comply with this Agreement, Franchisee will reimburse Franchisor for any of the costs and expenses which it reasonably incurs, including, without limitation, reasonable accounting, attorneys' and related fees to enforce such provisions of the Agreement.

(h)     WAIVER OF JURY TRIAL.  THE PARTIES HERETO IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM IN CONNECTION WITH ANY MATTER OR DISPUTE OF ANY KIND ARISING UNDER OR IN ANY WAY CONNECTED WITH THIS AGREEMENT OR ANY RIGHT OR REMEDY HEREUNDER, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF FRANCHISOR OR FRANCHISEE.

(i)     Individual Capacity.  In the event that an action is permitted, any legal action or arbitration commenced by either Party will be brought in an individual capacity and not on a class-wide basis. FRANCHISEE WAIVES ITS RIGHTS TO INITIATE A CLAIM ON A "CLASS" BASIS OR INCLUDE ANY OTHER FRANCHISEE AS A NAMED PARTY UNLESS FRANCHISOR AGREES IN WRITING.

(j)     Injunctions and Emergency Relief.  Notwithstanding the foregoing, nothing in this Section 21 shall prevent Franchisor from terminating this Agreement or from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other injunctive or emergency relief available to safeguard and protect Franchisor's interests prior to the filing of or during or following any mediation, arbitration or other legal proceeding or pending the handing down of a decision or award in connection with any other proceeding.

(k)     Intellectual Property, Confidential Information and Security Interests.  Notwithstanding anything in this Section 21, Franchisor will not be obligated to mediate or arbitrate any claim arising from Franchisee's alleged infringement of the Intellectual Property or disclosure of Confidential Information, or related to any action to foreclose on any security interest.  The Parties agree that any action based on infringement of any of the Marks will be governed by and interpreted and enforced in accordance with the United States Trademark (Lanham) Act or the United States Copyright Act, as applicable, and will be litigated in any federal District Court sitting in New York, New York.  Further, Franchisee and Franchisor agree that the provisions of this Section 21 will not be applicable to the exercise of rights and remedies under any Ancillary Agreements unless expressly provided in such Ancillary Agreement.

## 22.     **Miscellaneous**.

(a)     Independent Contractors.  It is understood and agreed by the Parties that this Agreement does not create a fiduciary relationship between the Parties.  In performing this Agreement, the Parties specifically agree that Franchisor and Franchisee's relationship is and always will be solely that of independent contractors.  Neither Franchisor nor Franchisee will represent itself or permit any of its employees, agents or representatives to represent itself as an employee, agent or joint venturer of the other. Franchisee shall conspicuously identify itself as an independent franchisee of Franchisor in all dealings with the public and other third parties and will place such notices of independent ownership on such forms, business cards, stationery and advertising and other materials as Franchisor may periodically require. Franchisee must post a prominent sign in the Molly Tea Store identifying Franchisee as a Molly Tea Store franchisee in a format prescribed by Franchisor, including without limitation, an acknowledgment that Franchisee independently owns and operates the Molly Tea Store, that the Marks are owned by Franchisor and that Franchisee's use of such Marks is pursuant to a license issued by Franchisor.  This Agreement (and

the relationship of the Parties which arises from this Agreement) grants Franchisor the right to make decisions, take actions and/or refrain from taking actions which are not inconsistent with Franchisee's explicit rights and obligations hereunder or under Applicable Laws and that may affect favorably or adversely Franchisee's interest.  Franchisee acknowledges and agrees that Franchisor may operate and change the System and Franchisor's business in any manner that is not expressly and specifically prohibited by this Agreement or Applicable Laws.  Whenever Franchisor has reserved in this Agreement a right and/or discretion to take or withhold an action, or to grant or decline to grant Franchisee a right to take or withhold an action, except as otherwise expressly and specifically provided in this Agreement or prohibited by Applicable Laws, Franchisor may make its decision or exercise its right and/or discretion on the basis of its judgment of what is in its best interests, including its judgment of what is in the best interests of the Molly Tea Store  franchise network, at the time Franchisor's decision is made, without regard to: (i) whether other reasonable or even arguably preferable alternative decisions or actions could have been made by Franchisor; (ii) whether Franchisor's decision or the action it takes promotes its financial or other individual interest; (iii) whether Franchisor's decision or the action it takes applies differently to Franchisee and one or more other franchisees; or (iv) whether Franchisor's decision or the exercise of its rights is adverse to Franchisee's individual interest or the individual interests of any other particular franchisees.  Franchisor will have no liability to Franchisee for any such decision or exercise of its rights.  Neither Party will have any right to and will not attempt to enter into contracts or commitments in the name of or on behalf of the other in any respect whatsoever.  Franchisor will not be liable for any damages to any person or Entity directly or indirectly arising out of the operation of Franchisee's Molly Tea Store.

(b)     No Fiduciary Relationship.  This Agreement does not create a fiduciary relationship between the Parties to this Agreement.

(c)     Compliance with Laws.  Franchisee will comply, at its sole expense, with all Applicable Laws applicable to this Agreement and the operation of the Molly Tea Store.  Copies of all inspection reports, warnings, certificates and ratings, issued by any governmental entity during the Term of this Agreement in connection with the conduct of the Molly Tea Store which indicate Franchisee's failure to meet or maintain the highest governmental standards or less than full compliance by Franchisee with any Applicable Laws, will be forwarded to Franchisor by Franchisee immediately upon Franchisee's receipt thereof.

(d)     Force Majeure.  Neither Franchisor nor Franchisee will be liable for loss or damage or deemed to be in breach of this Agreement if its failure to perform obligations results from a Force Majeure event.  Any delay resulting from any Force Majeure event will extend performance accordingly or excuse performance, in whole or in part, as may be reasonable in the judgment of the Party to whom performance is owed.  Franchisee or Franchisor will, within five days of the occurrence of the Force Majeure event, give a written notice to the other Party stating the nature of the Force Majeure event, its anticipated duration and any action being taken to avoid or minimize its effect.  Any suspension of performance will be of no greater scope and of no longer duration than is reasonably required; provided, however, if the suspension of performance continues for sixty (60) years from the date of the occurrence and such failure to perform would constitute an Event of Default of this Agreement in the absence of such Force Majeure event, the Parties will meet and discuss in good faith any amendments to this Agreement to permit Franchisor to exercise its rights under this Agreement.  If the Parties are not able to agree on such amendments within fifteen (15) days and if suspension of performance continues, Franchisor may terminate this Agreement immediately by giving written notice to Franchisee or exercise any of the remedies described in this Agreement or otherwise available under Applicable Laws or in equity.  In no event will Franchisee's inability to pay amounts due under this Agreement constitute a Force Majeure event, and no Force Majeure event will operate to excuse Franchisee from the prompt payment of Royalty Fees, Advertising Fund Contribution or any other fee or payment due to Franchisor pursuant to this Agreement.

(e)    <u>Further Assurances</u>.  Franchisor and Franchisee will execute and deliver any and all additional papers, documents and other assurances and will do any and all acts and things reasonably necessary in connection with the performance of their obligations hereunder and to carry out the intent of the Parties hereto.

(f)    <u>Judgment; Discretion</u>.  FRANCHISEE AND FRANCHISOR ACKNOWLEDGE THAT VARIOUS PROVISIONS OF THIS AGREEMENT SPECIFY CERTAIN MATTERS THAT ARE WITHIN THE SOLE DISCRETION OR JUDGMENT OF FRANCHISOR OR ARE OTHERWISE TO BE DETERMINED UNILATERALLY BY FRANCHISOR.  IF THE EXERCISE OF FRANCHISOR'S SOLE DISCRETION OR JUDGMENT AS TO ANY SUCH MATTER IS SUBSEQUENTLY CHALLENGED, THE PARTIES TO THIS AGREEMENT EXPRESSLY DIRECT THE TRIER OF FACT THAT FRANCHISOR'S RELIANCE ON A BUSINESS REASON IN THE EXERCISE OF ITS SOLE DISCRETION OR JUDGMENT IS TO BE VIEWED AS A REASONABLE AND PROPER EXERCISE OF SUCH SOLE DISCRETION OR JUDGMENT, WITHOUT REGARD TO WHETHER OTHER REASONS FOR ITS DECISION MAY EXIST, WITHOUT REGARD TO WHETHER THE TRIER OF FACT WOULD INDEPENDENTLY ACCORD THE SAME WEIGHT TO THE BUSINESS REASONS, AND WITHOUT REGARD TO WHETHER SUCH SOLE DISCRETION OR JUDGMENT IS EXERCISED IN THE BEST INTERESTS OF FRANCHISEE.

(g)    <u>Approvals</u>.  If the approval, consent or agreement of a Party is required in this Agreement, the request for such approval shall be in writing, shall be accompanied by reasonable detail if the circumstances require and shall refer to the Section pursuant to which such approval is requested.

(h)    <u>No Waiver</u>.  Either Party's failure to exercise any right or remedy or to enforce any obligation, covenant or agreement herein will not constitute a waiver by, or estoppel of, such Party's right to enforce strict compliance with any such obligation, covenant or agreement.  No custom or practice will modify or amend this Agreement.  Either Party's waiver of, or failure or inability to enforce, any right or remedy will not impair such Party's rights or remedies with respect to subsequent default of the same, similar or different nature.  Acceptance of any payment will not waive any default.

(i)    <u>Notice</u>.  All notices, requests, demands and claims required or desired to be given hereunder will be in writing and will be served in person, by express mail, by certified mail, by personal delivery by overnight delivery or by electronic mail.  Such notices, requests, demands and claims will be deemed conclusively given: (i) at the time of delivery, if personally delivered; (ii) 24 hours (exclusive of weekends and national holidays) after deposited in the United States mail, properly addressed and postage prepaid, if delivered by express mail; (iii) upon the earlier of actual receipt or three calendar days after deposit in the United States mail, properly addressed and postage prepaid, return receipt requested, if delivered by certified mail; (iv) upon receipt, if delivered overnight delivery; or (v) at the time of the electronic transmission if by electronic mail.  All notices, requests, demands and claims will be given to the intended Party at the location set forth on the Summary Page, however, either Party may change its location for the purpose of receiving notices, requests, demands and claims by giving written notice to the other Party in the manner above set forth.

(j)    <u>Severability</u>.  If any provision of this Agreement, or the application thereof, for any reason and to any extent, is held to be invalid, illegal or unenforceable under Applicable Laws, it will be fully severable and the remaining provisions of this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision never comprised a part hereof.  The remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.  Every part of this Agreement will be considered severable.  If any covenant herein which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of geographical area, type of business activity prohibited and/or length of time, but

could be rendered enforceable by reducing any part or all of it, Franchisee and Franchisor agree that it will be enforced to the fullest extent permissible under Applicable Laws and public policy. If any Applicable Law requires a greater prior notice of the termination of or refusal to enter into a successor franchise than is required hereunder, a different standard of "good cause," or the taking of some other action not required hereunder, the prior notice, "good cause" standard and/or other action required by such law will be substituted for the comparable provisions hereof. If any provision of this Agreement or any specification, standard or operating procedure prescribed by Franchisor is invalid or unenforceable under Applicable Laws, Franchisor has the right, at Franchisor's sole option, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to make it valid and enforceable.

(k)     Counterparts. This Agreement may be executed in any number of counterparts each of which when so executed will be an original, but all of which together will constitute one and the same instrument.

(l)     References and Headings. All references in this Agreement to Sections refer to corresponding Sections of this Agreement unless expressly provided otherwise. Headings appearing at the beginning of any of such Sections are for convenience only and shall not constitute part of such Section and shall be disregarded in construing the language contained in such Section. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular Section unless expressly so limited. Pronouns in masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

(m)     Entire Agreement. This Agreement, the Ancillary Agreements (including any multi-unit development agreement), the Operating Manual and the exhibits and attachments, hereto, constitute the entire agreement between Franchisor, Franchisee and its Principals and supersede any and all prior or negotiations, representations and agreements. Nothing in this Agreement or any Ancillary Agreement, however, is intended to disclaim the representations Franchisor made in the Franchise Disclosure Document that Franchisor furnished to Franchisee. Franchisee acknowledges that Franchisee is entering into this Agreement as a result of its own independent investigation of the franchised business and not as a result of any representations about Franchisor made by its shareholders, officers, directors, employees, agents, representatives, independent contractors, or franchisees that are contrary to the terms set forth in this Agreement, or in any disclosure document, prospectus, or other similar document required or permitted to be given to Franchisee pursuant to applicable law. There are no other oral or written understandings or agreements between Franchisor and Franchisee relating to the subject matter of this Agreement.

(n)     Amendments. Except those permitted to be made unilaterally by Franchisor, any amendments or modifications of this Agreement will be in writing and executed by Franchisor and Franchisee.

(o)     Survival. Any provision or covenant of this Agreement which expressly or by its nature imposes obligations beyond the expiration or termination of this Agreement shall survive such expiration or termination.

## 23.     **Acknowledgments**.

(a)     Receipt of Disclosure Document. Franchisee and its Principals acknowledge that they received the Franchise Disclosure Document required by the Federal Trade Commission, and a complete copy of this Agreement and all related attachments and agreements, at least 14 calendar days before this

Agreement was executed, or Franchisee made a payment to the Franchisor or an Affiliate in connection with the proposed franchise sale.

(b)     <u>Commercial Relationship</u>.  Franchisee and its Principals acknowledge that this Agreement creates an arm's length commercial relationship that cannot and will not be transformed into a fiduciary or other "special" relationship by course of dealing, by any special indulgences or benefits that Franchisor bestows on Franchisee, or by inference from a Party's conduct.

(c)     <u>Certain Profits, Consideration and Charges</u>.  Franchisee acknowledges that Franchisor may, under certain circumstances: (i) receive a profit from goods, products and/or services made available to Franchisee; (ii) receive consideration from suppliers and/or manufacturers related to the sale of goods, products and/or services to Franchisee, the promotion of goods, products and/or services by the System, or in consideration of services rendered or rights licensed to such persons; and (iii) charge Franchisee or non-approved vendors for reasonable inspection costs and actual testing costs for any equipment, supplies or other products and materials from such non-approve vendors used in the operation of the Molly Tea Store.

(d)     <u>Compliance with Anti-Corruption and Anti-Money Laundering Laws and Anti-Terrorism Laws</u>.  Franchisee and each Principal represents and warrants to Franchisor that: (i) neither Franchisee nor, to the best of its knowledge after reasonable inquiry, any of Franchisee's Principals or any executive officer of Franchisee, is identified, either by name or an alias, pseudonym or nickname, on the lists of "Specially Designated Nationals" or "Blocked Persons" maintained by the U.S. Treasury Department's Office of Foreign Assets Control (text available at <u>www.treas.gov/offices/enforcement/ofac/</u>); (ii) neither Franchisee nor any Principal is directly or indirectly owned or controlled by the government of any country that is subject to a United States or Canadian embargo; (iii) neither Franchisee nor any Principal acts or will act directly or indirectly on behalf of the government of any country that is subject to a United States or Canadian embargo; and (iv) neither Franchisee nor any of Franchisee's Principals or executive officers has violated, and Franchisee will not violate and will cause Franchisee's Principals and executive officers not to violate, any Applicable Laws prohibiting money laundering or the aid or support of Persons who conspire to commit acts of terror against any Person or government, including acts prohibited by the U.S. Patriot Act (text available at <u>http://www.epic.org/privacy/terrorism/hr3162.html</u>), U.S. Executive Order 13224 (text available at <u>http://www.treasury.gov/resource-center/sanctions/Programs/Documents/terror.pdf</u>) or any similar Applicable Laws.  The foregoing constitute continuing representations and warranties, and Franchisee will immediately notify Franchisor in writing of the occurrence of any event or the development of any circumstance that might render any of the foregoing representations and warranties of this <u>Section 23</u> incorrect, false, inaccurate or misleading, or which constitutes a breach of any of the covenants of this <u>Section 23</u>.

(e)     <u>No Claims</u>.  Franchisee and its Principals represent, covenant and warrant to Franchisor that, to the best of their knowledge, neither they nor any Affiliate of either hold or are due, as applicable, any claims, debts, liabilities, demands, obligations, expenses, actions or causes of action of any nature, character or description related to this Agreement against Franchisor or any other Franchisor Indemnitees, in their corporate or individual capacities.

(f)     <u>No Waiver</u>.  No statement, questionnaire, or acknowledgment signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor.  this provision supersedes any other term or any document executed in connection with the franchise.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement on the date first written above.

**FRANCHISOR:**                                    **FRANCHISEE:**

MOLLYTEA FRANCHISING LLC,
a Delaware limited liability company

By:_____          By:_____
Name:_____          Name:_____
Title:_____          Title:_____

Docusign Envelope ID: EEECDDA2-E407-4D8C-8F2B-5E55B78422C4

## EXHIBIT A

## EQUITY INTERESTS AND PRINCIPALS

The following is a list of stockholders, partners, members or other investors in Franchisee, including all investors who own or hold a direct or indirect Equity Interest in Franchisee and a description of the nature of their interest. All such individuals and entities will be deemed to be "*Franchisee's Principals*" described in and designated pursuant to the Franchise Agreement, each of whom will execute the Guaranty and Undertaking of Obligations.

Name                                          Percentage of Ownership/Nature of Interest

_____              _____

_____              _____

_____              _____

_____              _____

EXHIBIT A – EQUITY INTERESTS AND PRINCIPALS

## EXHIBIT B

## MOLLY TEA STORE LOCATION AND TERRITORY

A.  Premises

The following location has been selected by Franchisee and approved by Franchisor as the Premises for the Molly Tea Store in accordance with Section 5 of the Franchise Agreement.

_____

_____

_____

B.  Territory

The following area has been designated by Franchisor and accepted by Franchisee as the Territory in accordance with Section 2(b) of the Franchise Agreement.

_____

_____

_____

In witness whereof the Parties have executed this Exhibit B on _____,

202_.

**MOLLYTEA FRANCHISING LLC**                         **FRANCHISEE**

By:_____        By:_____
Its:_____        Its:_____

**EXHIBIT B – PREMISES AND TERRITORY**

EXHIBIT C

RELEASE

**THIS RELEASE** ("*Release*") is made and entered into this ___ day of _____, 20__, by _____ ("*Franchisee*"), and the undersigned Franchisee's Principals.

RECITALS

A.      MOLLYTEA Franchising LLC ("*Franchisor*") and Franchisee entered into that certain Franchise Agreement dated _____ ("*Franchise Agreement*"), for the establishment of a Molly Tea Store located at _____;

B.      Franchisee's Principals are defined in the Franchise Agreement and have, among other things, agreed to be bound by certain of the obligations contained in the Franchise Agreement; and

C.      **[Option 1:  For Renewal]**  Franchisee desires to renew or otherwise extend the term of the Franchise Agreement, and the Franchise Agreement provides that, as a condition to such renewal, Franchisee and Franchisee's Principals will, among other things, execute a general release as contained herein.

**[Option 2:  For Transfer]**  The Franchise Agreement provides that, as a condition to Franchisor's approval of such Transfer, Franchisee and Franchisee's Principals will execute a release of certain claims.

NOW, THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged by each of the parties hereto, Franchisee and Franchisee's Principals agree as follows:

AGREEMENT

1.      **Release**.  (a) Franchisee, and each of Franchisee's Principals, individually and collectively, jointly and severally, do hereby release and forever discharge Franchisor and its Affiliates, and each of their respective successors, shareholders, partners, members, managers, directors, officers, employees, representatives, agents and independent contractors, in their corporate and individual capacities ("*Designees*"), of and from any claims, debts, liabilities, demands, obligations, costs, expenses, actions, and causes of action of every nature, character, and description, known or unknown, vested or contingent, direct or indirect, foreseen or unforeseen, whether in contract or tort, which Franchisee and/or Franchisee's Principals now own or hold, or have at any time heretofore owned or held, or may at any time own or hold against Franchisor or any of its respective Designees, arising under or in connection with any agreement, law, rule, regulation ordinance or any other context whatsoever, including, without limitation, the Franchise Agreement, any Ancillary Agreement or the operation of a Molly Tea Store established thereunder, and any state or federal franchise or business opportunity Law; provided, however, that this Release will not serve to terminate any agreement currently effective by and among Franchisee or any or all of Franchisee's Principals and Franchisor.

(b)      Franchisee and Franchisee's Principals acknowledge there is a risk that, after the date hereof, they will discover, incur or suffer claims which are unknown or unanticipated at the time of execution of this Release and which, if known by them on the date hereof, may have materially affected their decision to execute this Release.  Nevertheless, Franchisee and each of Franchisee's Principals agree that they intend to assume, and are assuming, the risk of such unknown or unanticipated claims, and that their release of Franchisor and its Designees set forth in this Release shall apply to any and all such claims.

**EXHIBIT C – RELEASE**                                                                                                    **PAGE 1**

Docusign Envelope ID: EEECDDA2-E407-4D8C-8F2B-5E55B78422C4

Neither Franchisee nor any of Franchisee's Principals has assigned, transferred or purported to assign or transfer to any other person or Entity any of the claims or any portion thereof or interest therein and agrees to indemnify, defend and hold Franchisor and its Designees harmless from and against any and all claims based on or arising out of any such assignment or transfer or purported assignment or transfer.

(c)    Franchisee and each of Franchisee's Principals represent and warrant that they intend to be legally bound by this Release, that the execution of this Release is free and voluntary, that no inducements, threats, presentations or influences of any kind were made or exerted by or on behalf of Franchisor or its Designees, and that, prior to the execution hereof, they were given the opportunity, if desired, to consult with counsel.

*[INSERT THE FOLLOWING FOR CALIFORNIA FRANCHISEES:*

**It is the express intention that this Release be as broad as permitted by law, except that this Release excludes such claims as Franchisee may have arising under the California Franchise Investment Law or the California Franchise Relations Act.**

**The parties intend this Section 1 to cover, encompass, release and extinguish all claims and matters that might otherwise be reserved by California Civil Code Section 1542, which provides as follows:**

> **"A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that, if known by him or her, would have materially affected his or her settlement with the debtor or the released party."]**

*[INSERT THE FOLLOWING FOR WASHINGTON FRANCHISEES:*

**"The general release does not apply with respect to claims arising under the Washington Franchise Investment Protection Act, RCW19.100 and the rules adopted thereunder."]**

2.    **Authority**.  By executing this Release, the parties represent and warrant that each have the right and authority to enter into and to accept the terms and covenants of this Release, and that no third party has or claims an interest in any claim released hereby.

3.    **No Conflicts**.  Each of the undersigned hereby represents and warrants that its execution of this Release does not violate any other agreement to which it is a party.

4.    **Miscellaneous**.

4.1    Counterparts.  This Release may be executed simultaneously in two or more counterparts, each of which will be deemed an original and all of which together will constitute but one and the same instrument.

4.2    Opportunity to Review.  Franchisee and Franchisee's Principals represent and warrant that they (i) have had an opportunity to review this Release, (ii) have had an opportunity to consult with an attorney, and (iii) fully understand the content and legal effect of this Release.

4.3    Governing Law.  This Release will be governed by the laws of the State of New York, which laws will be controlling in the event of any conflict of law.

EXHIBIT C – RELEASE                                                                                         PAGE 2

Docusign Envelope ID: EEECDDA2-E407-4D8C-8F2B-5E55B78422C4

4.4    Section Headings.  The Section headings of this Release are for the convenience of the parties only and will have no force or effect.

4.5    Severability.  The provisions of this Release are severable, and, in the event that any provision is held void and unenforceable as a matter of law, the remaining provisions will continue in full force and effect.

4.6    Defined Terms.  All terms not expressly defined in this Release will have the meaning given to such term in the Franchise Agreement.

IN WITNESS WHEREOF, Franchisee and Franchisee's Principals have executed and delivered this Release.

**FRANCHISEE**:

By:_____
Name:_____
Title:_____

**FRANCHISEE'S PRINCIPALS:**

Name: _____          Name:_____
Date:  _____          Date:_____


Name: _____          Name:_____
Date:  _____          Date:_____


Name: _____          Name:_____
Date:  _____          Date:_____

EXHIBIT C – RELEASE                                          PAGE 3

## EXHIBIT D

## ELECTRONIC FUNDS TRANSFER AUTHORIZATION FORM

Franchisee: _____

Principal Name: _____ Phone: _____

Contact Person: _____ Title: _____

Address: _____

Franchisee hereby authorizes MOLLYTEA Franchising LLC ("*Franchisor*") to initiate entries to the checking or savings account identified below for payment of Royalty Fees, Advertising Fund Contributions and any other amounts owed by Franchisee to Franchisor or its Affiliates under the Franchise Agreement between Franchisor and Franchisee or otherwise and, if necessary, to initiate any adjustments for transactions credited in error.

This authorization will remain in full force and effect until five calendar days after Franchisor has received signed written notification from Franchisee of its termination.

---

Name and Address on Account: _____

_____

_____

Pay to the order of: [ _____ ]

Franchisee's Financial Institution: _____
(Name, Address & Phone #) _____

_____

Transit/ABA Routing Number: _____

Account Number: _____

**PLEASE ATTACH A VOIDED CHECK**

---

Signature: _____ Date: _____

Printed Name: _____

## EXHIBIT E

## LEASE RIDER TERMS

Any Lease executed by Franchisee in connection with the Molly Tea Store must contain the following terms:

1.        During the term of the Franchise Agreement and the Lease, the Molly Tea Store will be used only for the operation of the Molly Tea Store using the System (as defined below).

2.        Landlord consents to Franchisee's use of such proprietary marks (the "**Marks**") and signs, decor items, color schemes, plans, specifications and related components of the Molly Tea Store (the "**System**") as MOLLYTEA Franchising LLC ("**Franchisor**") may prescribe for the Molly Tea Store. Landlord agrees not to unreasonably withhold, delay or condition consent or approval of any future changes to the Molly Tea Store location (the "**Premises**") required by Franchisee to conform to changes in the System and the Marks.

3.        Landlord agrees to furnish Franchisor with copies of any and all letters and notices (including, without limitation, any notice of default or termination) sent to Franchisee pertaining to the Lease and the Premises, at the same time that such letters and notices are sent to Franchisee at the following address:  MOLLYTEA Franchising LLC, 6 Kilmer Road, Suite B, Edison, New Jersey 08817, Attn: Jie Xiao.

4.        In the event of Franchisee's default under the terms of the Lease, Franchisor may, but is not required, to cure the default.  Within thirty (30) days after Franchisor receives notice of the default, Franchisor will have the option, in its sole discretion, to cure the default.  If Franchisor elects to cure the default, Franchisor will notify Landlord of its intent and will cure the default within thirty (30) days of such election or, if the default cannot be reasonably cured within such 30 day period, then Franchisor will commence and diligently proceed to cure the default within such time as is reasonably necessary to cure the default.  Landlord will provide to Franchisor an estoppel certificate confirming that no additional defaults exist and no acts or omissions have occurred which, with the passage of time, would result in default.

5.        Franchisor will have the right, and Landlord consents to allow Franchisor, its personnel and/or agents to enter the Premises to make any modification or alteration necessary to protect the System and Marks (including, without limitation, to de-identify the Premises as a Molly Tea Store following expiration or termination of the Franchise Agreement) or to cure any default under the Franchise Agreement or under the Lease, without civil or criminal liability for such entry and action that would otherwise be a tort or subject Franchisor, its personnel or agents to criminal prosecution, and Landlord will not be responsible for any expenses or damages arising from Franchisor's action in connection therewith.

6.        Franchisor has the option but not the obligation to acquire the Molly Tea Store from Franchisee if the Franchise Agreement expires or terminates or upon termination of the Lease by Landlord upon a default by Tenant provided Franchisor cures the default.  If Franchisor exercises the option, it will notify the Landlord when it notifies Franchisee of its decision to exercise the option.  Such notice will be sent to Landlord at the address for notices in the Lease no later than thirty (30) days after the option becomes exercisable.  If Franchisor exercises its option, or makes a different arrangement with Franchisee to acquire the Molly Tea Store, then Landlord will permit Franchisee to assign the Lease to Franchisor or its designee as successor-in-interest to Franchisee ("**Successor**").  The Successor will be obligated to assume Franchisee's obligations under the Lease.  Landlord will not seek to impose or effect any modification of the Lease terms and conditions upon the Successor.  The Successor will attorn to Landlord under the Lease

**EXHIBIT E – LEASE TERMS**                                                                                          **PAGE 1**

and Landlord will attorn to and agree not to disturb the tenancy of the Successor. The Successor will also assume Franchisee's occupancy rights, rights under any renewal or purchase options, and the right to sublease the Premises for the remainder of the term of the Lease including any applicable renewal periods. Any prior payments toward such rights or options made by or for Franchisee will be credited to the account and benefit of the Successor as if Franchisee retained such rights or options. Landlord consents to such assignment to the Successor in advance and agrees not to impose or assess any assignment fee or similar charge increase or accelerate rent, cease any rent abatement, reduction or rebate granted to Franchisee, or demand repayment of improvement costs or advances under the Lease or any other agreement if and when such assignment occurs, or require the Successor to pay any rent or other financial obligation of Franchisee to Landlord arising prior to the assignment. Landlord agrees to look solely to Franchisee and its guarantors for any rents or other financial obligations owed to Landlord arising prior to such assignment. Landlord and Franchisee acknowledge that neither Franchisor nor the Successor is a party to the Lease and neither will have any liability under the Lease, unless and until the Lease is assigned to, and assumed by Franchisor or the Successor, as applicable.

