# LAW OFFICES OF CHEN & ASSOCIATES, P.C.

## COUNSELORS & ATTORNEYS AT LAW

**Queens Office**
**37-12 Prince Street, Suite 9D**
**Flushing, New York 11354**
**Tel: (718)886-1858/4858**
**Fax: (800) 490-0564**

**\*\* Yimin Chen**
**mindy@ymclaw.com**
**\*Binyue Xiao**
**brianna@ymclaw.com**
**\*Haizhan Zheng**
**allanzheng@ymclaw.com**

**Brooklyn Office**
**6402 8th Avenue, Suite 604**
**Brooklyn, NY 11220**
**Tel: (347) 899-4777**
**Fax: (800) 490-0564**
**www.ymclaw.com**

**Beini Zhang**
**betty@ymclaw.com**

**\*Admitted in NY**
**\*\*Admitted in NY&NJ**

*Please direct all correspondence to our Queens Office*

June 1, 2026

VIA ECF
**Hon. John P. Cronan**
United States District Court
Southern District of New York
500 Pearl Street, Room 1320
New York, New York 10007-1312

Re:     ***SHENZHEN MOLLY TEA FOOD AND BEVARAGE MANAGEMENT CO. LTD., et al. v. MHL NY LLC, et al.*** (Case No.: 1:26-cv-04051-JPC)
*__Defendants' Supplemental Letter Brief in Response to Plaintiffs' Opposition Letter Brief dated May 26, 2026 and in Further Opposition to Plaintiffs' Application for Preliminary Injunction and Temporary Restraining Order Based upon the May 27, 2026 Hearing__*

Dear Judge Cronan:

Please accept this letter brief in lieu of a more formal submission of Defendants' supplemental brief in response to Plaintiffs' Opposition Letter Brief dated May 27, 2026 and in further opposition to Plaintiffs' application for preliminary injunction and temporary restraining order. To the extent the Court determines that additional pleadings are required before considering Defendants' request for affirmative injunctive relief, Defendants respectfully request leave to file an Answer and Counterclaims.

1

For the reasons discussed below, Plaintiffs' motion for preliminary injunction and temporary restraining order should be denied in its entirety.

**FACTS AND PROCEDURAL HISTORY**

The Parties executed a Brand Authorization and Technical Services Cooperation Agreement ("Cooperation Agreement") in late December 2023, authorizing Defendant MHL NY LLC to Use Plaintiffs' Molly Tea brand and intellectual property in New York City for not more than five stores, from December 20, 2023 to December 20, 2026. Notably, at that point, Plaintiffs had no Molly Tea store in New York market and thus the Parties agreed to expand Molly Tea's brand in New York by and through their cooperation.

In order to expand Molly Tea's brand awareness and influence, Defendants, with Plaintiffs' express or implied authorization and approval, established and continuously operated various social media account, including but not limited the Instagram accounts @mollyteamood and @ mollyteany, the RedNote account "茉莉奶白纽约 MollyTea NYC," and the website mollyteany.com. Since April 2024, three Molly Tea stores in New York City have been established and operating successfully as a result of Defendants' enormous investment and efforts and Plaintiffs' technical supports and cooperation. In late 2025, Defendants, by and through Xiaozhe Liu, provided Plaintiffs with potential locations for Columbia University area and Long Island City area. In January 2026, Plaintiffs, by and through their president Biao Zhang personally visited the proposed store locations. After Plaintiff's visitation of the proposed store locations, Defendants subsequently proceeded the lease execution and store establishments for CU Store and LIC Store with Plaintiffs' express or implied approval.

The Parties worked closely to expand Molly Tea's brand in New York market until Plaintiffs completed the franchise registration in New York State in January 2026 and coercively

demanded Defendant MHL NY LLC to sign the Franchise Agreement to surrender its ownership interest in the joint venture entities for Molly Tea New York Stores in late March 2026. Molly Tea deliberately imposed a deadline of April 15, 2026 for Defendants to sign the Franchise Agreement, surrendered their ownership interest in Joint Venture entities, transfer the lease agreement for CU Store and LIC Store to Plaintiffs, and give up their control over the New York Molly Tea Stores, by threatening to withheld technical support, suspended logistics and block Defendants' access to Molly Tea's system in late March and early April 2026. Plaintiffs, by and through April 2, 2026 Notice Letter, put their own threats into practice, by restricting or discontinuing product supply, removing Defendants' personnel from operational communication channels, terminating access to training resources, discontinuing operational support, restricting access to marketing materials, interfering with Defendants' access to business platforms, and seeking control over social media and other business assets. See Doc. No. 53-12.

