## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHENZHEN MOLLY TEA FOOD AND BEVERAGE MANAGEMENT CO., LTD., MOLLYTEA SHOPS LLC, and MOLLY TEA HOLDING INC.<br><br>        Plaintiffs,<br><br>and<br><br>MOLLYTEA SHOPS LLC, derivatively on behalf of MOLLY TEA NYC INC., MOLLY TEA BK INC., and MOLLY TEA MANHATTAN CHINATOWN INC.,<br><br>Plaintiffs,<br><br>        v.<br><br>MHL NY LLC, MOLLY TEA CU LLC, GENESIS BRAND MANAGEMENT LLC, MEI HUI LIN, XIAOZHE LIU a/k/a ZIAOZHE LIU, and BINBIN XU,<br><br>Defendants,<br><br>and<br><br>MOLLY TEA NYC INC., MOLLY TEA BK INC., and MOLLY TEA MANHATTAN CHINATOWN INC.,<br>Nominal Defendants. | Case No. 1:26-cv-04051 (JPC) |

## DECLARATION OF MEI HUI LIN IN SUPPORT OF DEFENDANTS' MOTION FOR RECONSIDERATION

I, Mei Hui Lin, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am a defendant in this action. I submit this declaration in support of Defendants' motion for reconsideration of the Court's preliminary injunction.

2. I am the owner of MHL NY LLC. I was also the sole owner of Molly Tea NYC Inc. at the time the first MOLLY TEA store opened in Flushing, New York and at the time of the first U.S. use date identified in Plaintiffs' U.S. trademark filings. See Ex1 (Molly Tea NYC Inc) and Ex 2 (A true and correct copy of US Trademark Application SN 98360430).

3. On or about December 20, 2023, MHL NY LLC and Shenzhen Molly Tea Food and Beverage Management Co., Ltd. entered into the Molly Tea Brand Licensing and Technical Services Cooperation Contract. Dkt. 11-2.

4. Molly Tea NYC Inc. was not a party to the December 2023 agreement.

5. No separate trademark license agreement was ever executed between Shenzhen Molly Tea and MHL NY LLC, Molly Tea NYC Inc., or any other New York operating entity. I am not aware of any such agreement, and no such agreement has been produced to me.

6. When the Flushing store project began, Shenzhen Molly Tea did not instruct me to use any particular legal entity for the New York business. Shenzhen Molly Tea did not direct what entity should hold the lease, operate the store, employ personnel, maintain bank accounts, obtain permits, or conduct day-to-day operations.

7. Defendants independently formed Molly Tea NYC Inc. for the purpose of developing and operating the Flushing store. Molly Tea NYC Inc. held the lease, opened bank accounts, hired employees, obtained permits and licenses, entered into vendor and service-provider

agreements, and conducted the day-to-day business operations of the Flushing store. Ex. 3 (Lease for 37-11C Prince Street, Flushing, listing Molly Tea NYC Inc. as Tenant).

8. Shenzhen Molly Tea was aware that the Flushing store was being developed and operated through Molly Tea NYC Inc. Shenzhen Molly Tea never objected to the use of Molly Tea NYC Inc. as the operating entity for the Flushing store.

9. Shenzhen Molly Tea received financial reports and business information relating to Molly Tea NYC Inc. and continued to conduct business with Defendants through Molly Tea NYC Inc. and other New York operating entities.

10. Shenzhen Molly Tea later prepared or circulated joint venture, shareholder, franchise, and FDD-related documents that referred to the New York operating entities, including Molly Tea NYC Inc.

11. The same general structure was used for other New York stores. Defendants independently formed or used separate U.S. operating entities, including Molly Tea BK Inc. and Molly Tea Manhattan Chinatown Inc., for the Brooklyn and Chinatown stores. Shenzhen Molly Tea was aware of those entities and did not object to the use of those entities before the disputes between the parties arose.

12. Throughout the development and operation of the New York business, Shenzhen Molly Tea communicated with, accepted reports from, and conducted business through Molly Tea NYC Inc. and the other New York operating entities. At no time before the parties' dispute arose did Shenzhen Molly Tea direct Defendants to cease using those entities or require that the stores be transferred to any different operating entity.

13. When Defendants began operating in New York, there were no MOLLY TEA stores operating in the United States, and the MOLLY TEA name had no established consumer recognition in the United States to my knowledge.

14. Defendants identified store locations, negotiated leases, funded store development, supervised buildouts, hired employees, established banking relationships, obtained permits, and opened the first MOLLY TEA store in the United States.

15. Defendants were responsible for day-to-day operation of the New York stores, including employee management, training, scheduling, inventory control, supplier relationships, logistics, customer service, and store operations.

16. Shenzhen Molly Tea never provided any written SOPs or manuals for customer service so all customer experience was handled by Defendants.

