

**Joseph DiPietro**
Office: (212) 803-9025
Direct: (212) 803-9041
joseph@bfklawoffice.com
780 Third Avenue, Suite 902
New York, New York 10017

July 1, 2026

<u>Via ECF and E-Mail</u>
Hon. John P. Cronan
United States District Court
Southern District of New York
500 Pearl Street, Room 1320
New York, New York 10007-1312
CronanNYSDChambers@nysd.uscourts.gov

> Re:    ***Shenzhen Molly Tea Food and Beverage Management Co., Ltd. et al. v. MHL NY LLC et al.*; Case No. 1:26-cv-04051-JPC**

Dear Judge Cronan:

We represent the Plaintiffs in the above action. We respectfully submit this letter, pursuant to the Court's June 23, 2026 directive, in support of the Plaintiffs' motions (ECF Nos. 63, 69) for an order of civil contempt against all Defendants. For the reasons set forth below, Plaintiffs respectfully request that the Court issue such order and impose the sanctions described herein.[1]

On June 8, 2026, via written Order (ECF No. 62), the Court immediately enjoined Defendants and their agents from utilizing the Molly Tea name, trademarks, trade dress, and trade secrets and Plaintiffs' intellectual property in any way, including by operating or permitting the operation of the three Joint Venture Stores and the Columbia Store, to the extent they make use of same. At the hearing, the Court inquired of Defendants' counsel as to her understanding of the scope of the injunction so as to specifically avoid any possibility of contempt. Unfortunately, such inquiry was unavailing.

The evidence of Defendants' contempt, which is characterized by three distinct species, is clear. First, it is uncontroverted and, indeed, conceded that Defendants continued fully utilizing the Molly Tea trademarks in totality for at least several days after the issuance of the injunction and subsequently in part. Simply put, Defendants utterly ignored the Court's order until the Plaintiffs moved for contempt and, thereafter, took belated and ultimately deficient steps to incrementally cure their blatant violations, as the Plaintiffs laid bare the evidence of their contempt

---

[1] The Plaintiffs hereby incorporate by reference their June 10, 2026 letter motion for contempt with exhibits annexed thereto (ECF Nos. 63 – 63-9), their June 12, 2026 renewed letter motion for contempt with exhibits annexed thereto (ECF Nos. 69 – 69-12), their June 16, 2026 attorneys' fees and costs declaration with exhibits annexed thereto (ECF Nos. 77 – 77-5) , their June 19, 2026 supplemental memorandum with exhibits annexed thereto (ECF Nos. 80 – 80-6), and their arguments proffered and evidence adduced at the June 11, 2026 contempt conference, the June 17, 2026 contempt hearing, the June 22, 2026 continued contempt hearing, and the June 23, 2026 continued contempt hearing.

over the course of the two-week proceedings.  Second, Defendants have made only half-hearted and apparently deliberately slow efforts to turn over social media and e-commerce accounts to Plaintiffs—a process that, even now, is still not complete.  Third, Defendants have engaged in a scheme to circumvent and avoid the express purposes of the injunction by continuing to operate their stores under the Plaintiffs' marks, while making only marginal attempts to comply, instead of temporarily closing and reopening as genuinely independent stores.  Each of these contumacious actions is addressed seriatim.

"[T]o demonstrate contempt, 'a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner.'"  *In re Markus*, 78 F.4th 554, 566 (2d Cir. 2023) (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)).  "To be clear and unambiguous, an order must enable the party enjoined to ascertain from the four corners of the order precisely which acts are forbidden." *In re Eletson Holdings Inc.*, No. 25-CV-1312 (LJL), 2025 WL 2710411, at *22 (S.D.N.Y. Sept. 22, 2025) (internal quotations omitted).

### A.      Defendants Used the Plaintiffs' Trademarks After the Injunction Issued.

First, Defendants' continued use of the Plaintiffs' trademarks, in direct violation of the injunction, is uncontroverted.  As articulated in the Plaintiffs' June 10, 2026 letter motion for contempt (ECF No. 63), as of June 9, 2026, Defendants had apparently made no efforts to comply with the injunction and, instead, continued operating the Flushing, Chinatown, Brooklyn, and Columbia Stores precisely as they had before the issuance of the injunction.

