# Exhibit 10

Q6MESHEH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

SHENZHEN MOLLY TEA FOOD AND
BEVERAGE MANAGEMENT CO., LTD.,
et al.,

                    Plaintiffs,

          v.                              26 Civ. 4051 (JPC)

MHL NY LLC, et al.,

                                          Hearing

                    Defendants.

-------------------------------x
                                          New York, N.Y.
                                          June 22, 2026
                                          10:00 a.m.

Before:

                    HON. JOHN P. CRONAN,

                                          District Judge

                         APPEARANCES

BERGSTEIN FLYNN KNOWLTON & POLLINA PLLC
     Attorneys for Plaintiffs
BY:  LEE BRETT BERGSTEIN
     JOSEPH MATTHEW DIPIETRO

     Attorneys for Defendants
BY:  YIMIN CHEN
     -and-
     PETER ERIK SVERD

Also Present:

Junjie Chen, Interpreter

to the Chinatown store, would someone be able to access in this Uber Eats or DoorDash page for that store and see 1,000 or so customer reviews that really go back to Molly Tea?

MR. DIPIETRO:  Your Honor, I don't know whether our client has actually been able to get into the account, because as I said, I think either all or most of the accounts have a two-factor authentication.  I'm trying to get an update that's most up to date today.  And if your Honor would like, I can provide a supplemental update after the hearing.

THE COURT:  Well, the main concern I had last week was that I was surprised that that access had not already occurred since I think that was one of the issues that was particularly clear in terms of the injunction.  And also if somehow the store is continuing to operate and benefiting from reviews that really are for Molly Tea, that would seem problematic.  But it also sounds like we've at least made progress in that respect.

MR. BERGSTEIN:  Your Honor -- I'm sorry, your Honor. May I just add one thing?

THE COURT:  Go ahead.

MR. BERGSTEIN:  I ran just a not-very-scientific search this morning of the various delivery platforms accounts, and it appeared that they were nonfunctioning other than -- and we weren't able to do this in a completely direct way, but it appeared that the DoorDash account for Brooklyn still was at least still active and reflecting the ability to order on

Q6MESHEH

that we are now litigating trade dress. And we've raised this point on numerous occasions, that it feels like the goal post keeps moving in this hearing, and that's the most troubling to the defense.

It's very, very conceivable that on appeal this is just going to be remanded. It's not procedurally proper. It's just not where it ought to be for this level of proceeding.

THE COURT: So, I will allow the testimony to include trade dress today, largely because we don't have the jury here and it will be -- I'll be able to distinguish and, frankly, determine later what is relevant or not, but I do take the points you're making there regarding whether there will be a basis for a contempt finding on trade dress.

Can you tell me more about where things stand from your clients and in terms of the store's operation? For example, are the menu items going to continue to be using the prior titles for drinks that Molly Tea used? What is the long-term plan for the sign outside of the store? Are there any plans to alter the interior store design? Stuff like that, to the extent you know.

MR. SVERD: Yes, Judge.

As the Court is aware from the very early stages of this proceeding, the defendant stores have obliterated the names and the logos within the store, which maybe the complaint particularizes that there's a trademark to that. That's been

Q6MESHEH

delivery and pick up.  Again, you needed to do some crafty Googling to get to it, but it did still exist.  Other than that, the other pages appeared to all say "permanently closed" or "closed" or "not accepting online orders," which is different than the status last Wednesday when I was questioning the witness about it.

THE COURT:  So, I just Googled "Molly Tea Brooklyn" and one of the results does come out to a DoorDash page for Molly Tea, and there's still an ability to place orders at least on this page.  I don't know if this is the same one.  There was only one Molly Tea, I take it, in Brooklyn; is that correct?

MR. DIPIETRO:  Yes, your Honor.

THE COURT:  Okay.

With respect to the dual-factor authentication, is there anything else that needs to occur to make sure that that access is possible?

MR. DIPIETRO:  Well, your Honor, I can't speak in too much detail about the technical aspect of it, but from what I understand, there's personally identifiable information tied to some of the accounts that has to be removed and replaced with that of our clients, and I understand there's a waiting period involved in that.

THE COURT:  Uh-huh.

MR. DIPIETRO:  And that also requires two-factor

Q6MESHEH

done very early on.

