**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SHENZHEN MOLLY TEA FOOD AND BEVERAGE MANAGEMENT CO., LTD., *et al.*,

Plaintiffs,

-against-

MHL NY LLC, *et al.*,

Defendants.

1:26-cv-04051-JPC

**DECLARATION OF QIANG CUI**

1

# TABLE OF CONTENTS

2

**SECTION 1.**    **Introduction and Background**

    A.  Introduction

    B.  Background

    C.  A Glossary of Abbreviations and Significant Technical

Terms

**SECTION 2.**    **Analysis**

    A.  Issue 1

    B.  Issue 2

    C.  Issue 3

    D.  Issue 4

    E.  Issue 5

**SECTION 3.**    **Conclusions**

**SECTION 4.**    **Expert's declaration & Statement of Truth**

    **Exhibits**

I, Qiang CUI, declare as follows, pursuant to 28 U.S.C. § 1746:

1.    I am over 18 years of age and have knowledge of the facts and circumstances stated herein.

2.    I am an attorney licensed in the People's Republic of China and an equity partner of Commerce & Finance Law Offices, with my office address at 14th Floor, China World Office 2, No. 1 Jianguomenwai Avenue, Beijing, People's Republic of China.   A true and accurate copy of my curriculum vitae is annexed hereto as **Exhibit 1**.

3.    My practice focuses on commercial dispute resolution, and I have substantial experience in equity and debt investments, commercial real estate, international trade, financial and banking disputes, bankruptcy and restructuring, intellectual property, unfair competition, and other complex commercial matters.

4.    I have been engaged by Shenzhen Molly Tea Food and Beverage Management Co., Ltd., a plaintiff in the above-captioned case, to provide my expert opinion on certain issues of PRC law in connection with the above-captioned case, including in regard to a certain Brand Licensing and Technical Services Cooperation Contract dated December 20, 2023.

5.    In preparing this Declaration, I have independently reviewed and analyzed the documents listed in **Exhibit 2** hereto.   My opinions rendered herein are true, impartial, and objective, based on my professional knowledge and experience.

## I.    INTRODUCTION AND BACKGROUND

### A.    INTRODUCTION

6.    I have reviewed the reference documents and understood the information stated therein. This Declaration has been prepared and finalized by me based on the assumptions

stated in this Report and the facts set out in the relevant reference documents, in particular those summarized in the Background section below. Based on my professional knowledge and experience, I believe that the opinions I express on PRC Law are true, impartial and objective.

7.    I fully recognize and understand that findings of fact, issues of United States law, and the ultimate determination of the issues before the Court are matters for the Court. My opin-ions in this Declaration are limited to issues of PRC Law and are provided for the Court's assistance on those issues.

8.    Unless otherwise specified, references to the PRC or China in this Declaration mean the Chinese mainland, excluding Hong Kong, Macau and Taiwan.

9.    This Declaration is issued on the following assumptions:

    a.    All materials, information and statements provided to me are true and accu-rate;

    b.    All facts stated in the reference documents and background information pro-vided to me are true;

    c.    All signatures, stamps and official seals appearing on the reference docu-ments are authentic;

    d.    All original copies of the reference documents have been duly verified and are complete, and all duplicates are complete and consistent with the origi-nals.

## B.    BACKGROUND

10.    Based on my review of the relevant documents, my understanding of the factual background of the SDNY Action is set out below.

11.    The plaintiffs in the SDNY Action are Shenzhen Molly Tea, Molly Tea Shops LLC (the "2nd Plaintiff"), and Molly Tea Holding Inc. (the "3rd Plaintiff"; together with Shen-

zhen Molly Tea and the 2nd Plaintiff, the "Plaintiffs"). Molly Tea Shops LLC also brings derivative claims on behalf of Molly Tea NYC Inc., Molly Tea BK Inc., and Molly Tea Manhattan Chinatown Inc.

12.    The defendants in the SDNY Action are MHL NY LLC ("MHL"), Molly Tea CU LLC, Genesis Brand Management LLC, Mei Hui Lin, Xiaozhe Liu a/k/a Ziaozhe Liu, and Binbin Xu (collectively, the "Defendants"). Molly Tea NYC Inc., Molly Tea BK Inc., and Molly Tea Manhattan Chinatown Inc. are named as nominal defendants.

13.    Shenzhen Molly Tea and MHL entered into the Brand License Agreement. Based on the documents provided to me, MHL is the only defendant in the SDNY Action that signed the Brand License Agreement.

1.    The Brand License Agreement contains an arbitration clause providing for arbitration before the Shenzhen Court of International Arbitration ("**SCIA"**). The Brand License Agreement also provides that it is governed by PRC law.

2.    I have not seen any document showing that Molly Tea Shops LLC, Molly Tea Holding Inc., Molly Tea NYC Inc., Molly Tea BK Inc., Molly Tea Manhattan Chinatown Inc., Molly Tea CU LLC, Genesis Brand Management LLC, Mei Hui Lin, Xiaozhe Liu a/k/a Ziaozhe Liu, and Binbin Xu (collectively, the "**Non-Signatory Parties**") signed the Brand License Agreement or any separate arbitration agreement with Shenzhen Molly Tea.

3.    The Brand License Agreement contains provisions concerning trademarks, brand authorization, authorized marks, the authorized operating system, operating resources, and Shenzhen Molly Tea's application for relevant trademarks and intellectual property rights in the place where MHL operates.

4.    I understand that:

4.1.    In addition to the Brand License Agreement, certain joint venture arrangements were entered into in relation to Molly Tea NYC Inc., Molly Tea BK Inc., and Molly Tea Manhattan Chinatown Inc.;

4.2.   Those joint venture arrangements contain dispute resolution provisions different from the SCIA arbitration clause in the Brand License Agreement.

5.   On or about April 15, 2026, MHL commenced an action before the Supreme Court of the State of New York, Queens County, Index Number 711066/2026 (the "**Queens Action**"). I understand that the Queens Action sought judicial relief relating to the parties' ongoing commercial relationship, including continued performance, supply and authorization.

6.   On May 1, 2026, Shenzhen Molly Tea issued a notice of breach and termination letter to MHL in relation to the Brand License Agreement.

7.   On May 15, 2026, the Plaintiffs commenced the SDNY Action before the United States District Court for the Southern District of New York.

8.   In the SDNY Action, the Plaintiffs assert claims and seek relief arising from, among other things, alleged unauthorized use of the Molly Tea trademarks and trade dress, unfair competition, conversion, breach of contract, breach of fiduciary duty, declaratory relief and injunctive relief.

9.   I understand that the claims and relief in the SDNY Action involve not only Shenzhen Molly Tea and MHL, but also the Non-signatory Parties.

