**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------X

SHENZHEN MOLLY TEA FOOD AND BEVERAGE MANAGEMENT CO., LTD., MOLLYTEA SHOPS LLC and MOLLY TEA HOLDING INC.,

Plaintiffs,

-and-

MOLLYTEA SHOPS LLC, derivatively on behalf of MOLLY TEA NYC INC., MOLLY TEA BK INC., and MOLLY TEA MANHATTAN CHINATOWN INC.,

Plaintiff,

-against-

MHL NY LLC, MOLLY TEA CU LLC, GENESIS BRAND MANAGEMENT LLC, MEI HUI LIN, XIAOZHE LIU a/k/a ZIAOZHE LIU, and BINBIN XU,

Defendants,

-and-

MOLLY TEA NYC INC., MOLLY TEA BK INC., and MOLLY TEA MANHATTAN CHINATOWN INC.,

Nominal Defendants.

---------------------------------------------------------X

1:26-cv-04051

**VERIFIED ANSWER, AFFIRMATIVE DEFENSES AND COUTERCLAIMS**

Defendants MHL NY LLC (“MHL”), Molly Tea CU LLC (“Molly Tea CU”), Genesis Brand Management LLC (“Genesis”), Mei Hui Lin (“Lin”), Xiaozhe Liu a/k/a Ziaozhe Liu (“Liu”), and Binbin Xu (“Xu”) (collectively, “Defendants”), by and through their undersigned counsels, hereby answer the First Amended Verified Complaint With Jury Demand (the

"Amended Complaint") of Plaintiffs Shenzhen Molly Tea Food and Beverage Management Co., Ltd. ("Shenzhen Molly Tea"), Mollytea Shops LLC ("Mollytea Shops"), and Molly Tea Holding Inc. ("Molly Tea Holding"), and the derivative claims purportedly asserted by Mollytea Shops on behalf of Molly Tea NYC Inc., Molly Tea BK Inc., and Molly Tea Manhattan Chinatown Inc. (collectively, the "Joint Venture Entities"), and allege as follows.

Unless expressly admitted herein, Defendants deny each and every allegation of the Amended Complaint, including the characterizations of the parties' agreements, the alleged exclusivity and clarity of Plaintiffs' claimed governance and operational-control rights, the alleged effectiveness and legal consequences of the purported May 1, 2026 termination and July 10, 2026 dissolution notices, and the allegations that Defendants engaged in any unlawful, unauthorized, or actionable conduct as claimed. Defendants further deny that Plaintiffs are entitled to any of the relief sought.

Defendants respond to the numbered paragraphs of the Amended Complaint below. To the extent any allegation purports to characterize, summarize, paraphrase, or quote from any agreement, notice, communication, or other writing, such document speaks for itself, and Defendants deny any allegation inconsistent with the actual contents of such document.

Defendants further state that Plaintiffs' Amended Complaint rests on a selective and incomplete account of the parties' business relationship. As reflected by the overlapping and inconsistent governing documents at issue, including the shareholder/bylaw framework invoked by Plaintiffs and the executed LLC-agreement framework alleged by Defendants in the Queens action, the parties' respective ownership, governance, management, and operational rights are disputed and cannot be reduced to the simplified version advanced in the Amended Complaint.

Defendants further state that, after inducing Defendants to build, finance, lease, guarantee, and operate multiple New York stores, Plaintiffs used their control over supply chain, operational systems, branding, approvals, and related business levers to impair store operations and coerce Defendants into surrendering ownership, control, and related rights. Defendants deny that Plaintiffs come before this Court with clean hands or are entitled to the equitable and extraordinary relief they seek.

1. In response to paragraph 1, Defendants admit only that Plaintiffs purport to bring claims concerning the Columbia Store, the LIC concession, and the operation of three New York store locations, and that Plaintiffs characterize certain agreements as governing aspects of the parties' relationship. Defendants deny the allegations that Defendants' conduct was "unauthorized," that the stores or concession were "renegade," that the agreements are properly characterized as alleged, and that Plaintiffs are entitled to the exclusive contractual and operational rights they claim. Defendants further deny any allegation inconsistent with the actual contents of the governing documents.

2. In response to paragraph 2, Defendants admit only that a written agreement dated December 20, 2023, identified by Plaintiffs as the Brand Authorization and Technical Service Cooperation Contract, exists. Defendants deny the remaining allegations in paragraph 2, including Plaintiffs' characterization of the scope, exclusivity, legal effect, and present enforceability of that agreement and any allegation inconsistent with the actual terms of the governing documents and the parties' course of dealing.

3. In response to paragraph 3, Defendants admit only that three New York stores were operated through entities identified by Plaintiffs as the Joint Venture Entities, and that

Plaintiffs contend certain shareholder agreements and bylaws govern those entities. Defendants deny that paragraph 3 fully or accurately describes the parties' agreements, governance structure, ownership rights, operational rights, or the scope of any alleged veto, exclusivity, approval, or control rights. Defendants further deny that Plaintiffs' shareholder/bylaw characterization is the sole or controlling framework governing the parties' relationship.

4. In response to paragraph 4, Defendants deny the allegations in paragraph 4, including the allegation that Defendants embarked on any "coordinated campaign" to capture goodwill for themselves, the alleged characterization of communications in late February 2026, and the allegation that Defendants lacked rights or justification with respect to the Columbia Store or related business operations. Defendants admit only that communications occurred among the parties in or about late February 2026 and thereafter.

5. In response to paragraph 5, Defendants deny the allegations in paragraph 5. Defendants specifically deny that they ignored lawful demands, refused amounts properly owed, or opened and operated any store in the manner characterized by Plaintiffs. Defendants further deny Plaintiffs' characterization of the parties' reporting obligations, fee obligations, authorization structure, and the circumstances surrounding the Columbia Store. Defendants aver that any failure of performance was caused in whole or in part by Plaintiffs' own prior breaches, interference, and coercive conduct.

6. In response to paragraph 6, Defendants deny the allegations in paragraph 6, including Plaintiffs' characterization of the LIC concession as "unauthorized," the allegation

that any guaranty or pledge was improper, and the allegation that any actions were taken without lawful basis or without authority. Defendants admit only that Plaintiffs challenge conduct relating to an LIC concession arrangement. Defendants further deny any allegation inconsistent with the actual governing documents and underlying transactions.

7. In response to paragraph 7, Defendants admit only that Plaintiffs purported to issue a termination notice on or about May 1, 2026. Defendants deny that any such purported termination was valid, effective, justified, or had the legal consequences alleged by Plaintiffs. Defendants further deny that Defendants acted in "flagrant violation" of Plaintiffs' rights or that Plaintiffs possessed the exclusive rights they now claim.

8. In response to paragraph 8, Defendants deny the allegations in paragraph 8, including Plaintiffs' characterization of the June 2026 rebranding, the nature of any assets, materials, infrastructure, or accounts allegedly used by Defendants, the allegation that Defendants refused to relinquish property "without any lawful authority," and the allegation that any purported dissolution notices lawfully conferred the unilateral control rights asserted by Plaintiffs. Defendants admit only that Plaintiffs purport to rely on certain dissolution notices and related demands.

9. In response to paragraph 9, Defendants admit only that paragraph 9 purports to list the causes of action asserted by Plaintiffs and the relief they seek. Defendants deny that Plaintiffs are entitled to any such relief or that Plaintiffs have stated valid claims as alleged. Defendants further deny that Plaintiffs validly terminated the Brand License Agreement, validly effected dissolution, or possess the unilateral operational-control rights claimed.

10. In response to paragraph 10, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding Shenzhen Molly Tea's organization under the laws of the People's Republic of China, principal place of business, internal identity issues, and trademark ownership records, and on that basis deny those allegations. Defendants admit only that Plaintiffs allege Shenzhen Molly Tea is the licensor under the agreement referenced in the Amended Complaint.

11. In response to paragraph 11, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding Mollytea Shops' organization under Delaware law, its internal structure, and its precise corporate role, and on that basis deny those allegations. Defendants admit only that Mollytea Shops is named as a plaintiff and purports to assert claims in its own right and derivatively.

12. In response to paragraph 12, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding Molly Tea Holding's organization, internal structure, and alleged role, and on that basis deny those allegations.

13. In response to paragraph 13, Defendants admit that MHL is a New York limited liability company. Defendants admit that Lin is the managing member of MHL. Defendants otherwise deny the allegations in paragraph 13 to the extent they characterize MHL's contractual rights, obligations, ownership status, or Plaintiffs' asserted governance rights, except that Defendants admit Plaintiffs allege MHL holds a 65% interest in each of the three Joint Venture Entities.

14. In response to paragraph 14, Defendants admit that Molly Tea CU is a New York limited liability company. Defendants otherwise deny knowledge or information

sufficient to form a belief as to the truth of Plaintiffs' allegations concerning ownership, control, and the asserted absence of any shareholder interest, and on that basis deny the remaining allegations.

15. In response to paragraph 15, Defendants admit that Genesis is a New York limited liability company. Defendants otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding ownership and control as characterized by Plaintiffs, and on that basis deny the remaining allegations.

16. In response to paragraph 16, Defendants admit that Lin is an individual residing in New York and that Plaintiffs allege she served as President of certain operating entities and executed certain guaranties. Defendants deny any remaining allegations in paragraph 16 to the extent they characterize legal status, capacity, effect, or liability.

17. In response to paragraph 17, Defendants admit that Liu is also known as Ziaozhe Liu and is an individual residing in New York. Defendants admit that Liu executed certain agreements on behalf of entities identified by Plaintiffs. Defendants otherwise deny the allegations in paragraph 17 to the extent they characterize Liu's role, authority, liability, or the legal effect of any document or transaction.

18. In response to paragraph 18, Defendants admit that Xu is an individual residing in New York. Defendants otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning ownership, principal status, and guaranty obligations as characterized by Plaintiffs, and on that basis deny the remaining allegations.

19. In response to paragraph 19, Defendants admit that Molly Tea NYC Inc. is alleged to be a New York corporation and has been associated with the Flushing Store location identified by Plaintiffs. Defendants otherwise deny any allegation in paragraph 19 inconsistent with the actual governing documents or the parties' disputed rights with respect to that entity and location.

20. In response to paragraph 20, Defendants admit that Molly Tea BK Inc. is alleged to be a New York corporation and has been associated with the Brooklyn Store location identified by Plaintiffs. Defendants otherwise deny any allegation in paragraph 20 inconsistent with the actual governing documents or the parties' disputed rights with respect to that entity and location.

21. In response to paragraph 21, Defendants admit that Molly Tea Manhattan Chinatown Inc. is alleged to be a New York corporation and has been associated with the Chinatown Store location identified by Plaintiffs. Defendants otherwise deny any allegation in paragraph 21 inconsistent with the actual governing documents or the parties' disputed rights with respect to that entity and location.

22. In response to paragraph 22, Defendants admit only that the Amended Complaint purports to assert federal trademark claims. Defendants do not contest that this Court may exercise subject-matter jurisdiction over properly pleaded federal claims, but deny any implication that Plaintiffs have stated valid federal claims or are entitled to relief thereunder.

23. In response to paragraph 23, Defendants admit only that Plaintiffs purport to invoke supplemental jurisdiction and rely on certain contractual provisions in support of their request for injunctive or provisional relief. Defendants deny Plaintiffs'

characterization of the scope, meaning, and enforceability of those provisions and deny that Plaintiffs are entitled to the relief sought.

24. In response to paragraph 24, Defendants admit that Lin, Liu, and Xu reside in New York, and that MHL, Molly Tea CU, and Genesis are New York entities. Defendants deny any remaining allegations in paragraph 24 to the extent they purport to state legal conclusions or otherwise require no response.

25. In response to paragraph 25, Defendants admit only that the Columbia Store location identified by Plaintiffs is located in this District. Defendants otherwise deny the allegations in paragraph 25 to the extent they characterize the opening, build-out, advertisement, operation, or legal significance of events relating to that location.

26. In response to paragraph 26, Defendants lack knowledge or information sufficient to form a belief as to the truth of Plaintiffs' allegations regarding the global scale, prominence, or reputation of the MOLLY TEA brand, and on that basis deny those allegations. Defendants admit only that Plaintiffs purport to describe the brand in promotional terms.

27. In response to paragraph 27, Defendants admit only that Plaintiffs contend they developed and maintained certain design, operational, marketing, and quality-control standards, and that Plaintiffs refer to certain alleged systems as a "Corporate Identity System" and an "Authorized Business System." Defendants deny the remaining allegations in paragraph 27, including Plaintiffs' characterization of exclusivity, ownership, comprehensiveness, and uniformity.

28. In response to paragraph 28, Defendants admit only that the agreement referenced by Plaintiffs contains defined terms and speaks for itself. Defendants deny any allegation

in paragraph 28 inconsistent with the actual language, scope, and legal effect of that agreement.

29. In response to paragraph 29, Defendants admit only that the agreement referenced by Plaintiffs contains defined terms and provisions concerning certain systems, materials, operations, and brand-related matters, and that the agreement speaks for itself. Defendants deny any allegation in paragraph 29 inconsistent with the actual language, scope, and legal effect of that agreement.

30. In response to paragraph 30, Defendants lack knowledge or information sufficient to form a belief as to the truth of Plaintiffs' allegations regarding what consumers allegedly encounter across all allegedly authorized Molly Tea stores, and on that basis deny those allegations.

31. In response to paragraph 31, Defendants deny the allegations in paragraph 31, except admit only that Plaintiffs claim ownership or control over certain branding, recipes, supply-chain arrangements, training materials, and related assets. Defendants further deny Plaintiffs' characterization that all such items were exclusively developed by or belong solely to Plaintiffs in the manner alleged.

32. In response to paragraph 32, Defendants admit only that public trademark records may reflect certain registrations in the name of Shenzhen Molly Tea. Defendants deny the remaining allegations in paragraph 32, including Plaintiffs' characterization of the validity, scope, legal effect, exclusivity, and present enforceability of any such registrations as against Defendants under the circumstances alleged here. Defendants further state that the validity and continued registration of one or more asserted marks are the subject of separate proceedings before the USPTO and/or Trademark Trial and

Appeal Board, and Defendants expressly preserve all rights and positions asserted therein.

33. In response to paragraph 33, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning trademark application details, claimed first-use dates, and the contents of annexed registration certificates, and on that basis deny those allegations. To the extent paragraph 33 purports to characterize public filings or documents, those documents speak for themselves.

34. In response to paragraph 34, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning PRC trademark registration and, on that basis, deny those allegations.

35. In response to paragraph 35, Defendants deny the allegations in paragraph 35, except admit only that Plaintiffs claim common-law rights in certain names, designs, and branding elements and that the agreement referenced by Plaintiffs contains provisions relating to design and brand usage. Defendants deny Plaintiffs' characterization of the scope, exclusivity, distinctiveness, common-law ownership, and enforceability of such alleged rights, and further deny any allegation inconsistent with the parties' actual agreements and course of dealing.

36. In response to paragraph 36, Defendants deny the allegations in paragraph 36, except admit only that Plaintiffs allege a combination of design and presentation elements across certain store locations. Defendants deny Plaintiffs' characterization that any such alleged combination is inherently distinctive, exclusively owned, or legally protectable in the manner asserted.

37. In response to paragraph 37, Defendants deny the allegations in paragraph 37, including Plaintiffs' characterization of the existence, scope, secrecy, ownership, and protectability of alleged trade secrets, as well as Plaintiffs' characterization of any machine, cartridge, operational information, or supply-chain information as a protectable trade secret. Defendants admit only that Plaintiffs purport to rely on contractual confidentiality language and to claim proprietary information.

38. In response to paragraph 38, Defendants admit only that Liu communicated with representatives of the MOLLY TEA enterprise concerning New York expansion. Defendants deny the remaining allegations in paragraph 38, including Plaintiffs' characterization that Liu "required" Plaintiffs' capital and brand support in the manner alleged, that MHL was established solely for the purpose alleged, and any implication that the relationship was as one-sided or uniform as Plaintiffs contend.

39. In response to paragraph 39, Defendants admit only that an agreement dated December 20, 2023 exists and that Liu signed a document on behalf of MHL. Defendants deny the remaining allegations in paragraph 39, including Plaintiffs' characterization of the agreement as the sole contractual instrument under which MHL had any right to use the MOLLY TEA marks or operate stores in the United States, and further deny any allegation inconsistent with the full body of the parties' governing agreements and course of performance.

40. In response to paragraph 40, Defendants admit only that the agreement referenced by Plaintiffs contains provisions concerning the use of certain marks, systems, materials, know-how, manuals, and support. Defendants deny any remaining allegations in

paragraph 40 to the extent they characterize the scope, exclusivity, legal effect, or practical implementation of those provisions beyond the documents themselves.

41. In response to paragraph 41, Defendants admit only that the agreement referenced by Plaintiffs contains provisions concerning certain fees and payments. Defendants deny the remaining allegations in paragraph 41 to the extent they characterize the parties' actual obligations, Plaintiffs' performance, amounts due, present enforceability, or any breach by Defendants. To the extent paragraph 41 purports to quote or summarize the agreement, the agreement speaks for itself.

42. In response to paragraph 42, Defendants admit only that the agreement referenced by Plaintiffs contains provisions concerning design, suppliers, product specifications, marketing, social media, and POS systems. Defendants deny the remaining allegations in paragraph 42 to the extent Plaintiffs characterize those provisions selectively, overstate their scope or exclusivity, or omit Plaintiffs' own obligations and course of dealing. Defendants further deny any allegation inconsistent with the actual agreements and the parties' performance thereunder.

43. In response to paragraph 43, Defendants deny the allegations in paragraph 43, including Plaintiffs' characterization that the referenced assets "belong to Plaintiff" exclusively and that MHL possessed only the limited and revocable rights alleged. Defendants admit only that Plaintiffs contend certain assets and systems were part of the parties' relationship and that Plaintiffs now assert MHL failed to comply with certain requirements.

44. In response to paragraph 44, Defendants deny the allegations in paragraph 44, including Plaintiffs' characterization that the Brand License Agreement did not

convey any rights to operate stores outside the alleged framework described by Plaintiffs. Defendants further deny any allegation inconsistent with the actual agreements, including the other executed agreements governing the parties' New York business relationship.

45. In response to paragraph 45, Defendants admit only that three New York stores were operated through a structure involving store-specific operating entities, that such entities were formed on or about the dates alleged, and that certain documents identified by Plaintiffs as shareholder agreements and bylaws exist. Defendants deny the remaining allegations in paragraph 45, including Plaintiffs' characterization that those agreements fully and exclusively define the parties' relationship, rights, and obligations.

46. In response to paragraph 46, Defendants deny the allegations in paragraph 46, including Plaintiffs' characterization that duties allegedly imposed on MHL under the Brand License Agreement "explicitly extended" to the operation of the Joint Venture Stores in the manner and to the extent alleged by Plaintiffs.

47. In response to paragraph 47, Defendants admit only that Plaintiffs allege Mollytea Shops held a 35% interest and MHL held a 65% interest in each of the Joint Venture Entities. Defendants deny any allegation in paragraph 47 to the extent it omits other relevant executed agreements or purports to resolve disputed governance and ownership issues in Plaintiffs' favor.

48. In response to paragraph 48, Defendants admit only that communications occurred in or about January 2026 regarding documents Plaintiffs characterize as shareholder agreements. Defendants deny the remaining allegations in paragraph 48, including

Plaintiffs' characterization of when and how such agreements became effective, the legal effect of such communications, the alleged capital-contribution amounts, and the asserted significance of such contributions. Defendants further deny any allegation inconsistent with the parties' other executed agreements and the disputed governance framework.

49. In response to paragraph 49, Defendants admit only that Liu signed documents on behalf of MHL and/or certain entities in a representative capacity. Defendants deny the remaining allegations in paragraph 49, including Plaintiffs' characterization that by signing such documents Liu personally bound himself to the fiduciary, non-compete, confidentiality, or corporate-opportunity duties alleged by Plaintiffs in the manner asserted.