7.      Notwithstanding anything contained in the Lease, Franchisee is expressly authorized, without the consent of Landlord, to sublet the Premises to an authorized System franchisee approved by Franchisor, provided such subletting is specifically subject to the terms of the Lease and further provided the franchisee expressly assumes in writing all obligations of the Lease. Franchisor agrees to notify Landlord as to the name of the franchisee within ten (10) days after such subletting.

8.      Franchisee will not assign the Lease or renew or extend the term thereof without the prior written consent of Franchisor.

9.      Landlord and Franchisee will not amend or otherwise modify the Lease in any manner that could materially affect any of Franchisor's Lease requirements without the prior written consent of Franchisor.

10.     Landlord acknowledges that any landlord's lien or security interest arising under or from the Lease will not apply to any Operating Manual, software, scripts, videos or other tangible or intangible personal property of Franchisee furnished by Franchisor or any supplier to Franchisee under a use restriction, obligation of confidentiality or under license, and to any signage, printed materials, merchandise or other tangible media, goods, inventory and supplies bearing the Marks. At termination of the Lease, Franchisor will arrange for recovery and removal of such items as provided in the Franchise Agreement.

11.     Notwithstanding any term, condition or covenant of the Lease to the contrary, Landlord covenants with Franchisee that during the term of the Lease, Landlord will not enter into a lease, rental arrangement, license or other agreement for space within the same retail center or facility as the Premises or use as part of the retail center's parking lot to a party for any use that is the same as or substantially similar to a Molly Tea Store. The prohibition will extend to the granting of permission or consent for the operation of any business which sells the same or similar products as the Molly Tea Store on the Landlord's property where the Premises are located.

12.     Under the Franchise Agreement, any lease for the Premises of a Molly Tea Store is subject to Franchisor's approval. Accordingly, the Lease is contingent upon such approval.

13.     Landlord and Franchisee agree that the terms of this Rider shall supersede any terms of the contrary set forth in the Lease and shall be incorporated into the terms of the Lease.

**EXHIBIT F-1**

**CONFIDENTIALITY AND NONCOMPETE AGREEMENT FOR MANAGER**

[_____], a [_____] ("***Franchisee***"), and on behalf of MOLLYTEA Franchising LLC, a New York limited liability company ("the ***Company***"), and [_____], an individual having an address at [_____] ("***Manager***"), hereby enter into this Confidentiality and Noncompete Agreement ("***Agreement***"), effective as of this _____ day of _____, 20__ ("***Effective Date***") and agree as follows:

A.    Confidential Information

1.    Franchisee and Manager, for their mutual benefit, desire to have Franchisee disclose to Manager certain Confidential Information (defined in Paragraph 2 below) for the purpose of serving as an management employee for Franchisee's Molly Tea Store ("***Employment***").

2.    Confidential Information consists of certain computer systems, software programs, the Company's manuals, methods of services implementation, pricing and presentation of the Company's products and services, trade secrets and other proprietary materials, orientation and training procedures, strategies, internal procedures, designs, software, information regarding the Company's operational, sales, promotional and marketing methods and techniques of the Company and the Molly Tea Store brand and system, employees, customers and any other business and technical information that may be provided to Manager that the Company designates as proprietary or confidential, and all copies and derivatives containing such Confidential Information, which the Company or its affiliates, considers proprietary or confidential ("***Confidential Information***").    Confidential Information may be in any form or medium, tangible or intangible, and may be communicated in writing, orally, or through visual observation.

3.    For the duration of Manager's employment with Franchisee and at all times thereafter, Manager will use Confidential Information solely in connection with Manager's employment as directed by Franchisee, will not disclose such Confidential Information to any third parties without the Company's consent, and will reproduce Confidential Information only to the extent essential to fulfilling Manager's duties.

4.    Manager will notify Franchisee immediately upon discovery of any unauthorized use or disclosure of Confidential Information, or any other breach of this Agreement by Manager or any representative of Manager, and will cooperate with Franchisee and the Company in every reasonable way to help Franchisee and the Company regain possession of the Company's Confidential Information and prevent its further unauthorized use or disclosure.

5.    The covenants of confidentiality set forth in this Agreement will apply after the Effective Date to all Confidential Information disclosed to Manager before and after the Effective Date.

6.    Upon Franchisee's request, Manager will either return to Franchisee all Confidential Information or, at Franchisee's option, will certify to Franchisee that all media containing Confidential Information has been destroyed; provided, however, that an archival copy of the Confidential Information may be retained in the files of Manager's counsel solely for the purpose of proving the contents of the Confidential Information.

**EXHIBIT F-1 – CONFIDENTIALITY AND NONCOMPETE AGREEMENT**                    **PAGE 1**

7.  The foregoing restrictions on Manager's use or disclosure of Confidential Information will not apply to Confidential Information that Manager can demonstrate:  (a) was independently developed by or for Manager without reference to the Confidential Information, or was received without restrictions; (b) has become generally available to the public through no wrongful act or breach of confidentiality obligations by Manager; (c) was in Manager's possession without restriction or was known by Manager without restriction at the time of disclosure; or (d) is required by a court order to be disclosed; provided, however, that Manager has given Franchisee prompt notice of such demand for disclosure, has taken reasonable steps to enable Franchisee and the Company to seek to protect the confidentiality of the Confidential Information required to be disclosed, and will disclose only that part of the Confidential Information which, in the written opinion of his or her legal counsel, it is required to disclose.

8.  By disclosing Confidential Information or executing this Agreement, Franchisee does not grant to Manager any license or right to or to, explicitly or implicitly, any Confidential Information or any trademark, patent, copyright, mask work protection right, trade secret or any other intellectual property right.  Further, any Confidential Information provided by the Company or Franchisee hereunder is provided "AS IS" and no warranties are made by Franchisee or the Company regarding such Confidential Information.

9.  Execution of this Agreement and the disclosure of Confidential Information pursuant to this Agreement do not constitute or imply any commitment, promise, or inducement by Franchisee to make any purchase or sale, or to enter into any additional agreement of any kind.  Moreover, unless otherwise specifically agreed in writing, any knowledge or information which Manager discloses to Franchisee will not be deemed to be proprietary or confidential and will be acquired by Franchisee free from any restrictions; however, no license under any applicable patent(s) of Manager will be granted or implied.

B.  <u>Competition</u>

1.  For so long as Manager is employed by Franchisee and for a period of two (2) years from the date Manager ceases to be employed by Franchisee, Manager will not, either directly or indirectly, individually or through, on behalf of, or in conjunction with any other person:

   (i)  Own, maintain, manage, operate, engage in, or have any financial or beneficial interest in, advise, assist or render services or make loans to, any person engaged in any business or products that, as determined by the Company, is the same as or substantially similar to a Molly Tea Store (a "***Competitive Business***"); or

   (ii) Divert or attempt to divert any business or customer of the Molly Tea Store to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Company, the Molly Tea Store brand or Molly Tea Store system.

   The above covenants apply exclusively in the United States of America during the time that Manager serves as Manager for the Molly Tea Store and within 10 miles of any then-existing Molly Tea Store for the two-year period following the date Manager ceases to be an employee of the Molly Tea Store.

2.  If all or any portion of this Agreement is held unreasonable or unenforceable by a tribunal, court or agency having valid jurisdiction in an unappealed final decision to which

Franchisee is a party, Manager agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by applicable law. If any portion of the restrictions contained in this Agreement is held to be unreasonable, arbitrary or against public policy by any tribunal, court or agency having valid jurisdiction, then the restrictions will be considered divisible, both as to time and to the geographical area, with each month or the specified period being deemed a separate period of time and each radius mile of the restricted territory being deemed a separate geographical area, so that the lesser period of time or geographical area will remain effective and may be enforced against Manager so long as the same is not unreasonable, arbitrary or against public policy.  If Manager violates any of the covenants contained herein, and if any court, tribunal or agency action is instituted by Franchisee to prevent or enjoin such violation, then the period of time during which the covenants of this Agreement apply will be lengthened by a period of time equal to the period between the date of the breach of the terms or covenants contained in this Agreement and the date on which the decree of the disposition of the tribunal, court or agency having valid jurisdiction of the issues upon the merits will become final and not subject to further appeal.

3.  Manager acknowledges that the geographical and time limitations contained in this Agreement are reasonable and properly required for the adequate protection of the Confidential Information, including the Company's trade secrets.  Manager acknowledges that Franchisee will provide to Manager training and Confidential Information in reliance upon the covenants contained in this Agreement.

4.  Manager also recognizes and agrees that Manager's employment by Franchisee is "at will", which means that Manager may be terminated by Franchisee or Manager at any time and with or without cause.

C.  General Provisions

1.  Franchisee's failure to enforce any provision, right or remedy under this Agreement will not constitute a waiver of such provision, right or remedy.

2.  This Agreement and performance hereunder will be interpreted, enforced and governed by the laws of the location in which Manager's services are performed, without regard to such state's conflicts of law rules.

3.  Manager acknowledges that money damages alone would be an inadequate remedy for the injuries and damages that would be suffered and incurred by Franchisee as a result of Manager's breach of this Agreement.  Therefore, Manager agrees that if Manager violates or threatens to violate this Agreement, Franchisee, in addition to any other remedies it may have at law or equity, will be entitled to a restraining order, injunction, or other similar remedy in order to enforce the provisions of this Agreement.  In the event Franchisee should seek an injunction hereunder, Manager hereby waives any requirement for the submission of proof of the economic value of any Confidential Information or the posting of a bond or any other security.  Manager will bear all costs and expenses, including attorneys' fees and costs, incurred by Franchisee in enforcing the provisions of this Agreement.

4.  This Agreement constitutes the entire agreement of the parties with respect to the parties' respective obligations in connection with Confidential Information disclosed hereunder and supersedes all prior oral and written agreements and discussions with respect thereto. Each party intends that an electronic copy of his or her signature be regarded as an original

signature and agrees that this Agreement can be executed in counterparts.  The parties can amend or modify this Agreement only by a writing duly executed by their respective authorized representatives.  Manager will not assign this Agreement without first securing Franchisee's prior written consent.

5.      The Company will be an intended third-party beneficiary of this Agreement with the full and independent right to enforce each and all of its terms.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed by their duly authorized representatives on the date(s) indicated.

**FRANCHISEE:**                                                    **MANAGER:**

[_____]
a [_____]


By: _____          By:_____
Name: _____          Manager Name:_____
Title: _____          Date:_____

Docusign Envelope ID: EEECDDA2-E407-4D9C-8F2B-5E55B78422C4

**EXHIBIT F-2**

**CONFIDENTIALITY AGREEMENT**

[_____], a [_____] ("***Franchisee***"), and on behalf of MOLLYTEA Franchising LLC, a Delaware limited liability company ("the ***Company***"), and [_____], an individual having an address at [_____] ("***Employee***"), hereby enter into this Confidentiality Agreement ("***Agreement***"), effective as of this \_\_\_\_\_ day of _____, 20\_\_ ("***Effective Date***") and agree as follows:

1. Franchisee and Employee, for their mutual benefit, desire to have Franchisee disclose to Employee certain Confidential Information (defined in <u>Paragraph 2</u> below) for the purpose of serving as an employee for Franchisee's Molly Tea Store ("***Employment***").

2. Confidential Information consists of certain computer systems, software programs, the Company's manuals, methods of services implementation, pricing and presentation of the Company's products and services, trade secrets and other proprietary materials, orientation and training procedures, strategies, internal procedures, designs, software, information regarding the Company's operational, sales, promotional and marketing methods and techniques of the Company and the Molly Tea Store brand and system, employees, customers and any other business and technical information that may be provided to Employee that the Company designates as proprietary or confidential, and all copies and derivatives containing such Confidential Information, which the Company or its affiliates, considers proprietary or confidential ("***Confidential Information***"). Confidential Information may be in any form or medium, tangible or intangible, and may be communicated in writing, orally, or through visual observation.

3. For the duration of Employee's Employment with Franchisee and at all times thereafter, Employee will use Confidential Information solely in connection with Employee's Employment as directed by Franchisee, will not disclose such Confidential Information to any third parties without the Company's consent, and will reproduce Confidential Information only to the extent essential to fulfilling Employee's duties.

4. Employee will notify Franchisee immediately upon discovery of any unauthorized use or disclosure of Confidential Information, or any other breach of this Agreement by Employee or any representative of Employee, and will cooperate with Franchisee in every reasonable way to help Franchisee and the Company regain possession of the Company's Confidential Information and prevent its further unauthorized use or disclosure.

5. The covenants of confidentiality set forth in this Agreement will apply after the Effective Date to all Confidential Information disclosed to Employee before and after the Effective Date.

6. Upon Franchisee's request, Employee will either return to Franchisee all Confidential Information or, at Franchisee's option, will certify to Franchisee that all media containing Confidential Information has been destroyed; provided, however, that an archival copy of the Confidential Information may be retained in the files of Employee's counsel solely for the purpose of proving the contents of the Confidential Information.

7. The foregoing restrictions on Employee's use or disclosure of Confidential Information will not apply to Confidential Information that Employee can demonstrate: (a) was independently developed by or for Employee without reference to the Confidential Information, or was received without restrictions; (b) has become generally available to the public through no wrongful act or breach of confidentiality obligations by Employee; (c) was in Employee's possession without

**EXHIBIT F-2 – CONFIDENTIALITY AGREEMENT**                                                          **PAGE 1**

restriction or was known by Employee without restriction at the time of disclosure; or (d) is required by a court order to be disclosed; provided, however, that Employee has given Franchisee prompt notice of such demand for disclosure, has taken reasonable steps to enable Franchisee and the Company to seek to protect the confidentiality of the Confidential Information required to be disclosed, and will disclose only that part of the Confidential Information which, in the written opinion of his or her legal counsel, it is required to disclose.

8.    By disclosing Confidential Information or executing this Agreement, Franchisee does not grant Employee any license or right in or to, explicitly or implicitly, any Confidential Information or any trademark, patent, copyright, mask work protection right, trade secret or any other intellectual property right.  Further, any Confidential Information provided by the Company or Franchisee hereunder is provided "AS IS" and no warranties are made by Franchisee regarding such Confidential Information.

9.    Execution of this Agreement and the disclosure of Confidential Information pursuant to this Agreement do not constitute or imply any commitment, promise, or inducement by Franchisee to make any purchase or sale, or to enter into any additional agreement of any kind.  Moreover, unless otherwise specifically agreed in writing, any knowledge or information which Employee discloses to Franchisee will not be deemed to be proprietary or confidential and will be acquired by Franchisee free from any restrictions; however, no license under any applicable patent(s) of Employee will be granted or implied.

10.    Franchisee's failure to enforce any provision, right or remedy under this Agreement will not constitute a waiver of such provision, right or remedy.

11.    This Agreement and performance hereunder will be interpreted, enforced and governed by the laws of the location in which Employee's services are performed, without regard to such state's conflicts of law rules.

12.    Employee acknowledges that money damages alone would be an inadequate remedy for the injuries and damages that would be suffered and incurred by Franchisee as a result of Employee's breach of this Agreement.  Therefore, Employee agrees that if Employee violates or threatens to violate this Agreement, Franchisee, in addition to any other remedies it may have at law or equity, will be entitled to a restraining order, injunction, or other similar remedy in order to enforce the provisions of this Agreement.  In the event Franchisee should seek an injunction hereunder, Employee hereby waives any requirement for the submission of proof of the economic value of any Confidential Information or the posting of a bond or any other security.  Employee will bear all costs and expenses, including attorneys' fees and costs, incurred by Franchisee in enforcing the provisions of this Agreement.

13.    This Agreement constitutes the entire agreement of the parties with respect to the parties' respective obligations in connection with Confidential Information disclosed hereunder and supersedes all prior oral and written agreements and discussions with respect thereto.  Each party intends that an electronic copy of his or her signature be regarded as an original signature and agrees that this Agreement can be executed in counterparts.  The parties can amend or modify this Agreement only by a writing duly executed by their respective authorized representatives.  Employee will not assign this Agreement without first securing Franchisee's prior written consent.

14.    The Company will be an intended third-party beneficiary of this Agreement with the full and independent right to enforce each and all of its terms.

EXHIBIT F-2 – CONFIDENTIALITY AGREEMENT                                                                 PAGE 2

Docusign Envelope ID: EEECDDA2-E407-4D8C-8F2B-5E55B78422C4

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed by their duly authorized representatives on the date(s) indicated.

**FRANCHISEE:**                                         **EMPLOYEE:**

[_____]
a [_____]


By: _____          By:_____
Name: _____          Employee Name:_____
Title: _____          Date:_____

## EXHIBIT G

## GUARANTY AND UNDERTAKING OF OBLIGATIONS

**THIS GUARANTY AND UNDERTAKING OF OBLIGATIONS** is made and entered into _____, 20__ ("*Guaranty*"), in accordance with the terms and conditions of that certain franchise agreement dated _____, 20__ ("*Franchise Agreement*"), by and between MOLLYTEA Franchising LLC, a Delaware limited liability company ("*Franchisor*"), _____ ("*Franchisee*") and _____, _____ and _____ (individually, a "*Guarantor*" and collectively, "*Guarantors*"). Capitalized terms not defined in this Guaranty have the meanings given in the Franchise Agreement.

## Agreement

NOW, THEREFORE, in consideration of the undertakings and commitments of Franchisee set forth in the Franchise Agreement and the Ancillary Agreements each of the undersigned Guarantors acknowledge and agree as follows:

1. Each Guarantor is included in the definition "*Franchisee's Principals*" as defined in the Franchise Agreement and without limiting any guarantee of Franchisee's obligations under the Franchise Agreement, makes all covenants, representations, warranties and agreements of Principals set forth in the Franchise Agreement and is obligated to individually perform thereunder for so long as he or she qualifies as a Principal and thereafter to the extent expressly provided by the terms of the Franchise Agreement, including, without limitation, the representations, warranties and covenants described in the following sections of the Franchise Agreement: Section 14 (Representations, Warranties and Covenants), Section 15 (Restrictive Covenants), Section 16 (Indemnification) and Section 18 (Transfer of Interest).

2. Each Guarantor has read the terms and conditions of the Franchise Agreement, and acknowledges that the execution of this Guaranty and the undertakings of Guarantors in the Franchise Agreement and any Ancillary Agreements, are in partial consideration for, and a condition to, the granting of the Molly Tea Store franchise, and that Franchisor would not have granted the franchise without the execution of this Guaranty and the other undertakings by each of the Guarantors.

3. Each Guarantor individually and personally, jointly and severally, unconditionally and irrevocably guarantees to Franchisor and its successors and assigns for the Term, and afterward as provided in the Franchise Agreement, that Franchisee will punctually pay and perform each and every undertaking, agreement and covenant set forth in the Franchise Agreement. Upon default by Franchisee or upon notice from Franchisor, each Guarantor will immediately make each payment and perform each obligation required of Franchisee under the Franchise Agreement and any Ancillary Agreements.

4. Each Guarantor, individually and personally, agrees to be personally bound by, and personally liable for, the breach of each and every provision in the Franchise Agreement, both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities. Each Guarantor consents and agrees that he or she will render any payment or performance required under the Franchise Agreement upon demand if Franchisee fails or refuses punctually to do so.

5. Each Guarantor consents and agrees that such liability will not be contingent or conditioned upon pursuit by Franchisor of any remedies against Franchisee or any other person or Entity and waives any right Guarantor may have to require that an action be brought against Franchisee or any other person or Entity as a condition of his or her liability. Franchisor may pursue its rights against any Guarantor

**EXHIBIT G – GUARANTY AND UNDERTAKING OF OBLIGATIONS**                                       **PAGE 1**

without first exhausting its remedies against Franchisee and without joining any other Guarantor, and no delay on the part of Franchisor in the exercise of any right or remedy will operate as a waiver of the right or remedy, and no single or partial exercise by Franchisor of any right or remedy will preclude the further exercise of that or any other right or remedy.

6.    Without affecting the obligations of any Guarantors under this Guaranty, Franchisor may, without notice to the Guarantors, waive, renew, extend, modify, amend or release any indebtedness or obligation of Franchisee or settle, adjust or compromise any claims that Franchisor may have against Franchisee.

7.    Each Guarantor consents and agrees that such liability will not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence that Franchisor may periodically grant to Franchisee or to any other person or Entity, including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during the Term.  Each Guarantor waives all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the undersigned's execution of and performance under this Guaranty.

8.    Further, each Guarantor hereby waives all other rights or benefits otherwise provided to sureties or guarantors under any state or federal law or common law, except as provided in this Guaranty. Each Guarantor agrees that Franchisor may unqualifiedly exercise, in its sole discretion, any or all rights and remedies available to it against Franchisee or any other guarantor or pledgor without impairing Franchisor's rights and remedies in enforcing this Guaranty, under which Guarantor's liabilities will remain independent and unconditional.  Each Guarantor acknowledges that Franchisor's exercise of certain of such rights or remedies may affect, or eliminate Guarantor's right of subrogation or recovery against Franchisee and that each Guarantor may incur a partially or totally nonreimbursable liability under this Guaranty.

9.    On Franchisor's request, each Guarantor will promptly deliver to Franchisor complete and current financial statements and tax returns and such other financial information about each Guarantor as Franchisor may reasonably request.  Each Guarantor further agrees to keep Franchisor fully informed on all aspects of Franchisee's financial condition and the performance of Franchisee's obligations to Franchisor and that Franchisor has no duty to disclose to Guarantor any information pertaining to Franchisee or to notify Guarantor of Franchisee's default under the Franchise Agreement or any Ancillary Agreement.

10.    Upon receipt by Franchisor of notice of the death of any Guarantor, the estate of the deceased will be bound by the foregoing Guaranty, but only for defaults and obligations under the Franchise Agreement and any Ancillary Agreement existing at the time of death, and the obligations of the remaining Guarantors will continue in full force and effect.

11.    If this Guaranty is executed by more than one party, each Guarantor agrees that Franchisor may enforce the provisions of this Guaranty against one or more of the parties without seeking to enforce this Guaranty as to all or any other parties to this Guaranty.  Each Guarantor waives any requirement of joinder of all or any other of the parties to this Guaranty in any suit or proceeding to enforce the provisions of this Guaranty.

12.    The provisions of this Guaranty are severable, and, in the event that any of them is held void and unenforceable as a matter of law, the remainder will be deemed modified so as to impose the maximum duty permitted by law and such provision will be valid and enforceable in such modified form as if separately stated in and made a part of this Guaranty.

13.     All disputes concerning the validity, interpretation, or performance of this Guaranty and any of its terms or provisions, or any rights or obligations of the parties hereto, will be governed by and resolved in accordance with the laws of the State of New York (without regard to New York conflicts of laws rules), and be resolved in the courts located within New York County, New York.

14.     If any legal action is initiated by either of the parties hereto, the prevailing party will be entitled to recover from the other party reasonable attorneys' fees and costs in addition to any other relief that may be awarded.

15.     Each Guarantor represents and warrants that the following is a complete and accurate list of all Principals of Franchisee and a full description of the nature and extent of each Principal's Equity Interest in Franchisee.  Franchisee, and each Guarantor (as to his or her Equity Interest), represents and warrants that Principal is the sole and exclusive legal and beneficial owner of his or her Equity Interest in Franchisee, free and clear of all liens, restrictions, agreements and encumbrances of any kind or nature, other than those required or permitted by this Guaranty.

*[Signatures appear on following page.]*

Docusign Envelope ID: EEECDDA2-E407-4D8C-8F2B-5E55B78422C4

IN WITNESS WHEREOF, each of the undersigned Guarantor has executed this Guaranty effective as of the date of this Guaranty.

| GUARANTORS | EQUITY INTEREST |
|---|---|
| | _____% |
| Name:_____ | |
| Date:_____ | |
| | _____% |
| Name:_____ | |
| Date:_____ | |
| | _____% |
| Name:_____ | |
| Date:_____ | |
| | _____% |
| Name:_____ | |
| Date:_____ | |
| | _____% |
| Name:_____ | |
| Date:_____ | |
| | _____% |
| Name:_____ | |
| Date:_____ | |

**EXHIBIT G – GUARANTY AND UNDERTAKING OF OBLIGATIONS**                    **PAGE 4**

## EXHIBIT H

## INSURANCE REQUIREMENTS

The insurance requirements described below are for a single Molly Tea Store. If Franchisee owns multiple Molly Tea Stores, Franchisee must meet the insurance requirements below for each Molly Tea Store and each "Molly Tea Store location" aggregate limits when multiple Molly Tea Stores are insured under single comprehensive general liability policy or liquor liability policy (e.g. for two Molly Tea Stores, Franchisee must purchase a commercial general liability policy with a minimum per occurrence liability limit of $1,000,000 and an aggregate liability limit of $2,000,000). Franchisor may modify the terms of these insurance requirements at any time upon written notice to Franchisee. The insurance policies and limits required below will not limit, and are independent of, the indemnification obligations under the Agreement. Franchisor recommends that Franchisee maintain workplace safety and risk management programs at Franchisee's Molly Tea Store.

A.     Commercial General Liability.  The commercial general liability policy will be written on an occurrence basis and will include coverage for products/completed operations on the Molly Tea Store Premises through ISO form CG 24 07 or equivalent coverage and must not include an exclusion or sublimit for assault and battery. The commercial general liability policy will have a minimum per occurrence liability limit of $1,000,000 and an aggregate liability limit of $2,000,000. The commercial general liability policy will also have the following endorsements: the additional insured coverage for MOLLYTEA Franchising LLC ("*Franchisor*") and its affiliates and their respective owners, directors, managers, officers, employees, agents, successors and assignees (collectively, the "*Franchisor Indemnitees*") which will include Premises-operations, contractual liability, independent contractors, and products and completed operations.  The additional insured coverage will not be limited to Franchisor's vicarious liability, and will include coverage for liability arising out of or occurring upon or in connection with the condition, operation, use or occupancy of the Molly Tea Store.

B.     Crime (inside/outside) and Employee  Dishonesty Insurance:  Crime (moneys and securities) inside/outside coverage will have a minimum per occurrence liability limit of $100,000 for inside crime and a minimum per occurrence liability limit of $100,000 for outside crime.  Employee dishonesty coverage will have a minimum per occurrence liability limit of $100,000.

C.     Worker's Compensation Insurance.  Worker's compensation insurance in amounts provided by applicable law or, if permissible under applicable law, any legally appropriate alternative providing substantially similar compensation for injured workers satisfactory to Franchisor, provided that Franchisee conduct and maintain a risk management and safety program for Franchisee's employees as Franchisee deem appropriate.

D.     Automobile Liability Insurance.  Automobile liability insurance coverage for owned, non-owned and hired vehicles with a liability limit of not less than $1,000,000 combined single limit (which will include, without limitation, coverage for Franchisee's delivery, including home delivery, if applicable, and catering operations).

E.     Building and Personal Property Insurance:  Property coverage for physical loss or damage to personal property and real property including leasehold improvements, at each Molly Tea Store location. The policy will include all risk replacement cost property insurance for Franchisee's Molly Tea Store and its contents, including, without limitation, awnings, equipment, signs, glass, additions under construction, outdoor fixtures, personal property, as well as business interruption insurance for income loss for at least twelve (12) months and Royalty Fees due under Franchisee's Franchise Agreement for the applicable Molly Tea Store, equipment breakdown, business ordinance, debris removal, preservation of property, fire

**EXHIBIT H – INSURANCE REQUIREMENTS**                                                    **PAGE 1**

department service charges, pollutant clean up and removal, newly acquired or constructed property, property of others, property off Premises and stock. This policy will include Franchisor as a loss payee for equipment and supplies financed by Franchisor either by a loan, line of credit or an open account.

F.    Umbrella Liability Insurance.    Umbrella coverage over the above-described general commercial liability, liquor liability, automobile liability and employer's liability insurance policies listed above and provide coverage at least as broad as these underlying policies.  Such coverage will be written on a per occurrence basis.  The policy must provide coverage of at least a $1,000,000 per occurrence limit and $1,000,000 aggregate limit.    The umbrella liability insurance will also have the following endorsements:  the additional insured coverage for Franchisor Indemnitees will not be limited to Franchisor vicarious liability, and will include coverage for liability arising out of or occurring upon or in connection with the condition, operation, use or occupancy of the franchised business.