Defendants had no other choice but commenced an action for, inter alia, breach of contract, breach of good faith and fair dealing, breach of fiduciary duty and other claims against Plaintiffs and other Molly Tea's affiliates and/or subsidiaries in the Supreme Court of State of New York, County of Queens ("State Action") on or about April 16, 2026. Defendants also demand Plaintiff Molly Tea to restore the supplies and other technical support for New York Store's normal operations, by submitting an order to show cause for injunctive relief, which was opposed by Plaintiffs in the State Action and is still pending.

Plaintiffs failed to raise any counterclaims or cross-application in the State Action, but subsequently deliberately and abusively issued a Termination Notice dated May 1, 2026 in bad faith. Plaintiffs thereafter brought this action on May 15, 2026, against Defendants for alleged trademark infringement, unfair competition and breach of the Contract. Plaintiffs further submitted their own application for preliminary injunction and temporary restraining order on or

about May 18, 2026, seeking an order enjoining Defendants from using Plaintiffs' Molly Tea

intellectual property in the New York Stores operation and social media platform, transfer to

Plaintiffs all administrative access, ownership rights and control over the social media accounts.

However, as Defendants fully responded in the Declaration of Mei Hui Lin, the facts alleged

by Plaintiffs were misleading and unsupported. However, as Defendants fully responded in the

Declaration of Mei Hui Lin, the facts alleged by Plaintiffs were misleading and unsupported. The

timeline of the Parties' cooperation since 2024 and the alleged minor non-compliance

demonstrate Plaintiffs' effort to obtain ownership, management, and operational control over the

successful Molly Tea Stores in New York City.

The chronology of the parties' relationship, franchise-conversion dispute, suspension notices,

state-court litigation, termination notice, and commencement of this action is summarized in the

Franchise Conversion Timeline attached as Exhibit "A".


**ARGUMENT**

**I.**     **PLAINTIFFS ACTIVELY PARTICIPATED IN THE DEVELOPMENT OF THE COLUMBIA UNIVERSITY AND LONG ISLAND CITY LOCATIONS**

Plaintiffs' current characterization of the Columbia University Store ("CU Store") and

Long Island City location ("LIC Store") as "unauthorized" is inconsistent with Plaintiffs' own

conduct over many months.

Both locations were developed during the term of the Brand Authorization and Technical

Services Cooperation Agreement as part of the parties' agreed five-store New York development

plan. Plaintiffs were informed of the proposed locations, personally visited the locations,

participated in lease-related discussions, reviewed development plans, provided design

specifications, supplied store fixtures and branded materials, provided training resources, and participated in opening preparations. See Mei Hui Lin Decl. ¶¶ 16-18, 55-57, Doc. No. 53-1.

With respect to the CU Store, Plaintiffs' representatives personally visited the location, reviewed development plans, approved store design elements, arranged production of branded fixtures and signage, and participated in grand-opening preparations. In addition, Plaintiff Molly Tea Holding Inc. executed a Good-Guy Guaranty relating to the Columbia lease, further demonstrating Plaintiffs' knowledge of and participation in the project. See Mei Hui Lin Decl. ¶ 18; See Columbia Good-Guy Guaranty, Ex. D. Plaintiffs further worked with Defendants to develop Columbia-specific promotional materials, including commemorative opening merchandise. See Doc. No. 53-7.

Defendants invested substantial capital and completed development activities in reliance upon Plaintiffs' continued participation and approval. Prior to March 2026, Plaintiffs never objected to the CU Store, never demanded that development cease, and never advised Defendants that the project lacked authorization.