17. Defendants received customer feedback in three main ways: third party delivery platform (for example: Uber, DoorDash, HungryPanda), in store feedback to employees and management, and social media interaction (for example: Instagram, Rednotes, Google, Yelp).

18. With regard to the delivery platforms, Shenzhen Molly Tea never provided any direct feedback to customers on those platforms. Those accounts were created by Defendants and we personally monitored and responded to all posts when the accounts were first active and only later transferred that responsibility to our internal management team.

19. With regard to the instore feedback from customers we received, Shenzhen Molly Tea never provided any direct feedback to customers in our stores. All instore customer experience was handled by our employees and our internal management team.

20. With regard to the social media, Shenzhen Molly Tea never provided any feedback to customers on the U.S. Molly Tea social media.  Those accounts were created by Defendants and we personally monitored and responded to all posts when the accounts were first active and only later transferred that responsibility to our internal management team.  Attached as Exhibit 4 is a true and correct screenshot of the Instagram account that Defendants managed on behalf of the New York Molly Tea business.

21. Defendants also managed several WeChat group chats for U.S. customers to be able to talk directly with the management team.  The day-to-day management, customer communication, customer support, promotional activities, and community engagement were all handled by Defendants and the local New York operations team. Shenzhen Molly Tea did not directly interact with customers in those groups or participate in the day-to-day management of those customer communities. We estimate that there were approximately 24 WeChat groups with a combined membership of approximately 6,000 users.

22. Defendants have a long track record of experience in the food and service business and relied extensively on their own experience and background to ensure a high customer experience and satisfaction and to ensure consistent control over the flavor of the tea. For example, Defendants implemented additional quality-management procedures beyond those provided by Shenzhen Molly Tea that required all beverages on the menu be tasted three times each day—during the morning, afternoon, and evening shifts—to verify product consistency, flavor, and overall quality.  Shenzhen Molly Tea never provided any SOP or manual or guidance requiring the tasting of the products. Defendants also implemented a system for monitoring the temperature of the storage areas of the

products.  Temperature and humidity were closely monitored so that the flavor of the tea was consistent.  Shenzhen Molly Tea never provided any SOP or manual or guidance for monitoring the temperature and humidity of the storage rooms to control the flavor of the tea.

23. Defendants also implemented different and more stringent quality control standards then what was recommended by Shenzhen Molly Tea.  For example, Shenzhen Molly Tea recommended changing the filter of the tea machines every 3 months but Defendants implemented a system of changing the filters every 15-20 days depending on volume.  Defendants did this because we noticed that we needed increased quality control standards to maintain the quality of the tea taste.  Another example is that we learned through our experience that the tea tasted different after a heavy rain so we implemented our own policy of changing the filter after every heavy rain to control consistent flavor to our own standards.

24. We also developed our own internal testing protocol and testing team that was not specified by Shenzhen Molly Tea.  We hired and trained our own internal special team of testers and created a protocol for them to inspect each of our stores.  Those protocols were based on Defendants long experience in the food and beverage business.  As a result of our work, we are proud to say that all of our stores were always awarded a grade of A by the NY health inspectors.

25. We also developed our own system for ensuring that our stores maintained a consistent customer experience.  That system was again based on our own experience and required each store to take share photos of several areas of the store with our management team before they were allowed to open the store each day.  Again, these systems for consistent

customer experience were not based anything we received from Shenzhen Molly Tea but were based on our experience in the industry.

26. Defendants developed the original menu presentation and pricing structure for the New York market and made operational, marketing, and branding decisions regarding how the MOLLY TEA business would be presented to U.S. consumers.

27. For example, Defendants created the menu for the US market and decided to focus primarily on the Fresh Milk Tea products to market to the US customer base. Defendants also independently created the English names for the products sold in the stores. Defendants personally conducted market research and then decided on the English names for the products without input from Shenzhen Molly Tea. Specifically, Defendants created the names: Premium Jasmine Milk Tea, White Champaca Milk Tea, Snowy Jasmine, Snowy Golden Peony, Snowy Gardenia, and Snowy Dancong.

28. Defendants managed local supply-chain operations, warehousing, delivery coordination, customs clearance, and relationships with suppliers and service providers necessary to support the New York business.

29. Defendants created and managed the social-media accounts used to promote the New York MOLLY TEA business, including Instagram and RedNote accounts. Shenzhen Molly Tea never provided any SOP or manual or guidance for collecting information on actual customers in the store but Defendants created a system for monitoring and recording customer profiles that physically visited the store so they could target their marketing and advertising to those specific customers.

30. Defendants also invented and implemented novel marketing campaigns to launch the Molly Tea brand in the U.S. For example, we created a campaign launch for a pre-sale

combo that attracted thousands of customers to our stores on the first days of our launch. Shenzhen Molly Tea never provided any input on the novel marketing strategize implemented by Defendants. Defendants were also the first milk tea product to invest in the NBA and sponsor marketing and advertising at the Barclay Center and to develop collaborative merchandise with the Brooklyn Nets.