Specifically, as photographed at 4:37 p.m. on June 9, the Flushing Store continued to serve numerous customers, while prominently displaying and illuminating the Molly Tea name and accompanying trade dress on the store's exterior.  (*See* Ex. 2 to June 10 Contempt Motion, ECF No. 63-2.)  The Flushing Store also fulfilled an order for Molly Tea's proprietary "Premium Jasmine Milk Tea" and continued issuing product stickers clearly bearing the Molly Tea name. (*See* Ex. 3 to June 10 Contempt Motion, ECF No. 63-3.)  Defendants' violations continued further. As described in the Plaintiffs' June 10 letter, at approximately 2:30 p.m. on June 10, employees at each Joint Venture Store and the Columbia Store explicitly confirmed that each location was a Molly Tea store, confirmed their respective addresses as matching those identified in section 1(c) of the injunction, and confirmed that the stores were open and able to fulfill bulk orders, even further underscoring that the stores were still utilizing Plaintiffs' inventory.  For example, when clearly asked "Is this Molly Tea?" store employees replied "Yes, how can I help you?" (*see* Ex. 1 at 00:15-00:24) or "Yeah, yeah, yeah" (*see* Ex. 2 at 00:10-00:15).  True and accurate recordings of those calls are annexed hereto as **Exhibits 1 through 4**.[2]

Moreover, Defendants' disregard of the injunction is exhibited by their continued operation of the Molly Tea social media accounts, which prominently and extensively displayed the Molly Tea name and trademarks.  As of approximately 3:00 p.m. on June 10, Defendants' website

---

[2] The undersigned is unable to upload such recordings via ECF and, therefore, attaches them to the e-mail by which this letter is submitted to the Court, with Defendants' counsel copied.

mollyteany.com, RedNote account "茉莉奶白纽约 MollyTea NYC," and Instagram accounts @mollyteamood and @mollyteany, all of which are specifically identified in the Order, remained in operation and visible to the public, extensively bearing the Molly Tea name and trademarks. Indeed, @mollyteany, which promotes the Columbia Store, and which the Order requires to be transferred to Plaintiffs, even made a public post displaying the Molly Tea name and dress on June 9, the day after the Order was entered. Further, as of the same time, the DoorDash account for the Chinatown Store remained visible to the public and available for ordering. (*See* Exs. 5-9 to June 10 Contempt Motion, ECF Nos. 63-5 – 63-9).

Even now, Defendants' meager efforts toward compliance continue to violate the injunction. Ample, uncontroverted evidence establishes that, as of this submission, Defendants continue to partially display the Molly Tea tradename, utilizing Plaintiffs' unique font. (*See* June 17, 2026 Hearing Pltf. Ex. 1; June 12 Contempt Motion Exs. 1-2, 4-7, 12, ECF Nos. 69-1 – 69-2, 69-4 – 69-7, 69-12.) Plaintiffs' federally registered trademarks (*see* Ex. 1 to Corrected Verified Compl., ECF No. 11-1) clearly depict the distinct typeface and formatting that the Molly Tea tradename utilizes and which consumers associate with Plaintiffs' brand. Hence, Defendants' marginal efforts to simply cover the word "Molly" but leave the stylized word "Tea" that, in the most literal sense, was an integral part of the trademark "Molly Tea" and which continues to bear identical styling of the full Molly Tea trademark, fall far short of complying with the injunction.

Put simply, the continuing use of the stylized word "Tea" is continued utilization of Plaintiffs' trademarks. It is well-established that "'[a]n identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning.'" *DJ Direct, Inc. v. Margaliot*, 512 F. Supp.3d 396, 408 (E.D.N.Y. 2021) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992)). "'Inherent distinctiveness is assessed on a continuum from least to most distinctive, with the aid of categories usually called (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful, with marks in the last category considered the strongest.'" *Id*. (quoting *Car-Freshner Corp. v. Am. Covers, Inc.*, 980 F.3d 314, 329 (2d Cir. 2020)).