At this juncture, the painting in the stores is going on to move the wood to an off-white or a white. We have rebranded and renamed the cups. We use different ingredients now. All the ingredients are original and unique. And even while it was brought to our attention that the defendants believe that their tea maker is novel and unique to Molly's, other stores do use the same machine, we have photographs of that, but we have ceased using that machine all together.

THE COURT: Okay.

MR. SVERD: So, there's nothing cognizable that, you know, is really very similar. Even, Judge, now we're hearing for the first time, I think, as of Friday we have this marble facade of a beautiful sign and blah, blah, blah. Other stores using the same stuff. Other stores, their competitors, are using the same wood. This is -- you know, so as we're having to adjust our position as this hearing continues along and we're confronted with now menu discrepancies and all other kinds of items, as the Court will see -- and, again, this is a contempt proceeding, it's not a trial as to whether or not these are trade dress items, but it's sort of morphing into that, much to the disadvantage of the defendants, and, again, we're going to note our objection to the proceeding and that the preliminary injunction, at least with respect to trade dress, be dissolved, and we will follow-up with that.

Q6MESHEH                     Gao - Direct

A.  No difference.

MR. BERGSTEIN:  Joe, could we just go back to the other page one more time?

MR. DIPIETRO:  Yep.

Q.  All right.  I'm going to direct the witness's attention to the Pistachio Jasmine Coconut.  Do you see that drunk?

A.  Okay.

Q.  And now I'm going to direct the witness's attention what's been previously entered into evidence as Plaintiff's Exhibit 7C, which is an Uber Eats product page for Pistachio Jasmine Tea from the Columbia store.

What differences, if any, are there between the product depicted on this page that you can observe from the product that we just looked at on the Molly Tea menu?

A.  They changed the logo.

Q.  Okay.  What about the drink itself?

A.  No difference.  It's the same.

Q.  And do you see the options for ice level, sugar level, and toppings?  Are those all consistent with the offerings at other Molly Tea locations?

A.  No.

Q.  How were the -- at the time that these locations were operating as Molly Tea stores, how were the ingredients for these drinks provided to the defendant's stores?

A.  Shipped from China.

Q6MESHEH                        Gao - Direct

THE COURT:  Mr. Bergstein, can you rephrase to ask what would be required under the terms of their --

MR. BERGSTEIN:  Sure.

THE COURT:  -- agreement?

Q.  You previously testified that the ingredients were shipped from China for these products; correct?

A.  Yes.

Q.  Approximately how long does it take from placing an order for the products used in these -- the ingredients used in these products to the date they're received by the store?

A.  About two months.

Q.  Have the defendants ever returned any of the ingredients or other product supplies that were shipped to them in April?

A.  No.

MR. BERGSTEIN:  Your Honor, could I just have 30 seconds to look over my notes?

THE COURT:  You may.

(Counsel confer)

MR. BERGSTEIN:  Your Honor, we're going to show what will be marked Plaintiff's Exhibit 9 to the witness digitally. This was provided to defendants and the Court in our letter from last Friday.

Q.  Do you recognize what's contained in this photo, Mr. Gao?

MR. BERGSTEIN:  Do you want to scroll down?

A.  Yes.  These are the automatic tea makers.

received by the defendants in February of 2026?

A.  Do you mean shipping from?

Q.  No, I mean received by the defendants.

A.  I'm not sure, but you can look up the records.

Q.  Okay.  But you testified earlier that you knew for certain that they were -- that their last delivery was delivered to their doorstep here in April of 2026, but now you're not sure.

A.  I do remember it was in April, but since you asked your question this way, I am now a little confused.

Q.  Okay.  Now, when was the last time you were in one of the ? Tea shops?

A.  In January.

Q.  And when was the last time you were in -- well, are there any other competitors to Molly's that you're aware of?

        MR. BERGSTEIN:  Objection as to form.

        THE COURT:  Overruled.

A.  Yes.

Q.  Is Master Panda one of those?

A.  I'm not sure.  I don't know about this Master Panda.

Q.  I'm sorry.  You don't know about this Master Panda?

A.  I'm not sure.

        MR. SVERD:  Your Honor, may I show the witness what's been marked as Defendant's 3?

        THE COURT:  Yes.

Q.  Does looking at this document refresh your recollection as