10.   On June 8, 2026, the Court issued preliminary injunctive relief. I understand that the Court ordered the relevant New York stores to cease using the Plaintiffs' intellectual property and to cease operating under the Molly Tea brand. On June 23, 2026, the Court entered an Amended Preliminary Injunction. I understand the Defendants' motion for reconsideration is directed to that Amended Preliminary Injunction.

11.   On June 10, 2026, the Defendants filed a letter motion seeking, among other relief, leave to move for reconsideration or dissolution of the injunction and to compel arbitration. I understand that the Defendants rely on the SCIA arbitration clause in the Brand License Agreement in support of that request.

12.   Defendants later submitted an Affidavit Declaration of Lang, dated June 29, 2026 (ECF No. 90-7) (the "Lang Declaration") and a certain memorandum of law, dated June 29, 2026, in support of Defendants' motion for reconsideration (ECF No. 90-8). I have reviewed

those documents in preparing this Declaration. I have considered the opinions expressed in paragraphs 4 through 18 of the Lang Declaration. For the reasons set forth in the Analysis below, I respectfully disagree with the opinions stated in paragraphs 4 through 17 of the Lang Declaration. Paragraph 18 of the Lang Declaration expressly disclaims any opinion concerning the ownership of trademark rights arising under United States law.

13. Defendants' filings in support of reconsideration raise issues concerning the interpretation of the Brand License Agreement under PRC law, including whether the Brand License Agreement addresses trademark ownership issues, whether the definition of "Trademark" should be limited to the four Chinese characters "茉莉奶白", whether the absence of an executed separate Trademark License Agreement affects the scope of the parties' rights and obligations under the Brand License Agreement, whether the Brand License Agreement addresses trademarks and intellectual property rights outside the PRC, and how goodwill should be analyzed under PRC law.

## C.  A GLOSSARY OF ABBREVIATIONS AND SIGNIFICANT TECHNICAL TERMS

14. As used in this Declaration, the following terms shall have the following meanings:

"**Arbitration Law**" means *Arbitration Law of the People's Republic of China (2025 Revision) (Order No. 54 of the President of the People's Republic of China)*;(《中华人民共和国仲裁法（2025 年修订）》，中华人民共和国主席令第 54 号)

"**Civil Procedure Law**" means *Civil Procedure Law of the People's Republic of China (2023 Revision)*;（《中华人民共和国民事诉讼法（2023 修正）》）

"**Civil Code**" means *Civil Code of the People's Republic of China, Order No. 45 of the President of the People's Republic of China*；（《中华人民共和国民法典》，中华人民共和国主席令第 45 号）

"**Court**" means the United States District Court for the Southern District of New York;

| | |
|---|---|
| "**Defendants**" | means MHL NY LLC, Molly Tea CU LLC, Genesis Brand Management LLC, Mei Hui Lin, Xiaozhe Liu a/k/a Ziaozhe Liu, and Binbin Xu; |
| "**Brand License Agreement**" | means *the Brand Licensing and Technical Services Cooperation Contract* between Shenzhen Molly Tea and MHL NY LLC; |
| "**MHL**" | means MHL NY LLC; |
| "**Shenzhen Molly Tea**" | means Shenzhen Molly Tea Food and Beverage Management Co., Ltd; |
| "**Non-signatory Parties**" | means Molly Tea Shops LLC, Molly Tea Holding Inc., Molly Tea NYC Inc., Molly Tea BK Inc., Molly Tea Manhattan Chinatown Inc., Molly Tea CU LLC, Genesis Brand Management LLC, Mei Hui Lin, Xiaozhe Liu a/k/a Ziaozhe Liu, and Binbin Xu; |
| "**Plaintiffs**" | means Shenzhen Molly Tea, Molly Tea Shops LLC, and Molly Tea Holding Inc; |
| "**PRC**" | means the People's Republic of China; |
| "**PRC Law**" | means the laws, administrative regulations, judicial interpretations and other applicable normative rules of the PRC, excluding the laws of Hong Kong, Macau and Taiwan; |
| "**Queens Action**" | means the action commenced by MHL NY LLC in the Supreme Court of the State of New York, Queens County, Index Number 711066/2026; |
| "**SCIA**" | means the Shenzhen Court of International Arbitration; |
| "**SDNY Action**" | means the civil action pending before the United States District Court for the Southern District of New York, Case No. 26-cv-04051-JPC. |

## II.  ANALYSIS

### A.  ISSUE 1: WHETHER THE BRAND LICENSE AGREEMENT IS GOVERNED BY PRC LAW

15. In my opinion, the parties' express choice of PRC law in the Brand License Agreement should be given effect, and the Brand License Agreement should therefore be governed by PRC law. As a result, issues concerning the interpretation, performance, termination and post-termination contractual consequences of the Brand License Agreement should be analysed under PRC law.

16. As a general matter, PRC law recognizes party autonomy in the choice of law for foreign-related civil relations, including foreign-related contracts. Article 3 of the Law of the People's Republic of China on the Application of Laws to Foreign-Related Civil Relations provides that "the parties may expressly choose the law applicable to foreign-related civil relations in accordance with the provisions of law" ("当事人依照法律规定可以明示选择涉外民事关系适用的法律。").

17. With respect to contracts specifically, Article 41 of the Law of the People's Republic of China on the Application of Laws to Foreign-Related Civil Relations provides that "the parties may by agreement choose the law applicable to a contract. Where the parties have made no such choice, the law of the habitual residence of the party whose performance of obligations best reflects the characteristics of the contract, or the law otherwise having the closest connection with the contract, shall apply" ("当事人可以协议选择合同适用的法律。当事人没有选择的，适用履行义务最能体现该合同特征的一方当事人经常居所地法律或者其他与该合同有最密切联系的法律。").

18. In this case, the Brand License Agreement expressly provides that it shall be governed by the laws of the PRC. I have not seen any provision in the materials provided to me that would render this choice of law invalid as a matter of PRC law. Accordingly, in my opinion, the parties' express choice of PRC law should be given effect under PRC law.

19. It follows from the parties' valid choice of law that issues concerning the interpretation, performance, termination and post-termination contractual consequences of the Brand License Agreement should be analysed under PRC law. This includes, among other things, the interpretation of the SCIA arbitration clause, the contractual basis for termination by unilateral notice, and the interpretation of the trademark and brand-related provisions of

the Brand License Agreement. This conclusion concerns the governing law of the Brand License Agreement itself. It does not mean that PRC law necessarily governs all claims asserted in the SDNY Action, including claims arising under U.S. federal statutes, including the Lanham Act or the Defend Trade Secrets Act, or other non-contractual causes of action.

**B.  ISSUE 2: WHETHER THE SDNY ACTION SHOULD BE RESOLVED IN THIS COURT NOTWITHSTANDING THE SCIA ARBITRATION CLAUSE IN THE BRAND LICENSE AGREEMENT**

**I.  The SCIA Arbitration Clause Does Not Bind Non-Signatory Parties**

20.  In my opinion, notwithstanding the SCIA arbitration clause in the Brand License Agreement, the SDNY Action should be resolved by this Court as a whole.