50. In response to paragraph 50, Defendants admit only that lease agreements were entered into for the Flushing, Brooklyn, and Chinatown store locations on or about the dates alleged, and that Lin executed documents in connection with such locations. Defendants deny the remaining allegations in paragraph 50 to the extent Plaintiffs characterize the legal effect of such documents, the parties' approval rights, or the significance of Plaintiffs' alleged advance knowledge and approval. Defendants further state that Counterclaim-Plaintiffs entered into substantial lease and guaranty obligations in reliance on Counterclaim-Defendants' representations that they would support the New York operations.

51. In response to paragraph 51, Defendants admit only that certain documents identified by Plaintiffs as bylaws and shareholder agreements contain provisions that Plaintiffs characterize as minority protections, board rights, approval rights, and related

governance provisions. Defendants deny the remaining allegations in paragraph 51, including Plaintiffs' characterization of the scope, exclusivity, legal effect, and present enforceability of those alleged rights, and deny any allegation inconsistent with the actual documents and the parties' other executed agreements.

52. In response to paragraph 52, Defendants admit only that the documents referenced by Plaintiffs contain provisions that Plaintiffs contend relate to compliance with a license agreement and the use of certain operating systems or standards. Defendants deny the remaining allegations in paragraph 52 to the extent Plaintiffs selectively characterize those provisions or omit other governing agreements and course-of-performance facts.

53. In response to paragraph 53, Defendants admit only that Plaintiffs contend they designated Chowbus as a POS system for certain stores and that Plaintiffs contend certain manuals were provided. Defendants deny the remaining allegations in paragraph 53, including Plaintiffs' characterization of any exclusive designation, required use, scope of understanding, or legal significance.

54. In response to paragraph 54, Defendants admit only that a sponsorship agreement relating to Barclays Center was entered into on or about September 3, 2025, and that Plaintiffs allege Molly Tea NYC committed to payment obligations thereunder. Defendants deny the remaining allegations in paragraph 54, including Plaintiffs' characterization of the source and significance of any alleged capital contribution, the reasons for any later nonpayment, and the implication that Defendants acted wrongfully apart from Plaintiffs' own prior breaches and interference.

55. In response to paragraph 55, Defendants admit only that a guaranty relating to the Columbia Store was executed on or about January 8, 2026 and that Plaintiffs characterize it as a "Good Guy Guaranty." Defendants deny the remaining allegations in paragraph 55 to the extent they characterize the purpose, effect, or legal significance of that guaranty.

56. In response to paragraph 56, Defendants deny the allegations in paragraph 56, including Plaintiffs' characterization of Plaintiffs' alleged understanding, reasonable belief, intended future joint-venture structure, and Defendants' alleged intent not to proceed in good faith. Defendants admit only that discussions occurred concerning the Columbia Store, and that design-related materials existed. Defendants further deny any allegation inconsistent with the disputed and conflicting contractual framework governing the parties' New York operations.

57. In response to paragraph 57, Defendants admit only that Molly Tea CU was formed and that Plaintiffs contend it operated outside the structure Plaintiffs now advocate. Defendants deny the remaining allegations in paragraph 57, including Plaintiffs' characterization of ownership, control, lack of consent, and the legal consequences alleged. Defendants further deny any implication that Plaintiffs' now-asserted governance framework was the sole operative framework between the parties.

58. In response to paragraph 58, Defendants lack knowledge or information sufficient to form a belief as to the truth of Plaintiffs' allegation that Plaintiffs first became aware of the Columbia lease only upon marketing of the grand opening, and on that basis deny that allegation. Defendants admit only that Plaintiffs requested documents relating to the Columbia lease and that a lease was executed on or about January 9,

2026, to the extent reflected in the underlying documents. Defendants deny the remaining allegations.

59. In response to paragraph 59, Defendants deny the allegations in paragraph 59, including the allegation that Defendants were on actual notice that they lacked authorization to open or operate the Columbia Store except under the precise structure alleged by Plaintiffs. Defendants further deny Plaintiffs' characterization of Defendants' rights, notice, intent, and conduct.

60. In response to paragraph 60, Defendants deny the allegations in paragraph 60, including Plaintiffs' alter-ego allegations, capitalization allegations, alleged evasion motive, alleged unlawful capture of benefits, and alleged diversion of assets or inventory. Defendants further deny Plaintiffs' conclusory allegation that Molly Tea CU is bound by the Brand License Agreement as an alter ego of Defendants in the manner alleged.

61. In response to paragraph 61, Defendants deny the allegations in paragraph 61, including Plaintiffs' characterization of any conduct as breach, the alleged scope and meaning of the cited provisions, the allegation that Defendants violated any contractual formation or approval requirements, the allegation that any procurement or sourcing was improper, the allegation that any POS use was unauthorized in the manner asserted, and the allegation that any social-media or online activity violated binding restrictions as Plaintiffs contend. Defendants further deny any allegation inconsistent with the actual agreements and the parties' course of dealing.

62. In response to paragraph 62, Defendants deny the allegations in paragraph 62, including Plaintiffs' allegation that Defendants used Joint Venture Entity inventory or assets to capitalize, open, or operate the Columbia Store.

63. In response to paragraph 63, Defendants deny the allegations in paragraph 63, including Plaintiffs' characterization of Defendants' conduct as extracting credit support while wrongfully capturing brand benefits, acting without accountability, or causing harm to the brand as alleged. Defendants further deny any allegation inconsistent with Counterclaim-Plaintiffs' position that MHL undertook substantial capital, lease, guaranty, and operating risk in reliance on Plaintiffs' promises of support and cooperation.

64. In response to paragraph 64, Defendants deny the allegations in paragraph 64, including Plaintiffs' characterization of events in late February 2026 as an "unequivocal course of conduct" breaching or repudiating the agreements. Defendants admit only that communications occurred in or about late February 2026, that a March 2, 2026 meeting did not occur, and that certain communications channels changed. Defendants deny the remaining allegations, including Plaintiffs' characterization of the significance, motive, and legal effect of those events.

65. In response to paragraph 65, Defendants deny the allegations in paragraph 65, including Plaintiffs' characterization of any February 27, 2026 communication, the asserted meaning of the quoted phrase, the allegation that Defendants lacked permission to operate the stores "in this manner," and the allegation that Defendants froze Plaintiffs out or used joint-venture inventory and assets to expand New York

operations as alleged. Defendants admit only that communications occurred regarding store operations and possible resolution.

66. In response to paragraph 66, Defendants deny the allegations in paragraph 66, including Plaintiffs' characterization of late-February 2026 events as an unequivocal repudiation, freeze-out, or violation of the governing agreements. Defendants further deny Plaintiffs' characterization of any quality-control or brand-standards obligations and any alleged repudiation thereof.

67. In response to paragraph 67, Defendants admit only that communications occurred on or about March 25, 2026 and that Plaintiffs proposed a course of action concerning the New York stores and financial documentation. Defendants deny the remaining allegations in paragraph 67, including Plaintiffs' characterization of Defendants' position, Plaintiffs' rights, and the surrounding factual context.

68. In response to paragraph 68, Defendants admit only that Plaintiffs communicated a proposal regarding the Columbia Store and other business matters. Defendants deny the remaining allegations in paragraph 68, including Plaintiffs' characterization of any proposed structure, Plaintiffs' alleged rights, and the legal significance of the proposal.

69. In response to paragraph 69, Defendants admit only that Lin responded to Plaintiffs' proposal. Defendants deny the remaining allegations in paragraph 69, including Plaintiffs' characterization of Lin's response as a rejection confirming noncompliance or refusal to agree to a legitimate resolution path. Defendants further deny any implication that Plaintiffs' proposal reflected binding rights that Defendants were obligated to accept.

70. In response to paragraph 70, Defendants admit only that Plaintiffs issued a written notice on or about March 27, 2026 concerning management and compliance issues at certain overseas stores. Defendants deny the remaining allegations in paragraph 70, including Plaintiffs' characterization of the factual basis, legitimacy, scope, and legal effect of that notice, and deny that the cited issues justified the coercive operational measures later taken by Plaintiffs.

71. In response to paragraph 71, Defendants admit only that Plaintiffs contend the Brand License Agreement contains reporting, supervision, termination, inspection, remedy, and fee-shifting provisions, and that Plaintiffs purported to demand information or action under those provisions. Defendants deny the remaining allegations in paragraph 71, including Plaintiffs' characterization of the scope, enforceability, and lawful application of those provisions and the allegation that Plaintiffs were entitled to invoke them in the manner asserted. To the extent paragraph 71 purports to quote or summarize the agreement, the agreement speaks for itself.

72. In response to paragraph 72, Defendants admit only that Plaintiffs contacted Liu on or about March 30, 2026 regarding compliance items and threatened suspension of store operations. Defendants deny the remaining allegations in paragraph 72 to the extent Plaintiffs characterize that communication as justified, lawful, or contractually authorized under the circumstances.

73. In response to paragraph 73, Defendants deny the allegations in paragraph 73, including Plaintiffs' characterization that Defendants failed to respond, acted unbeknownst to Plaintiffs in the manner alleged, or that Plaintiffs had the right to suspend operations "as it had the right to do" under the Brand License Agreement.

Defendants admit only that Plaintiffs issued a notice on or about April 2, 2026 stating that operations at certain stores would be suspended effective April 3, 2026. Defendants further deny any allegation that the asserted basis for suspension was valid, justified, or nonpretextual.

74. In response to paragraph 74, Defendants deny the allegations in paragraph 74, including Plaintiffs' characterization of the April 2, 2026 suspension as a "measured intermediate enforcement step intended to preserve the brand." Defendants further deny that Plaintiffs acted in good faith or within lawful contractual bounds in issuing or implementing that suspension.

75. In response to paragraph 75, Defendants deny the allegations in paragraph 75, including Plaintiffs' characterization that Defendants refused to cure breaches, that continued operations were unauthorized, or that the opening of the Columbia Store was "unauthorized" or culminated from wrongful conduct as alleged. Defendants further deny any allegation inconsistent with Counterclaim-Plaintiffs' position that Plaintiffs' own conduct, including operational shutdowns, supply interference, and coercive use of control rights, materially impaired performance and precipitated the parties' dispute.

76. In response to paragraph 76, Defendants admit only that MHL commenced an action in the Supreme Court of the State of New York, Queens County, under Index No. 711066/2026, on or about April 16, 2026. Defendants deny the remaining allegations in paragraph 76, including Plaintiffs' characterization of the Queens action as "transparent," "bad faith," or based on "demonstrably false allegations," and deny Plaintiffs' characterization of the purpose, timing, and legal effect of that action.

Defendants further deny any allegation inconsistent with the verified allegations of the Queens complaint.

77. In response to paragraph 77, Defendants admit only that the Columbia Store opened to the public on or about April 17, 2026 and that it was promoted in connection with a grand opening. Defendants deny the remaining allegations in paragraph 77, including Plaintiffs' characterization that the opening was "unauthorized" or in material non-compliance as alleged.

78. In response to paragraph 78, Defendants admit only that the agreement referenced by Plaintiffs contains language that Plaintiffs contend addresses store-opening approval. Defendants deny the remaining allegations in paragraph 78, including Plaintiffs' characterization of the legal effect, enforceability, and application of that provision under the circumstances alleged here. Defendants further deny that the Columbia Store lacked authorization in the manner asserted by Plaintiffs.

79. In response to paragraph 79, Defendants deny the allegations in paragraph 79, including Plaintiffs' assertion that Defendants failed to obtain approvals required under the governing agreements or that all items identified by Plaintiffs required the approvals and procedures characterized in the Amended Complaint. Defendants further deny Plaintiffs' characterization of the facts surrounding the Columbia Store opening.

80. In response to paragraph 80, Defendants admit only that the agreement referenced by Plaintiffs contains language concerning design and decoration work and that the document speaks for itself. Defendants deny any remaining allegations in paragraph 80 inconsistent with the actual terms, scope, and legal effect of that document.

81. In response to paragraph 81, Defendants deny the allegations in paragraph 81, including Plaintiffs' characterization that any approved plan "was never implemented," that Defendants designed the store solely "in the manner they desired," that the alleged design differences were material, and that any such differences violated enforceable contractual obligations as alleged. Defendants further deny the accuracy and legal significance of Plaintiffs' chart and descriptions.

82. In response to paragraph 82, Defendants deny the allegations in paragraph 82, including the allegations that any alleged design differences impaired brand value, consumer perception, or distinctiveness, or that any such actions were taken without required knowledge or consent in the manner alleged by Plaintiffs.

83. In response to paragraph 83, Defendants admit only that the agreement referenced by Plaintiffs contains provisions relating to signage and displays and that the document speaks for itself. Defendants deny the remaining allegations in paragraph 83, including Plaintiffs' characterization that required consultation did not occur or that the store was unauthorized in the manner asserted.

84. In response to paragraph 84, Defendants admit only that the agreement referenced by Plaintiffs contains provisions that Plaintiffs characterize as requiring compliance with certain specifications and updates and that the document speaks for itself. Defendants deny the remaining allegations in paragraph 84, including Plaintiffs' characterization of the scope, application, and legal consequences of those provisions.

85. In response to paragraph 85, Defendants lack knowledge or information sufficient to form a belief as to the truth of Plaintiffs' allegations concerning what unnamed persons allegedly observed on the day of the Columbia Store opening, including

alleged POS lag, customer positioning, and staff demeanor, and on that basis deny those allegations. Defendants further deny Plaintiffs' characterization that any such alleged observations were inconsistent with ordinary operations or any contractual standard.

86. In response to paragraph 86, Defendants admit only that the agreement referenced by Plaintiffs contains provisions that Plaintiffs characterize as relating to food-safety standards, inspections, and supervision. Defendants deny the remaining allegations in paragraph 86, including Plaintiffs' characterization that "none of this took place," that removal of any person from any communication channel prevented lawful oversight as alleged, or that Defendants materially breached the agreement in the manner asserted.

87. In response to paragraph 87, Defendants deny the allegations in paragraph 87, including Plaintiffs' allegation, made upon information and belief, that employees lacked required certificates and the allegation that Plaintiffs were entitled to the documents or disclosures asserted in the manner alleged.

88. In response to paragraph 88, Defendants admit only that the agreement referenced by Plaintiffs contains provisions that Plaintiffs contend relate to social-media accounts and WeChat operations and that the document speaks for itself. Defendants deny the remaining allegations in paragraph 88, including Plaintiffs' characterization of scope, exclusivity, and application of those provisions under the circumstances.

89. In response to paragraph 89, Defendants admit only that social-media accounts and promotional activity existed relating to the Columbia Store. Defendants deny the

remaining allegations in paragraph 89, including Plaintiffs' characterization that such activity was unauthorized, violative, or wrongful in the manner alleged.

90. In response to paragraph 90, Defendants deny the allegations in paragraph 90, including Plaintiffs' characterization of promotions, pricing, review procedures, authorization, and alleged inconsistency with standards followed by "thousands of other Molly Tea stores." Defendants lack knowledge or information sufficient to form a belief as to the truth of Plaintiffs' broad allegations concerning pricing and promotional standards across all other stores and, on that basis, deny those allegations.

91. In response to paragraph 91, Defendants admit only that the agreement referenced by Plaintiffs contains provisions concerning pricing and promotions and that the document speaks for itself. Defendants deny the remaining allegations in paragraph 91, including Plaintiffs' assertion that any pricing or promotions were in "clear contravention" of enforceable obligations as alleged.

92. In response to paragraph 92, Defendants admit only that the agreement referenced by Plaintiffs contains provisions that Plaintiffs characterize as relating to monitoring systems and supervision. Defendants deny the remaining allegations in paragraph 92, including Plaintiffs' assertions that Defendants operated entirely outside monitoring infrastructure, prevented lawful supervisory access in the manner alleged, or materially breached the agreement as alleged. Defendants further deny any implication that Plaintiffs' own prior interference with operations, systems, and communications did not contribute to the circumstances complained of.

93. In response to paragraph 93, Defendants admit only that Plaintiffs contend certain agreements required use of a designated POS system and that the cited documents speak for themselves. Defendants deny the remaining allegations in paragraph 93, including Plaintiffs' characterization of exclusivity, scope, and enforceability of those alleged requirements.

94. In response to paragraph 94, Defendants lack knowledge or information sufficient to form a belief as to the truth of Plaintiffs' allegations concerning Chowbus's corporate business, system architecture, telemetry, and headquarters functions, and on that basis deny those allegations. Defendants admit only that Plaintiffs allege Chowbus had agreements with certain operating entities.

95. In response to paragraph 95, Defendants admit only that Toast was used in connection with the Columbia Store. Defendants deny the remaining allegations in paragraph 95, including Plaintiffs' characterization that such use was wrongful, lacked authority, or occurred in violation of binding obligations as alleged.

96. In response to paragraph 96, Defendants deny the allegations in paragraph 96, including Plaintiffs' characterization that Defendants "thwarted" access to sales data, deprived Plaintiffs of required transparency, or deprived Plaintiffs of royalty, supply-chain, or data rights in the manner alleged. Defendants further deny any implication that Plaintiffs' claimed rights are undisputed or exclusive.

97. In response to paragraph 97, Defendants admit only that the agreement referenced by Plaintiffs contains provisions concerning pre-opening procurement and designated suppliers and that the document speaks for itself. Defendants deny the remaining

allegations in paragraph 97 to the extent Plaintiffs characterize the scope, exclusivity, and legal effect of those provisions or the role of affiliates as alleged.

98. In response to paragraph 98, Defendants admit only that the agreement referenced by Plaintiffs contains provisions concerning certain items, production, procurement, and written applications, and that the document speaks for itself. Defendants deny the remaining allegations in paragraph 98, including Plaintiffs' characterization that the designated supply arrangement ensured authenticity, quality control, or uniformity in the absolute manner alleged.

99. In response to paragraph 99, Defendants deny the allegations in paragraph 99, including Plaintiffs' assertion that no designated supplier procurement orders were placed as alleged, that any product sold was necessarily diverted from joint-venture inventory or sourced from unauthorized third parties, and that either scenario constituted breach or diminished brand quality in the manner alleged. Defendants further deny Plaintiffs' characterization of the underlying facts and legal consequences.

100. In response to paragraph 100, Defendants admit only that the agreement referenced by Plaintiffs contains provisions that Plaintiffs characterize as relating to procurement, designated materials, locations of use, and substitutes, and that the document speaks for itself. Defendants deny the remaining allegations in paragraph 100, including Plaintiffs' allegation that Defendants operated the Columbia Store on a non-designated supply chain in the manner alleged, diverted materials in violation of enforceable restrictions, or materially breached the agreement as alleged. Defendants further deny any allegation inconsistent with Counterclaim-Plaintiffs' position that

Plaintiffs themselves impaired operations and used control over supply and systems as leverage.

101. In response to paragraph 101, Defendants deny the allegations in paragraph 101, including Plaintiffs' assertion that no supply arrangement was extended to Molly Tea CU or the Columbia Store, that Plaintiffs were never approached regarding such an arrangement, that Defendants intended concealment, or that the Columbia Store opened and operated entirely outside any authorized or lawful framework as alleged. Defendants further deny Plaintiffs' alternative assertion that products were necessarily non-authentic or diverted in the manner alleged.

102. In response to paragraph 102, Defendants deny the allegations in paragraph 102, including Plaintiffs' characterization that Defendants caused consumers to receive counterfeit or substantially non-conforming goods, or that Plaintiffs were deprived of royalty, supply-chain, or quality-control rights in the manner alleged. Defendants further deny that Plaintiffs' asserted rights are exclusive, undisputed, or enforceable as alleged.

103. In response to paragraph 103, Defendants admit only that a concession agreement relating to a food-court location at 28-07 Jackson Avenue, Long Island City, New York was entered into on or about January 13, 2026 and that Plaintiffs challenge that arrangement in this action. Defendants deny the remaining allegations in paragraph 103, including Plaintiffs' characterization of the trade-name provisions, the legal effect of the agreement and guaranties, and the asserted significance of Molly Tea NYC's alleged role as corporate guarantor.