G.    Insurance Required Under Applicable Law.  Any insurance which may be required by statute or rule of the state or locality in which Franchisee's Molly Tea Store will be operated.

H.    Deductibles. The insurance coverages described above may not have any deductible, self-insured retention, self-funded retention, or any similar provision unless prior written consent is given by Franchisor.

**EXHIBIT H – INSURANCE REQUIREMENTS**                                        **PAGE 2**

## EXHIBIT I

## CONSENT TO OPTION

The undersigned spouses of the Principals identified in the Franchise Agreement hereby consent to the provisions of Sections 18 and 20(k) of the Franchise Agreement and agree that any interest which he or she owns in the Franchise Agreement, in the business operated thereunder, or in Franchisee (whether a separate property interest, community property interest, joint ownership interest or otherwise) will be subject to Franchisor's right of first refusal or purchase option , as applicable, described in said Sections.


_____                              _____
Name of Principal                                      Name of Principal


_____                              _____
Name of Principal's Spouse                             Name of Principal's Spouse


_____                              _____
Signature of Principal's Spouse                        Signature of Principal's Spouse


_____
Name of Principal


_____
Name of Principal's Spouse


_____
Signature of Principal's Spouse

EXHIBIT I – CONSENT TO OPTION                                                    PAGE 1

## EXHIBIT J

## REVENUE ALLOCATION AGREEMENT

This Revenue Allocation Agreement (this "**Agreement**") is made and entered into as of **[Effective Date]** (the "**Effective Date**"), by and between **MOLLYTEA Franchising LLC** ("**HQ**"), and [**Legal Name of Restaurant Store Entity**] ("**Store**") (each, a "**Party**" and collectively, the "**Parties**").

### RECITALS

**WHEREAS**, HQ operates and manages a restaurant group ("**Restaurant Group**");

**WHEREAS**, Store is a separate legal entity operating a restaurant location under the Restaurant Group;

**WHEREAS**, Store utilizes certain services facilitated by HQ, including potentially a third-party platform for payment processing provided by Chowbus, Inc. (the "**Platform**");

**WHEREAS**, as a condition of Store's affiliation with the Restaurant Group and use of HQ-facilitated services, Store has authorized the Platform and its underlying payment processor to route all Platform Net Revenue (as defined herein and in the Routing Authorization Agreement) generated from transactions at the Store location directly to a bank account designated by HQ, as documented in a separate Routing Authorization Agreement with the Platform (the "**Routing Authorization Agreement**");

**WHEREAS**, the Parties desire to establish the terms and conditions under which HQ shall receive such Platform Net Revenue and allocate and disburse a portion thereof, defined herein as the "**Net Payout**," to Store, and to define their respective financial and tax responsibilities related thereto;

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.     **Purpose**. The purpose of this Agreement is to govern the financial relationship between HQ and Store regarding the collection by HQ of Platform Net Revenue generated by Store's operations, the deduction of agreed-upon Service Fees (as defined below) and other authorized amounts by HQ, and the subsequent calculation and payout of the Net Payout (as defined below) to Store. This Agreement is intended to create a clear framework for revenue allocation and disbursement between the Parties.

2.     **Revenue Collection and Processing**.

a.     <u>Platform Net Revenue Collection</u>. Store acknowledges and agrees that, pursuant to the Routing Authorization Agreement and other related agreements with the Platform and its payment processor, all customer payments processed through the Platform for transactions at the Store location, less any standard payment processor fees, chargebacks, refunds, disputed amounts, sales tax collected and remitted by the processor, and other deductions or adjustments as defined in the agreement between Store and the Platform or by the payment processor's terms (collectively, the "**Platform Net Revenue**"), will be directed and settled directly into a bank account designated by HQ.

b.     <u>Platform Role</u>. The Parties acknowledge that the collection of Platform Net Revenue as described herein is facilitated by Chowbus, Inc. and its payment processing partners, and is subject to the terms of service of the Platform and the payment processor. HQ's receipt of Platform Net Revenue is contingent upon the successful processing and transfer of funds by these third parties.

c.     <u>Gift Cards and Stored Value</u>. All amounts from the sale or reload of gift cards or stored value accounts ("**Gift Card Funds**"), whether sold in-store, online, or through the Platform,

shall be collected into the HQ-designated account (or by the Platform/payment processor on HQ's behalf) and held until redemption. Gift Card Funds shall be included in Platform Net Revenue only upon redemption for transactions at the Store, at which point they will be allocated and paid out in accordance with Section 3, less applicable deductions. HQ shall track outstanding balances and comply with all applicable laws regarding unredeemed amounts. Upon Store's termination, HQ will redeem outstanding balances through the termination date, settle redeemed amounts with Store, and remain responsible for any unredeemed balances thereafter, except for balances issued solely by Store prior to its affiliation with the Restaurant Group.

3.      **Revenue Allocation and Payout**.

a.      Calculation of Net Payout. On a **bi-weekly** basis, HQ shall calculate the amount due to Store (the "**Net Payout**") for the preceding period. The Net Payout shall be calculated as follows: Net Payout = Platform Net Revenue (collected by HQ for the period) MINUS (-) Service Fees MINUS (-) Payment Processor Fees and other third-party costs directly related to transactions (to the extent not already deducted by the processor and reflected in Platform Net Revenue) MINUS (-) Chargebacks and Refunds processed for the Store's transactions (to the extent not already deducted by the processor and reflected in Platform Net Revenue) MINUS (-) Any other deductions mutually agreed upon in writing by the Parties.

b.      Payout Disbursement. HQ shall disburse the calculated Net Payout to the Store via **ACH transfer** within **ten** business days following the end of each payout period.

c.      Statement of Account. Concurrently with each payout, HQ shall provide Store with a detailed statement outlining the calculation of the Net Payout, including Platform Net Revenue received, itemized Service Fees, other deductions, and the resulting Net Payout amount. Store shall have **two** days from receipt of the statement to dispute any amounts, after which the statement shall be deemed final, absent manifest error.

4.      **Service Fees and Deductions**.

a.      Authorization to Deduct. Store hereby authorizes HQ to deduct certain fees and costs ("**Service Fees**") directly from the Platform Net Revenue received by HQ prior to calculating and disbursing the Net Payout. These Service Fees compensate HQ for services provided, contributions to the Restaurant Group system, and reimbursement of shared costs.

b.      Schedule of Service Fees. The specific Service Fees and their calculation methods (e.g., fixed amount, percentage of Platform Net Revenue) are set forth in **Exhibit A**, attached hereto and incorporated by reference. Exhibit A may include, but is not limited to: (i) Franchise Fees or Royalty Fees; (ii) Marketing and Advertising Contributions; (iii) Administrative and Management Fees; (iv) Technology Fees; and (v) Shared Services Costs.

c.      Modification of Service Fees. HQ reserves the right to modify the Service Fees set forth in Exhibit A upon providing Store with **thirty** days' prior written notice. Any such modification shall apply to Platform Net Revenue collected from the effective date specified in the notice.

5.      **Tax Responsibilities**.

a.      HQ Reporting Obligation. HQ acknowledges that it receives funds generated from Store's operations (specifically, the **Platform Net Revenue**). HQ shall be responsible for issuing appropriate tax forms (e.g., IRS Form 1099-K, 1099-NEC, or other applicable forms as required by the Internal Revenue Service and applicable state tax authorities) to Store reflecting the financial activity covered by this Agreement, including but not limited to the Net Payouts disbursed to Store and/or the Service Fees retained by HQ, as required by applicable law and the tax characterization of these transactions.

EXHIBIT J – REVENUE ALLOCATION AGREEMENT                                          PAGE 2

b.　　Store Tax Responsibility. Store is a separate legal entity and is solely responsible for all of its own tax obligations. This includes, without limitation: (i) reporting all income received, including the Net Payouts from HQ, on its federal, state, and local income tax returns; (ii) all payroll taxes for its employees; (iii) all sales, use, and occupancy taxes related to its operations (acknowledging that collection of sales tax is often facilitated by the Platform or payment processor); and (iv) any business licenses, permits, or other taxes or fees required for its operation.

c.　　Information Sharing. Both Parties agree to provide accurate and complete tax identification information (e.g., EIN, legal name, address) and any other information reasonably required by the other Party to comply with applicable tax reporting obligations.

6.　　**Liability and Indemnification**.

a.　　Store Liability. Store shall be solely responsible and liable for: (i) all liabilities arising from its operation of the restaurant location, including but not limited to customer claims, employee disputes, injury occurring on its premises, and regulatory violations; (ii) all chargebacks, refunds, and payment disputes arising from transactions originating at its location due to operational issues, service quality, or failure to deliver goods/services; and (iii) its own debts, obligations, and liabilities not expressly assumed by HQ in this Agreement.

b.　　HQ Liability. HQ shall be responsible and liable for: (i) errors in the calculation of the Net Payout that result in an incorrect amount being disbursed to Store; (ii) failure to disburse the calculated Net Payout to Store in a timely manner as required by this Agreement, provided funds were successfully received by HQ from the Platform; and (iii) its own debts, obligations, and liabilities not expressly assumed by Store in this Agreement.

c.　　Mutual Indemnification. Each Party (the **"Indemnifying Party"**) shall indemnify, defend, and hold harmless the other Party and its officers, directors, employees, and agents (the **"Indemnified Party"**) from and against any and all claims, losses, damages, liabilities, costs, and expenses (including reasonable attorneys' fees) arising out of or related to any material breach by the Indemnifying Party of any representation, warranty, covenant, or obligation contained in this Agreement.

7.　　**Waiver and Release of Chowbus**. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, STORE AND HQ ACKNOWLEDGE AND AGREE THAT CHOWBUS, INC, THE PLATFORM PROVIDER, IS NOT A PARTY TO THIS AGREEMENT AND THAT CHOWBUS, INC. HAS NO LIABILITIES OR OBLIGATIONS WHATSOEVER UNDER, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE UNDERLYING TRANSACTIONS HERETO. EACH OF STORE AND HQ HEREBY RELEASES, INDEMNIFIES AND HOLDS HARMLESS CHOWBUS, INC. FROM ANY AND ALL CLAIMS, ACTIONS, LIABILITIES, DAMAGES, COSTS AND EXPENSES UNDER, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE UNDERLYING TRANSACTIONS IN ANY WAY. CHOWBUS, INC. IS AN IRREVOCABLE, INTENDED THIRD-PARTY BENEFICIARY UNDER THIS SECTION.

8.　　**Miscellaneous**. This Agreement: (i) may be modified only by a writing signed by each of the Parties; (ii) may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument; (iii) is governed by, and will be interpreted, construed and enforced in accordance with, the laws of the State of New York, without giving effect to New York' conflict of laws rules; (iv) is binding upon, and will inure to the benefit of, the Parties and their respective successors and permitted assigns; and (v) constitutes the sole and entire agreement of the Parties with respect to the subject matter herein, and supersedes all prior and contemporaneous written or oral negotiations, understandings, agreements, representations, and warranties, with respect to the subject matter herein. In entering into this Agreement, no Party has relied upon any statement, representation, warranty, or agreement of the other Party except for those expressly contained in this Agreement. Neither Party may

directly or indirectly assign, transfer, or delegate any of or all of its rights or obligations under this Agreement, voluntarily or involuntarily, including by change of control, merger (whether or not such Party is the surviving entity), operation of law, or any other manner, without the prior written consent of the other Party. Any purported assignment or delegation in violation of this Section shall be null and void. Unless otherwise agreed by the Parties, no assignment or delegation shall relieve the assigning or delegating Party of any of its obligations hereunder. Each Party expressly consents to the exclusive jurisdiction of the federal, state and local courts serving New York, to govern all disputes arising out of or relating to this Agreement. The due performance or observance by a Party of any of its obligations under this Agreement may be waived only by a writing signed by the Party against whom enforcement of such waiver is sought, and any such waiver will be effective only to the extent specifically set forth in such writing. The waiver by a Party of any breach or violation of any provision of this Agreement will not operate as, or be construed to be, a waiver of any subsequent breach or violation hereof. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. Section 7 (Waiver and Release of Chowbus) of this Agreement, as well as any other provision that, in order to give proper effect to its intent, should survive the expiration or termination of this Agreement, will survive such expiration or termination.

[SIGNATURE PAGE TO FOLLOW]

**IN WITNESS WHEREOF**, the Parties have executed this Revenue Allocation Agreement as of the Effective Date first written above.

**MOLLYTEA Franchising LLC**
By:_____
Name:_____
Title:_____
Date:_____

**[STORE LEGAL ENTITY]**
By:_____
Name:_____
Title:_____
Date:_____

## EXHIBIT A TO THE REVENUE ALLOCATION AGREEMENT

### SERVICE FEE SCHEDULE

This Exhibit A sets forth the Service Fees that HQ is authorized to deduct from Platform Net Revenue received from Store pursuant to Revenue Allocation Agreement.

The following fees shall be deducted on a **monthly** basis from the Platform Net Revenue collected for the preceding period:

1. **Franchise Fee / Royalty:**

Amount: 5% of Platform Net Revenue

Description: Fee for the use of the Restaurant Group name, system, and ongoing support.

2. **Marketing & Advertising Contribution:**

Amount: 2% of Platform Net Revenue

Description: Contribution to the Restaurant Group's collective marketing and advertising fund.

3. **Administrative Fee:**

Amount: 1% of Platform Net Revenue

Description: Fee for HQ's administrative services, including facilitating this revenue allocation process.

4. **Technology Fee:**

Amount: $100 per week per active terminal

Description: Fee for access to HQ-provided or facilitated technology systems (excluding fees paid directly to third-party platforms like Chowbus, which may be passed through as deductions in the Net Payout calculation if not already deducted from **Platform Net Revenue**).

**EXHIBIT B**

**MULTI-UNIT DEVELOPMENT AGREEMENT**

**MULTI-UNIT DEVELOPMENT AGREEMENT**

**BY AND BETWEEN**

**MOLLYTEA FRANCHISING LLC**

**AND**

**_____**
**(Name of Developer)**

# TABLE OF CONTENTS

1.    Grant of Rights ................................................................................................................ 1

2.    Term ................................................................................................................................ 3

3.    Development Fees ........................................................................................................... 3

4.    Development Schedule ................................................................................................... 3

5.    Condition Precedent to Franchisor's Obligations ......................................................... 3

6.    Confidential Information ................................................................................................ 4

7.    Intellectual Property Rights ........................................................................................... 4

8.    Representations and Warranties ..................................................................................... 5

9.    Covenants ....................................................................................................................... 6

10.    Indemnification .............................................................................................................. 7

11.    Transfer of Interest ........................................................................................................ 7

12.    Termination .................................................................................................................... 9

13.    Dispute Resolution ...................................................................................................... 11

14.    Miscellaneous ............................................................................................................. 12

15.    Acknowledgments ....................................................................................................... 15

Exhibit A      Development Area
Exhibit B      Franchise Agreement
Exhibit C      Equity Interests and Principals
Exhibit D      Guaranty
Exhibit E      General Release

State Law Addendum to Multi-Unit Development Agreement

<u>**MULTI-UNIT DEVELOPMENT AGREEMENT**</u>

**THIS MULTI-UNIT DEVELOPMENT AGREEMENT** ("*Agreement*") is executed and entered into on this _____ day of _____, 20_____ ("*Effective Date*") by and between MOLLYTEA Franchising LLC, a Delaware limited liability company, with its principal place of business at 6 Kilmer Road, Suite B, Edison, New Jersey 08817 ("*Franchisor*"), and _____, a _____ *(insert State)*, _____ *(insert type of entity)* with its principal place of business at _____ ("*Developer*").  Franchisor and Developer shall individually be referred to in this Agreement as a "*Party*" and collectively as the "*Parties*."

<u>**RECITALS**</u>

A.      Franchisor, as a result of the expenditure of time, skill, effort and money, has developed and continues to develop a distinctive system (the "*System*") relating to the sale of a variety of milk tea drinks, whipped cream drinks, fruit teas, oat milk teas, tea-based beverages, coffees, pastries and compatible food products  (and related products and services), through the establishment and operation of a retail store (the "*Molly Tea Store*").

B.      The System includes, without limitation, Franchisor's products and services (the "*Products and Services*") which incorporate Franchisor's trade secrets and confidential information; distinctive exterior and interior design, layout, décor, color scheme, furnishings and signage; specially designed equipment and fixtures; unique and uniform standard specifications, policies  and procedures for operation and quality control; management and operations training; and advertising and promotional programs, all of which may be changed, improved and further developed by Franchisor from time to time.

C.      The System is identified by certain trademarks, service marks, trade names, trade dress, logos, symbols and other indicia of origin, including, but not limited to, the mark "*Molly Tea* 茉莉奶白"that are now or later designated by Franchisor for use in the operation of the Molly Tea Stores and the System (the "*Marks*"), and which Franchisor may license others to use.

D.      Franchisor desires to grant to Developer the right to develop Molly Tea Stores using the System within a specified development area and pursuant to a specified development schedule in accordance with the terms of this Agreement.

<u>**AGREEMENT**</u>

**NOW THEREFORE**, Franchisor and Developer, in consideration of the undertakings and commitments set forth herein, agree as follows:

1.      <u>**Grant of Rights**</u>.

(a)      <u>Grant</u>.  Subject to the terms, and conditions and limitations of this Agreement, Franchisor hereby grants to Developer the right to establish and operate the number of Molly Tea Stores ("*Molly Tea Stores*") set forth on <u>Exhibit A</u> to this Agreement, attached hereto and incorporated herein by reference, at approved locations in the geographic area set forth on <u>Exhibit A</u> (the "*Development Area*").  Developer undertakes the obligation to open the Molly Tea Stores pursuant to the development schedule (the "*Development Schedule*") set forth on <u>Exhibit A</u>.  Time is of the essence for the development of each Molly Tea Store in accordance with the Development Schedule.  Each Molly Tea Store must be developed and operated pursuant to the then current form of franchise agreement approved by Franchisor, the current form

1

of which is attached hereto as <u>Exhibit B</u> and incorporated herein by reference. Developer has no right to operate or function as a master franchisee, sub-franchisor, franchise broker or to otherwise franchise a Molly Tea Store to any other entity or person or delegate its duties under this Agreement.

(b)    <u>Development Area</u>. Except as otherwise expressly set forth herein, for so long as Developer is in compliance with this Agreement in accordance with the Development Schedule and all Franchise Agreements and all related agreements during the Term (as defined in <u>Section 2</u>), Franchisor will not establish or operate, or license anyone other than Developer to establish or operate, a Molly Tea Store in the Development Area. Except as expressly provided for in this <u>Section 1(b)</u>, the license granted to Developer under this Agreement is nonexclusive, and Developer shall have no territorial or protective rights.

(c)    <u>Limitation of Rights</u>. Franchisor retains all rights not expressly granted hereunder. Franchisor, its Affiliates (as defined in <u>Section 14(o)</u>), and their respective franchisees and licensees may, among other things, operate other types of facilities besides a Molly Tea Store in the Development Area, including facilities that are identified by some or all of the Marks. Franchisor may (or may authorize an Affiliate or other third party to) conduct, among other things, the following activities:

(i)    advertise and promote sales of the Products and Services at any location, including within the Development Area;

(ii)    develop, own, establish, acquire, promote and/or operate and grant others the right to develop, own, establish, acquire, promote and/or operate a Molly Tea Store anywhere outside of the Development Area, regardless of proximity or financial impact to any Molly Tea Store in the Development Area;

(iii)    develop, own, establish, acquire, promote and/or operate and grant others the right to develop, own, establish, acquire, promote and/or operate a business (A) not using the System and/or (B) which sells products and/or services the same, similar to or different from the Products and Services through other channels of distribution anywhere inside or outside of the Development Area, regardless of proximity or financial impact to any Molly Tea Store;

(iv)    operate one or more sites on the Internet that advertises a Molly Tea Store or sells Products and Services anywhere inside or outside the Development Area;

(v)    develop, own, acquire, establish and/or operate and grant others the right to develop, own and operate other methods and channels of distribution utilizing the Marks and the System, whether inside or outside of the Development Area, including, without limitation, using toll-free telephone numbers, domain names, URLs, on-line computer networks and services, mobile vehicles, carts, concessions, satellite units, other mobile, remote, limited services or non-permanent facilities or other retail operations as a part of larger retail venues such as department centers, supermarkets, or in public areas such as amusement parks, airports, train stations, public facilities, college and school campuses, arenas, stadiums, hospitals, office buildings, convention centers, airlines (in-flight service) and military bases or at special events, such as sporting events, conventions or concerts; and

(vi)    purchase, merge, or acquire any business, or be acquired by or sell its assets or equity interests to, any business which sells products and/or services, whether or not such products are the same or similar to the Products and Services and whether or not it is competitive with Developer, any Molly Tea Store or the System, inside or outside the Development Area.

2

**2.**     **Term.**  Unless earlier terminated as provided for herein, the term of this Agreement and all rights granted hereunder will commence upon the Effective Date and will expire on the earlier to occur of either (i) three (3) years after the Effective Date or (ii) the date on which Developer successfully and timely completes the Development Schedule and opens the last Molly Tea Store pursuant to the terms of the Development Schedule ("***Term***").  Developer will have no option to renew or otherwise extend the Term for any additional period of time, except as otherwise provided in the Agreement.

**3.**     **Development Fees.**  Developer shall pay the development fee set forth on Exhibit A (the "***Development Fee***").  The Development Fee is payable in full upon execution of this Agreement and is non-refundable.  The Development Fee is fully earned by Franchisor when received and is in consideration for execution of this Agreement and for administrative and other expenses incurred by Franchisor and for the development opportunities lost or deferred as a result of Franchisor's entering into this Agreement with Developer.  The portion of the Development Fee attributable to a particular Molly Tea Store will be credited to the initial franchise fee for that Molly Tea Store when the Franchise Agreement for the Molly Tea Store is executed.

**4.**     **Development Schedule.**

     (a)     Compliance with Development Schedule.  Developer must comply with the Development Schedule.  In order to satisfy the terms and conditions of the Development Schedule, Developer must have (i) each Molly Tea Store opened for business by the dates set forth in the Development Schedule; and (ii) the cumulative number of Molly Tea Stores opened for business by the dates set forth in the Development Schedule.

     (b)     Execution of Franchise Agreements.  Developer may not develop a Molly Tea Store under this Agreement unless Developer has executed the then current form of Franchise Agreement for the proposed Molly Tea Store.  Franchisor shall deliver a Franchise Agreement once it has complied with all franchise laws including the delivery of the Franchise Disclosure Agreement (the "***FDD***").  Developer understands that Franchisor may modify the form of Franchise Agreement, attached hereto as Exhibit B from time to time, and that the then current form may be different than the form of Franchise Agreement attached hereto, including different fees and obligations.  Developer understands and agrees that all Franchise Agreements will be construed and exist independently of this Agreement.  The continued existence of each Franchise Agreement will be determined by the terms and conditions of such Franchise Agreement.  Except as specifically set forth in this Agreement, the establishment and operation of each Molly Tea Store must be in accordance with the terms of the applicable Franchise Agreement.

**5.**     **Condition Precedent to Franchisor's Obligations**.  Developer must satisfy all of the following conditions, prior to Franchisor's execution of the Franchise Agreement:

     (i)     Developer has notified Franchisor of its intention to develop a Molly Tea Store at least thirty (30) days prior to the date set forth in the Development Schedule;

     (ii)     Developer (and, if applicable, its Affiliates) has fully performed all of its obligations under this Agreement and all Franchise Agreements and other agreements ("***Ancillary Agreements***") between Franchisor or its Affiliates and Developer (or any Affiliate), and is not in default of any of its contractual or other legal obligations to Franchisor or any of its Affiliates or any approved vendor or supplier, or in violation of any Law (as defined in Section 14(o));

     (iii)     Developer has demonstrated to Franchisor, as determined in Franchisor's sole discretion, Developer's financial and other capacity to perform the obligations set forth in the proposed new Franchise Agreement;

3

(iv)    Developer continues to operate in the Development Area not less than the cumulative number of Molly Tea Stores required by the Development Schedule to be in operation; and

(v)    Developer has signed a general release of any and all claims which Developer may have or believes to have against Franchisor and/or its Affiliates and their respective officers, directors, managers, employees and agents in the form as set forth on Exhibit E, attached hereto and incorporated herein by reference.

6.    **Confidential Information**.  Except as expressly provided herein, Developer and its Principals (as defined below) shall have no right, title or interest in the Confidential Information (as defined below). Developer and its Principals shall only communicate, disclose or use the Confidential Information as expressly permitted herein or as required by Law.  Developer and its Principals shall disclose the Confidential Information only to such of Developer's employees, agents or independent contractors who must have access to it in connection with their employment.  The covenants in this Section 6 will survive the expiration, termination or transfer of this Agreement or any interest in this Agreement and will be perpetually binding upon Developer and each of its Principals.  For purposes of this Agreement, "*Confidential Information*" means the terms of this Agreement and all exhibits and amendments hereto, all proprietary and confidential information relating to the development and operation of Molly Tea Stores including, without limitation, all information, knowledge, know-how, trade secrets, methodologies, techniques, procedures, processes, applications, research and materials, in whatever form, used in or related to the System and the operation of the Molly Tea Store, either in writing, orally or in electronic format, which Franchisor provides to Developer, or which Developer or its Affiliates or their respective employees develop or have access to, in connection with this Agreement or the development and operation of Molly Tea Stores hereunder, including, without limitation, any products and services; product sourcing, manufacturing, inventory management and control, supply and distribution standards and procedures; pricing; standards for site selection, general contractors, architects, architectural and construction plans and trade dress; technology and computer software; advertising, marketing and promotional programs; the operating manual; recipes and formulas; customer lists; pricing data; financial data; Customer Data and other data imparted or made available by Franchisor or its Affiliates to Developer, however learned or received. "*Customer Data*" includes any personally identifiable information, such as a person's or entity's name, address, phone number, fax number, email address, passport number, financial profile, credit card information or any other information by which one is reasonably able to personally identify one or more persons or entities; financial data and statements; training and management programs; product ordering and sales data; and any other information or data regarding Franchisor's or any of its Affiliates' business that would reasonably be considered the proprietary or Confidential Information of Franchisor or its Affiliates. Confidential Information includes, but is not limited to, information (i) designated as confidential, (ii) known by Developer to be considered confidential by Franchisor or (iii) by its nature inherently or reasonably to be considered confidential.  For purpose of this Agreement, "*Principal*" means Developer's spouse, if Developer is an individual, and all holders of equity interests in Developer and of any entity directly or indirectly controlling Developer, all as listed on Exhibit C to this Agreement, attached hereto and incorporated herein by reference.

7.    **Intellectual Property Rights.**  Developer and its Principals acknowledge Franchisor's exclusive ownership of, or right to use all Marks, copyrights, patents, trade dress, trade secrets, domain names, email addresses and proprietary technology, programs, appliances and materials, some of which also constitutes Confidential Information, that have been or may later be developed or created by or on behalf of Franchisor, or which is or may be based on materials relating to the System that Developer or any other franchisee creates, develops, modifies, improves or otherwise changes (the "*Intellectual Property*").  Developer has no right, title or interest in the Intellectual Property or the System by virtue of this Agreement.  Any rights

4

granted to use the Intellectual Property or the System will be conveyed through the Franchise Agreement(s) executed to operate the individual Molly Tea Store.

**8.    Representations and Warranties.**

    (a)    Representations, Warranties and Covenants of Developer.

        (i)    If Developer is an Entity (as defined in Section 14(o)), then Developer and each of its Principals represent, warrant and covenant to Franchisor that:

            A.    it is duly formed and organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite power and authority to enter into this Agreement and perform its obligations contained herein and therein;

            B.    the execution, delivery and performance by Developer (or its Affiliates, as applicable) of this Agreement and all Ancillary Agreements have been duly authorized by all requisite actions on the part of Developer (and any Affiliate, if applicable) and no further actions are necessary to make this Agreement and the Ancillary Agreements valid and binding upon it (and any Affiliate, if applicable) and enforceable against it in accordance with their respective terms;

            C.    Developer's corporate charter, articles of organization or formation, bylaws, written partnership, limited liability company or membership agreement or other governing documents and all amendments thereto (the "*Governing Documents*") will at all times provide that Developer's activities are confined exclusively to the development and establishment of Molly Tea Stores;

            D.    neither the execution, delivery nor performance by Developer of this Agreement or any Ancillary Agreement will conflict with, or result in a breach of any term or provision of Developer's Governing Documents, any indenture, mortgage, deed of trust or other material contract or agreement to which Developer is a party or by which it or any of its assets are bound, or breach any order, writ, injunction or decree of any court, administrative agency or governmental body;

            E.    certified copies of Developer's Governing Documents, including resolutions authorizing this Agreement have been delivered to Franchisor;

            F.    all holders of equity interests in Developer and all Principals of Developer are accurately described in Exhibit C, attached hereto and incorporated herein by reference; and

            G.    Developer's Governing Documents expressly provide that the equity interests in Developer are held subject to all restrictions imposed by this Agreement and any certificate evidencing an equity interest shall conspicuously contain a statement in a form satisfactory to Franchisor that it is held subject to all restrictions imposed by this Agreement.