These facts sharply distinguish this case from situations where a franchisee opens a location after explicit rejection by the franchisor.

## II.  PLAINTIFFS' OWN MARCH 30, 2026 COLUMBIA LLC AGREEMENT CONFIRMS PLAINTIFFS EXPECTED AND APPROVED THE OPENING OF THE COLUMBIA STORE

On March 30, 2026, Plaintiffs transmitted to Defendants a draft Limited Liability Company Agreement prepared by Plaintiffs' headquarters specifically for the Columbia University store. See Ex. B (March 30, 2026 transmittal email); Ex. C (Columbia LLC Agreement).

The draft agreement identifies:

• "Mollytea Columbia";

• 2857 Broadway, New York, New York;

• an opening date of April 15, 2026;

• a proposed ownership structure under which Molly Tea Holding Inc. would own 70% and MHL NY LLC would own 30%;

• Biao Zhang as Manager;

• and a requirement that the Columbia lease be transferred into the newly formed entity.

The agreement was transmitted by Plaintiffs only two days before Plaintiffs issued the April 2 suspension notice. See Ex. B.

Plaintiffs' preparation and transmission of a detailed ownership agreement for the Columbia store is fundamentally inconsistent with Plaintiffs' present contention that the Columbia store was unauthorized. Significantly, the March 30, 2026 LLC Agreement was prepared after Plaintiffs completed franchise registration and after Plaintiffs allegedly knew all facts concerning the Columbia project. Nevertheless, Plaintiffs drafted an agreement identifying the Columbia location, proposing a detailed ownership structure, and anticipating an April 15, 2026 opening date.

Plaintiffs' conduct concerning the Columbia location was not limited to preparation of the March 30, 2026 LLC Agreement. Plaintiff Molly Tea Holding Inc. also executed a Good-Guy Guaranty relating to the Columbia lease. See Ex. D. Plaintiffs have never explained why a Plaintiff entity would guarantee obligations associated with a location that Plaintiffs allegedly considered unauthorized. Plaintiffs' March 30, 2026 transmission of a Columbia-specific LLC Agreement demonstrates that, as of March 30, 2026, Plaintiffs were not attempting to stop the Columbia Store from opening. Rather, Plaintiffs were attempting to dictate the ownership

structure under which the Columbia Store would open. The agreement expressly identified the Columbia location, contemplated an April 15, 2026 opening date, proposed a revised ownership structure, designated Biao Zhang as manager, and required transfer of the lease into a new entity. Plaintiffs' conduct is fundamentally inconsistent with their present contention that the Columbia Store was an unauthorized operation. At minimum, these facts create substantial factual disputes concerning authorization, acquiescence, waiver, course of performance, and the parties' understanding regarding the Columbia project, precluding the extraordinary injunctive relief Plaintiffs seek.

III.     **THE DISPUTE AROSE ONLY AFTER PLAINTIFFS DEMANDED OWNERSHIP TRANSFERS, LEASE TRANSFERS, AND EXECUTION OF NEW FRANCHISE AGREEMENTS**

The record demonstrates that Plaintiffs did not begin characterizing Defendants' conduct as unauthorized until after Plaintiffs demanded that Defendants execute new franchise agreements, surrender majority ownership positions in existing joint venture entities, transfer lease interests, and relinquish operational control of the New York business. See Ex. A; March 27 Notice, Doc. No. 53-9; March 30 Franchise Agreement Email, Doc. No. 53-10; March 31 Voice Message Transcript, Doc. No. 53-11; April 1 Headquarters Email, Doc. No. 53-8.

The March 27, March 30, March 31, and April 2 communications—including Plaintiffs' March 30 transmittal of the Columbia LLC Agreement—demonstrate that Plaintiffs' primary concern was Defendants' refusal to execute the proposed franchise structure. See Ex. B; Ex. C; Doc. Nos. 53-9, 53-10, 53-11, 53-12.