31. Defendants funded and executed local advertising campaigns, influencer partnerships, promotional events, community outreach initiatives, sponsorships, and brand collaborations for the New York stores.

32. Through the efforts and expenditures of the New York team, the stores accumulated more than 10,000 customer reviews and ratings across platforms including Google Business Profiles, Yelp, Uber Eats, DoorDash, and other platforms.

33. Through the efforts and expenditures of the New York team, the New York MOLLY TEA business accumulated more than 18,000 followers across Instagram and RedNote.

34. Defendants also developed customer membership databases, loyalty programs, repeat-customer relationships, influencer relationships, sponsorship relationships, local marketing partnerships, delivery-platform reputations, and community engagement programs.

35. Defendants invested substantial time, labor, and financial resources in developing the reputation, consumer recognition, online presence, customer relationships, and commercial success associated with the MOLLY TEA name in New York.

36. In addition to day-to-day management responsibilities, Defendants implemented and maintained significant quality-control procedures for the New York stores. The New York team independently monitored customer feedback and complaints, addressed

quality issues, managed employee training and supervision, conducted regular product testing and tastings, maintained store presentation standards, and developed operational procedures designed to ensure consistent customer experiences. Although Plaintiffs provided recipes, operating procedures, and brand standards, the day-to-day implementation, monitoring, and enforcement of quality standards in the New York stores was performed by the New York team. The customer experience associated with the New York stores—including product quality, customer service, cleanliness, employee performance, and responsiveness to customer concerns—depended upon the day-to-day management performed by the New York team.

37. In my experience, customers returned to the New York stores because of the quality of the products, the consistency of the customer experience, and the relationships developed with our employees and management team. Those aspects of the business depended upon the day-to-day operation and quality-management practices implemented by Defendants.

38. I was not involved in preparing or filing Plaintiffs' U.S. trademark applications for the MOLLY TEA mark.

39. The photos shown in those U.S. trademark applications are photos of Defendants' New York MOLLY TEA business.  Exhibit 2 (excerpts from TM Application 98360430) shows photos of the Flushing store which was operated by Molly Tea NYC Inc., that I solely owned at that time and a photo of our Brooklyn store which was also owned solely by Defendants.   Exhibit 5 (excerpts from TM Application 99379782) shows photos from the Flushing store and Defendants Chinatown store. At the time of those photos, Plaintiffs had no ownership interest in either the Flushing or Chinatown stores.

40. Before the applications were filed, Plaintiffs did not inform me that they intended to rely on the New York stores or the use generated by Molly Tea NYC Inc. as the basis for claiming U.S. trademark rights.

41. I did not consent to Plaintiffs claiming exclusive ownership of U.S. trademark rights or goodwill arising from the operation of the New York stores.

42. I never signed any agreement acknowledging that goodwill generated through the operation of Molly Tea NYC Inc. or the other New York operating entities belonged exclusively to Shenzhen Molly Tea.

43. To my knowledge, before this dispute arose, no one from Shenzhen Molly Tea ever informed me that the goodwill generated through operation of the New York stores belonged exclusively to Shenzhen Molly Tea or that Defendants' use of the MOLLY TEA name would automatically inure to Shenzhen Molly Tea's benefit.

44. In or about January 2026, Plaintiffs provided Defendants with proposed franchise documents, including a Franchise Disclosure Document and proposed Franchise Agreement.

45. The proposed franchise documents contained provisions addressing ownership of goodwill and stating that goodwill associated with use of the system and intellectual property would inure to the benefit of the franchisor. See Dkt. 53-5.

46. Defendants did not execute the proposed franchise documents.

47. Before Plaintiffs proposed the franchise documents, I had not executed any agreement containing the same or similar goodwill-inurement language for the New York business.

48. After Defendants did not execute the proposed franchise documents, Plaintiffs issued notices challenging Defendants' continued operation of the New York stores. Dkt. 11-8.

49. To my knowledge, before this dispute arose, Plaintiffs did not require Defendants to transfer the New York store operations to a different entity, did not require Defendants to change the corporate structure, and did not object to Defendants' use of the separately formed U.S. operating entities.

50. The social-media accounts, delivery-platform accounts, customer reviews, platform reputations, customer relationships, loyalty programs, and other digital and customer-facing assets associated with the New York stores were developed through the work, expenditures, and management of the New York team. These assets were developed over several years through Defendants' expenditures, marketing efforts, customer interactions, and daily operation of the New York business.

51. In my experience operating the New York business, the value of the social-media accounts, customer-review platforms, loyalty programs, and customer databases depends significantly on the continuity of those accounts and the customer relationships associated with them. If those assets are transferred, modified, merged into other operations, or used under a different management structure, it may be difficult or impossible to restore them to their prior condition.

52. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 28, 2026.

_____  6.28.26.

Mei Hui Lin