The term "Molly Tea" is depicted in a distinctive typeface as reflected in Plaintiffs' federal trademark registrations. (Exhibit 1 to Corrected Verified Compl., ECF 11-1.) The stylized typeface is a protected, integral element of the registered marks themselves. Consumers reasonably associate that stylized typeface with the Molly Tea brand. The Molly Tea trademark is "arbitrary" and "fanciful" and, thereby, is the strongest variety of a trademark entitled to protection under the Lanham Act. Indeed, Defendants' conduct here is not merely analogous to a "reverse passing off" violation of the Lanham Act; it is textbook "reverse passing off:" when "A sells B's product under A's name." *DJ Direct*, 512 F. Supp.3d at 414. Following the issuance of the injunction, Defendants continued to sell Molly Tea products, made from Molly Tea recipes, using Molly Tea ingredients and its menu, at stores physically outfitted as Molly Tea locations, with only a piece of wood obscuring the word "Molly" while retaining the stylized "Tea" element in its identical registered typeface with the original sign that had been installed when the stores were first opened as "Molly Tea" stores. In *DJ Direct*, the defendant covered the plaintiff's trademark with their own mark. The court held that the covering up of the plaintiff's trademark was "likely to cause confusion as to the source" of the plaintiff's product. So, too, here is

Defendants' partial covering-up of the Molly Tea trademark causing significant consumer confusion as to the source of the products sold at those locations.

The evidentiary record establishes that the Molly Tea products were being sold after the injunction issued. At the June 22 and June 23 hearings, Wen Duo Gao testified, without contradiction, that the products sold at the "? Tea Stores," which opened following a mere hours-long turnover from a Molly Tea store, are the same as previously sold under the Molly Tea store. For example, the names of products at Defendants' stores remained the same or substantially the same as Molly Tea products, including Molly Tea's "Premium Jasmine Milk Tea," "Matcha Jasmine Salted Cheese," and "Pistachio Jasmine Coconut" (*see* June 22, 2026 Hearing Pltf. Exs. 7B, 7C, 7D, 8), and the products depicted on the Defendants' Uber Eats account were identical to Molly Tea products, aside from a changed logo. (*See, e.g.*, June 22, 2026 Hearing Tr. 147:12-17.)

That is because Defendants were using the exact same ingredients, the exact same equipment, and the exact same formulae to prepare the drinks. There simply was not adequate time to prepare new products, using new recipes and equipment, as the time between placing an order for Molly Tea inventory and receipt of that inventory is two months. (*See* June 22, 2026 Hearing Tr. 149:8-11.) Defendants' counsel also implicitly confirmed that Molly Tea products were being sold at some point, stating at the June 22 hearing, "We use different ingredients now." (*See* June 22, 2026 Hearing Tr. 118:2-5.)

This concession is critical: it confirms that until Defendants switched—and counsel offered no date for that switch—Defendants were using the same Molly Tea ingredients that Plaintiffs had shipped to Defendants in April 2026, the last authorized shipment before termination. (*See* June 22, 2026 Hearing Tr. 166:5-9.) During that period, Defendants were selling drinks using Molly Tea's own ingredients and Molly Tea's own recipes, following Molly Tea's menu, at stores outfitted as Molly Tea locations, with only a piece of wood obscuring the word "Molly"—textbook "reverse passing off" prohibited by the Lanham Act and this Court's injunction.

Indeed, consumer confusion has already ensued from Defendants' actions. For example, as of the June 17 hearing, the Uber Eats accounts for the Brooklyn and Columbia Stores (*see* June 17, 2026 Hearing Pltf. Exs. 3A-3C), the Yelp account for the Chinatown and Columbia Stores (*see* June 17, 2026 Hearing Pltf. Exs. 5A-5B), and the DoorDash account for the Brooklyn Store (*see* June 17, 2026 Hearing Pltf. Ex. 6) remained active and publicly accessible. Meanwhile, as of the June 22 hearing, the Brooklyn Store's DoorDash account appeared to remain publicly visible and capable of accepting orders (*see* June 22, 2026 Hearing Tr. 104:20-105:12). Any reasonable consumer would be confused by these public representations by Defendants. This confusion was undoubtedly compounded by Defendant Liu's statements to Bloomberg News, in which he conveyed that he had no intention of ceasing the stores' operations and, instead, would "continue operating the shops under the '? Tea' brand, which he said is 'a scream for myself, for my team, for my staff has enough supplies to operate for another month.'" (*See* Ex. 12 to June 12 Contempt Motion, ECF No. 69-12.) For example, numerous Reddit comments reflect significant consumer confusion as to whether the stores remain Molly Tea locations. True and accurate screenshots, captured on July 1, 2026, of two such comment threads are annexed hereto as **<u>Exhibits 5 and 6</u>**.