21.  Under PRC law, an arbitration agreement is based on party consent. Article 4 of the Arbitration Law provides that "Where parties choose arbitration as the method for resolving disputes, they shall do so on the basis of voluntariness and reach an arbitration agreement. Where there is no arbitration agreement, an arbitration institution shall not accept a case if one party applies for arbitration" ("当事人选择仲裁方式解决纠纷，应当遵循自愿原则，达成仲裁协议。没有仲裁协议，一方申请仲裁的，仲裁机构不予受理。"). Article 465 of the Civil Code further provides that "A lawfully formed contract shall be protected by law. A lawfully formed contract shall be legally binding only upon the parties to the contract, except as otherwise provided by law" ("依法成立的合同，受法律保护。依法成立的合同，仅对当事人具有法律约束力，但是法律另有规定的除外。").

22.  Accordingly, as a matter of principle, the SCIA arbitration clause in the Brand License Agreement binds only Shenzhen Molly Tea and MHL, the parties that entered into that agreement. Based on the materials I have reviewed, I have not seen any document showing that the Non-signatory Parties signed the Brand License Agreement or entered into any separate arbitration agreement with Shenzhen Molly Tea. PRC law recognizes only limited circumstances in which an arbitration agreement may affect a non-signatory, such as agency or apparent authority, merger, division, succession or inheritance of rights and obligations, assignment or transfer of contractual rights and obligations, or subsequent express consent to the arbitration agreement. Based on the materials I have reviewed, I do not consider those limited circumstances to be present here.

**II.     Where Signatory and Non-Signatory Parties Are Both Involved, the SDNY Action Should Be Resolved by the Court as a Whole**

23. Where a court action involves both parties who are bound by an arbitration agreement and parties who are not, PRC law requires consideration of whether the relevant claims are divisible. The principle articulated by the Supreme People's Court in *XX Asia Pacific Holdings Co., Ltd. et al. v. XX Xinjiang Management Consulting Co., Ltd. et al.*, Case No. (2018) Zui Gao Fa Min Xia Zhong 453, dated March 27, 2019, is instructive (《某亚太控股有限公司等诉新疆某某管理咨询有限责任公司等仲裁程序案》, 最高人民法院, (2018) 最高法民辖终 453 号, 2019.03.27 裁判). The case summary states that "Where the parties to a tort action go beyond the parties to the contract, if the tort action constitutes an ordinary joint action and the subject matter of the action is divisible, the arbitration clause binds only the contracting parties; if the tort action constitutes a necessary joint action and the subject matter of the action is indivisible, although there is an arbitration clause between the contracting parties, such arbitration clause cannot bind the necessary joint tort dispute between the contracting parties and non-contracting parties, and therefore the people's court has jurisdiction over the tort action as a whole" ("侵权之诉的当事人超出合同当事人范畴的，如该侵权之诉属于普通共同诉讼，诉讼标的具有可分性，仲裁条款仅约束合同当事人；如该侵权之诉属于必要共同诉讼，诉讼标的具有不可分性，虽然合同当事人之间存在仲裁条款约定，但该仲裁条款不能约束合同当事人与非合同当事人之间的必要共同侵权纠纷，故人民法院对于该侵权之诉整体享有管辖权。"). Although the PRC is not a common-law jurisdiction, decisions and case summaries issued or included in the official case databases by the Supreme People's Court carry significant authoritative and persuasive weight for courts throughout the PRC.

24. Based on this principle, if the claims are divisible, the arbitration clause may apply only to the dispute between the signatories that falls within the scope of the arbitration agreement, while claims involving non-signatories should remain outside the arbitration clause. If the claims are indivisible and require a unified determination, the dispute should not be fragmented between arbitration and court litigation, and the court may hear the action as a whole.

25. In my opinion, based on the materials I have reviewed, the SDNY Action appears to involves an indivisible dispute concerning the same Molly Tea brand, the same alleged unauthorized use of the Molly Tea marks, trade dress and brand system, and overlapping injunctive and declaratory relief against multiple parties, including the Non-signatory Parties. Therefore, the SCIA arbitration clause in the Brand License Agreement should not

require the SDNY Action to be divided between SCIA arbitration as to Shenzhen Molly Tea and MHL and court litigation as to the Non-signatory Parties. In my opinion, the SDNY Action should be resolved by the Court as a whole.

### III. In Any Event, the Parties Waived the SCIA Arbitration Clause by Their Litigation Conduct in the Queens Action

26. Separately, PRC law recognizes that an arbitration agreement may be waived by litigation conduct. Article 37 of the Arbitration Law provides that "Where parties have reached an arbitration agreement and one party brings an action before a people's court without declaring the existence of the arbitration agreement, after the people's court accepts the case, if the other party submits the arbitration agreement before the first hearing, the people's court shall dismiss the action, unless the arbitration agreement is invalid or the law provides otherwise; if the other party does not object to the people's court's acceptance of the case before the first hearing, that party shall be deemed to have waived the arbitration agreement, and the people's court shall continue to hear the case" ("当事人达成仲裁协议，一方向人民法院提起诉讼未声明有仲裁协议，人民法院受理后，另一方在首次开庭前提交仲裁协议的，人民法院应当驳回起诉，但仲裁协议无效或者法律另有规定的除外；另一方在首次开庭前未对人民法院受理该案提出异议的，视为放弃仲裁协议，人民法院应当继续审理。").

27. Based on the materials provided to me, MHL commenced the Queens Action without invoking the SCIA arbitration clause, and Shenzhen Molly Tea participated in that action without objecting on the basis of the SCIA arbitration clause. In my opinion, as a matter of PRC law, such litigation conduct supports the conclusion that the parties waived the SCIA arbitration clause with respect to the dispute submitted in the Queens Action.

28. For the reasons set out above, the SCIA arbitration clause in the Brand License Agreement does not require the SDNY Action to be submitted to SCIA arbitration. First, the clause binds only Shenzhen Molly Tea and MHL, and does not bind the Non-signatory Parties. Second, the clause should not be applied in a manner that would fragment an indivisible dispute involving multiple parties and overlapping relief. Third, in any event, the arbitration clause appears to have been waived with respect to the dispute submitted in the Queens Action.

## C. ISSUE 3: WHETHER, UNDER PRC LAW, THE BRAND LICENSE AGREE-MENT PROVIDES A CONTRACTUAL BASIS FOR TERMINATION BY UNI-LATERAL NOTICE

### I.    PRC Law Recognizes Contractual Termination by Unilateral Notice

29. My analysis is limited to whether the relevant provisions of the Brand License Agreement, as a matter of PRC law and contractual interpretation, provide a basis for termination by unilateral notice. I do not make independent findings of fact as to whether each alleged breach occurred.