104. In response to paragraph 104, Defendants deny the allegations in paragraph 104, including Plaintiffs' assertion that Lin executed any corporate guaranty "without valid corporate authorization" or that the guaranty had the legal effect and scope alleged by Plaintiffs.

105. In response to paragraph 105, Defendants deny the allegations in paragraph 105, including Plaintiffs' characterization that the cited provisions required the approvals alleged, that any such approvals were absent, and that Defendants' actions violated the bylaws or shareholder agreements in the manner asserted. To the extent paragraph 105 purports to characterize the governing documents, those documents speak for themselves. Defendants further deny any allegation inconsistent with the parties' other executed agreements and disputed governance structure.

106. In response to paragraph 106, Defendants deny the allegations in paragraph 106, including Plaintiffs' assertion that no board authorization existed, that the Brand Director never approved the transaction as alleged, and that the LIC Corporate Guaranty is void and unenforceable as against Molly Tea NYC in the manner claimed by Plaintiffs.

107. In response to paragraph 107, Defendants deny the allegations in paragraph 107, including Plaintiffs' assertion that the LIC Concession was not authorized by any written agreement with Plaintiffs or that Genesis lacked authority in the manner alleged. Defendants further deny any allegation inconsistent with the parties' full course of dealing and disputed contractual framework.

108. In response to paragraph 108, Defendants deny the allegations in paragraph 108, including Plaintiffs' assertion that Defendants falsely represented affiliation,

sponsorship, or authorization to LIC Food Court LLC, and including Plaintiffs' characterization of the legal and factual significance of the cited agreement language. To the extent paragraph 108 quotes or paraphrases the LIC concession agreement, that document speaks for itself.

109. In response to paragraph 109, Defendants deny the allegations in paragraph 109, including Plaintiffs' characterization of a coordinated pattern to expand outside Plaintiffs' alleged framework while siphoning goodwill, credit support, or supply chain benefits. Defendants further deny any allegation inconsistent with Counterclaim-Plaintiffs' position that Plaintiffs themselves induced the New York expansion and later used control over operations and supply to coerce surrender of rights.

110. In response to paragraph 110, Defendants deny the allegations in paragraph 110, including Plaintiffs' characterization that the Joint Venture Stores were operated "unlawfully" or in breach as alleged. Defendants admit only that Plaintiffs purport to divide their allegations into pre-termination and post-termination categories.

111. In response to paragraph 111, Defendants deny the allegations in paragraph 111, including Plaintiffs' assertions that Defendants operated the Joint Venture Stores on unauthorized systems or supply chains, entered unauthorized engagements, excluded Plaintiffs from governance, refused reporting or inspection rights as alleged, or bound the entities without authorization in the manner asserted. Defendants further deny any allegation inconsistent with the actual agreements, the parties' course of dealing, and Plaintiffs' own interference with operations and systems.

112. In response to paragraph 112, Defendants admit only that the agreement referenced by Plaintiffs contains language that Plaintiffs characterize as relating to consumer complaints and remedial measures and that the document speaks for itself. Defendants deny the remaining allegations in paragraph 112 to the extent Plaintiffs imply the existence of breach or legal consequence beyond the terms of the document.

113. In response to paragraph 113, Defendants deny the allegations in paragraph 113, including Plaintiffs' assertion that the operation of the Joint Venture Stores led to deviations from standard quality or a "barrage" of consumer complaints that Defendants disregarded. Defendants lack knowledge or information sufficient to form a belief as to Plaintiffs' broad and conclusory characterization of all consumer feedback and, on that basis, deny those allegations.

114. In response to paragraph 114, Defendants admit only that the agreement referenced by Plaintiffs contains provisions concerning revenue recording, reporting, financial reports, and inspection or audit rights and that the document speaks for itself. Defendants deny the remaining allegations in paragraph 114 to the extent Plaintiffs selectively characterize the scope, application, and legal effect of those provisions.

115. In response to paragraph 115, Defendants deny the allegations in paragraph 115, including Plaintiffs' assertion that MHL failed to calculate daily revenue, failed to record revenue in the prescribed manner, failed to settle all outstanding accounts since January 2026, failed to provide required reports in the manner alleged, refused all audit or inspection requests, retained revenue beyond entitlement, diverted funds

to Columbia or LIC, or concealed wrongdoing. Defendants further deny any allegation inconsistent with Counterclaim-Plaintiffs' position that Plaintiffs themselves disrupted operations and access to key systems and channels.

116. In response to paragraph 116, Defendants deny the allegations in paragraph 116, including Plaintiffs' assertion that MHL failed to pay the referenced fees as alleged or that any such amounts were properly due, owing, and recoverable in the manner claimed by Plaintiffs. Defendants further deny that Plaintiffs lack an understanding of amounts allegedly owed for reasons attributable solely to Defendants.

117. In response to paragraph 117, Defendants admit only that Plaintiffs purported to issue a written termination notice on or about May 1, 2026. Defendants deny the remaining allegations in paragraph 117, including Plaintiffs' assertion that the termination was formal, valid, justified, effective, or legally sufficient to extinguish all rights in the manner alleged. Defendants further deny Plaintiffs' characterization of the grounds for termination and any allegation that Counterclaim-Plaintiffs lost all authority as claimed.

118. In response to paragraph 118, Defendants deny the allegations in paragraph 118, including Plaintiffs' characterization that Defendants "refused to cease operations," "continue to operate" in "flagrant violation" of Plaintiffs' rights, or used marks, trade dress, or systems without any lawful basis. Defendants further deny any allegation inconsistent with the parties' disputed contractual rights and Plaintiffs' own prior breaches and coercive conduct.

119. In response to paragraph 119, Defendants deny the allegations in paragraph 119, including Plaintiffs' assertion that each day of operation caused loss of control, harm

to goodwill, or exposure of the public to non-conforming goods in the manner alleged. Defendants further deny that such allegations can be established as pleaded.

120. In response to paragraph 120, Defendants admit only that this Court entered a preliminary injunction on June 8, 2026 and that the order speaks for itself. Defendants deny any allegation in paragraph 120 inconsistent with the actual terms, scope, and legal effect of that order.

121. In response to paragraph 121, Defendants admit only that this Court entered an amended preliminary injunction on June 23, 2026 and that the order speaks for itself. Defendants deny any remaining allegations in paragraph 121 to the extent Plaintiffs selectively characterize the modifications or legal significance of that order.

122. In response to paragraph 122, Defendants deny the allegations in paragraph 122, including Plaintiffs' characterization that Defendants "continued to unlawfully operate" the Joint Venture Stores or that the described rebranding and signage conditions establish actionable wrongdoing as alleged. Defendants admit only that rebranding activity occurred after entry of the June 8, 2026 preliminary injunction. Defendants lack knowledge or information sufficient to form a belief as to Plaintiffs' broad allegations regarding historic tagline usage across all operators and, on that basis, deny those allegations.

123. In response to paragraph 123, Defendants deny the allegations in paragraph 123, including Plaintiffs' characterization that the stores remained "Molly Tea stores in all but name," that operations were unauthorized in the manner alleged, or that such acts constituted "blatant" violations of the Brand License Agreement or Shareholder Agreements.

124. In response to paragraph 124, Defendants deny the allegations in paragraph 124, including Plaintiffs' assertion that Defendants preserved and used MOLLY TEA marks without authorization merely by reason of the alleged "?Tea" rebranding.

125. In response to paragraph 125, Defendants deny the allegations in paragraph 125, including Plaintiffs' detailed characterization of a uniform exterior commercial impression, alleged exclusive exterior elements, and the legal significance of such alleged features. Defendants further deny that paragraph 125 accurately or completely describes the exterior design of all relevant locations or establishes protectable rights as alleged.

126. In response to paragraph 126, Defendants deny the allegations in paragraph 126, including Plaintiffs' detailed characterization of a supposedly unified interior design palette, wall treatment, and branding aesthetic across all authorized locations, and deny that such allegations establish exclusive or protectable rights as alleged. Defendants further deny that paragraph 126 fully or accurately describes the relevant locations.

127. In response to paragraph 127, Defendants deny the allegations in paragraph 127, including Plaintiffs' characterization of lighting elements, technical standards, illumination features, and their alleged significance to any protectable trade dress or other exclusive rights. Defendants further deny that paragraph 127 accurately or completely describes the relevant locations or binding standards applicable to Defendants.

128. In response to paragraph 128, Defendants deny the allegations in paragraph 128, including Plaintiffs' characterization of standardized ceiling construction, design

requirements, stepped details, or other asserted features as uniform, distinctive, exclusive, or legally protectable in the manner alleged.

129. In response to paragraph 129, Defendants deny the allegations in paragraph 129, including Plaintiffs' characterization of a standardized floor plan, counter placement, partitioning, queue zones, display shelving, lighting, menu boards, and their alleged legal significance. Defendants further deny that paragraph 129 accurately or completely describes all relevant locations or enforceable requirements applicable to Defendants.

130. In response to paragraph 130, Defendants deny the allegations in paragraph 130, including Plaintiffs' characterization of mandatory uniform specifications, alleged branding placement, and the existence or scope of any enforceable inspection or supervision rights as asserted. Defendants admit only that Plaintiffs contend certain manuals and agreements addressed employee presentation and uniforms.

131. In response to paragraph 131, Defendants deny the allegations in paragraph 131, including Plaintiffs' assertion that packaging elements constituted an integral and exclusive part of a protectable commercial impression or that all such items were required to be procured exclusively from Plaintiffs or their designated suppliers in the manner and to the extent alleged. To the extent paragraph 131 purports to characterize agreements, those documents speak for themselves.

132. In response to paragraph 132, Defendants deny the allegations in paragraph 132, including Plaintiffs' assertion that menu boards and promotional materials followed a single standardized format with the legal significance alleged.

133. In response to paragraph 133, Defendants deny the allegations in paragraph 133, including Plaintiffs' assertions that the listed elements were non-functional, that the alleged combination created a singular "look and feel," that such look and feel was immediately recognizable in the manner alleged, or that Plaintiffs possess the protectable rights claimed.

134. In response to paragraph 134, Defendants deny the allegations in paragraph 134, including Plaintiffs' assertions that the Joint Venture Stores were built out solely under Plaintiffs' direction, that each element was executed pursuant to Plaintiffs' drawings in the manner alleged, or that the confidentiality obligations were as broad or as legally consequential as Plaintiffs contend. Defendants further deny any allegation inconsistent with the parties' full course of dealing and disputed contractual framework.

135. In response to paragraph 135, Defendants deny the allegations in paragraph 135, including Plaintiffs' characterization that visual differences reflect only "authorized variations," that branding formats and taglines were controlled in the manner alleged, or that those allegations establish exclusive trade-dress rights or the legal conclusions Plaintiffs seek to draw. Defendants lack knowledge or information sufficient to form a belief as to Plaintiffs' broad allegations concerning branding department updates and all allegedly authorized historic variations across locations, and on that basis deny those allegations.

136. In response to paragraph 136, Defendants deny the allegations in paragraph 136, including Plaintiffs' characterization that, after May 1, 2026, Defendants continued

operations using protectable trade secrets in the manner alleged or without any lawful basis. Defendants further deny that Plaintiffs validly terminated all rights as asserted.

137. In response to paragraph 137, Defendants deny the allegations in paragraph 137, including Plaintiffs' characterization of recipes, formulations, methods, manuals, training materials, supply-chain specifications, and related information as trade secrets within the meaning of the Defend Trade Secrets Act, as well as Plaintiffs' assertions concerning independent economic value, secrecy, and non-ascertainability. Defendants admit only that Plaintiffs claim proprietary information and assert trade-secret protection over broad categories of information.

138. In response to paragraph 138, Defendants deny the allegations in paragraph 138, including Plaintiffs' characterization of any beverage machine as proprietary, exclusive, confidential, trade-secret-bearing, or custom-manufactured solely for Plaintiffs in the manner alleged, and deny Plaintiffs' assertions concerning the legal significance of any product agreements, ingredient cartridges, embedded formulas, or exclusive supply arrangements.

139. In response to paragraph 139, Defendants deny the allegations in paragraph 139, including Plaintiffs' assertion that they took reasonable measures to maintain secrecy, that the cited contractual language has the scope or legal effect alleged, that post-termination use occurred as characterized by Plaintiffs, or that Defendants were obligated to return the listed items in the manner alleged. Defendants further deny Plaintiffs' characterization of the operation of the stores and any alleged use of trade-secret materials.

140. In response to paragraph 140, Defendants admit only that Plaintiffs issued documents on or about July 10, 2026 that Plaintiffs characterize as dissolution notices. Defendants deny the remaining allegations in paragraph 140, including Plaintiffs' assertion that those notices were effective, valid, properly served, legally sufficient, or based on actual dissolution events under binding and controlling agreements. Defendants further deny Plaintiffs' characterization that the cited shareholder-agreement provisions exclusively govern the parties' rights.

141. In response to paragraph 141, Defendants deny the allegations in paragraph 141, including each subpart A through F to the extent they allege that dissolution events occurred, that trade secrets or confidential information were disclosed or misused as alleged, that brand-damaging conduct occurred as alleged, that Defendants violated Section 6.5, Section 7.3(b), Section 6.3, Section 6.4, or any other cited provision in the manner asserted, or that Liu solicited competing brands in a way giving rise to uncured dissolution events. Defendants further deny that Plaintiffs' characterizations of "?Tea," Columbia, LIC, inventory use, social media, suppliers, employees, or alleged competing businesses are accurate or legally sufficient.

142. In response to paragraph 142, Defendants deny the allegations in paragraph 142, including Plaintiffs' assertion that the alleged breaches were not capable of cure, that no cure period existed, or that any completed acts or alleged reputational consequences automatically or self-evidently created dissolution events. Defendants further deny Plaintiffs' characterization of the legal consequences of the cited conduct.

143. In response to paragraph 143, Defendants deny the allegations in paragraph 143, including Plaintiffs' assertion that Mollytea Shops validly elected dissolution or that Section 8.2(a)(2) conferred the unilateral rights alleged under the actual disputed contractual framework.

144. In response to paragraph 144, Defendants deny the allegations in paragraph 144, including Plaintiffs' assertion that Section 8.2(c) conferred the immediate operational-control rights alleged, that Plaintiffs validly assumed full operational control, or that Defendants were obligated to cease all involvement and turn over keys, credentials, accounts, and records in the manner and on the timetable alleged. Defendants admit only that Plaintiffs made such demands.

145. In response to paragraph 145, Defendants deny the allegations in paragraph 145, including Plaintiffs' assertion that dissolution occurred pursuant to Section 8.3 as alleged or that the cited provisions had the self-operative legal effect claimed by Plaintiffs.

146. In response to paragraph 146, Defendants deny the allegations in paragraph 146, including Plaintiffs' assertions regarding the operative dissolution procedures, the alleged requirement that each Joint Venture Entity immediately cease business operations, the alleged termination of all authority, and the assertion that MHL refused to cooperate with a valid dissolution. Defendants further deny that continued operations constituted a continuing breach in the manner alleged by Plaintiffs.

147. In response to paragraph 147, Defendants deny the allegations in paragraph 147, including Plaintiffs' assertion that the shareholder agreements indisputably control over the bylaws for the purposes asserted, that no bylaw provision may be relied upon

as a matter of law in the manner alleged, or that Plaintiffs possess the unilateral operational-control rights claimed. Defendants further deny any allegation inconsistent with the parties' disputed and conflicting contractual framework.

148. In response to paragraph 148, Defendants deny the allegations in paragraph 148, including Plaintiffs' assertion that Defendants' conduct caused ongoing loss of control over reputation, goodwill, quality, or brand identity, or that any alleged use of marks, trade dress, social-media accounts, POS, or supply chain was unauthorized or harmful in the manner asserted. Defendants further deny Plaintiffs' claim of irreparable harm.

149. In response to paragraph 149, Defendants deny the allegations in paragraph 149, including Plaintiffs' assertion that they cannot verify conformity, monitor pricing or promotional environments, access transaction data, or ensure consumer consistency in the manner alleged. Defendants further deny that any inability claimed by Plaintiffs arose solely or primarily from Defendants' conduct rather than Plaintiffs' own actions, shutdowns, and interference.

150. In response to paragraph 150, Defendants deny the allegations in paragraph 150, including Plaintiffs' characterization of the "?Tea" rebranding, the source and nature of goods allegedly sold, the alleged stripping of source identifiers, the alleged dilution or erosion of goodwill, the alleged false commercial impression, and the assertion that any such harm is inherently unquantifiable or incapable of monetary remedy. Defendants further deny Plaintiffs' claim of irreparable harm.

151. In response to paragraph 151, Defendants deny the allegations in paragraph 151, including Plaintiffs' assertion that continued use of any alleged trade secrets caused

irreparable harm, deprived Plaintiffs of exclusive control, risked disclosure, or enabled ongoing unauthorized commercial benefit in the manner alleged. Defendants further deny that any such harm is incapable of monetary valuation or other legal remedy.

152. In response to paragraph 152, Defendants deny the allegations in paragraph 152, including Plaintiffs' assertions regarding exclusive possession of books and records, lack of reporting since February 2026, nonpayment since January 2026, refusal of all audits, inability to ascertain financial condition, or risk of irretrievable loss of data in the manner alleged. Defendants further deny any allegation that Plaintiffs' claimed inability to access information arose solely from Defendants' conduct rather than from Plaintiffs' own actions and interference.

153. In response to paragraph 153, Defendants deny the allegations in paragraph 153, including Plaintiffs' assertion that Mollytea Shops possessed valid dissolution and operational-control rights that were being obstructed by MHL, that MHL operated "without authority," that assets were being diverted as alleged, or that any resulting harm was ongoing and incapable of monetary compensation in the manner asserted.

154. In response to paragraph 154, Defendants deny the allegations in paragraph 154, including Plaintiffs' assertions regarding the alleged unique and non-replicable value of the store locations, alleged unauthorized signage alterations, alleged landlord-default exposure, and the claim that the loss or impairment of those locations could not be remedied by money damages.

155. Defendants repeat and reallege their responses to the preceding paragraphs as if fully set forth herein.

156. In response to paragraph 156, Defendants admit only that a document dated December 20, 2023 exists and that Plaintiffs characterize it as the Brand License Agreement. Defendants deny any remaining allegations inconsistent with the actual terms and disputed effect of that document.

157. In response to paragraph 157, Defendants admit only that the document referenced by Plaintiffs contains provisions that Plaintiffs contend relate to design, suppliers, POS systems, pricing, promotions, social media, sourcing, store development, and fees, and that the document speaks for itself. Defendants deny the remaining allegations in paragraph 157.

158. In response to paragraph 158, Defendants deny the allegations in paragraph 158, including Plaintiffs' assertion that Shenzhen Molly Tea fully performed its obligations under the Brand License Agreement. Defendants aver that Plaintiffs materially breached first and impaired Defendants' performance.

159. In response to paragraph 159, Defendants deny the allegations in paragraph 159, including Plaintiffs' alter-ego allegations regarding Molly Tea CU.

160. In response to paragraph 160, Defendants deny the allegations in paragraph 160, including Plaintiffs' assertion that MHL or Molly Tea CU materially breached the Brand License Agreement in the manner alleged.

161. In response to paragraph 161, Defendants deny the allegations in paragraph 161, including Plaintiffs' assertion that rebranding or continued operations violated Sections 13.4, 15.10, or 16.8 in the manner alleged or that Defendants exploited any authorized system unlawfully.

162. In response to paragraph 162, Defendants deny the allegations in paragraph 162, including Plaintiffs' assertions concerning financial reporting, settlement of accounts, and refusal of audits as alleged.

163. In response to paragraph 163, Defendants deny the allegations in paragraph 163, including Plaintiffs' assertion that MHL materially breached payment obligations in the manner alleged.

164. In response to paragraph 164, Defendants deny the allegations in paragraph 164, including Plaintiffs' assertion that any alleged breaches were material, went to the essence of the agreement, or deprived Plaintiffs of the benefit of their bargain as alleged.