        (ii)    If Developer is an individual, then Developer represents, warrants and covenants that neither the execution, delivery nor performance by Developer of this Agreement or any Ancillary Agreement conflicts with, or results in a breach of any contract or agreement to which

5

Developer is a party or a breach of any order, writ, injunction or decree of any court, administrative agency or governmental body.

(b)    Financial Statements.  Developer and each of its Principals have provided Franchisor with their most recent financial statements upon execution of this Agreement, and Developer will provide annual financial statements each year within sixty (60) years after Developer's fiscal year-end, in the form and for the time periods specified by Franchisor.  The financial statements (i) present fairly Developer's financial position and the financial position of each of its Principals, as applicable, at the dates indicated therein and, with respect to Developer, the results of its operations and cash flow for the periods then ended; (ii) are certified as true and correct by Developer; and (iii) have been prepared in conformity with generally accepted accounting principles in the United States, applied on a consistent basis.  No material liabilities, adverse claims, commitments or obligations of any nature, whether accrued, unliquidated, absolute, contingent or otherwise, exist as of the date of this Agreement which are not reflected as liabilities on Developer's financial statements or those of its Principals.

(c)    Change in Developer's Principals.  Developer will notify Franchisor within five days following the date that any person or Entity previously identified as a Principal ceases to qualify as such or that any new person or Entity succeeds to or otherwise comes to occupy a position which would qualify such person or Entity as a Principal.  That person or Entity will immediately execute all documents and instruments (including, without limitation, the consent to a background check at such person's or Entity's cost and this Agreement) required by Franchisor to be executed by Principals.

(d)    Guaranty.  Each Principal will, jointly and severally, guaranty the performance of Developer's obligations, covenants and agreements under this Agreement pursuant to the terms and conditions of the form of Guaranty, attached to this Agreement as Exhibit D and incorporated herein by reference, and will otherwise bind themselves to the terms of this Agreement as stated herein.

9.    **Covenants.**

(a)    In consideration of the training described herein and disclosure to Developer of the System and the Confidential Information, during the Term of this Agreement for a period of two (2) years after the expiration, non-renewal or termination of this Agreement or after an approved Transfer (as defined in Section 11), neither Developer nor its Principals will, directly or indirectly for itself, himself or herself or through, on behalf of, or in conjunction with any other person or Entity:

(i)    divert or attempt to divert any present or future customer of any Molly Tea Store to any competitor, or do or perform any other act injurious or prejudicial to the goodwill associated with the Intellectual Property or the System; or

(ii)    own, maintain, advise, operate, engage in, or have an equity interest in a business that is the same or similar to a Molly Tea Store or which offers products or services similar to those offered at a Molly Tea Store (a "*Competing Business*"); provided, however (A) that this provision will not apply to any minority interest collectively held by Developer or its Principals in any publicly-held corporation listed on a national stock exchange, and (B) after the Term or upon a Transfer, the geographic restriction for a Competing Store will be a 10-mile radius of any Molly Tea Store.

(b)    Independent Covenants/Reasonableness.  Each of the covenants in this Section 9 will be construed as independent of any other covenant or provision of this Agreement.  Developer and each of its Principals acknowledge that the covenants not to compete contained in this Section 9 are reasonable and

6

necessary to protect the business and goodwill of the System and to avoid misappropriation or other unauthorized use of the System and Franchisor's other trade secrets.

(c)    Irreparable Injury.  Developer acknowledges and agrees that the failure to comply with the requirements of this Section 9 would result in irreparable harm and any damages would be both incalculable and an insufficient remedy so that Franchisor would have no adequate remedy at law.  Accordingly, Franchisor, in addition to any other remedies provided for in this Agreement or at law or in equity, shall be entitled to seek in any court of competent jurisdiction, equitable relief, including injunctive relief and specific performance, without the requirement of posting bond or security.  Developer shall pay all court costs and attorneys' fees incurred by Franchisor in obtaining such relief.

## 10.    **Indemnification.**

(a)    Indemnification.  Developer and each of its Principals agree to and hereby, jointly and severally, indemnify, defend (by counsel chosen by Franchisor) and agree to hold harmless Franchisor and its Affiliates and their respective equity holders, directors, officers, managers, employees and agents (collectively, "***Indemnified Parties***") from and against any and from all losses, compensatory, exemplary or punitive damages, fines, penalties, charges, costs, expenses, lost profits, assessments and fees (including reasonable attorneys', experts', accountants' and consultants' fees), interest, court costs, settlement or judgment amounts, compensation for damages to reputation and goodwill, costs of or resulting from delays or financing costs and consequential damages, whether or not foreseeable, and whether or not based in contract, tort, warranty claims or otherwise, suffered or incurred in connection with this Agreement ("***Losses***") suffered or incurred as a result of, directly or indirectly, from any action, suit, proceeding, claim, investigation or inquiry arising in connection with:  (i) Developer's development of the Molly Tea Stores regardless of whether as a result of any breach or default by Developer under this Agreement; (ii) Developer's or any of its Principal's alleged infringement or alleged violation of any trademark or other proprietary name, mark, or right allegedly owned or controlled by a third party; (iii) a violation, breach or asserted violation or breach, by Developer or any of Developer's Principals, of any Law or any industry standard;  (iv) libel, slander or any other form of defamation of Franchisor, the System or any developer or franchisee operating under the System, by Developer or by any of its Principals; or (v) the violation or breach by Developer or any of its Principals, of any warranty, representation, agreement or obligation in this Agreement, any Ancillary Agreement or in any other agreement between Developer or Affiliates and a third party provider or Franchisor or its Affiliates.

(b)    Expenses.  All Losses incurred under this Section 10 will be chargeable to and paid by Developer or any of its Principals regardless of any actions, activity or defense undertaken by Franchisor or the subsequent success or failure of such actions, activity or defense.

(c)    Third Party Recovery.  Under no circumstances will the Indemnified Parties be required or obligated to seek recovery from third parties or otherwise mitigate their losses in order to maintain a claim against Developer or any of its Principals.  Developer and each of its Principals agree that the failure to pursue such recovery or mitigate such loss will in no way reduce the amounts recoverable from Developer or any of its Principals by the Indemnified Parties.

(d)    Survival.  Developer and Developer's Principals expressly agree that the terms of this Section 10 will survive the termination, expiration or Transfer of this Agreement or any interest herein.

## 11.    **Transfer of Interest**.

(a)    Transfer by Franchisor.  Franchisor will have the right to transfer, sell, convey, mortgage, pledge or otherwise encumber or assign (a "***Transfer***") this Agreement, its equity interests, its assets and

all or any part of such rights, interests or obligations, to any person or Entity without the consent of Developer or its Principals. Upon such Transfer by Franchisor, any transferee or assignee of Franchisor will become solely responsible for all such obligations of Franchisor under this Agreement from the date of Transfer.

(b)    Transfer by Developer.    Developer and Developer's Principals understand and acknowledge that the rights and duties set forth in this Agreement are personal to Developer and are granted, in part, in reliance upon the skill, aptitude, business and financial capacity of Developer and its Principals and their intention of complying with its terms and conditions. Therefore, if the Developer and/or its Principals desire to Transfer any interest in this Agreement, any equity interest in Developer or any substantial assets of Developer (an "*Interest*") to any individual or Entity, they must first obtain the prior written approval of Franchisor, which can be withheld in its sole and absolute discretion. Any such attempted Transfer not approved in writing by Franchisor pursuant to the terms of this Agreement will be null and void from its purported inception. In the event Franchisor is considering approving a Transfer, prior to authorizing such a Transfer, Franchisor may require, among other things, satisfaction (as determined in its sole discretion), of any or all of the following:

(i)    Developer is in full compliance with all of the terms and conditions of this Agreement and any Ancillary Agreement and any other agreement between Developer or its Affiliates and Franchisor or its Affiliates and pays all amounts due to Franchisor or its Affiliates and other trade accounts and debts in full;

(ii)    Developer and its Principals will remain liable for the performance of their obligations contained in this Agreement through the date of Transfer and for all acts, events and omissions which occurred prior to the effective date of the Transfer and will execute all instruments reasonably requested by Franchisor to evidence such liability;

(iii)    The transferee satisfies Franchisor's then existing criteria for a developer including, without limitation: (i) education, (ii) business skill, experience and aptitude, (iii) character and reputation and (iv) financial resources and credit ratings and has agreed to a background check at transferee's sole cost;

(iv)    The transferee and all owners of any record or beneficial interest in the equity interests of the transferee will execute all instruments (including a new multi-unit development agreement and guaranty) reasonably requested by Franchisor to evidence acceptance and assumption of all of the terms and conditions of this Agreement which may contain terms materially different from this Agreement, including higher fees and will be for a term equal to the then unexpired Term hereof;

(v)    Developer and its Principals must execute a general release, of any and all claims against Franchisor, its Affiliates, and the officers, directors, managers, members, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and any other Ancillary Agreement in a form substantially similar to that form of general release attached hereto Exhibit E, and incorporated herein by reference;

(vi)    Developer pays a transfer fee equal to seventy-five percent (75%) of Franchisor's then current franchise fee;

(vii)    The transferee has complied with Franchisor's then-current application requirements for a new multi-unit development agreement, including, but not limited to, being

8

provided with Franchisor's current form of Franchise Disclosure Document and a receipt evidencing the date of delivery of the Franchise Disclosure Document(s) to the transferee has been delivered to Franchisor, provided, however, Franchisor will not be liable for any representations other than those contained in the Franchise Disclosure Document(s); and

(viii)    Developer and each Principal have complied with any other conditions that Franchisor reasonably requires from time to time as part of its Transfer policies, provided that such conditions will not be more stringent than any conditions otherwise imposed on new developers signing the then-current multi-unit development agreement.

Franchisor's consent to any Transfer shall not constitute a waiver or release of any conditions to such Transfer or any claims Franchisor has against Developer or any Principal.

(c)    <u>Granting of a Security Interest by Developer</u>.  Developer shall not grant a security interest in or otherwise encumber any Molly Tea Store, any of the assets of the Molly Tea Stores or of Developer or in any equity interest of Developer without first obtaining the prior written consent of Franchisor, which consent or refusal to consent may be made in its sole discretion.

(d)    <u>Death or Disability</u>.  Within fifteen (15) days after the death or Permanent Disability (as defined below) of Developer or any of its Principals, Developer or a representative of Developer must notify Franchisor in writing.  Any Transfer upon death or Permanent Disability will be subject to the same terms and conditions as described in this <u>Section 11</u> for any inter vivos Transfer. Upon the death of Developer (if a natural person) or any Principal who is a natural person, the executor, administrator, or other person representative of the deceased will Transfer the interest of the deceased to a third party approved by Franchisor within six months after the date of death.  Upon the Permanent Disability of Developer (if a natural person) or any of Developer's Principals who is a natural person, Franchisor may require the interest to be Transferred to Franchisor or a third party in accordance with the conditions described in this <u>Section 11</u> within six (6) months after notice to Franchisor.  For purposes of this <u>Section 11(d)</u> "***Permanent Disability***" means any physical, emotional, or mental injury, illness or incapacity that would prevent Developer or any Principal holding a controlling interest in Developer from performing his or her obligations under this Agreement or Ancillary Agreement for at least ninety (90) consecutive days, and from which condition recovery within ninety (90) days from the date of determination of disability is unlikely.  If the Parties disagree as to whether a person is permanently disabled, the existence of Permanent Disability will be determined by a licensed practicing physician selected by Franchisor, upon examination of the person; or if the person refuses to submit to an examination, then the person automatically will be considered permanently disabled as of the date of refusal. The costs of any examination will be paid by Franchisor. If an interest is not Transferred upon death or Permanent Disability as required in this <u>Section 11(d)</u> then the failure will constitute an Event of Default under this Agreement.

## 12.    <u>Termination</u>.

(a)    <u>Events of Default</u>.  Developer will be in default under this Agreement, and all rights granted by this Agreement will automatically terminate upon written notice to Developer if;

(i)    Developer (or any Affiliate or Principal) becomes insolvent or makes a general assignment for the benefit of its creditors;

(ii)    Developer files a voluntary petition under any section or chapter of the federal bankruptcy laws or under any similar laws or statute of the United States or any state or admits in writing its inability to pay its debts when due;

9

(iii)    Developer is adjudicated bankrupt or insolvent in proceedings filed against Developer under any section or chapter of the federal bankruptcy laws or under any similar laws of the United States or any state, or if a bill in equity or other proceeding for the appointment of a receiver of Developer or other custodian for Developer's business or assets is filed and consented to by Developer, or if a receiver or other custodian (permanent or temporary) of Developer's assets or property, or any part thereof, is appointed by any court of competent jurisdiction;

(iv)    Developer's business or its assets are attached, seized, subject to a writ or distress warrant or levied upon, unless such attachment, writ or distress warrant or levy is vacated within thirty (30) days after written notice from Franchisor;

(v)    a final judgment against Developer remains unsatisfied of record for thirty (30) days or longer;

(vi)    a suit to foreclose any lien or mortgage against any Molly Tea Store developed by Developer or its assets is instituted against Developer and not dismissed within thirty (30) days, or is not in the process of being dismissed;

(vii)    Developer fails to timely meet the development obligations set forth in the Development Schedule; or

(viii)    Developer fails to comply with any other provision of this Agreement or Developer or any of its Affiliates fail to comply with any Ancillary Agreement with Franchisor or its Affiliates and does not correct the failure within thirty (30) days after written notice of that failure is delivered to Developer (except that if the failure to comply is the third failure to comply with any provision of any agreement that Developer or any of its Affiliates has with Franchisor or any Affiliate within 12 consecutive months, then Franchisor need not provide any opportunity to cure the default.

(b)    Cross-Default.  Any default by Developer under the terms and conditions of any Ancillary Agreement, including any Franchise Agreement, or any other agreement between Franchisor and/or its Affiliates and Developer or its Affiliates shall be deemed to be a default of this Agreement.  In the event of the termination of this Agreement for any cause, Franchisor and its Affiliates may, at their option and as determined in their sole discretion, terminate any or all of such other agreements.  This provision does not apply to a default or termination of this Agreement consisting solely of Developer's failure to meet the Development Schedule.

(c)    Notice Required by Law.  Notwithstanding anything to the contrary contained in this Section 12, in the event any valid, applicable Law having jurisdiction over this Agreement shall limit Franchisor's rights of termination hereunder or shall require longer notice periods or restrictions upon termination required by such Laws, such Laws shall apply.  Franchisor shall not, however, be precluded from contesting the validity, enforceability or application of such Laws in any action, arbitration, hearing or dispute relating to this Agreement or the termination thereof.

(d)    Obligations Upon Termination or Expiration.  Upon termination or expiration of this Agreement for any reason, all rights of Developer under this Agreement will immediately terminate and all remaining rights granted to Developer to develop Molly Tea Stores under this Agreement will automatically be revoked and will be null and void, and Developer will not be entitled to any refund of any fees. Developer shall immediately return all Confidential Information to Franchisor, and shall retain no copy or record of any Confidential Information, excepting Developer's copy of this Agreement and of any correspondence between the Parties, and any other documents which Developer and its Principals reasonably need for compliance with any provision of Law.  Developer and Developer's Principals will

10

promptly pay all sums owing to Franchisor and its Affiliates, including all damages, costs and expenses including reasonable attorneys' fees, incurred by Franchisor as a result of any default by Developer and/or in connection with obtaining any remedy available to Franchisor for any violation of this Agreement. Developer and its Principals will cease all use of the Marks and comply with the non-competition and non-solicitation covenants and the restrictions on Confidential Information contained in this Agreement.

(e)　　Remedies Upon Breach or Termination.

(i)　　Upon the occurrence of an uncured breach or subsequent termination pursuant to this Section 12, Franchisor may exercise one or more of the following remedies set forth in this Section 12, or such other remedies as may be available at Law or in equity. Franchisor, at its sole discretion, can (A) terminate the Agreement or (B) reduce the number of Molly Tea Stores that Developer was given the right to develop and establish pursuant to the Development Schedule, and/or terminate or reduce the territorial exclusivity granted to Developer. If Franchisor exercises its rights under subsection (B), this Agreement will remain in effect and will be considered to be amended accordingly.

(ii)　　Franchisor, at Franchisor's discretion and without obligation, may cure such breach at Developer's expense and, in connection therewith, Developer (i) hereby grants to Franchisor all rights and powers necessary or appropriate to accomplish such cure, (ii) shall indemnify, defend (by counsel chosen by Franchisor) and agree to hold harmless the Indemnified Parties from all Losses alleged, incurred or assessed against any of the Indemnified Parties in connection with Franchisor's cure, and (iii) shall reimburse or pay such costs or damages within ten (10) days of receipt of Franchisor's invoice therefore.

13.　　**Dispute Resolution.**

(a)　　Non-Binding Mediation. Except as otherwise set forth in this Agreement, the Parties will use their best efforts to resolve and settle by direct, private negotiation any dispute, claim or issue which arises under or in relation to this Agreement or which concerns the relationship created by this Agreement. Both Parties may seek the advice and assistance of legal counsel in connection with any such negotiation. If the Parties cannot resolve and settle a dispute by private negotiation within thirty (30) days after one Party gives the other notice that a dispute exists, the Parties mutually agree to submit the dispute to non-binding mediation in New York, New York, as follows before a single mediator, using the facilities and Commercial Rules of the American Arbitration Association ("*AAA*"). Within thirty (30) days of the failure to resolve the dispute, the Parties will jointly select a mediator from the panel of mediators maintained by the AAA. If the Parties are unable to agree on a mediator within a reasonable time period (not to exceed 10]days), then the mediation shall be submitted by either Party to the AAA for resolution in accordance with its rules governing mediation at the office of the AAA located in New York, New York. The mediator must be a person experienced in franchising and who has no prior business or professional relationship with either Party. The Parties will share the mediation filing fee equally but will otherwise separately bear their own costs and expenses (including legal fees) of participating in the mediation process. Each Party agrees to send at least one representative to the mediation conference who has authority to enter into binding contracts on that Party's behalf. Each Party further agrees to sign a confidentiality agreement which prohibits the mediator from disclosing, orally or in writing, any information the other Party discloses to the mediator in confidence at any stage of the mediation process. Either Party's failure or refusal to participate in mediation in accordance with this Section 13(a) will be considered a dispute subject to binding arbitration in accordance with Section 13(b).

(b)　　Arbitration. Except as otherwise set forth in this Agreement, if the Parties cannot fully resolve and settle a dispute through mediation, except as otherwise set forth in this Agreement, all

unresolved issues involved in the dispute will be submitted to binding arbitration which will be conducted in New York, New York before a single arbitrator using the facilities of and the Commercial Rules of the AAA. The Parties will jointly select an arbitrator from the panel of arbitrators maintained by the AAA. The arbitrator must be an attorney experienced in the practice of franchise law and who has no prior business or professional relationship with either Party and who agrees to follow and apply the express provisions of this Agreement. If the Parties are unable to agree upon an arbitrator with a reasonable time period (not to exceed ten (10) days), then the AAA will select an arbitrator in accordance with its arbitration rules. The arbitrator's award will be final and binding on all Parties, and neither Party will have any right to contest or appeal the arbitrator's award except on the grounds expressly provided by the Commercial Rules of the AAA. The Party who demands arbitration will pay the arbitration filing fee, but the Parties will otherwise separately bear their own costs and expenses (including legal fees) of participating in the arbitration process. Responsibility for the arbitrator's fees and expenses will be determined as part of the arbitrator's award. Franchisor and Developer agree that any arbitration shall be conducted on an individual, not a class-wide basis. DEVELOPER WAIVES ITS RIGHT TO INITIATE A CLAIM ON A "CLASS BASE" OR INCLUDE ANY OTHER FRANCHISEE OR DEVELOPER AS A NAMED PARTY UNLESS FRANCHISOR AGREES IN WRITING.

(c)    Injunctions and Emergency Relief.    Notwithstanding the foregoing, nothing in this Section 13 shall prevent Franchisor from terminating this Agreement or from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other injunctive or emergency relief available to safeguard and protect Franchisor's interests prior to the filing of or during or following any arbitration or other proceeding or pending the handing down of a decision or award in connection with any arbitration or other proceeding.

(d)    Intellectual Property, Confidential Information and Security Interests.    Notwithstanding this Section 13, Franchisor will not be obligated to mediate or arbitrate any claim arising from Developer's alleged infringement of the Intellectual Property or disclosure of Confidential Information or related to any action to foreclosure on a security interest. The Parties agree that any action based on infringement of any of the Marks will be governed by and interpreted and enforced in accordance with the United States Trademark (Lanham) Act or the United States Copyright Act, as applicable, and will be litigated in any federal district court sitting in New York, New York. The Parties further agree to submit to the jurisdiction and venue of any such federal or district court and that service of process by certified mail, return receipt requested, will be sufficient to confer in personam jurisdiction over them in connection with any such litigation. Further, Developer and Franchisor agree that the provisions of this Section 13 will not be applicable to the exercise of rights and remedies under any Ancillary Agreement unless expressly provided in such Ancillary Agreement.

14.    **Miscellaneous.**

(a)    Governing of Law.    This Agreement will be governed by and interpreted and enforced exclusively in accordance with the laws of the State of New York without given effect to the conflicts of law principals rules will not apply.

(b)    Independent Contractors.    In performing this Agreement, the parties specifically agree that Franchisor and Developer's relationship is and always will be solely that of independent contractors. Neither Franchisor nor Developer will not represent itself or permit any of its employees, agents or representatives to represent itself as an employee, agent or joint venturer of the other. Except as expressly set forth herein, neither Party will have any right to and will not attempt to enter into contracts or commitments in the name of or on behalf of the other in any respect whatsoever.

(c)　　No Fiduciary Relationship.　This Agreement does not create a fiduciary relationship between the Parties.

(d)　　Compliance with Laws.　Developer will comply, at its sole expense, with all Laws applicable to this Agreement and the development and operation of the Molly Tea Stores.

(e)　　Further Assurances.　Franchisor and Developer will execute and deliver any and all additional papers, documents and other assurances and will do any and all acts and things reasonably necessary in connection with the performance of their obligations hereunder and to carry out the intent of the Parties hereto.

(f)　　Judgment; Discretion.　DEVELOPER AND FRANCHISOR ACKNOWLEDGE THAT VARIOUS PROVISIONS OF THIS AGREEMENT SPECIFY CERTAIN MATTERS THAT ARE WITHIN THE SOLE DISCRETION OR JUDGMENT OF FRANCHISOR OR ARE OTHERWISE TO BE DETERMINED UNILATERALLY BY FRANCHISOR.　IF THE EXERCISE OF FRANCHISOR'S SOLE DISCRETION OR JUDGMENT AS TO ANY SUCH MATTER IS SUBSEQUENTLY CHALLENGED, THE PARTIES TO THIS AGREEMENT EXPRESSLY DIRECT THE TRIER OF FACT THAT FRANCHISOR'S RELIANCE ON A BUSINESS REASON IN THE EXERCISE OF ITS SOLE DISCRETION OR JUDGMENT IS TO BE VIEWED AS A REASONABLE AND PROPER EXERCISE OF SUCH SOLE DISCRETION OR JUDGMENT, WITHOUT REGARD TO WHETHER OTHER REASONS FOR ITS DECISION MAY EXIST, WITHOUT REGARD TO WHETHER THE TRIER OF FACT WOULD INDEPENDENTLY ACCORD THE SAME WEIGHT TO THE BUSINESS REASONS, AND WITHOUT REGARD TO WHETHER SUCH SOLE DISCRETION OR JUDGMENT IS EXERCISED IN THE BEST INTERESTS OF DEVELOPER.

(g)　　No Waiver.　Either Party's failure to exercise any right or remedy or to enforce any obligation, covenant or agreement herein will not constitute a waiver by, or estoppel of, such Party's right to enforce strict compliance with any such obligation, covenant or agreement.　No custom or practice will modify or amend this Agreement.　Either Party's waiver of, or failure or inability to enforce, any right or remedy will not impair such Party's rights or remedies with respect to subsequent default of the same, similar or different nature.　Acceptance of any payment will not waive any default.

(h)　　Notice.　All notices, requests, demands and claims required or desired to be given hereunder will be in writing and will be served in person, by express mail, by certified mail, by personal delivery, by private overnight delivery or by facsimile or email or other electronic transmission.　Such notices, requests, demands and claims will be deemed conclusively given: (i) at the time of delivery, if personally delivered; (ii) 24 hours (exclusive of weekends and national holidays) after deposited in the United States mail, properly addressed and postage prepaid, if served by express mail; (iii) upon the earlier of actual receipt or three calendar days after deposit in the United States mail, properly addressed and postage prepaid, return receipt requested, if served by certified mail; (iv) upon receipt, if delivered by private overnight delivery; or (v) at the time of the email, facsimile or other electronic transmission.　All notices, requests, demands and claims will be given to the intended Party at the location set forth below; provided, however, either Party may change its location for the purpose of receiving notices, requests, demands and claims by giving written notice to the other Party in the manner set forth above:

Notices to Franchisor:

MOLLYTEA Franchising LLC
6 Kilmer Road, Suite B
Edison, New Jersey 08817

Notices to Developer:

Tel.    (___) _____
Attn: _____

Tel.    (347) 561-4066
Attn:    **Jie Xiao**

(i)        <u>Severability</u>.  If any provision of this Agreement, or the application thereof, for any reason and to any extent, is held to be invalid, illegal or unenforceable under applicable law, it will be fully severable and the remaining provisions of this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision never comprised a part hereof.  The remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.  Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as part of this Agreement a provision as similar in its terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

(j)        <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts each of which when so executed will be an original, but all of which together will constitute one and the same instrument.  Faxed or digitally scanned copies of manually executed signature pages to this Agreement will be fully binding and enforceable without the need for delivery of the original manually executed signature pages.

(k)        <u>Entire Agreement</u>.  This Agreement, the Ancillary Agreements (including any  Franchise Agreement), and the exhibits and attachments, hereto, constitute the entire agreement between Franchisor, Developer and its Principals and supersede any and all prior or negotiations, representations and agreements.  Nothing in this Agreement or any Ancillary Agreement, however, is intended to disclaim the representations Franchisor made in the Franchise Disclosure Document that Franchisor furnished to Developer.  Developer acknowledges that Developer is entering into this Agreement as a result of its own independent investigation of the franchised business and not as a result of any representations about Franchisor made by its shareholders, officers, directors, employees, agents, representatives, independent contractors, or franchisees that are contrary to the terms set forth in this Agreement, or in any disclosure document, prospectus, or other similar document required or permitted to be given to Developer pursuant to applicable law. There are no other oral or written understandings or agreements between Franchisor and Developer relating to the subject matter of this Agreement.

(l)        <u>Amendments</u>.   Except those permitted to be made unilaterally by Franchisor, any amendments or modifications of this Agreement will be in writing and executed by Franchisor and Developer.

(m)        <u>Survival</u>.  Any provision or covenant of this Agreement which expressly or by its nature imposes obligations beyond the expiration or termination of this Agreement shall survive such expiration or termination.

(n)        <u>Conflict</u>.  In the event of any conflict between the terms of this Agreement and any Franchise Agreement, the terms of the Franchise Agreement will control.

14

(o)    <u>Defined Terms</u>.  For purposes of this Agreement, (i) "***Affiliates***" means as to any person or entity, any other person or entity that, directly or indirectly, controls, or is under the control of such person or entity, (ii) "***Law***" or "***Laws***" means any statute, law, ordinance, treaty, rule, code, regulation or binding directive issued, promulgated or enforced by any court, administrative or regulatory agency or other governmental authority, and (iii) "***Entity***" means a corporation, general or limited partnership, limited liability company, trust or other legal entity.

(p)    <u>Offsets</u>.  All payments made by Developer to Franchisor pursuant to this Agreement will be in United States dollars and will be made free and clear of any tax, deduction, offset or withholding of any kind.  All taxes and penalties on any payment made by Developer pursuant to this Agreement now or in the future will be fully borne by Developer.  In the event of any bona fide dispute as to liability for taxes assessed or other indebtedness, Developer may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; however, in no event shall Developer permit a tax sale or seizure by levy of execution or similar writ or warrant or attachment by a creditor, to occur against the premises of any Molly Tea Store, or any improvements thereon.