The chronology therefore demonstrates that this case arises from a dispute concerning ownership, governance, franchise conversion, and operational control, rather than a traditional trademark infringement dispute involving an unrelated third-party infringer. The chronology is particularly significant because Plaintiffs' March 30, 2026 transmission of the Columbia LLC Agreement occurred after Plaintiffs had completed franchise registration and after Plaintiffs allegedly possessed all facts now cited to characterize the Columbia Store as unauthorized. Nevertheless, Plaintiffs continued to prepare ownership documents for the Columbia location and contemplated its imminent opening. Only after Defendants refused to execute the proposed franchise structure and ownership-transfer arrangements did Plaintiffs begin characterizing the Columbia project as unauthorized and infringing. This sequence strongly suggests that the dispute concerns franchise conversion, ownership restructuring, and operational control—not the discovery of an unauthorized trademark user. At minimum, Plaintiffs' own conduct creates substantial factual disputes regarding authorization, acquiescence, and course of performance that cannot be resolved on the present record.

## IV.    THE VALIDITY OF PLAINTIFFS' TERMINATION NOTICE IS IN DISPUTE

As Defendants argued in the Opposition papers, Plaintiffs' purported Termination Notice is subject to substantial factual and legal dispute as Plaintiffs' conduct was not a good faith business decision, but a coordinated and intentional effort to weaponize their control over supply chain, systems, and branding to force Defendants into surrendering their contractual and ownership rights.

The Termination Notice dated May 1, 2026 lists Plaintiffs' grounds for termination as: (i) refusal to communicate with Shenzhen Molly Tea and breakdown of the cooperative relationship; (ii) failure to provide accurate and timely financial statements or permit audit and

inspection; (iii) unauthorized opening and operation of a Molly Tea branded store at 2857 Broadway, New York, New York ("CU Store"); (iv) Operation of a competing or related business through Genesis Brand Management LLC; and (v) Brand harm and quality-control failures at authorized stores.

In the Declaration of Mei Hui Lin, Defendants clearly responded to these false or misleading grounds for termination. Defendants have always been communicating with Plaintiffs in order to address any disputes between the Parties in good faith and to protect the both Parties' interest in the New York Molly Tea Stores, as evidenced by multiple exhibits. Defendants also sworn that prior to March 2026, Defendants had consistently provided the monthly financial statements as required by Plaintiffs. As to the alleged unauthorized opening and operation CU Store and LIC Store, Defendants have reasonably believed they were authorized as fully discussed in the above subpart II of Arguments. Regarding the last grounds, Defendants have always complied with Plaintiff's quality standards by purchasing the raw materials and inventory from Plaintiffs' designated supplier. In the Declaration of Mei Hui Lin, Defendants also responded to other alleged deficiencies or breaches in the Complaint.

Defendants respectively note the Court that even Plaintiffs alleged these grounds for termination and other minor non-compliance for Defendants' breach of contract in the Complaint to support their preliminary injunction and claims, Plaintiffs failed to provide any documents except Plaintiffs' self-serving affidavit to support their allegations. Plaintiffs primarily rely upon declarations from interested witnesses and did not submit LLC agreements, shareholder agreements, ownership-transfer documents, inspection reports, audit demands, cure notices, or other contemporaneous records supporting the alleged defaults. See Plaintiffs' TRO submissions generally. For example, there is no audit or inspection notice issued by Plaintiffs to Defendants.

Similarly, there is no default and cure notice about Defendants' quality-control listing the details of Defendants' deficiencies and demanding Defendants to cure within reasonable time period.