4

Importantly, as this Court noted at the June 17 hearing, *i.e. nine days* after the injunction was first issued, "? Tea is now benefiting from the reputation of Molly Tea, which it would seem to me could be easily resolved by just shutting down these accounts." (June 17, 2026 Hearing Tr. 68:2-8.)  It is clear that Defendants have profited off of the Molly Tea brand and reputation from the moment the injunction issued.  Indeed, Defendants have done so not only by continuing to directly utilize Plaintiffs' trademarks but also by utilizing colorable imitations of those marks and products. *See generally Cartier v. Aaron Faber, Inc.*, 512 F. Supp.2d 165, 173 (S.D.N.Y. 2007) (colorable imitation of a registered mark sustains a Lanham Act violation).

Hence, Defendants' use of the term "Tea," in the identical registered typeface—amplified by the fact that its use occurs on locations that are well-known to consumers as former Molly Tea locations, and coupled with Defendants' continued use of Molly Tea's product line and menu—inevitably causes consumer confusion.  Put simply, covering half of the Molly Tea trademark while continuing to sell Molly Tea products (albeit, after June 11 with a "?" mark on the cup and, in some instances, marginally tweaked product names) constitutes an ongoing use of Plaintiffs' trademarks, in direct violation of the Court's injunction.  As Mr. Gao explained, Defendants are "still continuing to use all of [Plaintiffs'] photos, they just removed the logo and put the question mark logo over it" and those photos were "the exclusive content of our company that was provided to them." (June 23, 2026 Hearing Tr. 195:11-20.)  Indeed, when asked by the Court, Mr. Gao made clear that the photographs still being used by Defendants are "the same photographs provided to all Molly Tea stores for those drinks." (June 23, 2026 Hearing Tr. 209:2-8.)  Meanwhile, at the June 22 hearing, Defendants' counsel apparently acknowledged that Defendants continued utilizing Plaintiffs' proprietary tea machine well after the issuance of the injunction, which strongly suggests that Defendants also continued utilizing proprietary Molly Tea products. (*See* June 22, 2026 Hearing Tr. 118:5-9.)

Thus, Defendants simply disregarded the Court's order for multiple days.  Defendants' compliance with the injunction was a purely secondary concern—their primary concern was the uninterrupted profitability of the stores, including through use of Plaintiffs' trademarks.  Only *after* Plaintiffs moved for an order of contempt did Defendants take belated and incremental steps to remove the Molly Tea marks from the stores, so long as such steps did not interfere with the stores' unceasing operations.  These steps fell far short of the injunction's requirements and necessitated the expenditure of considerable time and resources by Plaintiffs to bring such violations to the Court's attention.

### B.    Defendants Failed to Make Meaningful Efforts to Promptly Transfer the Social Media and E-Commerce Accounts to the Plaintiffs.

The Court's injunction unambiguously required Defendants "within forty-eight hours of this Order" to "transfer to Plaintiffs all administrative access, credentials, ownership rights, and control over" Defendants' "social media, e-commerce, delivery platform, or marketing account[s]." (June 8 Order ¶ 2.)  Undisputedly, Defendants did not do so.  They took only partial and belated steps *after* Plaintiffs moved for an order of contempt.  Defendants' cooperation has been consistently woefully deficient and, even now, Plaintiffs still lack ownership of all the accounts.

Notwithstanding the fact that the Court has since narrowed the injunction to trademark violations, the trademark-based evidence before the Court, along with evidence of other violations of the injunction, establishes clear and convincing evidence of contempt.

On June 9, the undersigned emailed Defendants' counsel requesting the log-in credentials for all social accounts and Defendants' Molly Tea website. Defendants' counsel did not respond. (*See* Ex. 1 to June 10 Contempt Motion, ECF No. 63-1.) On June 10, after Plaintiffs filed their first contempt motion, Defendants' counsel provided the undersigned with log-in credentials for five social-media accounts and the website. However, Plaintiffs were unable to access those accounts or the website using those log-in credentials.