30. Under PRC law, parties may agree in advance on the circumstances in which one party is entitled to terminate a contract. Article 562 of the Civil Code provides that "*the parties may terminate a contract by agreement. The parties may agree on the grounds for one party to terminate the contract. When the grounds for termination arise, the party entitled to terminate may terminate the contract*" ("当事人协商一致，可以解除合同。当事人可以约定一方解除合同的事由。解除合同的事由发生时，解除权人可以解除合同。").

31. Where a party exercises a right of termination, PRC law requires notice to the other party. Article 565 of the Civil Code provides that "where one party claims termination of a contract in accordance with law, it shall notify the other party. The contract shall be terminated when the notice reaches the other party; where the notice states that the contract will be automatically terminated if the debtor fails to perform its obligations within a specified period, and the debtor fails to perform within such period, the contract shall be terminated upon expiration of the period specified in the notice. Where the other party objects to the termination of the contract, either party may request the people's court or an arbitration institution to confirm the validity of the termination" ("当事人一方依法主张解除合同的，应当通知对方。合同自通知到达对方时解除；通知载明债务人在一定期限内不履行债务则合同自动解除，债务人在该期限内未履行债务的，合同自通知载明的期限届满时解除。对方对解除合同有异议的，任何一方当事人均可以请求人民法院或者仲裁机构确认解除行为的效力。").

32. Under Articles 562 and 565 of the Civil Code, where the parties have agreed on grounds for unilateral termination and the party entitled to terminate considers that such grounds have arisen, that party may terminate the contract by giving notice to the other party. The contract is terminated when the termination notice reaches the other party. If the other party objects to the termination, the objecting party may request the people's court or an

arbitration institution to determine the validity of the termination. If the termination is confirmed to be valid, the legal effect of termination relates back to the time when the termination notice reached the other party. Under Article 565, an objection to a termination does not suspend or reverse its effect: the contract is terminated when the termination notice reaches the other party, and it is for the objecting party to seek a determination that the termination was invalid. I am not aware of MHL having sought such a determination. Unless and until a competent forum determines otherwise, the Brand License Agreement was terminated when the May 1, 2026 notice reached MHL.

## II.   The Brand License Agreement Contains Express Contractual Termination Grounds

33. The Brand License Agreement contains express provisions allowing Shenzhen Molly Tea to terminate the agreement upon specified contractual grounds:

   33.1. Section 12.2 provides that "under the following circumstances, Party A shall have the right to elect to unilaterally terminate this Contract in advance" ("以下情况下，甲方有权选择提前单方解除本合同");

   33.2. Section 12.2.1 then identifies as one such circumstance that "Party B commits a fundamental breach, material breach, seriously damages Party A's brand image, or seriously damages Party A's interests" ("乙方根本违约、重大违约、严重损害甲方品牌形象或者严重损害甲方利益的").

34. The Brand License Agreement further specifies certain conduct, including but not limited to the following, that constitutes fundamental breach or material breach:

   34.1. Section 8.2 provides that "materials and equipment purchased by Party B from Party A's designated suppliers or from Party A shall be used only for providing services to customers within the stores under this Contract; unless Party A's prior written consent is obtained, Party B shall not sell them to any third party, use them at any other location or for products of any other brand, produce or use substitutes, or procure from any third party materials and equipment that must be procured from Party A's designated suppliers or from Party A; otherwise, such conduct shall constitute a fundamental breach" ("乙方向甲方指定供应商及甲方采购的物料及设备只能用于本合同项下门店内向顾客提供服务，除非事先经甲方书面同意，乙方不得向第三方出售或在其他地点或为供其他品牌产品使用，亦不得生产或使用替代

品代替、或者向第三方采购必须从甲方指定供应商及甲方处采购的物料和设备，否则构成根本违约。”).

34.2. Section 10.2 of the Brand License Agreement provides that "Party B's stores shall use the POS system in a standardized manner in accordance with Party A's requirements, and shall not damage the POS system or alter POS data; otherwise, such conduct shall constitute a fundamental breach" ("乙方门店应按照甲方的要求规范使用收银系统，不得破坏收银系统，不得更改收银数据，否则构成根本违约。").

34.3. Section 10.2 further provides that "Party B's stores shall not use two POS systems in the same store; otherwise, such conduct shall constitute a fundamental breach" ("乙方门店不得在同一门店使用两套收银系统，否则构成根本违约。").

34.4. Section 16.3 of the Brand License Agreement provides that "where Party B commits a fundamental breach or material breach under this Contract, Party A has the right unilaterally to take measures including suspension of settlement, requiring Party B to suspend business for rectification, and early termination of this Contract, and to require Party B to pay liquidated damages of not less than RMB 300,000" ("乙方发生本合同项下根本违约、重大违约行为时，甲方有权单方面采取暂停结算、要求乙方停业整顿、提前终止本合同等措施，并要求乙方承担不低于叁拾万元的违约金。").

### III. The Materials Reviewed Support Shenzhen Molly Tea's Exercise of Its Contractual Termination Right by Notice

35. The materials I have reviewed indicate that Shenzhen Molly Tea had a reasonable basis to consider that the contractual grounds for unilateral termination had arisen. Paragraph 113 of the Verified Complaint alleges that, on May 1, 2026, Shenzhen Molly Tea "formally terminated the Brand License Agreement by written notice to MHL," citing Defendants' alleged material breaches.

36. The Corrected Verified Complaint, which refers to the Brand License Agreement as the "Brand License Agreement," alleges several categories of conduct relevant to the contractual termination grounds under Sections 12.2.1 and 16.3 of the Brand License Agreement:

36.1. First, Paragraph 73 alleges that Defendants opened and operated the Columbia Store "without the authorization of Plaintiffs" and "in material non-compliance with the Brand License Agreement and Plaintiffs' brand standards."

36.2. Second, Paragraph 53 alleges that Defendants "unilaterally formed Molly Tea CU," which "operates entirely outside the joint venture structure and the requirements of the Brand License Agreement."

36.3. Third, Paragraph 57 alleges that Defendants used "the POS platform Toast, rather than Plaintiff's designated POS system, Chowbus," thereby "depriving Plaintiff of the telemetry, financial oversight, and quality-control visibility" required under the agreement. Paragraph 96 further alleges "operation of the Columbia Store on a non-designated supply chain" and "diversion of Plaintiffs' supplied materials and equipment from the Joint Venture Stores to the Columbia Store."

36.4. Fourth, Paragraph 124 alleges that MHL and Molly Tea CU materially breached the Brand License Agreement by, among other things, "failing to provide required financial reporting and access for audit," "refusing to communicate and cooperate with Shenzhen Molly Tea regarding compliance," and "failing to pay required contractual fees." Paragraph 184 further alleges that the relevant stores were operated without Plaintiffs' "quality control, supervision, supply-chain oversight, or financial transparency."