165. In response to paragraph 165, Defendants deny the allegations in paragraph 165, including Plaintiffs' damages allegations and their claim to damages exceeding five million dollars.

166. Defendants repeat and reallege their responses to the preceding paragraphs as if fully set forth herein.

167. In response to paragraph 167, Defendants admit only that documents Plaintiffs characterize as shareholder agreements exist. Defendants deny any allegation that such agreements exclusively and conclusively govern the parties' relationship as alleged.

168. In response to paragraph 168, Defendants admit only that the documents referenced by Plaintiffs contain provisions Plaintiffs characterize as requiring compliance, adherence to standards, designated systems, and brand-shareholder

oversight, and that such documents speak for themselves. Defendants deny the remaining allegations.

169. In response to paragraph 169, Defendants deny the allegations in paragraph 169, including Plaintiffs' assertion that Plaintiffs performed all obligations under the shareholder agreements.

170. In response to paragraph 170, Defendants deny the allegations in paragraph 170, including each subpart alleging refusal to comply with standards, exclusion from governance, lack of financial transparency, and diversion of resources or opportunities.

171. In response to paragraph 171, Defendants deny the allegations in paragraph 171, including Plaintiffs' assertions that Defendants misappropriated trade secrets, engaged in prohibited competitive conduct, or solicited employees, customers, or suppliers in violation of Article VI.

172. In response to paragraph 172, Defendants deny the allegations in paragraph 172, including Plaintiffs' characterization of Section 7.3(b), the alleged breaches thereof, and the asserted significance of Columbia, LIC, or "?Tea" operations. Defendants further deny any allegation inconsistent with the disputed contractual framework.

173. In response to paragraph 173, Defendants deny the allegations in paragraph 173.

174. In response to paragraph 174, Defendants admit only that Plaintiffs cite provisions they contend permit interim or provisional relief and that the documents speak for themselves. Defendants deny Plaintiffs' characterization of those provisions and deny entitlement to the relief sought.

175. In response to paragraph 175, Defendants admit only that Plaintiffs cite a fee-shifting provision and that the documents speak for themselves. Defendants deny the remaining allegations.

176. In response to paragraph 176, Defendants deny the allegations in paragraph 176, including Plaintiffs' assertion that they are entitled to injunctive relief "without additional showing."

177. In response to paragraph 177, Defendants deny the allegations in paragraph 177, including Plaintiffs' damages allegations.

178. Defendants repeat and reallege their responses to the preceding paragraphs as if fully set forth herein.

179. In response to paragraph 179, Defendants deny the allegations in paragraph 179, including Plaintiffs' assertions regarding possessory rights and ownership interests in the property identified.

180. In response to paragraph 180, Defendants deny the allegations in paragraph 180, including the alleged diversion, taking, use, consumption, transfer, or dominion and control as asserted.

181. In response to paragraph 181, Defendants deny the allegations in paragraph 181, including Plaintiffs' assertion that post-May 1 conduct constituted continuing conversion.

182. In response to paragraph 182, Defendants deny the allegations in paragraph 182.

183. In response to paragraph 183, Defendants deny the allegations in paragraph 183, including Plaintiffs' assertion that a legally sufficient demand was made and refused in the manner alleged.

184. In response to paragraph 184, Defendants deny the allegations in paragraph 184, including Plaintiffs' damages allegations.

185. In response to paragraph 185, Defendants deny the allegations in paragraph 185, including Plaintiffs' punitive-damages allegations.

186. Defendants repeat and reallege their responses to the preceding paragraphs as if fully set forth herein.

187. In response to paragraph 187, Defendants deny the allegations in paragraph 187, except admit only that Plaintiffs claim rights in certain trademarks, trade dress, and related branding. Defendants deny Plaintiffs' characterization of exclusivity, distinctiveness, ownership, and protectability.

188. In response to paragraph 188, Defendants deny the allegations in paragraph 188, including Plaintiffs' assertion that operation of Columbia or LIC constituted false designation of origin or likely consumer confusion as alleged.

189. In response to paragraph 189, Defendants admit only that Plaintiffs purported to terminate the Brand License Agreement on May 1, 2026. Defendants deny the remaining allegations, including the assertion that any such purported termination extinguished rights in the manner alleged.

190. In response to paragraph 190, Defendants deny the allegations in paragraph 190, including Plaintiffs' assertion that continued operation of the Joint Venture Stores was unauthorized or actionable under Section 43(a) as alleged.

191. In response to paragraph 191, Defendants deny the allegations in paragraph 191.

192. In response to paragraph 192, Defendants deny the allegations in paragraph 192, including Plaintiffs' reverse-passing-off theory concerning "?Tea," the alleged retention of complete trade dress, recipes, beverage systems, and goodwill, and the alleged false designation of origin.

193. In response to paragraph 193, Defendants deny the allegations in paragraph 193, including Plaintiffs' assertion that Columbia or LIC constituted independent false designation of origin or that goods were sourced or sold as alleged.

194. In response to paragraph 194, Defendants deny the allegations in paragraph 194, including Plaintiffs' factual assertions about proprietary supply components and mid-June usage.

195. In response to paragraph 195, Defendants deny the allegations in paragraph 195, including Plaintiffs' assertions regarding confusion and authenticity.

196. In response to paragraph 196, Defendants deny the allegations in paragraph 196.

197. In response to paragraph 197, Defendants deny the allegations in paragraph 197.

198. In response to paragraph 198, Defendants deny the allegations in paragraph 198, including irreparable-injury allegations.

199. In response to paragraph 199, Defendants deny the allegations in paragraph 199, including Plaintiffs' assertion that they have no adequate remedy at law or that only injunctive relief can prevent further harm.

200. In response to paragraph 200, Defendants deny the allegations in paragraph 200, including Plaintiffs' entitlement to profits, enhanced damages, costs, or attorneys' fees.

201. Defendants repeat and reallege their responses to the preceding paragraphs as if fully set forth herein.

202. In response to paragraph 202, Defendants admit only that Plaintiffs claim ownership of certain registered marks. Defendants deny the remaining allegations in paragraph 202 to the extent Plaintiffs characterize exclusivity, enforceability, or legal consequences beyond the public records themselves.

203. In response to paragraph 203, Defendants deny the allegations in paragraph 203, including Plaintiffs' assertion that Defendants used copies or colorable imitations without consent in a manner likely to cause confusion.

204. In response to paragraph 204, Defendants admit only that Plaintiffs purported to terminate the Brand License Agreement on May 1, 2026. Defendants deny the remaining allegations in paragraph 204.

205. In response to paragraph 205, Defendants deny the allegations in paragraph 205, including Plaintiffs' theory that use of "Tea" signage and retained lighting/taglines created a colorable imitation designed to evade the injunction.

206. In response to paragraph 206, Defendants deny the allegations in paragraph 206, including Plaintiffs' assertion that confusion is likely or inevitable.

207. In response to paragraph 207, Defendants deny the allegations in paragraph 207, including knowledge and intent allegations.

208. In response to paragraph 208, Defendants deny the allegations in paragraph 208, including irreparable-harm allegations and Plaintiffs' entitlement to enhanced remedies.

209. Defendants repeat and reallege their responses to the preceding paragraphs as if fully set forth herein.

210. In response to paragraph 210, Defendants deny the allegations in paragraph 210, including Plaintiffs' assertions regarding market recognition and the scope of protectable rights.

211. In response to paragraph 211, Defendants deny the allegations in paragraph 211.

212. In response to paragraph 212, Defendants deny the allegations in paragraph 212, including Plaintiffs' assertion that post-May 1 continued operations were wholly unauthorized and constituted common-law unfair competition.

213. In response to paragraph 213, Defendants deny the allegations in paragraph 213, including the reverse-passing-off theory asserted therein.

214. In response to paragraph 214, Defendants deny the allegations in paragraph 214, including likely confusion and sponsorship/approval allegations.

215. In response to paragraph 215, Defendants deny the allegations in paragraph 215.

216. In response to paragraph 216, Defendants deny the allegations in paragraph 216, including bad-faith allegations and Plaintiffs' characterization of the history of the parties' dispute.

217. In response to paragraph 217, Defendants deny the allegations in paragraph 217.

218. In response to paragraph 218, Defendants deny the allegations in paragraph 218, including irreparable-harm, damages, and punitive-damages allegations.

219. Defendants repeat and reallege their responses to the preceding paragraphs as if fully set forth herein.

220. In response to paragraph 220, Defendants deny the allegations in paragraph 220.

221. In response to paragraph 221, Defendants deny the allegations in paragraph 221.

222. In response to paragraph 222, Defendants deny the allegations in paragraph 222.

223. In response to paragraph 223, Defendants deny the allegations in paragraph 223.

224. In response to paragraph 224, Defendants deny the allegations in paragraph 224.

225. In response to paragraph 225, Defendants deny the allegations in paragraph 225, including irreparable-harm and punitive-damages allegations.

226. Defendants repeat and reallege their responses to the preceding paragraphs as if fully set forth herein.

227. In response to paragraph 227, Defendants deny the allegations in paragraph 227.

228. In response to paragraph 228, Defendants deny the allegations in paragraph 228.

229. In response to paragraph 229, Defendants deny the allegations in paragraph 229.

230. In response to paragraph 230, Defendants deny the allegations in paragraph 230.

231. In response to paragraph 231, Defendants deny the allegations in paragraph 231.

232. In response to paragraph 232, Defendants deny the allegations in paragraph 232.

233. In response to paragraph 233, Defendants deny the allegations in paragraph 233.

234. In response to paragraph 234, Defendants deny the allegations in paragraph 234, including assertions concerning quality-control failures and delivery delays.

235. In response to paragraph 235, Defendants deny the allegations in paragraph 235.

236. In response to paragraph 236, Defendants deny the allegations in paragraph 236.

237. In response to paragraph 237, Defendants deny the allegations in paragraph 237.

238. In response to paragraph 238, Defendants deny the allegations in paragraph 238, including irreparable-harm, damages, and punitive-damages allegations.

239. Defendants repeat and reallege their responses to the preceding paragraphs as if fully set forth herein.

240. In response to paragraph 240, Defendants deny the allegations in paragraph 240.

241. In response to paragraph 241, Defendants deny the allegations in paragraph 241.

242. In response to paragraph 242, Defendants deny the allegations in paragraph 242, including Plaintiffs' dual-deception theory regarding "?Tea."

243. In response to paragraph 243, Defendants deny the allegations in paragraph 243.

244. In response to paragraph 244, Defendants deny the allegations in paragraph 244.

245. In response to paragraph 245, Defendants deny the allegations in paragraph 245, including irreparable-harm, damages, and punitive-damages allegations.

246. Defendants repeat and reallege their responses to the preceding paragraphs as if fully set forth herein.

247. In response to paragraph 247, Defendants deny the allegations in paragraph 247, including Plaintiffs' characterization of the nature and scope of fiduciary duties allegedly owed directly to Mollytea Shops in the manner asserted.

248. In response to paragraph 248, Defendants deny the allegations in paragraph 248.

249. In response to paragraph 249, Defendants deny the allegations in paragraph 249, including each subpart (a) through (j), Plaintiffs' usurpation theory, guaranty theory, sponsorship-repudiation theory, diversion theory, freeze-out theory, post-termination-operation theory, "?Tea" theory, and self-dealing/conflict theory. Defendants further deny any allegation inconsistent with the disputed contractual framework and Plaintiffs' own prior conduct.

250. In response to paragraph 250, Defendants deny the allegations in paragraph 250.

251. In response to paragraph 251, Defendants deny the allegations in paragraph 251, including damages and punitive-damages allegations.

252. Defendants repeat and reallege their responses to the preceding paragraphs as if fully set forth herein.

253. In response to paragraph 253, Defendants admit only that Plaintiffs purport to assert derivative claims. Defendants deny any remaining allegations to the extent they imply those claims are properly pleaded or legally supported.

254. In response to paragraph 254, Defendants deny the allegations in paragraph 254, including Plaintiffs' futility allegations and their characterization of control, communications, and self-interest.

255. In response to paragraph 255, Defendants deny the allegations in paragraph 255 to the extent Plaintiffs characterize legal duties in the manner asserted.

256. In response to paragraph 256, Defendants deny the allegations in paragraph 256, including each subpart (a) through (h) and Plaintiffs' allegations of damages, exposure, and legal consequences.

257. Defendants repeat and reallege their responses to the preceding paragraphs as if fully set forth herein.

258. In response to paragraph 258, Defendants deny the allegations in paragraph 258.

259. In response to paragraph 259, Defendants deny the allegations in paragraph 259, except admit only that certain stores operated in New York.

260. In response to paragraph 260, Defendants deny the allegations in paragraph 260.

261. In response to paragraph 261, Defendants deny the allegations in paragraph 261.

262. In response to paragraph 262, Defendants deny the allegations in paragraph 262, including Plaintiffs' assertion that Defendants misappropriated trade secrets after May 1, 2026 or used them in the manner alleged.

263. In response to paragraph 263, Defendants deny the allegations in paragraph 263, including knowledge allegations.

264. In response to paragraph 264, Defendants deny the allegations in paragraph 264, including alleged improper means, diversion, and off-system concealment theories.

265. In response to paragraph 265, Defendants deny the allegations in paragraph 265, including irreparable-injury allegations.

266. In response to paragraph 266, Defendants deny the allegations in paragraph 266, including Plaintiffs' entitlement to injunctive relief, damages, exemplary damages, and attorneys' fees.

267. Defendants repeat and reallege their responses to the preceding paragraphs as if fully set forth herein.

268. In response to paragraph 268, Defendants deny the allegations in paragraph 268, including Plaintiffs' assertion that MHL committed multiple material breaches constituting dissolution events under Section 8.1(b), or that any such breaches were not capable of cure.

269. In response to paragraph 269, Defendants admit only that Plaintiffs served documents on or about July 10, 2026 that Plaintiffs characterize as dissolution notices and made demands relating to operational control. Defendants deny the remaining allegations, including the validity, effectiveness, and legal consequences of such notices and demands

270. In response to paragraph 270, Defendants deny the allegations in paragraph 270 to the extent Plaintiffs characterize service, effectiveness, or legal consequence in the manner alleged.

271. In response to paragraph 271, Defendants deny the allegations in paragraph 271, including Plaintiffs' assertion that MHL failed to comply with a valid Section 8.2(c) demand or continued operations in direct violation of enforceable rights as alleged.

272. In response to paragraph 272, Defendants admit only that Plaintiffs cite Section 9.3 in support of their claims and that the documents speak for themselves. Defendants deny the remaining allegations in paragraph 272.

273. In response to paragraph 273, Defendants deny the allegations in paragraph 273, including Plaintiffs' entitlement to specific performance, injunctions, damages, or attorneys' fees.

274. In response to paragraph 274, Defendants deny the allegations in paragraph 274, including Plaintiffs' assertion that Mollytea Shops is entitled to exercise all officer and director authorities during a pre-dissolution period or that court intervention is needed to give effect to such alleged rights.

275. In response to paragraph 275, Defendants admit only that Plaintiffs purport to assert supplemental claims based on alleged later events. Defendants deny any remaining allegations to the extent they imply those claims are proper or meritorious.

276. Defendants repeat and reallege their responses to the preceding paragraphs as if fully set forth herein.

277. In response to paragraph 277, Defendants admit only that disputes exist between the parties concerning their rights and obligations. Defendants deny the remaining allegations in paragraph 277, including Plaintiffs' characterization of the issues in controversy and the premise that Plaintiffs' asserted rights arose as alleged.

278. In response to paragraph 278, Defendants deny the allegations in paragraph 278, including each requested declaration in subparts (a) through (g).

279. In response to paragraph 279, Defendants deny the allegations in paragraph 279.

280. Defendants repeat and reallege their responses to the preceding paragraphs as if fully set forth herein.

281. In response to paragraph 281, Defendants admit only that disputes exist between the parties concerning the LIC Corporate Guaranty, the purported May 1, 2026 termination, and the parties' alleged rights concerning marks, trade dress, systems, and store operations. Defendants deny the remaining allegations in paragraph 281 to the extent Plaintiffs characterize those disputes in their favor.

282. In response to paragraph 282, Defendants deny the allegations in paragraph 282, including each requested declaration in subparts (a) through (d), the allegation that the LIC Corporate Guaranty is void, the allegation that the Brand License Agreement was validly and effectively terminated, and the allegation that Defendants had no authority to use marks, trade dress, systems, or related assets as alleged.

283. In response to paragraph 283, Defendants deny the allegations in paragraph 283.

284. In response to paragraph 284, Defendants admit only that Plaintiffs purport to demand a jury trial on triable issues. No response is otherwise required to the extent paragraph 284 states a demand rather than factual allegations. To the extent a response is deemed required, Defendants deny any implication inconsistent with their own jury demand.

285. Without assuming any burden not otherwise imposed by law, and reserving the right to amend this Answer and assert additional defenses as discovery and investigation proceed, Defendants assert the following affirmative defenses.

**First Affirmative Defense**

286. The First Amended Complaint, and each purported cause of action therein, fails to state a claim upon which relief can be granted.

**Second Affirmative Defense**

287. Plaintiffs' claims are barred, in whole or in part, because Plaintiffs themselves materially breached the parties' agreements first, including by withholding operational support, supply chain access, logistics, systems access, and related performance allegedly necessary for operation of the New York stores, thereby excusing any further performance by Defendants.

**Third Affirmative Defense**

288. Plaintiffs' claims are barred, in whole or in part, by the doctrines of unclean hands and inequitable conduct. Plaintiffs seek equitable and injunctive relief while having themselves engaged in coercive, bad-faith, and inequitable conduct, including using control over branding, supply, systems, and operations to pressure Defendants into surrendering ownership, control rights, lease rights, and related business interests.

**Fourth Affirmative Defense**

289. Plaintiffs' claims are barred, in whole or in part, by waiver, estoppel, acquiescence, ratification, and/or consent. Upon information and belief, Plaintiffs knew of, approved, participated in, benefited from, or failed timely to object to material aspects of the parties' New York operations, store development, lease

arrangements, guaranties, branding structure, and business activities, and therefore may not now disavow those same arrangements selectively.

**Fifth Affirmative Defense**

290. Plaintiffs' claims are barred, in whole or in part, because the governing agreements are ambiguous, internally inconsistent, or subject to conflicting interpretations. As reflected by the parties' execution of multiple agreements addressing overlapping business relationships, including the shareholder/bylaw framework alleged by Plaintiffs and the LLC agreements alleged by Defendants in the Queens action, Plaintiffs cannot establish the clear and unambiguous rights they assert.

**Sixth Affirmative Defense**

291. Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have failed to satisfy contractual and/or legal conditions precedent to the relief they seek, including to termination, operational takeover, dissolution-related remedies, specific performance, declaratory relief, and other extraordinary relief.

**Seventh Affirmative Defense**

292. Plaintiffs are not entitled to injunctive, declaratory, or other equitable relief because they have an adequate remedy at law, including money damages, accounting remedies, contractual remedies, and other post-judgment relief.

**Eighth Affirmative Defense**

293. Plaintiffs are not entitled to preliminary or permanent injunctive relief because they cannot establish irreparable harm. Any alleged injury is economic, commercial, contractual, reputational, or otherwise compensable through legal remedies.

**Ninth Affirmative Defense**

294. Plaintiffs' claims for equitable relief are barred because the relief they seek is mandatory, would alter rather than preserve the status quo, and would effectively grant substantial ultimate relief prior to adjudication on the merits.

**Tenth Affirmative Defense**

295. Plaintiffs' claims are barred, in whole or in part, because Defendants acted with license, authorization, consent, contractual right, good-faith claim of right, or a reasonable belief in such right, based on the parties' course of dealing, the executed agreements, and Plaintiffs' own conduct.