(q)    <u>Force Majeure</u>.  If Developer cannot meet the Development Schedule solely as the result of acts of God (such as tornadoes, hurricanes, floods, fire or other natural catastrophe); strikes, lockouts or other industrial disturbances; war, riot, or other civil disturbance; pandemics or epidemics; acts of governments, such as the exercise of eminent domain rights and condemnation (if caused by reasons beyond a party's control); or other forces beyond a party's reasonable control (a "***Force Majeure***") which result in Developer's inability to construct or operate any Molly Tea Stores, the opening dates will be extended for a period equal to the time during which such Developer was unable to perform such action or task as a result of an event of Force Majeure, up to a maximum of six months.  Force Majeure does not include insufficiency of funds or failure to make any payment required hereunder.

(r)    <u>No Exclusive Remedy</u>.  The rights and remedies provided in this Agreement shall not be exclusive of any other rights or remedies, whether by contract, at Law or in equity.  The rights and remedies provided in this Agreement are cumulative and are in addition to any and all other rights and remedies provided by Law or in equity.  The exercise of one right or remedy by any Party shall not preclude or constitute a waiver of in equity or its right to exercise any and all other rights or remedies to which it is entitled.

## 15.    **Acknowledgments**.

(a)    <u>Independent Investigation</u>.  Developer and its Principals acknowledge that they have conducted an independent investigation of the business venture contemplated by this Agreement and recognize that the success of this business venture involves substantial business risks and will largely depend upon the ability of Developer.  Franchisor expressly disclaims making, and Developer and its Principals acknowledge that they have not received or relied on, any warranty or guaranty, express or implied, as to the potential volume, profits or success of the business venture contemplated by this Agreement.

(b)    <u>Opportunity to Assess Risks</u>.  Developer and its Principals acknowledge that Developer has received, read, and understands this Agreement and the related Exhibits and Ancillary Agreements and that Franchisor has afforded Developer sufficient time and opportunity to consult with advisors selected by Developer about the potential benefits and risks entering into this Agreement.

(c)    <u>Receipt of Disclosure Document</u>.  Developer and its Principals acknowledge that they received the FDD required by the Federal Trade Commission, and a complete copy of this Agreement and

all related attachments and agreements at least 14 calendar days before this Agreement was executed or Developer made a payment to the Franchisor or an Affiliate in connection with the proposed franchise sale.

(d)     No Extraneous Promises.  Developer and its Principals confirm and acknowledge that no written or oral agreements, promises, commitments, undertakings, understandings, side agreements, options, right of refusal or others were made to or with Developer with respect to any matter (including but not limited to advertising, marketing, site location, operational, marketing or administrative assistance, exclusive rights or exclusive or Development Area or otherwise), nor have they relied in any way on the same, expressly as set forth in this Agreement and any duly executed amendment or addendum attached to this Agreement or the FDD.

(e)     Disclaimer of Warranties.  Developer and its Principals confirm and acknowledge that no representation, warranty, guaranty or promise other than those expressly set forth in this Agreement and in the FDD was made by Franchisor or any other person to induce Developer to sign this Agreement. Developer and its Affiliates acknowledge that no oral, written, visual or other claim or representation (including but not limited to charts, tables, spreadsheets or mathematical calculations to demonstrate actual or possible results based on a combination of variables, such as multiples of price and quantity to reflect gross revenues, or otherwise), which stated or suggested a specific level or range of actual or potential sales, income, expenses, profits, cash flow, tax effects or otherwise (or from which such items might be ascertained) from the Molly Tea Stores or any Molly Tea Store was made to Developer by any person or Entity.  Developer and its Principals recognize that neither Franchisor nor any other party can guarantee Developer's business success or state the exact costs of operating Developer's business, and that such success and costs will depend primarily upon Developer's own efforts and business ability.  Developer and its Principals also recognize that any new business venture is speculative.

(f)     Other Agreements.  Developer is aware of the fact that some developers and franchisees of Franchisor may operate under different forms of agreements with different terms and conditions, and, consequently, Franchisor's obligations and rights in respect to its various developer's franchisees may differ in certain circumstances.

(g)     Compliance with Anti-Corruption and Anti-Money Laundering Laws and Anti-Terrorism Laws.  Developer and each Principal represents and warrants to Franchisor that:  (i) neither Developer nor, to the best of its knowledge after reasonable inquiry, any of Developer's Principals or any executive officer of Developer, is identified, by name or an alias, pseudonym or nickname, on the lists of "Specially Designated Nationals" or "Blocked Persons" maintained by the U.S. Treasury Department's Office of Foreign Assets Control (text available at www.treas.gov/offices/enforcement/ofac/); (ii) neither Developer nor any Principal is directly or indirectly owned or controlled by the government of any country that is subject to a United States or Canadian embargo; (iii) neither Developer nor any Principal acts or will act directly or indirectly on behalf of the government of any country that is subject to a United States or Canadian embargo; and (iv) neither Developer nor any of Developer's Principals or executive officers have violated, and Developer will not violate and will cause its Principals and executive officers not to violate, any Applicable Laws prohibiting money laundering or the aid or support of Persons who conspire to commit acts of terror against any Person or government, including acts prohibited by the U.S. Patriot Act (text available at http://www.epic.org/privacy/terrorism/hr3162.html), U.S. Executive Order 13224 (text available at http://www.treasury.gov/resource-center/sanctions/Programs/Documents/terror.pdf) or any similar Applicable Laws.  The foregoing constitute continuing representations and warranties, and Developer will immediately notify Franchisor in writing of the occurrence of any event or the development of any circumstance that might render any of the foregoing representations and warranties of this Section 15(g) incorrect, false, inaccurate or misleading, or which constitutes a breach of any of the covenants of this Section 15(g).

16

(h)  <u>No Claims</u>.  Developer and its Principals represent, covenant and warrant to Franchisor that, to the best of their knowledge, neither they nor an Affiliate of either hold or are due, as applicable, any claims, debts, liabilities, demands, obligations, expenses, actions or causes of action of any nature, character or description related to this Agreement against Franchisor or any Indemnified Party.

*[Signatures appear on following page]*

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement on the date first written above.

**FRANCHISOR:**                          **DEVELOPER:**

**MOLLYTEA FRANCHISING LLC,**            _____
a Delaware limited liability company


By: _____      By: _____
Name: _____      Name: _____
Title: _____      Title: _____

18

**EXHIBIT A**

**DEVELOPMENT AREA AND DEVELOPMENT SCHEDULE**

A.      <u>Total Number of Molly Tea Stores to be Developed</u>:

B.      <u>Development Fee</u>:

C.      <u>Development Area</u>:

D.      <u>Development Schedule</u>:

| Number of Molly Tea Stores | Date by Which the Franchise Agreement Must be Signed | Date by Which the Molly Tea Store Must Be Opened and Operating in the Development Area | Cumulative Number of Molly Tea Stores to be Opened and Operating in the Development Area as of the date in Preceding Column |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

EXHIBIT A – DEVELOPMENT AREA AND DEVELOPMENT SCHEDULE        SOLO PAGE
4887-3902-2323.2

# EXHIBIT B

# FRANCHISE AGREEMENT

Docusign Envelope ID: EEECDDA2-E407-4D8C-8F2B-5E55B78422C4

## EXHIBIT C

## EQUITY INTERESTS AND PRINCIPALS

The following is a list of stockholders, members, partners or other investors in Developer, including all investors who own or hold a direct or indirect equity interest or controlling interest in Developer, and a description of the nature of their interest. All such individuals and entities will be deemed to be "*Principals*" described in and designated pursuant to the Development Agreement, each of whom will execute the Guaranty:

| Name | Percentage of Ownership/Nature of Interest |
|------|--------------------------------------------|
| | |
| | |
| | |
| | |
| | |

**EXHIBIT C – EQUITY INTERESTS AND PRINCIPALS**                                                                 **PAGE 1**
4887-3902-2323.2

## EXHIBIT D

## GUARANTY

This Guaranty is made and entered into _____, 20__ ("**Guaranty**"), in accordance with the terms and conditions and underwriting of obligations of that certain Multi-Unit Development Agreement dated _____, 20__ ("**Development Agreement**"), by and between MOLLYTEA Franchising LLC, a Delaware limited liability company ("**Franchisor**") and _____ ("**Developer**").

### Recitals

**WHEREAS**, Developer's Principals (each a "**Guarantor**") are required to execute this Guaranty as a condition to entering into the Development Agreement.

### Agreement

**NOW, THEREFORE**, in consideration of the undertakings and commitments of Developer set forth in the Development Agreement, each of the undersigned Guarantors acknowledge and agree as follows:

1.      Each Guarantor is included in the term "***Developer's Principals***" as defined in the Development Agreement and without limiting any guarantee of Developer's obligations under the Development Agreement, makes all covenants, representations, warranties and agreements of Principals set forth in the Development Agreement and is obligated to individually perform thereunder for so long as he or she qualifies as a Principal and thereafter to the extent expressly provided by the terms of the Development Agreement.

2.      Each Guarantor has read the terms and conditions of the Development Agreement and acknowledges that the execution of this Guaranty and the undertakings of Developer and Guarantors in the Development Agreement are in partial consideration for, and a condition to, the granting of the development rights, and that Franchisor would not have granted the development rights without the execution of this Guaranty and the other undertakings by each of the Guarantors.

3.      Each Guarantor individually, jointly and severally, unconditionally, and irrevocably guarantees to Franchisor and its successors and assigns that all of Developer's obligations under the Development Agreement will be punctually paid and performed.  Upon default by Developer or upon notice from Franchisor, each Guarantor will immediately make each payment and perform each obligation required of Developer under the Development Agreement.

4.      Each Guarantor, individually and personally, agrees to be personally bound by, and personally liable for, the breach of each and every provision in the Development Agreement, both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities.  Each Guarantor consents and agrees that he or she will render any payment or performance required under the Development Agreement upon demand if Developer fails or refuses punctually to do so.

5.      Each Guarantor consents and agrees that such liability will not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence that Franchisor may periodically grant to Developer or to any other person or Entity, including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which will in any way modify or amend this Guaranty, which will be continuing and

**EXHIBIT D – GUARANTY**                                                                                          **PAGE 1**

irrevocable during the Term.  Each Guarantor waives all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Developer arising as a result of the undersigned's execution of and performance under this Guaranty.

6.      Each Guarantor consents and agrees that such liability will not be contingent or conditioned upon pursuit by Franchisor of any remedies against Developer or any other person or Entity and waives any right Guarantor may have to require that an action be brought against Developer or any other person or Entity as a condition of his or her liability.

7.      Without affecting the obligations of any Guarantors under this Guaranty, Franchisor may, without notice to the Guarantors, waive, renew, extend, modify, amend, or release any indebtedness or obligation of Developer or settle, adjust, or compromise any claims that Franchisor may have against Developer.

8.      Each Guarantor waives all demands and notices of every kind with respect to the enforcement of this Guaranty, including notices of presentment, demand for payment or performance by Developer, any default by Developer or any guarantor, and any release of any guarantor or other security for this Guaranty or the obligations of Developer.

9.      Further, each Guarantor waives all other rights or benefits otherwise provided to sureties or guarantors under any state or federal law or common law, except as provided in this Guaranty. Each Guarantor agrees that Franchisor may unqualifiedly exercise, in its sole discretion, any or all rights and remedies available to it against Developer or any other guarantor or pledgor without impairing Franchisor's rights and remedies in enforcing this Guaranty, under which Guarantor's liabilities will remain independent and unconditional.  Each Guarantor acknowledges that Franchisor's exercise of certain of such rights or remedies may affect, or eliminate Guarantor's right of subrogation or recovery against Developer and that Guarantor may incur a partially or totally nonreimbursable liability under this Guaranty.

10.     At Franchisor's request, each Guarantor will promptly deliver to Franchisor complete and current financial statements and tax returns and such other financial information about such Guarantor as Franchisor may reasonably request.  Each Guarantor further agrees to keep Franchisor fully informed on all aspects of Developer's financial condition and the performance of Developer's obligations to Franchisor and that Franchisor has no duty to disclose to any Guarantor any information pertaining to Developer or to notify any Guarantor of Developer's default under the Development Agreement or any Ancillary Agreement.

11.     Franchisor may pursue its rights against any Guarantor without first exhausting its remedies against Developer and without joining any other Guarantor and no delay on the part of Franchisor in the exercise of any right or remedy will operate as a waiver of the right or remedy, and no single or partial exercise by Franchisor of any right or remedy will preclude the further exercise of that or any other right or remedy.

12.     Upon receipt by Franchisor of notice of the death of any Guarantor, the estate of the deceased will be bound by the foregoing Guaranty, but only for defaults and obligations under the Development Agreement existing at the time of death, and in that event, the obligations of the remaining Guarantors will continue in full force and effect.

13.     If this Guaranty is executed by more than one party, each Guarantor agrees that Franchisor may enforce the provisions of this Guaranty against one or more of the parties without seeking to enforce this Guaranty as to all or any other parties to this Guaranty and each Guarantor waives

any requirement of joinder of all or any other of the parties to this Guaranty in any suit or proceeding to enforce the provisions of this Guaranty.

14.     The provisions of this Guaranty are severable, and, in the event that any of them is held void and unenforceable as a matter of law, the remainder will be deemed modified so as to impose the maximum duty permitted by law and such provision will be valid and enforceable in such modified form as if separately stated in and made a part of this Guaranty.

15.     All disputes concerning the validity, interpretation, or performance of this Guaranty and any of its terms or provisions, or any rights or obligations of the parties hereto, will be governed by and resolved in accordance with the laws of the State of New York, and be resolved in the courts located within New York, New York.

16.     If any legal action is initiated by either of the parties hereto, the prevailing party will be entitled to recover from the other party reasonable attorneys' fees and costs in addition to any other relief that may be awarded.

17.     Each Guarantor represents and warrants that the following is a complete and accurate list of all Principals of Developer and a full description of the nature and extent of each Principal's Equity Interest in Developer.  Developer, and each Guarantor (as to his or her Equity Interest), represents and warrants that Principal is the sole and exclusive legal and beneficial owner of his or her Equity Interest in Developer, free and clear of all liens, restrictions, agreements and encumbrances of any kind or nature, other than those required or permitted by this Guaranty.

*[Signatures appear on following page.]*

IN WITNESS WHEREOF, each of the undersigned Guarantor has executed this Guaranty effective as of the date of this Guaranty.

**ATTEST:        GUARANTORS**                **EQUITY INTERESTS**

_____%

Name: _____
Date: _____

_____%

Name: _____
Date: _____

_____%

Name: _____
Date: _____

_____%

Name: _____
Date: _____

_____%

Name: _____
Date: _____

_____%

Name: _____
Date: _____

**EXHIBIT E**

**GENERAL RELEASE**

**THIS GENERAL RELEASE** ("*Release*") is made and entered into this ___ day of _____, 20__, by _____ ("*Developer*"), the undersigned Principals of Developer ("*Principals*").

**RECITALS**

A.    MOLLYTEA Franchising LLC ("*Franchisor*") and Developer entered into that certain Multi-Unit Development Agreement dated _____ ("*Development Agreement*"), for the development of Molly Tea Stores;

B.    Franchisee's Principals are defined in the Development Agreement and have, among other things, agreed to be bound by certain of the obligations contained in the Development Agreement; and

C.    The Development Agreement provides that, as a condition to Franchisor's approval of any transfer, Developer and its Principals will execute a release of certain claims.

**NOW, THEREFORE**, for good and valuable consideration, receipt of which is hereby acknowledged by each of the parties hereto, Developer and its Principals agree as follows:

**AGREEMENT**

1.    **Release**.

(a)    Developer and each of its Principals, individually and collectively, jointly and severally, do hereby release and forever discharge Franchisor and its Affiliates, and each of their respective successors and owners, and the shareholders, partners, owners, members, representatives, assigns, agents, servants, employees, independent contractors, officers, and directors of each of them, in their corporate and individual capacities ("*Designees*"), of and from any claims, debts, liabilities, demands, obligations, costs, expenses, actions and causes of action of every nature, character and description, known or unknown, vested or contingent, direct or indirect, foreseen or unforeseen, whether in contract or tort ("*Claims*"), which the Developer and/or its Principals now own or hold, or have at any time heretofore owned or held, or may at any time own or hold against Franchisor, or each of the respective Designees of Franchisor, arising under or in connection with any agreement, law, rule, regulation, ordinance or any other context whatsoever, including, without limitation, the Development Agreement, any Franchise Agreement and any other agreement between Developer and Franchisor or its Affiliates, or the development or operation the Molly Tea Stores, and any state or federal franchise or business opportunity Law; provided, however, that this Release will not serve to terminate any agreement currently effective by and among Developer or any or all of its Principals and Franchisor.

(b)    Developer and its Principals acknowledge there is a risk that, after the date hereof, they will discover, incur, or suffer claims which are unknown or unanticipated at the time of execution of this Release and which, if known by them on the date hereof, may have materially affected their decision to execute this Release. Nevertheless, Developer and each of its Principals agree that they intend to assume, and are assuming, the risk of such unknown or unanticipated claims, and that their release of Franchisor and its Designees set forth in this Release shall apply to any and all such claims. Neither have assigned, transferred or purported to assign or transfer to any other person or entity any of the claims or any portion thereof or interest therein and agrees to indemnify, defend and hold Franchisor and its Designees harmless

**EXHIBIT E – GENERAL RELEASE**                                                    **PAGE 1**

from and against any and all claims based on or arising out of any such assignment or transfer or purported assignment or transfer.

Developer and each of its Principals represent and warrant that they intend to be legally bound by this Release; that the execution of this Release is free and voluntary, that no inducements, threats, presentations or influences of any kind were made or exerted by or on behalf of Franchisor or its Designees, and that, prior to the execution hereof, they were given the opportunity, if desired, to consult with counsel.

*[INSERT THE FOLLOWING FOR CALIFORNIA DEVELOPERS:*

**It is the express intention that this Release be as broad as permitted by law, except that this Release excludes such claims as Franchisee may have arising under the California Franchise Investment Law or the California Franchise Relations Act.**

**The parties intend this paragraph 1 to cover, encompass, release and extinguish all claims and matters that might otherwise be reserved by California Civil Code Section 1542, which provides as follows:**

> **"A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and if known by him or her would have materially affected his or her settlement with the debtor or released party."]**

*[INSERT THE FOLLOWING FOR WASHINGTON FRANCHISEES:*

**"The general release does not apply with respect to claims arising under the Washington Franchise Investment Protection Act, RCW19.100 and the rules adopted thereunder."]**

2.    **Authority**.  By executing this Release, the parties represent and warrant that each have the right and authority to enter into and to accept the terms and covenants of this Release, and that no third party has or claims an interest in any claim released hereby.

3.    **No Conflicts**.  Each of the undersigned hereby represents and warrants that its execution of this Release does not violate any other agreement to which it is a party.

4.    **Miscellaneous**.

4.1    Counterparts.  This Release may be executed simultaneously in two or more counterparts, each of which will be deemed an original and all of which together will constitute but one and the same instrument.

4.2    Opportunity to Review.  Developer and its Principals represent and warrant that they: (i) have had an opportunity to review this Release; (ii) have had an opportunity to consult with an attorney and (iii) fully understand the content and legal effect of this Release; and

4.3    Governing Law.  This Release will be governed by the laws of the State of New York, which laws will be controlling in the event of any conflict of law.

4.4    Section Headings.  The Section headings of this Release are for the convenience of the parties only and will have no force or effect.

4.5 <u>Severability</u>. The provisions of this Release are severable, and, in the event that any provision is held void and unenforceable as a matter of law, the remaining provisions will continue in full force and effect.

4.6 <u>Defined Terms</u>. All terms not expressly defined in this Release will have the meanings given such terms in the Development Agreement.

**IN WITNESS WHEREOF**, Developer and its Principals have executed and delivered this Release.

**DEVELOPER:**

By: _____

Name: _____

Title: _____

**DEVELOPER'S PRINCIPALS:**

_____          _____
Name: _____     Name: _____
Date: _____     Date: _____


_____          _____
Name: _____     Name: _____
Date: _____     Date: _____


_____          _____
Name: _____     Name: _____
Date: _____     Date: _____

**EXHIBIT C**

**<u>OPERATING MANUAL TABLE OF CONTENTS</u>**

## EXHIBIT D

## FORM OF GENERAL RELEASE

### RELEASE

This Release ("**Release**") is made and entered into this ___ day of _____, 20__, by _____ ("**Franchisee**"), and _____ _____ ("**Franchisee's Principals**").

### RECITALS

D.      MOLLYTEA Franchising LLC ("**Franchisor**") and Franchisee entered into that certain Franchise Agreement dated _____ ("**Franchise Agreement**"), for the establishment of a Molly Tea Store located at _____;

E.      Franchisee's Principals are defined in the Franchise Agreement and have, among other things, agreed to be bound by certain of the obligations contained in the Franchise Agreement; and

F.      **[Option 1:  For Renewal]**  Franchisee desires to renew or otherwise extend the term of the Franchise Agreement, and the Franchise Agreement provides that, as a condition to such renewal, Franchisee and the Franchisee's Principals will, among other things, execute a general release as contained herein.

**[Option 2:  For Transfer]**  The Franchise Agreement provides that, as a condition to Franchisor's approval of such Transfer, Franchisee and Franchisee's Principals will execute a release of certain claims.

NOW, THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged by each of the parties hereto, Franchisee and the Franchisee's Principals agree as follows:

### AGREEMENT

1.      **Release**. (a) Franchisee, and each of Franchisee's Principals, individually and collectively, jointly and severally, do hereby release and forever discharge Franchisor and its Affiliates, and each of their respective successors, shareholders, partners, members, managers, directors, officers, employees, representatives, agents and independent contractors, in their corporate and individual capacities ("**Designees**"), of and from any claims, debts, liabilities, demands, obligations, costs, expenses, actions, and causes of action of every nature, character and description, known or unknown, vested or contingent, direct or indirect, foreseen or unforeseen, whether in contract or tort, which Franchisee and/or Franchisee's Principals now own or hold, or have at any time heretofore owned or held, or may at any time own or hold against Franchisor or any of its respective Designees, arising under or in connection with any agreement, law, rule, regulation ordinance or any other context whatsoever, including, without limitation, the Franchise Agreement, any Ancillary Agreement or the operation of a Molly Tea Store established thereunder, and any state or federal franchise or business opportunity Law; provided, however, that this Release will not serve to terminate any agreement currently effective by and among Franchisee or any or all of Franchisee's Principals and Franchisor.

(b)      Franchisee and Franchisee's Principals acknowledge there is a risk that, after the date hereof, they will discover, incur or suffer claims which are unknown or unanticipated at the time of execution of this Release and which, if known by them on the date hereof, may have materially affected their decision to execute this Release.  Nevertheless, Franchisee and each of Franchisee's Principals agree

**FORM OF GENERAL RELEASE**
**EXHIBIT D TO FRANCHISE DISCLOSURE DOCUMENT**

that they intend to assume, and are assuming, the risk of such unknown or unanticipated claims, and that their release of Franchisor and its Designees set forth in this Release shall apply to any and all such claims. Neither Franchisee nor any of Franchisee's Principals has assigned, transferred or purported to assign or transfer to any other person or Entity any of the claims or any portion thereof or interest therein and agrees to indemnify, defend and hold Franchisor and its Designees harmless from and against any and all claims based on or arising out of any such assignment or transfer or purported assignment or transfer.

(c)    Franchisee and each of Franchisee's Principals represent and warrant that they intend to be legally bound by this Release, that the execution of this Release is free and voluntary, that no inducements, threats, presentations or influences of any kind were made or exerted by or on behalf of Franchisor or its Designees, and that, prior to the execution hereof, they were given the opportunity, if desired, to consult with counsel.

### *[INSERT THE FOLLOWING FOR CALIFORNIA FRANCHISEES:*

**It is the express intention that this Release be as broad as permitted by law, except that this Release excludes such claims as Franchisee may have arising under the California Franchise Investment Law or the California Franchise Relations Act.**

**The parties intend this Section 1 to cover, encompass, release and extinguish all claims and matters that might otherwise be reserved by California Civil Code Section 1542, which provides as follows:**

**"A general release does not extend to claims that the creditor or the releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that, if known by him or her would have materially affected his or her settlement with the debtor or released party."]**

### *[INSERT THE FOLLOWING FOR WASHINGTON FRANCHISEES:*

**"The general release does not apply with respect to claims arising under the Washington Franchise Investment Protection Act, RCW19.100 and the rules adopted thereunder."]**

2.    **Authority**.  By executing this Release, the Parties represent and warrant that each have the right and authority to enter into and to accept the terms and covenants of this Release, and that no third party has or claims an interest in any claim released hereby.

3.    **No Conflicts**.  Each of the undersigned hereby represents and warrants that its execution of this Release does not violate any other agreement to which it is a party.

4.    **Miscellaneous**.

(a)    Counterparts.  This Release may be executed simultaneously in two or more counterparts, each of which will be deemed an original and all of which together will constitute but one and the same instrument.

(b)    Opportunity to Review.  Franchisee and Franchisee's Principals represent and warrant that they (i) have had an opportunity to review this Release, (ii) have had an opportunity to consult with an attorney, and (iii) fully understand the content and legal effect of this Release.

**FORM OF GENERAL RELEASE**
**EXHIBIT D TO FRANCHISE DISCLOSURE DOCUMENT**

(c)    <u>Governing Law</u>.  This Release will be governed by the laws of the State of New York, which laws will be controlling in the event of any conflict of law.

(d)    <u>Section Headings</u>.  The Section headings of this Release are for the convenience of the parties only and will have no force or effect.

(e)    <u>Severability</u>.  The provisions of this Release are severable, and, in the event that any provision is held void and unenforceable as a matter of law, the remaining provisions will continue in full force and effect.

(f)    <u>Defined Terms</u>.  All terms not expressly defined in this Release will have the meaning given to such term in the Franchise Agreement.

IN WITNESS WHEREOF, Franchisee and Franchisee's Principals have executed and delivered this Release.

**FRANCHISEE**:

By:    _____
Name:  _____
Title: _____

**FRANCHISEE'S PRINCIPALS:**

_____          _____
Name:  _____          Name:  _____
Date:  _____          Date:  _____


_____          _____
Name:  _____          Name:  _____
Date:  _____          Date:  _____


_____          _____
Name:  _____          Name:  _____
Date:  _____          Date:  _____

**EXHIBIT E**

**AUDITED
FINANCIAL STATEMENTS**

See Attached

*[Remainder of this page is intentionally left blank]*

Docusign Envelope ID: EEECDDA2-E407-4D8C-8F2B-5E55B78422C4

THESE FINANCIAL STATEMENTS ARE PREPARED WITHOUT AN AUDIT. PROSPECTIVE FRANCHISEES OR SELLERS OF FRANCHISES SHOULD BE ADVISED THAT NO CERTIFIED PUBLIC ACCOUNTANT HAD AUDITED THESE FIGURES OR EXPRESSED HIS/HER OPNION WITH REGARD TO THE CONTENT OR FORM.