Contrary to these alleged non-compliance, Defendants' multiple exhibits demonstrate that the core intention of Plaintiffs is only to force Defendants to sign the Franchise Agreements. For example, the March 27, 2026 Notice indicates that if Defendants' New York Molly Tea Stores failed to complete the signing of legal agreements necessary for store operations by April 15, 2026, Beijing Time, the Stores will be indefinitely closed. See Doc. No. 53-9. Clearly, the alleged legal agreements mentioned in this notice are Franchise Agreements, which would fundamentally alter Defendants' ownership interest in the joint entities from 80.1% to 30%. See Ex. C; Doc. No. 53-8. Two days later, Plaintiffs sent an email dated March 30, 2026 to Defendants, demanding Defendants to sign the FDD and then sign the Franchise Agreements within 14 days after the execution of FDD receipt. See Doc. No. 53-10. One day later, Plaintiffs, by and through Yiding Sun, sent an voice message to Defendants, demanding Defendants to sign the FDD receipt and Franchise Agreement and to transfer the lease agreement and Barclays Center Sponsorship Agreement, in the avoidance of the Plaintiffs' interference with the CU Store's opening scheduled in mid-April 2026. See Doc. No. 53-11. The April 2, 2026 Notice also indicates that the Plaintiffs made the decision to suspend the operation of Defendants' Stores because Defendants failed to sign the Franchise Agreement. See Doc. No. 53-12. Plaintiffs only made conclusory allegations about quality standard issues, but never issued any default and cure notice with specific quality issues that Plaintiffs observed and demanded Defendants to cure. The record demonstrates that the central dispute between the Parties concerns Plaintiffs' demand that Defendants execute the Franchise Agreement and surrender ownership, lease, and operational rights. Apparently, the nature of this dispute arises from the Parties' contractual, ownership, and operational-control relationships, rather than a trademark infringement matter under Lanham

10

Act. However, signing the Franchise Agreement is not a contractual obligation of Defendants under any and all Agreements executed by the parties.

Thus, Plaintiffs' Termination Notice should be void on the ground that Plaintiffs' conduct was not a good faith business decision, but a coordinated and intentional effort to weaponize their control over supply chain, systems, and branding to force Defendants into surrendering their contractual and ownership rights.

Defendants have raised a substantial question concerning the alleged infringement in this case, which warrants a denial of the Plaintiffs' application for injunctive relief. *GeigTech East Bay LLC v. Lutron Electronics Co., Inc.*, 2018 WL 4360792 (S.D.N.Y. 2018); *Giantceutical, Inc. v. Ken Mable, Inc.*, 356 F.Supp.2d 374 (S.D.N.Y. 2005).

## V.    AT MINIMUM, THE RECORD ESTABLISHES SERIOUS QUESTIONS GOING TO THE MERITS AND PRECLUDES THE EXTRAORDINARY RELIEF PLAINTIFFS SEEK

### A.    Serious Factual Disputes Concerning Authorization, Termination, Ownership, and Control

Regardless of whether the Court reaches Defendants' request for affirmative injunctive relief at this stage, the present record demonstrates substantial factual disputes that preclude the extraordinary relief sought by Plaintiffs.

First, Defendants have raised substantial questions concerning whether Plaintiffs validly terminated the Brand Authorization and Technical Services Cooperation Agreement. Defendants contend that the purported termination arose not from trademark concerns or quality-control issues, but from Defendants' refusal to execute new franchise agreements, transfer lease interests, and surrender ownership and operational control of the New York Molly Tea business.

11

Second, Defendants have presented evidence that Plaintiffs actively participated in and approved the development of the Columbia University and Long Island City locations. See Ex. C; Ex. D; Doc. Nos. 53-7 and 53-8. Plaintiffs visited the locations, participated in development discussions, provided design specifications and operational guidance, arranged production of branded materials and fixtures, assisted with opening preparations, and never objected to the projects until after the parties' franchise-related dispute arose. Most notably, Plaintiffs themselves prepared and transmitted a Columbia-specific LLC Agreement identifying the location, anticipated opening date, ownership structure, and lease-transfer requirements for the Columbia Store, further demonstrating that Plaintiffs expected the store to open and were negotiating control of the project rather than objecting to its existence.

Third, Plaintiffs seek relief that would substantially alter, rather than preserve, the status quo. Plaintiffs request transfer of social-media accounts, administrative credentials, operational access, and control over business assets developed and maintained by Defendants over a multi-year period. Such relief would effectively grant Plaintiffs a significant portion of the ultimate relief sought in this action before discovery and before the Court resolves the parties' competing factual contentions.

At minimum, the present record demonstrates serious questions concerning authorization, termination, ownership, and control of the New York Molly Tea operations. Those disputes cannot be resolved on the limited record presently before the Court and weigh strongly against issuance of the extraordinary injunctive relief requested by Plaintiffs.