At the June 11 conference on Plaintiffs' contempt motion, the Court "direct[ed] the parties to meet and confer regarding the social media accounts to make sure that any login information is accurate and . . . to allow the plaintiffs to be able to log in with their own passwords and to access those sites to the extent any multi-factor authentication is needed." (June 11, 2026 Contempt Hearing Tr. 36:3-8.)[3] Subsequently, the undersigned e-mailed Defendants' counsel to request the availability of Defendants' IT personnel to confer. Defendants' counsel provided the contact information for their IT employee. Plaintiffs contacted him by e-mail on June 12, identifying steps necessary to transfer the website and Instagram, RedNote, TikTok, Yelp, and Google Business accounts. However, as of June 14, Defendants' IT employee had not responded to Plaintiffs' e-mail. On June 16, Defendants' IT personnel finally conferred with Plaintiffs' personnel, but failed to transfer ownership of the Google, RedNote, Instagram, TikTok, and Yelp accounts because Defendants had to remove Defendants' personal information.

Importantly, at the June 17 hearing, Plaintiffs presented extensive and uncontroverted evidence that Defendants' Uber Eats accounts for the Brooklyn and Columbia Stores (*see* June 17, 2026 Hearing Pltf. Exs. 3A-3C), the Yelp account for the Chinatown and Columbia Stores (*see* June 17, 2026 Hearing Pltf. Exs. 5A-5B), and the DoorDash account for the Brooklyn Store (*see* June 17, 2026 Hearing Pltf. Ex. 6) remained active and publicly accessible. Each such account displayed the customer review rating of the respective location, based on thousands of reviews of the stores as Molly Tea locations. Indeed, the Court explicitly observed the thousands of individual ratings of the locations and accurately noted that "? Tea is now benefiting from the reputation of Molly Tea, which it would seem to me could be easily resolved by just shutting down these accounts." (June 17, 2026 Contempt Hearing Tr. 67:21-68:8.)

Critically, when the undersigned recounted for the Court the meager steps Defendants had taken to cooperate with Plaintiffs regarding the transfer of the accounts, the Court again correctly observed, "That seems much less than what is required under paragraph two of the order." (June 17, 2026 Hearing Tr. 70:10-11.)

Indeed, as of this submission—23 days after the issuance of the injunction—the transfer of social media and e-commerce accounts still remains incomplete. This is despite the fact that on June 17, the Court explicitly warned Defendants that the Court would consider an order of civil confinement due to their failure to take meaningful steps to transfer the accounts. (*See* June 17,

---

[3] True and accurate copies of excerpts of the relevant portions of the June 8, June 11, June 17, June 22, and June 23 hearing transcripts are annexed hereto as **Exhibits 7 through 11**, respectively.

2026 Hearing Tr. 71:19-72:10.)  While the parties' personnel have communicated in the past several days, Plaintiffs have been unable to complete the transfer of the Instagram account, as they cannot change Defendants' passwords or remove Defendants' two-factor authentication credentials, as such changes must be confirmed by Defendants.  Transfer of the e-commerce platforms has been even less fruitful.  With regard to the Uber Eats and HungryPanda accounts, Defendants claim to not know how to transfer ownership of the accounts, requiring the Plaintiffs to intervene by contacting the platforms directly for assistance.  With regard to the DoorDash account, a meeting between Plaintiffs, Defendants, and DoorDash is anticipated.

Thus, despite Defendants bearing the onus of taking necessary steps to effectuate the transfer of the accounts, Defendants' cooperation has been half-hearted, continually belated, and, to date, only partially productive—far from the proactive efforts required by the injunction. Defendants' actions have apparently been purely reactive to Plaintiffs' continued inquiries of Defendants, and seemingly motivated by Plaintiffs repeatedly bringing such facts to the Court's attention.  In short, Defendants' lack of diligent efforts and ongoing failure to complete the transfer establish their non-compliance with the Court's injunction.