37. In my opinion, based on the materials I have reviewed, these alleged circumstances provide a sufficient basis under the Brand License Agreement to support Shenzhen Molly Tea's exercise of its contractual right to terminate by unilateral notice under Sections 12.2.1 and 16.3 of the Brand License Agreement. If the Court confirms that the contractual grounds for termination had arisen, then under Article 565 of the Civil Code, the termination would take effect from the time the termination notice reached MHL.

## IV.    Legal Consequences of Termination under PRC Law

38. Under PRC law, once a contract is validly terminated, obligations that have not yet been performed cease to be performed, while accrued liabilities and post-termination obligations may continue to apply. Article 566 of the Civil Code provides that "after a contract is terminated, performance shall cease with respect to obligations that have not yet been performed; with respect to obligations that have already been performed, the parties may, having regard to the performance status and the nature of the contract, request restoration to the original state or other remedial measures, and shall have the right to request compensation for losses. Where a contract is terminated due to breach, the party entitled to

terminate may request the breaching party to bear liability for breach, unless otherwise agreed by the parties" ("合同解除后，尚未履行的，终止履行；已经履行的，根据履行情况和合同性质，当事人可以请求恢复原状或者采取其他补救措施，并有权请求赔偿损失。合同因违约解除的，解除权人可以请求违约方承担违约责任，但是当事人另有约定的除外。").

39. Article 567 of the Civil Code further provides that "termination of the contractual rights and obligations shall not affect the validity of the settlement and cleanup clauses in the contract" ("合同的权利义务关系终止，不影响合同中结算和清理条款的效力。").

40. Section 13.5 of the Brand License Agreement further provides that "after this Contract is terminated, this shall not affect either party's right to pursue the other party's liability for breach of contract or infringement in accordance with this Contract" ("本合同终止后，不影响任何一方根据本合同之约定追究另一方之违约或侵权责任。").

41. Accordingly, if the Brand License Agreement was validly terminated under PRC law, MHL would no longer have contractual authorization under the Brand License Agreement to use Shenzhen Molly Tea's brand-related rights, authorized marks, authorized system, operating resources or other rights granted under the Brand License Agreement.

42. Such termination would not discharge liabilities that had already arisen before termination, including any unpaid brand usage fees, management fees, security deposits or other contractual amounts, any liability for breach that had already arisen, any liability to compensate losses caused by pre-termination breaches, and any liquidated damages that had already been triggered under the Brand License Agreement. Nor would termination affect post-termination obligations, settlement and cleanup obligations, or claims for breach of contract or infringement that survive termination under the Brand License Agreement and PRC law.

**D.    ISSUE 4: WHETHER THE BRAND LICENSE AGREEMENT SHOULD BE INTERPRETED AS AN INTEGRATED BRAND AUTHORIZATION AND OPERATING SYSTEM AGREEMENT UNDER PRC LAW**

**I.       PRC Law Requires the Brand License Agreement to Be Interpreted as a Whole**

43. Under PRC law, where the meaning of a contractual provision is disputed, the provision should not be interpreted in isolation. The proper approach is to determine the meaning of the disputed provision on the basis of the words used, and in light of the relevant provisions,

the nature and purpose of the contract, custom, the principle of good faith, the contracting background, the negotiation process and the parties' performance conduct.

44. Article 142(1) of the Civil Code provides that "for the interpretation of a declaration of intent made to another person, the meaning of the declaration of intent shall be determined according to the words and expressions used, in light of the relevant clauses, the nature and purpose of the conduct, custom, and the principle of good faith" ("有相对人的意思表示的解释，应当按照所使用的词句，结合相关条款、行为的性质和目的、习惯以及诚信原则，确定意思表示的含义。").

45. Article 466(1) of the Civil Code further provides that "where the parties dispute the interpretation of a contract clause, the meaning of the disputed clause shall be determined in accordance with the first paragraph of Article 142 of this Code" ("当事人对合同条款的理解有争议的，应当依据本法第一百四十二条第一款的规定，确定争议条款的含义。").

46. Article 1(1) of the Interpretation of the Supreme People's Court on the Application of the General Provisions of the Contract Book of the Civil Code of the People's Republic of China provides that "when a people's court interprets contract clauses pursuant to Article 142(1) and Article 466(1) of the Civil Code, it shall take the ordinary meaning of the words and expressions as the basis, and determine the meaning of the disputed clause by considering the relevant clauses, the nature and purpose of the contract, custom and the principle of good faith, with reference to factors including the contracting background, negotiation process and performance conduct" ("人民法院依据民法典第一百四十二条第一款、第四百六十六条第一款的规定解释合同条款时，应当以词句的通常含义为基础，结合相关条款、合同的性质和目的、习惯以及诚信原则，参考缔约背景、磋商过程、履行行为等因素确定争议条款的含义。").

47. The same approach is reflected in the decision of the Supreme People's Court in *Chengdu Jinchuangmeng Technology Co., Ltd. v. Chengdu Aihua Rehabilitation Hospital Co., Ltd.*, Auction Contract Dispute, Case No. (2022) Zui Gao Fa Min Zai 59, dated March 30, 2022, which is instructive (《成都金创盟科技有限公司与成都爱华康复医院有限公司拍卖合同纠纷案》，最高人民法院，（2022）最高法民再 59 号，2022.03.30 裁判). In that case, the Supreme People's Court stated that "where the parties dispute the interpretation of a contract clause, the clause shall be interpreted in accordance with the principles of literal interpretation, systematic interpretation, transaction rules or custom, and good faith"

("当事人对合同条款理解存在争议的，应按照文义解释、体系解释、交易规则或者习惯、诚实信用等原则进行解释。").

48. Accordingly, when interpreting the trademark and brand-related provisions of the Brand License Agreement, it would be inappropriate under PRC law to isolate a single definition of "Trademark" and read the Brand License Agreement as if it concerned only the PRC-registered Chinese-character mark "茉莉奶白" (cf Lang Declaration, Paragraph 4) The Brand License Agreement should instead be interpreted as a whole, by reference to its title, definitions, authorization provisions, restrictions on use, provisions concerning the place where MHL operates, post-termination provisions, and the overall commercial purpose of the contractual arrangement.

## II.    The Brand License Agreement Establishes an Integrated Brand Authorization and Operating System Authorization Arrangement

49. The Brand License Agreement should not be characterized as a narrow trademark license concerning only the PRC-registered Chinese-character mark "茉莉奶白". When the agreement is read as a whole, it is directed to the authorization, operation, control and protection of an integrated Molly Tea brand business and operating system.

50. This is first reflected in the title and structure of the Brand License Agreement. The agreement is titled the Brand Licensing and Technical Services Cooperation Contract not merely a trademark license agreement. Its operative provisions do not concern only the use of a registered trademark, but also address brand authorization, authorized marks, the authorized operating system, store presentation, operating standards, supply-chain control, POS system, proprietary technology, training, manuals, and post-termination restrictions.