**Eleventh Affirmative Defense**

296. Plaintiffs lack standing, in whole or in part, to assert some or all of the claims, including to the extent they seek relief for injuries allegedly suffered by separate entities, seek to enforce rights they do not exclusively own or control, or improperly conflate rights of licensors, shareholders, operating entities, affiliates, and nominal defendants. Plaintiffs' amended federal pleading itself separates alleged rights among Shenzhen Molly Tea, Mollytea Shops, Molly Tea Holding, and derivative claims on behalf of the joint-venture entities.

**Twelfth Affirmative Defense**

297. Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have failed to plead causation and damages adequately. Any losses alleged by Plaintiffs were caused, in whole or in part, by Plaintiffs' own acts, omissions, business decisions, contractual breaches, selective enforcement, operational interference, or failure to mitigate.

**Thirteenth Affirmative Defense**

298. Plaintiffs' damages, if any, must be reduced or offset by the doctrines of setoff, offset, recoupment, and/or apportionment, including by amounts Plaintiffs owe Defendants arising from the same transactions, occurrences, and business relationships.

**Fourteenth Affirmative Defense**

299. Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to mitigate their alleged damages.

**Fifteenth Affirmative Defense**

300. To the extent Plaintiffs assert contract-based or fiduciary-duty-based claims premised on rights of operational control, governance, dissolution, exclusivity, or post-termination possession, those claims are barred or limited by Plaintiffs' own prior repudiation, hindrance of performance, bad-faith exercise of discretion, and/or misuse of contractual leverage.

**Sixteenth Affirmative Defense**

301. Plaintiffs' tort claims, including conversion, unfair competition, trademark-related state-law claims, fiduciary-duty claims, and trade-secret claims, are barred in whole or in part because they improperly duplicate contractual claims, are precluded by the economic-loss rule to the extent applicable, or fail to allege a duty independent of contract.

**Seventeenth Affirmative Defense**

302. Plaintiffs' fiduciary-duty claims are barred, in whole or in part, because any duties owed were limited, displaced, modified, or defined by the parties' governing agreements, and Plaintiffs may not recast contract disputes as fiduciary torts.

**Eighteenth Affirmative Defense**

303. Plaintiffs' interference-based and unfair-competition-based theories are barred, in whole or in part, because Defendants' conduct was justified, privileged, undertaken to protect their own legal and economic interests, and/or not wrongful as a matter of law.

**Nineteenth Affirmative Defense**

304. Plaintiffs' fraud-based or deception-based allegations, to the extent relied upon in support of equitable or statutory relief, are barred because Plaintiffs have not pleaded fraud or deception with the particularity required by Rule 9(b), and because the alleged conduct sounds in contract rather than fraud.

**Twentieth Affirmative Defense**

305. Plaintiffs' trade-secret claims are barred, in whole or in part, because Plaintiffs have failed to identify protectable trade secrets with sufficient specificity, failed to allege reasonable secrecy measures adequately, and/or seek to characterize general operational know-how, ordinary business information, or contract-governed information as trade secrets.

**Twenty-First Affirmative Defense**

306. Plaintiffs' Lanham Act and trademark-related claims are barred, in whole or in part, because Plaintiffs cannot establish likelihood of confusion, exclusive entitlement, unauthorized use, or actionable misuse as alleged, particularly in light of the parties' prior business relationship, the disputed contractual framework, and the factual disputes regarding authorization, governance, and operational rights.

**Twenty-Second Affirmative Defense**

307. Plaintiffs' claims for declaratory relief should be dismissed because declaratory relief would be duplicative of other claims and remedies, would not resolve the parties' underlying factual disputes, and/or seeks advisory determinations on contested contractual and governance questions.

**Twenty-Third Affirmative Defense**

308. Plaintiffs' claims are barred, in whole or in part, by lack of ripeness, mootness, and/or absence of a present justiciable controversy as to some of the declaratory or prospective relief sought.

**Twenty-Fourth Affirmative Defense**

309. Plaintiffs are not entitled to attorneys' fees, enhanced damages, exemplary damages, punitive damages, or other extraordinary monetary relief because the allegations do not satisfy the applicable contractual, statutory, or common-law standards for such relief.

**Twenty-Fifth Affirmative Defense**

310. Plaintiffs' claims are barred, in whole or in part, because any alleged corporate, governance, dissolution, or operational-control rights cannot be resolved in Plaintiffs' favor on the pleadings alone where the controlling agreements, the parties' intent, and the governing structure are factually disputed.

**Twenty-Sixth Affirmative Defense**

311. Defendants reserve the right to assert additional affirmative defenses as discovery and investigation proceed.

**Reservation Concerning Trademark Cancellation Proceeding**

312. For the avoidance of doubt, nothing in this Answer, the foregoing affirmative defenses, or the Counterclaims below is intended to withdraw, waive, abandon, supersede, or otherwise prejudice any pending proceeding before the United States Patent and Trademark Office or Trademark Trial and Appeal Board challenging the validity or registration of any trademark asserted by Plaintiffs in this action, including any petition for cancellation filed or maintained by Michael Lin. Defendants expressly reserve all rights, claims, grounds, arguments, and remedies asserted or

available in any such proceeding. Defendants do not, by this reservation, assert a separate counterclaim in this action for cancellation of any federal trademark registration, and nothing herein shall be construed as requesting this Court to adjudicate any cancellation claim that has not otherwise been pleaded.

## COUNTERCLAIMS

Defendants/Counterclaim-Plaintiffs MHL NY LLC ("MHL"), Mei Hui Lin ("Lin"), Binbin Xu ("Xu"), Xiaozhe Liu ("Liu"), Molly Tea CU LLC ("Molly Tea CU"), and Genesis Brand Management LLC ("Genesis," collectively, "Counterclaim-Plaintiffs"), by and through undersigned counsels, assert the following counterclaims against Plaintiffs/Counterclaim-Defendants Shenzhen Molly Tea Food and Beverage Management Co., Ltd. ("Shenzhen"), Mollytea Shops LLC ("Mollytea Shops"), and Molly Tea Holding Inc. ("Molly Tea Holding," collectively, "Counterclaim-Defendants"). The claims below are pleaded in the alternative where permitted by Federal Rule of Civil Procedure 8(d).

Counterclaim-Plaintiffs incorporate only the affirmative factual allegations expressly stated below and, to the extent consistent with these Counterclaims, the admissions and affirmative factual allegations contained in the foregoing Answer. Counterclaim-Plaintiffs do not incorporate their denials, statements of insufficient knowledge, or legal defenses as affirmative allegations supporting these Counterclaims.

### Common Factual Allegations

A. The New York Team Establishes the New York MOLLY TEA Business

1. Counterclaim-Plaintiff MHL NY LLC (“MHL”) is a New York limited liability company through which Mei Hui Lin (“Lin”), Xiaozhe Liu (“Liu”), Binbin Xu (“Xu”), and their

New York-based business partners developed, financed, and operated the MOLLY TEA business in New York.

2. Lin, Liu, Xu, MHL, and the other individuals and entities through which they developed, financed, and operated the New York MOLLY TEA businesses are referred to collectively herein, where appropriate, as the "New York Team."

3. The New York Team was responsible for identifying commercial locations, negotiating leases, arranging financing, funding construction and buildouts, acquiring equipment and fixtures, hiring and managing employees, developing local marketing and customer relationships, establishing delivery-platform and social-media accounts, and performing the day-to-day work necessary to establish and operate the New York stores.

4. Beginning in or about 2023, the New York Team developed the MOLLY TEA business in New York in coordination with Shenzhen Molly Tea Food and Beverage Management Co., Ltd. ("Shenzhen Molly") and certain of its affiliated entities and personnel.

5. The parties contemplated that the New York Team would undertake substantial financial and operational responsibility for developing the New York market, while Shenzhen Molly and its affiliates would provide brand-related cooperation, product supply, technical systems, operational support, store-development assistance, and other resources associated with the MOLLY TEA business.

6. Importantly, the development of the New York business did not begin with the purported Shareholder Agreements upon which Plaintiffs now rely. Before those purported agreements were signed, the New York Team had already formed the three New York

operating corporations, secured their commercial premises, undertaken lease obligations, invested substantial capital, and developed the stores.

7. The first of those operating corporations, Molly Tea NYC Inc., was incorporated in New York on October 12, 2023, for the purpose of developing and operating the MOLLY TEA store in Flushing, New York. At that time, Molly Tea NYC was wholly owned and controlled by Lin.

8. On November 14, 2023, Molly Tea NYC Inc. entered into the commercial lease for the Flushing store located at 37-11C Prince Street, Flushing, New York.

9. Accordingly, both Molly Tea NYC Inc.'s incorporation and its execution of the Flushing commercial lease occurred before MHL and Shenzhen Molly entered into their written licensing and cooperation agreement in December 2023.

10. On or about December 20, 2023, MHL and Shenzhen Molly entered into a written Brand Licensing and Technical Services Cooperation Contract (the “Licensing and Cooperation Agreement”). The agreement was between MHL and Shenzhen Molly; Molly Tea NYC Inc. was not a party to it.

11. Pursuant to the Licensing and Cooperation Agreement, Shenzhen Molly agreed to provide brand-related authorization, supply-chain coordination, technical support, operational systems, and related cooperation in connection with the parties' New York business relationship.

12. The parties' commercial relationship thereafter included ongoing purchase orders, supply transactions, inventory procurement, product development, design coordination,

operational support, store-development communications, technical assistance, and other commercial dealings.

13. In reliance upon the parties' relationship and Shenzhen Molly's continuing participation and support, the New York Team committed substantial capital, labor, credit, and personal financial exposure to the development of the New York MOLLY TEA business.

14. The New York Team secured additional commercial locations, funded construction and buildouts, acquired equipment and fixtures, hired and trained employees, marketed the stores, cultivated customer relationships, established delivery-platform accounts, developed social-media channels, and undertook the other activities necessary to establish and expand the business in New York.

15. The New York Team therefore was not merely a passive investor in businesses established by Plaintiffs. It undertook substantial local financial risk and performed the development and day-to-day operational work through which the New York stores were created, established, and operated.

B. The Three New York Operating Corporations and Their Leases Pre-Dated the Purported Shareholder Agreements

16. Three separate New York corporations were formed to develop and operate the original New York stores: Molly Tea NYC Inc., Molly Tea BK Inc., and Molly Tea Manhattan Chinatown Inc. (collectively, the “New York Operating Entities”).

17. Molly Tea NYC Inc. was incorporated on October 12, 2023, for the purpose of developing and operating the Flushing store at 37-11C Prince Street, Flushing, New York.

18. Molly Tea BK Inc. was incorporated on May 31, 2024, for the Brooklyn business located at 5909 Eighth Avenue, Brooklyn, New York.

19. Molly Tea Manhattan Chinatown Inc. was incorporated on July 29, 2024, for the Chinatown business located at 63 Mott Street, New York, New York.

20. Thus, all three New York Operating Entities were incorporated and existed before the purported Shareholder Agreements upon which Plaintiffs now rely. The incorporation dates are October 12, 2023, May 31, 2024, and July 29, 2024, respectively.

21. The commercial premises for each of the three businesses likewise were secured before execution of the purported Shareholder Agreements.

22. Molly Tea NYC Inc. entered into the Flushing commercial lease on November 14, 2023.

23. Molly Tea BK Inc. thereafter entered into the commercial lease for the Brooklyn location.

24. Molly Tea Manhattan Chinatown Inc. thereafter entered into the commercial lease for the Chinatown location.

25. All three commercial leases were executed before the purported Shareholder Agreements upon which Plaintiffs now rely.

26. Accordingly, by the time the purported Shareholder Agreements were presented and signed, all three New York Operating Entities already existed, and the corporations had already undertaken the commercial lease obligations necessary to operate their respective stores.

27. The New York Operating Entities likewise already held or controlled the operating assets associated with their respective stores, employed or managed store personnel, maintained business and vendor relationships, and conducted the day-to-day operations of the stores.

28. The sequence is particularly significant with respect to Flushing. Molly Tea NYC Inc. was formed on October 12, 2023, and entered into its lease on November 14, 2023, before MHL and Shenzhen Molly entered into the Licensing and Cooperation Agreement on December 20, 2023, and long before the purported Shareholder Agreement concerning Molly Tea NYC Inc.

29. Thus, neither the Licensing and Cooperation Agreement nor the later purported Shareholder Agreement created Molly Tea NYC Inc., caused it to enter into its commercial lease, or constituted the original source of the New York Team's leasehold interest in the Flushing premises.

30. Lin undertook personal guaranty obligations in connection with the commercial leases for the three New York Operating Entities.

31. Those leases imposed substantial fixed rent and other commercial obligations regardless of whether the stores generated revenue or remained operational.

32. The New York Team funded or arranged substantial expenditures for construction, equipment, furniture, fixtures, staffing, inventory, permitting, marketing, and operation of the stores.

33. Shenzhen Molly and its affiliates knew of and participated in aspects of the development of the stores, including through brand-related cooperation, product supply, design and operational coordination, technical assistance, and other support.

34. Through these efforts, the New York Team and the New York Operating Entities developed the New York MOLLY TEA businesses into ongoing commercial enterprises with trained employees, established customer traffic, delivery-platform activity, social-media followers, customer reviews, vendor relationships, and locally generated goodwill.

35. Only later did the parties undertake to document additional aspects of their relationship through purported Shareholder Agreements and related corporate-governance documents concerning the already-existing New York Operating Entities.

36. Counterclaim-Plaintiffs dispute Plaintiffs' characterization of the formation, execution, effective dates, and legal effect of those purported Shareholder Agreements.

37. In 2026, MHL signed and transmitted undated proposed Shareholder Agreements concerning Molly Tea NYC Inc., Molly Tea BK Inc., and Molly Tea Manhattan Chinatown Inc. Counterclaim-Plaintiffs allege that MHL did not receive copies countersigned by Mollytea Shops or Shenzhen Molly.

38. The versions subsequently submitted by Plaintiffs in this federal action contain purported effective dates and handwritten information that did not appear on the copies signed and transmitted by MHL. Counterclaim-Plaintiffs dispute that those subsequently appearing dates were agreed upon.

39. Counterclaim-Plaintiffs further allege that the chronology of incorporation, lease execution, store development, and operation demonstrates that the purported Shareholder Agreements did not create the New York Operating Entities, their leases, their stores, or the business value that had already been developed before those agreements were signed.

40. Accordingly, although the parties subsequently conducted business together in various respects, the formation and enforceability of the purported Shareholder Agreements, their effective dates, and the nature and scope of the ownership, governance, management, and operational rights Plaintiffs claim under those agreements remain disputed.

C. The New York Team Develops the Market and Incurs Substantial Third-Party Obligations

41. As the New York business expanded, the New York Team undertook additional long-term obligations in reliance on the parties' continuing commercial relationship and Shenzhen Molly's continued participation in and support for the New York business.

42. Those obligations included additional commercial leases, personal guaranties, sponsorship commitments, deposits, buildout expenditures, equipment purchases, staffing and marketing costs, and other substantial commercial commitments.

43. Through Molly Tea NYC Inc., the New York business entered into a sponsorship arrangement dated September 3, 2025 with Brooklyn Events Center, LLC and Brooklyn Nets, LLC in connection with a MOLLY TEA presence at Barclays Center.

44. That arrangement imposed substantial financial obligations upon Molly Tea NYC Inc., including significant sponsorship payments.

45. Plaintiffs were aware of the Barclays relationship and of the substantial financial commitments undertaken in connection with that opportunity.

46. The New York Team undertook these and other obligations with the expectation that the parties' commercial relationship would continue and that Shenzhen Molly would continue

providing the brand-related, supply-chain, technical, and operational cooperation upon which the stores had come to depend.

D. Development of the Columbia University Location

47. Following development of the original stores, members of the New York Team separately pursued and developed a location near Columbia University at 2857 Broadway, New York, New York (the "Columbia Store").

48. The Columbia Store was not owned or operated by any of the three New York Operating Entities and was not one of the three purported joint ventures governed by the Shareholder Agreements upon which Plaintiffs rely.

49. The Columbia Store was developed through Molly Tea CU LLC, a separate entity with a different ownership and contractual structure.

50. The Columbia lease carried a substantial term and required significant investment in rent, construction, equipment, design, staffing, permitting, and other pre-opening expenses.

51. Lin and Xu undertook personal guaranty exposure in connection with the Columbia lease.

52. Plaintiffs were aware of the Columbia project during its development.

53. Plaintiffs and their personnel participated in aspects of the Columbia project, including communications concerning store design, branding, products, equipment, operational requirements, and preparations for opening.

54. Members of the New York Team invested substantial sums and undertook substantial obligations in connection with Columbia while Plaintiffs knew of and participated in the project's development.

55. By early 2026, the Columbia Store had been substantially developed and was preparing to open.

56. Counterclaim-Plaintiffs allege that only after substantial capital had been invested and personal financial exposure undertaken did Plaintiffs begin asserting that the Columbia Store was unauthorized and invoking the purported Shareholder Agreements as a basis to restrict its operation.

E. Development of the Long Island City Opportunity

57. Members of the New York Team separately pursued a business opportunity in Long Island City, New York (the "LIC Concession").

58. The LIC Concession likewise was separate from the three New York Operating Entities and was not itself one of the purported joint ventures governed by the Shareholder Agreements.

59. Genesis Brand Management LLC ("Genesis") entered into the concession-related arrangement concerning the location at or near 28-07 Jackson Avenue, Long Island City, New York.

60. Substantial deposits, development efforts, negotiations, and commercial commitments were undertaken in connection with the LIC Concession.

61. Lin, Xu, and Liu undertook personal guaranty exposure associated with the LIC arrangement.

62. Plaintiffs were aware of the LIC opportunity but subsequently asserted that the arrangement was unauthorized and challenged the use of Molly Tea NYC Inc.'s credit or guaranty in connection with that project.

63. Plaintiffs' later objections placed members of the New York Team in the position of facing substantial contractual and personal-guaranty exposure after commitments had already been undertaken in connection with the parties' ongoing business relationship.

F. Shenzhen Molly Sells MHL an Unregistered and Undisclosed Franchise

64. Although the December 20, 2023 Licensing and Cooperation Agreement did not use the term “franchise,” the rights granted and obligations imposed under that agreement constituted a franchise within the meaning of the New York Franchise Sales Act, N.Y. Gen. Bus. Law § 681.

65. Under the Licensing and Cooperation Agreement, Shenzhen Molly granted MHL the right to establish and operate a business substantially associated with the MOLLY TEA name, trademarks, trade dress, and other commercial symbols.

66. Shenzhen Molly also granted MHL access to an integrated business system that included MOLLY TEA products, recipes, operating procedures, store designs, training systems, financial and accounting systems, information-network systems, point-of-sale systems, advertising and promotional materials, procurement channels, distribution systems, and other proprietary business resources.

67. The Licensing and Cooperation Agreement required MHL to operate subject to Shenzhen Molly’s prescribed operational system and corporate management requirements.

68. Among other things, Shenzhen Molly retained authority over store-site approval, store design and construction, required equipment, employee training, operating hours, authorized products, product pricing, suppliers, point-of-sale systems, financial reporting, food-safety practices, advertising, promotional activities, social-media accounts, inspections, and approval to open each store.

69. In exchange for these rights, the Licensing and Cooperation Agreement required MHL to pay Shenzhen Molly a one-time Brand Usage Fee of $15,000 for the right to use the MOLLY TEA brand, operating rights, and proprietary operational resources.

70. The Licensing and Cooperation Agreement also required MHL to provide a $15,000 Brand Security Deposit and to pay Shenzhen Molly a continuing monthly Management Fee equal to two percent of store revenue, together with additional charges for training, site-selection services, design services, engineering supervision, and other required goods and services.

71. The Licensing and Cooperation Agreement expressly characterized the Brand Usage Fee as a one-time entry fee payable in consideration for MHL's operating rights and use of Shenzhen Molly's authorized business resources.

72. MHL did not pay the Brand Usage Fee or the monthly Management Fee. Shenzhen Molly nevertheless treated those amounts as due, recorded them as accounts receivable, and demanded payment from MHL while continuing to supply products, provide operational support, and participate in the development and operation of the New York MOLLY TEA stores.