**LIST OF CURRENT FRANCHISEES**
**EXHIBIT F TO FRANCHISE DISCLOSURE DOCUMENT**

Docusign Envelope ID: EEECDDA2-E407-4D8C-8F2B-EE55B78422C4

**09/05/25**
**Accrual Basis**

**Feaster Franchising LLC**

# Profit & Loss

**January through August 2025**

|  | Jan - Aug 25 |
|---|---:|
| **Ordinary Income/Expense** | |
| **Expense** | |
| Business Licenses and Permits | 1,594.81 |
| Franchise Expense | 1,000.00 |
| **Total Expense** | 2,594.81 |
| **Net Ordinary Income** | -2,594.81 |
| **Net Income** | **-2,594.81** |

Docusign Envelope ID: EEECDDA2-E407-4D8C-8F2B-EE55B78422C4

**09/05/25**
**Accrual Basis**

# Mollytea Franchising LLC
# Balance Sheet
### As of August 31, 2025

|  | Aug 31, 25 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| **Chase 9352** | 55,289.67 |
| **Total Checking/Savings** | 55,289.67 |
| **Total Current Assets** | 55,289.67 |
| **Other Assets** | |
| **Loan Receivable** | |
| **Mollytea Supplychain LLC** | 100,000.00 |
| **Total Loan Receivable** | 100,000.00 |
| **Total Other Assets** | 100,000.00 |
| **TOTAL ASSETS** | **155,289.67** |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| **Franchise Fee Payable** | 1,000.00 |
| **Unearned Revenue** | 55,289.67 |
| **Total Other Current Liabilities** | 56,289.67 |
| **Total Current Liabilities** | 56,289.67 |
| **Long Term Liabilities** | |
| **Loan Payable** | |
| **Mollytea USA Inc** | 100,000.00 |
| **Shenzhen Mollytea Food and Beve** | 1,594.81 |
| **Total Loan Payable** | 101,594.81 |
| **Total Long Term Liabilities** | 101,594.81 |
| **Total Liabilities** | 157,884.48 |
| **Equity** | |
| **Net Income** | -2,594.81 |
| **Total Equity** | -2,594.81 |
| **TOTAL LIABILITIES & EQUITY** | **155,289.67** |

Docusign Envelope ID: EEECDDA2-E407-4D8C-8F2B-EE55B78422C4
09/05/25

**Mollytea Franchising LLC**

## Statement of Cash Flows

**January through August 2025**

|  | Jan - Aug 25 |
|---|---|
| **OPERATING ACTIVITIES** | |
| Net Income | -2,594.81 |
| Adjustments to reconcile Net Income | |
| to net cash provided by operations: | |
| Franchise Fee Payable | 1,000.00 |
| Unearned Revenue | 55,289.67 |
| **Net cash provided by Operating Activities** | 53,694.86 |
| **INVESTING ACTIVITIES** | |
| Loan Receivable:Mollytea Supplychain LLC | -100,000.00 |
| **Net cash provided by Investing Activities** | -100,000.00 |
| **FINANCING ACTIVITIES** | |
| Loan Payable:Mollytea USA Inc | 100,000.00 |
| Loan Payable:Shenzhen Mollytea Food and Beve | 1,594.81 |
| **Net cash provided by Financing Activities** | 101,594.81 |
| **Net cash increase for period** | 55,289.67 |
| **Cash at end of period** | **55,289.67** |

**MOLLYTEA FRANCHISING LLC**

**FINANCIAL STATEMENTS**

**AS OF APRIL 30, 2025**
**AND FOR THE PERIOD FROM JANUARY 16, 2025 (INCEPTION)**
**THROUGH APRIL 30, 2025**

**MOLLYTEA FRANCHISING LLC**

**INDEX TO FINANCIAL STATEMENTS**

|  | **Page(s)** |
|---|---|
| Independent Auditors' Report | 1-2 |
| Balance Sheet | 3 |
| Statement of Operations | 4 |
| Statement of Changes in Member's Deficit | 5 |
| Statement of Cash Flows | 6 |
| Notes to the Financial Statements | 7-10 |



CBIZ CPAs P.C.

111 West Saint John Street
Suite 515
San Jose, CA 95113

P: 669.232.9500

**Independent Auditors' Report**

To the Board of Directors and Members of
**Mollytea Franchising LLC**

*Opinion*

We have audited the financial statements of Mollytea Franchising LLC (the "Company"), which comprise the balance sheet as of April 30, 2025, and the related statements of operations, changes in member's deficit, and cash flows for the period from January 16, 2025 (Inception) through April 30, 2025, and the related notes to the financial statements (collectively referred to as the "financial statements").

In our opinion, the accompanying financial statements present fairly, in all material respects, the financial position of the Company as of April 30, 2025, and the results of its operations and its cash flows for the period from January 16, 2025 (Inception) through April 30, 2025 in accordance with accounting principles generally accepted in the United States of America.

*Basis for Opinion*

We conducted our audit in accordance with auditing standards generally accepted in the United States of America ("GAAS"). Our responsibilities under those standards are further described in the Auditors' Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of the Company and to meet our other ethical responsibilities in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Responsibilities of Management for the Financial Statements*

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for one year after the date that the financial statements are available to be issued.

1

CBIZ.COM

*Auditors' Responsibilities for the Audit of the Financial Statements*

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditors' report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with GAAS will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

In performing an audit in accordance with GAAS, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.

- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, no such opinion is expressed.

- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the financial statements.

- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control related matters that we identified during the audit.

*CBIZ CPAs P.C.*

San Jose, California
June 9, 2025

2

**MOLLYTEA FRANCHISING LLC**
**BALANCE SHEET**
As of April 30, 2025

| | |
|---|---:|
| **ASSETS** | |
| **Current assets:** | |
| Cash | $ 100,000 |
| Member contribution receivable | 1,000 |
| **Total current assets** | **101,000** |
| **TOTAL ASSETS** | **101,000** |
| **LIABILITIES AND MEMBER'S DEFICIT** | |
| **Current Liabilities:** | |
| Loan from related parties | 100,000 |
| Amounts due to related parties | 38,845 |
| **Total current liabilities** | **138,845** |
| **TOTAL LIABILITIES** | **138,845** |
| **TOTAL MEMBER'S DEFICIT** | **(37,845)** |
| **TOTAL LIABILITIES AND MEMBER'S DEFICIT** | **$ 101,000** |

The accompanying notes are an integral part of these financial statements.

**MOLLYTEA FRANCHISING LLC**
**STATEMENT OF OPERATIONS**
For the period from January 16, 2025 (Inception) through April 30, 2025

| | |
|---|---:|
| **Operating expenses:** | |
| General and administrative expenses | $ (38,845) |
| **Total operating expenses** | **(38,845)** |
| | |
| **Net loss** | **$ (38,845)** |

The accompanying notes are an integral part of these financial statements.

Docusign Envelope ID: EEECDDA2-E407-4D8G-8F2B-EE55B78422C4

**MOLLYTEA FRANCHISING LLC**
**STATEMENT OF CHANGES IN MEMBER'S DEFICIT**
For the period from January 16, 2025 (Inception) through April 30, 2025

| | Member's Contributed Equity | Retained Deficit | Total |
|---|---|---|---|
| **Member's deficit as of January 16, 2025 (Inception)** | $            - | $            - | $            - |
| Member contribution | 1,000 | - | 1,000 |
| Net loss | - | (38,845) | (38,845) |
| **Member's deficit as of April 30, 2025** | **$      1,000** | **$   (38,845)** | **$   (37,845)** |

The accompanying notes are an integral part of these financial statements.

5

**MOLLYTEA FRANCHISING LLC**
**STATEMENT OF CASH FLOWS**
For the period from January 16, 2025 (Inception) through April 30, 2025

| | |
|---|---:|
| **Cash flows from operating activities:** | |
| Net loss | $ (38,845) |
| Adjustments to reconcile net loss to net cash used in operating activities: | |
| Amounts due to related parties | 38,845 |
| **Net cash used in operating activities** | - |
| | |
| **Cash flows from financing activities:** | |
| Loans from related parties | 100,000 |
| **Net cash provided by financing activities** | **100,000** |
| | |
| **Net increase in cash** | **100,000** |
| **Cash as of January 16, 2025** | **-** |
| **Cash as of April 30, 2025** | **$ 100,000** |
| | |
| | |
| **Supplemental disclosure of non-cash financing activities** | |
| Member contribution | **$1,000** |

The accompanying notes are an integral part of these financial statements.

**MOLLYTEA FRANCHISING LLC**
**NOTES TO THE FINANCIAL STATEMENTS**
As of April 30, 2025 and
for the period from January 16, 2025 (Inception) through April 30, 2025

## 1. ORGANIZATION AND NATURE OF OPERATIONS

Mollytea Franchising LLC (the "Company") was formed in the State of Delaware on January 16, 2025. The principal purpose of the Company is to offer and sell franchises in the food and beverage industry in the United States of America (the "U.S.").

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### (a) Basis of presentation

The accompanying financial statements of the Company have been prepared in accordance with the accounting principles generally accepted in the United States of America ("U.S. GAAP").

### (b) Use of estimates

The preparation of financial statements and related disclosures in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements. Actual results could differ from those estimates. Estimates and assumptions are reviewed periodically, and the effects of revisions are reflected in the period in which they are determined to be necessary.

### (c) Cash

Cash represents demand deposits placed with a bank, which are unrestricted as to withdrawal or use. Deposits in these financial institutions may, from time to time, exceed the Federal Deposit Insurance Corporation ("FDIC")'s federally insured limits. The Company has not experienced any losses from funds held in bank accounts and believes it is not exposed to any risk to its cash held in its bank account.

### (d) Loan agreement with related party

The Company entered into a loan agreement (See Note 4) with a related party that does not bear interest. The Company considered Accounting Standards Codification 835-30-25-6, *Interest*, and has concluded that no rights or privileges other than cash attended to the exchange. As such, the cash received is equivalent to the face amount of the loan, and therefore it is presumed to have a present value at issuance measured by the cash proceeds exchanged.

### (e) General and administrative expenses

General and administrative expenses consist primarily of organization costs, legal and auditing fees.

### (f) Income taxes

The Company is organized as an LLC and as a result is treated as a partnership for federal and state income tax purposes. Accordingly, the Company's taxable income, deductions, assets and liabilities are reported by the member on its income tax return. Therefore, no provision for federal or state income tax has been made by the Company.

There are no uncertain tax positions that would require recognition in the financial statements. If the Company were to incur an income tax liability in the future, interest on any income tax liability would be reported as interest expense and penalties on any income tax would be reported as income taxes. Management's conclusions regarding uncertain income tax positions may be subject to review and adjustment at a later date based upon ongoing analysis of or changes in tax laws, regulations, and interpretations thereof as well as other factors.

**MOLLYTEA FRANCHISING LLC**
**NOTES TO THE FINANCIAL STATEMENTS**
As of April 30, 2025 and
for the period from January 16, 2025 (Inception) through April 30, 2025

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

### (g) Going concern and management's plans

The Company has not yet begun operations and has both a working capital deficiency and member's deficit as of April 30, 2025. These factors raise substantial doubt about the Company's ability to continue as a going concern. Management has evaluated the significance of these conditions in relation to the Company's ability to continue as a going concern and as part of its plan to alleviate this substantial doubt, has received a firm commitment letter from a sister entity stating the sister entity will provided funding, as needed, for at least twelve months from the date of these financial statements. Management believes it can continue as a going concern as its cash resources available as of the date of these financial statement coupled with the firm commitment letter, will be sufficient to allow the Company to fund its current operating plan through at least the next twelve months from the date these financial statements. Management has concluded these plans are probable of alleviating the substantial doubt which was raised.

## 3. RELATED PARTY TRANSACTIONS

Parties are considered to be related if one party has the ability, directly or indirectly, to control the other party or exercise significant influence over the other party in making financial and operational decisions. Parties are also considered to be related if they are subject to common control. Related parties may be individuals or corporate entities.

The following entities are considered to be a related party to the Company:

| Name of related parties | Relationship with the Company |
|---|---|
| Zhang, Biao | Chief Executive Manager and Acting CFO |
| Beijing Xingyun Juhong Information Technology Co., Ltd. | Beneficial Owner |
| Beijing Jingmo Business Consulting Co., Ltd. | Beneficial Owner |
| BaiCheng Jasmine Limited | Beneficial Owner |
| Sheena Jasmine Limited | Beneficial Owner |
| BJ Jasmine Limited | Beneficial Owner |
| Rajax Holding | Beneficial Owner |
| Tea Bush Limited | Beneficial Owner |
| Tea Forest Limited | Beneficial Owner |
| Tea Shrub Limited | Beneficial Owner |
| Qin Jasmine Limited | Beneficial Owner |
| Kobe Jasmine Limited | Beneficial Owner |
| Ruizhen Co., Ltd | Beneficial Owner |
| Summitbitz Investment Holding Limited | Beneficial Owner |
| Mollytea Limited | Beneficial Owner |
| Fragrant Flowering Limited | Commonly controlled sister entity |
| Mollytea Investment Limited | Commonly controlled sister entity |
| Fragrant Tea Limited | Commonly controlled sister entity |
| Lovely Jasmine Limited | Commonly controlled sister entity |
| Shenzhen Mollytea Food and Beverage Management Co., Ltd. | Commonly controlled sister entity |
| Mollytea International Limited | Beneficial Owner |
| Mollytea International Investment Limited | Beneficial Owner |

**MOLLYTEA FRANCHISING LLC**
**NOTES TO THE FINANCIAL STATEMENTS**
As of April 30, 2025 and
for the period from January 16, 2025 (Inception) through April 30, 2025

### 3. RELATED PARTY TRANSACTIONS (Continued)

| Name of related parties | Relationship with the Company |
|---|---|
| Mollytea （Hong Kong）Limited | Commonly controlled sister entity |
| Molly tea IP Inc. | Beneficial Owner |
| Mollytea USA INC. | Commonly controlled sister entity |
| Mollytea Holding Inc | Commonly controlled sister entity |
| Mollytea shopsLLC | Commonly controlled sister entity |
| MollyteasupplychainLLC | Commonly controlled sister entity |
| Mollytea brand LLC | Commonly controlled sister entity |
| Shenzhen Mollytea Holding Limited | Commonly controlled sister entity |
| Shenzhen Moli Naibai Catering Management Co., Ltd. | Commonly controlled sister entity |
| Shenzhen Bao'an District Moli Milk White No.1 Beverage Store (Limited Partnership) | Commonly controlled sister entity |
| Huizhou Jasmine Milk White Catering Co., Ltd. | Commonly controlled sister entity |
| Shenzhen Futian District Moli Milk White No.2 Beverage Store (Limited Partnership) | Commonly controlled sister entity |
| Shenzhen Mile Supply Chain Management Co., Ltd. | Commonly controlled sister entity |
| Shenzhen Moli Milk White Supply Chain Management Co., Ltd. | Commonly controlled sister entity |
| Shenzhen Jasmine Milk White Operation Management Co., Ltd. | Commonly controlled sister entity |
| Suzhou Moli Milk White Operation Management Co., Ltd. | Commonly controlled sister entity |
| Chengdu Moli Milk White Catering Management Co., Ltd. | Commonly controlled sister entity |
| hengzhou Moli Milk White Catering Management Co., Ltd. | Commonly controlled sister entity |
| Shanghai Moli Milk White Catering Management Service Co., Ltd. | Commonly controlled sister entity |
| Guangzhou Jasmine Milk White Operation Management Co., Ltd. | Commonly controlled sister entity |
| Hangzhou Moli Milk White Operation Management Co., Ltd. | Commonly controlled sister entity |
| Xi'an Moli Milk White Catering Management Co., Ltd. | Commonly controlled sister entity |
| Nanjing Jasmine Milk White Operation Management Co., Ltd. | Commonly controlled sister entity |
| Beijing Jasmine Milk White Catering Management Co., Ltd. | Commonly controlled sister entity |

The Company had the following balances with related parties as a result of an advance from or loan from the related party noted:

| | |
|---|---|
| Amounts due to related parties: | |
| Shenzhen Mollytea Food and Beverage Management Co., Ltd. | $ 1,595 |
| Mollytea USA INC. | 37,250 |
| | $38,845 |
| Short-term loans from related parties: | |
| Mollytea USA INC. | $ 100,000 |

### 4. DEBT

In April 2025, the Company received $100,000 loan in cash from MOLLYTEA USA INC to fund operations. There is no formal written agreement. There is no stated interest rate and the loan is due on demand. Imputed interest is minimal for the period from January 16, 2025 (Inception) through April 30, 2025.

**MOLLYTEA FRANCHISING LLC**
**NOTES TO THE FINANCIAL STATEMENTS**
As of April 30, 2025 and
for the period from January 16, 2025 (Inception) through April 30, 2025

## 5. MEMBER'S DEFICIT

In accordance with the Company's operating agreement, the Company's net profits or losses will be allocated in proportion with member capital interests. Distributions of available funds will be determined and distributed annually, or as the member sees fit. Available funds refers to net cash of the Company after available expenses and liabilities are paid. Upon liquidation of the Company or of a member's interest, distributions will be made in accordance with the positive capital account balances. To the extent a member has a negative capital account balance, there will be a qualified income offset. The member may dissolve the Company at any time.

Pursuant to the Company's operating agreement, the member is required to contribute $1,000 as an initial contribution. As of April 30, 2025, this amount has not yet been paid.

## 6. COMMITMENTS AND CONTINGENCIES

In the normal course of business, the Company may be subject to certain claims or lawsuits. Management is not aware of any claims or lawsuits that will have a material adverse effect on the financial position or results of operations of the Company.

## 7. RISKS AND UNCERTAINTIES

The Company has not yet commenced principal operations (see Note 1) and all activities to date have been focused on obtaining the requisite licenses from applicable authorities in the U.S.

The Company's future operations may be subject to extensive government regulations and standards. It is uncertain whether the Company will be able to obtain appropriate licenses and commence operations. Delays in obtaining necessary approvals or changes in regulatory requirements could adversely affect the Company's ability to carry out its planed principal operations.

## 8. SUBSEQUENT EVENTS

Management has evaluated subsequent events or transactions occurring through June 9, 2025, the date these financial statements were available to be issued, and has not identified any items requiring adjustment to or disclosure in these financial statements.

**EXHIBIT F**

**LIST OF CURRENT FRANCHISEES**

**California**
RS Plan, LLC
Jiangling Ouyang
#101 425 W Valley Blvd #101, San Gabriel, CA 91776
+1 (626) 464-7666
mollyteala@gmail.com
*This outlet opened April 25, 2025

**EXHIBIT G-1**

**STATE SPECIFIC ADDENDA AND RIDERS TO THE FRANCHISE
DISCLOSURE DOCUMENT**

**ADDITIONAL FRANCHISE DISCLOSURE DOCUMENT DISCLOSURES
REQUIRED BY THE STATE OF CALIFORNIA**

The following provisions supplement or modify certain provisions of the Franchise Disclosure Document with respect to franchises offered and sold in the State of California:

1.      SECTION 31125 OF THE CALIFORNIA CORPORATIONS CODE REQUIRES US TO GIVE YOU A FRANCHISE DISCLOSURE DOCUMENT, IN A FORM CONTAINING THE INFORMATION THAT THE COMMISSIONER MAY BY RULE OR ORDER REQUIRE, BEFORE A SOLICITATION OF A PROPOSED MATERIAL MODIFICATION OF AN EXISTING FRANCHISE.

THESE FRANCHISES HAVE BEEN REGISTERED UNDER THE FRANCHISE INVESTMENT LAW OF THE STATE OF CALIFORNIA. SUCH REGISTRATION DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION NOR A FINDING BY THE COMMISSIONER THAT THE INFORMATION PROVIDED HEREIN IS TRUE, COMPLETE AND NOT MISLEADING.

THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE DISCLOSURE DOCUMENT 14 DAYS PRIOR TO EXECUTION OF THE AGREEMENTS.

SEE THE COVER PAGE OF THE DISCLOSURE DOCUMENT FOR OUR URL ADDRESS. OUR WEBSITE HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION. ANY COMPLAINTS CONCERNING THE CONTENTS OF THIS WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION AT WWW.dfpi.CA.GOV.

**California's Franchise Investment Law (Corporations Code sections 31512 and 31512.1) states that any provision of a franchise agreement or related document requiring the franchisee to waive specific provisions of the law is contrary to public policy and is void and unenforceable. The law also prohibits a franchisor from disclaiming or denying (i) representations it, its employees, or its agents make to you, (ii) your ability to rely on any representations it makes to you, or (iii) any violations of the law.**

STATE SPECIFIC ADDENDA AND RIDERS TO THE FRANCHISE DISCLOSURE DOCUMENT
EXHIBIT G TO FRANCHISE DISCLOSURE DOCUMENT

2.     <u>Item 3, Supplemental Disclosure</u>.  Item 3 is supplemented by the following statement:

Neither we nor any person listed in Item 2 is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities Exchange Act of 1934, 15 U.S.C.A. 78a et seq., suspending or expelling such parties from membership in such association or exchange.

3.     <u>Supplemental Disclosure</u>.  Item 6 is supplemented by the following statement:

The highest interest rate allowed by law in California for late payments is 10% annually.

<u>Item 17, Supplemental Disclosures</u>.  Item 17 is supplemented by the additional following statements:

California Business and Professions Code Sections 20000 through 20043 provide rights to you concerning termination or non-renewal of the franchise. If the Franchise Agreement contains a provision that is inconsistent with the law, the law will control.

The Franchise Agreement provides for termination upon bankruptcy. These provisions may not be enforceable under federal bankruptcy law (11 U.S.C.A. § 101, *et seq.).*

The Franchise Agreement provides for application of the laws of New York.  This provision may not be enforceable under California law.

The Franchise Agreement contains a covenant not to compete which extends beyond the termination of the franchise. These provisions may not be enforceable under California law.

If the Franchise Agreement contains a liquidated damages clause, under California Civil Code Section 1671, certain liquidated damages clauses are unenforceable.

If the Franchise Agreement contains a waiver of punitive damages and/or jury trial provisions, these provisions may not be enforceable.

The Franchise Agreement requires binding arbitration which will occur in New York, New York, with costs being borne by the non-prevailing party which may not be enforceable.  Prospective franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code Section 20040.5, Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provisions of the Franchise Agreement or any Development Agreement restricting venue to a forum outside the State of California.

You must sign a general release when you execute the Franchise Agreement and the Development Agreement, if applicable, and if you transfer your franchise or

**STATE SPECIFIC ADDENDA AND RIDERS TO THE FRANCHISE DISCLOSURE DOCUMENT**
**<u>EXHIBIT G</u> TO FRANCHISE DISCLOSURE DOCUMENT**

development rights, if applicable, or execute a successor Franchise Agreement or any Development Agreement. These provisions may not be enforceable under California law. California Corporations Code Section 31512 voids a waiver of your rights under the Franchise Investment Law. Section 20010 voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code Sections 20000 through 20043).

THE FRANCHISE AGREEMENT CONTAINS PROVISIONS THAT LIMIT THE FRANCHISEE'S RIGHTS AND MAY NOT BE ENFORCEABLE IN CALIFORNIA INCLUDING, BUT NOT LIMITED TO, A WAIVER OF JURY TRIAL AND WAIVER OF PUNITIVE DAMAGES.

You will not receive an exclusive territory. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control.

No disclaimer, questionnaire, clause, or statement signed by a franchisee in connection with the commencement of the franchise relationship shall be construed or interpreted as waiving any claim of fraud in the inducement, whether common law or statutory, or as disclaiming reliance on or the right to rely upon any statement made or information provided by any franchisor, broker or other person acting on behalf of the franchisor that was a material inducement to a franchisee's investment. Any statements or representations signed by a franchisee purporting to understand any fact or its legal effect shall be deemed made only based upon the franchisee's understanding of the law and facts as of the time of the franchisee's investment decision. This provision supersedes any other or inconsistent term of any document executed in connection with the franchise.

No statement, questionnaire, or acknowledgment signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

Each provision of these additional disclosures will be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the California Franchise Investment Law are met independently without reference to these additional disclosures.

**STATE SPECIFIC ADDENDA AND RIDERS TO THE FRANCHISE DISCLOSURE DOCUMENT**
**EXHIBIT G TO FRANCHISE DISCLOSURE DOCUMENT**

## ADDITIONAL FRANCHISE DISCLOSURE DOCUMENT DISCLOSURES
## REQUIRED BY THE STATE OF HAWAII

The following provisions supplement or modify certain provisions of the Franchise Disclosure Document with respect to franchises offered and sold in the State of Hawaii:

THESE FRANCHISES HAVE BEEN FILED UNDER THE FRANCHISE INVESTMENT LAW OF THE STATE OF HAWAII. FILING DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE DIRECTOR OF COMMERCE AND CONSUMER AFFAIRS OR A FINDING BY THE DIRECTOR OF COMMERCE AND CONSUMER AFFAIRS THAT THE INFORMATION PROVIDED HEREIN IS TRUE, COMPLETE AND NOT MISLEADING.

THE FRANCHISE INVESTMENT LAW MAKES IT UNLAWFUL TO OFFER OR SELL ANY FRANCHISE IN THIS STATE WITHOUT FIRST PROVIDING TO THE PROSPECTIVE FRANCHISEE, OR SUBFRANCHISOR, AT LEAST SEVEN DAYS PRIOR TO THE EXECUTION BY THE PROSPECTIVE FRANCHISEE, OF ANY BINDING FRANCHISE OR OTHER AGREEMENT, OR AT LEAST SEVEN DAYS PRIOR TO THE PAYMENT OF ANY CONSIDERATION BY THE FRANCHISEE, OR SUBFRANCHISOR, WHICHEVER OCCURS FIRST, A COPY OF THE FRANCHISE DISCLOSURE DOCUMENT, TOGETHER WITH A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE.

THIS FRANCHISE DISCLOSURE DOCUMENT CONTAINS A SUMMARY ONLY OF CERTAIN MATERIAL PROVISIONS OF THE FRANCHISE AGREEMENT. THE CONTRACT OR AGREEMENT SHOULD BE REFERRED TO FOR A STATEMENT OF ALL RIGHTS, CONDITIONS, RESTRICTIONS AND OBLIGATIONS OF BOTH THE FRANCHISOR AND THE FRANCHISEE.

NO STATEMENT, QUESTIONNAIRE, OR ACKNOWLEDGMENT SIGNED OR AGREED TO BY A FRANCHISEE IN CONNECTION WITH THE COMMENCEMENT OF THE FRANCHISE RELATIONSHIP SHALL HAVE THE EFFECT OF (I) WAIVING ANY CLAIMS UNDER ANY APPLICABLE STATE FRANCHISE LAW, INCLUDING FRAUD IN THE INDUCEMENT, OR (II) DISCLAIMING RELIANCE ON ANY STATEMENT MADE BY ANY FRANCHISOR, FRANCHISE SELLER, OR OTHER PERSON ACTING ON BEHALF OF THE FRANCHISOR. THIS PROVISION SUPERSEDES ANY OTHER TERM OR ANY DOCUMENT EXECUTED IN CONNECTION WITH THE FRANCHISE.

Each provision of these additional disclosures will be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Hawaii Franchise Investment Law are met independently without reference to these additional disclosures.

STATE SPECIFIC ADDENDA AND RIDERS TO THE FRANCHISE DISCLOSURE DOCUMENT
EXHIBIT G TO FRANCHISE DISCLOSURE DOCUMENT

**ADDITIONAL FRANCHISE DISCLOSURE DOCUMENT DISCLOSURES**
**REQUIRED BY THE STATE OF ILLINOIS**

The following provisions supplement or modify certain provisions of the Franchise Disclosure Document with respect to franchises offered and sold in the State of Illinois:

1.      Risk Factors. State Cover Page. The following statement is added to the end of the first risk factor on the state cover page:

**SECTION 4 OF THE ILLINOIS FRANCHISE DISCLOSURE ACT (THE "ACT") PROVIDES THAT ANY PROVISION IN A FRANCHISE AGREEMENT WHICH DESIGNATES JURISDICTION OR VENUE IN A FORUM OUTSIDE OF ILLINOIS IS VOID WITH RESPECT TO ANY CAUSE OF ACTION WHICH OTHERWISE IS ENFORCEABLE IN ILLINOIS.**

The following statement is added to the end of the second risk factor on the state cover page:

**NOTWITHSTANDING THE FOREGOING, ILLINOIS LAW WILL GOVERN THE FRANCHISE AGREEMENT.**

2.      Item 17, Supplemental Disclosures. The following statement is added to Item 17:

Any provision in the Franchise Agreement or any Development Agreement that designates jurisdiction or venue in a forum outside of Illinois may not be enforceable with respect to any action which is otherwise enforceable in Illinois, except that the Franchise Agreement or any Development Agreement may provide for arbitration outside of Illinois. In addition, Illinois law will govern the Franchise Agreement and any Development Agreement.

The Act requires that termination and non-renewal rights cannot be waived or modified and may be affected by Illinois law and are set forth in Section 19 and Section 20 of the Act.

Each provision of these additional disclosures will be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Illinois Franchise Disclosure Act are met independently without reference to these additional disclosures.

## ADDITIONAL FRANCHISE DISCLOSURE DOCUMENT DISCLOSURES
## <u>REQUIRED BY THE STATE OF INDIANA</u>

The following provisions supplement or modify certain provisions of the Franchise Disclosure Document with respect to franchises offered and sold in the State of Indiana:

1.      The laws of the State of Indiana supersede any provisions of this Franchise Disclosure Document, the Franchise Agreement, the other agreements or New York law if such provisions are in conflict with Indiana law.

2.      The prohibition by Indiana Code 23-2-2.7-1(7) against unilateral termination of the franchise without good cause or in bad faith, good cause being defined therein as a material breach of the Franchise Agreement, will supersede the provisions of Section 19 of the Franchise Agreement in the State of Indiana, but only to the extent that may be inconsistent with such prohibition.

3.      Notwithstanding the Franchise Agreement, you recognize that in the event of any use of the System not in accord with the Franchise Agreement, we will be entitled to seek injunctive and other relief.