To the extent the Court concludes that formal counterclaims are required before considering Defendants' request for affirmative injunctive relief, Defendants respectfully request leave to file their Answer and Counterclaims within a time period set by the Court.

**B. Plaintiffs Seek Mandatory Relief That Would Alter, Rather Than Preserve, The Status Quo**

Plaintiffs do not merely seek to preserve the status quo.

Instead, Plaintiffs seek mandatory relief requiring transfer of social-media accounts, administrative credentials, operational access, and control over ongoing business assets.

Such relief would alter rather than preserve the status quo and would effectively grant Plaintiffs substantial portions of their ultimate requested relief before discovery has occurred and before the factual disputes concerning authorization, ownership, and termination have been resolved. This is particularly significant where the parties dispute not only trademark rights, but also ownership, management, and control of operating businesses, leases, digital assets, and customer-facing platforms developed over several years. At minimum, these unresolved disputes weigh strongly against issuance of extraordinary mandatory injunctive relief at the TRO stage.

**C. Defendants Respectfully Request Leave to Assert Counterclaims If Necessary**

To the extent the Court concludes that formal counterclaims are required before considering Defendants' request for affirmative injunctive relief, Defendants respectfully request leave to file their Answer and Counterclaims within a schedule established by the Court. Defendants submit that the factual disputes discussed above independently require denial of Plaintiffs' request for extraordinary injunctive relief.

**VI.    THE CASE LAWS CITED BY PLAINTIFFS IN SUPPORT OF THEIR INJUNCTIVE RELIEF ARE INCONSISTENT WITH THE FACTS OF THIS ACTION**

13

During the May 27, 2026 Hearing, Plaintiffs substantially relied upon two case laws, i.e., *Singas* and Dunkin' Donuts, in support their application for preliminary injunction and temporary restraining order. However, these two actions are not similar with the facts of this action.

In *Singas*, Plaintiffs first approved for an opening of Plaintiff's franchisee pizza restaurant by Defendants on Avenue C. Plaintiffs disapproved Defendant's to operate as Plaintiffs' franchisee at a Jackson Height location. Despite Plaintiffs' rejection, Defendants proceeded to open a competing pizza restaurant under other name at the Jackson Height location. Plaintiffs discovered the Jackson Heights restaurant and observed multiple indicia of a connection to its franchisee: shared employees (a former Plaintiffs' employee making pizza), use of custom-made pizza pans from the authorized franchisee pizza restaurant, and nearly identical menus (same design, colors, fonts, coupons, and calorie information—the latter not legally required for a single operation). After sending cease-and-desist letters that went unheeded, Plaintiffs terminated the franchise agreement on the ground of Defendants' breach of non-compete covenant. *Singas Famous Pizza Brands Corp. v. New York Advertising LLC*, 2011 WL 497978 (S.D.N.Y. 2011). In *Singas*, Plaintiffs, on November 1, 2010, became aware of Defendants' competing restaurant was about to open on November 4, 2010. *Id*. However, here, Plaintiffs had been aware of Defendants' plan to open the CU Store in mid-April 2026 since January 2026. Despite Defendant Genesis Brand Management LLC executed the concession agreement for LIC Store, the LIC Store was authorized by the Plaintiffs because after reviewing the location, Plaintiffs continued to participate in discussions regarding the development of the LIC store, including site-related considerations, store planning, design, construction, equipment requirements, and operational matters. Moreover, the LIC location has not yet opened and remained in the development stage.

In *Dunkin' Donuts*, Plaintiffs and Defendants entered into Franchise and Lease Agreements, authorizing Defendants to operate Dunkin' franchise shops. From May to June 2001, Plaintiffs inspected Defendants' shops and found numerous deficiencies for health and/or safety violations. Plaintiffs served Defendants with Notice of Default and Notice to Cure with details, demanding Defendants to cure the deficiencies. After Plaintiffs' re-inspection, the deficiencies remained. Thus, Plaintiffs terminated the Franchise Agreement based upon Defendants' uncured defaults for safety and health standards. *Dunkin' Donuts Inc. v. Northern Queens Bakery, Inc.*, 216 F.Supp.2d 31 (E.D.N.Y. 2001). However, here, Plaintiffs never issue a notice of default and notice to cure to Defendants, demanding the exact deficiencies that need to be cured within a reasonable time period. Plaintiffs, here, only made conclusory allegations that Defendants failed to meet the quality standards without providing specific details. More importantly, prior to the franchise agreement dispute that erupted in March 2026, Plaintiffs never claimed or asserted that Defendants had committed any material breach or non-compliance with the Cooperation Agreement.