C.    **Defendants Have Engaged in a Scheme to Circumvent the Injunction, in Violation of the Express Terms of the Order.**

As articulated *supra*, Defendants could have readily complied with the Court's injunction by temporarily closing the stores for some period of time to fully divest the Molly Tea brand identity: remove *all* marks fully, replace inventory, cease the unauthorized point-of-sale misappropriation, and cease selling Molly Tea products.  Instead, Defendants chose to charge through the injunction, crudely masking the word "Molly" with wood planks, while retaining every other identifying element, and profiting off of the inevitable consumer confusion, reaping the financial rewards of uninterrupted operations, and only once haled before the Court, implementing deficient and incremental steps toward partial compliance with the injunction.  This directly violates section 1(d) of the Order, which enjoins Defendants from, *inter alia*, "utilizing any other device for the purpose of circumventing or otherwise avoiding the directives of this injunction." (Order ¶ 1(d)).  Indeed, Plaintiffs deliberately included this language in their proposed order to show cause (ECF No. 7-1) in recognition of the fact that, due to the suffusion of Defendants' stores with Plaintiffs' trademarks and other intellectual property, it was impossible to anticipate every conceivable way in which Defendants could take steps to circumvent or avoid the express purpose of the Order on trivial technicalities.

The scheme set forth above—in which Defendants have made only the most minimal efforts to comply with the injunction, having done so only when compelled, and which nonetheless fall far short of actual compliance—is precisely the kind of avoidance and circumvention encompassed by section 1(d).  There was never any ambiguity as to how Defendants could comply with the Order: temporarily close the stores and reopen them as legitimately new milk tea businesses.  As early as June 11, the Court even put Defendants on notice that it was "anticipating that the stores would not be able to operate.  They were opened as Molly Tea stores.  It seems like it would need to function as a completely different store to be able to operate in the space." (June 11, 2026 Hearing Tr. 39:5-9.)  Yet, Defendants simply chose not to do so, so as to benefit from

Plaintiffs' valuable brand and inventory.  As such, Defendants have violated section 1(d) of the Order.

### D.    Compensatory and Coercive Sanctions are Appropriate.

Plaintiffs respectfully request that the Court impose not only compensatory sanctions, but also coercive ones, as Defendants' contempt of the injunction is willful and part of a deliberate scheme to continue operating the stores at all costs, while making no and, later, only half-hearted efforts at compliance.  The Court rightly expressed its frustration with Defendants' actions at the June 17 hearing, stating "[Defendant Liu is] playing games here, Mr. Sverd, and I'm sick of it. I'm sick of him playing games here . . . He thinks I'm an idiot." (June 17, 2026 Hearing Tr. 71:4-7.)  Hence, the Court specifically admonished Defendants that it would consider "coercive sanctions," including an order of "civil confinement" if Defendants "continue[] to flack my orders." (*See* June 17, 2026 Hearing Tr. 71:19-72:18.)  Notwithstanding that warning, Defendants continued to disregard the injunction, including by failing to transfer the accounts, even *as of this filing*.

Defendants' counsel's inaccurate representation to the Court is part of a pattern of Defendants' willful non-compliance.  For instance, at the June 22 hearing, Defendants' counsel represented that "the defendant stores have obliterated the names and the logos within the store." (*See* June 22, 2026 Hearing Tr. 117:22-24.)  The record squarely refutes that representation. Defendants merely covered the word "Molly" with wooden planks, while retaining the stylized "Tea" element; Molly Tea logos remained in place behind paper covers in store interiors; the Molly Tea signage remains visible on Defendants' tea makers; and Defendants continue to use all of Plaintiffs' photos of Molly Tea products.  The names and logos have not been obliterated but, rather, partially and sloppily covered, while the substance of the Molly Tea brand persists.  This pattern of obfuscation and inaccurate representation confirms that the contempt has been calculated and willful.

"Civil sanctions have two purposes: to coerce compliance with a court order and to compensate a plaintiff." *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 101 (2d Cir. 2016). "[A] hallmark of coercive sanctions [is] that 'the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus 'carries the keys of his prison in his own pocket.'" *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 101 (2d Cir. 2016) (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828 (1994)).