51. Section 2.1 of the Brand License Agreement provides that "during the term of this Contract, Party A grants Party B a license to operate the '茉莉奶白' business pursuant to this Contract. The operating resources granted by Party A to Party B include: (a) registered trademarks: the trademark registered in mainland China is 茉莉奶白 (Registration No. 50234810, Class 43); (b) the authorized brand '茉莉奶白'; (c) authorized marks and the authorized system, including but not limited to the CIS and VI systems; (d) proprietary technology, including but not limited to formulas, process flows, technical specifications, management and sales techniques; and (e) operating manuals, including the Store Food Safety Management Manual, Product Standards Manual, Operations Manual and Boss Manual" ("甲方按照本合同的约定，在本合同的有效期限内授予乙方'茉莉奶白'经营权的许可。甲方授予乙方的经营资源包括：（a）注册商标：中国大陆注册商标

19

为茉莉奶白（注册号：50234810，第 43 类）；(b) 授权品牌'茉莉奶白'；(c) 授权标识及授权体系（包括但不限于 CIS、VI 系统）；(d) 专有技术（包括但不限于配方、工艺流程、技术规范、管理和销售技巧）；(e) 运营手册：《门店食品安全管理手册》、《产品标准手册》、《营运手册》、《Boss 手册》等。").

52. This provision is important because it distinguishes between the registered trademark, the authorized brand, the authorized marks, the authorized system, proprietary technology and operating manuals. It therefore supports the view that the Brand License Agreement is not limited to the PRC-registered trademark alone, but concerns a broader bundle of brand-related and operating-system rights and resources.

53. The definition provisions of the Brand License Agreement are consistent with that reading. The agreement defines the "authorized marks" and "authorized system" broadly to include not only trademarks, but also store signage, packaging materials and packaging methods, utensils, operating and preparation standards, equipment, exterior and interior designs, decoration, color schemes and layouts, furniture, uniforms, advertising and promotional materials, documents, coupons, business cards, letterhead, training systems, operating systems, financial systems, information network systems, POS systems, supply-production-sales systems and other operating management systems. These provisions further confirm that the object of the contractual authorization is an integrated brand operating system, rather than a single trademark in isolation.

54. In addition, the Brand License Agreement expressly addresses the place where MHL operates. The agreement provides that "Party A is currently applying for relevant trademarks and intellectual property rights in the place where Party B operates, and Party B undertakes not to pre-emptively register or use any other means to prevent Party A from successfully registering the corresponding trademarks and intellectual property rights" ("甲方目前正在乙方运营所在地申请办理相关商标及知识产权权益，乙方承诺不得抢注或使用其他任何方式致使甲方无法顺利注册相应的商标及知识产权权益。").

55. In my opinion, this provision is directly relevant to the interpretation of the Brand License Agreement under PRC law. It shows that the parties contemplated Shenzhen Molly Tea's registration and protection of relevant trademarks and intellectual property rights in the place where MHL operated. Accordingly, the Brand License Agreement should not be interpreted as wholly unrelated to trademarks or intellectual property rights outside the PRC.

56. Section 2.7 of the Brand License Agreement further provides that "Party A authorizes Party B to use, within the scope agreed in this Contract, Party A's trademarks, trade names, service marks and all operating technical assets owned by Party A, including store decoration style, training system, operating system, financial system, information network system, supply-production-sales system, advertising and promotion, product production or supply channels, distribution and other operating management systems" ("甲方授权乙方依本合同的约定使用其商标、商号、服务标志及甲方所有的经营技术资产，如门店装修风格、培训体系、营运体系、财务体系、信息网络系统、产供销系统、广告宣传及促销、商品生产或进货渠道、配送等经营管理体系。").

57. This provision again confirms that the contractual authorization extends beyond the registered trademark. It covers the broader commercial system through which the Molly Tea brand business is operated, presented, controlled and protected. Therefore, under PRC contract interpretation principles, the Brand License Agreement should be read as an integrated brand authorization and operating system agreement.

**III.    The Unexecuted Separate Trademark License Agreement Does Not Negate the Broader Authorization Reflected in the Brand License Agreement**

58. The Brand License Agreement refers to a separate Trademark License Agreement. However, in my opinion, the fact that such separate agreement was not ultimately executed does not mean that the Brand License Agreement itself contains no trademark, brand or intellectual property-related authorization or restrictions.

59. The proper question under PRC law is not whether a separate trademark license agreement was later executed, but what rights, obligations and restrictions are already reflected in the executed Brand License Agreement itself. As explained above, the Brand License Agreement expressly refers to the authorized brand, authorized marks, authorized system, trademarks, trade names, service marks, operating technical assets, store signage, store design, operating manuals, POS system, supply chain, and other operating resources. Those provisions form part of the parties' binding contractual arrangement.

60. The contemplated separate Trademark License Agreement may have been intended to further implement or make detailed stipulations on certain trademark-use arrangements, such as use of the trademark in contexts beyond the operation of Molly Tea-branded stores contemplated by the Brand License Agreement. It does not follow, however, that the absence of such separate agreement eliminates the broader contractual authorization, control and restriction framework already set out in the Brand License Agreement.

61. This is particularly so because the Brand License Agreement itself expressly addresses trademark and intellectual property rights in the place where MHL operates. Article 1 of the Brand License Agreement, in its definition of "Trademark," provides that "Party A is currently applying for relevant trademarks and intellectual property rights in the place where Party B operates, and Party B undertakes not to pre-emptively register or use any other means to prevent Party A from successfully registering the corresponding trademarks and intellectual property rights" ("甲方目前正在乙方运营所在地申请办理相关商标及知识产权权益，乙方承诺不得抢注或使用其他任何方式致使甲方无法顺利注册相应的商标及知识产权权益。").

62. In my opinion, under PRC rules of contract interpretation, this provision should be given effect. It confirms that, at the time of contracting, the parties contemplated the registration and protection of relevant trademarks and intellectual property rights in the place where MHL operated. It also imposed on MHL a negative covenant not to pre-emptively register, obstruct or otherwise impair Shenzhen Molly Tea's ability to obtain such trademark and intellectual property rights. Further, as this provision appears in Article 1 of the Brand License Agreement, the statement in paragraph 17 of the Lang Declaration that the Brand License Agreement "contains no reference to trademarks outside the People's Republic of China or to rights arising under foreign trademark laws" is textually inaccurate.

63. Accordingly, the absence of a separately executed Trademark License Agreement should not be used to read the Brand License Agreement as if it were silent on trademark, brand or intellectual property issues. Such a reading would fail to give effect to the relevant provisions of the Brand License Agreement and would be inconsistent with the requirement under PRC law to interpret the contract as a whole.