73. Accordingly, the December 20, 2023 transaction granted MHL the right to operate businesses substantially associated with Shenzhen Molly's commercial symbols and required MHL to pay direct and indirect franchise fees, regardless of whether MHL ultimately remitted those fees.

74. Shenzhen Molly offered and sold that franchise to MHL in New York, where MHL is domiciled and where the franchised businesses were to be developed and operated.

75. Before offering or selling the franchise to MHL, Shenzhen Molly did not register an offering prospectus with the New York Department of Law and did not provide MHL with a registered Franchise Disclosure Document or copies of all proposed agreements within the time required by New York law.

76. MHL executed the Licensing and Cooperation Agreement, undertook substantial financial obligations, and proceeded with the development and operation of the New York stores without having received the disclosures required by the New York Franchise Sales Act.

77. The Franchise Disclosure Document later provided to MHL bears an issuance date of July 15, 2025 and states that MOLLYTEA Franchising LLC first began offering Molly Tea franchises as of that date. The document separately identifies Shenzhen Molly as an affiliate that had offered Molly Tea franchises internationally since 2021.

78. Exhibit I to that Franchise Disclosure Document states that the franchise offering did not become effective in New York until January 14, 2026. MHL did not receive the Franchise Disclosure Document until approximately January 20, 2026, more than two

years after execution of the Licensing and Cooperation Agreement and after MHL had already incurred substantial expenses and obligations developing the New York stores.

79. The subsequent registration and disclosure did not cure Shenzhen Molly's earlier offer and sale of the franchise to MHL without the registration and pre-sale disclosures required by New York law.

80. Shenzhen Molly's violation was willful and material. Shenzhen Molly had substantial experience offering franchises internationally, intentionally required MHL to enter into an agreement containing the essential economic and operational features of a franchise, and permitted MHL to undertake substantial investments and business obligations without first providing the disclosures and protections mandated by New York law.

81. Had MHL received the disclosures required by New York law before entering into the Licensing and Cooperation Agreement and undertaking the resulting investments and obligations, MHL would have been able to evaluate the offering, the parties responsible for the franchise system, the required fees, the financial condition and experience of the franchisor and its affiliates, and the material risks of the proposed relationship before committing its capital and credit.

G. Plaintiffs Seek to Restructure the Parties' Relationship and Escalate Their Demands After the New York Team Refuses

82. By early 2026, Plaintiffs began seeking to restructure the parties' New York business relationship.

83. Counterclaim-Plaintiffs allege that Plaintiffs sought to replace or supplement the existing Licensing and Cooperation Agreement with a new formal franchise arrangement on

materially different economic and operational terms and to obtain increased control over stores, commercial leases, ownership interests, operations, and other business assets developed by the New York Team.

84. In early 2026, Plaintiffs emailed a Franchise Disclosure Document ("FDD") and proposed new franchise-related documentation to Mei Hui Lin and demanded that Counterclaim-Plaintiffs enter into the proposed replacement arrangement.

85. The proposed replacement arrangement would have materially altered the parties' existing economic and operational relationship. Among other things, the FDD contemplated substantial initial franchise fees, continuing royalties, technology fees, supplier restrictions, mandatory operational systems, transfer restrictions, and extensive franchisor control over products, equipment, advertising, point-of-sale systems, and other aspects of store operations.

86. Lin and the New York Team reviewed the proposed documentation and declined to accept the replacement structure because they considered its terms materially adverse to the contractual, ownership, leasehold, operational, and economic rights that they had already developed through the existing New York businesses.

87. Plaintiffs also proposed or demanded changes concerning the commercial leases, ownership interests, and operational control of businesses that members of the New York Team had developed, financed, and operated and for which they had undertaken substantial lease obligations, capital expenditures, and personal guaranties.

88. Counterclaim-Plaintiffs did not agree to execute the proposed franchise documents, transfer or surrender their leasehold interests, or relinquish the ownership, governance,

operational, or economic rights they believed they possessed in the businesses they had developed.

89. In late March and early April 2026, Plaintiffs intensified those demands. On or about March 31 and April 1, 2026, Plaintiffs, including through Yiding Sun and other representatives, demanded that MHL execute franchise-related documentation by approximately April 15, 2026.

90. Counterclaim-Plaintiffs allege that those demands were accompanied by threats that the New York stores would be suspended or deprived of necessary operational support if MHL did not accept Plaintiffs' proposed restructuring.

91. The timing of those demands was particularly consequential because the New York Team and the New York Operating Entities had already undertaken long-term commercial leases, personal guaranties, substantial buildout expenses, sponsorship commitments, staffing obligations, and other fixed financial commitments, and the Columbia Store was preparing to open.

92. After Counterclaim-Plaintiffs declined Plaintiffs' proposed replacement franchise documents and related restructuring arrangements, Plaintiffs began asserting a series of alleged operational and contractual deficiencies, including issues relating to lighting, signage, curtains, point-of-sale systems, store standards, supply arrangements, reporting, and other operational matters.

93. Counterclaim-Plaintiffs deny that those alleged matters constituted material, incurable breaches warranting termination of the parties' business relationship or the extraordinary

suspension, termination, dissolution, and operational-control remedies later asserted by Plaintiffs.

94. Counterclaim-Plaintiffs further allege that at least certain of the asserted deficiencies were minor or readily curable, were previously known to Plaintiffs, or concerned matters as to which Plaintiffs had participated in, acquiesced in, or failed timely to object to the underlying operations.

95. Counterclaim-Plaintiffs allege that Plaintiffs did not provide a meaningful opportunity to address or cure all of the asserted deficiencies before invoking suspension, termination, and ultimately dissolution and operational-control remedies.

96. Counterclaim-Plaintiffs further allege, upon information and belief, that Plaintiffs did not conduct a reasonable and good-faith investigation sufficient to substantiate all of the alleged breaches upon which they subsequently relied.

97. Instead, Counterclaim-Plaintiffs allege that Plaintiffs selectively elevated minor or curable operational matters into purported "material breaches" after Counterclaim-Plaintiffs declined Plaintiffs' proposed replacement franchise documents and related restructuring arrangements.

98. On April 2, 2026, immediately following this escalating dispute, Plaintiffs issued a notice stating that the Flushing, Brooklyn, and Chinatown stores would be suspended indefinitely for "rectification."

99. Counterclaim-Plaintiffs allege that the asserted operational deficiencies were not the true or sole cause of Plaintiffs' subsequent actions but instead were used, at least in substantial part, as a pretext for suspension, termination, and efforts to obtain greater

ownership and operational control after Counterclaim-Plaintiffs refused Plaintiffs' proposed restructuring.

100. Counterclaim-Plaintiffs further allege that Shenzhen Molly's May 1, 2026 purported termination of the Licensing and Cooperation Agreement, and Plaintiffs' subsequent efforts to invoke dissolution and operational-control remedies, formed part of the same escalating course of conduct.

101. After Counterclaim-Plaintiffs refused to execute Plaintiffs' proposed replacement franchise documents, transfer their commercial leases, or surrender majority ownership and operational control, Plaintiffs responded by suspending the New York stores, cutting off or interfering with product supply and logistics, disabling or interfering with point-of-sale and other operational systems, terminating the brand authorization, and commencing this action seeking control over the businesses. Counterclaim-Plaintiffs allege that this course of conduct was retaliatory and coercive and was intended to pressure them to relinquish ownership, leasehold, governance, operational, and economic rights that they had declined voluntarily to surrender.

H. Plaintiffs Use Their Control of Essential Business Infrastructure

102. Plaintiffs and their affiliated entities exercised control over certain infrastructure upon which the New York stores had come to depend during the parties' commercial relationship.

103. That infrastructure included product supply, logistics, certain operational systems, point-of-sale integration, store-opening materials, brand-related approvals, technical systems, and communications with certain third-party platforms.

104. Because Plaintiffs controlled these dependencies, abrupt withdrawal of access or support could cause substantial disruption, delay, and expense to the New York Operating Entities and the New York Team.

105. Counterclaim-Plaintiffs allege that Plaintiffs used this control as leverage in the parties' ownership, governance, and franchise dispute.

106. Shortly after the April 2, 2026 suspension notice, Plaintiffs and their affiliates ceased or interfered with supply-chain support, logistics, operational systems, and other resources used in the stores' operations.

107. The New York Operating Entities had previously placed substantial orders for inventory and store-opening materials through Plaintiffs' designated systems and had paid required deposits in connection with certain orders.

108. Plaintiffs' supply personnel had confirmed that production and shipment of certain materials were underway.

109. Nevertheless, beginning in approximately early April 2026, shipments and logistics supporting the New York operations were suspended or interrupted.

110. Counterclaim-Plaintiffs further allege that Plaintiffs communicated with or caused disruptions involving third-party delivery platforms and operational systems, including DoorDash and Chowbus, and took actions affecting social-media or other digital accounts associated with the New York businesses.

111. As a result, the existing stores temporarily lost access to critical operational resources, and the New York Team was required to undertake emergency measures to preserve the businesses.

I. Plaintiffs’ Conduct Places the Stores, Leases, and Guarantors at Risk

112. Plaintiffs’ alleged conduct occurred while the New York Operating Entities remained obligated under their existing long-term commercial leases.

113. Rent and other fixed obligations continued to accrue regardless of whether Plaintiffs supplied inventory or continued providing access to systems that had historically been used to operate the stores.

114. Lin remained personally exposed under guaranties associated with the three New York Operating Entities’ commercial leases.

115. Lin and Xu also remained personally exposed under the Columbia lease guaranty.

116. Lin, Xu, and Liu remained personally exposed in connection with the LIC arrangement.

117. The New York businesses also remained responsible for payroll, vendors, utilities, sponsorship commitments, insurance, and other continuing obligations.

118. Accordingly, the withdrawal or disruption of supply and operational support did not merely affect the New York Team’s ability to use the MOLLY TEA brand. It threatened the viability of businesses into which the New York Team had invested substantial capital and for which its members and entities remained contractually and personally liable.

119. Plaintiffs did not simultaneously assume the New York Operating Entities' lease obligations or obtain releases of the New York Team members' personal guaranties when Plaintiffs sought to suspend the businesses or assert increased operational control.

J. The New York Team Attempts to Preserve the Businesses

120. Faced with the operational disruption alleged above, the New York Team took steps to preserve the stores, employees, customer relationships, leases, vendor relationships, and other business assets for which its members and entities remained financially responsible.

121. The New York Team sought alternative sources of ingredients and supplies where necessary to maintain or restore operations.

122. The New York Team also worked to restore or replace operational systems and third-party platform access that had been disrupted.

123. These mitigation efforts were undertaken while the stores continued to face rent, payroll, guaranty, sponsorship, vendor, and other obligations notwithstanding Plaintiffs' withdrawal of the support upon which the businesses had historically relied.

124. Counterclaim-Plaintiffs allege that these measures were undertaken to prevent the destruction of operating businesses and preserve the value of assets, leases, employment relationships, customer relationships, and goodwill for which the New York Team remained financially responsible.

K. The Parties' Dispute Escalates Into Litigation

125. By April 2026, the parties' commercial relationship had deteriorated into an acute dispute concerning operational support, supply obligations, ownership, governance, commercial leases, Plaintiffs' proposed franchise restructuring, expansion businesses, and control of the New York operations.

126. On April 16, 2026, MHL commenced an action in Supreme Court of the State of New York, Queens County, asserting New York-law claims arising from Plaintiffs' alleged contractual breaches, operational interference, restructuring demands, and interference with MHL's business relationships.

127. The Queens County action sought, among other things, relief concerning Plaintiffs' alleged use of their control over supply, operational systems, and other business infrastructure to interfere with the New York businesses and MHL's contractual and economic rights.

128. After commencement of the Queens County action, Shenzhen Molly served a May 1, 2026 notice purporting to terminate the Licensing and Cooperation Agreement.

129. Plaintiffs asserted numerous grounds for termination, including allegations concerning the Columbia and LIC businesses, use of allegedly unauthorized systems and supply channels, diversion of assets, financial information, and claimed fees.

130. Counterclaim-Plaintiffs dispute those allegations and allege that the purported termination was part of the same escalating course of conduct through which Plaintiffs sought to use asserted rights over the brand and business infrastructure to obtain increased control over the New York businesses after Counterclaim-Plaintiffs declined Plaintiffs' proposed restructuring.

131. Plaintiffs thereafter commenced the present federal action.

132. In the federal action, Plaintiffs have relied extensively upon the purported Shareholder Agreements as the asserted source of ownership, governance, restrictive-covenant, dissolution, and operational-control rights concerning the three New York Operating Entities.

133. Among other things, Plaintiffs' second application for injunctive relief seeks to prevent Defendants from modifying or surrendering the three commercial leases and seeks to require MHL to cooperate with Mollytea Shops in the pre-dissolution and ultimate dissolution of the three New York Operating Entities.

134. Counterclaim-Plaintiffs dispute Plaintiffs' asserted rights under those purported Shareholder Agreements, including their formation, execution, effective dates, enforceability, and the scope of any rights they may confer.

135. Counterclaim-Plaintiffs further allege that Plaintiffs' present attempt to use the purported Shareholder Agreements to obtain control over the corporations, stores, leaseholds, operating assets, employees, customer relationships, and locally developed goodwill must be considered against the actual chronology: the three New York Operating Entities were formed, their commercial leases were executed, and substantial business value was created before the purported Shareholder Agreements were signed.

136. With respect to Flushing in particular, Molly Tea NYC Inc. was formed and entered into the Flushing lease before even the December 20, 2023 Licensing and Cooperation Agreement between MHL and Shenzhen Molly, and long before the purported Shareholder Agreement upon which Plaintiffs now rely.

137. An actual controversy therefore exists concerning the agreements governing the parties' relationship; the formation and enforceability of the purported Shareholder Agreements; the parties' respective ownership, governance, management, operational, and economic rights; and the legal consequences of Plaintiffs' suspension, termination, dissolution, and asserted operational-control measures.

**Derivative Allegations**

138. MHL is, and at all times relevant to the derivative claims alleged herein has been, a shareholder of Molly Tea NYC Inc., Molly Tea BK Inc., and Molly Tea Manhattan Chinatown Inc. (collectively, the "New York Operating Entities").

139. To the extent any injury alleged below was suffered directly by one or more of the New York Operating Entities rather than by MHL individually, MHL asserts the applicable claims derivatively on behalf of the affected New York Operating Entity or Entities pursuant to Federal Rule of Civil Procedure 23.1 and applicable New York law.

140. MHL fairly and adequately represents the interests of the New York Operating Entities in seeking to protect and preserve their corporate contracts, commercial leases, accounts, assets, employees, customer and vendor relationships, goodwill, and other corporate property.

141. MHL has not made a formal demand that the New York Operating Entities commence the derivative claims asserted herein.

142. Counterclaim-Plaintiffs are not presently aware of any duly constituted and functioning board of directors of the New York Operating Entities, or of any identified

directors constituting a disinterested corporate decision-making body to which such a demand could meaningfully be directed.

143. The parties themselves dispute the corporate-governance structure of the New York Operating Entities, including the formation, execution, effective dates, and legal effect of the purported Shareholder Agreements upon which Mollytea Shops relies for its asserted governance and control rights.

144. Mollytea Shops, which claims a 35% ownership interest and governance rights in each New York Operating Entity, is itself a Counterclaim-Defendant and has participated in, supported, or sought judicial enforcement of the conduct challenged in the derivative claims, including asserted dissolution and operational-control measures affecting the New York Operating Entities.

145. Plaintiffs are likewise presently asserting purported derivative claims on behalf of the same New York Operating Entities against MHL and other Defendants while simultaneously seeking to obtain operational control over those entities and their corporate property.

146. Under these circumstances, there is no presently identifiable disinterested corporate decision-making body capable of independently determining whether the New York Operating Entities should pursue claims against Counterclaim-Defendants arising from the same conduct that Counterclaim-Defendants have authorized, defended, or seek to enforce.

147. Under the circumstances alleged in paragraphs 141–146, MHL alleges that a pre-suit demand was excused as futile because no presently identifiable disinterested

corporate decision-making body existed to consider independently whether the New York Operating Entities should pursue the claims asserted herein.

148. The derivative claims are pleaded in the alternative to MHL's direct claims to the extent the Court determines that a particular injury belongs to a New York Operating Entity rather than to MHL individually.

149. This action is not a collusive action brought to confer jurisdiction that this Court would otherwise lack.

**FIRST COUNTERCLAIM**
**Breach of Licensing and Cooperation Agreement**
**(By MHL Directly Against Shenzhen Molly)**

150. MHL repeats and realleges paragraphs 1–20, 21-35, 43-137, and 138–149 to the extent applicable to this Counterclaim.

151. On or about December 20, 2023, MHL and Shenzhen Molly entered into the written Brand Licensing and Technical Services Cooperation Contract (the "Licensing and Cooperation Agreement"), pursuant to which Shenzhen Molly agreed to provide brand-related authorization, supply-chain coordination, technical support, operational systems, and related cooperation in connection with the parties' New York business relationship.

152. Although MHL did not pay the disputed Brand Usage Fee or Management Fees, Shenzhen Molly did not treat that nonpayment as preventing the Licensing and Cooperation Agreement from taking effect or as terminating the parties' relationship. Instead, Shenzhen Molly recorded the disputed fees as accounts receivable, continued attempting to collect them, and continued performing under the agreement. MHL

otherwise performed or substantially performed its material obligations or, to the extent any further non-fee performance was required, such performance was excused, prevented, or rendered impracticable by Shenzhen Molly's prior breach, repudiation, interference, or failure to provide required cooperation.

153. After entering into the Licensing and Cooperation Agreement, MHL committed substantial additional capital, labor, credit, and commercial resources to the New York MOLLY TEA business, including development and operation of the Brooklyn and Chinatown stores and additional expenditures and commitments associated with the continuing New York business relationship.

154. Shenzhen Molly knew that MHL and members of the New York Team had undertaken substantial leases, guaranties, sponsorship commitments, inventory orders, buildout expenses, staffing expenses, and other fixed obligations in reliance upon the continuing availability of the support and cooperation contemplated by the Licensing and Cooperation Agreement.

155. In early 2026, Shenzhen Molly and its affiliates sought to condition continuation of the parties' relationship upon MHL's acceptance of materially different franchise, ownership, leasehold, governance, and operational-control arrangements.

156. After MHL declined those proposed arrangements, Shenzhen Molly began asserting alleged operational and contractual deficiencies that MHL disputes and that, as alleged above, included matters that were minor or curable, previously known or acquiesced in, or insufficient to warrant suspension or termination.

157. Beginning no later than March and April 2026, Shenzhen Molly breached the Licensing and Cooperation Agreement by, among other things, withholding, suspending, terminating, or materially interfering with product supply, logistics, operational systems, technical support, approvals, communications, and other cooperation used in connection with MHL's New York operations.

158. Shenzhen Molly further breached the Licensing and Cooperation Agreement by using its control over essential supply, technical, and operational infrastructure as leverage to demand that MHL accept materially different franchise, ownership, governance, leasehold, and control arrangements.

159. On or about April 2, 2026, Shenzhen Molly and/or entities acting in concert with it caused or participated in the indefinite suspension of the Flushing, Brooklyn, and Chinatown stores for purported "rectification," followed by suspension or disruption of supply-chain, logistics, technical, and operational support.

160. Those actions occurred notwithstanding inventory orders and deposits previously made through Shenzhen Molly's designated systems and prior confirmations that production or shipment of certain materials was underway.

161. Shenzhen Molly's breaches substantially impaired MHL's ability to operate and support businesses that remained subject to rent, payroll, guaranty, sponsorship, vendor, and other continuing obligations and caused MHL to incur additional mitigation expenses.

162. Shenzhen Molly thereafter served a May 1, 2026 notice purporting to terminate the Licensing and Cooperation Agreement based upon alleged breaches that MHL disputes.

163. To the extent the Licensing and Cooperation Agreement required notice, an opportunity to cure, cooperation, or other contractual prerequisites before suspension or termination, Shenzhen Molly failed to satisfy those requirements with respect to one or more grounds upon which it relied.