4.      No release language set forth in the Franchise Disclosure Document, Franchise Agreement, or any Development Agreement will relieve us or any other person, directly or indirectly, from liability imposed by the laws concerning franchising of the State of Indiana.

5.      The Franchise Agreement and the Development Agreement, if applicable, if amended to provide that each such agreement (as applicable) will be construed in accordance with the laws of the State of Indiana.

6.      Any provision in the Franchise Disclosure Document, Franchise Agreement, or any Development Agreement which designates jurisdiction or venue, or requires franchisee to agree to jurisdiction or venue, in a forum outside of Indiana, may not be enforceable.

Each provision of these additional disclosures shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Indiana Franchise Disclosure Law and the Indiana Deceptive Franchise Practices Act are met independently without reference to these additional disclosures.

STATE SPECIFIC ADDENDA AND RIDERS TO THE FRANCHISE DISCLOSURE DOCUMENT
<u>EXHIBIT G</u> TO FRANCHISE DISCLOSURE DOCUMENT

## ADDITIONAL FRANCHISE DISCLOSURE DOCUMENT DISCLOSURES
## <u>REQUIRED BY THE STATE OF MARYLAND</u>

The following provisions supplement or modify certain provisions of the Franchise Disclosure Document with respect to franchises offered and sold in the State of Maryland:

1.      Items 5 and 13, Supplemental Disclosures.  Items 5 and 13 are supplemented by the following statement:

Any provisions requiring you to sign a general release of claims against us, including upon execution of the Franchise Agreement or any Development Agreement or a successor Franchise Agreement or transfer, does not release any claim you may have under the Maryland Franchise Registration and Disclosure Law.

2.      Item 17, Supplemental Disclosures.  Item 17 is supplemented by the following statements:

The Franchise Agreement provides for termination upon bankruptcy.  These provisions may not be enforceable under federal bankruptcy law, but we intend to enforce it to the extent enforceable.

Any provisions requiring you to sign a general release of claims against us, including upon execution of the Franchise Agreement or any Development Agreement or a successor Franchise Agreement or transfer, does not release any claim you may have under the Maryland Franchise Registration and Disclosure Law.

Any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within three years after the grant of the franchise.

You may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

3.      Item 17 is amended to reflect that the Franchise Agreement and Development Agreement provide that disputes are resolved through arbitration.  A Maryland franchise regulation states that it is an unfair or deceptive practice to require a franchisee to waive its rights to file a lawsuit in Maryland claiming a violation of the Maryland Franchise Law.  In light of the Federal Arbitration Act, there is some dispute as to whether this forum selection requirement is legally enforceable.

4.      No statement, questionnaire, or acknowledgment signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor.  This provision supersedes any other term or any document executed in connection with the franchise.

## ADDITIONAL FRANCHISE DISCLOSURE DOCUMENT DISCLOSURES
## REQUIRED BY THE STATE OF MINNESOTA

The following provisions supplement or modify certain provisions of the Franchise Disclosure Document with respect to franchises offered and sold in the State of Minnesota:

1.      Item 13, Supplemental Disclosure.  Item 13 is supplemented by the following statement:

Pursuant to Minnesota Statues, Section 80C.12, we will protect your right to use the trademarks, service marks, trade names, logotypes or other commercial symbols or indemnify you from any loss, costs or expenses arising out of any claim, suit or demand regarding the use of our name.

2.      Item 17, Supplemental Disclosures.  Item 17 is supplemented by the following statements:

Minnesota Statutes, Section 80C.21 and Minnesota Rule 2860.4400(J) prohibit us from requiring litigation to be conducted outside Minnesota, requiring waiver of a jury trial, or requiring you to consent to liquidated damages, injunctive relief, termination penalties or judgment notes.  In addition, nothing in the Franchise Disclosure Documents or Franchise Agreement can abrogate or reduce any of your rights as provided for in Minnesota Statutes, Chapter 80C, or your rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction.

Minnesota law provides you with certain termination and non-renewal rights. Minnesota Statues, Section 80C.14, Subdivisions 3, 4 and 5 require, except in certain specified cases, that you be given ninety (90) days' notice of termination (with sixty (60) years to cure) and one hundred and eighty (180) days' notice for non-4887-3902-2323.2 renewal of the Franchise Agreement.

No release language set forth in the Franchise Agreement will relieve us or any other person, directly or indirectly, from liability imposed by the Minnesota Franchise Act.

You cannot consent to our obtaining injunctive relief.  We may see injunctive relief.  A court will determine if a bond is required.

3.      Each provision of these additional disclosures shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Minnesota Franchise Investment Law are met independently without reference to these additional disclosures.

**ADDITIONAL FRANCHISE DISCLOSURE DOCUMENT DISCLOSURES
REQUIRED BY THE STATE OF NEW YORK**

The following provisions supplement or modify certain provisions of the Franchise Disclosure Document with respect to franchises offered and sold in the State of New York:

1.      The following is added to the cover page of the Franchise Disclosure Document:

2.      **INFORMATION COMPARING FRANCHISORS IS AVAILABLE. CALL THE STATE ADMINISTRATORS LISTED IN EXHIBIT A OR YOUR PUBLIC LIBRARY FOR RESOURCES OR INFORMATION. REGISTRATION OF THIS FRANCHISE BY NEW YORK STATE DOES NOT MEAN THAT NEW YORK STATE RECOMMENDS IT OR HAS VERIFIED THE INFORMATION IN THIS FRANCHISE DISCLOSURE DOCUMENT. IF YOU LEARN ANYTHING IN THIS FRANCHISE DISCLOSURE DOCUMENT IS UNTRUE, CONTACT THE FEDERAL TRADE COMMISSION AND THE APPROPRIATE STATE OR PROVINCIAL AUTHORITY. THE FRANCHISOR MAY, IF IT CHOOSES, NEGOTIATE WITH YOU ABOUT ITEMS COVERED IN THE FRANCHISE DISCLOSURE DOCUMENT. HOWEVER, THE FRANCHISOR CANNOT USE THE NEGOTIATING PROCESS TO PREVAIL UPON A PROSPECTIVE FRANCHISEE TO ACCEPT TERMS THAT ARE LESS FAVORABLE THAN THOSE SET FORTH IN THIS FRANCHISE DISCLOSURE DOCUMENT.**The following is added at the end of Item 3: Neither we nor any of our predecessors, nor any person identified in item 2 above, nor any affiliate offering franchises under our principal trademark:

A.      Has an administrative, criminal or civil action pending against that person alleging: a felony, a violation of a franchise, antitrust or securities law, fraud, embezzlement, fraudulent conversion, misappropriation of property, unfair or deceptive practices or comparable civil or misdemeanor allegations.

B.      Has been convicted of a felony or pleaded nolo contendere to a felony charge or, within the ten-year period immediately preceding the application for registration, has been convicted of or pleaded nolo contendere to a misdemeanor charge or has been the subject of a civil action alleging a violation of a franchise, antifraud or securities law, fraud, embezzlement, fraudulent conversion or misappropriation of property or unfair or deceptive practices or comparable allegations.

C.      Is subject to a currently effective injunctive or restrictive order or decree relating to the franchise, or under a Federal, State or Canadian franchise, securities, antitrust, trade regulation or trade practice law, resulting from a concluded or pending action or proceeding brought by a public agency or is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities and Exchange Act of 1934, suspending or expelling such person from membership in such association or exchange; or is subject to a currently effective injunctive or restrictive order relating to any other business activity as a result of an action brought by a public agency or department, including without limitation, actions affecting a license as a real estate broker or sales agent.

3.      Item 4 is modified to read as follows:

Neither nor any of our predecessors, affiliates or officers during the 10-year period immediately before the date of the Franchise Disclosure Document; (a) filed as debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code; (b) obtained a discharge of its debts under the bankruptcy code;

**STATE SPECIFIC ADDENDA AND RIDERS TO THE FRANCHISE DISCLOSURE DOCUMENT
EXHIBIT G TO FRANCHISE DISCLOSURE DOCUMENT**

Docusign Envelope ID: EEECDDA2-E407-4D8C-8F2B-5E55B78422C4

or (c) was a principal officer of a company or a general partner in a partnership that either filed as a debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code or that obtained a discharge of its debts under the U.S. Bankruptcy Code during or within 1 year after the officer or general partner of the Franchisor held this position in the company or partnership.

4.      The following is added to the end of the "Summary" sections of Item 17(c), titled "Requirements for a franchisee to renew or extend," and Item 17(m), entitled "Conditions for franchisor approval of transfer":

However, to the extent required by applicable law, all rights you enjoy and any causes of action arising in your favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; this proviso intends that the nonwaiver provisions of General Business Law Sections 687(4) and 687(5) be satisfied.

5.      The following language replaces the "Summary" section of Item 17(d), titled "Termination by a franchisee": "You may terminate the agreement on any grounds available by law."

6.      Items 17(v) and (w), are supplemented by the following statement:

"The foregoing choice of law should not be considered a waiver of any right conferred upon us or upon you by Article 33 of the General Business Law of the State of New York.

7.      Franchise Questionnaires and Acknowledgements--No statement, questionnaire, or acknowledgment signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

8.      Receipts--Any sale made must be in compliance with § 683(8) of the Franchise Sale Act (N.Y. Gen. Bus. L. § 680 et seq.), which describes the time period a Franchise Disclosure Document (offering prospectus) must be provided to a prospective franchisee before a sale may be made. New York law requires a franchisor to provide the Franchise Disclosure Document at the earliest of the first personal meeting, ten (10) business days before the execution of the franchise or other agreement, or the payment of any consideration that relates to the franchise relationship.

**STATE SPECIFIC ADDENDA AND RIDERS TO THE FRANCHISE DISCLOSURE DOCUMENT**
**EXHIBIT G TO FRANCHISE DISCLOSURE DOCUMENT**

**ADDITIONAL FRANCHISE DISCLOSURE DOCUMENT DISCLOSURES
REQUIRED BY THE STATE OF NORTH DAKOTA**

The North Dakota Securities Commission has found certain provisions to be unfair, unjust or inequitable to North Dakota franchisees  The following provisions supersede certain provisions of the Franchise Disclosure Document with respect to franchises offered and sold in the State of North Dakota:

1.      The Franchise Agreement and any Development Agreement will be governed and construed under the laws of the State of North Dakota.  Any provision in the Franchise Agreement or any Development Agreement which designates jurisdiction or venue, or requires you to agree to jurisdiction or venue, in a forum outside of North Dakota, is deleted from the Franchise Agreement or any Development Agreement issued in the State of North Dakota.

2.      Any non-competition covenants contained in the Franchise Agreement or any Development Agreement will be subject to the Section 9-08-06, N.D.C.C.  Covenants not to compete such as those mentioned in the Franchise Agreement or any Development Agreement, as applicable, may be considered unenforceable in the State of North Dakota.

3.      Liquidated damages are prohibited by law in the State of North Dakota.

4.      No release language set forth in the Franchise Agreement or any Development Agreement will relieve us or any other person, directly or indirectly, from liability imposed by the laws of the State of North Dakota.

5.      Any provisions in the Franchise Agreement or any Development Agreement which requires you to waive the right to a jury trial or to exemplary or punitive damages are deleted from the Franchise Agreement and the Development Agreement, if applicable, issued in the State of North Dakota.

6.      Any mediation or arbitration authorized under the Franchise Agreement or any Development Agreement will be held at a site agreeable to all parties.

7.      Any provision in the Franchise Agreement requiring that you pay all costs and expenses incurred by you in enforcing the Franchise Agreement may be unenforceable in the State of North Dakota.  The prevailing party in any enforcement action is entitled to recover all costs and expenses including attorney's fees.

To the extent these additional disclosures are inconsistent with any terms or conditions of the Franchise Agreement or any Development Agreement or any exhibits attached thereto, or the Franchise Disclosure Document, the terms of these additional disclosures will control.

Each provision of these additional disclosures shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the North Dakota law are met independently without reference to these additional disclosures.

**STATE SPECIFIC ADDENDA AND RIDERS TO THE FRANCHISE DISCLOSURE DOCUMENT
EXHIBIT G TO FRANCHISE DISCLOSURE DOCUMENT**

## ADDITIONAL FRANCHISE DISCLOSURE DOCUMENT DISCLOSURES
## REQUIRED BY THE STATE OF RHODE ISLAND

The following provision supplements or modifies certain provisions of the Franchise Disclosure Document with respect to franchises offered and sold in the State of Rhode Island:

Item 17, Supplemental Disclosure.  Items 17 (v) and (w) are supplemented by the following statement:

A provision in the Franchise Agreement restricting jurisdiction or venue to a forum outside Rhoda Island or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under the Rhode Island Franchise Investment Act.

Each provision of these additional disclosures to the Franchise Disclosure Document will be effective only to the extent, with respect to such provisions, that the jurisdictional requirements of the Rhode Island Franchise Investment Act are independently met, without reference to these additional disclosures to the Franchise Disclosure Document.

**STATE SPECIFIC ADDENDA AND RIDERS TO THE FRANCHISE DISCLOSURE DOCUMENT**
**EXHIBIT G TO FRANCHISE DISCLOSURE DOCUMENT**

## ADDITIONAL FRANCHISE DISCLOSURE DOCUMENT DISCLOSURES
## REQUIRED BY THE STATE OF VIRGINIA

The following provision supplements or modifies certain provisions of the Franchise Disclosure Document with respect to franchises offered and sold in the State of Virginia:

<u>Item 17, Supplemental Disclosure.</u>  Item 17 is supplemented by the following statement:

Pursuant to Section 13.1-564 of the Virginia Retail Franchise Ac, it is unlawful for us to cancel a franchise without reasonable cause.  If any ground for default or termination sated in the Franchise Agreement does not constitute "reasonable cause," as that term may be defined in the Virginia Retail Franchise Act or the laws of Virginia, that provision may not be enforceable.

Each provision of these additional disclosures to the Franchise Disclosure Document will be effective only to the extent, with respect to such provisions, that the jurisdictional requirements of the Virginia Retail Franchising Act are independently met, without reference to these additional disclosures to the Franchise Disclosure Document.

**ADDITIONAL FRANCHISE DISCLOSURE DOCUMENT, FRANCHISE AGREEMENT, AND RELATED AGREEMENTS DISCLOSURES**
<u>**REQUIRED BY THE STATE OF WASHINGTON**</u>

The following provisions supplement or modify certain provisions of the Franchise Disclosure Document with respect to franchises offered and sold in the State of Washington:

<u>Item 17, Supplemental Disclosures.</u>  Item 17 is supplemented by the following statements:

Item 17(d) is revised to provide that you may terminate the Franchise Agreement in the event Franchisor materially breaches its obligations under the Franchise Agreement and fails to cure such breach within sixty (60) years after Franchisor's receipt of written notice of such default from Franchisee.

Item 17(r) is revised to provide that the restrictive covenant applies to any business located (i) within the Territory; (ii) at or within a 10-mile radius of your Molly Tea Store, or (iii) within a 10-mile radius of any Molly Tea Store then operating or under construction in the United States or outside the United States.

Item 17(u) is revised to provide that this provision is subject to Washington state law.

RCW 19.100.180 may supersede the Franchise Agreement and your relationship with us, including the areas of termination and renewal of your franchise. There also may be court decisions which may supersede the Franchise Agreement in your relationship with us including the areas of termination and renewal of your franchise.  To the extent the Franchise Agreement offers less protection than Washington law, Washington law will control.

In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW will prevail.

A release and waiver of rights executed by you may not include rights under the Washington Franchise Investment Protection Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel.  Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act or rights or remedies under the Act such as a right to a jury trial may not be enforceable.

Transfer fees are collectable to the extent that they reflect our reasonable estimated or actual costs in effecting a transfer.

In any arbitration or mediation involving a franchise purchased in Washington, the arbitration or mediation will occur either be in the state of Washington, in a place mutually agreed upon by the parties at the time of the arbitration or mediation, or the location required by the arbitrator at the time of the arbitration or mediation.  In addition, if litigation is not precluded by the Agreement, you may bring an action or proceeding arising out of or in connection with the sale of franchises, or a violation of the Washington Franchise Investment Protection Act, in Washington.

Pursuant to RCW 49.62.020, a noncompetition covenant is void and unenforceable against an employee, including an employee of a franchisee, unless the employee's earnings from the party seeking enforcement, when annualized, exceed $100,000 per year (an amount that will be adjusted annually for inflation).  In addition, a noncompetition covenant is void and unenforceable against an independent contractor of a franchisee under RCW 49.62.030 unless the independent contractor's earnings from the party seeking enforcement, when annualized, exceed $250,000 per

**STATE SPECIFIC ADDENDA AND RIDERS TO THE FRANCHISE DISCLOSURE DOCUMENT**
<u>**EXHIBIT G**</u> **TO FRANCHISE DISCLOSURE DOCUMENT**

Docusign Envelope ID: EEECDDA2-E407-4D8C-8F2B-5E55B78422C4

year (an amount that will be adjusted annually for inflation). As a result, any provisions contained in the Franchise Agreement or elsewhere that conflict with these limitations are void and unenforceable in Washington. RCW 49.62.060 prohibits a franchisor from restricting, restraining, or prohibiting a franchisee from (i) soliciting or hiring any employee of a franchisee of the same franchisor or (ii) soliciting or hiring any employee of the franchisor. As a result, any such provisions contained in the Franchise Agreement or elsewhere are void and unenforceable in Washington.

No statement, questionnaire, or acknowledgment signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

Each provision of these additional disclosures will be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Washington Franchise Investment Protection Act, Wash. Rev. Code §§19.100, are met independently without reference to these additional disclosures to the Franchise Disclosure Document.

**STATE SPECIFIC ADDENDA AND RIDERS TO THE FRANCHISE DISCLOSURE DOCUMENT**
**EXHIBIT G TO FRANCHISE DISCLOSURE DOCUMENT**

**ADDITIONAL FRANCHISE DISCLOSURE DOCUMENT DISCLOSURES**
**<u>REQUIRED BY THE STATE OF WISCONSIN</u>**

The following provision supplements or modifies certain provisions of the Franchise Disclosure Document with respect to franchises offered and sold in the State of Wisconsin:

<u>Item 17, Supplemental Disclosure.</u>  Item 17 is supplemented by the following statement:

The conditions under which the Franchise Agreement can be terminated or not renewed may be affected by the Wisconsin Fair Dealership Law, Wisconsin Statutes 1981-82, Title XIV-A, Chapter 135.

Each provision of these additional disclosures to the Franchise Disclosure Document will be effective only to the extent, with respect to such provisions, that the jurisdictional requirements of the Wisconsin Fair Dealership Law are independently met, without reference to these additional disclosures to the Franchise Disclosure Document

# EXHIBIT G-2

## STATE SPECIFIC ADDENDA AND RIDERS TO THE FRANCHISE AGREEMENT

**AMENDMENT TO MOLLYTEA FRANCHISING, LLC
FRANCHISE AGREEMENT
FOR THE STATE OF CALIFORNIA**

The Franchise Agreement between _____ ("Franchisee") and Mollytea Franchising, LLC ("Franchisor") dated _____, 20___ (the "Agreement"), shall be amended and superseded by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

**The registration of this franchise offering by the California Department of Financial Protection and Innovation does not constitute approval, recommendation, or endorsement by the commissioner.**

CALIFORNIA LAW MODIFICATIONS

1.      The California Department of Financial Protection and Innovation requires that certain provisions contained in the franchise documents for franchises offered or sold to either a resident of the State of California or non-resident who will be operating a franchise in the State of California be amended to be consistent with California law, including the California Franchise Investment Law §§ 31000 through 31516, and the California Franchise Relations Act, California Business and Professions Code §§ 20000 through 20043 (collectively the "Acts"). To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended and superseded:

a.      The Acts provide rights to Franchisee concerning non-renewal and termination of the Agreement. The Federal Bankruptcy Code (11 U.S.C. §101 et seq.) also provides rights to Franchisee concerning termination of the Agreement upon certain bankruptcy-related events. To the extent the Agreement contains a provision that is inconsistent with these laws, these laws will control.

b.      If the Franchisee is required in the Agreement to execute a release of claims, such release shall exclude claims arising under the Acts. California Corporations Code 31512 voids a waiver of Franchisee's rights under the Franchise Investment Law (California Corporations Code 31000 through 31516). Business and Professions Code 20010 voids a waiver of Franchisee's rights under the Franchise Relations Act (Business and Professions Code 20000 through 20043.

c.      If the Agreement requires payment of liquidated damages that is inconsistent with California Civil Code Section 1671, the liquidated damage clause may be unenforceable.

d.      If the Agreement contains a covenant not to compete which extend beyond the expiration or termination of the Agreement, the covenant may be unenforceable under California law.

e.      If the Agreement requires litigation, arbitration, or mediation to be conducted in a forum other than the State of California, the requirement may be unenforceable under California law.

f.      If the Agreement requires that it be governed by a state's law, other than the State of California, such requirement may be unenforceable.

2.      The following statement is added to the end of Section 4.1 of the Agreement:

3

Notwithstanding anything to the contrary in this Section 4.1, Franchisor shall defer collection of the initial franchise fee and other initial payments owed by Franchisee to Franchisor and/or its affiliates until such time as the franchise is operational.

3.    No disclaimer, questionnaire, clause, or statement signed by a franchisee in connection with the commencement of the franchise relationship shall be construed or interpreted as waiving any claim of fraud in the inducement, whether common law or statutory, or as disclaiming reliance on or the right to rely upon any statement made or information provided by any franchisor, broker or other person acting on behalf of the franchisor that was a material inducement to a franchisee's investment. This provision supersedes any other or inconsistent term of any document executed in connection with the franchise.

4.    NO STATEMENT, QUESTIONNAIRE, OR ACKNOWLEDGMENT SIGNED OR AGREED TO BY A FRANCHISEE IN CONNECTION WITH THE COMMENCEMENT OF THE FRANCHISE RELATIONSHIP SHALL HAVE THE EFFECT OF (I) WAIVING ANY CLAIMS UNDER ANY APPLICABLE STATE FRANCHISE LAW, INCLUDING FRAUD IN THE INDUCEMENT, OR (II) DISCLAIMING RELIANCE ON ANY STATEMENT MADE BY ANY FRANCHISOR, FRANCHISE SELLER, OR OTHER PERSON ACTING ON BEHALF OF THE FRANCHISOR. THIS PROVISION SUPERSEDES ANY OTHER TERM OF ANY DOCUMENT EXECUTED IN CONNECTION WITH THE FRANCHISE.

IN WITNESS WHEREOF, the Franchisee on behalf or itself and its equity owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound by it. The parties have duly executed and delivered this Amendment to the Agreement on _____, 20____.

FRANCHISEE: _____

BY: _____
NAME: _____
TITLE: _____

Mollytea Franchising, LLC

BY: _____
NAME: _____
TITLE: _____

**AMENDMENT TO MOLLYTEA FRANCHISING, LLC**
**FRANCHISE AGREEMENT**
**FOR THE STATE OF HAWAII**

The Franchise Agreement between_____("Franchisee") and Mollytea Franchising, LLC ("Franchisor") dated_____, 20___(the "Agreement"), shall be amended and superseded by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

HAWAII LAW MODIFICATIONS

The Agreement is amended to include the following:

1.    **INITIAL FRANCHISE FEE**. The following statement is added to the end of Section 4.1 of the Agreement:

Notwithstanding anything to the contrary in this Section 4.1, Franchisor shall defer collection of the initial franchise fee and other initial payments owed by Franchisee to Franchisor and/or its affiliates until such time as the franchise is operational.

2.    NO STATEMENT, QUESTIONNAIRE, OR ACKNOWLEDGMENT SIGNED OR AGREED TO BY A FRANCHISEE IN CONNECTION WITH THE COMMENCEMENT OF THE FRANCHISE RELATIONSHIP SHALL HAVE THE EFFECT OF (I) WAIVING ANY CLAIMS UNDER ANY APPLICABLE STATE FRANCHISE LAW, INCLUDING FRAUD IN THE INDUCEMENT, OR (II) DISCLAIMING RELIANCE ON ANY STATEMENT MADE BY ANY FRANCHISOR, FRANCHISE SELLER, OR OTHER PERSON ACTING ON BEHALF OF THE FRANCHISOR. THIS PROVISION SUPERSEDES ANY OTHER TERM OF ANY DOCUMENT EXECUTED IN CONNECTION WITH THE FRANCHISE.

IN WITNESS WHEREOF, the Franchisee on behalf or itself and its equity owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound by it. The parties have duly executed and delivered this Amendment to the Agreement on__, 20_.

FRANCHISEE: _____

BY:_____

NAME:_____

TITLE: _____


Mollytea Franchising, LLC


BY:_____
NAME:_____
TITLE: _____

5

**AMENDMENT TO MOLLYTEA FRANCHISING, LLC
FRANCHISE AGREEMENT
FOR THE STATE OF ILLINOIS**

The Franchise Agreement between _____ ("Franchisee") and Mollytea Franchising, LLC ("Franchisor") dated _____, 20____ (the "Agreement"), shall be amended and superseded by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

ILLINOIS LAW MODIFICATIONS

1.      Notwithstanding anything to the contrary within the Agreement, Illinois law governs the Agreement.

2.      In accordance with Illinois law 815 ILCS 705/4, any provision in the Franchise Agreement that designates jurisdiction or venue in a forum outside Illinois is void with respect to any action which is otherwise enforceable in Illinois, except that the Franchise Agreement may provide for arbitration outside Illinois. In addition, Illinois law will govern the Franchise Agreement.

3.      In conformance with Section 4 of the Illinois Franchise Disclosure Act, any provision in the Agreement that designates jurisdiction and venue in a form outside of the State of Illinois is void. However, the Agreement may provide for arbitration to take place outside of Illinois.

4.      Franchisee's rights upon termination and non-renewal of the Agreement are set forth in Sections 19 and 20 of the Illinois Franchise Disclosure Act.

5.      In conformance with Section 41 of the Illinois Franchise Disclosure Act, any condition, stipulation or provision purporting to bind any person acquiring a franchise to waive compliance with the Illinois Franchise Disclosure Act or any other law of Illinois is void.

6.      The conditions under which Franchisor may terminate the Agreement may be affected by Illinois law, 815 ILCS 705/19 and 705/20.

7.      The Franchise Agreement provides that if negotiation fails, any dispute between us or claim arising out of or relating to the franchise Agreement or any other franchise related agreement will be arbitrated in New York under Tennessee law, except that we may seek an injunction and other remedies to prohibit infringement of our intellectual property rights disclosure of our confidential information and a breach of non-compete covenants in any court of competent jurisdiction. These provisions to the extent they dictate the location and governing law for occur proceedings are not permitted under the Illinois Franchise Disclosure Act. For Illinois franchisees, all court must be in Illinois under Illinois law.

IN WITNESS WHEREOF, the Franchisee on behalf or itself and its equity owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound by it. The parties have duly executed and delivered this Amendment to the Agreement on _____, 20____.

FRANCHISEE: _____

6

BY: _____

NAME: _____

TITLE: _____


Mollytea Franchising, LLC


BY: _____

NAME: _____

TITLE: _____

**AMENDMENT TO MOLLYTEA FRANCHISING, LLC
FRANCHISE AGREEMENT
FOR THE STATE OF INDIANA**

The Franchise Agreement between _____ ("Franchisee") and Mollytea Franchising, LLC ("Franchisor") dated _____, 20___ (the "Agreement"), shall be amended and superseded by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

<u>INDIANA LAW MODIFICATIONS</u>

1.      The Indiana Securities Commissioner requires that certain provisions contained in the franchise documents offered or sold to either a resident of the State of Indiana or a non-resident who will be operating a franchise in the State of Indiana be amended to be consistent with Indiana law, including the Indiana Deceptive Franchise Practices Law, Indiana Code §§ 23-2-2.7-1 through 23-2-2.7-10, and the Indiana Franchise Disclosure Law, Indiana Code §§ 23-2-2-2.5-1 through 23-2-2-2.5-51 (collectively the "Act"). To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended and superseded.

        a.      The Indiana Deceptive Franchise Practices Act provides rights to Franchisee concerning non-renewal and termination of this Agreement. To the extent the Agreement contains a provision that is inconsistent with the Act, the Act will control.

        b.      If the Franchisee is required in the Agreement to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation or action that would violate this Act, or a role or order under the Act, such release shall exclude claims arising under the Indiana Deceptive Franchise Practices Act and the Indiana Franchises Act, and such acknowledgments shall be void with respect to claims under the Acts.

        c.      If this Agreement contains covenants not to compete upon expiration or termination of the Agreement that are inconsistent with the Indiana Deceptive Franchise Practices Act, the requirements of the Act will control.

        d.      The Indiana Deceptive Franchise Practices Act provides that substantial modification of the Agreement by Franchisor requires written consent of the Franchisee. If the Agreement contains provisions that are inconsistent with this requirement, the Act will control.

        e.      If the Agreement requires litigation to be conducted in a forum other than the State of Indiana, the requirement may be unenforceable as a limitation on litigation under the Indiana Deceptive Franchise Practices Act.

        f.      If the Agreement requires that it be governed by a state's law, other than the State of Indiana, to the extent that such law conflicts with the Indiana Deceptive Franchise Practices Act and the Indiana Franchises Act, the Act will control.