Thus, both *Singas* and *Dunkin' Donuts* cannot support Plaintiffs' application for injunctive relief.

## VII.    SUBSTANTIAL BOND SHOULD BE PROVIDED BY PLAINTIFFS IF THE COURT GRANTS PLAINTIFFS' INJUNCTIVE RELIEF AS THE MONTHLY GROSS REVENUE LOSS OF DEFENDANTS EXCEEDS $1.2 MILLION

Due to the significant disputes regarding the facts between the Parties and the injunction would cause harm to the public interest, Plaintiffs should be required to provide sufficient bond and/or security if the Court may grant the injunctive relief in favor of Plaintiffs.

The summer is coming and Defendants' Stores monthly gross revenue is expected to exceed $1.2 Million. Defendants currently employ approximately 110 employees across the New York

15

locations and incur substantial payroll obligations each month. Further, Defendants remain responsible for substantial lease obligations for multiple locations. Certain leases are guaranteed by individual Defendants and/or entities affiliated with the parties, including guarantees executed in connection with the Columbia location. Defendants financed significant portions of their business investments through loans and financing arrangements secured by personal assets. Certain obligations are secured by real property owned by Defendants. If Defendants are unable to continue operating the stores and generating revenue, Defendants may be unable to satisfy these obligations, creating a risk of foreclosure and loss of personal assets. In addition, Defendants would suffer loss of goodwill, customer relationships, trained employees, business opportunities, and pre-opening investment in each New York Molly Tea Store. These investments include, but are not limited to: lease deposits and lease-related costs; architectural and engineering expenses; store design and construction planning costs; custom storefront signage; custom display cabinets and fixtures; custom flooring, tiles, furniture, and décor; equipment purchases and installation costs; ingredients, packaging materials, and inventory purchases; employee recruitment and training expenses; marketing and grand opening preparation costs; professional fees, permits, and licensing expenses.

Defendants' Stores only have been selling Molly Tea's products with Molly Tea's raw materials, packaging, equipment and other supports provided by Plaintiffs for past years. There is nothing sold or any other business done by Defendants which do not involve some intellectual property of Plaintiffs. If the Court may grant the injunctive relief in favor of Plaintiffs, Defendants' business would be shut down and destroyed indefinitely and Defendants would be liable for significant financial loss and may lose their own real property.

"The party against whom a preliminary injunction is sought has the burden of establishing the amount of a bond necessary to secure against the wrongful issuance of the injunction." *Elite*

*Licensing, Inc. v. Thomas Plastics, Inc.*, 250 F. Supp. 2d 372, 391 (S.D.N.Y. 2003). If the Court may grant the injunction and/or temporary restraining order sought by Plaintiffs, Plaintiffs should be required to provide security and/or bond in the amount not less than $1.2 Million pending the strength and length of the restraining.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for preliminary injunction and temporary restraining order in its entirety and permit Defendants sufficient time to submit their answer and counterclaims if the Court found that it is necessary to consider Defendants' cross application for preliminary injunction and temporary restraining order. At minimum, the substantial factual disputes concerning authorization, ownership, termination, and operational control require denial of Plaintiffs' request for extraordinary injunctive relief.

Dated: June 1, 2026

Respectfully submitted,
LAW OFFICES OF CHEN & ASSOCIATES, P.C.

 /s/ Yimin Chen
Yimin Chen, Esq.
37-12 Prince Street, Suite 9D
Flushing, New York 11354
Tel: (718)886-4858
*Counsel for Defendants MHL NY LLC, Molly Tea CU LLC, Genesis Brand Management LLC, Mei Hui Lin, Xiaozhe Liu and Binbin Xu*