First, Plaintiffs have been compelled to expend considerable amounts of time and resources—in the form of attorneys' fees and investigator and translator costs—in identifying and investigating Defendants' violations of the injunction and briefing such issues, haling Defendants before the Court, and participating in five days of hearings.  Plaintiffs' attorneys' fees and costs incurred in connection with their contempt motion, supplementing those previously submitted as ECF Nos. 77 and 77-1, are annexed hereto as **Exhibit 12**.[4]  Indeed, the bulk of the cost incurred

---

[4] Exhibit 12 annexed hereto is a true and accurate copy, as redacted, of a contemporaneous record of the attorneys' fees and investigator, translation, and transcript costs incurred by Plaintiffs in preparing and appearing for the June 22 and June 23, 2026 contempt hearings and in preparing this supplemental brief. The hourly rates reflected are the customary rates for attorneys and paralegals at the undersigned firm and,

by Plaintiffs resulted from the renewed contempt motion, which was premised on evidence contradicting the inaccurate and un-corrected representation to the Court by Defendants that their stores had closed on June 10 at 4:00 p.m., a representation the Court itself found deficient at the June 17th hearing.  (*See* June 17, 2026 Hearing Tr. 6:23-9:4.)  The Court even reminded Defendants' counsel of their "obligation to correct the record immediately."  (*See* June 17, 2026 Hearing Tr. 8:14-23.)

Through the ongoing use of Plaintiffs' trademarks and Defendants' willful circumvention of the purposes of the injunction, in violation of section 1(d) of the Order, Defendants reap significant monetary benefit—they profit from the illicit use of Plaintiffs' brand.  Defendants' willful noncompliance with the injunction is evinced by, *inter alia*, their uninterrupted operation of the stores and their continued use of the Uber Eats and DoorDash accounts that were, in every way but name, Molly Tea accounts.

The Second Circuit has addressed precisely this circumstance, holding that the owners of a trademark and beneficiaries of an injunction were entitled to the net profits of sales made by the contemnor-defendants utilizing the plaintiff's marks for the duration of the period of civil contempt.  *See Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 7 (2d Cir. 1989).  Further, "the burden is on the contemnor 'to prove any deductions for its costs from the gross revenues attributable to its contempt.'"  *Id*. (quoting *Oral-B Lab'ys, Inc. v. Mi-Lor Corp.*, 810 F.2d 20, 26 (2d Cir. 1987)).

As such, Plaintiffs request that the Court order Defendants, jointly and severally, to pay to Plaintiffs the net profits of all five stores—the three Joint Venture Stores, the Columbia Store, and the LIC Concession—made during the period of June 9, 2026 to present and, additionally, all future profits until such time as Defendants comply with the Amended Injunction (ECF No. 83). At the June 8 hearing, upon consulting with Defendant Liu, who was seated at counsel's table, Defendants' counsel represented to the Court that, as of June 8, the three Joint Venture Stores' aggregate monthly revenue was $1,400,000.  (*See* June 8, 2026 Hearing Tr. 6:12-14.)  As such, compensatory sanctions, at a minimum, should be the *pro rata* amount of $46,666.67 per day, from June 8 to the present, in addition to the aforementioned fees and costs expended.  As of this filing, that amounts to a total of $1,073,333.41, plus $73,486.27 in attorneys' fees and investigator, interpreter, and transcription costs.  (*See* ECF Nos. 77 – 77-5 and Exhibit 12.)  In addition, the Court should order Defendants to furnish a verified copy of their financials as part of their injunction-compliance report due on July 8, so as to enable Plaintiffs to determine the stores' net profits.

It should also be noted that, as discussed in the Corrected Verified Complaint, Defendant MHL NY LLC has failed to pay the $15,000 brand usage fee, the $15,000 brand security deposit, and the monthly 2% management fee to Plaintiff Shenzhen Molly Tea due under the Brand License Agreement.  (*See* Corrected Verified Compl. ¶¶ 37, 112.)  Hence, Defendants' profiting from their contempt of the injunction, at Plaintiffs' expense, should be viewed in conjunction with their failure to comply with their basic contractual duties to Plaintiffs.

---

in my opinion, are reasonable for legal work of this nature in the Southern District of New York.

Moreover, because Defendants' violations of the Order are willful, egregious, and ongoing, the imposition of additional, coercive sanctions in an amount the Court sees fit is justified until such time as Defendants are compliant.

We thank the Court for its time and attention to this matter.

Respectfully submitted,

**BERGSTEIN FLYNN KNOWLTON & POLLINA PLLC**

By: ___*/s/ Joseph M. DiPietro*___
Joseph M. DiPietro
Lee Bergstein

cc:     All counsel of record
        (via ECF and e-mail)

10