64. I understand that Defendants also contend that, because Shenzhen Molly Tea provided MHL with a Franchise Disclosure Document and a proposed franchise agreement in January 2026 that expressly addressed goodwill, the absence of a comparable provision in the Brand License Agreement is significant. In my opinion, that contention is not supported by PRC law. As set forth above, the parties' rights are determined from the executed contract itself; a separate agreement proposed, but not signed, more than two years later does not diminish or alter rights already established by the executed contract. The Brand License Agreement proceeds on the premise that the registered trademark, the authorized brand, the authorized marks and system, and proprietary technology are Shenzhen Molly Tea's property and grants MHL only a limited license to use them during the term of the

contract.    As further set forth below, the absence of a clause separately "allocating good-will" is of no legal consequence.

## IV.    PRC Trademark Law Supports a Non-Mechanical Reading of Trademark and Brand-Related Rights

65. PRC trademark law supports the view that trademark and brand-related provisions should not be read in an overly narrow or mechanical manner. In particular, PRC law recognizes that trademark protection may extend beyond the exact registered words themselves, and may be relevant to the copying, imitation or translation of a well-known trademark, or the principal part thereof.

66. Article 13 of the Trademark Law of the People's Republic of China provides that "where a trademark is well known to the relevant public, the holder may request well-known trademark protection in accordance with this Law when it considers that its rights have been infringed. Where a trademark applied for registration on identical or similar goods is a reproduction, imitation or translation of another party's well-known trademark that has not been registered in the PRC and is likely to cause confusion, it shall not be registered and its use shall be prohibited. Where a trademark applied for registration on goods that are not identical or similar is a reproduction, imitation or translation of another party's well-known trademark that has been registered in the PRC, misleads the public, and may cause damage to the interests of the registrant of such well-known trademark, it shall not be registered and its use shall be prohibited" ("为相关公众所熟知的商标，持有人认为其权利受到侵害时，可以依照本法规定请求驰名商标保护。就相同或者类似商品申请注册的商标是复制、摹仿或者翻译他人未在中国注册的驰名商标，容易导致混淆的，不予注册并禁止使用。就不相同或者不相类似商品申请注册的商标是复制、摹仿或者翻译他人已经在中国注册的驰名商标，误导公众，致使该驰名商标注册人的利益可能受到损害的，不予注册并禁止使用。").

67. Article 2 of the Interpretation of the Supreme People's Court on Several Issues Concerning the Application of Law in the Trial of Civil Trademark Dispute Cases provides that "pursuant to Article 13(2) of the Trademark Law, where a party reproduces, imitates or translates another party's well-known trademark that has not been registered in the PRC, or the principal part thereof, and uses it as a trademark on identical or similar goods, thereby being likely to cause confusion, it shall bear civil liability to cease the infringement" ("依据商标法第十三条第二款的规定，复制、摹仿、翻译他人未在中国注册的驰名商标

或其主要部分，在相同或者类似商品上作为商标使用，容易导致混淆的，应当承担停止侵害的民事法律责任。”).

68. These provisions do not, by themselves, determine the ownership of any U.S. trademark rights. However, they are relevant to the interpretation of the Brand License Agreement under PRC law. They show that, in the PRC legal context, trademark protection is not necessarily confined to the exact Chinese characters appearing in a registered mark. Rather, the translation, imitation, reproduction or principal identifying elements of a well-known mark may also have legal significance, particularly where such use may cause confusion among the relevant public.

69. Based on the materials provided, "茉莉奶白" appears to enjoy substantial recognition among consumers in the PRC tea beverage market. If supported by relevant evidence, including evidence concerning consumer awareness, duration of use, promotion, geographic scope, and prior protection records, there appears to be a substantial basis for seeking well-known trademark protection for "茉莉奶白" under PRC law.

70. In my opinion, this further supports an interpretation of the Brand License Agreement that does not artificially separate the PRC-registered Chinese-character mark "茉莉奶白" from the broader brand identity and brand operating system authorized and controlled under the Brand License Agreement. This is particularly so where the Brand License Agreement itself refers not only to the registered trademark, but also to the authorized brand, authorized marks, authorized system, trade names, service marks and operating technical assets.

71. In short, the Brand License Agreement, when analysed under PRC law, does not support the narrow and overly technical interpretation proposed by Defendants in their reconsideration papers.

72. I have also considered the statement in paragraph 4 of the Lang Declaration that the "Trademark" defined in the Brand License Agreement refers to the four Chinese characters "茉莉奶白" and that the contract does not mention the term "Molly Tea." In my opinion, this point does not alter the interpretation of the Brand License Agreement under PRC law. The Brand License Agreement is a Chinese-language contract, and it is therefore natural that the operative provisions use the Chinese expression "茉莉奶白" to refer to the relevant brand. At the same time, the contract document itself displays "茉莉奶白 | Molly Tea" in its header, which clearly presents the Chinese expression "茉莉奶白" and the

24

English expression "Molly Tea" as corresponding identifiers of the same brand within the same contractual document.

73. The same point is reinforced by the English-language corporate documents relating to the joint venture stores. Those bylaws do not use the four Chinese characters "茉莉奶白", but refer instead to "Molly Tea" and "Molly Tea branded" stores. This difference in terminology is consistent with the language of the respective documents: the bylaws are English-language documents, just as the Brand License Agreement is a Chinese-language document. In my opinion, the proper conclusion is not that the Chinese expression "茉莉奶白" and the English expression "Molly Tea" refer to unrelated concepts merely because each document uses the language appropriate to that document. Rather, when the transaction documents are read in their commercial context, they support the view that "茉莉奶白" and "Molly Tea" were used as corresponding Chinese and English identifiers for the same brand and store operating system.

74. As discussed above, Article 13 of the Trademark Law of the People's Republic of China prohibits the registration and use of confusing reproductions, imitations or translations of another party's well-known trademark in the circumstances specified therein. This provision confirms that, under PRC trademark law, the legal protection of a brand identifier is not confined mechanically to the exact Chinese characters of a mark. Rather, PRC law also prohibits confusing reproductions, imitations and translations of a protected trademark. Accordingly, the fact that the Brand License Agreement uses the Chinese expression "茉莉奶白" in its operative provisions does not support an artificially narrow reading that disregards the corresponding English expression "Molly Tea" or the broader brand operating system authorized under the Brand License Agreement.

## E.  ISSUE 5: WHETHER GOODWILL IS AN INDEPENDENT PROPRIETARY RIGHT UNDER PRC LAW

75. Goodwill is not generally treated under PRC law as an independent proprietary right with a separate ownership structure apart from trademarks, brand-related interests or specific business assets. Nor is "goodwill" ("商誉") an independent concept expressly used in the Trademark Law of the People's Republic of China. In the PRC legal context, goodwill is more commonly addressed as an accounting, auditing, valuation and impairment concept, and may be relevant to the assessment of economic loss or damages.