164. To the extent Shenzhen Molly relies upon conditions caused or materially contributed to by its own prior breaches, interference, repudiation, withholding of cooperation, or disruption of systems or supply, Shenzhen Molly may not rely upon those conditions as grounds to terminate the Licensing and Cooperation Agreement or avoid its own obligations.

165. MHL further alleges that Shenzhen Molly's suspension and purported termination were undertaken, at least in substantial part, as part of an escalating effort to obtain franchise, ownership, leasehold, governance, operational, or economic concessions that MHL declined voluntarily to provide.

166. As a direct and foreseeable result of Shenzhen Molly's breaches, MHL suffered damages in an amount to be determined at trial.

**SECOND COUNTERCLAIM**
**Breach of Governance and Operating Agreements**
**(By MHL Directly Against Mollytea Shops, in the Alternative)**

167. MHL repeats and realleges paragraphs 1–20, 43–137, and 138–149 to the extent applicable.

168. MHL disputes Plaintiffs' characterization of the formation, execution, effective dates, completeness, and legal effect of the documents upon which Mollytea Shops relies as governing ownership and management of the New York Operating Entities.

169. Without admitting the validity, effective date, completeness, or enforceability of any disputed document, MHL pleads this Counterclaim expressly in the alternative pursuant to Federal Rule of Civil Procedure 8(d).

170. To the extent Mollytea Shops establishes that one or more governance, ownership, operating, shareholder, or related agreements became binding upon MHL and Mollytea Shops, those agreements imposed reciprocal contractual obligations upon Mollytea Shops.

171. MHL performed its material obligations under any such enforceable agreement, substantially performed them, or was excused from further performance by Mollytea Shops' prior breach, prevention, repudiation, or interference.

172. After MHL declined Plaintiffs' proposed restructuring, Mollytea Shops participated in or supported efforts to invoke governance and control remedies against the New York Operating Entities, including asserted dissolution and operational-control rights.

173. Mollytea Shops breached any enforceable governance or operating agreements by, among other things, participating in or causing withdrawal of essential operational support; asserting ownership, management, dissolution, or takeover rights beyond those actually conferred by the governing documents; failing to satisfy applicable contractual

prerequisites; and using disputed governance rights to advance restructuring demands not authorized by the parties' agreements.

174. Mollytea Shops further breached any enforceable agreements to the extent it sought to exercise control over corporate property, commercial leases, accounts, operating rights, employees, customer relationships, goodwill, or other assets beyond rights actually granted by those agreements.

175. To the extent Mollytea Shops relied upon alleged operational deficiencies as grounds for extraordinary governance, dissolution, or operational-control remedies, those deficiencies did not satisfy applicable contractual prerequisites and/or were selectively elevated after MHL rejected Plaintiffs' restructuring demands.

176. MHL suffered resulting damages in an amount to be determined at trial.

**THIRD COUNTERCLAIM**
**Breach of Purported Shareholder Agreements**
**(By MHL Directly Against Mollytea Shops, Strictly in the Alternative)**

177. MHL repeats and realleges paragraphs 8–20, 35–40, 82–137, and 138-149 to the extent applicable.

178. Plaintiffs contend that Mollytea Shops and MHL are bound by purported Shareholder Agreements governing the New York Operating Entities.

179. MHL denies that the purported Shareholder Agreements became binding in the form, on the dates, or with the legal effect alleged by Plaintiffs, including because the versions executed on MHL's behalf did not contain the handwritten retroactive effective dates appearing in versions later produced by Plaintiffs.

180. This Counterclaim is pleaded solely in the alternative and shall not constitute an admission that any purported Shareholder Agreement is valid, fully executed, enforceable, retroactively effective, or otherwise binding in the form asserted by Plaintiffs.

181. If Plaintiffs establish that one or more purported Shareholder Agreements are enforceable, Mollytea Shops was required to comply with all obligations, limitations, notice requirements, cure provisions, governance procedures, and other contractual conditions imposed upon the Brand Shareholder.

182. Mollytea Shops breached those agreements by invoking or attempting to invoke contractual remedies without satisfying applicable prerequisites and by asserting rights of dissolution, operational control, possession, or transfer broader than those authorized by the agreements.

183. Mollytea Shops further breached those agreements to the extent it invoked alleged defaults or dissolution events based upon matters that were curable, previously known or acquiesced in, caused or materially contributed to by Plaintiffs' own conduct, or otherwise insufficient to support the remedies asserted.

184. Mollytea Shops further breached those agreements to the extent it used purported contractual governance rights as a means to obtain ownership, leasehold, operational, or economic rights that the agreements themselves did not transfer to Mollytea Shops.

185. Mollytea Shops may not enforce the benefits of the purported Shareholder Agreements while disregarding their limitations, conditions, and reciprocal obligations.

186. MHL suffered resulting damages and is entitled to appropriate contractual, declaratory, and equitable relief.

**FOURTH COUNTERCLAIM**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(By MHL Directly Against Shenzhen Molly and, in the Alternative, Mollytea Shops)**

187. MHL repeats and realleges paragraphs 1–15, 21–35, 43–137, and 138–149 to the extent applicable.

188. Every enforceable agreement governing the parties' New York business relationship contained an implied covenant that neither party would act arbitrarily, irrationally, or in bad faith so as to deprive the other of the fruits of the agreement.

189. MHL reasonably expected that contractual discretion concerning supply, approvals, technical systems, operational support, compliance, governance, and related matters would be exercised consistently with the purposes of the parties' agreements and not as a pretext to appropriate MHL's separately held economic or operating rights.

190. Counterclaim-Defendants violated the implied covenant by using contractual discretion and control over essential business infrastructure as leverage to compel MHL to accept materially different franchise, ownership, leasehold, governance, and control arrangements.

191. After MHL declined those arrangements, Counterclaim-Defendants selectively invoked alleged operational deficiencies as grounds for suspension, termination, dissolution, and operational-control remedies.

192. At least certain asserted deficiencies were minor or readily curable, previously known or acquiesced in, or concerned circumstances to which Counterclaim-Defendants themselves had contributed.

193. Counterclaim-Defendants further violated the implied covenant by failing to provide a meaningful opportunity to address or cure asserted deficiencies before escalating to suspension, termination, dissolution, and operational-control measures, to the extent such an opportunity was required by the agreements or by the good-faith exercise of contractual discretion.

194. Counterclaim-Defendants further violated the implied covenant by withdrawing or interfering with essential supply, logistics, systems, approvals, and operational support after MHL and members of the New York Team had undertaken substantial fixed obligations in reliance upon the continuing business relationship.

195. Counterclaim-Defendants thereafter attempted to rely upon operational difficulties caused or materially aggravated by their own withdrawal of support as grounds for additional contractual remedies.

196. MHL alleges that this course of conduct was undertaken, at least in substantial part, to pressure MHL to relinquish ownership, leasehold, governance, operational, and economic rights it declined voluntarily to surrender.

197. This Counterclaim is pleaded only to the extent the complained-of conduct is not duplicative of an express contractual obligation and instead concerns the bad-faith exercise of contractual discretion or deprivation of contractual benefits.

198. MHL suffered resulting damages.

**FIFTH COUNTERCLAIM**
**Declaratory Judgment**
**(By Counterclaim-Plaintiffs Directly and, to the Extent Necessary, by MHL Derivatively on Behalf of the New York Operating Entities)**

199. Counterclaim-Plaintiffs repeat and reallege paragraphs 8–20, 27–46, 82–137, and 138–149 to the extent applicable.

200. An actual and substantial controversy exists concerning the parties' respective ownership, governance, management, operational, lease-related, and economic rights concerning the New York Operating Entities and related New York businesses.

201. The New York Operating Entities and their underlying businesses were formed and developed before the purported Shareholder Agreements became effective on the dates now asserted by Plaintiffs, and their commercial leases were executed before those purported agreements.

202. In particular, Molly Tea NYC Inc. and the Flushing lease existed before the December 20, 2023 Licensing and Cooperation Agreement and long before the purported Shareholder Agreement concerning Molly Tea NYC Inc.

203. Counterclaim-Plaintiffs dispute the formation, execution, effective dates, enforceability, and legal effect of the purported Shareholder Agreements relied upon by Plaintiffs.

204. Plaintiffs nevertheless assert present ownership, governance, dissolution, operational-control, and related rights under those documents.

205. A further controversy exists concerning the validity and legal effect of Plaintiffs' April 2, 2026 suspension, Shenzhen Molly's May 1, 2026 purported termination, and Plaintiffs' subsequent dissolution and operational-control measures.

206. That controversy includes whether the alleged deficiencies constituted material defaults or dissolution events; whether applicable notice, cure, approval, or other contractual prerequisites were satisfied; whether Plaintiffs may rely upon conditions they caused or materially contributed to; and whether the remedies asserted were authorized by any valid agreement.

207. A further controversy exists concerning whether rights arising under agreements concerning the three New York Operating Entities extend to Columbia or LIC, which were developed through separate entities and contractual structures.

208. Counterclaim-Plaintiffs seek declarations determining the parties' respective rights, including the validity and enforceability of the disputed agreements and asserted suspension, termination, dissolution, and operational-control measures.

209. To the extent a declaration concerns rights belonging to a New York Operating Entity itself—including rights concerning its corporate property, leases, accounts, contracts, records, employees, operating assets, customer relationships, or goodwill—MHL asserts such relief derivatively on behalf of the affected New York Operating Entity.

210. Counterclaim-Plaintiffs further seek a declaration that the purported Shareholder Agreements did not, by themselves, transfer ownership of any preexisting corporate

property, commercial leases, leasehold interests, or other separately owned rights unless an enforceable agreement expressly provides for such a transfer.

**SIXTH COUNTERCLAIM**
**Accounting**
**(By MHL Directly and, in the Alternative, Derivatively on Behalf of the New York Operating Entities)**

211. MHL repeats and realleges paragraphs 1–20, 21–26, 102–124, and 138-149 to the extent applicable.

212. During the parties' business relationship, Counterclaim-Defendants participated in or exercised control over material aspects of supply, inventory procurement, logistics, operational systems, deposits, charges, and other economic transactions affecting MHL and/or the New York Operating Entities.

213. Counterclaim-Defendants possess or control financial, transactional, supply-chain, operational, or related information necessary to determine amounts paid, charged, retained, transferred, credited, withheld, or otherwise attributable to the parties' dealings.

214. The financial dealings at issue are sufficiently complex that the disposition of particular funds, deposits, inventory transactions, revenues, distributions, and other economic benefits cannot be fully determined without an accounting.

215. To the extent particular funds, deposits, inventory, revenues, distributions, or other economic interests belong to a New York Operating Entity, MHL seeks an accounting derivatively on behalf of the affected entity.

216. To the extent particular amounts or transactions concern rights belonging directly to MHL, MHL seeks an accounting in its individual capacity.

217. MHL seeks a full accounting to the extent such equitable relief is legally available and not duplicative of an adequate remedy at law.

**SEVENTH COUNTERCLAIM**
**Breach of Fiduciary Duty**
**(By MHL Directly and, in the Alternative, Derivatively on Behalf of the New York Operating Entities Against Mollytea Shops)**

218. MHL repeats and realleges paragraphs 8–20, 82–137, and 138-149 to the extent applicable.

219. To the extent Mollytea Shops establishes that it became a shareholder, joint venturer, or other fiduciary participant in one or more of the New York Operating Entities, fiduciary duties arose to the extent provided by applicable law.

220. This Counterclaim concerns conduct occurring during any period in which such fiduciary duties legally existed and does not depend upon the proposition that Mollytea Shops owed fiduciary duties before acquiring any legally cognizable ownership or fiduciary status.

221. During such period, Mollytea Shops owed duties including duties of loyalty and good faith and an obligation not to use fiduciary authority for self-interested purposes adverse to MHL or the affected New York Operating Entity.

222. Mollytea Shops breached those duties by using or participating in the use of its position and access to essential business infrastructure to pressure MHL to accept restructuring demands and to obtain greater ownership, operational, leasehold, or economic control than that to which Mollytea Shops was lawfully entitled.

223. Mollytea Shops further breached those duties by participating in or supporting suspension, termination, dissolution, or operational-control measures that impaired or threatened the businesses, assets, commercial leases, contracts, employees, customer relationships, goodwill, or other interests of the New York Operating Entities for Mollytea Shops' own benefit.

224. Such conduct placed the New York Operating Entities at risk while MHL and members of the New York Team remained exposed to substantial lease, guaranty, payroll, sponsorship, and other liabilities.

225. To the extent the complained-of conduct caused injury directly to a New York Operating Entity, including impairment of its business, assets, contracts, leases, goodwill, or opportunities, MHL asserts this claim derivatively on behalf of the affected entity.

226. To the extent Mollytea Shops' conduct caused a separate and distinct injury directly to MHL, MHL asserts that portion of the claim in its individual capacity.

227. MHL and/or the affected New York Operating Entities suffered resulting damages.

**EIGHTH COUNTERCLAIM**
**Aiding and Abetting Breach of Fiduciary Duty**
**(By MHL Directly and, in the Alternative, Derivatively on Behalf of the New York Operating Entities Against Shenzhen Molly)**

228. MHL repeats and realleges paragraphs 8–20, 82-137, and 138-149 to the extent applicable.

229. To the extent Mollytea Shops owed and breached fiduciary duties as alleged in the Seventh Counterclaim, Shenzhen Molly knew of the ownership and governance

relationship between MHL and Mollytea Shops and knew of the conduct constituting the alleged breach.

230. Shenzhen Molly knowingly provided substantial assistance to Mollytea Shops' alleged breaches by controlling or withholding supply, logistics, technical systems, approvals, communications, and other essential infrastructure and by coordinating those measures with demands relating to franchise restructuring, ownership, leasehold rights, and operational control.

231. Such assistance included participation in the suspension and disruption of the New York stores and their supply, systems, logistics, and operational support after MHL declined the proposed restructuring.

232. Shenzhen Molly's assistance was substantial because the challenged conduct depended in material part upon infrastructure, supply channels, systems, or resources controlled by Shenzhen Molly.

233. To the extent the resulting injury was suffered by a New York Operating Entity, MHL asserts this claim derivatively on behalf of the affected entity.

234. To the extent MHL suffered a separate and distinct direct injury, MHL asserts that portion of the claim individually.

235. MHL and/or the affected New York Operating Entities suffered resulting damages.

**NINTH COUNTERCLAIM**
**Tortious Interference with Contract — Barclays Center**
**(By MHL Derivatively on Behalf of Molly Tea NYC Inc. Against Shenzhen Molly and Mollytea Shops)**

236. MHL repeats and realleges paragraphs 21–26, 43–46, 82-124, and 138-149 to the extent applicable.

237. Molly Tea NYC Inc. entered into a sponsorship agreement dated September 3, 2025 with Brooklyn Events Center, LLC and Brooklyn Nets, LLC relating to a MOLLY TEA presence at Barclays Center.

238. The sponsorship agreement imposed substantial contractual obligations upon Molly Tea NYC Inc., including significant payment obligations.

239. Shenzhen Molly and Mollytea Shops knew of the Barclays Center contractual relationship and knew that Molly Tea NYC Inc. had undertaken substantial financial commitments in connection with it.

240. Shenzhen Molly and Mollytea Shops intentionally interfered with Molly Tea NYC Inc.'s performance and enjoyment of that contractual relationship by withdrawing or disrupting brand-related, supply, operational, and other support and thereby impairing Molly Tea NYC Inc.'s ability to obtain the contemplated benefits of the sponsorship arrangement.

241. Such conduct occurred while Counterclaim-Defendants knew that Molly Tea NYC Inc.'s sponsorship obligations remained outstanding and after MHL rejected Plaintiffs' proposed restructuring.

242. To the extent required, such interference was undertaken without justification and through independently wrongful means, including the contractual, fiduciary, coercive, and other conduct alleged herein.

243. Molly Tea NYC Inc. suffered resulting damages.

244. MHL therefore asserts this Counterclaim derivatively on behalf of Molly Tea NYC Inc.

**TENTH COUNTERCLAIM**
**Tortious Interference with Prospective Economic Advantage**
**(By Molly Tea CU and Genesis Directly and by MHL Derivatively on Behalf of the New York Operating Entities, as Applicable)**

245. Counterclaim-Plaintiffs repeat and reallege paragraphs 16, 21–63, 82-137, and 138-149 to the extent applicable.

246. Molly Tea CU had existing and prospective business relationships associated with the Columbia Store, including relationships with its landlord, customers, vendors, employees, delivery platforms, and other counterparties.

247. Genesis had existing and prospective business relationships associated with the LIC Concession, including relationships with its concession counterparty, customers, vendors, and other counterparties.

248. Each New York Operating Entity separately had existing and prospective relationships with customers, landlords, vendors, delivery platforms, sponsors, employees, and other counterparties.

249. Counterclaim-Defendants knew of the applicable relationships and opportunities through their participation in and knowledge of the New York businesses.

250. Counterclaim-Defendants intentionally interfered with such relationships and opportunities by withdrawing operational support, interfering with supply and systems,

causing disruptions involving third-party platforms, and challenging projects after substantial commitments had been undertaken.

251. Counterclaim-Plaintiffs further allege that such interference intensified after they rejected Plaintiffs' proposed franchise and restructuring arrangements.

252. Counterclaim-Defendants acted for the purpose of harming the applicable business relationship and/or used wrongful means, including contractual breaches, fiduciary misconduct, coercive conduct, and other independently wrongful means alleged herein.

253. But for the interference, there was a reasonable probability that one or more of the affected business relationships or opportunities would have continued or been consummated.

254. Molly Tea CU asserts this claim directly with respect to relationships and opportunities belonging to the Columbia business.

255. Genesis asserts this claim directly with respect to relationships and opportunities belonging to the LIC business.

256. To the extent a relationship or opportunity belonged to Molly Tea NYC Inc., Molly Tea BK Inc., or Molly Tea Manhattan Chinatown Inc., MHL asserts the claim derivatively on behalf of the affected New York Operating Entity.

257. The affected Counterclaim-Plaintiffs and/or New York Operating Entities suffered resulting economic injury.

**ELEVENTH COUNTERCLAIM**
**Fraudulent Inducement**

**(By MHL, Lin, Xu, and Liu Directly Against Shenzhen Molly and Any Other Counterclaim-Defendant Shown to Have Made or Participated in the Applicable Misrepresentation)**

258. MHL, Lin, Xu, and Liu repeat and reallege paragraphs 3–7 and 21–63. Paragraphs 82-137 are incorporated only insofar as subsequent conduct constitutes circumstantial evidence relevant to knowledge, intent, or falsity of earlier representations or omissions.

259. Before Counterclaim-Plaintiffs undertook particular post-December 20, 2023 investments and commercial commitments, Shenzhen Molly and/or its authorized representatives represented, through words and conduct, that Shenzhen Molly would continue providing authorization, supply-chain support, technical systems, operational cooperation, approvals, and other assistance necessary to develop and operate contemplated New York MOLLY TEA businesses and opportunities.

260. Those representations were material because Shenzhen Molly knew that MHL and members of the New York Team would commit substantial capital, enter or support long-term commercial obligations, undertake personal guaranties, and incur substantial development expenses in reliance upon continued cooperation.

261. MHL, Lin, Xu, and Liu relied upon the applicable representations in undertaking subsequent investments and obligations, including, as applicable, commitments associated with Brooklyn, Chinatown, Barclays Center, Columbia, and LIC.

262. Counterclaim-Plaintiffs do not allege that the December 20, 2023 Licensing and Cooperation Agreement induced formation of Molly Tea NYC Inc. or execution of the November 14, 2023 Flushing lease, both of which preceded that agreement.

263. To the extent Shenzhen Molly or another responsible Counterclaim-Defendant had already determined, when making the applicable representations, not to provide the represented cooperation or intended to condition such cooperation upon later surrender of ownership, leasehold, governance, or economic rights not disclosed at the time, the applicable representations were knowingly false or recklessly made.