2.      Each provision of the Amendment shall be effective only to the extent that the jurisdictional requirements of the Indiana Deceptive Franchise Practices Act and the Indiana Franchises Act, relating to each such provision, are met independent of this Agreement. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

8

3.      NO STATEMENT, QUESTIONNAIRE, OR ACKNOWLEDGMENT SIGNED OR AGREED TO BY A FRANCHISEE IN CONNECTION WITH THE COMMENCEMENT OF THE FRANCHISE RELATIONSHIP SHALL HAVE THE EFFECT OF (I) WAIVING ANY CLAIMS UNDER ANY APPLICABLE STATE FRANCHISE LAW, INCLUDING FRAUD IN THE INDUCEMENT, OR (II) DISCLAIMING RELIANCE ON ANY STATEMENT MADE BY ANY FRANCHISOR, FRANCHISE SELLER, OR OTHER PERSON ACTING ON BEHALF OF THE FRANCHISOR. THIS PROVISION SUPERSEDES ANY OTHER TERM OF ANY DOCUMENT EXECUTED IN CONNECTION WITH THE FRANCHISE.

IN WITNESS WHEREOF, the Franchisee on behalf or itself and its equity owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound by it. The parties have duly executed and delivered this Amendment to the Agreement on _____, 20____.

FRANCHISEE: _____

BY: _____
NAME: _____
TITLE: _____

Mollytea Franchising, LLC

BY: _____
NAME: _____
TITLE: _____

**AMENDMENT TO MOLLYTEA FRANCHISING, LLC**
**FRANCHISE AGREEMENT**
**FOR THE STATE OF MARYLAND**

The Franchise Agreement between _____ ("Franchisee") and Mollytea Franchising, LLC ("Franchisor") dated _____, 20___ (the "Agreement"), shall be amended and superseded by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

<u>MARYLAND LAW MODIFICATIONS</u>

1.      The Maryland Securities Division requires that certain provisions contained in the franchise documents offered or sold to either a resident of the State of Maryland or a non-resident who will be operating a franchise in the State of Maryland be amended to be consistent with Maryland law, including the Maryland Franchise Registration and Disclosure Law. To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended and superseded.

        a.      The general release required as a condition of renewal, sale and/or assignment/transfer shall not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

        b.      A franchisee may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

2.      Any claims arising under the Maryland Franchisor Registration and Disclosure Law must be brought within three years after the grant of the franchise.

3.      The Franchise Agreement requires prospective franchisees to disclaim the occurrence and/or acknowledgment the non-occurrence of acts that would constitute a violation of Section 14-226 of the Maryland Franchise Registration and Disclosure Law and therefore the Franchise Agreement is hereby amended and superseded to state that such representations are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

4.      Each provision of the Amendment shall be effective only to the extent that the jurisdictional requirements of the Act, relating to each such provision, are met independent of this Agreement. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

5.      The Agreement provides that disputes are resolved through arbitration. A Maryland franchise regulation states that it is an unfair or deceptive practice to require a franchisee to waive its rights to file a lawsuit in Maryland claiming a violation of the Maryland Franchise Law. In light of the Federal Arbitration Act, there is some dispute as to whether this forum selection requirement is legally enforceable.

6.      All representations requiring prospective franchisees to assent to a release, estoppel, or waiver of liability are not intended to nor shall they act as a release, estoppel or waiver of liability incurred under the Maryland Franchise Registration and Disclosure Law.

7.      The following statement is added to the end of Section 4.1 of the Agreement: Based upon the franchisor's financial condition, the Maryland Securities Commissioner has required a financial assurance. Therefore, all initial fees and payments owed by franchisees shall be deferred until the franchisor completes its pre-opening obligations under the franchise agreement and the outlet is opened.

Docusign Envelope ID: EEECDDA2-E407-4D8C-8F2B-5E55B78422C4

1.      NO STATEMENT, QUESTIONNAIRE, OR ACKNOWLEDGMENT SIGNED OR AGREED TO BY A FRANCHISEE IN CONNECTION WITH THE COMMENCEMENT OF THE FRANCHISE RELATIONSHIP SHALL HAVE THE EFFECT OF (I) WAIVING ANY CLAIMS UNDER ANY APPLICABLE STATE FRANCHISE LAW, INCLUDING FRAUD IN THE INDUCEMENT, OR (II) DISCLAIMING RELIANCE ON ANY STATEMENT MADE BY ANY FRANCHISOR, FRANCHISE SELLER, OR OTHER PERSON ACTING ON BEHALF OF THE FRANCHISOR. THIS PROVISION SUPERSEDES ANY OTHER TERM OF ANY DOCUMENT EXECUTED IN CONNECTION WITH THE FRANCHISE.

        IN WITNESS WHEREOF, the Franchisee on behalf or itself and its equity owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound by it. The parties have duly executed and delivered this Amendment to the Agreement on _____, 20____.

FRANCHISEE: _____

BY: _____
NAME: _____
TITLE: _____

Mollytea Franchising, LLC

BY: _____
NAME: _____
TITLE: _____

# AMENDMENT TO MOLLYTEA FRANCHISING, LLC
## FRANCHISE AGREEMENT
## FOR THE STATE OF MINNESOTA

The Franchise Agreement between _____ ("Franchisee") and Mollytea Franchising, LLC ("Franchisor") dated _____, 20___ (the "Agreement"), shall be amended and superseded by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

MINNESOTA LAW MODIFICATIONS

The franchise agreement is amended to include the following:

1.      Minn. Stat. §80C.21 and Minn. Rule 2860.4400J prohibits the Franchisor from requiring litigation to be conducted outside Minnesota. In addition, nothing in the offering circular or agreement can abrogate or reduce any of the Franchisee's rights as provided for in Minnesota Statutes, Chapter 80C, or the Franchisee's rights to any procedure, forum or remedies provided for by the laws of the jurisdiction.

2.      With respect to franchises governed by Minnesota law, the Franchisor will comply with Minn. Stat. Sec. 80C. 14, Subs. 3, 4 and 5 which require, except in certain specified cases, that a franchisee be given ninety (90) days' notice of termination (with sixty (60) days to cure) and one hundred eighty (180) days' notice for non-renewal of the Franchise Agreement.

3.      The agreements contain a liquidated damages clause. Under Minn. Rule 2860.4400J liquidated damage clauses are prohibited.

4.      The Franchisor will protect the Franchisee's right to use the Principal Trademarks and/or indemnify Franchisee from any loss, costs or expenses arising out of any claim, suit or demand regarding the use of the Principal Trademarks.

5.      Minn. Rule 2860.4400D prohibits the Franchisor from requiring the Franchisee to assent to a general release. Any release the Franchisee signs as a condition of renewal or transfer will not apply to any claims you may have under the Minnesota Franchise Law.

6.      For Minnesota franchisees, to the extent the Franchise Agreement requires it to be governed by a state's law other than the State of Minnesota or provides for arbitration or mediation, these provisions shall not in any way abrogate or reduce any rights of the franchisee as provided for in the Minnesota Franchise Act, including the right to submit matters to the jurisdiction of the courts of Minnesota.

7.      Section 80Cl7, Subd. 5. of the Minnesota Franchise Act states that no civil action may be commenced for violation of the Minnesota Franchise Act more than three years after the cause of action accrues. Section 18.3 of the Franchise Agreement contains certain time limits on commencing actions. For Minnesota franchisees, to the extent that these limitations are inconsistent with those under the Minnesota Franchise Act, the provisions of the franchise Agreement are superseded by the Minnesota Franchise Act's requirements and shall have no force or effect.

8.      Notwithstanding anything to the contrary in the Franchise Agreement, Minn. Rule 2860.4400J prohibits the Franchisee's consent to the Franchisor obtaining injunctive relief. Rather, where

injunctive relief is provided for in the Franchise Agreement, the Franchisee acknowledges that the Franchisor <u>may</u> seek injunctive relief. Further, in connection with injunctive relief, Franchisee and Franchisor acknowledge that a court will determine whether a bond is required.

9.      Minn. Stat. §604.113 prohibits the Franchisor from requiring Minnesota franchisees to pay a service charge exceeding thirty dollars ($30.00) per occurrence, for any dishonored check.

10.      The following statement is added to the end of Section 4.1 of the Agreement:

Notwithstanding anything to the contrary in this Section 4.1, Franchisor shall defer collection of the initial franchise fee and other initial payments owed by Franchisee to Franchisor and/or its affiliates until such time as the franchise is operational.

8.      NO STATEMENT, QUESTIONNAIRE, OR ACKNOWLEDGMENT SIGNED OR AGREED TO BY A FRANCHISEE IN CONNECTION WITH THE COMMENCEMENT OF THE FRANCHISE RELATIONSHIP SHALL HAVE THE EFFECT OF (I) WAIVING ANY CLAIMS UNDER ANY APPLICABLE STATE FRANCHISE LAW, INCLUDING FRAUD IN THE INDUCEMENT, OR (II) DISCLAIMING RELIANCE ON ANY STATEMENT MADE BY ANY FRANCHISOR, FRANCHISE SELLER, OR OTHER PERSON ACTING ON BEHALF OF THE FRANCHISOR. THIS PROVISION SUPERSEDES ANY OTHER TERM OF ANY DOCUMENT EXECUTED IN CONNECTION WITH THE FRANCHISE.

IN WITNESS WHEREOF, the Franchisee on behalf or itself and its equity owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound by it. The parties have duly executed and delivered this Amendment to the Agreement on _____, 20____.

FRANCHISEE: _____

BY: _____
NAME: _____
TITLE: _____

Mollytea Franchising, LLC

BY: _____
NAME: _____
TITLE: _____

2

**AMENDMENT TO MOLLYTEA FRANCHISING, LLC**
**FRANCHISE AGREEMENT**
**FOR THE STATE OF NORTH DAKOTA**

The Franchise Agreement between _____ ("Franchisee") and Mollytea Franchising, LLC ("Franchisor") dated _____, 20____ (the "Agreement"), shall be amended and superseded by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

NORTH DAKOTA LAW MODIFICATIONS

The Agreement is amended to include the following:

1.   **RELEASES**. The following is added to the end of Sections 3.2, and 10.3 of the Agreement:

   Any release required as a condition of renewal, sale and/or assignment/transfer will not apply to the extent prohibited by the North Dakota Franchise Investment Law.

2.   **COVENANT NOT TO COMPETE**. The following is added as a new Section 9.8 of the Agreement:

   **9.8.   North Dakota Franchise Law**

   Covenants not to compete such as those mentioned above are generally considered unenforceable in the State of North Dakota; however, we will enforce the covenants to the maximum extent the law allows.

3.   **GOVERNING LAW**. The following statement is added to the end of Section 23.3 of the Agreement:

   Notwithstanding the foregoing, to the extent required by the North Dakota Franchise Investment Law, North Dakota law shall apply.

4.   **CONSENT TO JURISDICTION**. The following language is added to the end of Section 23.4 of the Agreement:

   Notwithstanding the foregoing, to the extent required by the North Dakota Franchise Investment Law, you may bring an action in North Dakota for claims arising under the North Dakota Franchise Investment Law.

5.   **ARBITRATION**. The following is added at the end of Section 23.4 of the Agreement:

   Notwithstanding anything to the contrary herein, the arbitration proceedings shall be conducted in the city where we then have our principal place of business in accordance with the then-current commercial arbitration rules of the AAA, except the parties shall be entitled to limited discovery at the discretion of the arbitrator(s) who may, but are not required to, allow depositions; however, to the extent otherwise required by the North Dakota Franchise Investment Law (unless such a requirement is preempted by the Federal

64

Docusign Envelope ID: EEECDDA2-E407-4D8C-8F2B-5E55B78422C4

Arbitration Act), arbitration proceedings shall be held at a mutually agreeable site in North Dakota.

6. **<u>LIMITATIONS ON LEGAL CLAIMS</u>**. Notwithstanding anything to the contrary in the Agreement, including but not limited to Section 23.5 thereof, nothing in the Agreement shall require a waiver by Franchisee to exemplary or punitive claims. Accordingly, Section 23.5 is deleted in its entirety. Further, any reference to a waiver of exemplary or punitive damages by Franchisee in the Franchise Disclosure Document or any agreement attached to the Agreement is deleted in its entirety.

7. **<u>NO WAIVER OF TRIAL BY JURY</u>**. Notwithstanding anything to the contrary in the Agreement, including but not limited to Section 23.6 thereof, nothing in the Agreement shall require a waiver by Franchisee to a trial by jury. Accordingly, Section 23.6 is deleted in its entirety. Further, any reference to a waiver of a trial by jury in the Franchise Disclosure Document or any agreement attached to the Agreement is deleted in its entirety.

8. **<u>FEE DEFERRAL</u>**. Until such time as all initial obligations have been performed by Franchisor and Franchisee has opened its Franchised Business for business, all initial fees due by Franchisee to Franchisor shall be deferred. Simultaneously upon commencement of the operation of its Franchised Business, Franchisee shall remit payment to Franchisor for all initial fees which have been deferred.

9. NO STATEMENT, QUESTIONNAIRE, OR ACKNOWLEDGMENT SIGNED OR AGREED TO BY A FRANCHISEE IN CONNECTION WITH THE COMMENCEMENT OF THE FRANCHISE RELATIONSHIP SHALL HAVE THE EFFECT OF (I) WAIVING ANY CLAIMS UNDER ANY APPLICABLE STATE FRANCHISE LAW, INCLUDING FRAUD IN THE INDUCEMENT, OR (II) DISCLAIMING RELIANCE ON ANY STATEMENT MADE BY ANY FRANCHISOR, FRANCHISE SELLER, OR OTHER PERSON ACTING ON BEHALF OF THE FRANCHISOR. THIS PROVISION SUPERSEDES ANY OTHER TERM OF ANY DOCUMENT EXECUTED IN CONNECTION WITH THE FRANCHISE.

IN WITNESS WHEREOF, the Franchisee on behalf or itself and its equity owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound by it. The parties have duly executed and delivered this Amendment to the Agreement on _____, 20____.

FRANCHISEE: _____

BY: _____
NAME: _____
TITLE: _____

Mollytea Franchising, LLC

BY: _____
NAME: _____
TITLE: _____

65

# AMENDMENT TO MOLLYTEA FRANCHISING, LLC
# FRANCHISE AGREEMENT
# FOR THE STATE OF RHODE ISLAND

The Franchise Agreement between _____ ("Franchisee")     and Mollytea Franchising, LLC ("Franchisor") dated _____, 20____ (the     "Agreement"), shall be amended and superseded by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

RHODE ISLAND LAW MODIFICATIONS

The Agreement is amended to include the following:

1.  **GOVERNING LAW/CONSENT TO JURISDICTION**. The following statement is added to the end of Article XXIII of the Agreement:

Section 19-28.1-14 of the Rhode Island Franchise Investment Act provides that "A provision in a franchise agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under this Act." To the extent required by applicable law, Rhode Island law will apply to claims arising under the Rhode Island Franchise Investment Act.

2.     NO STATEMENT, QUESTIONNAIRE, OR ACKNOWLEDGMENT SIGNED OR AGREED TO BY A FRANCHISEE IN CONNECTION WITH THE COMMENCEMENT OF THE FRANCHISE RELATIONSHIP SHALL HAVE THE EFFECT OF (I) WAIVING ANY CLAIMS UNDER ANY APPLICABLE STATE FRANCHISE LAW, INCLUDING FRAUD IN THE INDUCEMENT, OR (II) DISCLAIMING RELIANCE ON ANY STATEMENT MADE BY ANY FRANCHISOR, FRANCHISE SELLER, OR OTHER PERSON ACTING ON BEHALF OF THE FRANCHISOR. THIS PROVISION SUPERSEDES ANY OTHER TERM OF ANY DOCUMENT EXECUTED IN CONNECTION WITH THE FRANCHISE.

IN WITNESS WHEREOF, the Franchisee on behalf or itself and its equity owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound by it. The parties have duly executed and delivered this Amendment to the Agreement on _____, 20____.

FRANCHISEE: _____

BY: _____
NAME: _____
TITLE: _____


Mollytea Franchising, LLC


BY: _____
NAME: _____
TITLE: _____

66

**AMENDMENT TO MOLLYTEA FRANCHISING, LLC**
**FRANCHISE AGREEMENT**
**FOR THE STATE OF VIRGINIA**

The Franchise Agreement between _____ ("Franchisee") and Mollytea Franchising, LLC ("Franchisor") dated _____, 20____ (the "Agreement"), shall be amended and superseded by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

VIRGINIA LAW MODIFICATIONS
The Agreement is amended to include the following:

NO STATEMENT, QUESTIONNAIRE, OR ACKNOWLEDGMENT SIGNED OR AGREED TO BY A FRANCHISEE IN CONNECTION WITH THE COMMENCEMENT OF THE FRANCHISE RELATIONSHIP SHALL HAVE THE EFFECT OF (I) WAIVING ANY CLAIMS UNDER ANY APPLICABLE STATE FRANCHISE LAW, INCLUDING FRAUD IN THE INDUCEMENT, OR (II) DISCLAIMING RELIANCE ON ANY STATEMENT MADE BY ANY FRANCHISOR, FRANCHISE SELLER, OR OTHER PERSON ACTING ON BEHALF OF THE FRANCHISOR. THIS PROVISION SUPERSEDES ANY OTHER TERM OF ANY DOCUMENT EXECUTED IN CONNECTION WITH THE FRANCHISE.

IN WITNESS WHEREOF, the Franchisee on behalf or itself and its equity owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound by it. The parties have duly executed and delivered this Amendment to the Agreement on _____, 20____.

FRANCHISEE: _____

BY: _____
NAME: _____
TITLE: _____

Mollytea Franchising, LLC

BY: _____
NAME: _____
TITLE: _____

67

**ATTACHMENT A**

**STATE ADMINISTRATORS**

California
Department of Financial Protection and
Innovation
320 West 4th Street, Suite 750
Los Angeles, California 90013
866-275-2677 - Toll Free

Hawaii
Commissioner of Securities of the State of
Hawaii
Business Registration Division
Department of Commerce and Consumer
Affairs
Securities Compliance Branch
335 Merchant Street, Room 203
Honolulu, Hawaii 96813
808-586-2722

Illinois
Office of the Attorney General
Franchise Bureau
500 South Second Street
Springfield, Illinois 62706
217-782-4465

Indiana
Secretary of State
Franchise Section, Securities Division
302 West Washington, Room E-111
Indianapolis, Indiana 46204
317-232-6681

Maryland
Office of the Attorney General
Securities Division
200 St. Paul Place
Baltimore, Maryland 21202-2020
410-576-6360

Michigan
Department of the Attorney General's Office
Consumer Protection Division, Franchise Unit
670 G. Mennen Williams Building, 1st Floor
525 West Ottawa Street
Lansing, Michigan 49807
517-373-1837

Minnesota
Commissioner of Commerce
Department of Commerce
85 7th Place East, Suite 500
St. Paul, Minnesota 55101-2198
651-296-4026

Nebraska
Department of Banking and Finance
1200 N. Street, Suite 311
P.O. Box 95006
Lincoln, Nebraska 68509-5006

New York
New York Department of Law
Investor Protection Bureau
28 Liberty Street, 21st Floor
New York, New York 10005
212-416-8222

North Dakota
Franchise Examiner
North Dakota Securities Department
600 East Boulevard, State Capitol,
Fifth Floor, Dept. 414
Bismarck, North Dakota 58505-0510
701-328-4712

Oregon
Administrator
Division of Finance and Corporate Securities
350 Winter Street, N.E., Room 21
Salem, Oregon 97310
503-378-4387

Rhode Island
Securities Division
Department of Business Regulation
1511 Pontiac Avenue - Building 69-1
Cranston, Rhode Island 02920
401-462-9585

South Dakota
Franchise Administrator
Department of Labor and Regulation
Director of Division of Securities
1245 Euclid, Suite 104
Pierre, South Dakota 57501-2017
605-773-4823

Texas
Statutory Document Section
Secretary of State
P.O. Box 12887
Austin, Texas 78711

Utah
State of Utah, Division of Consumer Protection
160 East Three Hundred South
Salt Lake City, Utah 84145-0811
801-530-6601

Virginia
State Corporation Commission
Division of Securities and Retail Franchising
1300 East Main Street, 9th Floor
Richmond, Virginia 23219
804-371-9051

Washington
Securities Division
Department of Financial Institutions
P. O. Box 41200
Olympia, Washington 98504-1200
360-902-8760

Wisconsin
Franchise Administration
Division of Securities
Department of Financial Institutions
345 West Washington Avenue
Madison, Wisconsin 53703
608-266-3364

STATE ADMINISTRATORS
ATTACHMENT A TO FRANCHISE DISCLOSURE DOCUMENT

**ATTACHMENT B**

**AGENTS FOR SERVICE OF PROCESS**

California

Commissioner of Department of Financial
Protection and Innovation
320 West 4th Street, Suite 750
Los Angeles, California 90013-2344

Illinois

Illinois Attorney General
500 South Second Street
Springfield, Illinois 62706

Maryland

Maryland Securities Commissioner
Office of the Attorney General
Securities Division
200 St. Paul Place
Baltimore, Maryland 21202-2020

Minnesota

Commissioner of Commerce
85 7th Place East, Suite 500
St. Paul, Minnesota 55101

Hawaii

Commissioner of Securities
Department of Commerce and Consumer Affairs
Business Registration Division
335 Merchant Street, Room 203
Honolulu, Hawaii 96813

Indiana

Indiana Secretary of State
201 State House
200 West Washington Street
Indianapolis, Indiana 46204

Michigan

Michigan Department of Commerce
Corporations and Securities Bureau
6170 Law Building
Lansing, Michigan 48913

New York

Secretary of State
99 Washington Avenue
Albany, NY 12231
(518) 473-2492

Oregon

Director
Department of Consumer and Business Services
Division of Finance and Corporate Securities
Labor and Industries Building
Salem, Oregon 97310

North Dakota

Securities Commissioner
North Dakota Securities Department
600 East Boulevard, State Capitol,
Fifth Floor, Dept. 414
Bismarck, North Dakota 58505-0510

South Dakota

Department of Labor and Regulation
Director of Division of Securities
124 S. Euclid, Suite 104
Pierre, South Dakota 57501-2017

Rhode Island

Director of Department of Business Regulation
233 Richmond Street, Suite 232
Providence, Rhode Island 02903-4232

Virginia

Clerk, State Corporation Commission
Division of Securities and Retail Franchising
1300 East Main Street, 1st Floor
Richmond, Virginia 23219

Washington

Securities Division
Department of Financial Institutions
150 Israel Road, S.W.
Tumwater, Washington 98501

Wisconsin

Commissioner of Securities
345 West Washington Avenue, 4th Floor
Madison, Wisconsin 53703

AGENTS FOR SERVICE OF PROCESS
ATTACHMENT B TO FRANCHISE DISCLOSURE DOCUMENT

**EXHIBIT I**

**STATE EFFECTIVE DATES**

       The following states require that the Franchise Disclosure Document be registered or filed with the state or be exempt from registration of franchises are being offered in that state:  California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington and Wisconsin.

       This Disclosure Document is registered or on file with, or exempt from registration in, the following applicable states with franchise registration and disclosure laws:

| State | Effective Date |
|---|---|
| California | |
| Hawaii | |
| Illinois | |
| Indiana | |
| Maryland | |
| Michigan | |
| Minnesota | |
| New York | January 14, 2026 |
| North Dakota | |
| Rhode Island | |
| South Dakota | |
| Virginia | |
| Washington | |
| Wisconsin | |

Other states may require registration, filing or exemption of a franchise under other laws, such as those that regulate the offer and sale of business opportunities or seller assisted marketing plans.

**EXHIBIT J**

**RECEIPTS**

**RECEIPT**

**[RETAIN THIS COPY FOR YOUR RECORDS]**

**RECEIPT**

This Disclosure Document summarizes certain provisions of the franchise agreement and other information in plain language.  Read this Disclosure Document and all agreements carefully.

If we offer you a franchise, we must provide this Disclosure Document to you 14 calendar days before you sign a binding agreement with, or make a payment to, us or an affiliate in connection with the proposed franchise sale, or sooner if required by applicable state law.

**New York and Rhode Island laws require us to provide this Disclosure Document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.**

**Michigan and Washington require that we give you this Disclosure Document at least 10 business days before the execution of any binding franchise or any other agreement or the payment of any consideration, which occurs first.**

If we do not deliver this Disclosure Document on time or if it contains a false or misleading statement or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the applicable state agency listed in Exhibit G.

Issuance Date: July 15, 2025.

The franchise seller(s) for this offering is/are (check all that apply):

☐       Xiao Jie, MOLLYTEA Franchising LLC, 6 Kilmer Road, Suite B, Edison, New Jersey 08817. Its telephone number is (347) 561-4066.

☐       Other (Specify name, company, address and telephone number): _____
_____

MOLLYTEA Franchising LLC authorizes the respective state agencies identified on Exhibit G to receive service of process for it in that particular state.

I received a Disclosure Document dated July 15, 2025, that included the following Exhibits:

Exhibits

A.   Franchise Agreement (with Guaranty and Undertaking of Obligations, State Addendum to Franchise Agreements and Exhibits)
B.   Multi-Unit Development Agreement and State Addendum to Multi-Unit Development Agreement
C.   Operating Manual Table of Contents
D.   Form of General Release
E.   Financial Statements
F.   List of Current Franchisees
G.   State Administrators
G-1 State Specific Addenda to the FDD
G-2 State Specific Addenda to the Franchise Agreement
H.   Agents for Service of Process
I.   State Effective Dates
J.   This Receipt

**RECEIPT**

Date:       January 14, 2026

Franchisee:       MOLLY TEA MANHATTAN CHINATOWN INC.

By: _____

Title: _____

[Please keep this Receipt for your records]

**RECEIPT**

**RECEIPT**

This Disclosure Document summarizes certain provisions of the franchise agreement and other information in plain language.  Read this Disclosure Document and all agreements carefully.

If we offer you a franchise, we must provide this Disclosure Document to you 14 calendar days before you sign a binding agreement with, or make a payment to, us or an affiliate in connection with the proposed franchise sale, or sooner if required by applicable state law.

**New York and Rhode Island laws require us to provide this Disclosure Document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.**

**Michigan and Washington require that we give you this Disclosure Document at least 10 business days before the execution of any binding franchise or any other agreement or the payment of any consideration, which occurs first.**

If we do not deliver this Disclosure Document on time or if it contains a false or misleading statement or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the applicable state agency listed in Exhibit G.

Issuance Date: July 15, 2025.

The franchise seller(s) for this offering is/are (check all that apply):

☐    Xiao Jie, MOLLYTEA Franchising LLC, 6 Kilmer Road, Suite B, Edison, New Jersey 08817. Its telephone number is (347) 561-4066.

☐      Other (Specify name, company, address and telephone number):  _____

_____

MOLLYTEA Franchising LLC authorizes the respective state agencies identified on Exhibit G to receive service of process for it in that particular state.

I received a Disclosure Document dated July 15, 2025, that included the following Exhibits:

Exhibits

A.  Franchise Agreement (with Guaranty and Undertaking of Obligations, State Addendum to Franchise Agreements and Exhibits)
B.  Multi-Unit Development Agreement and State Addendum to Multi-Unit Development Agreement
C.  Operating Manual Table of Contents
D.  Form of General Release
E.  Financial Statements
F.  List of Current Franchisees
G.  State Administrators
G-1 State Specific Addenda to the FDD
G-2 State Specific Addenda to the Franchise Agreement
H.  Agents for Service of Process
I.   State Effective Dates
J.  This Receipt

**RECEIPT – [RETURN THIS COPY TO US]**

Docusign Envelope ID: EEECDDA2-E407-4D8C-8F2B-5E55B78422C4

Date:            January 14, 2026
Franchisee:      MOLLY TEA MANHATTAN CHINATOWN INC.
By:
Title:

You may return the signed receipt either by signing, dating and mailing it to Xiao Jie, 6 Kilmer Road, Suite B, Edison, New Jersey 08817 or by scanning and e-mailing a copy of the signed and dated Receipt to MollyTeausa@MollyTea.com.

RECEIPT – [RETURN THIS COPY TO US]