76. Accounting Regulatory Risk Alert No. 8 — Goodwill Impairment, issued by the China Securities Regulatory Commission, states that, in a business combination not involving

enterprises under common control, "where the acquisition cost is greater than the acquirer's share of the fair value of the acquiree's identifiable net assets obtained in the combination, the difference shall be recognized as goodwill" ("在非同一控制下的企业合并中，购买方对合并成本大于合并中取得的被购买方可辨认净资产公允价值份额的差额，应当确认为商誉。"). This reflects the accounting treatment of goodwill as the excess of acquisition cost over the fair value share of identifiable net assets in a business combination.

77. The same Risk Alert further provides that "for goodwill formed from a business combination, because it is difficult for goodwill to independently generate cash flows, the company shall, from the acquisition date, allocate its carrying amount to the relevant asset group or portfolio of asset groups using a consistent and reasonable method, and conduct impairment testing accordingly" ("对因企业合并形成的商誉，由于其难以独立产生现金流量，公司应自购买日起按照一贯、合理的方法将其账面价值分摊至相关的资产组或资产组组合，并据此进行减值测试。").

78. These accounting and regulatory materials support the view that, under PRC law, goodwill is ordinarily analyzed by reference to accounting recognition, impairment testing, valuation and loss assessment, rather than as a standalone proprietary entitlement detached from the underlying trademark, brand, business assets or operating system.

79. Accordingly, in the context of the Brand License Agreement, the analysis under PRC law should first determine who owns or controls the relevant trademarks, brand identifiers, authorized marks, authorized system, operating resources and other brand-related interests, and who had the contractual right to authorize or terminate their use. Once those questions are answered, goodwill may be relevant as a factor in assessing the trademark owner's or brand owner's loss, the infringer's profits, impairment of brand value, or the amount of damages. It should not, however, displace the prior analysis of trademark rights, brand-related interests and contractual authorization under the Brand License Agreement.

80. In my opinion, Defendants' emphasis on goodwill does not change the interpretation of the Brand License Agreement under PRC law. The Brand License Agreement should first be interpreted according to its text, structure, purpose and the parties' contractual arrangement concerning the Molly Tea brand business and operating system. Any goodwill associated with that business may be relevant to valuation or damages, but it is not a separate right that overrides the trademark, brand-related and contractual rights reflected in the Brand License Agreement.

81. As such, when analyzed under PRC law, the Brand License Agreement does not sustain Defendants' contention that Defendants possess ownership of or a separate interest in the goodwill associated with the New York stores.

**SECTION 3 CONCLUSIONS**

83. Based on the analysis above, my conclusions are as follows:

   83.1. First, the Brand License Agreement is governed by PRC law. The parties expressly chose PRC law as the governing law of the Brand License Agreement, and I have not seen any basis under PRC law to disregard that choice. Accordingly, issues concerning the interpretation, performance, termination and contractual consequences of the Brand License Agreement should be determined under PRC law.

   83.2. Second, notwithstanding the SCIA arbitration clause in the Brand License Agreement, the SDNY Action should not be referred to SCIA arbitration as a whole. The arbitration clause binds only the parties to the Brand License Agreement and does not bind the Non-signatory Parties. Where a dispute involves both signatory and non-signatory parties and the claims are not properly divisible, PRC law supports the court's exercise of jurisdiction over the dispute as a whole. In addition, the parties' litigation conduct in the Queens Action provides a further basis for concluding that the arbitration clause was waived with respect to the dispute submitted to that court.

   83.3. Third, under PRC law, the Brand License Agreement provides a contractual basis for termination by unilateral notice. The Brand License Agreement expressly permits Shenzhen Molly Tea to terminate the agreement unilaterally where MHL commits a fundamental breach, material breach, seriously damages Shenzhen Molly Tea's brand image, or seriously damages Shenzhen Molly Tea's interests. Based on the materials I have reviewed, the alleged conduct provides a sufficient contractual basis to support Shenzhen Molly Tea's exercise of its termination right. If the termination is confirmed to be valid, the Brand License Agreement would be terminated from the time the termination notice reached MHL.

   83.4. Fourth, under PRC rules of contract interpretation, the Brand License Agreement should be interpreted as an integrated brand authorization and operating system agreement, rather than as a narrow trademark license limited only to the PRC-registered Chinese-character mark "茉莉奶白". The agreement covers not only trademarks, but also the authorized brand, authorized marks, authorized system, trade names, service marks, operating technical assets, store design, operating manuals, POS system, supply chain and other operating resources. The fact that a separate

Trademark License Agreement was contemplated but not ultimately executed does not negate the broader authorization, control and restriction framework reflected in the executed Brand License Agreement.

83.5. Fifth, goodwill is not generally treated under PRC law as an independent proprietary right separate from trademarks, brand-related interests or specific business assets. Nor is "goodwill" (商誉) an independent concept expressly used in the Trademark Law of the People's Republic of China. In the PRC legal context, goodwill is more commonly addressed as an accounting, auditing, valuation and impairment concept, and may be relevant to loss assessment or damages. It does not override the analysis of trademark rights, brand-related interests and contractual authorization under the Brand License Agreement.

84. For the reasons set out above, I am of the opinion that: (i) the Brand License Agreement is governed by PRC law; (ii) the SDNY Action should not be compelled to SCIA arbitration as a whole; (iii) the Brand License Agreement provides a contractual basis for termination by unilateral notice; (iv) the Brand License Agreement should be interpreted as an integrated brand authorization and operating system arrangement; and (v) goodwill should not be treated under PRC law as an independent proprietary right displacing the trademark, brand-related and contractual rights reflected in the Brand License Agreement, including Shenzhen Molly Tea's ownership of its trademark rights.

## SECTION 4 EXPERT'S DECLARATION AND STATEMENT OF TRUTH

85. I understand that my overriding duty is to the Court, both in preparing reports and in giving oral evidence. I have complied and will continue to comply with that duty.

86. I confirm that insofar as the facts stated in my report are within my own knowledge I have made clear which they are and I believe them to be true and that the opinions I have expressed represent my true and complete professional opinion.

87. I confirm that all the issues addressed in the opinions expressed by me fall within my professional scope.

88. I confirm that I have referred to all matters which, in my opinion, are relevant to the opinions expressed by me, and have brought to the attention of the Court all matters known to me that may have an adverse impact on my opinions.

89. I confirm that, in providing this written opinion, I consider it to be complete and accurate and that it constitutes my genuine professional opinion.

90. I confirm that if I subsequently consider that any correction, modification or qualification is required to this opinion, I will immediately notify the parties to this action and the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signature: _Qiang Cui_

Qiang CUI

Place of Signing: Chaoyang District, Beijing

Date: _July 13, 2026_

30