264. The responsible Counterclaim-Defendants intended that MHL, Lin, Xu, and Liu rely upon the applicable representations.

265. MHL, Lin, Xu, and Liu reasonably and justifiably relied upon the representations in light of Shenzhen Molly's and its affiliates' ongoing participation in store development, design, supply, approvals, technical systems, and operations.

266. Plaintiffs' subsequent demands for a materially different franchise and restructuring arrangement, followed by withdrawal of support, challenges to previously developed projects, suspension, and purported termination after MHL refused those demands, constitute circumstantial evidence relevant to knowledge and intent.

267. MHL, Lin, Xu, and Liu suffered resulting pecuniary losses.

268. This Counterclaim is based upon actionable representations or omissions collateral to contractual promises and is pleaded in the alternative to contract claims where appropriate.

**TWELFTH COUNTERCLAIM**
**Conversion**
**(By MHL Directly as to Its Property and Derivatively on Behalf of the New York Operating Entities as to Corporate Property)**

269. MHL repeats and realleges paragraphs 6, 14–16, 27, 102-124, and 138-149 to the extent applicable.

270. MHL owned or possessed an immediate and superior right to possession of specifically identifiable property belonging directly to MHL.

271. The New York Operating Entities separately owned or possessed immediate and superior rights to possession of specifically identifiable corporate property, including particular accounts, credentials, business records, deposits, funds, digital assets, customer-facing accounts, inventory, and other discrete corporate property.

272. Counterclaim-Defendants intentionally exercised unauthorized dominion over such specifically identifiable property, interfered with the owner's access to or control over such property, and/or refused to restore or return such property after demand in a manner inconsistent with the owner's rights.

273. To the extent the converted property belongs to MHL, MHL asserts this Counterclaim directly.

274. To the extent the converted property belongs to one of the New York Operating Entities, MHL asserts this Counterclaim derivatively on behalf of the affected entity.

275. This Counterclaim does not seek conversion recovery for a generalized contractual debt, an indeterminate sum of money, or property lawfully controlled by Counterclaim-Defendants pursuant to an enforceable agreement.

276. This Counterclaim likewise does not challenge any transfer, restriction, surrender, or possession expressly required by an operative order of the Court while such order remains in effect.

277. MHL and/or the affected New York Operating Entities suffered resulting damages.

**THIRTEENTH COUNTERCLAIM**
**Unjust Enrichment**
**(By Counterclaim-Plaintiffs Directly and, in the Alternative, by MHL Derivatively on Behalf of the New York Operating Entities)**

278. Counterclaim-Plaintiffs repeat and reallege paragraphs 1–20, 21–63, 82-137, and 138-149 to the extent applicable.

279. Counterclaim-Plaintiffs invested substantial capital, labor, credit, business-development effort, and financial exposure in creating and developing the New York businesses.

280. The New York Operating Entities themselves accumulated substantial identifiable corporate value through their commercial leases, buildouts, operations, employees, contracts, customer relationships, vendor relationships, delivery-platform relationships, and goodwill.

281. Counterclaim-Defendants knew of and accepted benefits arising from those investments and efforts through their continuing participation in the New York business relationship.

282. After substantial value had been created, Counterclaim-Defendants sought increased franchise, ownership, leasehold, governance, operational, or economic control over the businesses and their assets.

283. Counterclaim-Plaintiffs declined voluntarily to transfer or surrender those rights on the terms proposed by Counterclaim-Defendants.

284. To the extent a particular benefit was conferred directly by MHL, Lin, Xu, Liu, Molly Tea CU, or Genesis and no valid and enforceable contract governs that benefit, the applicable Counterclaim-Plaintiff asserts unjust enrichment directly.

285. To the extent a benefit belongs to, was conferred by, or was obtained at the expense of a New York Operating Entity, MHL asserts this Counterclaim derivatively on behalf of the affected entity.

286. Counterclaim-Defendants would be unjustly enriched if permitted to retain benefits generated at the applicable Counterclaim-Plaintiff's or New York Operating Entity's expense without compensation or superior legal entitlement.

287. This Counterclaim is pleaded strictly in the alternative and does not seek quasi-contractual recovery concerning subject matter governed by a valid and enforceable agreement between the same parties.

288. Counterclaim-Plaintiffs seek restitution, disgorgement, and such other equitable relief as permitted by law.

**FOURTEENTH COUNTERCLAIM**
**Promissory Estoppel**
**(By MHL, Lin, Xu, and Liu Directly Against Shenzhen Molly and Any Other Counterclaim-Defendant Shown to Have Made the Applicable Promise, in the Alternative)**

289. MHL, Lin, Xu, and Liu repeat and reallege paragraphs 3–7, 21–63, and 82-124 to the extent applicable.

290. To the extent no enforceable contract governs a particular commitment, Shenzhen Molly and/or its authorized representatives made clear and definite promises that they would provide or continue authorization, supply access, approvals, technical systems, operational support, and cooperation necessary for specified New York expansion projects and commercial commitments.

291. Those promises were made under circumstances in which the responsible Counterclaim-Defendants reasonably should have expected MHL and members of the New York Team to undertake substantial action and financial exposure in reliance upon them.

292. MHL, Lin, Xu, and Liu reasonably and foreseeably relied upon the applicable promises by investing funds and labor, causing entities to enter commercial commitments, and undertaking lease, sponsorship, development, and personal-guaranty exposure.

293. Such reliance included, as applicable to the particular Counterclaim-Plaintiff and promise, commitments associated with Brooklyn, Chinatown, Barclays Center, Columbia, and LIC.

294. After those commitments had been undertaken, Counterclaim-Defendants sought to condition continued cooperation upon acceptance of materially different franchise, ownership, leasehold, governance, or control arrangements that had not formed part of the promises upon which the commitments were undertaken.

295. When Counterclaim-Plaintiffs declined those arrangements, Counterclaim-Defendants withdrew promised support, disrupted supply and operational infrastructure, challenged projects in which they had previously participated or of which they had knowledge, and invoked suspension, termination, dissolution, or operational-control measures.

296. MHL, Lin, Xu, and Liu suffered substantial and foreseeable detriment as a result.

297. Injustice can be avoided only through enforcement of the applicable promises or an award of appropriate reliance relief.

298. This Counterclaim is pleaded solely in the alternative to any enforceable contract governing the same promise or subject matter.

**FIFTEENTH COUNTERCLAIM**
**Violation of the New York Franchise Sales Act**
**(N.Y. Gen. Bus. Law §§ 683 and 691)**
**(By MHL Directly Against Shenzhen Molly)**

299. MHL repeats and realleges paragraphs 1-15 and 64-81 to the extent applicable.

300. The December 20, 2023 Licensing and Cooperation Agreement constituted a "franchise" within the meaning of N.Y. Gen. Bus. Law § 681(3).

301. Under the Licensing and Cooperation Agreement, Shenzhen Molly granted MHL the right to establish and operate a business substantially associated with the MOLLY TEA name, trademarks, trade dress, and other commercial symbols.

302. The Licensing and Cooperation Agreement also required MHL to operate under Shenzhen Molly's prescribed operational system and corporate management requirements, including requirements governing site approval, store design and

construction, equipment, training, operating hours, authorized products, pricing, suppliers, point-of-sale systems, financial reporting, food safety, advertising, promotions, social-media accounts, inspections, and store-opening approval.

303. In consideration for these rights, the Licensing and Cooperation Agreement required MHL to pay Shenzhen Molly a $15,000 Brand Usage Fee, which the agreement expressly characterized as a one-time entry fee for MHL's operating rights and use of Shenzhen Molly's authorized business resources.

304. The Licensing and Cooperation Agreement also required MHL to provide a $15,000 Brand Security Deposit and to pay a continuing monthly Management Fee equal to two percent of store revenue, together with additional charges for training, site-selection services, design services, engineering supervision, and other required goods and services.

305. Although MHL did not remit the Brand Usage Fee or monthly Management Fee, Shenzhen Molly demanded those fees, recorded them as accounts receivable, and continued performing under the parties' relationship. Because MHL was required and agreed to pay those charges, they constituted direct or indirect "franchise fees" within the meaning of N.Y. Gen. Bus. Law § 681(7).

306. Shenzhen Molly therefore offered and sold a franchise to MHL in New York within the meaning of N.Y. Gen. Bus. Law § 681(12) and (15).

307. At the time of the offer and sale, Shenzhen Molly had not registered an offering prospectus with the New York Department of Law as required by N.Y. Gen. Bus. Law § 683(1).

308. Shenzhen Molly also failed to provide MHL with a registered offering prospectus and copies of all proposed agreements before the first personal meeting concerning the proposed franchise, at least ten business days before execution of a binding agreement, or at least ten days before receipt of consideration, as required by N.Y. Gen. Bus. Law § 683(8).

309. MHL executed the Licensing and Cooperation Agreement and undertook substantial investments, lease obligations, guaranties, buildout expenses, staffing expenses, and other commercial commitments without receiving the disclosures required by the New York Franchise Sales Act.

310. The Franchise Disclosure Document subsequently provided to MHL bears an issuance date of July 15, 2025, and Exhibit I to that document states that the franchise offering did not become effective in New York until January 14, 2026.

311. MHL did not receive the Franchise Disclosure Document until approximately January 20, 2026, more than two years after execution of the Licensing and Cooperation Agreement and after MHL had already undertaken substantial investments and obligations in connection with the New York stores.

312. The subsequent registration and disclosure did not cure Shenzhen Molly's earlier offer and sale of the franchise in violation of N.Y. Gen. Bus. Law § 683.

313. Shenzhen Molly's violations were willful and material. Shenzhen Molly had substantial experience offering franchises internationally, knowingly required MHL to enter into an agreement containing the essential economic and operational features of a

franchise, and permitted MHL to undertake substantial investments and business obligations without providing the disclosures and protections required by New York law.

314. As a direct and proximate result of Shenzhen Molly's violations, MHL was deprived of the opportunity to evaluate the required disclosures before committing its capital and credit and suffered damages in an amount to be determined at trial.

315. Pursuant to N.Y. Gen. Bus. Law § 691(1), MHL is entitled to recover its damages and, because Shenzhen Molly's violations were willful and material, is alternatively entitled to rescission, together with interest at six percent per year from the date of purchase, reasonable attorneys' fees, and court costs.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim-Plaintiffs respectfully request that judgment be entered in their favor and, where applicable, in favor of Molly Tea NYC Inc., Molly Tea BK Inc., and/or Molly Tea Manhattan Chinatown Inc. on whose behalf MHL asserts derivative claims, and against the appropriate Counterclaim-Defendant or Counterclaim-Defendants, as follows:

A. On the First Counterclaim, awarding MHL compensatory, consequential, and other damages recoverable for breach of the Licensing and Cooperation Agreement, including damages arising from lost revenues and business opportunities, wasted expenditures, mitigation costs, supply- and inventory-related losses, impairment of business relationships, and other foreseeable commercial losses, in an amount to be determined at trial;

B. On the Second and Third Counterclaims, to the extent the applicable governance, operating, or purported Shareholder Agreements are determined to be valid and enforceable, awarding

MHL all damages and other relief recoverable for Mollytea Shops' breaches of those agreements, together with appropriate declaratory and equitable relief consistent with the agreements properly construed;

C. On the Fourth Counterclaim, awarding MHL damages recoverable for breach of the implied covenant of good faith and fair dealing, including damages resulting from the bad-faith exercise of contractual discretion and use of contractual and operational leverage, but only to the extent such recovery is not duplicative of damages awarded under an express-contract claim;

D. On the Fifth Counterclaim, pursuant to 28 U.S.C. § 2201 and other applicable law, declaring the parties' respective rights and legal relations, including:

1. which agreements govern the parties' relationship and the three New York Operating Entities;
2. whether the purported Shareholder Agreements became valid and enforceable contracts and, if so, their effective dates and the parties bound thereby;
3. the nature and scope of the parties' respective ownership, governance, voting, management, operational, lease-related, and economic rights;
4. whether the operational or contractual deficiencies asserted by Plaintiffs constituted material defaults, dissolution events, or other contractual grounds sufficient to support suspension, termination, dissolution, or operational-control remedies;
5. whether Plaintiffs satisfied all applicable notice, cure, approval, procedural, and other contractual prerequisites before invoking such remedies;

6. whether Plaintiffs may rely upon conditions or alleged defaults caused, prevented, or materially contributed to by their own breach, interference, withdrawal of support, or other conduct;

7. the validity and legal effect of the April 2, 2026 suspension notice;

8. the validity and legal effect of Shenzhen Molly's May 1, 2026 purported termination of the Licensing and Cooperation Agreement;

9. the validity and legal effect of the July 10, 2026 purported dissolution notices and related assertions of operational-control rights;

10. whether Mollytea Shops possesses any unilateral or self-executing right to assume control of the New York Operating Entities, their stores, commercial leases, accounts, employees, credentials, records, operating assets, customer relationships, or goodwill;

11. the purported Shareholder Agreements did not, by themselves, transfer ownership of any preexisting corporate property, commercial leases, leasehold interests, or other separately owned rights unless an enforceable agreement expressly provides for such a transfer; and

12. whether any governance, dissolution, restrictive-covenant, or operational-control rights concerning the three New York Operating Entities extend to the separately owned or operated Columbia or Long Island City businesses.

E. On the Sixth Counterclaim, directing an equitable accounting, to the extent legally warranted, of relevant contributions, revenues, expenses, deposits, charges, inventory transactions, transfers, distributions, payments, credits, withheld amounts, and other financial or economic benefits arising from the parties' New York business relationship, and directing that any amounts

determined to belong to a New York Operating Entity be accounted for and restored to that entity;

F. On the Seventh Counterclaim, awarding MHL, to the extent of any direct injury, and the affected New York Operating Entity or Entities, to the extent of derivative injury, compensatory damages, disgorgement and/or other equitable relief as appropriate for any actionable breach of fiduciary duty by Mollytea Shops, together with punitive damages only to the extent permitted by law and supported by the evidence;

G. On the Eighth Counterclaim, awarding MHL, to the extent of any direct injury, and the affected New York Operating Entity or Entities, to the extent of derivative injury, all damages and equitable relief recoverable for aiding and abetting any actionable breach of fiduciary duty by Shenzhen Molly;

H. On the Ninth Counterclaim, awarding Molly Tea NYC Inc., through MHL acting derivatively on its behalf, all damages recoverable for tortious interference with the Barclays Center Sponsorship Agreement, including losses arising from impairment, disruption, nonperformance, additional expense, or loss of contractual benefits, in an amount to be determined at trial;

I. On the Tenth Counterclaim, awarding:

1. Molly Tea CU all compensatory and consequential damages recoverable for tortious interference with prospective economic advantage relating to the Columbia Store;
2. Genesis all compensatory and consequential damages recoverable for tortious interference with prospective economic advantage relating to the LIC Concession; and

3. each affected New York Operating Entity, through MHL acting derivatively on its behalf, all damages recoverable for interference with prospective business relationships and opportunities belonging to that entity;

J. On the Eleventh Counterclaim, awarding MHL, Lin, Xu, and Liu all out-of-pocket, reliance, and other damages recoverable under New York law for fraudulent inducement, including losses arising from investments, development expenditures, guaranties, and commercial obligations undertaken in reliance upon actionable misrepresentations or omissions proven at trial;

K. On the Twelfth Counterclaim, awarding:

1. MHL the value of any specifically identifiable property belonging directly to MHL that is proven to have been converted; and
2. each affected New York Operating Entity, through MHL acting derivatively on its behalf, the value of specifically identifiable corporate property proven to have been converted,

together with loss-of-use damages and such other damages as are recoverable under applicable law;

L. On the Thirteenth Counterclaim, to the extent no valid and enforceable contract governs the particular benefit at issue, awarding:

1. the applicable Counterclaim-Plaintiff restitution, disgorgement, or other equitable relief for benefits unjustly retained at that Counterclaim-Plaintiff's expense; and
2. the affected New York Operating Entity or Entities, through MHL acting derivatively on their behalf, restitution, disgorgement, or other equitable relief for benefits unjustly obtained or retained at the expense of such entity or entities;

M. On the Fourteenth Counterclaim, to the extent no enforceable contract governs the particular promise at issue, awarding MHL, Lin, Xu, and Liu reliance damages and such other relief as is available under the doctrine of promissory estoppel;

N. On the Fifteenth Counterclaim, awarding MHL:

1. damages in an amount to be determined at trial;
2. alternatively, rescission of the December 20, 2023 Licensing and Cooperation Agreement, together with interest at six percent per year from the date of purchase;
3. reasonable attorneys' fees and court costs pursuant to N.Y. Gen. Bus. Law § 691(1); and
4. such other and further relief as the Court deems just and proper;

O. Granting preliminary and permanent injunctive relief, to the extent warranted by the evidence and applicable law, enjoining Counterclaim-Defendants from:

1. enforcing any invalid or ineffective suspension, termination, dissolution, takeover, or operational-control measure;
2. exercising or attempting to exercise ownership, governance, management, or operational authority beyond that conferred by valid and enforceable agreements;
3. wrongfully interfering with MHL's, the other Counterclaim-Plaintiffs', or the New York Operating Entities' operations, commercial leases, accounts, systems, credentials, business records, employees, customer relationships, vendor relationships, contractual relationships, or business opportunities;

4. compelling the transfer, surrender, assignment, termination, or modification of disputed commercial leases, ownership interests, operating assets, accounts, or other rights before adjudication of the parties' respective rights;

5. transferring, appropriating, dissipating, or exercising unauthorized dominion over property belonging to any New York Operating Entity;

6. using alleged defaults or operational conditions caused or materially contributed to by Counterclaim-Defendants' own conduct as a basis to obtain additional control or other contractual remedies; and

7. otherwise taking actions inconsistent with the rights ultimately determined by the Court;

P. Awarding pre-judgment and post-judgment interest to the fullest extent permitted by law;

Q. Awarding taxable costs and disbursements incurred in this action and attorneys' fees only to the extent authorized by contract, statute, or other applicable law;

R. Awarding punitive damages on those tort claims, if any, for which punitive damages are legally available and supported by the evidence; and

S. Granting such other and further legal or equitable relief as the Court deems just and proper.

**JURY DEMAND**

Defendants and Counterclaim-Plaintiffs demand a trial by jury on all issues so triable.

Dated: August 25, 2026

/s/ Yimin Chen

Yimin Chen, Esq.
**Law Offices of Chen & Associates, P. C.**
37-12 Prince Street, Suite 9D
Flushing, NY 11354

Telephone: (718)886-4858
Email: chenattorney@yahoo.com

Michael Cukor, Esq.
**McGeary Cukor LLC**
1460 Broadway
New York NY 10036
Telephone: (973) 339-7367
Email: mcukor@mcgearycukor.com

Peter Erik Sverd
**Law Offices of Peter Sverd, PLLC**
225 Broadway, Suite 613
New York, NY 10007
Telephone: (646) 751-8743
Email: psverd@sverdlawfirm.com

Evan M. Goldman
**THE FRANCHISE FIRM LLP**
2215 Wilmington West Chester Pike, Suite 200
Chadds Ford, Pennsylvania 19317
Telephone: (215)964-1553
Email: evan@thefranchisefirm.com

*Attorneys for Defendants*

# VERIFICATION

I, Xiaozhe Liu, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have reviewed the foregoing Answer, Affirmative Defenses, and Counterclaims.

I am a Defendant and Counterclaim-Plaintiff in this action and am familiar with the facts and circumstances underlying this action and the parties' business relationship. Based upon my personal knowledge, my review of relevant records and communications, and information provided to me in the course of the parties' business dealings and this litigation, I declare that the factual allegations contained in the foregoing Answer and Counterclaims are true and correct to the best of my knowledge, information, and belief, except as to matters expressly stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

I understand that the foregoing pleading also contains legal arguments, legal conclusions, affirmative defenses, and claims pleaded in the alternative, which are asserted upon advice of counsel and are not intended to constitute factual representations by me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2026
New York, New York

Xiaozhe Liu